# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

| | | |
|---|---|---|
| **STEPHANIE TROUTMAN,** | : | **CASE NO.  3:16-cv-000742-DJH** |
| **Administratrix of the Estate of** | : | |
| **CHARLES R. TROUTMAN, JR.,** | : | |
| **deceased,** | : | |
| | : | **JUDGE: DAVID J. HALE** |
| **Plaintiff,** | : | |
| **v.** | : | **MAGISTRATE: COLIN H. LINDSAY** |
| | : | |
| **LOUISVILLE METRO** | : | |
| **GOVERNMENT, et al.** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

---

## PLAINTIFF'S MEMORADUM IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

I.   INTRODUCTION ............................................................................................................ 1

II.  FACTS .......................................................................................................................... 1

III. ARGUMENT ............................................................................................................... 10

    A.  Summary Judgment Standard ................................................................................. 10

    B.  A Reasonable Jury Could Find Defendants Cox, Bolton, and Louisville Metro Liable for Mr.
    Troutman's Inadequate Medical Care ........................................................................... 11

        1.  Traditional Standard for Determining Liability for Inadequate Medical Care Leading to In
        Custody Suicide ................................................................................................... 11

        2.  Mr. Troutman Had a Serious Medical Need ................................................... 14

        3.  Contested Facts Preclude Summary Judgment for Defendant James Cox on Civil Rights Claim;
        Qualified Immunity Should be Denied .................................................................... 15

        4.  Contested Facts Preclude Summary Judgment for Defendants Mark Bolton and Louisville Metro
        Government on Civil Rights Claim; Qualified Immunity Should be Denied to Bolton ...................... 20

        5.  Contested Facts Preclude Summary Judgment for Defendant James Cox and Mark Bolton on
        Wrongful Death and Negligence Claim; State Law Immunity Should be Denied ........................... 25

IV.  CONCLUSION ........................................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alkire v. Irving*,
    330 F.3d 802 (6th Cir. 2003) ................................................................21

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)................................................................10, 11

*Back v. Nestle USA, Inc.*,
    694 F.3d 571 (6th Cir. 2012) ................................................................11

*Baynes v. Cleland*,
    799 F.3d 600 (6th Cir. 2015) ................................................................21

*Bays v. Montmorency County*,
    874 F.3d 264 (6th Cir. 2017) ................................................................13, 20

*Blackmore v. Kalamazoo Cty.*,
    390 F.3d 890 (6th Cir. 2004) ................................................................11

*Bonner-Turner v. City of Ecorse*,
    627 Fed.Appx. 400 (6th Cir. 2015)................................................................18

*Bruno v. City of Schenectady*,
    727 Fed.Appx. 717 (2nd Cir. 2018)................................................................12

*City of Revere v. Massachusetts General Hosp.*,
    463 U.S. 239 (1983)................................................................12

*Clay v. Emmi*,
    797 F.3d 364 (6th 2015)................................................................11

*Collins v. City of Harker Heights, Tex.*,
    503 U.S. 115 (1992)................................................................21

*Comstock v. McCrary*,
    273 F.3d 693 (6th Cir. 2001) ................................................................18, 20

*Crouch v. S. Health Partners, Inc.*,
    No. 1:08-cv-P89-R, 2009 WL 860414 (W.D. Ky. Mar. 27, 2009)........................................21

*Danese v. Asman*,
    875 F.2d 1239 (6th Cir. 1989) ................................................................13, 20

*Davis v. Fentress County Tennessee,*
    6 Fed.Appx. 243 (6th Cir. 2001) ............................................................13, 15

*Estelle v. Gamble,*
    429 U.S. 97 (1976)...................................................................................11

*Farmer v. Brennan,*
    511 U.S. 825 (1970)..................................................................................12

*Ford v. Cty. of Grand Traverse,*
    535 F.3d 483 (6th Cir. 2008) ......................................................................21

*Galloway v. Anuszkiewicz,*
    518 Fed.Appx. 330 (6th Cir. 2013).........................................................17, 18

*Garner v. Memphis Police Dep't,*
    8 F.3d 358 (6th Cir. 1993) .........................................................................21

*Gordon v. County of Orange,*
    888 F.3d. 1118 (9th Cir. 2018) ...................................................................12

*Griffith v. Franklin County, Kentucky,*
    2019 WL 1387691 (E.D. Ky. March 27, 2019) ...............................................12

*Grose v. Caruso,*
    284 F. App'x 279 (6th Cir. 2008) .................................................................12

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982)..................................................................................12

*Hill v. Marshall,*
    962 F.2d 1209 (6th Cir. 1992) ....................................................................20

*Horn by Parks v. Madison County Fiscal Court,*
    22 F.3d 653 (6th Cir. 1994) ...................................................................13, 15

*Kingsley v. Hendrickson,*
    135 S. Ct. 2466 (2015)..........................................................................11, 12

*Laster v. City of Kalamazoo,*
    746 F.3d 714 (6th Cir. 2014) ......................................................................10

*Leach v. Shelby County Sheriff,*
    891 F.2d 1241 (6th Cir. 1989) ...............................................................23, 24

*Linden v. Washtenaw County,*
    167 Fed.Appx. 410 (6th Cir. 2006)...............................................13, 16, 17, 18

*Logan v. Denny's, Inc.*,
   259 F.3d 558 (6th Cir. 2001) ...................................................................11

*Love v. Franklin County, Kentucky*,
   -- F.Supp.3d --, 2019 WL 1387692 (E.D. Ky. March 27, 2019) ...............12

*Lyons v. City of Xenia*,
   417 F.3d 565, 581 (6th Cir. 2005) ............................................................13

*Miranda v. County of Lake*,
   900 F.3d 335 (7th Cir. 2018) ...................................................................12

*Monell v. Dep't of Soc. Servs.*,
   436 U.S. 658 (1978) .................................................................................21

*Nouri v. County of Oakland*,
   615 Fed.Appx. 291 (6th Cir. 2015) ..........................................................23

*Richmond v. Huq*,
   885 F.3d 928 (6th Cir. 2018) ...................................................................12

*Jerauld ex rel. Robinson v. Carl*,
   405 F. App'x 970 (6th Ci. 2010)...............................................................20

*Rowan Cty. v. Sloas*,
   201 S.W.3d 469 (Ky. 2006) ..........................................................14, 15, 26

*Saucier v. Katz*,
   533 U.S. 194 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223
   (2009)................................................................................................12, 13

*Shorts v. Bartholomew*,
   255 Fed.Appx. 46 (6th Cir. 2007) ............................................................23

*Sigler v. Am. Honda Motor Co.*,
   532 F.3d 469 (6th Cir. 2008) ...................................................................10

*Smith v. Cty. of Lenawee*,
   505 F. App'x 526 (6th Cir. 2012) .............................................................11

*Taylor v. Barkes*,
   135 S.Ct. 2042 (2015).............................................................................19

*Taylor v. Michigan Dept. of Corrections*,
   69 F.3d 76 (6th Cir. 1995) ...........................................................13, 20, 22

*Waters v. City of Morristown*,
   242 F.3d 353 (6th Cir. 2001) ...................................................................21

5

*Winkler v. Madison Cty.*,
    893 F.3d 877 (6th Cir. 2018) ...............................................................................21

*Yanero v. Davis*,
    65 S.W.2d 510 (Ky. 2001) ..........................................................................14, 25

**Statutes**

42 U.S.C. §1983 ...........................................................................................1, 2, 20

**Other Authorities**

Eighth Amendment ...............................................................................11, 12, 19

Fourteenth Amendment ......................................................................................11

Fed. R. Civ. P. 56(a) ...........................................................................................10

## I.   INTRODUCTION

Plaintiff is the daughter and Administratrix of the Estate of Charles Troutman, who committed suicide while in the custody of Louisville Metro Corrections Department on November 24, 2015, after he had been placed in a single cell with barred windows.  Plaintiff's death was the sixth similar suicide in LMDC in a two-year period.  Plaintiff has filed an action pursuant to 42 U.S.C. §1983 and state law.  This case challenges the deliberate indifference to Mr. Troutman's serious psychological needs by Defendant Cox, the classification officer who had him placed in a single barred cell, and Defendant Bolton, the Director of Louisville Metro Department of Corrections, who was responsible for the oversight, management, and direction of the jail system, but who, despite knowing the recurring pattern of suicidal inmates committing suicide in single barred cells and receiving recommendations for how to prevent such deaths, took no action taken to reasonably reduce that risk.  Defendants have moved for summary judgment without any citation to evidence in the record.  Because there are contested issues of material fact their motion should be denied.

## II.   FACTS

### A.  History of Suicides by Hanging in Single Barred Cells at LMDC

Prior to Mr. Troutman's death, there were six in-custody hanging deaths at Louisville Metro Department of Corrections ("LMDC") over a 25-month period from October 2013-October 2015.  Five deaths occurred in single barred cells in the Hall of Justice ("HOJ") and one death occurred in the Community Corrections Center ("CCC").  On October 19, 2013, the first inmate hanged himself in a single barred cell in the HOJ.  Ex. 1, p.7.  That inmate had a history

of mental health issues.  Ex. 1, p. 153-158.  The second inmate died by suicide after he hanged himself in a single barred cell on January 4, 2014.  Ex. 2, p. 3.  He had a prior suicide attempt by hanging at LMDC and history of mental health issues.  Ex. 2, p. 103-105, 126.  That inmate was not cleared prior to being moved to the single barred cell where he took his life.

Ten days after the second in-custody hanging in January 2014, Mr. Kyle Ernst of LMDC, distributed an email to remind staff about the procedure for placement in a single barred cell. Ex. 3.  The procedure required classification staff to call medical and ask if the inmate had any medical conditions that classification should make security staff aware of *prior* to moving an inmate to a single cell.  *Id.*

On October 27, 2014, a third inmate hanged himself in a single barred cell in the HOJ. Ex. 4, p. 6.  The inmate had requested a mental health referral prior to his placement in the single cell.  Ex. 5, p. 2.  However, the inmate hanged himself before mental health staff evaluated him. Ex. 6, p. 41.  A fourth inmate hanged himself in a single barred cell on February 16, 2015.  Ex. 7, p. 2.  The inmate had a reported mental health history.  Ex. 8, p. 20.

The fifth in-custody hanging occurred at the CCC on May 29, 2015 when the inmate tied a bedsheet to the bars of a window in the bathroom.  Ex. 6, p. 115.  A report was completed after his death on June 23, 2015.  Ex. 6, p. 114.  The report included nine recommendations.  Ex. 6, p. 119.  In addition to the nine recommendations, the report also made an environmental recommendation:

1. The dorms at CCC have bars over the windows like single cells or disciplinary housing cells at the main jail.  **These bars present an easily accessible opportunity for self-harm**.  It is recommended that the necessity of these bars be evaluated, or an alternative safety implement for windows be considered.

*Id.* (emphasis added).

A sixth inmate hanged himself on October 4, 2015 in a single barred cell in the HOJ and died.  Ex. 6, p. 53; Ex. 9, p. 6; Ex. 10, Ramey Depo. 84.  The inmate had attempted suicide a few years prior and had a history of psychiatric hospitalization.  Ex. 6, p. 55.  This inmate died by suicide in the month prior to Mr. Troutman's suicide attempt and subsequent death by suicide.  Ex. 6, p. 53.  In response to this inmate's death, a report was generated on January 4, 2016 and recommended that:

1. Behavioral health professionals will complete a full evaluation on every patient who has had prior suicide attempts and/or psychotropic medications or inpatient psychiatric hospitalizations for mental health.  **Any inmate with a prior suicide attempt will not be housed in cells with bars and a 'no bars alert' will be assigned in X-Jail**.

Ex. 6, p. 56.  (emphasis added).

Defendant Bolton is the Director of Louisville Metro Department of Corrections and was responsible for the oversight, management, and direction of the jail system.  Ex. 11, Bolton Depo., p. 15.  He is the final decision-maker responsible for the policies of the LMDC.  Ex. 11, Bolton Depo., p. 16.

### A.  Mr. Troutman Had a Serious Medical Need and Made First Suicide Attempt at LMDC

On the evening of November 12, 2015, Mr. Troutman was arrested on drug related charges.  Ex. 12, p. 9.  Just after midnight, on November 13, 2015, he was booked into Louisville Metro Department of Corrections.  *Id.*  While still on the booking floor, Mr. Troutman attempted suicide in holding cell 2.  Ex. 13, p. 39 ("tried to strangle self in holding cell").  At approximately 18:05 on November 13, 2015, during a security check, Officer Vanover found Mr.

Troutman in his holding cell with "gauze tied so tightly around his neck that [he] was choking." Ex. 14, Schmitt Dep., p. 26-27.

After the attempt, Mr. Troutman asked Officer Vanover, "why [he] didn't just leave him for a few more minutes." Ex. 15, Smith Depo. p. 93. Mr. Troutman told Sgt. Schmitt shortly after the attempt that "he was a junkie and had no reason to live because he was going to get 20 years for his charges." Ex. 14, Schmitt Dep., p. 27. When speaking with his daughter Stephanie a few days later, Mr. Troutman admitted to the suicide attempt and was crying and ashamed. Ex. 16, Troutman Dep., p. 39.

During his intake evaluation after the suicide attempt, Mr. Troutman reported to Nurse Denning that he had previously attempted suicide 3-4 times. Ex. 13, p. 38. Nurse Denning noted that Mr. Troutman was showing signs of depression, expressing feelings of hopelessness, appeared anxious, afraid and angry, and also appeared ashamed. *Id.*

### B. Mr. Troutman's Serious Medical Need Continues

After his suicide attempt in booking, Mr. Troutman was moved to the mental health unit and placed on Level 1 Suicide Observation 1. Ex. 12, p. 11; Ex. 13, p. 183. On November 14, 2015, Mr. Troutman stated to mental health staff: "I'm not good at all, I'm dying! The nurses don't like me because I'm a junkie," and that "I just want to get out of this room." Ex. 13, p. 13. He was noted as being distractible, agitated, and irritable. Ex. 13, p. 12. Mr. Troutman's thought process was tangential, and his speech was pressured. *Id.*

The next day, Mr. Troutman noted sleep disturbance, which mental health staff attributed to detox and he was identified as distractible, agitated and irritable. Ex. 13, p. 10-11. His thought process was goal directed and speech was pressured. Ex. 13, p. 10.

4

On the afternoon of November 16, 2015, Mr. Troutman told mental health staff: "They told me I'd see the doctor and get out of here today." Ex. 13, p. 9. The staff member shared the process for clearance from the unit with Mr. Troutman. *Id.* That evening November 16, 2015, Mr. Troutman was observed by Dr. Smith for the first time. Ex. 13, p. 3. She spoke to him about his traumatic brain injury at this time. Ex. 15, Smith Depo., p. 97. She made note of a prior self-harm attempt as well.[1] *Id.* Additionally, Smith acknowledged his history of drug abuse. *Id.*

Mr. Troutman was released to general population on November 17, 2015 and placed in H6 Dorm 6. Ex. 12, p. 1. Stephanie spoke with her father again the next day. Ex. 16, Troutman Dep., p. 43. Mr. Troutman was upset. Ex. 16, Troutman Dep., p. 43. He wanted to be out of jail and to check on his son and his grandchildren. Ex. 16, Troutman Dep., p. 44. Mr. Troutman did not want to be in jail and was worried that he would have to do 20 years because of the charges the other men had received. Ex. 16, Troutman Dep., p. 44.

During the call, Mr. Troutman seemed depressed. Ex. 16, Troutman Dep., p. 44. Stephanie asked her father how he was feeling during that phone call because Mr. Troutman was crying. Ex. 16, Troutman Dep., p. 45. Since Mr. Troutman did not usually cry, Stephanie could tell that he was upset. *Id.* Mr. Troutman told Stephanie not to visit because "he wouldn't be able to watch [them] just walk away." Ex. 16, Troutman Dep., p. 49.

Based on the conversations with her father, Stephanie called LMDC. Ex. 16, Troutman Dep., p. 58. She wanted to let the counselor know that Mr. Troutman had a previous traumatic

---

[1] On March 2, 2002, Mr. Troutman was placed in the Security Detention Emergency Department at the University of Louisville Hospital for "suicidal/homicidal threats or attempts." UofL Hospital 01668. The Emergency Psychiatry Evaluation indicates that Mr. Troutman felt suicidal. UofL Hospital 01670. He also reported a suicide attempt at age 14 when he attempted to OD on aspirin because of problems at school. *Id.*

brain injury for which he had been hospitalized.  Ex. 16, Troutman Dep., p. 59).  Stephanie called LMDC and spoke with a receptionist because the counselor was either busy or out at the time.  Ex. 16, Troutman Dep., p. 59-60).  She told the receptionist that Mr. Troutman had been upset and crying over the phone, which was notable since he was not usually a crier, and that he had a TBI with hospitalization.  Ex. 16, Troutman Dep., p. 59.  Stephanie also wanted to remind the counselor of Mr. Troutman's previous suicide attempt, so she told the receptionist and requested that Mr. Troutman be spoken with in-depth.  Ex. 16, Troutman Dep., p. 59.

While in general population on November 18, 2015, Mr. Troutman was involved in a verbal altercation with another inmate in H6 Dorm 6.  *Id.*  As a result, he was moved to CCC 4 North 1.  *Id.*  Mr. Troutman remained in CCC 4 North 1 until November 21, 2015 when he was issued disciplinary for a physical altercation with another inmate.  *Id.*  After the incident, Mr. Troutman was moved to the Main Jail Complex and assigned to Rear Security Dorm 2.  *Id.*  On November 23, 2015, Mr. Troutman appeared in court on his charges.  Ex. 17, p. 2.  His case was sent to the grand jury for the week of January 4, 2016.  *Id.* at 3.  He subsequently returned to his placement in Rear Security Dorm 2.  *Id.*

Stephanie spoke with her father on the phone after his physical altercation and prior to Mr. Troutman's move to the single barred cell.  Ex. 16, Troutman Dep., p. 52-53.  Mr. Troutman was depressed, angry and very upset.  Ex. 16, Troutman Dep., p. 53.  That was the last time Stephanie spoke with her father.  Ex. 16, Troutman Dep., p. 54-55.

### C.  Defendants Had a Practice of Clearing Inmates Prior to Placement in Single Barred Cells Which Defendant Cox Deliberately and Indifferently Disregarded

A practice for clearing inmates prior to placement in single barred cells was established at LMDC a few years before Mr. Troutman hanged himself in November 2015.  Ex. 18, Ernst Dep., p. 69.  The practice had been implemented sometime prior to the in-custody hanging in October 2013.  *Id.*  It was started in response to an incident when another inmate, with multiple suicide attempts, was placed into a single barred cell and hanged himself.  *Id.*  According to Kyle Ernst, a former classification coordinator at LMDC, the procedure had "always been...to clear an inmate every time he gets moved" into a single cell.  *Id.*  This practice even applied to moves to single cells in rear security.  *Id.*

The procedure was a common and trained practice.  Ex. 18, Ernst Dep., 70.  Kyle Ernst stated that the procedure was already in place when he began as the classification coordinator.  Ex. 18, Ernst Dep., p. 71).  Mr. Ernst was a classification coordinator for 4-5 years before he retired in March 2015.  Ex. 18, Ernst Dep., p. 24, 110-111.  During his time as a classification coordinator, his staff was trained on this single cell clearance practice.  Ex. 18, Ernst Dep., p. 70.

The clearance practice requires that classification clear the inmate "through medical, prior to the inmate being put into a single cell."  Ex. 18, Ernst Dep., 91.  Clearance means that classification has "to contact medical, medical has to contact [classification] back and say this inmate is cleared for a single cell."  Ex. 18, Ernst Dep., p. 91-92.  Correction staff are not supposed to move an inmate until hearing back from medical.  Ex. 19, Schindler Dep., p. 52.

In addition to single cell clearance, there is a "no bars alert" policy at LMDC.  Ex. 18, Ernst Dep., p. 29, 49.  In 2012 or 2013, Mr. Ernst established the "no bars alert" policy.  *Id.*  The policy was in place at the time of the in-custody hanging in October 2013.  Ex. 18, Ernst Dep., p. 64.  The purpose of the policy was to prevent an inmate, with a vulnerable history, to be

7

misplaced in a cell where they could hurt themselves.  Ex. 18 Ernst Dep., p. 29.  During his time

as a classification coordinator, the policy evolved.  Ex. 18, Ernst Dep., p. 48.  At first, mental

health would make the determination if a "no bars alert" was appropriate.  *Id.*  Then the

responsibility was transferred to a broader group that met once per week for a "no bars meeting"

to review all inmates that were placed in a single cell.  Ex. 18, Ernst Dep., p. 48, 51.  This group

included various individuals from administration, corrections, security, mental health and

medical.  Ex. 18, Ernst Dep., p. 49-51.

According to Ernst, the alert is "automatic" for an inmate with a prior suicide attempt.

Ex. 18, Ernst Dep., p. 106.  When an alert is added, the inmate's page in X-Jail flashes red with

"no bars" indicated in.  Ex. 18, Ernst Dep., p. 117.  This flashing alert is used to ensure that an

inmate is not moved into a single cell in error.  Ex. 18, Ernst Dep., p. 117-118.

### D.  Mr. Troutman was Moved to a Single Barred Cell and Made Second Successful Suicide Attempt

Due to Mr. Troutman's pending disciplinary for the physical altercation with another

inmate in CCC, Defendant James Cox, a prison classification interviewer, was tasked with

placing Mr. Troutman in a single cell.  Ex. 20, Cox Dep., p. 49.  Defendant Cox knew of Mr.

Troutman because of Mr. Troutman's previous suicide attempt days prior in booking.  Ex. 20,

Cox Dep., p. 48.  Defendant Cox was on the booking floor on November 13, 2015 when Mr.

Troutman attempted suicide.  Ex. Cox Dep., p. 48.  Defendant Cox also entered the note about

the suicide attempt into classification system and into his record in X-Jail.  Ex. 20, Cox Dep., p.

65.

At approximately 15:58 on November 24, 2015, Defendant Cox placed Mr. Troutman on

the move list.  Ex. 20, Cox Dep., p. 72.  At that time, Defendant Cox notified Nurse Brown that

Mr. Troutman was being to be moved to H5D9, a single barred cell in the Hall of Justice, pending disciplinary.  Ex. 20, Cox Dep., p. 66.  He notified Nurse Brown in compliance with the practice of LMDC and to obtain clearance to move Mr. Troutman to a single barred cell.  Ex. 20, Cox Dep., p. 66.  When Defendant Cox notified Nurse Brown via telephone, he told her that he was moving Mr. Troutman to a single cell.  Ex. 20, Cox Dep., p. 68.

Defendant Cox never heard back from medical or the charge nurse regarding the move of Mr. Troutman.  Ex. 20, Cox Dep., p. 74, 108-109.  Defendant Cox did not follow up with anyone in mental health or medical that day regarding Mr. Troutman.  Ex. 20 Cox Dep., p. 109.  Despite knowing that a single barred cell gives a suicidal inmate the opportunity to complete that suicide, Ex. 20, Cox Dep., p. 108, Defendant Cox did not wait for clearance from medical before placing Mr. Troutman on the move list.  Ex. 18, Ernst Dep., p. 90, 117.

Defendant Cox admitted that his gut reaction is that the placement of an inmate, with a prior suicide attempt, in a single barred cell could be a serious risk.  Ex. 20, Cox Dep., p. 107. He did not have any training regarding the risk of placing an inmate with a prior suicide attempt in a single barred cell prior to Mr. Troutman's death by suicide.  Ex. 20, Cox Dep., p. 103-104. Defendant Cox also does not recollect having any training on particular risk factors of suicide prior to Mr. Troutman's death.  Ex. 20, Cox Dep., p. 44-45.

At 20:32 on November 24, 2015, Mr. Troutman was moved from Rear Security Dorm 2 to HOJ Unit 5 Dorm 9 Cell 2.  Ex. 17, p. 3.  Nurse Schindler stated that the move took place before medical had a chance to assess Mr. Troutman.  Ex. 19, Schindler Dep., p. 52.

At 22:47 on November 24, 2015, shortly after being placed in the single barred cell, Mr. Troutman was found hanging from the bars that cover the windows by Officer Miller when he was conducting his last security check of the night.  Ex. 17, p. 3; Ex. 12, p. 3.

After the ambulance arrived, Mr. Troutman was transported to University of Louisville Hospital.  Ex. 12, p. 1.  He never regained consciousness and was pronounced dead on November 28, 2015 after his family decided to take Mr. Troutman, their father, sibling, grandfather and friend, off of life support.  *Id*; Ex. 16, Troutman Dep., p. 56.

## III.   <u>ARGUMENT</u>

### A.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The "moving party bears the burden of showing the absence of any genuine issues of material fact."  *Sigler v. Am. Honda Motor Co.,* 532 F.3d 469, 483 (6th Cir. 2008).  Once a party files a properly supported motion for summary judgment, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson,* 477 U.S. at 250.  The Court must "accept Plaintiff's evidence as true and draw all reasonable inferences in his favor."  *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 255).  The Court may not "make credibility determinations" or "weigh the evidence when determining whether an issue of fact remains for trial."  *Id*. (citing *Logan v. Denny's, Inc*., 259 F.3d 558, 566 (6th Cir. 2001)).  "The ultimate question is 'whether the

evidence presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law.'" *Back v. Nestle USA, Inc.*, 694 F.3d

571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251-52). If there is a dispute over facts

that might affect the outcome of the case under governing law, the entry of summary judgment is

precluded. *Anderson*, 477 U.S. at 248.

### B.  A Reasonable Jury Could Find Defendants Cox, Bolton, and Louisville Metro Liable for Mr. Troutman's Inadequate Medical Care

#### 1.Traditional Standard for Determining Liability for Inadequate Medical Care Leading to In Custody Suicide

At the time of his suicide, Mr. Troutman was being held awaiting trial. Historically, the

Sixth Circuit has analyzed inadequate medical care cases brought by pretrial detainees under the

Fourteenth Amendment by using the same deliberate indifference standard applied to convicted

persons under the Eighth Amendment. *Smith v. Cty. of Lenawee*, 505 F. App'x 526, 531 (6th Cir.

2012). A convicted person's claim for inadequate medical care arises out of the Eighth

Amendment, which "forbids prison officials from 'unnecessarily and wantonly inflicting pain'

on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical

needs." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (*quoting Estelle v.

Gamble*, 429 U.S. 97, 104 (1976)). Traditionally this standard was used to analyze the rights of

pre-trial detainees as well, through the Fourteenth Amendment,[2] which was interpreted to require

---

[2] In *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015), the Supreme Court held that a pretrial detainee alleging excessive force "must show only that the force purposely or knowingly used against him was objectively unreasonable." The Sixth Circuit has followed *Kingsley* in excessive force cases brought by pre-trial detainees. See e.g. *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015). While this Circuit has yet to apply the analysis of *Kingsley* to medical treatment cases, the Sixth Circuit has acknowledged the "shift in Fourteenth Amendment deliberate indifference jurisprudence" which "calls into serious doubt whether [a plaintiff] need even show that the individual defendant officials were subjectively aware of [his or her] serious medical conditions and nonetheless wantonly disregarded them." *Richmond v. Huq*, 885 F.3d 928, 938 n. 3 (6th Cir. 2018). Since *Richmond*, the Second,

that the rights of pre-trial detainees be "as least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 244 (1983).

Under the Eighth Amendment, plaintiffs must prove both objective and subjective culpability. *Grose v. Caruso*, 284 F. App'x 279, 282 (6th Cir. 2008). "The objective component requires an inmate to show that the alleged deprivation is sufficiently serious." *Id.* (internal citations omitted). The subjective standard is met if 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

Officers are entitled to assert the defense of qualified immunity if the right they have violated was not clearly established and not something a reasonable officer would have known at the time of the violation. See *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once the defense of qualified immunity has been asserted, courts generally engage in a two-step analysis to determine if the defendant is entitled to the defense. *Saucier v. Katz*, 533 U.S. 194, 200-201 (2001), overruled in part by *Pearson v. Callahan*, 555 U.S. 223 (2009). The first question to ask is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. Once the court establishes that the officer's conduct violated some federally protected right, it may proceed to ask, "whether the right was clearly established." *Id.* Although this sequential analysis is not mandatory, it remains

---

Seventh, and Ninth Circuits have used *Kingsley* in medical treatment cases. *Bruno v. City of Schenectady*, 727 Fed.Appx. 717, 717 (2nd Cir. 2018); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. County of Orange*, 888 F.3d 1118 (9th Cir. 2018). District courts in Kentucky have started to shift as well. Both *Love v. Franklin County, Kentucky*, -- F.Supp.3d --, 2019 WL 1387692 *4 (E.D. Ky. March 27, 2019), and *Griffith v. Franklin County, Kentucky*, 2019 WL 1387691 *5 (E.D. Ky. March 27, 2019), found that the court "must apply the objective test to claims of deliberate indifference" to claims concerning response to a serious medical need.

12

beneficial because "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Pearson*, 555 U.S. at 236 (*citing Lyons v. City of Xenia*, 417 F.3d 565, 581 (6th Cir. 2005) (Sutton, J., concurring)).

"A detainee's psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies." *Horn by Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). There is no generalized right of pretrial detainees to be correctly screened for suicidal tendencies. *Davis v. Fentress County Tennessee, 6 Fed.Appx*. 243, 249 (6th Cir. 2001), citing *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989). The right at issue, however, which has been clearly established for years, is the "right to have a serious psychological illness treated seriously." *Bays v. Montmorency County*, 874 F.3d 264 (6th Cir. 2017). Contested facts preclude summary judgment for all of the Defendants because they violated Mr. Troutman's clearly established right to not have his serious psychological needs treated with deliberate indifference. Specifically, it was clearly established in 2006 that a classification officer acted with deliberate indifference to an inmate's serious psychological needs when he knew of the inmate's suicidal tendencies and moved the inmate to a more dangerous location anyway. *Linden v. Washtenaw County*, 167 Fed.Appx. 410, 425-426 (6th Cir. 2006). It was also clearly established that a supervisor will be liable when he was deliberately indifferent to a "substantial risk of serious harm to a particular class of persons." *Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76 (6th Cir. 1995). On this basis, Defendant Cox and Defendant Bolton must both be denied qualified immunity and summary judgment must be denied.

13

Under Kentucky law, state officials sued in their individual capacities "enjoy only qualified immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.2d 510, 522 (Ky. 2001).  "Qualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions, *i.e.,* those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment; (2) in good faith; and (3) within the scope of the employee's authority." *Id.*  Upon an officer's prima facie showing that the negligent act in question was performed within the scope of his or her discretionary authority, the plaintiff must establish, by direct or circumstantial evidence, that the act "was not performed in good faith." *Id*. at 523.  In the context of qualified official immunity, such absence of good faith "can be predicated on a violation of a causally related constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 476 (Ky. 2006) (citing *Yanero*, 65 S.W.3d at 523).  Thus, for the same reasons that Defendants' acts violated Plaintiff's clearly established rights, they acted in bad faith and are not entitled to qualified official immunity.

## 2. Mr. Troutman Had a Serious Medical Need

The Plaintiff must establish that Mr. Troutman suffered from a serious medical need in order to prevail against any of the defendants on the civil rights claim.  Dr. Glindmeyer described the many identifiable indicators of his serious medical need, including a history of suicide attempts, a history of traumatic brain injury, which increases the risk of suicide, and a serious

14

suicide attempt in that facility.  Ex. 21, Glindmeyer Report, p. 34-35.[3]  He also had altercations

with peers and had been delivered bad news, and was experiencing symptoms of depression,

including crying episodes.  *Id*.  "A detainee's psychological needs may constitute serious

medical needs, especially when they result in suicidal tendencies."  *Horn by Parks*, 22 F.3d at

660; *Davis, 6 Fed.Appx*. at 249.  Teresa Wallace, Joseph Schindler, and Dr. Smith all agreed that

Mr. Troutman's needs were sufficiently serious that he should not have been put in a cell with

bars.  Ex. 19, Schindler Depo, p. 48; Ex. 15, Smith Depo., p. 34; Ex. 22, Wallace Depo., p. 175.

It is clear that Mr. Troutman did in fact have an objectively serious medical need.  Defendants do

not attempt to argue that Mr. Troutman did not have a serious medical need, only that they did

not act with deliberate indifference.  (Doc. 140-1, p. 5.)

### 3. Contested Facts Preclude Summary Judgment for Defendant James Cox on Civil Rights Claim; Qualified Immunity Should be Denied

Liability will attach, and Defendant Cox will not be entitled to qualified immunity, if,

accepting Plaintiff's evidence as true and drawing all reasonable inferences in his favor,

Defendant Cox was subjectively aware of Mr. Troutman's serious medical need and acted with

deliberate indifference to that need.

Defendant Cox testified that he believed that there was a risk that Mr. Troutman would

commit suicide.  Ex. 20, Cox Depo., p. 106.  This belief was based on his awareness of the prior

suicide attempt in booking, combined with being moved to a single cell and being on

disciplinary.  Ex. 20, Cox Depo., p. 106.  Defendant Cox knew about the prior attempt because

he'd been in the booking floor when it happened.  Ex. 20, Cox Depo. p. 48.

---

[3] Defendants incorrectly insist that there is no medical evidence introduced to establish that Mr. Troutman suffered a traumatic brain injury.  (Doc. 140-1, p. 4.)  See e.g. University of Louisville Hospital Records, UofL Hospital 630 (listing under "PRINCIPAL FINAL DIAGNOSIS(ES)," "1. Moderate traumatic brain injury").

Defendant Cox also knew that placing an inmate with a prior suicide attempt, like Mr. Troutman, in a single barred cell created a "serious risk." Ex. 20, Cox Depo., p. 107. He agreed that putting a suicidal inmate into a single barred cell created an opportunity for a suicidal inmate to complete a suicide attempt. Ex. 20, Cox Depo., 108. However, he testified that even if he thought an inmate was going to commit suicide, he would not have changed the inmate's placement out of a single barred cell, despite that serious risk. Ex. 20, Cox Depo., p. 107. He thought that was medical's job, not his. *Id*.

Defendant Cox notified medical that Mr. Troutman was to be moved into a single barred cell "in case they had any objection to it." Ex. 20, Cox Depo., p. 66. He understood that he needed verbal authorization from medical before moving Mr. Troutman. Ex. 20, Cox Depo., p. 95. However, he never got a response from medical, nor did he ever follow up with medical for authorization. Ex. 20, Cox Depo., p. 109.

Despite believing that Mr. Troutman would be put at risk, due to the risk of suicide for a person with his serious medical needs being put in a single barred cell, and not receiving authorization from medical to move him to a single barred cell, he moved Mr. Troutman to a single barred cell anyway. Ex. 20, Cox Depo., p. 72. Approximately two hours after being moved to the single barred cell, Mr. Troutman was found hanging in his single barred cell. Ex. 17, p. 3.

This is comparable to *Linden v. Washtenaw County*, 167 Fed.Appx. 410, 425 (6th Cir. 2006), where a defendant classification officer was found to have acted with deliberate indifference, and denied qualified immunity, when he knew the plaintiff had attempted suicide in the past but transferred the plaintiff to an isolated cell anyway. Like in *Linden*, Defendant Cox

knew of Mr. Troutman's recent suicide attempt, but transferred him to a single barred cell anyway, where he was able to successfully commit suicide. Defendant Cox should be denied summary judgment and qualified immunity for the same reasons.

Defendants argue that Defendant Cox "relied upon the medical personnel's evaluation that he was not suicidal." (Doc. 140-1, p. 9.) That evaluation of course had occurred any days earlier, before the two disciplinary write ups and before the adverse news about his criminal case. Moreover, this does not alter Defendant Cox's constitutional obligation to not act with deliberate indifference to Mr. Troutman's serious medical needs. They cite to *Galloway v. Anuszkiewicz*, 518 Fed.Appx. 330 (6th Cir. 2013), for support. In that case, a defendant knew the plaintiff was on a 15-minute watch for "odd and aggression behavior" and had a suicide precautions blanket. *Id*. at 335. While the court makes reference to the fact that the defendant was able to rely on the mental health staff's assessment that the plaintiff was not suicidal, that is merely a part of the analysis of whether a reasonable jury could find that he had perceived a likelihood that the plaintiff was suicidal. The analysis did not end because the court said that the defendant could rely on the mental health staff assessment. The analysis ended, and the defendant could not be liable, because the record did not support finding that he perceived that the plaintiff was suicidal. The court emphasized that he had no personal knowledge that the plaintiff may have been suicidal. The court found that the only indication that the plaintiff may have been contemplating suicide, the blanket, could not create subjective knowledge of the likelihood of suicide, because the court had evidence that such blankets were issued "for a variety of reasons unrelated to self-harm concerns." *Id*. at 336.

The Sixth Circuit has distinguished facts like these from situations where the "defendants' subjective knowledge of substantial risk may be reasonably inferred from their

17

actual exposure" to the plaintiff.  *Bonner-Turner v. City of Ecorse*, 627 Fed.Appx. 400, 408 (6th Cir. 2015) (there was sufficient evidence from which a jury could reasonably conclude that defendants perceived facts from which to infer a substantial risk of self-harm, where defendants observed plaintiff's bizarre behavior and observed plaintiff engaging in self-harm).  Thus, the inquiry is not ended by arguing that Defendant Cox relied on medical personnel, *if he himself was aware of the risk*.

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).  Here, it is clear that Defendant Cox subjectively perceived facts from which to infer a substantial risk to the prisoner, because he knew of Mr. Troutman's very recent suicide attempt.  Defendant Cox admits that he knew of the suicide attempt and that he thought there was a risk that Mr. Troutman would commit suicide. Ex. 20, Cox Depo., p. 48, 106.  He also admitted that putting someone with a prior suicide attempt in a single barred cell created a serious risk to the inmate.  Ex. 20, Cox Depo., p. 106-107.  Here, unlike in *Galloway*, and just like in *Linden*, Defendant Cox did subjectively perceive Mr. Troutman's serious medical need, and did understand the risk that he was in, in a single barred cell.  This makes his acts, transferring Mr. Troutman to a single barred cell anyway, to be deliberate indifferent.

Finally, it would be wrong to treat this as a case where Defendant Cox actually reasonably relied on medical personnel to make the call.  He called medical for approval, knew he needed verbal authorization before Mr. Troutman could be transferred, but choose not to wait for that approval.  In fact, if he had waited, medical personnel would have told him that Mr.

Troutman should not be put in a single barred cell.  Health Services Administrator Teresa Wallace, Registered Nurse Joseph Schindler, and Dr. Donna Smith all agreed that Mr. Troutman's needs were sufficiently serious that he should not have been put in a cell with bars. Ex. 19, Schindler Depo, p. 48; Ex. 15, Smith Depo., p. 34; Ex. 22, Wallace Depo., p. 175. Defendant Cox knew he needed medical authorization, but instead of waiting for authorization, chose to move forward with the transfer instead.  He cannot hide behind the approval of medical personnel when he took that decision out of their hands and made his own.

Although Defendant Cox argues that because Mr. Troutman was cleared for general population, that meant he could be transferred anywhere, a jury could easily find that to be untrue.  (Doc. 140-1, p. 6.)  A single barred cell in the disciplinary unit is not "general population," and Defendants do not cite to any evidence in support of their assertion. Additionally, that is contrary to the practice of securing medical clearance before placing inmates in single barred cells, and contrary to Defendant Cox beginning the process for securing such authorization.  If he believed that Mr. Troutman could be placed anywhere, it does not follow that he would have called for authorization.

Defendants try to cast the right alleged as a right to a proper suicide screening.  (Doc. 140-1, p. 12.)  However, that is not the right being alleged here.  Defendants cite to *Taylor v. Barkes*, 135 S.Ct. 2042 (2015), for the proposition that there is no clearly established right to a proper suicide screening.  Plaintiff does not dispute that holding.  However, a right to a proper suicide screening is a right to have one's serious psychological needs *discovered*.  The courts have resisted such a finding because the basis for liability under the Eighth Amendment is that the official was *subjectively aware of the need* and acted with deliberate indifference to it.  The Sixth Circuit "ha[s] long held that prison officials who have been alerted to a prisoner's serious

19

medical needs are under an obligation to offer medical care to such a prisoner." *Jerauld ex rel. Robinson v. Carl*, 405 F. App'x 970, 976 (6th Ci. 2010) (citing *Comstock*, 273 F.3d at 702).  To find that a screening is necessary would be to impose liability without that subjective awareness. As noted by the Sixth Circuit, "[i]t would be one thing to ignore someone who has a serious injury" but "it is another to be required to screen prisoners correctly *to find out if they need help*." *Danese*, 875 F.2d at 1244.  However, this is not a screening case.  This is a case where the defendant, Defendant Cox, was subjectively aware of Mr. Troutman's serious psychological needs, and was deliberately indifferent to them.  See *Bays*, 874 F.3d at 270, (distinguishing between the right to suicide screening and the right to have one's serious psychological needs treated seriously).

Based on Defendant Cox's own testimony, a reasonable jury could find that he subjectively perceived that Mr. Troutman was at risk of committing suicide and that he was deliberately indifferent to that risk.  For these reasons, summary judgment should not be granted to Defendant Cox.

### 4. Contested Facts Preclude Summary Judgment for Defendants Mark Bolton and Louisville Metro Government on Civil Rights Claim; Qualified Immunity Should be Denied to Bolton

Defendants Bolton and Louisville Metro Government will be liable, and will not be entitled to qualified immunity, on several different bases.  Firstly, Defendant Bolton was Director of LMDC, and he can be liable in his supervisory capacity, for his "failure to do his job" if it resulted in the violation of Mr. Troutman's rights.  *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992); see also *Taylor v. Michigan Dept. of Corrections*, 69 F.3d 76 (6th Cir. 1995).  His failures are outlined below.

20

Secondly, the municipality will be liable as a result of a municipal policy or custom.  To impose municipal liability pursuant to 42 U.S.C. § 1983, a plaintiff must prove that a constitutional violation occurred and that the municipality is responsible for the violation.  *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 498 (6th Cir. 2008) (internal citation omitted); *Crouch v. S. Health Partners, Inc.*, No. 1:08-cv-P89-R, 2009 WL 860414 (W.D. Ky. Mar. 27, 2009) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 120 (1992)).  Further, there must be a "direct causal link" between a municipal policy or custom and the alleged deprivation, and such policy or custom must be the "moving force" of the constitutional violation.  *Crouch*, 2009 WL 860414, at *3 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001).  Stated another way, a plaintiff must (1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that the plaintiff incurred a particular injury due to execution of that policy.  *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003) (citing *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993)).

In order to demonstrate the requisite "municipal policy or custom" leading to the alleged violation, "a plaintiff can identify: (1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations."  *Winkler v. Madison Cty.*, 893 F.3d 877, 901 (6th Cir. 2018) (citing *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015)).  As Director of LMDC, he was the final decision-making authority, and his failure to protect at-risk inmates will bind him and the municipality. Additionally, the failure to adequately train and supervise in the face of a known risk will bind the municipality.  Finally, there is a custom or practice of inaction that binds the municipality.

21

Defendants argue that Defendant Bolton cannot be liable because he was not personally involved with any of the decisions to move Mr. Troutman, nor had any personal knowledge of Mr. Troutman's case.  (Doc. 140-1, p. 11.)  This misstates the law.  The "correct injury" for Defendant Bolton's individual liability "is whether [Bolton] had knowledge about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be."  *Taylor*, 69 F.3d at 81.

LMDC had an extensive history of in-custody suicides.  There had been six such suicides over a 25-month period, five of which occurred in single barred cells in the HOJ.  An inmate hanged himself on October 19, 2013 in a single barred cell in the HOJ.  Ex. 1.  A second inmate hanged himself in a single barred cell on January 4, 2014.  Ex. 2.  A third inmate hanged himself in a single barred cell in the HOJ on October 27, 2014.  Ex. 4.  A fourth inmate hanged himself in a single barred cell on February 16, 2015.  Ex. 7.  A fifth inmate hanged himself in a bathroom with bars, tying a bedsheet to the bars of a window.  Ex. 6.  A sixth inmate hanged himself in a single barred cell on October 4, 2015.  Ex. 6; Ex. 9.

A report with nine recommendations was made following the fifth in-custody suicide, in the summer before Mr. Troutman committed suicide in LMDC.  Ex. 6.  One of the opinions in the report referenced the single barred cells, finding that they "present an easily accessible opportunity for self-harm."  Ex. 6.  Based on this danger, the report "recommended that the necessity of these bars be evaluated, or an alternative safety implement for windows be considered."  Ex. 6.  However, Defendant Bolton took no action taken on that recommendation.

Despite knowledge of the danger of single barred cells for suicidal inmates and the many occurrences of suicides in that exact circumstance, Defendant Bolton did not take any steps to

reasonably reduce that risk.  In the past, LMDC had installed plexiglass over the bars in single

barred cells in the "mental health unit" to make the bars inaccessible.  Ex. 18, Ernst Depo, p. 17-

18.  This simple safety measure would remove the danger of single barred cells to suicidal

inmates.  Defendant Bolton knew of the risk, knew of this possible remedy, as it was

recommended to him following one of the many suicides, and it was feasible, because it had

been done in the past.  Defendant Bolton could have implemented this in response to the

recommendation, but he did not, nor did he take any other steps to reasonable reduce the danger

to inmates at LMDC.  This deliberate indifference to the risks to LMDC inmates makes

Defendant Bolton individually liable.  Additionally, Defendant Bolton is the final decision-

maker for LMDC policies.  Ex. 11, Bolton Depo., p. 16.  And as final decision-maker, Defendant

Bolton's actions impute liability to Defendant Louisville Metro Government as well.

Another available remedy was to expand use of the no bars list.  Finally – only after Mr.

Troutman's suicide – did Bolton require that all those with prior histories of suicide attempts

within LMDC be placed on the no bars list. That was another way to solve the problem that was

simply not utilized.  A reasonable jury could easily conclude that to be an act of deliberate

indifference.

Finally, the municipality will be liable for a custom of inaction.  In *Leach v. Shelby*

*County Sheriff*, 891 F.2d 1241 (6th Cir. 1989), the Sixth Circuit imposed municipal liability

following the mistreatment of a paraplegic prisoner.  Liability was imposed on the municipality

because "there had been enough similar incidents to put the Sheriff, in his official capacity, on

notice that [the plaintiff] would be subject to constitutional deprivation."  *Leach*, 891 F.2d at

1247.  The municipality was on notice of the problem because there had been 14 similar

incidents.  *Id*.

Here, like in *Leach*, there was a pattern of inmates with mental health histories committing suicide in LMDC.  Half of them had prior suicide attempts, like Mr. Troutman.  All but one committed suicide in a single barred cell, and all committed suicide by hanging (the only suicide not committed in a single barred cell was committed by hanging using the bars in a bathroom window, not a cell).  This was enough to put Defendant Louisville Metro Government on notice.  Indeed, it is not necessary to infer such knowledge, because in response to the repeated suicides, reports were made with recommendations for how to prevent further suicides.  However, Defendant Louisville Metro Government did not implement adequate training, supervision, policy changes, or modification of cells that could have reasonably reduced the danger to those with serious medical needs.  Failing to act when on notice of the history of suicides by hanging was deliberately indifferent to inmates with serious medical needs, specifically those at risk of committing suicide.  Plaintiff's expert Lindsay Hayes opined that LMDC had "grossly inadequate policies, procedures, and practices in the area of jail suicide prevention."  Ex. 23, Hayes Report, p. 20.  In addition to failing to act in response to the pattern of suicides, he identified a number of problems with LMDC's policies, including the failure to provide any written procedure or guidance as to the suicide risk assessment process, the reassessment process, the failure to have written procedures or guidance as to whether a suicidal inmate should be placed in a suicide-resistant cell, the failure to provide options for multiple levels of observation, the failure to provide any written procedure or guidance regarding downgrading an inmate from suicide precautions, the failure to provide a procedure for treatment planning for suicidal inmates, or for follow-up assessment, and the failure to provide any written procedure or guidance regarding the mortality review process following an inmate suicide.  Ex. 23, Hayes Report, p. 23-24.  These failures, reflecting a policy of inaction and inadequate

24

policies and procedures regarding inmates and suicide prevention, caused Mr. Troutman's death and municipal liability is appropriate.

For all of these reasons, summary judgment should be denied Defendant Bolton and Defendant Louisville Metro Government.

### 5. Contested Facts Preclude Summary Judgment for Defendant James Cox and Mark Bolton on Wrongful Death and Negligence Claim; State Law Immunity Should be Denied

Defendants' only argument in support of granting summary judgment on Plaintiff's wrongful death and negligence claims against Defendant Cox is that he was not negligent because he relied on the assessment of medical personnel.  (Doc. 140-1, p. 17.)  This fails for the same reason it fails to absolve him of liability for the constitutional violation.  Defendant Cox cannot rely on the judgment of medical personnel, when he himself had sufficient notice that Mr. Troutman had a serious medical need.

Defendants argue that Defendant Bolton is entitled to state qualified immunity from the state law claims.  Under Kentucky law, state officials sued in their individual capacities "enjoy only qualified immunity, which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment."  *Yanero v. Davis*, 65 S.W.2d 510, 522 (Ky. 2001).  Upon an officer's prima facie showing that the negligent act in question was performed within the scope of his or her discretionary authority, the plaintiff must establish, by direct or circumstantial evidence, that the act "was not performed in good faith."  *Id*. at 523.

Thus, assuming that Defendant Bolton was acting in the scope of his discretionary authority, he must act in good faith.  Defendants assert that there is no evidence of bad faith.  (Doc. 140-1, p. 16.)  However, such absence of good faith "can be predicated on a violation of a

25

causally related constitutional, statutory, or other clearly established right which a person in a public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Rowan Cty. v. Sloas*, 201 S.W.3d 469, 476 (Ky. 2006) (citing *Yanero*, 65 S.W.3d at 523). Plaintiff has raised evidence that Defendant Bolton violated Plaintiff's constitutional rights and acted with deliberate indifference. Defendant Bolton was responsible for the "oversight, management, and direction of the jail" but acted with deliberate indifference when he failed to protect inmates with serious medical needs from known dangers. Bolton Depo., p. 15. This is sufficient to show an absence of good faith for the purposes of Kentucky state qualified immunity.

Neither Defendant Cox nor Bolton is entitled to Kentucky state qualified immunity and summary judgment should not be granted on Plaintiff's state law claims of wrongful death and negligence.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

/s/ Alphonse A. Gerhardstein (0032053)
Trial Attorney for Plaintiff
Gerhardstein and Branch, Co. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 45202
Tel (513) 621-9100
Fax (513) 345-5543
agerhardstein@gbfirm.com

/s/ Larry D. Simon
LARRY D. SIMON
239 South Fifth Street, Suite 1700
Louisville, Kentucky 40202
(502) 589-4566
larrysimonlawoffice@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 21, 2019, a copy of the foregoing pleading was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail upon all parties for whom counsel has not yet entered an appearance electronically.

s/ Alphonse A. Gerhardstein
Attorney for Plaintiff