1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY


STEPHANIE TROUTMAN,            )
Administratrix of the         )
Estate of CHARLES R.          )
TROUTMAN, Jr. Deceased,       )
                              )        Case No.
           PLAINTIFF          )     3:16-cv-000742-
                              )           DJH
v.                            )
                              )
LOUISVILLE METRO              )
DEPARTMENT OF CORRECTIONS,    )
et al.                        )
                              )
           DEFENDANTS.        )


            *                  *                  *


        The deposition of **MARK EDWARD BOLTON**, taken

pursuant to notice by the Plaintiff on March 5,

2018, at Simon Law Office, 239 South Fifth Street,

Suite 1700, Louisville, Jefferson County, Kentucky.


            TRACY P. LUNDERGAN, RMR, KY CCR
         McLendon-Kogut Reporting Service, LLC
              Anchorage Office Plaza
        2525 Nelson Miller Parkway, Suite 204
              Louisville, Kentucky  40223
                   (502) 585-5634
            tlundergan@mclendon-kogut.com
                www.mclendon-kogut.com

2

C O N T E N T S

Page

Appearances                                               3

Examination by Mr. Simon                                  5

Notary Certificate                                      248

Exhibits
Bolton Deposition Exhibit 1                               23
Bolton Deposition Exhibit 2                               28
Bolton Deposition Exhibit 3                               50
Bolton Deposition Exhibit 3A                             105
Bolton Deposition Exhibit 4                               54
Bolton Deposition Exhibit 4A                             107
Bolton Deposition Exhibit 5                               59
Bolton Deposition Exhibit 6                               76
Bolton Deposition Exhibit 6A                             110
Bolton Deposition Exhibit 7                               80
Bolton Deposition Exhibit 8                               87
Bolton Deposition Exhibit 9                               89
Bolton Deposition Exhibit 10                              95
Bolton Deposition Exhibit 11                             166
Bolton Deposition Exhibit 12                             179
Bolton Deposition Exhibit 13                             181
Bolton Deposition Exhibit 14                             201
Bolton Deposition Exhibit 15                             238

Requested Items
Capacity of OBS one in November 2015                     47

Photos of single cells, esp. H5D9                        96

Sources re time of year and increased risk              122

Provide daily reports from 10-9-14 to 11-24-15          156

Provide info whether Mr. Workun was an HIP              203
participant when he died

                *                    *                    *

3

1                    APPEARANCES

2

3        FOR PLAINTIFF:
         Ms. Christina R. L. Norris
4        P.O. Box 386
         Prospect, Kentucky  40059
5        (502) 899-4755
         christina@norrislawky.com
6        and
         Mr. Larry Simon
7        Simon Law Office
         239 South Fifth Street, Suite 1700
8        Louisville, Kentucky  40202
         (502) 589-4566
9        larrysimonlawoffice@gmail.com

10       FOR DEFENDANT CORRECT CARE SOLUTIONS:
         Ms. Megan P. O'Reilly
11       Blackburn Domene & Burchett PLLC
         614 West Main Street, Suite 3000
12       Louisville, Kentucky  40202
         (502) 584-1600
13       moreilly@bdblawky.com

14       FOR DEFENDANTS LOUISVILLE METRO DEPARTMENT OF
         CORRECTIONS, ET AL:
15       Mr. J. Denis Ogburn
         Assistant Jefferson County Attorney
16       531 Court Place, Suite 900
         Louisville, Kentucky  40202
17       (502) 574-6312
         denis.ogburn@louisvilleky.gov
18
         ALSO PRESENT:
19       Mr. Tim Janes, Videographer (502) 419-5144

20

21              *              *              *

22

23

24

25

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634

4

1          (Deposition commenced at 9:41 a.m.)

2          THE VIDEOGRAPHER:  We are now on the record

3   in the matter of Stephanie Troutman, Administratrix

4   of the Estate of Charles R. Troutman, Jr., deceased

5   versus Louisville Metro Department of Corrections,

6   et al.

7          This deposition is being held pursuant to

8   notice in the United States District Court, Western

9   District of Kentucky, Case Number

10  3:16-cv-000742-DJH.

11         Today's date is March 5th, 2018.  The current

12  time is 9:41 a.m. Eastern Standard Time.  This is

13  the video-recorded deposition of Mark E. Bolton

14  being taken at the office of Larry Simon, 239 South

15  Fifth Street, Suite 1700, Louisville, Kentucky.

16         My name is Tim Janes, the videographer.  The

17  court reporter is Tracy Lundergan.

18         Will the attorneys please identify themselves

19  and the parties they represent beginning with the

20  party noticing this proceeding?

21         MR. SIMON:  Larry Simon, co-counsel for the

22  plaintiff.

23         MS. NORRIS:  Christina Norris, co-counsel for

24  the plaintiff.

25         MR. OGBURN:  Denis Ogburn, counsel for the

5

1    Louisville Metro Government defendants, including

2    Director Bolton.

3            MS. O' REILLY:  Megan O'Reilly for Correct

4    Care Solutions, Dr. Donna Smith, Nurse Brown, Nurse

5    Schindler, and Nurse Temple.

6            THE VIDEOGRAPHER:  The court reporter will

7    now please swear in the witness.

8            MARK EDWARD BOLTON, called by the Plaintiff,

9    having been first duly sworn, testified as follows:

10                        EXAMINATION

11   By Mr. Simon:

12   Q.    Good morning, Director Bolton.

13   A.    Good morning.

14   Q.    Can you state your full name for the record,

15   spell your last name, please?

16   A.    Mark, middle -- middle initial E. as in

17   Edward, last name Bolton, B-O-L-T-O-N.

18   Q.    And your position?

19   A.    I'm Director of Louisville Metro Department

20   of Corrections.

21   Q.    Director, I assume but I'm not positive, have

22   you given depositions before?

23   A.    Yes, sir.

24   Q.    On about how many occasions?

25   A.    More than I can remember.

6

1    Q.    All right.  So if a deposition is a legal

2    proceeding where counsel asks you, the deponent,

3    questions under oath, you understand you're

4    duty-bound to answer my questions under oath,

5    correct?

6    A.    I do.

7    Q.    Okay.  And it's fair because your lawyer is

8    here.  Would you agree with that?

9    A.    Yes.

10   Q.    All right.  In preparation for your

11   deposition today -- let me also say this:  I don't

12   know how long this is going to take, but it's

13   definitely not an endurance conferen -- contest, so

14   if you need to take a break, something comes up

15   where you need to get some water, whatever, just let

16   us know, we'll go off record and we'll -- we'll come

17   back in.  Is that all right?

18   A.    Great.  Thank you.

19   Q.    Sure.  In preparation for your deposition

20   today, what did you do to prepare?

21   A.    I met with my counsel.

22   Q.    Did you review any documents?

23   A.    I reviewed some policy.

24   Q.    And this is LMDC policies and procedures?

25   A.    Correct.

7

1    Q.    And these are written policies and procedures
2    that are part of the administration of the jail?
3    A.    They're -- yes.
4    Q.    And did you acquaint yourself with the
5    complaint that was filed by the plaintiff?
6    A.    Other than speaking with my counsel.
7    Q.    All right.  You have -- you have an idea, you
8    know what this action is about, what it concerns?
9    A.    I do.
10   Q.    Prior to your deposition today, did you have
11   the opportunity to review any depositions of other
12   witnesses?
13   A.    No.
14   Q.    And what documents did you bring with you
15   today?
16   A.    Just my work folder for the week.
17   Q.    Okay.  In terms of what?
18   A.    My work folder for the week --
19   Q.    Okay.
20   A.    -- and my calendar.
21   Q.    Okay.  What you have coming up this week --
22   A.    Correct.
23   Q.    -- your duties as director.
24   A.    Correct.
25   Q.    If you would, tell us the -- your education,

8

1      your background in terms of your education.

2      A.    Well, I've been in the business since 1979.

3      I started my career in 1979 while a student at

4      Arizona State University in Tempe, Arizona.  I've

5      been in this business for 37, 38 years.  Graduated

6      from Arizona State University with a degree in

7      criminal science.

8      Q.    Is that a four-year degree?

9      A.    Yes.

10     Q.    And you know the date that you graduated?

11     A.    No.

12     Q.    Would you --

13     A.    Somewhere back in the '80 -- early '80s.

14     Q.    Your résumé, which I assume you're acquainted

15     with --

16     A.    Correct.

17     Q.    -- has you earning a bachelor of science

18     degree in criminal justice from Arizona State.  It

19     has dates 1978 to 1986.  So can you explain to us

20     the -- the time period indicated there?

21     A.    Roughly, yes.

22     Q.    Okay.  Well, are you saying you earned your

23     degree in 1986?

24     A.    I believe so, yes.

25     Q.    And --

9

1     A.     That's what it says.

2     Q.     All right.  And subsequent to that time, did

3     you earn any other postgraduate degrees?

4     A.     No.

5     Q.     Tell us, if you would, starting with

6     graduating high school, where'd you -- where'd you

7     graduate high school?

8     A.     At Carroll High School, Dayton, Ohio.

9     Q.     What year was that?

10    A.     1975.

11    Q.     What employment have you had in the -- in

12    corrections related opportunities, activities since

13    graduating high school?

14    A.     Well, I started out in -- while a student at

15    Arizona State University as a corrections officer I

16    believe in 1979, working at various institutions and

17    release centers, prerelease centers.  I worked as a

18    parole officer for many years in the state of

19    Arizona.  I work --

20    Q.     Do you remember the dates that you did that?

21    A.     It'd be on the résumé.

22    Q.     All right.  There's a listing as parole

23    officer from February 1981 through May of 1986?

24    A.     That sounds about right.

25    Q.     All right.  Go ahead.

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634

1    A.    From there I worked as a administrator for a

2    inner city school in downtown Phoenix.  That was a

3    school for delinquent youth leaving state

4    institution and mainstreaming back into the

5    community.  The purpose of that program was to

6    mainstream adjudicated youth back into the public

7    school system.

8         From there I believe I became a parole

9    supervisor supervising a parole field office in

10   south Phoenix.

11   Q.    Okay.  That -- on your résumé that indicates

12   from May of '88 to January of 1989.  That sound

13   familiar?

14   A.    That sounds about right, yeah.

15   Q.    All right.

16   A.    From there I became a warden or

17   superintendent of a juvenile facility in Arizona,

18   and that was a specialized facility for mentally ill

19   individuals that were high risk individuals under

20   the age of 18, preparing them for release back into

21   the community.

22   Q.    When you say -- let me interrupt.  When you

23   say high risk, how would you define that?

24   A.    Individuals that were -- usually had a

25   history of mental illness, schizophrenia, early

1    onset schizophrenia, both Axis I, Axis II diagnosis.

2    Many were borderline personality disorders, some

3    were schizophrenic, kids that were probably not

4    going to be going home, and we were -- prepared them

5    for community release and put those individuals in

6    Pathways for continued treatment in the community.

7    Q.    Time period, as indicated on your résumé, was

8    January of 1989 to January of 1991.  Does that sound

9    accurate?

10   A.    Sounds about right, yeah.

11   Q.    All right.  Continue.

12   A.    From there I believe that I was a -- I ran

13   the contracts division for juvenile corrections in

14   Arizona.  Basically responsible for the development,

15   scope of work, solicitation and management of

16   outside provider contracts.

17   Q.    And that was for the Arizona Department of

18   Corrections?

19   A.    Correct.

20   Q.    And your dates as indicated in your résumé,

21   January 1991 to April of 1992, does that sound

22   accurate?

23   A.    Sounds close enough, yeah.

24   Q.    All right.  Please continue.

25   A.    From there I went to -- I left employment in

1    Arizona, moved to the state of Washington, and

2    became assistant chief of the jail system for

3    Thurston County sheriff's office in Olympia,

4    Washington.  That was -- that job description

5    basically consisted of running operations and

6    programs for that system.

7    Q.    And were you like the first assistant at

8    that --

9    A.    Correct.

10    Q.    -- facility?

11    A.    Correct.

12    Q.    All right.  That has your dates as April of

13    1992 through March of 2005?

14    A.    Sounds correct.

15    Q.    All right.  So that was a 13-year stint --

16    A.    Correct.  Some --

17    Q.    -- approximately?

18    A.    Something like that, yeah.

19    Q.    Would there have been times during that stint

20    of employment where you became essentially the

21    acting administrator?

22    A.    Correct.

23    Q.    And you would assume the job responsibilities

24    of the administrator of that institution?

25    A.    Correct.

13

1    Q.    Continue subsequent.

2    A.    During that employment with Thurston County,

3    I left on a leave of absence, went to work with

4    Department of Justice contract in Iraq during

5    Operation Desert Storm.  Spent about five and a half

6    months over in Iraq as a consultant working -- and

7    this was -- this was 2000 -- late 2003, 2004, I

8    believe.  Working with the Iraqi national prison

9    system on civil rights restorations, mentoring,

10   management of Iraqi wardens and prison

11   administrators, and then returned, I believe, in May

12   of 2004 to my employment in Thurston County.

13   Q.    All right.  After Thurston County, where did

14   you resume your employment after that?

15   A.    I was deputy director, assistant director

16   with the King County Department of Adult and

17   Juvenile Detention in Seattle, Washington.  In that

18   position I was second in command.  That system had

19   roughly at that time about 3,000 inmates, two large

20   jails.  A juvenile detention facility was also under

21   my bailiwick.  Around 1,000 staff, $130 million

22   budget.

23   Q.    And your time period at that position as

24   deputy director March 2005 through December 2007?

25   A.    Sounds about right.

14

1    Q.     And subsequent to that position.

2    A.     I returned to the state of Arizona for about

3    a year as operations director of parole, Community

4    Corrections and interstate compact parole and

5    probation.

6    Q.     Okay.  What -- what were your job

7    responsibilities?

8    A.     Basically the oversight and management of the

9    Community Corrections division with years under

10   Department of Corrections.  Managing all the parole

11   field offices statewide.

12   Q.     Now, did that involve prisons or jail?

13   A.     Post-institutional release.  Individuals

14   released from prison reentering the community, as

15   well as interstate compact probation and parole

16   services.

17   Q.     And the time period for that was?

18   A.     About a year.

19   Q.     Okay.  Starting in October or so of 9 -- of

20   2007?

21   A.     Sounds about right.

22   Q.     And subsequent to that.

23   A.     Director here in Louisville.

24   Q.     When did you obtain the current position that

25   you're in?

1      A.     I believe it was late 2008.

2      Q.     So tell us, what are your responsibilities as

3      director of Louisville Metro Department of

4      Corrections?

5      A.     Basically I am responsible for the oversight,

6      management, and direction of the jail system here in

7      Louisville, which consists of approximately 2,000 to

8      2,500 inmates on any given day, another six or 700

9      that are on the home incarceration program, the food

10     service operation.  All aspects of the day-to-day

11     operations of a very large jail system.  $60 million

12     budget.  Also --

13     Q.     Did you say 10 million?

14     A.     Sixty, six zero.

15     Q.     Very good.

16     A.     Which also includes private enterprise

17     contracts, which would be medical, mental health,

18     food services, some maintenance facility services,

19     etcetera.

20     Q.     I may ask you some more about this later, but

21     do you know the breakdown for the cost of your

22     budget for medical and mental health services?

23     A.     I believe this year it's right around

24     $9 million.

25     Q.     In 2015 would you be aware of the budget

1    amount for medical, mental health services?

2    A.    No, not without going back and looking at it.

3    Q.    As director of LMDC, are you the final

4    decision maker when it comes to setting policy?

5    A.    We vet all of our policy with our county

6    attorney's office, with my direct supervisor over in

7    the mayor's office, but for the most part, yes.

8    Q.    Well, tell us about that process.  If you're

9    setting policy and establishing standards for the

10   jail --

11   A.    Uh-huh.  Uh-huh.

12   Q.    -- that you're going to abide by and you

13   expect your staff to abide by, what's the process

14   that that decision-making takes place?  How's that

15   happen?

16   A.    Rephrase the question.

17   Q.    If you as the director of LMDC have the

18   responsibility as -- for oversight --

19   A.    Uh-huh.

20   Q.    -- of the facility, and one of your job --

21   one of your jobs is to set policy --

22   A.    Uh-huh.

23   Q.    -- and establish standards for your

24   employees, how do -- how's that come about?  Explain

25   the process.  'Cause you talk about interacting with

17

1     other people.

2     A.     Well, if I -- again, I'm -- I'm trying to

3     understand the -- the breadth of your question.  So

4     what I -- what -- what I -- and I'm not going to

5     assume anything, but I think what you're asking me

6     is how policy gets developed and -- and disseminated

7     throughout the agency.

8     Q.     Yes.

9     A.     Is that correct?

10    Q.     Yes.

11    A.     Well, policy is -- is developed as a result

12    of industry standards.  It's also -- assimilated in

13    that is, you know, local practice at times.  You

14    know, no two jail facilities are alike in terms of

15    their physical plant, but, you know, we look at best

16    practices, national practices, industry standards.

17           Here in Louisville we are ACA-accredited.  We

18    just got our second accreditation.  First time

19    that's ever happened.  That is basically compliance

20    with -- with national standards.

21           What we do is we -- you know, we look at --

22    at policies from best practice, industry standards

23    nationwide.  We craft those policies, those

24    procedures to match and to marry up, you know,

25    sometimes local ordinances, sometimes state jail

1    standards. Those go through a very significant,

2    somewhat bureaucratic vetting process.

3         Once they're developed through the entire

4    management staff, corrections, amendments, input

5    could be made on those policies. They come to me in

6    final draft format, I review them. Sometimes I

7    change them based upon my knowledge, significant

8    knowledge of national standards in American

9    Corrections Association standards, state jail

10   standards.

11        Once I approve those, I vet those through the

12   mayor's office for final review, they're signed,

13   implemented, and go into effect.

14   Q.    So would it be a fair statement to say that

15   when you're developing policy, you are going to draw

16   on all these resources and your experience in the

17   positions that you previously have and that you have

18   now, you're going to take input from numerous

19   individuals --

20   A.    Uh-huh.

21   Q.    -- and basically come up with a draft, we're

22   talking about a particular policy or procedure --

23   A.    Uh-huh.

24   Q.    -- and when you have that finalized, you're

25   going to provide that in writing to the mayor, and

1       the mayor is going to give final approval --

2       A.      Not to the mayor, to --

3       Q.      Oh.

4       A.      -- my direct report.

5       Q.      Your who?

6       A.      My direct report.

7       Q.      Okay.  And who is that?  Who is your

8       direct --

9       A.      It's Mr. Hamilton.

10      Q.      All right.  And Mr. Hamilton is whom?  That

11      Doug Hamilton?

12      A.      Correct.

13      Q.      All right.  What's his position?

14      A.      He is Chief of Public Protection, I believe.

15      Q.      And he is -- that's the position he holds

16      with metro government.

17      A.      Correct.

18      Q.      All right.  And your understanding of the way

19      metro government works in regard to your position is

20      that you interact with Mr. Hamilton and you share

21      information with Mr. Hamilton and together you

22      establish policy for the jail.  Taking into

23      consideration all the other --

24      A.      Mr. Hamilton --

25      Q.      Yeah.

20

 1    A.    -- is a -- is a signature -- signature on --

 2    on the policy.

 3    Q.    Okay.  So who --

 4    A.    I don't sit down and go through those

 5    policies word by word with my direct report.

 6    Q.    Let me ask you this:  Since 2008, when you

 7    started in this position, when you have brought

 8    proposed policies, amendments to policies --

 9    A.    Uh-huh.

10    Q.    -- for the jail to Mr. Hamilton, has he ever

11    vetoed any recommendation --

12    A.    Not that I recall, no.

13    Q.    All right.

14          THE REPORTER:  If you can let him finish his

15    question before you begin your answer.

16          THE WITNESS:  Yes, ma'am.

17          THE REPORTER:  Thank you.

18    Q.    Now, let me go back and just ask you some

19    things about what -- what you told us already.

20          In your position as director and probably

21    prior to 2008 when you started at Louisville

22    Metro --

23    A.    Uh-huh.

24    Q.    -- do you -- have you and do you regularly

25    attend workshops, seminars for individuals like

21

1      yourself that are in the field -- in the corrections

2      field that are high administrative officials?

3      A.     Yes, I do.

4      Q.     All right.  Can you tell us some of those

5      seminars that you've been to --

6      A.     Yeah.

7      Q.     -- say over the last five years?

8      A.     Well, I am a -- I'm a graduate of the

9      National Institute of Corrections, which is a

10     federal agency, of their High Level Executive

11     Excellence Academy.

12            I am a member of the Large Jail Network,

13     which is also a -- a unit of the National Institute

14     of Corrections whereby several times a year

15     directors, chiefs, commanders of large jails

16     throughout the country, those are jails of a

17     thousand beds or more, get together and discuss

18     everything from current industry practice to

19     technology to legal issues, and we communicate, you

20     know, throughout the year and on webinars, written

21     articles pur -- you know, pursuant to the industry.

22            I've been a member of that organization for

23     10, 12 years prior to coming here to Louisville.

24     Q.     And during these workshops and seminars,

25     would you have presentations by different experts in

1    the industry?

2    A.    Yes.

3    Q.    And they would talk about many different

4    topics, I'm sure.

5    A.    Correct.

6    Q.    All right.  And among those they'd talk about

7    suicide prevention.

8    A.    I imagine, yes.

9    Q.    Okay.  Do you specifically remember any

10   experts, say, participating in seminars or workshops

11   that was put on by this Large Jail Network?

12   A.    Not that I recall.

13   Q.    Have you attended any seminars or workshops

14   that were concentrating in the area of suicide

15   prevention?

16   A.    Not specifically, but that is an area that

17   is -- especially when discussing things like legal

18   issues, etcetera, they come up on a regular basis.

19   Q.    And in the course of those seminars and

20   workshops, when you're dealing with that type of

21   topic --

22   A.    Uh-huh.

23   Q.    -- are you -- well, strike that.

24         In the course of your attending workshops and

25   seminars with these organizations and de -- and

1    you're dealing with the topic of suicide prevention

2    in jail facilities, do you have -- did you have the

3    opportunity to review statistics of jail mortalities

4    during any particular period of time?  Would that

5    be --

6    A.     Yeah.

7    Q.     -- something that's available to you?

8    A.     Absolutely.

9    Q.     All right.  I'm going to show you what I've

10   marked Deposition Exhibit Number 1 and ask you if

11   that is a -- let me ask you if you recognize it.

12   A.     I've seen documents like this.

13          (Bolton Deposition Exhibit 1 was marked for

14   identification and is filed with this transcript.)

15   Q.     All right.  And what does that document --

16   what is that document?

17   A.     It's the U.S. Department of Justice, Office

18   of Justice Programs, Bureau of Justice Statistics,

19   Mortality and Local Jails 2000-2014, Statistical

20   Tables.

21   Q.     And would this be the type of information

22   that you and your colleagues would rely upon in

23   setting policy, particularly as it pertained to

24   protecting inmates and taking care of inmates

25   regarding keeping them safe?

1    A.    No, because this is -- this is more of a

2    statistical table of numbers.  I mean, this is

3    certainly something that we would look at.  This is

4    not the type of document that we would develop

5    policy off of.

6    Q.    Let me ask this:  I'm not going to ask you to

7    go through this report, obviously, for the purpose

8    of this deposition.  It's like 30 pages long.

9    A.    Uh-huh.

10   Q.    But to summarize a couple of things in this

11   report, let me -- let me make the statement about

12   what it says in this report and ask you if you are

13   aware of it during this time period.

14        The report, summarizing parts of it, this is

15   with the Bureau of Justice Statistics, (Reading)

16   From 2013 to 2014, the number of suicides among

17   state prisoners climbed from 192 to 249, an increase

18   of 30 percent, and suicides made up seven percent of

19   all state prisoner deaths in 2014, the largest

20   percentage since 2001.

21        Would that be a statistical statement that

22   you understood to be true in 2014?

23   A.    Specific to state prisons?

24   Q.    State jails.

25   A.    It says state prisons what you just conveyed.

25

```
 1      Q.     State prisoner deaths.

 2      A.     I'm sorry?

 3      Q.     State prisoner deaths.  So that would be

 4      among all prisoners.

 5      A.     Well, you -- well, you -- I'm sorry,

 6      Counselor, but you conveyed state prisoners.

 7      Q.     Let me read it again.

 8             (Reading) From 2013, 2014, the number of

 9      suicides among state prisoners climbed from 192 to

10      249, an increase of 30 percent.  Thirty percent.

11      Suicides made up seven percent of all state prisoner

12      deaths in 2014, the largest percentage since 2001.

13             Would that have been a subject for us --

14             MR. OGBURN:  Could you tell us where you're

15      reading from?

16      Q.     I'm reading from a summary of this report.

17      A.     Okay.  What page would that be?

18      Q.     It's not in that report.

19      A.     Okay.  Again, what I -- what I hear you

20      conveying to me is state prisoners.  State

21      prisoners --

22      Q.     Well, all state --

23      A.     -- and not --

24      Q.     -- prisoners.

25      A.     -- and not jail inmates, so those are two
```

1    different things.

2    Q.    Okay.  Let me ask you this:  In this report,

3    indicates that the suicide rate for jail

4    prisoners --

5    A.    Okay.

6    Q.    -- in 2014 was 45 per 100,000 prisoners.  The

7    rate for white prisoners was 95 compared to 19 for

8    blacks and 23 for Hispanics.  On average, a prisoner

9    who committed suicide had been in jail for nine

10   days.  About half, 47 percent, of the suicides

11   occurred in general population housing areas, while

12   20 percent were in segregation or special housing

13   units.

14   A.    Okay.

15   Q.    Okay.  Assuming that is true, okay, is that

16   consistent, are these statistics consistent with the

17   state of jail deaths in the country?

18        MR. OGBURN:  Objection to form.  Without

19   knowing exactly where you're reading, I mean, we

20   can't go by your summary to understand what these --

21   these data points are.  I mean, if you want to

22   show --

23        MR. SIMON:  That's an --

24        MR. OGBURN:  -- where you're reading from --

25        MR. SIMON:  That's fine.  That's an

27

1    objection.

2    Q.    Do you understand my question?

3    A.    No, sir; I do not.

4          MR. SIMON:  Okay.  Could you read it back,

5    Tracy?

6          THE REPORTER:  Sure.  Sure.

7          (Reporter read from the record as requested.)

8    A.    Again, I'm going to -- I'm -- I'm going to

9    have to ask you, Counselor, to restate your

10   question, 'cause I'm -- I'm clearly not

11   understanding what you're asking.

12         MR. SIMON:  Okay.  Let's do this.  Can we go

13   off record for a moment?

14         THE VIDEOGRAPHER:  We are off record at 10:13

15   a.m.

16         (Recess from 10:13 a.m. to 10:18 a.m.)

17         THE VIDEOGRAPHER:  We are back on the record

18   at 10:18 a.m.

19   Q.    Director, I'm going to show you what I've

20   marked as Deposition Exhibit Number 2.  This

21   purports to be a summary of the Bureau of Justice

22   Statistics report.

23         I'll give you a moment to get acquainted with

24   that, but I am going to ask you the -- about the

25   statement I made to you before we went off the

1       record, about the fourth paragraph from the bottom

2       where it starts, "The suicide rate for jail

3       prisoners."  All right?

4       A.      Okay.

5               (Bolton Deposition Exhibit 2 was marked for

6       identification and is filed with this transcript.)

7       A.      Once again, Counselor, where are you focusing

8       on?

9       Q.      Be about two full paragraphs from the

10      bottom --

11      A.      Okay.

12      Q.      -- that starts, "The suicide rate" --

13      A.      Gotcha.

14      Q.      -- "for jail prisoner."

15      A.      Okay.

16      Q.      All right.  My question is:  The information

17      that's in that paragraph as to the suicide rate for

18      jail prisoners in 2014 being 45 per 100,000

19      prisoners, is that consistent with what you

20      understood the statistics to be nationwide at that

21      point in time?

22      A.      Based upon that document, yes.

23      Q.      Okay.  But it'd also be consistent with what

24      your understanding was about that -- that type of

25      death in jail facilities?

1    A.    That's what the statistics say.  Correct.

2    Q.    The statistics, are they similar or in line

3    with the type of information you would receive at

4    the seminars and workshops --

5    A.    No, we don't --

6    Q.    -- that you attended?

7    A.    Yeah, we don't -- if I understand your --

8    your -- your -- your question, we don't spend a

9    whole lot of time, if at all, drilling down into

10   statistics.

11        Now, I look at that data as part of my

12   day-to-day body of work in the industry, so I'm very

13   familiar with statistics like this.  We participate

14   in some of these surveys.  These survey

15   documentation may come to us from DOJ and the Bureau

16   of Justice Statistics, and we will participate in

17   those studies, so I am familiar with that.

18        But I also am very aware that statistics

19   are -- are sometimes flawed or inaccurate or not

20   totally representative of the issue at hand.

21   Q.    Okay.  On the second page of Exhibit 1 --

22   A.    Yes, sir.

23   Q.    -- in the box on the top right-hand corner,

24   this is the DOJ's Bureau of Justice Statistics

25   report, it indicates -- it's titled 2015 Preliminary

30

1    Count of Jail Inmate Deaths.

2         It states, (Reading) As of September 6, 2016,

3    a total of 2,891 jails submitted 1,069 local jail

4    inmate death records to the Deaths in Custody

5    Reporting Program.

6    A.    Uh-huh.

7    Q.    "This is a 97 percent response rate.  BJS

8    will publish full details on the 2015 mortality of

9    local jail inmates in 2017."

10   A.    Correct.

11   Q.    Based upon that statement, do you have an

12   opinion about the reliability and the accuracy of

13   these types of statistics?

14   A.    Well, again, I'm not sure how many jails they

15   sent this out to, but I have no reason to discount

16   what's in the document.

17   Q.    And while you're saying this is not the only

18   document and statistics aren't the only factor --

19   A.    Uh-huh.

20   Q.    -- that drives policy, changing policy --

21   A.    Uh-huh.

22   Q.    -- etcetera, it's one thing that you would

23   take into consideration?

24   A.    It's one thing that I'm keenly aware of, yes.

25   Q.    And the report saying that suicides among

31

1      jail prisoners in 2014 were up 13 percent from 2013,

2      would that be consistent with what you understood

3      the statistics to be at that point in time?

4      A.      Now that you bring that to my attention,

5      yeah.

6      Q.      You mentioned accreditation agencies in

7      your --

8      A.      Accreditation bodies, yes.

9      Q.      Okay.  And you mention the ACA.  What does

10     that stand for?

11     A.      American Corrections Association.

12     Q.      And who are they?

13     A.      American Corrections Association is a -- a

14     body that -- they do a lot of things.  They are a

15     lobby and support group for the corrections

16     industry.  They are a -- a data collection, a data

17     warehouse for the corrections industry.  They are

18     advocates for the corrections industry.  They are

19     a -- the largest member association in the business,

20     international.

21             They are the -- kind of the -- the central

22     clearinghouse for correction vendors that are

23     selling goods and services in the corrections

24     industry, and they are also the accreditating entity

25     for establishing guidelines for best practice

1    correctional programs and policies.

2    Q.    Very good.  What is the accreditation

3    process --

4    A.    It's a --

5    Q.    -- by ACA?

6    A.    Yeah.  It -- and again, it's a -- there's

7    our -- there are multi-accreditations that a -- that

8    a jail and a state, maybe even federal institutions

9    and facilities, can get, so it depends on what type

10    of accreditation that you're going after.

11    Q.    Well, explain that.  Are we talking about --

12    A.    Yeah.

13    Q.    -- the size of the facility?  Are we talking

14    about --

15    A.    Yeah.  Well -- yeah.

16    Q.    -- the type of inmates or what?

17    A.    Yeah.  Yeah, I'll -- I'll go into that.

18    Q.    Okay.

19    A.    It is -- in -- in Kentucky, for example, most

20    of the prisons, if not all, are ACA, or American

21    Corrections Association, accredited, and those

22    standards are guidelines that they are in compliance

23    with, or not, are different from those of a jail.

24          In Louisville we have what's called core

25    standard accreditation.  Okay.  And, you know, there

33

1      is a -- there is a full accreditation process which

2      is -- the name is alluding me right now, Counselor,

3      but -- but we are core standard accredited.

4           Basically what those core standards are, they

5      are the mo -- what would be called the primary

6      guidelines of strong corrections programs and

7      practices.  We are the only jail in the state of

8      Kentucky that has such compliance of the 80 or so

9      jails that are in this state.  We are the only one.

10           It is a very complex, convoluted process in

11      terms of going through that compliance program, and

12      it is everything from operations to sanitation to

13      meal service to inmate programs to your medical

14      program, your mental health program, visitation

15      policies.

16           All the important operational policies are

17      encompassed in those guidelines and that

18      accreditation process.

19           There's a -- a high volume of pre-work that

20      goes into that process, you know, applications and

21      data collection, and we send all that electronically

22      to the accreditors.  They are usually subject matter

23      experts in the field.  They review that

24      documentation, they review those policies, they

25      review some of our empirical data.

1           Then there's a site visit, where those

2    monitors will actually come into the facility and

3    spend multiple days, basically, to determine if

4    you're doing what you say and you say what you do.

5    Q.     How long is the accreditation process?

6    A.     In terms of how long --

7    Q.     For --

8    A.     -- does it last?

9    Q.     How long does it last for the -- the core

10   standard accreditation that we talked about?

11   A.     I believe, Cou -- I believe, Counselor, it's

12   a two-year process.  It may be three.

13   Q.     And do you know when this process began for

14   Louisville Metro Corrections while you were

15   director?

16   A.     Yeah, we've -- we've never had it as a metro

17   agency.  It's not mandatory, 'cause it's a lot of

18   work.  But I think we first achieved our first

19   accreditation -- we just got our reaccreditation

20   for -- for 2018, so I think it was probably around

21   2015, maybe.  '14, '15.

22          But we actually started that process in 2009.

23   It was a -- a goal that I wanted to see done here in

24   metro.  It took a lot of work to get us there.

25   Frankly, it took -- it took me about seven years to

1    get there.

2    Q.    Would it be a fair statement to say that as

3    director of LMDC, you set policy for training

4    employees?

5    A.    Correct.

6    Q.    All right.  Tell us about that process.

7    A.    Well, pursuant to KRS and state jail

8    standards, all individuals in the jail business have

9    to go through 40 hours their first year of

10   employment.

11         Now, what that means is that individuals that

12   are statutorily required, if they are a jail

13   employee, to go through 40 hours of training their

14   first year.  Okay.  That's not pre-service training,

15   that's not before they start, that's sometime during

16   that first year employment.

17         So theoretically an individual that is hired

18   on January 1st of 2018 does not have to complete

19   that 40 hours until December 31st, 2018.  Now,

20   that's the standard.

21         Louisville Metro, however, goes through a

22   significant training curriculum.  We go through a

23   very complex vetting process in terms of who we

24   hire, how we background folks.  There's not another

25   jail in the state that -- that goes through the --

1      the process that we do here in terms of

2      backgrounding and training.

3            So every individual that comes into

4      Louisville, they go through nine weeks of

5      pre-service training, which means they don't even go

6      into a housing unit, they don't start work on the

7      clock, they're not assigned to a post until they go

8      through at least nine weeks of training on the front

9      end.  This is after a very rigorous hiring and

10     background process.  They go through nine weeks of

11     training, and then I believe it's three weeks of FTO

12     before they're ever assigned to a post.

13           Now, those nine weeks of pre-service training

14     runs the gamut of everything from physical fitness

15     to CPR, first aid, mental health training, substance

16     abuse training, how to use the computer system, use

17     of force, which is one of the most important

18     principles that we train on, firearms training,

19     defensive tactics training.  I mean, that curriculum

20     goes on and on and on.

21           In addition to that, we require 40 hours of

22     annual in-service training every year.  I can drill

23     down into some of that a little bit more based on

24     what you want to know.

25     Q.    Well, let me concentrate on this.  Among the

1    nine-week pre-service training regimens --

2    A.    Uh-huh.

3    Q.    -- mental health and suicide prevention,

4    what -- what training specifically would be directed

5    to those categories?  How much of that nine-week

6    period is devoted to mental health --

7    A.    Yeah, I -- I --

8    Q.    -- and suicide --

9    A.    -- I'd have to check with my training

10   administrator on that, but I believe it's -- because

11   it -- 'cause what we do, you know, for -- for su --

12   suicide mitigation, for example, you know, that may

13   be intertwined with several things in several

14   curriculums, so, you know, we may be touching on

15   suicide mitigation one day in mental health, then

16   we'll get into, you know, training on signs and

17   symptoms of addiction and treatment and suicide may

18   come up again.

19         So it's -- I -- I feel -- I feel it's a

20   fairly robust training curriculum in terms of mental

21   health, medical, suicide, drugs, detox, etcetera.

22   Q.    On the 40 hours of in-service training that

23   goes on, how much of that is devoted --

24   A.    It's probably --

25   Q.    -- to suicide --

38

1      A.     -- several hours.

2      Q.     Okay.  Let me finish my question.

3      A.     Okay.

4      Q.     Devoted to suicide intervention?  That was

5      the question.  How much of the 40 hours?

6      A.     I believe it's several hours.

7      Q.     Your -- your employees, are they subject to

8      performance review on a regular basis?

9      A.     Yes.

10     Q.     How often?

11     A.     I believe that's annual.

12     Q.     And that is a process that involves what type

13     of superiors to -- to the individual?  Immediate

14     superiors?  Superiors above that --

15     A.     Direct reports.

16     Q.     In terms of your position, Director, do you

17     have any type of peer review that's done by --

18     either internally or any outside agency?

19     A.     I'm not understanding your question.

20     Q.     Okay.  Well, saying employees and staff of

21     Metro Corrections, they're subject to --

22     A.     Correct.

23     Q.     -- review on a yearly basis by supervisors.

24     A.     Right.

25     Q.     And my question is:  As director of the

1      facility, is there any kind of method for reviewing

2      your performance?

3      A.      Yeah, I get reviewed every day.

4      Q.      Okay.  By whom?

5      A.      By my peers, by my colleagues, by my staff,

6      by the media.  All of the above.  I work for the

7      executive branch, I'm appointed.  I'm not covered

8      under civil service.

9      Q.      But is there a formal process where your

10     performance is reviewed on an annual basis?

11     A.      Is there a formal process?

12     Q.      Yeah.

13     A.      Like a form or report?

14     Q.      Yes.

15     A.      No.

16     Q.      Now, the -- the jail is run as a paramil --

17     paramilitary operation when it comes to corrections

18     staff?

19     A.      That's correct.

20     Q.      All right.  And when I describe it as a

21     paramilitary operation, what -- and if that's

22     correct, how would you define that?  What's the

23     chain of command?

24     A.      Chain of command is we have -- we have

25     various divisions within the department.  You know,

1 we have about 680 employees and a nu -- and several

2 hundred contract employees.

3   The civil side of the house is everything

4 from records to classification to clerical staff.

5 The sworn side of the house, that's probably about

6 120 employees. Maybe. Maybe that's -- may be fewer

7 than that on the civil side of the house, which is

8 covered under a contract and collective bargaining

9 agreement under AFSCME.

10   The sworn side of the house was where I

11 believe you're asking me in terms of the

12 paramilitary. Those are our sworn ranks, our

13 officers, our sergeants, our lieutenants, our

14 captains, which -- our shift commanders. We have an

15 operations major, I have a deputy, an assistant

16 director, and a chief staff, and then myself.

17 Probably 460, maybe, sworn staff.

18   Then we have our contracts side of the house.

19 Our food service contract, I think I mentioned this

20 earlier in the deposition, our medical, mental

21 health contract. Some of our maintenance components

22 are contracted out, especially some of our specialty

23 maintenance components, like HVAC systems, etcetera.

24 We're a really old set of facilities.

25   And that's pretty much it. I can get into

1      more minute detail if you wish.

2      Q.     The medical provider for Louisville Metro

3      Corrections in November of 2015 was Correct Care

4      Solutions?

5      A.     I believe so, correct.

6      Q.     And they still are today.

7      A.     Yes, sir.

8      Q.     And that's what you're talking about the

9      contract employees for medical and mental health.

10     A.     Yes, sir.

11     Q.     So other than the civil side staff, which are

12     records, those administrative types of positions?

13     A.     I'm sorry.

14     Q.     Are civil staff what one might consider

15     administrative type --

16     A.     Not entirely.

17     Q.     -- positions?

18     A.     Not entirely.

19     Q.     Okay.

20     A.     No, sir.

21     Q.     Well, again, civil side, you're saying people

22     that work in corrections?

23     A.     Yes.  They're civil -- not civil, they're

24     civilian.

25     Q.     Civilian.

1    A.    Civilian side.

2    Q.    Okay.

3    A.    I'm sorry.

4    Q.    I heard you say civil, but you're talking

5    about civil.

6    A.    Civilian.  I'm sorry.

7    Q.    Okay.  So civilian employees, sworn employees

8    which are like the correctional staff.

9    A.    Correct.

10   Q.    And then you have contracts with other

11   entities --

12   A.    Yes, sir.

13   Q.    -- that provide these other services.

14   A.    Yes.

15   Q.    No other categories, I assume, of people that

16   are on -- that -- that work at Metro Corrections?

17   A.    Oh, we have a very large contingent of

18   volunteers, religious volunteers, AA, NA, substance

19   abuse volunteers.  Some are what you might call

20   paraprofessionals, some are just good people trying

21   to do good things.

22   Q.    But they are not part of LMDC staff.

23   A.    They're not on the payroll; no, sir.

24   Q.    In -- on November 24th, 2015, that was the

25   day that Mr. Troutman hanged himself in his cell, do

43

1    you know how many inmates would've been in

2    corrections, in custody in corrections on that day?

3    A.    On what day again?

4    Q.    November 24th, 2015.

5    A.    I can tell you approximately.

6    Q.    Right.  I wouldn't expect you to tell me

7    exact number, but unless you reviewed some

8    statistic.

9    A.    No.

10   Q.    Okay.  But approximately be fine.

11   A.    Probably around 2,000 inmates, give or take.

12   Q.    And this would've been approximately the time

13   that he was -- he being Mr. Troutman, was found in

14   his cell is 22:47 hours or 10:47 p.m.  You know how

15   many corrections staff would've been on duty at the

16   jail at that time?

17   A.    No.

18   Q.    Well, tell us on second shift at that point

19   in time, what -- what is staffed by corrections?

20   What areas are staffed by corrections?  I'm saying

21   you have to have people on the floor, right?

22   A.    Yeah.

23   Q.    You have corrections officers on the floor.

24   You'll obviously have civilian staff work -- working

25   records at that time?

1    A.    Correct.

2    Q.    Can you estimate the type -- the amount of

3    staff that were there on second shift in November --

4    A.    No.

5    Q.    -- of 2015?

6    A.    No.

7    Q.    Okay.  Well, why don't you give us a layout

8    of the jail?  You house prisoners in different areas

9    of the jail.

10   A.    Correct.

11   Q.    Okay.  You have prisoners at the Community

12   Correction Center on Chestnut Street.

13   A.    Correct.

14   Q.    You have prisoners that are released through

15   court order on home incarceration.

16   A.    Correct.

17   Q.    Now, if I'm concentrating on the metro jail

18   complex, on what floors of the metro jail complex

19   are prisoners housed?  And I'm talking about

20   November 2015.

21   A.    Prisoners are housed in multiple floors and

22   buildings and locations.

23   Q.    Okay.  Prisoners housed on the first floor?

24   A.    Yes.

25   Q.    Okay.  Where are they housed on the first

1    floor?

2    A.     In the booking intake center.

3    Q.     And is that a temporary location for those

4    individuals?

5    A.     Correct.

6    Q.     Then any other type of housing on the first

7    floor?

8    A.     Classification, pre-classification housing.

9    Q.     Temporary as well?

10    A.     Correct.

11    Q.     Okay.  On the second floor, where would

12    inmates be housed on the second floor in the jail?

13    A.     Basically throughout the entire second floor.

14    Q.     Is medical, their medical services on the

15    second floor?

16    A.     Yes, sir.

17    Q.     And mental health offices on the second

18    floor?

19    A.     Correct.

20    Q.     And so would inmates be housed in those

21    units?

22    A.     Yes.

23    Q.     And from time to time can you -- well, strike

24    that.

25           Now, the observation units, are they on the

46

1    second floor?

2    A.    Yes.

3    Q.    And how many observation units are there?

4    A.    I -- I don't know.

5    Q.    Okay.

6    A.    Could not tell you.

7    Q.    Well, we've had observation units described

8    as OBS -- OBS one -- OBS, O-B-S, one and OBS two.

9    A.    Correct.

10   Q.    Do you know what they're talking about?

11   A.    Yes.

12   Q.    What are they?

13   A.    Observation one would be individuals that are

14   under acute suicide observation, and level two would

15   be not acute, but under close monitoring, under

16   close observation and the like.

17   Q.    And do you know the capacity for the number

18   of inmates in each of those units?

19   A.    It fluctuates.

20   Q.    Can you tell us approximately the number of

21   positions that would be available to house an inmate

22   in observation one during November of 2015?

23   A.    No.  No.

24   Q.    You couldn't estimate that for us?

25   A.    Again, if I can understand your question a

1    little more succinctly, I'd try to answer it.

2    Q.    Question is in November of 2015 --

3    A.    Uh-huh.

4    Q.    -- can you estimate for us the number of

5    places -- well, let me -- let me start over.

6          Can you estimate for us in November of 2015

7    at Metro Corrections for observation one the

8    capacity of that unit?

9    A.    No, I can't.  Again, that -- that's --

10   that -- that's dynamic and it fluctuates.  Now, I

11   can go back and look at a population report from

12   that day.  If you have one to share, I can look at

13   that.  As well as a shift report, I can look at

14   that.

15   Q.    All right.  Well, what -- what I'll ask is

16   that if you don't -- if you don't have that, I would

17   ask that that be produced for the plaintiff.

18         Would you have the same answer for

19   observation two?

20   A.    Yes.

21   Q.    Is that you'd need to refer to the --

22   A.    Yeah.

23   Q.    -- documentation and the statistics --

24   A.    Yeah.

25   Q.    -- from the jail?

1    A.    Yeah.

2    Q.    Okay.  So what is -- is there a primary

3    directive to corrections staff when it comes to what

4    their job is?

5    A.    There are policies, yes.

6    Q.    Well, when it comes to the safety of inmates

7    and staff at the jail, where does that rank on a --

8    on the job description of a Louisville Metro

9    Department of Corrections employee?

10   A.    The mission statement.

11   Q.    Very good.  And would you consider that to be

12   a similar type of mission statement for the mental

13   health and medical provider at your facility?

14   A.    I don't know exactly what the mission

15   statement is for the medical provider.

16   Q.    Would you consider that type of directive to

17   be an important part of the policy of a mental

18   health --

19   A.    Yes.

20   Q.    -- and medical provider at a facility like

21   yours?

22   A.    Yes, sir.

23   Q.    Do you consider suicide -- let me rephrase

24   that.

25         In -- in your training and your experience,

1    do you consider a -- an inmate who was suicidal --

2    excuse me.  Oh, sorry.  I apologize.

3    A.    I did that too, Larry.

4    Q.    From your training and experience, would you

5    consider an inmate who is suicidal as an individual

6    that had a serious medical need?

7    A.    Who is acutely suicidal, yes.

8    Q.    And would you consider a person that was

9    acutely suicidal of being under a substantial risk

10   of harm?

11   A.    Acutely suicidal?

12   Q.    Uh-huh.

13   A.    Yes.

14   Q.    And what would you describe -- how would you

15   describe an individual that's acutely suicidal?

16   A.    An individual that has current, here and now,

17   active suicidal ideation, thoughts of self-harm.  At

18   risk of doing it.

19   Q.    And would it be a fair statement that your

20   policies that exist at Louisville Metro Corrections

21   are designed to protect an inmate who is in that

22   zone, who is acutely suicidal?

23   A.    Yes.

24   Q.    And your training of your civilian and sworn

25   staff, that is also designed to protect that inmate

1      who's in that position of being acutely suicidal?

2      A.     As well as the contract medical, mental

3      health; yes, sir.

4      Q.     And have you designed, during the course of

5      time that you've been the director from 2007 to the

6      present, policies and procedures that -- that are

7      consistent with that directive, to protect that

8      inmate, that type of inmate?

9      A.     Policies, procedures, and practices,

10     absolutely.

11     Q.     Okay.  I'm going to show you what I'm marking

12     Deposition Exhibit 3 and ask you if you can identify

13     that exhibit.

14     A.     I can.

15     Q.     Excuse me?

16     A.     I can identify it, yes.

17            (Bolton Deposition Exhibit 3 was marked for

18     identification and is filed with this transcript.)

19     Q.     Yes.  Go ahead.

20     A.     It is the policy 04-4.08 titled Suicide

21     Prevention, Intervention.

22     Q.     Now, the effective date of this policy is

23     indicated as what?

24     A.     The effective date of this policy is 2-26 of

25     '17.

1    Q.    And it replaced or superseded the policy --

2    A.    Yes.

3    Q.    -- in this category --

4    A.    Correct.

5    Q.    -- from April 10th of 2014?

6    A.    Correct.

7    Q.    Now, Director, can -- can you tell us whether

8    or not there were any changes in this policy from

9    the policy that was superseded and in effect on

10   April 10th of 2014 and replaced by this policy?

11   A.    No, I can't.

12   Q.    And do you know whether or not the previous

13   policy is archived at corrections --

14   A.    Oh, I'm sure --

15   Q.    -- where you can obtain it?

16   A.    I'm sure it is, yeah.

17         MR. SIMON:  Okay.  Can we go off record for a

18   moment?

19         THE VIDEOGRAPHER:  We are off the record at

20   10:54 a.m.

21         (Recess from 10:54 a.m. to 10:58 a.m.)

22         THE VIDEOGRAPHER:  We are back on the record

23   at 10:58 a.m.

24   Q.    All right.  Director, when we went off I was

25   showing you Exhibit Number 3, which is Suicide

1      Prevention and Intervention, correct?

2      A.     Yes, sir.

3      Q.     All right.  Now, looking on the second page

4      of that document, under Protocol in section B,

5      Suicide Prevention and Intervention.

6      A.     Yes, sir.

7      Q.     Could you read in the record the provisions

8      two and three in that paragraph?

9      A.     Are these ones that you have circled?

10     Q.     Yes.

11     A.     Number two --

12     Q.     Apologize for not having a clean copy, but

13     that's what I had.

14     A.     Not a problem.

15     Q.     Okay.

16     A.     Number two, (Reading) The program includes

17     staff and inmate critical incident debriefing that

18     covers the manage -- management of suicidal

19     incidents, suicide watch and death of an inmate or

20     staff member.

21            Number three, "The LMDC suicide and

22     prevention program ensures a review of critical

23     incidents by administration, security and health

24     services staff."

25     Q.     The combination of those two policies, what

1      does that mean to you?

2      A.    I'm not -- again, Counselor, I'm not

3      understanding your question.  If you could rephrase,

4      please.

5      Q.    Well, when your policy says inmate -- talks

6      about inmate critical incident debriefing, okay,

7      what are inmate critical incidents?

8      A.    Whenever we have a -- a critical incident,

9      and a critical incident could be anything from a --

10     a disturbance to a serious staff injury to a inmate

11     death, it is basically an after action review of

12     that incident, the who, the what, the when, the

13     where, the how, the why, and reviewing that incident

14     from -- from its onset at whatever point we became

15     aware of it through the incident itself, their

16     response, what did we do good, what could -- how

17     could we do better.  It's a critique in debriefing

18     and what did we do right, what did we do wrong.

19     Q.    Now, from your own memory, do you know

20     whether or not those two pro -- provisions were

21     included in the LMDC policy under this index number

22     in November of 2015?

23     A.    Not with -- Counselor, we're -- our policies

24     are like War and Peace, so if I -- if I saw it, I

25     could -- I could --

1    Q.    All right.

2    A.    -- respond to that question.

3    Q.    All right.  Director, I'm going to give you a

4    document that I've labeled Deposition Exhibit 4.

5    A.    Are we done with 3?

6    Q.    For the time being, yes.

7    A.    Okay.

8          (Bolton Deposition Exhibit 4 was marked for

9    identification and is filed with this transcript.)

10   Q.    Okay.  Do you recognize Exhibit 4?

11   A.    I recognize it as a policy 04-4.01 titled

12   Health Care Services - Staffing and Authority and

13   Responsibilities.

14   Q.    Now, directing your attention on page 3 under

15   Protocol, which starts on the day be -- on the page

16   before that and continuing under Responsibility, can

17   you read in the record numbers five and six that

18   are --

19   A.    Un --

20   Q.    -- under A for pa -- on page 3?

21   A.    Yes, sir.  Number five and six?

22   Q.    Yes.

23   A.    Number five, (Reading) The health authority

24   shall immediately report any conditions pose --

25   posing a danger to staff or inmate health and

1        safety.

2              Number six, (Reading) Quarterly statistical

3        reports shall be prepared and include, at a minimum,

4        the use of health care services by category,

5        referrals to specialists, prescriptions written, lab

6        and x-ray tests completed, off-site hospital

7        admissions, serious injuries or illnesses, deaths

8        and off-site transportation.  These reports shall be

9        submitted to and reviewed by the health authority,

10       Major of Operations and Director.

11       Q.    Okay.  So the combination of those two items,

12       they pertain to the healthcare provider at your

13       facility?

14       A.    Yes, sir.

15       Q.    And what are these two provisions designed to

16       accomplish?

17       A.    Essentially these are in support of our

18       mission, the health and safety of the institution.

19       Q.    Would it be fair to state -- say that they

20       provide a scheduled review process towards your

21       mission, accomplishing your mission?

22       A.    On number five, no.  Number five states

23       "shall immediately report," so that's ongoing and

24       dynamic.  That would be as -- as something occurs,

25       as immediately as possible with respect to that.

1          Number six is scheduled, which states

2     quarterly.

3     Q.     And when it says, "These reports shall be

4     submitted to and reviewed by the health authority,"

5     are we talking about CCS in general?

6     A.     That would be the contract provider.

7     Correct.

8     Q.     All right.  And at that time it was CCS.

9     A.     Yes, sir.

10    Q.     And the Major of Operations, who's that

11    individual?

12    A.     It's currently Major Chuck Ev -- Eggers.

13    Q.     In 2015 who was Major of Operations?

14    A.     Oh, boy.  I believe it was Major Eggers.  I'd

15    have to go back and check that for sure.

16    Q.     And, of course, you were the director then.

17    A.     Yes, sir.

18    Q.     On page 5 of this document, starting with

19    section C, has Health Care Internal Review and

20    Quality Assurance?

21    A.     Yes, sir.

22    Q.     Continuing on to the next page, on page 6, in

23    the subheadings under d., which states, "On-site

24    monitoring of health services outcomes on a regular

25    basis through," can you read into the record the

1       provisions of little v, little vi, and little vii?

2       A.      I'm sorry.  One more time.

3       Q.      Can you read these provisions --

4       A.      Top of page 6?

5       Q.      Yeah.  Well --

6       A.      Starting with v?

7       Q.      Yeah.  Starting with v.

8       A.      Okay.

9       Q.      A re -- starting with v, so that would be --

10      A.      Okay.  "Reviewing all deaths in custody,

11      suicide attempts and illness outbreaks."

12              You want me to keep going?

13      Q.      Yes, the next two.

14      A.      "Developing and implementing corrective

15      action plans to address and resolve identified

16      problems and concerns."

17              Vii, "Reevaluating problems or concerns to

18      determine whether the corrective measures have

19      achieved and sustained the desired results."

20              Viii, "Incorporating findings of internal

21      review activities into the organization's

22      educational and training activities."

23      Q.      Okay.  That's good.

24      A.      Okay.

25      Q.      Now, let me ask you, those four provisions,

1    v, vi, vii, and viii, okay, what do they mean to

2    you?  What -- what is -- what is the goal of these

3    policies and procedures, that section?

4    A.     These focus on healthcare, internal review,

5    and quality assurance.

6    Q.     So when there is a suicide or a suicide

7    attempt, it is the directive of this policy to

8    review that incident; is that correct?

9    A.     "Reviewing all deaths in custody, suicide

10   attempts and illness outbreaks."  Yes, that's what

11   it says.

12   Q.     And when that review takes place, who

13   participates in that review?

14   A.     We meet daily as part of our -- we have daily

15   briefings five days a week.  Those briefings last

16   anywhere from an hour on up to maybe even two hours

17   depending upon what's gone on the preceding 24-hour

18   period.

19          Those briefings on Monday are inclusive of

20   Saturday or Sunday, so those encompass a 96-hour

21   period.  So we are constantly reviewing incidents,

22   critical incidents.  Inclusive in that would be

23   suicide attempts, suicides, which there are not very

24   many, fights, assaults, use of forces, significant

25   medical concerns.

1    Q.    Why do you do that?

2    A.    Again, are we -- are we saying what we do?

3    Are we doing what we're saying?  Are we -- we are

4    one of the few jails that I have ever been

5    associated with that reviews daily, that does a

6    daily review of the preceding 24, 48, 96 hours, and

7    we do that so we can quickly identify what we're

8    doing right, we can quickly identify maybe what we

9    can do better.

10   Q.    I'm going to show you what I've marked

11   Deposition Exhibit Number 5, ask if -- whoop.

12   Sorry.

13         (Bolton Deposition Exhibit 5 was marked for

14   identification and is filed with this transcript.)

15   Q.    Tell us, if you would, Exhibit 5, how does

16   that relate to what you just testified about, if it

17   does?

18   A.    Looks like a -- it's cut off at the top, but

19   I believe it says Daily Incidents 11-13-2015.  It

20   looks like a -- a supporting document to a shift

21   report.

22   Q.    Now, is this the type of agenda that would be

23   set up for the type of daily review that you've just

24   testified to?

25   A.    This could be a and likely is a ancillary

60

1    document that drives a bigger report.

2    Q.    But this is part of the process.  This

3    document would be representative of the process that

4    your employees go through in evaluating incidents

5    that happen in the jail that may have an effect on

6    the health and the welfare of inmates.

7    A.    Well, this is -- and, again, if I understand

8    your -- your -- your -- your -- your -- your -- I'm

9    not sure if you're making a comment or a question,

10    so I'm going to ask you to repeat.

11    MR. SIMON:  Okay.  Can you read the question

12    back, Tracy?

13    THE REPORTER:  Sure.

14    (Reporter read from the record as requested.)

15    A.    Again, that -- I'm understanding that as a --

16    as a comment, not a question, so if it could be

17    rephrased, please.

18    Q.    Okay.  What -- what does this document

19    represent when it comes to evaluating extraordinary

20    incidents?

21    A.    Okay.  What this is, Counselor, this is a --

22    a -- a incident report, okay, and there could be

23    many of these that occur on a shift.  You know, we

24    are operating a -- really a city under several sets

25    of roofs of people that don't really want to be

1   there, many with problems, addiction, mental health

2   issues, etcetera, so we have a lot of things that go

3   on on a -- on a shift.

4        This is an example of a -- of an incident

5   that will go into that daily briefing that I'm

6   talking about that gets reviewed the next day.  So

7   this is -- this is a -- a -- an example of an

8   incident that occurred on 11-13 of 2015 on or around

9   1805 hours.

10  Q.    And the -- the -- the people that contribute

11  to the information that would be indicated in that

12  incident, they are like the frontline people on --

13  A.    Yes.

14  Q.    -- your staff that observed it.

15  A.    Yes, sir.

16  Q.    All right.  And -- well, tell us what an

17  Extraordinary Incident Report is.

18  A.    Okay.  It would be -- could be a use of

19  force, if we had to use a reasonable force on an

20  individual to gain compliance.  It could be a

21  medical emergency.  Everything from a suicide

22  attempt, to somebody harming themselves, to an

23  individual that has sustained an injury during

24  recreation, to a fight, to a disturbance, to a

25  significant maintenance issue, to a breach of the

62

1     perimeter.  It could be one of hundreds of things.

2     Q.    Is what you're talking about are things that

3     could affect the personal safety of an inmate or

4     staff?

5     A.    It could.

6     Q.    Okay.  Is that what we might find in

7     Extraordinary Incident Reports?

8     A.    One of them of many, yes.

9     Q.    And these reports are -- how are -- how are

10    they produced?

11    A.    They're produced in a automated jail

12    management system.

13    Q.    Okay.  What do you call it?

14    A.    The vendor is a company out of Texas called

15    Securus, that division is called Archonix, and that

16    product is called XJail.

17    Q.    Okay.  And that is what is commonly referred

18    to as XJail by members of your staff.

19    A.    Correct.

20    Q.    When your staff members observe -- we're

21    talking -- let's talk about this:  When your

22    corrections staff observe an incident that would

23    qualify for being an extraordinary incident to be

24    written up as a report, what's their duty at that

25    time?  What's their duty when that occurs?

63

1      A.     To recur -- to record the who, the what, the

2      when, the where.

3      Q.     Okay.  And how do they do it?

4      A.     I'm not tracking your question to how --

5      Q.     Well, how do they do it where it becomes an

6      electronic record?

7      A.     Oh, it goes into the jail management system.

8      Q.     Now, we've learned from this case that the

9      frontline officers are generally told by their

10     supervisors that they need to make an entry about

11     what they observe for an Extraordinary Incident

12     Report before they get off shift.

13     A.     Correct.

14     Q.     Okay.  Is that a -- is that --

15     A.     For the most part, yeah.

16     Q.     Does that seem to be the way things should

17     work --

18     A.     Yes.

19     Q.     -- so it's fresh in somebody's mind?

20     A.     Correct.

21     Q.     All right.  And multiple employees of Metro

22     Corrections can log into XJail.  Can they log into

23     XJail and complete their narrative of what happened?

24     A.     Yes.  The supervisor has to open that

25     gateway, but yes.

1    Q.    And these reports on XJail, are they

2    available?  Who are they available to?

3    A.    To people that have authorization.

4    Q.    Okay.  Who are the people that have

5    authorization?

6    A.    I mean, there are numerous people that have

7    that authorization.

8    Q.    Okay.  Well, tell --

9    A.    Most of -- most of the sworn staff.  Some of

10   the civilian staff.  And the reason, Counselor, that

11   I'm -- I'm trying to answer your question.  It is a

12   very robust system, and so individuals may only be

13   authorized certain access points within that system.

14         So a person that is working in records is not

15   going to be able to access some of our internal

16   investigative modules, for example.

17         So there are -- the majority of the staff

18   have access to at least some modules in that system.

19   Q.    Now, the information that is contained of

20   Mr. Troutman's incident on November 13th of 2015 in

21   Exhibit Number 5 --

22   A.    Yes, sir.

23   Q.    -- would that information be available to

24   supervisors of the corrections staff that prepared

25   that report?

1     A.     Yes.

2     Q.     And would it be available to the -- well,

3     strike that.

4            What position would be or rank would be the

5     immediate supervisors of the staff members --

6     A.     Sergeant.

7     Q.     -- that prepare that report?

8     A.     Sergeant.

9     Q.     Okay.  They oversee the --

10    A.     Or lieutenant.  Yeah.

11    Q.     Okay.  They oversee the -- the online staff,

12    sergeants do.

13    A.     Correct.

14    Q.     All right.  And that the supervisors of

15    sergeants, which would be lieutenants?  Majors?

16    A.     I'm sorry?

17    Q.     Who are the supervisors of sergeants?

18    A.     Lieutenants.

19    Q.     Okay.  So would this information be available

20    to lieutenants?

21    A.     Yes.

22    Q.     And would it also be available to others up

23    the chain of command to yourself?

24    A.     Yes.

25    Q.     Would this information be available to

1    individuals working with your medical provider, the

2    Extraordinary Incident Report like the one you have

3    in front of you?

4    A.    Not sure.  Again, I need to understand your

5    question.  Individuals working with the medical

6    provider?

7    Q.    Yes.  Let's say nurse --

8    A.    Or with the medical provider?

9    Q.    Let me ask it this way:  The information that

10   you have in front of you, like an Extraordinary

11   Incident Report of --

12   A.    Uh-huh.

13   Q.    -- what happened on November 13th of --

14   A.    Okay.

15   Q.    -- 2014, through the XJail system, is that

16   available in the nurse's station?

17   A.    Yes.

18   Q.    And if an individual is an employee of CCS as

19   a nurse, would they have access to --

20   A.    This informa --

21   Q.    -- that -- that information?

22   A.    Yes.

23         MS. O'REILLY:  Objection.  Form.  Foundation.

24   Q.    Would it surprise you that a member of the

25   nursing staff of CCS testified in a earlier

1    deposition this case that she didn't have access to

2    XJail?

3    A.    Would that surprise me?

4    Q.    Yes.

5    A.    I find that curious, yes.

6    Q.    Okay.  Well, what -- well, what's your

7    expectation for a member of the medical staff, your

8    medical provider, when it comes to accessing that

9    information?  Why is that important?

10   A.    Well, again, you know, we are a very large

11   system, a very large jail system, and the

12   expectation is that people communicate multiple

13   ways.  Okay?  You communicate through telephone, you

14   communicate through radio, you communicate person to

15   person.  We have a jail management system.  We

16   have -- or our provider has an electronic health

17   record system.

18         And so there are multiple avenues, in --

19   including face-to-face, in which to communicate

20   pertinent information.  It's not just through one

21   avenue.

22   Q.    You said that you found that individual's

23   testimony to be curious.  Why do you feel that way?

24   A.    'Cause what I think I heard, and we may have

25   to go back and -- and -- and refresh.  If you could

68

1        refresh my -- my response to that question, please.

2             MR. SIMON:  Sure.  Tracy, is that possible?

3             THE REPORTER:  I'm sorry.  Exactly what would

4        you like me to read?

5             MR. SIMON:  The director had made a statement

6        to the effect of he -- he -- he felt or said that a

7        particular individual saying that they didn't have

8        access to XJail, who was a nurse with the healthcare

9        provider, felt that was curious that that person

10       said they didn't have access to XJail.

11            Yeah.  Could you read the question and the

12       answer?

13            THE REPORTER:  Sure.

14            (Reporter read from the record as requested.)

15  A.     Okay.  So your question is?

16  Q.     Why do you find that curious?

17  A.     Well, I find it curious that in -- in --

18       probably more so now that I've -- I've heard the

19       question and my response, that a contract medical or

20       mental health staff would not be aware of the

21       specifics of an incident in which they were called

22       to respond.

23            Now -- and again, whether that was vis-à-vis

24       a telephone call or a radio call or a escort from an

25       operations point A to point B or healthcare staff

1      that was in the vicinity, yeah, I find that -- I

2      find that -- I mean, there are just so many multiple

3      ways that we communicate.

4      Q.     Okay.  So how does this information that's in

5      Exhibit 5 about the Extraordinary Incident Report,

6      for example, of Mr. Troutman's suicide attempt on

7      November 13th, 2014, how is that information

8      communicated to the healthcare provider?

9             MS. NORRIS:  2015.  2015.

10     Q.     2015.  Excuse me.

11     A.     Yeah.  Again, I -- I -- I -- I -- I tried to

12     convey my response.  Maybe I wasn't clear.  It's

13     going to be a multiple of ways.  It's going to be

14     through -- again, through phone communication, radio

15     communication, personal escort, being close to the

16     proximity of -- of an incident.  It's going to be

17     in -- I -- I believe in this case there was

18     something in the in -- in the inmate medical record.

19             So communication moves back and forth a

20     multitude of ways.

21     Q.     And why is that important for the healthcare

22     provider to have that information?

23     A.     So they can -- when an incident occurs, it --

24     it's just like a serious incident on the street with

25     police.  You know, when you are first brought to the

1    attention of something or made aware of something,

2    there could be a million things going on at the same

3    time, and same things get sorted out and the issue

4    or the challenge gets dealt with.

5         It's -- it's really no different in a -- in

6    a -- in a jail environment.  So communication is

7    moving -- especially on a critical incident, it

8    could be moving multiple different ways through

9    multiple pathways.

10        But in the end it's -- it is mission critical

11   to sort out the facts, deal with the -- with the

12   issue or the challenge at hand, provide care in a

13   situation like this immediately, to assess that

14   situation, to follow up with that situation, and

15   having information available is -- is -- is very

16   important to ensure that that gets done.

17   Q.    Would you include the mental health

18   professional or mental health professionals of your

19   healthcare provider to be among the people that

20   should have access to that information?

21   A.    At some point, absolutely.

22   Q.    And would you expect that a health

23   professional, a mental health professional would

24   refer to the information much like the information

25   that's in that Extraordinary Incident Report when

1    they are making determinations as to whether that

2    person should be released back into the general

3    population?

4         MS. O'REILLY:  Objection.  Form.  Foundation.

5    Q.    You can answer.

6    A.    I'm going to ask you to rephrase.

7         MR. SIMON:  Can you restate it?  Can you

8    re -- read it back for us, please, Tracy?

9         THE REPORTER:  Sure.

10        (Reporter read from the record as requested.)

11   A.    A mental health professional and a mental

12   health staff and psychiatric staff is going to rely

13   on a multitude of factors with respect to evaluating

14   an individual that's been referred, and certainly

15   revealing that incident is one of those things that

16   more than likely they're going to be referring to,

17   as well as many others.

18   Q.    Okay.  Why would it be important to the

19   mental health professional to review the online

20   corrections staff version of what happened?

21   A.    'Cause the -- the corrections officers are --

22   are usually -- not all the time, but are usually the

23   first responders to a significant event, and that

24   first response is a -- is more than likely a

25   foundation and a triggering event that produces

1    additional response from medical and mental health

2    staff.  Or EMS, for that matter.

3    Q.    And your corrections staff are trained to

4    deal with the situation, correct?  That -- as it's

5    happening?  A situation that --

6    A.    Corrections officers are trained to deal with

7    significant events as they occur, and significant

8    events, as I stated earlier, could be a litany of

9    things.

10   Q.    But similar to the one that's in Exhibit 5.

11   A.    As a first responder, yes.

12   Q.    All right.  And their narrative about what

13   happens is the record of that event for purposes of

14   corrections, is it not?

15   A.    Yes.

16   Q.    Would you expect that the mental health

17   professional that determines whether an individual

18   is released from observation back into the general

19   population of your jail would refer to those reports

20   before making that decision?

21   A.    I'm not going to -- I'm not a mental health

22   professional, so I'm not going to act like I am, but

23   that information from a foundation perspective as

24   we -- as we just discussed, whatever that incident

25   was that created the need for that individual to be

1   assessed and evaluated, I think that answer speaks

2   for itself.

3   Q.     And you say that because you have the

4   background and the experience of all the training

5   that you told us about earlier, that --

6   A.     Thirty-seven years.

7   Q.     -- you would have that expectation.

8   A.     Thirty-seven years, yeah.

9   Q.     Director, this is a general question, so I'll

10  refine it if you'd like, but how well do you know

11  your staff in terms of knowing who they are?  You

12  understand what I'm saying?

13  A.     No.

14  Q.     Okay.  If I ask you about particular

15  individuals that were -- either testified in the

16  case, defendants in the case --

17  A.     Okay.

18  Q.     -- let me ask you if you know them.

19  A.     Okay.

20  Q.     Sergeant Eric Schmitt.

21  A.     I know -- I wouldn't recognize his face.

22  Q.     Okay.  That's a good -- I'm just going to ask

23  you, do you know that person to see him, have you

24  interacted with them, just could you tell us more

25  about that.

1          So Schmitt is that you recognize the name,

2     but --

3     A.    Right.

4     Q.    -- you wouldn't know him if you saw him.

5     A.    Correct.

6     Q.    Corrections Officer Dustin Miller.

7     A.    I know who he is.

8     Q.    Corrections Officer Randell Ramey.

9     A.    I don't know who he is.

10    Q.    Corrections Officer Terry Warden.

11    A.    I know who he is.

12    Q.    Okay.  How do you know him?

13    A.    I just know the name.  I think I know his

14    face.

15    Q.    All right.  Nurse Kimberly Brown?

16    A.    No.

17    Q.    Nurse Temp.  Temple.

18    A.    I've got a thousand staff, Counselor,

19    including contractors.

20    Q.    Well, I know.

21    A.    Yeah, it's -- it's not --

22    Q.    I know.

23    A.    -- ringing any bells.

24    Q.    I'm not saying --

25    A.    Yeah.  Yeah.

75

1    Q.    You understand my question.

2    A.    Right.  Right.

3    Q.    Nurse Schindler is a male nurse, works with

4    CCS.

5    A.    I believe I've had discussions with him.  I

6    believe he's no longer there.

7    Q.    And when you've had discussions, were they in

8    person?

9    A.    General walking out the door, how you doing

10   kind of thing.

11   Q.    Prisoner Classification Interviewer James

12   Cox.

13   A.    I know who he is.

14   Q.    How do you know Mr. Cox?

15   A.    He's been there for a while.  I believe he

16   works in -- I believe he may have worked in records

17   and now classification.

18   Q.    Nurse Denning, CCS staff.

19   A.    No.  No, I don't.

20   Q.    Dr. Donna Smith, psychiatrist.

21   A.    Yes.

22   Q.    How do you know Dr. Smith?

23   A.    She is a psychiatrist with a significant

24   background in correctional healthcare.  I've got a

25   lot of respect for her.  I've had multiple

76

1     discussions with her regarding the business,

2     experiences that she's had in corrections.

3            Her -- her and I have a -- kind of a similar

4     background with state corrections as well as local

5     corrections.  I've just gotten to know her from a --

6     you know, from a very broad perspective over the

7     years.  Not a person I've ever had lunch with or

8     socialized with.

9     Q.     Okay.  But you know her professionally?

10    A.     Yeah.  Absolutely.

11    Q.     All right.  Stand by.  I'm going to show you

12    what I've marked Deposition Exhibit Number 6, and

13    when you're ready, tell us what that document is.

14    A.     This document is 05-1.02, a Classification

15    Assessment.

16           (Bolton Deposition Exhibit 6 was marked for

17    identification and is filed with this transcript.)

18    Q.     Again, that has an effective date of

19    12-31-15?

20    A.     With a revise date of 2-3-17.  So correct,

21    yes, and has a revise date of 2-3-17.

22    Q.     The question that I asked you before, if the

23    previous policy in this cla -- in this title was

24    replaced, you would have to refer to it to tell us

25    what the differences were?

1    A.    Yeah, not replaced, but revised from --

2    Q.    Revised.

3    A.    -- potentially.

4    Q.    Okay.  Credit that correction to my question.

5    Revised.

6          Now, directing your attention to page 5 of

7    this document.  And I don't know if I have 6, but

8    let me ask you about 5.

9    A.    Okay.

10   Q.    Under section F for Classification Overrides,

11   read that to yourself and then tell us -- I'm going

12   to ask you a question about what that pertains to.

13   A.    Okay.  What's your question?

14   Q.    So what -- what -- we're talking about

15   classification overrides, obviously --

16   A.    Right.

17   Q.    -- 'cause that's --

18   A.    Correct.

19   Q.    -- the title.  So what does this section of

20   your policy mean?

21   A.    We utilize an objective classification system

22   that's called the SARN, S-A-R-N.

23   Q.    What does it stand for?

24   A.    I'd have to get back to you on that,

25   Counselor.

1    Q.    Okay.

2    A.    It's on -- that's on the tip of my tongue.

3    Q.    That's all right.

4    A.    I'm sure I'll come up with it.

5          But that is a validated classification

6    instrument, which validated means it's been proven

7    to work.  Within the -- within the guidelines of

8    that classification system, and most validated jail

9    classification instruments have what's called a

10   subjective override component to them, and that

11   component allows the experienced person that's doing

12   that assessment the ability to override those

13   objective components based upon a multitude or

14   variety of factors.

15   Q.    Now, according to your policy, is that --

16   when there is such an override, is that documented?

17   A.    It should be.

18   Q.    All right.  Does it indicate in the policy

19   that that is required?

20   A.    That's what it says, yes.

21   Q.    And that's your expectation, is that if

22   classification does do an override, that it should

23   be documented.

24   A.    My expectation is we follow all policies.

25   Q.    Does this section pertain to inmates that are

1      on an inmate alert, no barred single cells?  Does

2      that -- does this policy pertain to inmates on

3      that -- in that category?

4      A.    I'd have to go through the whole policy.  I

5      don't see it in that part that we read.

6      Q.    What's that?  Tell me --

7      A.    I said I'd have to read the entire policy.

8      Q.    You mean this section of the policy that

9      I've -- Classification Assessment?

10     A.    Yes.

11     Q.    Okay.  Well, take your time and go ahead and

12     read that.

13     A.    The whole policy?

14     Q.    Yes.

15          MR. SIMON:  I need page 6.

16          (Ms. Norris left the deposition room

17     momentarily.)

18     A.    Looks like I might be missing a page.

19     Q.    I'm missing a page too.  We're going to come

20     back with that.

21     A.    Yeah, I'm going to need to take a break.

22     Q.    Sure.  Let's take a break.

23          THE VIDEOGRAPHER:  We are off the record at

24     11:43.

25          (Recess from 11:43 a.m. to 11:52 a.m.)

1          THE VIDEOGRAPHER:  Okay.  We are back on the

2     record at 11:52 a.m.

3     Q.     Director, you've had an opportunity to review

4     this policy and procedure of LMDC, Classification

5     Assessment?

6     A.     Yes, sir.

7     Q.     And from your examination of that document,

8     does this relate in any way to the Inmate Alert

9     Report to prevent inmates from being placed in

10    single cells with bars?

11    A.     I don't see the word -- I think you said

12    alert of bars.  I don't see that in here.

13    Q.     All right.  I'm going to show you what is

14    marked Deposition Exhibit 7.  And let's -- if you

15    could look at the first two pages of that exhibit,

16    and after you've done so, can you tell us what --

17    what that document purports to be?

18    A.     Louisville Metro Department of Corrections,

19    Inmate Alert Report.

20         (Bolton Deposition Exhibit 7 was marked for

21    identification and is filed with this transcript.)

22    Q.     And the name of the alert?

23    A.     No bars single cell.

24    Q.     All right.  So what is the purpose of this

25    Inmate Alert Report?

1      A.    Well, as -- as -- as I pointed out, you know,

2      we are an old jail, and even new jails, a jail has

3      bars.  I think we can -- we can agree to that.  And

4      older jails have a lot of bars.

5            And as a result of historical challenges in

6      trying to mitigate some of the physical plant

7      nuances that we have in terms of individuals that

8      may have acute suicidal ideation, we developed a --

9      a protocol or a practice engaged in a discussion,

10     how can we mitigate some of our physical plant

11     challenges as it relates to dealing with individuals

12     that may have challenges.

13     Q.    So my question is this.

14     A.    Uh-huh.

15     Q.    Deposition Exhibit 6, the policy on --

16     A.    Uh-huh.

17     Q.    -- classification assessment --

18     A.    Right.

19     Q.    -- does that relate in any way to the Inmate

20     Alert Report that says no bars single cells?

21     A.    Not specifically, no.

22     Q.    Well, generally does it pertain to -- pertain

23     to that, to the Inmate Alert Report?

24     A.    I think there are -- and, again, when I --

25     when I read the classification assessment, you know,

82

1    I think it's inherent in a lot of the elements of

2    the classification policy that we are going to

3    assess an individual's classification, and it

4    conveys how we are going to do that, and -- and

5    that's by looking at risks, looking at protective

6    custody factors, looking at classification

7    assignments, location, etcetera.

8    Q.    Any other sections of Deposition Exhibit 6

9    regarding classification assessment that you would

10   consider to be in conjunction with the Inmate Alert

11   Report shown to you in Deposition Exhibit 7?

12   A.    Not that I'm seeing.

13   Q.    Let me ask you about mortality reviews.

14   A.    Uh-huh.

15   Q.    What's your definition of a mortality review?

16   A.    After action report.

17   Q.    And particularly as it pertains to your field

18   of endeavor, in-custody --

19   A.    In-custody --

20   Q.    -- deaths.

21   A.    -- death.  Correct.

22   Q.    All right.  And is that required for you to

23   do a mortality review?

24   A.    Yeah.

25   Q.    You being corrections.

83

```
 1       A.      Yeah.

 2       Q.      All right.  And that's in your policy and

 3       procedure.

 4       A.      It's standard practice in the business.

 5       Q.      To your knowledge, during this time period

 6       that we're talking about pertinent to Mr. Troutman

 7       estate's claim, did CCS as the healthcare provider,

 8       did they attend the mortality reviews?

 9       A.      Specifically, Counselor, I -- I don't

10       remember.

11       Q.      When there is a mor --

12       A.      It's a standard practice.

13       Q.      All right.  It's standard practice for the

14       healthcare provider to --

15       A.      Correct.

16       Q.      -- attend.

17       A.      Yes.  The -- the healthcare provider

18       administers that review process.

19       Q.      Okay.  What do you -- what do you mean when

20       they administer the review?

21       A.      They initiate it, they administer it, they

22       lead the discussion.

23       Q.      And who would be the individual that would

24       lead the discussion?

25       A.      It would normally be the health services
```

84

1    administrator or the charge nurse.

2    Q.    In 2015, do you remember who the health

3    services administrator was for CCS?

4    A.    I'd have to go back and check, but I believe

5    it was -- I know it was either Teresa Wallace or

6    Regina Reese-Davis.

7    Q.    If Ms. Wallace had previously testified that

8    was her position during that time period, would that

9    seem correct?

10   A.    Yeah.

11   Q.    And would you attend as the director any or

12   all of these mortality reviews?

13   A.    I may.

14   Q.    Is it required for you to attend?

15   A.    Or a designee, yes.

16   Q.    Excuse me?

17   A.    Or my designee.

18   Q.    And who would that be during this time

19   period?

20   A.    I have a chain of command.  It would normally

21   be Dwayne Clark in my absence.

22   Q.    And Mr. Clark, what is his position?

23   A.    Chief of staff.

24   Q.    And in November of 2015, would Mr. Clark have

25   been in that position?

1      A.      Chief of staff, yes.

2      Q.      If we went back to let's say the end of 2013,

3      would Mr. Clark have been in that position then?

4      A.      Yes, sir.

5      Q.      Okay.  And no breaks in between.  He would

6      have that position continuously?

7      A.      Yes.

8      Q.      What's the purpose of a mortality review in

9      the context of, you know, LMDC and your field of

10     endeavor?

11     A.      It's to overview again the event, the who,

12     the what, the when, the where, the how, and the why

13     if we can get to it.  It's also an opportunity to

14     engage anything that may be compelling or could or

15     should've been done differently.

16            It takes on a -- a multitude of -- of reasons

17     why we do that.  It is primarily to make sure that

18     we have the facts as we know them to be up to that

19     point, who responded, you know, the -- the type of

20     response, did we preserve the scene, did we report

21     it, who we reported it to, what time did we call

22     EMS, what time did EMS arrive, what time did we

23     report it to PIU, Professional Integrity Unit, what

24     time did they arrive.

25            It's basically a -- a check and balance as

1    to -- to what occurred, and then follow up what

2    could we have done better, what did we do well, that

3    sort of thing.

4    Q.    If you're telling us that one of the purposes

5    is to do fact-finding?

6    A.    Uh-huh.

7    Q.    Did I hear that correctly?

8    A.    Yes.

9    Q.    All right.  Who --

10   A.    As we -- as we know it to be up to that

11   point.

12   Q.    Who's responsible for bringing those facts to

13   that review?

14   A.    Again, it's not -- it's a multitude of

15   partnerships.  From -- certainly from the medical

16   and mental health, that is the role of the contract

17   medical, mental health provider.

18         In terms of the operational response, it is

19   our Professional Standards Unit that compiles that

20   information.  Along with we have -- we have

21   specifically assigned staff that have been trained

22   in putting together what's called a death report,

23   which is the -- compiling all the relevant data as

24   we know it to be at that point in time.

25   Q.    Would that be the report that's compiled by

1   the Professional Standards Unit of LMDC?

2   A.    No, that's a separate report, Counselor, but

3   that is -- that is forwarded to the Professional

4   Standards Unit.  It is a component of their

5   investigation.

6   Q.    I'm going to show you what I've marked

7   Deposition Exhibit 8 and ask you if you can describe

8   that document.

9         (Ms. Norris left the deposition room.)

10  A.    Yes, I can describe the document.

11  Q.    Okay.  What is it?

12  A.    It is a case report, referred to as Case

13  Report 2015-037, and this is basically the executive

14  summary of that incident.

15        (Bolton Deposition Exhibit 8 was marked for

16  identification and is filed with this transcript.)

17  Q.    Involving --

18  A.    Your question?

19  Q.    -- Mr. Troutman?

20  A.    Yes, sir.

21  Q.    Now, the report that you mentioned in your

22  previous answer, is that different than the report

23  that is in Exhibit -- that is Exhibit 8?

24  A.    Yes, but it's a -- it is a component --

25  that -- that report is a component of this.

```
 1        Q.      Explain what the component is.

 2        A.      I'm sorry?

 3        Q.      Explain what the component is.

 4        A.      There is a -- there is a -- a comprehensive

 5      investigation with all the relevant documentation

 6      regarding an incident, and the -- everything from,

 7      you know, the incident report that you showed me

 8      previously, all these documents may be in that --

 9      that entire investigative report, and what you have

10      in -- what I have in front of me now is the

11      executive summary of all that documentation.

12              (Ms. Norris reentered the deposition room.)

13        Q.      So what we -- let me ask you this:  In the --

14      as part of the comprehensive investigation, would

15      the inmate's medical records be included in that?

16        A.      It may.  And again, let me -- let me -- I

17      think this is important that we do not confuse the

18      administrative investigation, or the PSU

19      investigation, with the criminal investigation, or

20      the PIU investigation, which is done by LMPD.  Those

21      are two separate independent reports --

22        Q.      Okay.

23        A.      -- but contain much of the same information.

24        Q.      All right.  Well, in that regard let's go

25      ahead and mark this Exhibit 9, and ask if that is
```

1        the report that you're talking about in your last

2        answer.

3              MS. NORRIS:  Is this Exhibit 9?

4              MR. SIMON:  Yes.

5              (Bolton Deposition Exhibit 9 was marked for

6        identification and is filed with this transcript.)

7        Q.    All right.  So are you prepared to answer?

8        A.    Yes.

9        Q.    Okay.  Go ahead.

10       A.    Rephrase the question, please.

11       Q.    All right.  What is Exhibit 9?

12       A.    Exhibit 9 is the LMPD Public Integrity Unit

13       Case Summary.

14       Q.    And this report is compiled by another

15       department of metro government --

16       A.    Correct.

17       Q.    -- different than corrections.

18       A.    Yes.

19       Q.    And what you indicate in your previous

20       answer, these are two different types of reports.

21       A.    Yes.

22       Q.    All right.  And what is the purpose of the --

23       Exhibit Number 8, the LMDC case report?

24       A.    In -- in summary, short answer is that

25       Exhibit 8 is the case report from our PSU,

1    Professional Standards Unit, which is an

2    administrative investigation done internally by my

3    Internal Affairs personnel, whereas Exhibit 9 is a

4    criminal investigation that is done independently by

5    a separate agency that's purpose is to determine

6    whether there was any criminal violations or

7    criminal actions as it relates to the incident.

8    Q.    Now, can you tell us one of the purposes of

9    the mortality re -- let me restate it.

10        If I heard your testimony right when you're

11   talking about mortality reviews, part of what you're

12   doing with your health services provider is

13   determining whether or not -- what happened and how

14   you can follow up and improve the performance --

15   A.    That's --

16   Q.    -- of corrections?

17   A.    -- just one thing.  Correct.

18   Q.    All right.  But that's one of the purposes.

19   A.    Correct.

20   Q.    And how's that process work?

21   A.    I'm not sure if I understand your question.

22   Q.    Well, you told us that it's -- it's mandated

23   to have mortality review for suicides of inmates in

24   the jail and attempted suicides.

25   A.    It's a standard practice, yes.

1     Q.     And as part of that you're going to have your

2     healthcare provider and either you or your designee

3     as -- meeting on this mortality review.

4     A.     It's much more individuals than just that,

5     but yes.

6     Q.     Well, would you bring in individuals from

7     both the heal -- employees of both the healthcare

8     provider and the corrections staff, both civilian if

9     necessary --

10     A.     Correct.

11     Q.     -- and sworn staff, let me finish my

12     question, and do the fact-finding?

13     A.     Correct.

14     Q.     And after compiling that information, does

15     corrections review their policies to determine

16     whether or not there should be some changes?

17     A.     I'm going to have to ask -- ask you to repeat

18     that question.

19     Q.     Okay.  Let me rephrase it.

20          Would it be a fair statement that one of the

21     reasons that an institution like LMDC would do a

22     mortality review would be to improve performance?

23     A.     I think that's fair to say, yes.

24     Q.     All right.  Now, when I say -- I've asked the

25     question improve performance, what does that mean to

1      you, improving performance?  'Cause we aren't making

2      widgets.  I understand that.  You're -- we know what

3      you're doing.  Tell us what you mean by that.

4      A.    Well, I think that in any business, whether

5      you're making widgets or you're pumping gas or

6      you're operating and running or working in a

7      corrections field or a police department or a fire

8      department or EMS, that's what healthy organizations

9      do, look for ways to do it better.  You look at a

10     constructive review process and determine if you can

11     do it better, or if what you did do, if it went

12     well, certainly an indicator of that as well.

13     Q.    And these types of mortality reviews,

14     performance reviews, are those the types of

15     activities that are contemplated by accreditation

16     agencies?

17     A.    I'm not sure if I understand your question.

18     Q.    All right.  Let me try and restate -- restate

19     that.  You previously told us that the jail has gone

20     through a lengthy accreditation process?

21     A.    Yes.

22     Q.    All right.  And multiple aspects of the

23     operations of the jail are reviewed and evaluated

24     during the accreditation as -- process?

25     A.    Correct.  Those are guidelines, not

1    mandatory, something we chose to do.

2    Q.    And among the types of activities that are

3    evaluated by the accreditation agency, the ACA,

4    would your mortality review be among those items

5    that are evaluated?

6    A.    I don't know if they looked at that or not.

7    Q.    Are you aware of any evaluation by ACA of

8    the -- of any of the suicides that took place at

9    LMDC between late 2013 and November 2015?

10   A.    I believe they looked at hard numbers.  I

11   don't know if they drilled into any of those

12   specifics or not.

13   Q.    I asked you earlier about different sections

14   of the jail where inmates are housed.  Let me just

15   ask specifically.  On H5D9, what does that

16   designate?

17   A.    H5 I believe is in the Hall of Justice.

18   Q.    And dorm nine is a dorm with single cells.

19   Do you know that for a fact?

20   A.    Counselor, I'd have to -- I'd have to look.

21   I mean, we're -- we're a really large, spreadout

22   facility.  I know there are single cells on that --

23   on that floor, yeah.

24   Q.    Well, let me ask you this:  When was the last

25   time that you were in a single cell dorm with bars

94

1     at the Hall of Justice?

2     A.    The last time I was in there.

3     Q.    Well, I'm saying in a dorm that had single

4     cell -- that -- that was a single cell dorm with

5     bars on it, when was the last time that you would've

6     been in a cell like that?

7     A.    Every time I go into the Hall of Justice,

8     there's -- there are bars.

9     Q.    Okay.  And single cell dorms.

10    A.    I'd have to -- depends on what -- what

11    housing unit and cell you're talking about,

12    Counselor.

13    Q.    Okay.  Well, I'm talking about on the fifth

14    floor of the Hall of Justice, dorm nine, do you know

15    that independently as being --

16    A.    I don't.  We can take a trip over there.

17    Q.    All right.  Well, we've had testimony that

18    described it.

19    A.    Okay.

20    Q.    All right.  My -- my question at this time is

21    are you familiar with the way a dorm like that is

22    set up?

23    A.    That specific dorm I am not.  I think I've

24    tried to convey that.

25    Q.    We've taken testimony and we've learned from

1    your online officers --

2    A.    Uh-huh.

3    Q.    -- that were at that dorm on November 24th of

4    2015, they've described the dorm.

5    A.    Okay.

6    Q.    All right?

7    A.    All right.

8    Q.    Would you -- would it be your thought that a

9    corrections officer that works there on a regular

10   basis would be -- would be knowledgeable about the

11   way that that dorm is set up?

12   A.    Absolutely.

13   Q.    I'm going to show you what has been marked

14   Deposition Exhibit 10.  Previously Officer Miller

15   with LMPD had testified in regard to this deposition

16   exhibit, this was Exhibit 2 during his deposition.

17         So, Director, would you take a look at that

18   exhibit, and then let me ask you some questions

19   about it.

20   A.    Okay.

21         (Bolton Deposition Exhibit 10 was marked for

22   identification and is filed with this transcript.)

23   Q.    Okay.  Would that be a representation of what

24   a single cell dorm would look like, not drawn to

25   scale, on -- in the Hall of Justice?

1    A.    Counselor, I got to be honest with you.  This

2    is -- this is pretty primitive.  If you had actual

3    photographs, it would probably be -- I could respond

4    a little bit better.  I -- I -- I really have a

5    tough time visualizing this.  This is -- this is

6    something you would sketch on a napkin.

7    Q.    Does corrections maintain photographs of

8    single cells --

9    A.    There --

10    Q.    -- dorms?

11    A.    They could -- they could be made available,

12    yeah.

13    Q.    All right.  Would you make those available to

14    us?  Particularly H5, dorm nine, would you make

15    those available to us, please?

16    A.    Sure.

17    MR. OGBURN:  We have them.

18    Q.    Thank you.

19    MR. SIMON:  Can this be seen (indicating)?

20    THE VIDEOGRAPHER:  Okay.

21    MR. SIMON:  Thank you.

22    Q.    Now, you told us you've had occasions to be

23    in dorms with single cells --

24    A.    I've --

25    Q.    -- with bars?

1      A.     -- been through that jail for ten years

2      almost.

3      Q.     All right.  In a unit that this officer

4      described, he did talk and testified about this

5      common area, and in this case five cells where

6      inmates would be housed.

7      A.     Okay.

8      Q.     Okay?  With a shower, whether it's a cell or

9      not, but there's another enclosed space that he

10     labeled as a closet.  All right?

11     A.     Okay.

12     Q.     Okay.  That general description, would that

13     be consistent with what you've -- you've observed in

14     single cells dorms?

15     A.     Again, I'm -- I'm -- I'm not going to rely on

16     a -- a rudimentary drawing to respond to your

17     question.  If the question is is this is an

18     officer's rendition of what he believes a housing

19     unit looks like in this case, I do not have any

20     reason to dispute that.

21     Q.     Now, the doors to each of the single cells,

22     are those solid metal doors?

23     A.     It depends on which unit you were in.

24     Q.     So if you have photographs of that unit,

25     that -- that will be able to determine if it has

1    windows or not.

2    A.    Yes.

3    Q.    Okay.  Now, the officers that worked on that

4    unit describe the doors to each of the single cells

5    as a solid door with a small window (indicating).

6    A.    Okay.

7    Q.    All right.  And -- and the door, as an

8    entrance to the unit, also has a solid metal door

9    with a small window.

10   A.    Okay.

11   Q.    All right.  Director, do you know during this

12   time period, and we're talking about November 24th

13   of 2015, inmates that are in a single cell dorm, are

14   they locked in their dorms at particular times of

15   the shift?

16   A.    If they -- yes.

17   Q.    And what would be the occasions in which the

18   inmate would be let out of his single cell?

19   A.    Recreation, attorney visits, potential

20   emergency response.  Could be for a variety of

21   reasons.

22   Q.    Are you saying that -- that the inmate would

23   normally be in his single cell during the majority

24   of the shift unless, you know, there was a reason --

25   A.    Yes.

99

```
 1      Q.      -- to remove them?  Okay.

 2      A.      Correct.

 3      Q.      And each of the cells' doors would be locked?

 4      A.      Yes.

 5      Q.      And the door that entered into what's labeled

 6      on this diagram the common area, would that also be

 7      locked?

 8      A.      For the most part, yes.

 9      Q.      Director, can you tell us why -- well, re --

10      strike that.

11              Director, do you have an opinion about the

12      propriety of placing an acutely suicidal inmate in a

13      single cell like the one in dorm nine on the fifth

14      floor of the Hall of Justice?

15              MR. OGBURN:  Objection to form.  He's not an

16      expert.

17              MR. SIMON:  He's the director of the jail.

18      Q.      Go ahead and answer.

19      A.      Re -- repeat the question, please.

20              MR. SIMON:  Can you repeat the question,

21      Tracy?

22              THE REPORTER:  Sure.

23              (Reporter read from the record as requested.)

24      A.      Do I have an opinion.

25              MR. OGBURN:  Note an object -- additional
```

1    objection to form as well.  Go ahead.

2    A.    Let me -- let me set a little bit of a

3    foundation.  That we operate -- we have 1,793 beds

4    in our inventory.  That 1,793 beds is spread between

5    three facilities.  Okay?  We -- every day we're

6    overcrowded and we are over capacity.

7         Ideally most jails have, you know, 10 or

8    15 percent vacan -- vacancy, okay, for purposes of

9    classification.  There has been a movement in this

10   country to reduce administrative segregation and

11   disciplinary lockdown.

12        Inmates that are violent or pose a threat to

13   self or others that are involved in misbehavior or

14   violation of inmate behavioral guidelines are dealt

15   with, and they are dealt with according to policy

16   and procedure in best practices we know that best

17   practice to be.

18        We are constantly looking and striving to

19   improve.  Best intention is not a constitutional

20   violation.  Okay?  And things like our mitigation of

21   suicide and risk, you know, we -- we assess every

22   individual that comes into our facility, 33,000

23   times a year.  We assess those individuals.

24        We assess their healthcare, we assess their

25   mental health, we assess their risk, we assess their

1      behavior, we assess whether they have chronic or

2      acute medical issues, mental health issues, have

3      they been with us before.  We assess -- try to

4      assess all those things.  Okay.  We're not perfect,

5      but we do a pretty damn good job.  Okay?

6             So if your -- if your question is is, you

7      know, what's my opinion on administrative

8      segregation, my opinion on administrative

9      segregation or locking people down is that I'm part

10     of that movement to reduce that utilization of

11     administrative segregation when and where we can.

12  Q.     Why?

13  A.     Having been in this business for almost

14     40 years, okay, and specific to this issue that

15     we're discussing here today called suicide, okay,

16     I've seen individuals that have hung themselves with

17     elastic in their underwear.  I have seen individuals

18     that have -- that have taken a screw out of a light

19     fixture in what was supposedly called a

20     suicide-proof cell and slice their wrist and bleed

21     out.  I have seen individuals that have hung

22     themselves with telephone cords.

23             I've seen just about everything that you can

24     see in this business over the course of 40 years,

25     and every day we strive to do better.  Okay?

1           And so when we have a antiquated facility --

2    jails have bars, jails have bars everywhere.

3    Especially old antiquated jails have bars

4    everywhere.  If an individual wants to kill

5    themselves, you are probably not going to stop it,

6    you can try to mitigate it.  Okay?

7           We've taken phone cords, and instead of a

8    standard phone cord in a housing unit that's

9    two-foot long, we've shortened those to six or eight

10   inches.  Those are things that we have tried to do

11   to mitigate risk.

12          And, again, I will go back to best intentions

13   are not a constitutional violation.  We do

14   everything that we can to try to mitigate

15   opportunity of somebody that is actively has

16   suicidal ideation, and if I have the ability to

17   separate people, if I have the ability to -- to read

18   minds or if there are some new, fancy mental health

19   assessment suicide instrument out there and it's

20   been validated to work, I'm going to try it.

21          So, yeah, we are constantly looking to

22   improve.

23   Q.    And that's one of the reasons you do

24   mortality reviews, right?

25   A.    That's one of the reasons why we look at

1    data, that's one of the reasons why we do mortality

2    reviews, that's one of the reasons why we do a daily

3    briefing.  That's one of the reasons why we look at

4    everything that happened in the jail environment

5    preceding 24 hours.  That's one of the reasons why I

6    go to the media and talk about some of the problems

7    and challenges that we have with mental health, with

8    risk assessment, with alternatives to incarceration.

9    Yeah, that's the reason why.  One of them, one of

10   many.

11   Q.    Let me ask you this question directly related

12   to the cell that Mr. Troutman was in when he hanged

13   himself on November 24th of 2015.

14         An actively suicidal inmate has an increased

15   risk of harm being placed in a single cell with bars

16   like the one that Mr. Troutman was assigned to.  Is

17   that a fair statement?

18   A.    That's not -- that's --

19         MR. OGBURN:  Object to form.  Assuming facts

20   not in evidence.

21         MR. SIMON:  Please, can you just read it back

22   for the director and ask him to -- I'll ask him to

23   answer it?

24         THE REPORTER:  Sure.

25         (Reporter read from the record as requested.)

104

1    A.    Are you speaking specifically about Mr.

2    Troutman or are you speaking in a generalized

3    question?

4    Q.    Generalized.

5    A.    Again, jails have bars and an individual can

6    harm themselves with almost nothing.  I've seen

7    individuals hang themselves with toilet paper

8    braided together in my career.  Do we try to

9    mitigate risk?  Yes.

10         MS. NORRIS:  Can we go off the --

11   Q.    My que --

12         MS. NORRIS:  -- record a moment?  I'm sorry.

13   It's 12:30.  I --

14         THE REPORTER:  I'm sorry.  Is that agreeable

15   with all counsel, go off the record?

16         MR. OGBURN:  Yes, yes, yes.

17         (Ms. O'Reilly nodded head.)

18         THE VIDEOGRAPHER:  We are off the record at

19   12:33.

20         (Lunch recess from 12:33 p.m. to 1:46 p.m.)

21         THE VIDEOGRAPHER:  We are back on the record

22   at 1:46 p.m.

23   Q.    All right.  Director, what I'm going to do,

24   I'm going to show you the deposition exhibits that

25   we previously admitted, this is departmental

1    policies, and we were provided with the policies

2    that were in effect on November -- in November of

3    2015, when Mr. Troutman hanged himself in the jail.

4         And I'm going to ask you to compare the

5    departmental policies and see if there's a change in

6    the specific sections that I asked you about

7    earlier.  I'm not going through the whole thing.

8    All right?

9         So I'm going to show you Deposition Exhibit

10   3, which you've already identified.  This is Suicide

11   Prevention and Intervention, and the same policy as

12   earlier in effect.

13   A.    Okay.

14        (Bolton Deposition Exhibit 3A was marked for

15   identification and is filed with this transcript.)

16   Q.    And I'm going to direct your attention to

17   page 2 of the original policy -- excuse me, of

18   Exhibit 3.

19   A.    Okay.

20   Q.    Okay.  And compare it to -- well -- okay.

21   The provision on Exhibit 3 that you've previously

22   identified for Suicide Prevention and

23   Intervention --

24   A.    Uh-huh.

25   Q.    -- we identified B2 and 3 as an after

1    incident review.  Did those provisions exist in the

2    previous policy that was in effect in November of

3    2015?

4    A.    Looks to be the same.

5    Q.    Okay.  All right.  Thank you.

6          All right.  If those two provisions stayed

7    the same, do you know why the policy was updated for

8    Suicide Prevention and Intervention?

9    A.    I'm sorry.  Can you restate the question?

10   Q.    If those two provisions stayed the same, all

11   right, do you know why your Suicide Prevention and

12   Intervention policy was updated so that it was

13   effective in 2-26 of '17?

14         MR. OGBURN:  Well, note -- note my objection.

15   The documents speak for themselves, and the witness

16   hadn't had a chance to go through every part of

17   that, but to the extent that he knows, he can answer

18   the question.

19   Q.    Do you know what portions were updated?

20   A.    No.

21   Q.    Okay.  I'm going to show you -- I'm going to

22   show you Deposition Exhibit 4 and Deposition Exhibit

23   what we've marked 4A, and ask you specifically about

24   portions of that policy that I asked you about

25   before.

1              (Bolton Deposition Exhibit 4A was marked for

2        identification and is filed with this transcript.)

3        A.      Okay.

4        Q.      All right.  On page 3 of the -- of Exhibit 4,

5        under Responsibility of the healthcare services

6        provider -- I'll let you get to that.

7        A.      Okay.

8        Q.      We talked about or I asked you questions

9        about sections five and six, the quarterly

10       statistical reports in particular.  Did that policy

11       exist in the earlier version of the -- of that index

12       number 04-4.01?

13       A.      Specific to five and six?

14       Q.      Yes.

15       A.      Five looks to be the same.  The newer version

16       on number six looks to have some minor changes.

17       Q.      Just tell us what the minor changes are.

18       A.      It appears --

19              (Ms. Norris left the deposition room

20       momentarily.)

21              MR. OGBURN:  Number six.

22       A.      -- the revised version is inclusive of the

23       Major of Operations, whereas the previous policy was

24       not.

25       Q.      Okay.  The previous policy had Deputy

1     Director of Operations in place of Major of

2     Operations?

3     A.    That's what it appears, correct.

4     Q.    Is that a difference other than semantics?

5     A.    Yeah, that's a difference.

6     Q.    Okay.  What's the difference?

7     A.    The major is over the sworn -- uniform sworn

8     staff, whereas the deputy director of operations,

9     there is no such position for that.

10    Q.    Not -- not presently.  Is that what I

11    understand?

12    A.    Not presently, correct.

13    Q.    The other provision that I asked you about

14    before on Exhibit 4 was on page 5 and it had to do

15    under section C, Health Care Internal Review and

16    Quality Assurance.  And if you remember --

17    A.    Hold on.  Hold on, Counselor.

18    Q.    Yeah.

19    A.    It's on page 5 of the newer version, page 4

20    of the previous version.

21    Q.    All right.  And then, as you remember when I

22    was asking you the questions, I was asking you about

23    the subsections, v, vi, vii, and viii.  Do you see

24    those repeated or not in the updated -- excuse me,

25    on the previous policy section?

109

```
1      A.    New one is page 6 and the previous version is

2      page 5?

3      Q.    Correct.

4      A.    Okay.  What sections are you talking about?

5      Q.    Starting with v, that and the following three

6      sections.

7      A.    Starting with vi?

8      Q.    Starting with v.

9      A.    V?

10     Q.    Uh-huh.

11     A.    Okay.

12     Q.    All right.  Any changes to those four

13     sections?

14     A.    V appears to be the same.

15     Q.    All right.  Then proceeding to page 6 on the

16     exhibit -- strike that.

17           Proceeding to page 7 on Exhibit 4, which was

18     the newer version of the policy, section F, Use of

19     Inmate Assistants/Work Aides, and underneath that

20     you had subheading 2E where it talks about serve as

21     a suicide watch aide.  Is that in the previous

22     version of the policy?

23     A.    It appears to be, yes.

24     Q.    All right.  Thank you.

25     A.    Four and 4A.
```

110

1      Q.     Okay.  All right.  Now I'm going to show you

2      what was previously marked Deposition Exhibit 6 and

3      now Deposition Exhibit 6A, and that is

4      Classification Assessment.

5      A.     Okay.

6      Q.     The old version and the new.

7      A.     Okay.

8             (Bolton Deposition Exhibit 6A was marked for

9      identification and is filed with this transcript.)

10     Q.     All right.  I asked you during our earlier

11     part of our deposition on page 5 of the newer policy

12     about classification overrides.  If you can compare

13     that to the old superseded policy.  Is that -- there

14     in total, that would be on page 4 on that exhibit?

15     A.     Uh-huh.  Gotcha.  Which section?

16     Q.     D.  May have been re -- relettered, for lack

17     of a better word.

18     A.     Looks like this policy may be significantly

19     different.

20            MR. OGBURN:  Are you talking about

21     Classification Override?

22            MR. SIMON:  Yes.

23     Q.     So it looked like it was relettered in the --

24     from the new pol -- the more recent policy, it was

25     relettered from --

1        A.      D to F.

2        Q.      Yeah, D to F.  So by comparing the substance

3    of the classification overrides, is the substance

4    provision -- substantive provisions the same or not?

5        A.      Are you talking one, two, three, and four?

6        Q.      Yes.

7        A.      One is different than one on 6A.  Two is

8    different.  Three is different.  And four is --

9    there's some minor differences.  I think what

10   it's -- you know, we -- we moved from one

11   classification system to a new one --

12       Q.      Okay.  Well, let's go --

13       A.      -- between --

14       Q.      -- let's go --

15       A.      -- in between both of these.

16       Q.      -- let's go through that.  So that may be

17   easy to answer, but --

18       A.      Uh-huh.

19       Q.      -- on the -- on the older departmental

20   policy --

21       A.      Uh-huh.

22       Q.      -- it talks about factors not captured by

23   questions in the IMS Classification Navigator, and

24   that's been replaced by XJail Classification

25   Navigator.  So what's the difference?

112

1      A.      Well, we were under a -- an older jail

2      management system for number -- num -- first of all,

3      and secondly, we moved to a new validated

4      classification model between one policy and the

5      revised policy.

6      Q.      Okay.  Section two is essentially the same

7      but for the different -- the different hardware that

8      you were using?  Would that be a fair statement?

9      You went from IMS Classification Navigator to XJail

10     Classification Navigator?

11     A.      That is correct.  Any different

12     classification system.

13     Q.      And where would we find the different

14     classification system?

15     A.      I'm not sure I understand your question.

16     Q.      Okay.  Well, what -- what is different about

17     the prisoner classification system in the XJail

18     Classification Navigator and the IMS Classification

19     Navigator?

20     A.      The IMS Navigator was using a different

21     classification system.  The XJail utilized a revised

22     classification system, which is the SARN that I

23     alluded to earlier.

24     Q.      And to utilize the XJail system which was --

25     which was newer, right, than the IMS system --

1    A.    That is correct.

2    Q.    -- what type of -- what type of training

3    would your employees go under to use that system?

4    A.    Which system are you talking about?

5    Q.    The XJail system.

6    A.    I'd say -- I -- I -- I guess I would defer

7    that question to our training administrator, but

8    from a -- from a 10,000-foot level, all staff are --

9    are trained in the basics of the XJail system.

10   Q.    Well, the XJail system, one of the purposes

11   is to maintain a record of a lot of different

12   things, right?

13   A.    Absolutely.

14   Q.    Okay.  You're maintaining a record of

15   extraordinary incidents, right?

16   A.    Correct.

17   Q.    You're maintaining a record of inmate

18   movement, correct?

19   A.    Correct.

20   Q.    You're maintaining a record of dates and

21   times where an inmate would be housed?

22   A.    Correct.

23   Q.    You're maintaining when an inmate is subject

24   to discipline?

25   A.    Correct.

1    Q.    You would maintain when information from even

2    an outside source came into the jail that needed to

3    be -- to jail personnel that needed to be documented

4    in the inmate's records?

5    A.    I'm sorry.  I didn't understand your

6    question.

7    Q.    When information would come to the jail

8    through jail personnel from an outside source, not a

9    corrections officer, not a corrections employee, not

10   an employee of -- of your healthcare provider, would

11   there be occasions where important information would

12   be included on the XJail system?

13   A.    I'm -- again, I'm not sure how you're

14   defining important.  It could or could not be.

15   Q.    Okay.  Well, let me give you an example.

16   And -- and we'll introduce this in a minute.  The

17   inmate notes, inmate movement notes for Mr. Troutman

18   indicate that his daughter called corrections.

19   A.    Okay.

20   Q.    And you may have seen this.  Called

21   corrections and wanted the people in corrections to

22   know and relay to her father her phone number so she

23   can get a phone call from her father, and that was

24   on the XJail system.

25   A.    Okay.

115

1     Q.    That's what I was trying to allude to.

2     A.    Yeah.  Okay.  And the response to that is --

3     is -- is something like that may or may not be.  You

4     know, we -- like I said, we have 2,500 inmates at

5     any given time.  Something like that may or may not.

6     That would be a discretionary call based upon

7     whoever took that call and who entered it.

8     Q.    All right.  In the older system, it -- under

9     three, it says, "All classification overrides shall

10    be documented on the Shift Report by the PCI."

11         So when that was documented, what was the

12    manner in which it was documented?

13    A.    I don't know the answer to that question.

14    Q.    I mean, was it documented electronically or

15    is it just a paper document or what?

16    A.    On the old system or the new system?

17    Q.    On the old.

18    A.    The old system says it would clearly be

19    documented in the -- "Initial classification

20    overrides may be utilized.  The reason for the

21    override shall be clearly documented in the inmate's

22    chronological notes in IMS."

23    Q.    Okay.  What's the difference?

24    A.    What's the difference in what?

25    Q.    In those two provisions.

1      A.     Well, one refers to chronological notes in

2      IMS, the other one says in the inmate's notes in

3      XJail.

4      Q.     So the newer policy contained the directive

5      to document an override for classification in XJail,

6      correct?

7      A.     That's what it says.  Correct.

8      Q.     And does that have a similar documentation

9      provision, a change in F4 from the old policy to the

10     new?

11     A.     Well, again, the previous policy mentions

12     documented image chronological notes in IMS.  I'm

13     not familiar with that.

14     Q.     But in the -- in the updated report -- or the

15     updated departmental policy, those -- the

16     classification overrides should be documented in the

17     notes of the XJail --

18     A.     Correct.

19     Q.     -- Classification Navigator.

20     A.     Correct.

21     Q.     Okay.  So why was that policy changed?  Do

22     you know the reason why that policy was changed?

23     A.     All policies are reviewed on a regular basis.

24     One policy refers to a previous jail management

25     system.  The revised policy refers to a newer, more

117

1       robust jail management system.  That would be the

2       primary difference.  And then secondly,

3       classification system in its entirety was updated

4       and revised.

5       Q.    Okay.  I'm going to have you examine

6       Depositions 3 and 3A again.

7             MR. SIMON:  Oh, is this his?  This -- here's

8       3 (indicating).

9       Q.    Okay.  On page -- page 2 of the -- of the

10      revised policy under Protocol.

11      A.    Are you talking Exhibit 3?

12      Q.    Exhibit 3.

13      A.    I do not have that.

14      Q.    Oh.

15      A.    You gave me 3A.

16            MS. NORRIS:  I had both of them.

17      Q.    Oh.  Do you have the marked exhibit?

18      A.    I have 3A.

19      Q.    Oh.

20      A.    I don't have 3.

21      Q.    You need 3.  Oh, here it is.  All right.

22      We'll come back to that.

23            MS. NORRIS:  Let me borrow your copy.

24      A.    Okay.  Now I have 3 and 3A both.

25      Q.    All right.  We are -- I'm going to come back

1   to that in a moment.  I want to ask you about some

2   other stuff.

3         Director, tell us, based upon your experience

4   and training, what are warning signs for suicide --

5   what are warning signs that you and members of

6   corrections staff and healthcare providers at your

7   facility should look for to prevent suicides of

8   inmates?

9   A.    Are they actually stating that they are

10  suicidal, number one.  Are there any overt signs and

11  symptoms.  For example, is the person actively

12  cutting on themselves, for example.  We have the

13  records, might look at previous suicidal history if

14  there is any.

15        Primarily we rely upon a suicide screening

16  instrument, and that screening instrument is kind of

17  a decision tree type of instrument based upon that

18  questionnaire.  The mental health professional or

19  intake medical staff, there are certain things

20  within that questionnaire that will alert that a

21  person is potentially at higher risk.

22  Q.    It would alert the interviewer of the

23  different warning signs.

24  A.    Correct.

25  Q.    Okay.  And you would prepare an individual

119

1    that was on your staff that was in that position to

2    be trained to be aware for those warning signs,

3    correct?

4    A.    I don't supervise healthcare staff.

5    Q.    Not healthcare staff, corrections staff.

6    There's corrections staff on the booking store --

7    floor, right?

8    A.    Correct.

9    Q.    All right.  And don't you have -- well, let

10   me ask you.  Do you have civilian staff in booking

11   to ask questions of inmates coming into the

12   facility, questions that are designed to utilize the

13   screen, the -- the suicide screening?

14   A.    Contracted healthcare staff, yes.

15   Q.    Those individuals should be aware of those

16   warning signs, right?

17   A.    The contract medical staff?  Is that --

18   Q.    Yes.

19   A.    Yeah.

20   Q.    Okay.  But your correctional staff should be

21   aware of it as well, correct?

22   A.    We provide them with rudimentary training.

23   Q.    Your correctional officers on the floor, do

24   they get more than just rudimentary --

25   A.    Well, they get -- they ge --

1    Q.    Well, let me finish my question.  Do they get

2    more than just rudimentary training to look for

3    warning signs of suicide in inmates?

4    A.    Yeah.  Again, it is -- every -- every

5    corrections officer goes through a pre-service

6    academy in mental health, in suicide.  Suicide

7    mitigation are things that are taught in the

8    academy, and, as I previously stated, that are

9    reiterated annually during in-service.

10   Q.    Based upon your knowledge and experience and

11   training, inmates with traumatic brain injury, would

12   that, in certain circumstances, be an increase -- be

13   a warning sign, something to look for if we're

14   talking about suicide prevention?

15   A.    Very important that I understand that

16   question.  Traumatic brain injury, most of the time

17   a corrections officer, corrections staff is not

18   going to be aware of that.

19   Q.    Okay.  But would that be a factor that, based

20   upon your training and your experience, would be a

21   factor to increase the risk of suicide?

22   A.    It certainly could.  It could be.

23   Q.    Okay.  Agitation on the part of an inmate,

24   could that be a warning sign of a high risk?

25   A.    I get 33,000 inmates per year.  Just about

121

1     all of them are agitated when they're brought in.

2     Q.     Okay.  But my -- but your answer is.

3     A.     Could be.

4     Q.     All right.  An inmate fighting with other

5     inmates or corrections officers, could that be an

6     indication of an increased risk, someone had an

7     increased risk of suicide?

8     A.     I've been in the jail business for almost

9     40 years.  Fights happen all the time.  It could be.

10    Q.     All right.  And receiving bad news on their

11    criminal case, an inmate in the situation where he

12    gets some bad news, a longer sentence than

13    anticipated, something in that category, could that

14    also be a -- in the nature of increasing the risk

15    for an inmate?

16    A.     It could be.

17    Q.     Would you put the time of year, near the

18    holidays, Christmas, Thanksgiving, could that be an

19    increased -- another factor to increase the risk?

20    A.     Usually not.

21    Q.     Why do you say that?

22    A.     I've done some research on that.

23    Q.     Really.  From where -- what source?

24    A.     Through a variety of sources.  There's been

25    some research on that that that's more of a fallacy

122

1      than it is a fact.

2      Q.     Can you cite your source?

3      A.     I can probably do that and get back to you.

4      Q.     Okay.  Well, we'll ask for that to be

5      followed up on.

6             Now, I asked you a bunch of different

7      categories, and you gave answers to different

8      categories of warning signs that your staff would be

9      trained upon to mitigate suicides.  Just your most

10     recent answers.

11     A.     Okay.

12            MR. OGBURN:  Objection to form.  Go ahead.

13     A.     Okay.

14     Q.     Is that an answer?

15            MR. OGBURN:  Objection, form.  Yeah.  Let him

16     answer.

17     Q.     Would any of these factors that you talked

18     about standing alone constitute an increased risk of

19     suicide in an inmate?

20     A.     Majority of the time they are not.  They

21     could be.

22     Q.     Would the combination of some of these

23     factors increase the risk of suicide for an inmate?

24     A.     The vast majority of the time they're not.

25     They could be.

```
 1     Q.    When we talk about the factor of a previous

 2    suicide attempt by an inmate at the institution in

 3    which he remains lodged, tell us your -- where's

 4    that stand on warning signs for an inmate being at

 5    risk?

 6     A.    It could be.  It would be based upon a lot of

 7    different factors.

 8     Q.    What other factors?

 9     A.    Well, it could be based on previous history,

10    it could be based upon a current mental health

11    diagnosis, it could be based upon the severity of

12    the -- of the threat.

13          I mean, we have -- we have 33,000 people per

14    year.  People say they're going to hurt themselves

15    all the time.  That's why we hire mental health

16    professionals to ferret that out and use the -- the

17    tools, the experience, the skill set, the validated

18    instruments in the -- in the toolbox to make the

19    appropriate mental health or medical decision.

20          But those are -- are -- are some of the

21    primary factors.

22     Q.    Okay.  Would you agree with the opinion of

23    HSA Teresa Wallace with CCS when she testified that

24    an inmate with a previous suicide attempt in an

25    institution, that is in the same institution after
```

124

```
 1      that attempt, is at a high risk of suicide?
 2      A.     I would disagree with that.
 3             MS. O'REILLY:  Objection.  Form.
 4             MR. OGBURN:  Same objection.
 5      Q.     You would disagree with that?
 6      A.     I would disagree with that based upon what I
 7      just said.  It depends on a variety of factors.
 8      Q.     How do you evaluate the severity of an
 9      inmate's threat to do self-harm as a -- as a
10      corrections officer?
11      A.     As a corrections officer?
12      Q.     Uh-huh.  As someone trained on your staff.
13      A.     Okay.  Again, based upon the behavior, based
14      upon the affect of the inmate, based upon the actual
15      action or act the person is engaged in.  I mean, if
16      you want me to go into specific examples, I'll be --
17      I'll be happy to do that.
18      Q.     I'm just asking a question.
19      A.     You know, I have the -- you know, in the
20      40 years in this business, Counselor, I've had
21      individuals that have attempted or have stated that
22      they were going to kill themselves that just
23      scratched the surface with a fingernail.  You know,
24      I have indi -- I've seen individuals that have
25      sliced their wrist with a -- with a screw or with a
```

125

1     rock or with a piece of glass that have successfully

2     bled out.

3          So it -- it really runs the gamut.  There are

4     very serious threats and actions and there are some

5     that are not.  And that does not mean that one that

6     is not isn't to be taken lightly, but it certainly

7     is -- is -- is cause for that individual to be

8     looked at and evaluated.  Absolutely.

9     Q.    Okay.  And is it important for all the

10    information surrounding a previous suicide attempt

11    that you've talked about to be documented?

12    A.    I would -- absolutely.

13    Q.    Okay.  And it's documented for what reason?

14    A.    To create a historical record.

15    Q.    In terms of -- I'll let you finish your

16    que -- your answer.  I'm sorry.

17    A.    Just in -- just in terms of -- I mean, for --

18    for a whole variety of reasons.  Look, we are -- as

19    a -- as a -- as a jail or as a -- as a -- as a

20    corrections professional and is stated in, you know,

21    our mission to protect people.

22    Q.    Okay.  So --

23    A.    And sometimes to protect people from other

24    inmates, to protect inmates from each other, to

25    protect inmates from staff, to protect inmates from

126

1    themselves.  It's all inclusive.

2    Q.    Right.  Are you saying that that information

3    needs to be documented so it can be reviewed by that

4    part of the system, the jail system, to determine

5    what the proper classification level should be for

6    each inmate?

7    A.    Yeah.  And -- and again, I want to be --

8    'cause this is -- this is a -- this is an important

9    element.  You know, not -- not everything gets

10   documented, not everything goes into a database.

11   Some things are discretionary, some things are

12   mandatory, some things get documented based upon a

13   person's level of experience or a person's level of

14   training, a person's level of education.

15          And again, some things are -- are required

16   and some things are not, and so at times some people

17   put things in there that they don't have to put in

18   there, but it -- maybe it's a good idea.

19   Q.    All right.

20   A.    So there's a variety of -- of -- of -- of

21   what goes into that.

22   Q.    Your policies and procedures --

23   A.    Uh-huh.

24   Q.    -- when they're written down and they're

25   categorized and you train your staff on them --

127

1    A.    Okay.

2    Q.    -- you expect your staff to follow those

3    pol -- those policies and --

4    A.    Yes.

5    Q.    -- procedures, right?

6    A.    Yes.

7    Q.    All right.  The discretionary -- let me

8    strike that.  Let me rephrase it.

9         Is it your goal when you establish policy and

10   procedures that you incorporate best practices so

11   that discretionary decisions of your staff that

12   might cause mistakes are eliminated and you -- and

13   you are trained on established policies?

14   A.    Yeah, I don't think you're ever going to

15   eliminate mistakes.  I think you're going to

16   mitigate mistakes and you're going to learn to do

17   things better.  It's just like our accreditation

18   processes.  We have, you know, two straight terms of

19   ACA accreditation.  We didn't have to do that.

20   Q.    That's --

21   A.    Nobody forced -- nobody -- let me finish.

22   Nobody --

23   Q.    Go ahead.

24   A.    Nobody forced us to do that.  Those were

25   initiatives that were the right thing to do.  Just

128

1      like national accreditation on -- National

2      Commission on Correctional Health Care.  We are --

3      we are accredited by the National Commission.

4      Again, one of the only jails in the state to do

5      that.

6          That -- we're not required to do that.  We've

7      taken that initiative on because we want to run

8      safe, secure, and constitutionally regarded

9      facilities.

10     Q.    And is that one of the reasons that you have

11     policies and procedures and you upgrade them and

12     revise them over periods of time?

13     A.    Absolutely.

14     Q.    And that's what you utilize mortality reviews

15     to do in part.

16     A.    In part.

17     Q.    All right.  That's what you do when you have

18     performance reviews.  It may impact on a policy and

19     a procedure that may need to be revised.

20     A.    Correct.

21     Q.    Now, when employees at LMDC are hired for a

22     new position, they may be correctional officers that

23     are promoted or civilian employees that go to a new

24     position, what steps does corrections take to train

25     them in their new position?

1    A.    Well, again, it -- it -- it -- I want to make

2    sure that you understand that it's not a

3    one-size-fits-all application, that, first of all,

4    an individual has to meet minimum qualifications.

5    Okay.  We don't determine that internally.  That is

6    determined externally by metro HR.

7         So if you're a -- a clerk typist and you want

8    to be a -- and you've been there several years and

9    you want to be a classification interviewer, you're

10   going to have to meet those minimum qualifications

11   first and foremost.

12        And once you meet -- and if you meet those

13   minimum qualifications, then you're going to go

14   through a screening process, an application process,

15   an interview process, and our collective bargaining

16   nuances that also go into -- to this process.

17        And if you get that position or you get that

18   promotion and you meet all those basic requirements,

19   you're going to go through a -- a period of -- of --

20   of training and mentoring.

21   Q.    Okay.  And that is the responsibility of

22   corrections to make sure that new hires or people

23   that are promoted from within or taking new

24   positions are adequately trained at their new

25   position; is that right?

130

1     A.     Correct.

2     Q.     And do your policies and procedures reflect

3     that fact?  That people that are hired for new

4     positions that are promoted, they are given adequate

5     training to prepare them for that position?

6     A.     I'm going to ask you to -- to rephrase your

7     question.  I'm not sure where you're going with it.

8            MR. SIMON:  Tracy, can you ask the question

9     again?

10           THE REPORTER:  Sure.

11           (Reporter read from the record as requested.)

12    A.     Again, I don't understand your question.

13    Q.     Okay.  I'll restate it.

14           Do you have policies and procedures that

15    pertain to training LMDC employees?

16    A.     Yes.

17    Q.     Excuse me?

18    A.     Yes.

19    Q.     All right.  And do they provide a -- strike

20    that.

21           You told us earlier you identified the -- you

22    identified the LMDC PSU's report, case report

23    regarding Mr. Troutman's death?

24    A.     Yes, sir.

25    Q.     Okay.  That was Exhibit Number 8?

131

1       A.      Correct.  I have it in front of me.

2       Q.      Okay.  Now, what was the -- what was the

3   conclusion of the report?

4       A.      If you could rephrase the question, please,

5   or reask the question.

6       Q.      You're familiar with the report?

7       A.      I have it in front of me, yeah.

8       Q.      All right.  And you reviewed it in January of

9   last year?

10      A.      Correct.

11      Q.      And on the last page, this is page 6 of that

12  report, it talks about an email that apparently was

13  not received by the classification interviewer,

14  Mr. Cox.

15      A.      Okay.

16      Q.      Can you read that paragraph into the record?

17      A.      Paragraph states --

18              MR. OGBURN:  Objection.  Form.  Paragraph

19  speaks for itself.

20      Q.      Go ahead and read it into the record.

21      A.      The paragraph states, "The only written

22  direction pertaining to a requirement for

23  Classification Staff to gain Medical clearance prior

24  to placing an inmate in a single cell, was an email

25  sent to all classification personnel on January 13,

132

1     2014.  This email was sent seven months prior to

2     Mr. Cox receiving a bid to Classification; there was

3     no evidence that Mr. Cox was provided with this

4     information during his training."

5     Q.    So the conclusion made in this report had to

6     do with the classification officer placing an inmate

7     in a single cell without getting clearance from

8     mental health?

9     A.    I -- I don't know.

10    Q.    Well, you're familiar with Mr. Troutman's

11    suicide?

12    A.    I am.

13    Q.    All right.  And this is a case report that

14    dealt with that incident?

15    A.    This report is from over a year ago, so -- I

16    don't remember everything that's in the

17    investigation.

18    Q.    Well, Director, the -- you realize the -- the

19    whole point of this lawsuit --

20    A.    Uh-huh.

21    Q.    -- is about what happened to Mr. Troutman.

22    A.    Right.

23    Q.    Right?

24    A.    Right.

25    Q.    Okay.

133

1     A.     Absolutely.

2     Q.     You know from this situation Mr. Cox was the

3     classification interviewer?  He was the

4     classifica --

5     A.     I know that now, yeah.

6     Q.     Okay.  Well, did you know it at the time when

7     you read this report?

8     A.     I -- I haven't thought about it until I

9     discussed this with my counsel.

10           MR. SIMON:  All right.  Let's take a break.

11           THE VIDEOGRAPHER:  We are off the record at

12    2:35 p.m.

13           (Recess from 2:35 p.m. to 2:46 p.m.)

14           THE VIDEOGRAPHER:  We are back on the record

15    at 2:46 p.m.

16           MR. SIMON:  Thank you.

17    Q.     Director, I'm going to have you direct your

18    attention to Deposition Exhibit 7 at this time.

19    This is a document with some attachments, but first

20    two pages of the document I'm referring to as an

21    Inmate Alert Report.  Would that be accurate?

22    A.     Yes, sir.

23    Q.     And this is an Inmate Alert Report for

24    November 24th, 2015?

25    A.     Yes, sir.

134

1    Q.    And would -- well, strike that.

2          When was this protocol and practice

3    effective?

4    A.    I don't know the answer to that.

5    Q.    It was obviously effective on November 24th

6    of 2015?

7    A.    Yes.

8    Q.    On Exhibit 7, on the first and second pages,

9    there are a list of inmates who are -- have this

10   alert on them.  Would that be a fair statement?

11   A.    Yes.

12   Q.    And it has a start date and an end date for

13   each inmate?

14   A.    Yes.

15   Q.    In looking through the nine names that are on

16   this list, what's the oldest date that you see as to

17   the start date?

18   A.    It looks like it is October 9th of 2014.

19   Q.    Okay.  For Mr. Cambron?  That's the inmate

20   that it's designated for as the start date?

21   A.    Yes.

22   Q.    All right.  So would it be a correct

23   statement to say that the Inmate Alert Report that

24   was in existence on November 24th of 2015 was in

25   existence on October 9th of 2014?

1     A.     It was for Mr. Cambron.

2     Q.     How did you -- how did you, speaking you

3     being corrections, how did Louisville Metro

4     Department of Corrections develop this Inmate Alert

5     Report?

6     A.     Well, it is -- again, as I -- as I hope I was

7     able to convey throughout this deposition, that we

8     are -- we consistently try to improve and mitigate

9     challenges that we -- that we have with high risk

10    populations, and as I believe I -- I pointed out,

11    jails and especially old jails have bars and a lot

12    of bars, and this report and this protocol was not

13    something that historically has been in place, and

14    it came about as a result of trying to improve and

15    mitigate challenges with people that are at risk,

16    specifically those people that are acutely at risk.

17           You know, when I first got there in 2008, you

18    know, we were using 240 single cells on any given

19    day, and we have reduced that number probably by

20    250 percent, and that is a result of a lot of hard

21    work and constant review and performance improvement

22    initiatives.

23           This report -- and, you know, I don't know

24    this for a fact, and so I -- you know, I can't say

25    exactly when it started or what propelled us to try

1     to do something better, to take a intention of -- of
2     trying to do something and change something that is
3     problematic in the industry and in the business and
4     mitigate it, and -- and we've done that, by the way.
5     We did not have one in-custody death in 2016.  Not
6     one in-custody death in 2016.
7     Q.     All right.  Who --
8     A.     And it was a result of this type of process
9     where we're starting to achieve and have achieved
10     those type of results.
11     Q.     Who had input into developing this protocol
12     and practice?
13     A.     I would -- something like this is usually a
14     team approach that is a result of -- I mean, I could
15     tell you what my role was, was to bring people
16     together as director and have a brainstorming
17     session on how we can do something better.
18     Q.     Okay.
19     A.     It's just like with community detox.  You
20     know, we run the largest community detox program in
21     the region.  Not Healing Place.  Us.
22     Q.     Okay.  But what was the -- what was the
23     specific concern for developing this practical --
24     this practice and protocol?  What was happening that
25     lit a fire among you and the people you work with to

137

1     get this going?

2     A.     One suicide's too many.

3     Q.     So what the language of this alert would

4     indicate would be that an inmate whose name is on

5     this alert list and report could not be placed in a

6     single cell that had bars on it; is that correct?

7     A.     Without -- without a mental -- without mental

8     health staff releasing a person from that status.

9     Q.     Let's go back a little bit.

10    A.     Okay.

11    Q.     Who has the responsibility for placing an

12    inmate in a single cell that has bars?

13    A.     That had the -- a no bars?

14    Q.     That has bars.

15    A.     Well, that's --

16    Q.     Whose responsibility is that?

17    A.     That's a -- a classification move.

18    Q.     Okay.  Classification is part of corrections.

19    A.     Correct.

20    Q.     What is the criteria for being placed on --

21    an inmate being placed on this Inmate Alert Report?

22    A.     That would be a mental health team or staff

23    decision.  It is vetted and cleared by them.

24    Q.     So in -- everybody that's on this report,

25    your testimony is that mental health made a staff

138

1    decision that they were not cleared for --

2    A.    That's not my testimony, no.

3    Q.    Okay.  Well, explain to me what --

4    A.    Again, without --

5    Q.    It's mental health's decision.

6    A.    Without -- without drilling down into

7    everybody that's on this report and how they got on

8    a no bars alert, what I -- what I can tell you is

9    everybody that is a level one, okay, acutely

10   suicidal ideation, okay, that is vetted and

11   validated by mental health staff.

12   Q.    Is what you're saying -- let -- strike that.

13         If an inmate's in observation one, you're

14   talking level one and observation one --

15   A.    Uh-huh.

16   Q.    -- being the same person?

17   A.    Uh-huh.

18   Q.    Same type of category?

19   A.    OBS one observation, yeah.

20   Q.    Okay.  So if somebody is in -- if an inmate's

21   in observation one --

22   A.    Uh-huh.

23   Q.    -- it's up to a mental health professional to

24   release that person from observation?

25   A.    It's up -- it's up to the mental health staff

139

1       to put him on level one observation.  Okay.

2       Q.    Well, a level -- let me ask you this

3       question:  Information can be brought to mental

4       health from corrections staff, corrections employees

5       saying this particular incident happened and we're

6       bringing him to you because that's what we've been

7       trained to do, right?

8       A.    Yeah, that's collateral information.

9       Absolutely.

10      Q.    All right.  And based upon that information,

11      the mental health staff makes a determination as to

12      whether or not that inmate should be on level one

13      observation.

14      A.    Correct.

15      Q.    And your testimony is that an inmate that is

16      on level one observation can only be released from

17      level one observation by a mental health

18      professional.

19      A.    Correct.

20      Q.    And during this time period it would've been

21      a mental health professional employed by CCS.

22      A.    Yeah.  Correct.

23      Q.    Now, if they're not released into the general

24      population, if they're not released by a mental

25      health professional into the general population,

1      they're not going to go to a single cell with bars,

2      are they, if they're not released?

3      A.      Can you reask that question again, please?

4      Q.      Is there any possibility for an inmate who

5      has been placed on observation level one who is not

6      cleared by a mental health professional to wind up

7      on -- in a single cell with bars as long as

8      everybody's following policy and procedure?

9      A.      Right now, today, yes.

10     Q.      In 2015?

11     A.      I don't know.

12     Q.      How come?

13     A.      Because, again, what I -- what I -- what I

14     tried to convey to you, Counselor, within the last

15     five minutes, okay, this protocol was obviously in

16     place for Mr. Cambron at the time.  I'm clear about

17     that based upon this documentation.

18          Okay.  We just didn't come to this

19     conclusion, snap our fingers and come up with this

20     no bars alert process in an old antiquated jail that

21     is full of bars that has four, five, 600 more

22     inmates than what it was built for.  So it's a

23     process that developed over time as a performance

24     improvement measure as to how can we do things

25     better and different.

141

```
1              I can't tell you the exact time that this
2       protocol got traction and evolved into what it's
3       evolved into today.   That's what I'm trying to
4       convey.
5       Q.      The protocol and practice of this Inmate
6       Alert Report --
7       A.      Yes, sir.
8       Q.      -- are you saying that -- strike that.
9              Can you tell us the criteria for being -- for
10      placing an inmate on this Inmate Alert Report?   What
11      is the criteria?
12      A.      That is done by a mental health professional.
13      Q.      And a mental health professional says what?
14      A.      I'm not a mental health professional.
15      Q.      Okay.  Well, I mean, you're relying on --
16      A.      Right.
17      Q.      -- you're relying on an opinion of a mental
18      health professional that's working at your
19      facility --
20      A.      Correct.
21      Q.      -- during this time period.
22      A.      Correct.
23      Q.      All right?  And so what does the mental
24      health professional have to communicate to the
25      classification officer to put an inmate's name on
```

1    this alert?

2    A.    There's obviously something that -- that has

3    triggered the mental health professional that a

4    person is active suicidal ideation or there was a --

5    a reason to put them on a level one observation.

6          That's the purpose of the -- of the follow-up

7    with the mental health professional and the mental

8    health staff, is to determine whether they should be

9    placed on level one, remain on level one, for how

10   long, move from level one to level two.  They may

11   not even be put on level one, they could be placed

12   on level two.  That is the call from the mental

13   health staff.  That's why we pay $9 million a year

14   to have professionals do it.

15   Q.    An inmate that had been on level one -- one

16   and that was released to the general population --

17   A.    Okay.

18   Q.    -- are you saying every inmate that would be

19   in that category should be on this list?

20   A.    I'm not sure I understand your question.

21   Q.    All right.  Let me give you a hypothetical.

22   A.    Okay.

23   Q.    An inmate comes into corrections.

24   A.    Uh-huh.

25   Q.    An incident occurs.  Information is

1    communicated to the mental health provider at your

2    facility.  The mental health provider makes the

3    determination that person is supposed to be on level

4    one.

5    A.    Correct.

6    Q.    All right?  At a later point in time the

7    mental health provider releases -- the mental health

8    professional, the mental health provider releases

9    that individual back into the general population.

10   A.    Correct.

11   Q.    All right?  Under those circumstances are you

12   telling us in November of 2015 that person should've

13   been on the Inmate Alert Report?

14   A.    No, I'm not saying that at all.

15   Q.    Okay.  Well, I asked you what the criteria

16   was for being on the list, and -- am I incorrect in

17   interpreting that way?

18   A.    I'm not sure what you're interpreting it.

19   Q.    What you're say -- let me ask you this:  Are

20   you familiar with the inmates that are on this list?

21   A.    Am I familiar with the inmates?

22   Q.    Yes.  As the director of corrections.

23   A.    Counselor, I got 33,000 inmates a year that

24   come into my facility.  Am I familiar with the

25   individuals on this list?  I'm familiar with one.

1    Q.    There -- on November 24th of 2015, there are

2    nine individuals on this list.

3    A.    Right.

4    Q.    Mr. Troutman wasn't on this list.

5    A.    Right.

6    Q.    All right.  What I'm trying to find out is

7    what -- is there anything in addition to mental

8    health at your facility saying that person at

9    some -- that inmate at some point in time needed to

10   be on observation level one that would qualify them

11   for this list?

12   A.    No, the -- the individual was apparently

13   involved in a -- in an incident at booking where he

14   wrapped some gauze or something around his neck from

15   a -- from a hand injury.  That's what my review of

16   this case indicates to me.  Okay?  As a result of

17   that, he was put on the list to see a mental health

18   professional.  Okay?  He never had a no bars alert.

19        He saw mental health, mental health cleared

20   him for general population.  He never was -- never

21   received a no bars alert.

22        What the -- what the evaluation, based upon

23   the notes that I saw this morning, into the EMAR

24   report, in the medical report, indicated that this

25   individual, he -- his own words, was, "I did it to

1       get attention 'cause I didn't want to be here."

2              Thousands and thousands of inmates do that

3       every year.  Every day.  That's why we have mental

4       health professionals.  They made the decision, okay,

5       to clear him and return him to general population.

6       That's what occurred.

7       Q.     The fact that the mental health professional

8       did not refer to any reports from LMDC officers

9       regarding the suicide attempt incident on the 13th

10      of November, would that cause you some concern?

11      A.     I don't know that --

12             MS. O'REILLY:  Objection.  Form.

13      A.     -- Counselor.

14      Q.     You don't know what?

15      A.     I don't know if that -- if what you're saying

16      is correct.

17      Q.     Assume it's correct.

18      A.     Okay.  Rephrase the question, please.

19      Q.     If we've learned in this case and through

20      the -- you told us earlier that it would be your

21      expectation that a mental health professional would

22      refer to the reports of LMDC, the line officers, on

23      an incident that happened that generated an

24      Extraordinary Incident Report.

25      A.     It could.  Absolutely.  Yeah.

1   Q.     And that would be your expectation, that --

2   A.     That would --

3   Q.     -- that would be one of the pieces of

4   information a person in that position would rely

5   upon?

6   A.     That could be, yes.

7   Q.     Is it a fair statement to say that

8   corrections makes the decision to lodge an inmate in

9   a particular place in the jail?

10  A.     Not in every case.  The general population,

11  yes.  Disciplinary lockdown, yes.  Medical, special

12  needs, mental health, no.

13  Q.     Tell us what the process is.  Tell us what

14  the process for mental --

15  A.     Well, every case -- Counselor, every case is

16  going to be different based upon a -- you know,

17  based upon a variety of factors.  Everything from --

18  from mental health to chronic and acute diseases,

19  transgender, gang affiliations, keep separate

20  issues.

21  Q.     Okay.  Well, let me ask --

22  A.     Could be one or many of those woven together.

23  It's not a one-size-fits-all.  We use an objective

24  classification system that has built-in subjective

25  override functionality to it, and with medical and

1    mental health, all that is taken in consideration.

2    Medical, mental health drives that process.

3    Q.    An objective classification system would be

4    codified in policy and procedure?

5    A.    It is assimilated therein, yes.

6    Q.    All right.  That's where you'd find it,

7    that's where your staff would find it, right?

8    A.    Yes.

9    Q.    And that's what they're trained on, correct?

10   A.    That's what classification staff are trained

11   on, yeah.

12   Q.    All right.  Now, on this protocol and

13   practice of this Inmate Alert Report --

14   A.    Uh-huh.

15   Q.    -- where's the policy?  Is the policy

16   contained in anything that we've marked as a depo --

17   A.    No.  No.

18   Q.    -- deposition exhibit?

19   A.    Not that I saw, no.

20   Q.    All right.  And so where does the policy --

21   where does the -- strike that.

22         This is a -- Exhibit 7 is a Louisville

23   Metropolitan Department of Corrections document,

24   correct?

25   A.    Yeah.  Looks like an ad hoc document that was

1     developed for this purpose.  Yeah.

2     Q.    And it's produced by corrections personnel?

3     A.    Correct.

4     Q.    And you're telling us, or are you telling us,

5     that mental health has the final say-so as to

6     whether an inmate is on this report?

7     A.    Correct.

8     Q.    Have you examined the documents that

9     accompany this list of inmates that are on the

10    report?

11    A.    No.

12    Q.    They were provided us by your counsel.

13    A.    Okay.

14    Q.    Okay.  Let's go through this.  With

15    Mr. Cambron, these are all in sections about his

16    situation.

17    A.    Okay.

18    Q.    Okay.  Mr. Cambron was on the list, this

19    Inmate Alert Report, on November 24th, 2015, because

20    why?  What's the incident that caused him to be

21    placed on this list?

22    A.    I don't know.

23    Q.    Well, go ahead and read -- there's some

24    Extraordinary Incident Reports that are attached to

25    that.

1    A.    Okay.

2    Q.    All right.  Did it appear that this inmate

3    made a suicide attempt on October 8th of 2014 in a

4    single cell?

5    A.    I don't see that, but -- where are you

6    looking?

7    Q.    Okay.  On the Extraordinary Incident Report

8    on October 8th at approximately 19:40 hours --

9    A.    Okay.

10   Q.    -- 19:44 hours --

11   A.    Okay.

12   Q.    -- it's called the H5 East North 1 Cell 9.

13   Okay.  That's the beginning of this Extraordinary

14   Incident --

15   A.    Okay.

16   Q.    -- Report?

17   A.    Uh-huh.

18   Q.    Okay.  Okay.  The officer observed Inmate

19   Cambron in a semi squatted position on his bunk with

20   a piece of a towel tied to the bars and the other

21   end around his neck?

22   A.    Okay.

23   Q.    And he was holding on to it in his left hand,

24   his face was red and it says feet kicking.  Right?

25   A.    Okay.

150

1    Q.    All right.  Would that be fairly described as

2    a suicide attempt on that date?

3    A.    Yes.

4    Q.    Mr. Garrett's case.

5    A.    I'm sorry?

6    Q.    In Mr. Garrett's case, he's the next inmate

7    on the list.  The information that we were provided

8    regarding Mr. Garrett is contained in an inmate

9    notes.  This is an Xfile entry or the copy of an

10   Xfile entry?

11   A.    Yes.

12   Q.    And this entry indicates that the inmate had

13   made statements of -- saying that he is depressed.

14   A.    Correct.

15   Q.    And because of those concerns of the officer,

16   the corrections officer, he was removed from the

17   single cell with bars and placed on this list; is

18   that correct?

19   A.    Says, "Spoke with Nurse Hatcher who stated

20   inmate is not appropriate for mental health, but

21   would be better behind a solid door and with a no

22   bars alert."  Correct.

23   Q.    So it is one indication of the people on this

24   list that were not cleared by medical for general

25   population; is that correct?

1    A.    I don't understand your question.

2    Q.    Can you determine from the information that

3    accompanies Mr. Garrett's situation as to whether or

4    not he was cleared by medical to go into the general

5    population?

6    A.    It appears as if we gained fairly significant

7    guidance from medical, Nurse Hatcher, that they're

8    familiar with this inmate, he's not appropriate for

9    mental health, provide a guidance that would be

10   better behind a solid door with a no bars alert.

11   What it says almost verbatim.

12   Q.    As to the next inmate on the list, Mr. James.

13   A.    Okay.

14   Q.    My question is:  What was observed to cause

15   him to be placed on this list?

16   A.    It looked like an officer by the name of T.

17   O'Bryant was conducting his security checks, and

18   Inmate James indicated that he was having thoughts

19   of self-harm.  It looks like the officer notified

20   medical, again Nurse Hatcher, who the inmate looks

21   like validated with her that he was indeed having

22   self-harm thoughts, and that medical and Nurse

23   Hatcher indicates that he needed to be placed on

24   level one observation.

25   Q.    On in -- Inmate Montgomery, what indications

152

1    are in the Extraordinary Incident Report that would

2    show that he was appropriate for the Inmate Alert

3    Report?

4    A.    Again, it looks like -- looks like my

5    officers are doing a hell of a job.  Doesn't say

6    what Sergeant Schmitt was doing at the time, but

7    looks like he apparently had some type of dialogue

8    with the inmate, and the inmate made statements

9    wanting to harm himself or in this case wanting to

10   kill himself, he was put on level one observation by

11   Nurse S-N-A-R-D-O-N.

12   Q.    Okay.  Next inmate on the list is Ernest

13   Powell.

14   A.    Okay.

15   Q.    Are you familiar with Mr. Powell?

16   A.    I am not.

17   Q.    All right.  If you review the information

18   that looks -- that appears to be XJail entries, why

19   was Mr. Powell put on the list?

20   A.    Looks like -- I'm not going to assume

21   anything, but from what I can read here, it looks

22   like this was an elderly inmate, and he may have

23   been in our -- what we refer to as a -- as geriatric

24   housing.

25        A person can be placed on a bottom bunk for a

153

1      variety of reasons, and it could be medical

2      complications, medical issues.  If I was in jail, I

3      would need a bottom bunk.  Okay.

4          But it looks like this individual was having

5      some mental health issues.  A Sergeant Hornback

6      referred to a Nurse Mark, and he was put on a no

7      bars alert status.  Again, done in conjunction with

8      medical staff.

9  Q.    All right.  Mr. Rodriguez is the next inmate

10     on the list.

11 A.    Now this inmate I do know.

12 Q.    Okay.  How do you know Mr. Rodriguez?

13 A.    Mr. Rodriguez is what we call a familiar

14     face.  He has been -- he pretty much lives his life

15     in custody on the installment plan.

16 Q.    Okay.  There is a very brief Extraordinary

17     Incident Report associated with this document.

18     Basically Mr. Rodriguez made statements of

19     self-harm.

20 A.    Right.  Pretty much same scenario, other

21     than just about everybody knows who Mr. Rodriguez

22     is.  He has an extensive history with us.  I mean,

23     if I know these inmates personally by name,

24     everybody that works with them pretty much does.

25          And again, it looks like while being screened

1   by Nurse Stith during medical screening, the inmate

2   stated that he would attempt to harm himself, he put

3   on level one.

4   Q.    Okay.  The next inmate is Mr. Klock with a K?

5   A.    Yes, sir.

6   Q.    What was the -- what was the information in

7   the Extraordinary Incident Report that placed him on

8   this list?

9   A.    Apparently he was fresh arrest.  Looked like

10  probably during the assessment, made statements of

11  being suicidal.

12  Q.    Okay.  Mr. Presley is the next inmate.  What

13  information is there accompanying Mr. Presley that

14  would indicate he needed to be on this inmate alert?

15  A.    Are we talking Mr. Presley?

16  Q.    Yes.

17  A.    Okay.  This is apparently an inmate, we

18  intercepted a letter that the inmate had written

19  basically stating if he got bad news in court, he

20  was going to harm himself or hang himself.  This

21  information was -- medical then made the decision --

22  it looks like Lisa in mental health made the call to

23  bring him, when he went to court, directly from

24  court to second floor, a level one suicide

25  observation.

1          I got to tell you, I mean, I'm -- I'm

2     impressed by reading it.  Man, we're -- we're -- all

3     of these that we're talking about so far, this is --

4     this is the way it should be done.

5     Q.    Okay.  On Alex Smith, who is the last person

6     on the list, what incident prompted Mr. Smith to be

7     placed on the alert report?

8     A.    Looks like this individual, Mr. Smith, tied a

9     sheet around his neck.  Officer Wiley, Laws, and

10    D-U-R-G-A-S-I-N-G-G -- I-N-G-H were at the cell

11    immediately and started to -- medical treatment on

12    Inmate Smith.

13         Subject upon arrival at the scene, he was

14    alert and breathing.  Vitals were stable.  EMS was

15    called.  The inmate was sent out to U of L Hospital

16    via EMS.  That's where that report ends.

17    Q.    All right.  Director, do you know from day to

18    day the number of people that are on this list?  Do

19    you know the -- the lowest figure it's been up to

20    the highest figure it's been?

21    A.    I can tell you probably a range is pretty

22    close.

23    Q.    Can you tell us that?

24    A.    I mean, this information is available.  Been

25    zero, as probably high as 10 or 11.

156

1    Q.    When would it have been zero?

2    A.    Pardon me?

3    Q.    When would it have been zero?

4    A.    I -- I don't know, Counselor.  I can just

5    tell you that those reports are part of our daily

6    packet.  There have been times where there's been

7    zero, been times where it's been high.

8    Q.    All right.  I'll -- can you agree to give us

9    copies of those reports for at least the dates

10   beginning on October 9th of 2014 up until

11   November 24th of 2015?

12        MR. OGBURN:  Well, I mean, I'm not going to

13   guarantee anything without -- I -- I don't know how

14   long those reports are kept and for -- what are you

15   talking about?  Every day for a year?

16        MR. SIMON:  Yes.  Let me ask Director Bolton.

17   Q.    Are these reports archived?

18   A.    I can't tell you that for a fact.

19   Q.    How are they viewed by -- what -- what's the

20   manner in which they are viewed by jail personnel?

21   A.    Pardon me?

22   Q.    In other words, an inmate's name is on this

23   alert report.  Someone in classification has

24   generated this list?

25   A.    Yeah.

157

1    Q.    All right.  And how would other people

2    working in corrections know about whether or not

3    somebody's on this list -- whether or not an --

4    A.    There is a --

5    Q.    -- inmate's on this list?

6    A.    I understand.  There is a regular review

7    group that meets on a regular basis, and they review

8    everybody that is -- again, this is -- this is

9    ongoing, but there is a -- a specific group that

10   meets on a regular basis to discuss some of our more

11   challenging cases, including those that are on level

12   one at the time of that review.  And a lot of these

13   individuals we may already know through previous

14   incarcerations or challenges.

15   Q.    The individuals on this regular review list,

16   have they been the same during this time period?

17   A.    I'm not sure I understand your question.

18   Q.    You said there's a regular review group.

19   A.    Yes.

20   Q.    Okay.  Who are the people that are in the

21   regular review group that reviews the people on --

22   A.    Yeah.

23   Q.    -- then that's on this list?

24   A.    That would be -- that would be classification

25   staff, that could be operation staff, mental health

158

1    staff, medical staff.  It's a multidisciplinary

2    approach.

3    Q.    And how often do they meet?

4    A.    I -- I don't have that for sure, Counselor.

5    I believe it -- it -- again, I'd have to find that

6    out for sure.  It's a regular basis.  It's a

7    regularly occurring function.

8    Q.    And apparently and from what you're telling

9    us, it was in practice for at least a year, over a

10   year, before Mr. Troutman was found hanging on

11   November 24th of 2015.

12   A.    I'm not going to let you put words in my

13   mouth.  I'm not saying that.  I'm saying I don't

14   know about that.  What I'm saying is that there is a

15   regularly occurring multidisciplinary group, okay,

16   that meets on a regular basis to discuss in-staff

17   challenging cases.

18   Q.    Okay.  And that group -- is it correct from

19   what you're telling us, that group makes a joint

20   decision as to whether an inmate shows up on an

21   Inmate Alert Report?

22   A.    No.  That's not what I'm -- that's not what

23   I'm saying at all.

24   Q.    Okay.  What's the purpose of that group

25   meeting?

159

1    A.    The purpose of that group meeting, as I

2    discussed, is a multidisciplinary approach.  You

3    know what that means?

4    Q.    Uh-huh.

5    A.    Okay.

6    Q.    Well, you explain it to us.

7    A.    Okay.

8    Q.    What does that mean?

9    A.    A multidisciplinary approach is where we have

10   individuals working at corrections that have

11   different functions, whether it's security, whether

12   it's classification, whether it's medical, whether

13   it's mental health.  They meet collectively, okay,

14   as a team, okay, to discuss challenging cases.

15        It's not everybody that's on a level one.  It

16   could be people that are on level one, it could be a

17   person that's been locked up for four years on a

18   capital case that's in administrative segregation.

19        Serves a whole variety of purposes, but what

20   it's designed primarily to do is how is this inmate

21   doing, is he getting better, is he getting worse, is

22   he staying the same, is he taking his medication, is

23   he compliant, how's his hygiene, how is here -- how

24   are his nutritional habits, is he -- is he

25   decompensating, is he getting better, is his -- are

160

1        his meds adjusted right.

2              It's for a whole variety of purposes, but

3        basically it has to do with how well is that

4        individual doing in custody.  Is there anything that

5        we can do to try to improve upon that or -- or not.

6        Q.    I heard what you said --

7        A.    Okay.

8        Q.    -- about this is an ongoing thing and you're

9        developing this as you go along?  Is that what

10       you're telling us?

11       A.    No, it's -- it's dynamic.  It -- and I don't

12       know exactly how long that's been in place.  I've

13       been there for ten years.  We've been doing it for a

14       while.  But not every single case is staffed at

15       every single meeting.  It's -- it's -- it's dynamic,

16       it varies.  People come off that list, people go on

17       that list.  People go on that agenda, off that

18       agenda.

19       Q.    Is there a consensus among the individuals

20       that make up this review group that when it comes to

21       placing an inmate on an Inmate Alert Report, that

22       they should err on the side of caution?

23       A.    I'm not understanding your question.

24       Q.    You told us about the individuals that are on

25       the review group.  They're part -- they're from

1    classification --

2    A.    Okay.  Right.

3    Q.    -- they're mental health, they're medical,

4    they are -- what other category?

5    A.    Classification, medical, mental health,

6    security.

7    Q.    Okay.  They all meet and they talk about

8    particular inmates that are either on the alert

9    report or should be on the alert report?

10   A.    It could be, yeah.  Could be.  But they --

11   they do not decide who goes on level one and who

12   comes off level one.

13   Q.    I understand that.  I understand that.  Who's

14   the representative from mental health that's in that

15   group?

16   A.    It's an MHP and it's usually the mental

17   health, the MHP supervisor participates in that.

18   Q.    And what -- what would be the position of the

19   MHP supervisor?  Would it be --

20   A.    Supervisor's --

21   Q.    -- like a charge nurse?

22   A.    Supervisor's the MHP.

23   Q.    Su -- that supervise.  So it might be the

24   director of nursing?  Might be the health services

25   administrator?

1    A.    Well, there -- there are medical staff that

2    are on there and there are mental health staff that

3    are on there, that both --

4    Q.    I'm talking about -- talking about mental

5    health staff.

6    A.    And so your question is?

7    Q.    Who would be on this review group from mental

8    health?

9          MS. O'REILLY:  Objection.  Form.

10   A.    MHP -- MHPs as well as the MHP supervisor.

11   Q.    What are the positions that supervise the

12   MHPs, do you know?

13   A.    The MHP supervisor.

14         MS. NORRIS:  I'm sorry, I got a text, I need

15   to take a call.

16         MR. SIMON:  All right.  We'll take a break

17   and go off record.

18         THE VIDEOGRAPHER:  We are off the record at

19   3:35 p.m.

20         (Recess from 3:35 p.m. to 3:53 p.m.)

21         THE VIDEOGRAPHER:  We are back on the record

22   at 3:53 p.m.

23   Q.    All right.  Director, let me ask you if an

24   inmate that had been placed on observation one,

25   level one at LMDC in November of 2015 was cleared to

1    the general population by mental health --

2    A.    Uh-huh.

3    Q.    -- your testimony is he would not be placed

4    on this list?

5    A.    I want to be sure I understand your question,

6    Counselor, so if you can repeat that, please, or ask

7    it a different way.

8    Q.    An inmate at LMDC in November of 2015 --

9    A.    Uh-huh.

10   Q.    -- that had previously been placed in level

11   one observation, but subsequently cleared to enter

12   the general population, would that person

13   necessarily be on this list or not on this list?

14   A.    They would not necessarily be on that list,

15   no.  Absolutely not.

16   Q.    So they could be placed in general population

17   after they're cleared by mental health.

18   A.    Absolutely.

19   Q.    All right.

20   A.    Yes.

21   Q.    Now, while they're in general population, if

22   LMDC staff observes things with the inmate that

23   would indicate that they should be moved for

24   disciplinary --

25   A.    Okay.

164

1    Q.    -- what -- in November of 2015, what steps

2    were supposedly taken at that time?

3    A.    I'm -- I'm going to -- I'm going to have to

4    ask you to -- to repeat and rephrase the question.

5    Q.    Okay.  I'll do that.  An inmate in that

6    situation that was previously cleared by mental

7    health --

8    A.    Okay.

9    Q.    -- and is written up --

10   A.    Okay.

11   Q.    -- for fighting --

12   A.    Okay.

13   Q.    -- and there's going to be a disciplinary

14   move, what's the procedure on that?  What was the

15   procedure at that time?

16   A.    Again, it's -- it's not a -- it's not a

17   one-size-fit -- fit-all answer to a -- to a broader

18   question.  It depends upon the -- the nature of the

19   disciplinary infraction, it depends upon the

20   severity.  In this case you're asking me if it was a

21   fight.

22   Q.    Okay.  Well, let's talk -- let's talk about a

23   specific instance.  Okay?

24   A.    Okay.

25   Q.    In Mr. Troutman's case, he's fighting.

1    A.    Right.

2    Q.    He has a fight with another inmate.

3    A.    Right.

4    Q.    And at that time, in November of 2015, the

5    policy of LMDC was for him to be moved to a single

6    cell.  To be isolated from other individuals so he's

7    protected and he doesn't cause any harm to anybody

8    else.

9    A.    Correct.

10   Q.    Is that a fair statement?

11   A.    Again, it -- it's -- it's -- there's more to

12   it than that, but -- but okay.

13   Q.    All right.  Well, I mean, are you agreeing?

14   Is that the case?

15   A.    Well, again, you know, it -- it depends on a

16   lot of factors.  It depends upon, you know, did he

17   have a medical condition, did he have a mental

18   health condition, was he actively engaged in

19   suicidal ideation, had he already been cleared from

20   mental health.

21        Depends upon a lot of things.  If we're

22   talking just about a fight and a -- and a -- and a

23   somewhat serious fight, he will go into disciplinary

24   segregation.  Okay?  Now, do we do that all the

25   time?  Again, it's -- it depends upon the severity

1    of the situation.

2         If it's a -- if it's two inmates that are

3    having a verbal altercation and squaring off and not

4    throwing punches and they're -- and they are -- are

5    obeying officer commands, well, that may get handled

6    a little bit different as a -- as a warning, versus

7    physical punches, an actual fight, physical contact

8    made and a person being put on disciplinary

9    lockdown.

10        So not all fights or not all verbal

11   confrontations are -- are -- are -- are written up

12   and put in disciplinary lockdown.

13        In this case, in the Troutman case, and,

14   again, I have not seen the incident reports on

15   the -- on the fight, but he was brought back from

16   CCC, according to what I reviewed, and put on

17   disciplinary lockdown.  That I do know.

18   Q.    All right.  That's why I'm asking, in Mr.

19   Troutman's case, if the inmate movement -- I'm going

20   to show you Deposition Exhibit 11.

21   A.    Yes, sir.

22        (Bolton Deposition Exhibit 11 was marked for

23   identification and is filed with this transcript.)

24   Q.    What is -- what is Exhibit 11?

25   A.    It looks like a inmate movement report out of

1        the jail management system.

2        Q.    Okay.  Pertinent to Mr. Troutman himself,

3        right?

4        A.    Yes, sir.

5        Q.    And basically, what, is this like a screen

6        shot of the XJail information?

7        A.    It appears to be.  I mean, I'm not overly

8        familiar with this report, but that's what it

9        appears to be.

10       Q.    All right.  This is information that's

11       available to --

12       A.    Yes, sir.

13       Q.    -- corrections officers and CCS staff,

14       correct?

15       A.    Yes, sir.

16       Q.    So if we're going to trout Mr. -- if we're

17       going to track Mr. Troutman, this is Exhibit 11 --

18       A.    Yes, sir.

19       Q.    -- after his orientation on November 13th of

20       2015, there's a notation where Mr. Troutman tried to

21       hang himself on the booking floor in Hold 2,

22       correct?

23       A.    That's what this says, yes.

24       Q.    All right.  And is that similar -- that

25       information a very short version of the information

1      that was in the incident report, Deposition

2      Exhibit 5?  That match up?

3      A.     Exhibit 5 is a little bit more detail.

4      Q.     Well, sure.  But the XJail entry would be a

5      reflection of the same fact situation that happened

6      on --

7      A.     Yes.  Summary of that.

8      Q.     -- November 13th.

9      A.     Yes, sir.

10     Q.     All right.  And as a result of that, Mr.

11     Troutman was moved to observation one, correct?

12     A.     Yes, sir.

13     Q.     It also indicated that he was a detox patient

14     as well?  According to the inmate notes.

15     A.     Yes, sir.

16     Q.     Now, Mr. Troutman was cleared from detox and

17     for entry into the general population on the 17th of

18     November?

19     A.     Yes, sir.

20     Q.     Later on that same day, what we had mentioned

21     before, there's an inmate services note that denotes

22     the decedent's daughter calling, asking corrections

23     to give information about her phone number to her

24     father?

25     A.     Yes, sir.

169

1    Q.    From calls that come in to your facility,

2    what's your policy when an individual, relative,

3    close friend of an inmate, calls corrections and

4    wants to give information regarding an inmate?

5    A.    If that information gets to the right person,

6    we will attempt to do that.  I rarely see this in

7    a -- get entered into jail management system.  It

8    doesn't mean that it doesn't.  I -- I've never seen

9    it before.

10   Q.    Okay.  If we learn from an employee of LMDC

11   during the course of this case that if a call came

12   in and it was a medical related call, that employee

13   would transfer that call from that caller to

14   medical, the medical unit, so that information could

15   be received by that individual or -- and/or they

16   would be given the extension number, the caller, the

17   outside caller would be given --

18   A.    They should, yeah.

19   Q.    Okay.  So that's consistent with your policy

20   and your training of people that are on the

21   switchboard that take calls from the public?

22   A.    Well, we don't really have a switchboard,

23   Counselor.  Those calls would be coming in through,

24   you know, multiple sources.  You know, sometimes

25   people go to the Internet and they get a general

170

1    number, sometimes they get the number to medical.

2          So it could come in --

3    Q.    Well, at a point --

4    A.    It could come in a variety of different ways.

5    Q.    But as descri -- as I described it and what

6    we learned through depositions in this case, that

7    would be consistent with your policy.

8    A.    I think so, yeah.

9    Q.    All right.  So subsequent, if we go back to

10   Exhibit 11, the -- Mr. Troutman had a verbal

11   altercation with another inmate according to that

12   report, and Mr. Troutman was moved to CCC in a --

13   had like a keep-from order imposed with that other

14   inmate.

15   A.    Uh-huh.

16   Q.    All right.

17   A.    Correct.

18   Q.    So while -- and Mr. Troutman is at CCC, on

19   November 21st he receives a write-up for some

20   violation and as a result of that he's returned back

21   to the metro jail complex.

22   A.    Main jail complex.

23   Q.    Main jail complex.  All right.  And he is

24   placed in passive booking?  Is that what that is?

25   A.    Says he was placed on move list to passive.

171

1    Q.    So where is passive?

2    A.    I'm sorry?

3    Q.    Where in the main jail complex is passive?

4    A.    It's the first floor --

5    Q.    All right.

6    A.    -- off the sally port.

7    Q.    And the next entry was on the 24th of

8    November, the time being 12:58 military time, which

9    would be 12:58 p.m., that Mr. Troutman got a

10   write-up for fighting, correct?

11   A.    That's what it indicates.

12   Q.    Okay.  And it indicates that this was an

13   entry that was based upon information by a

14   disciplinary officer?

15   A.    It appears to be, yes.

16   Q.    So at that time, in November of 2015, what

17   was the policy and procedure of LMDC when an inmate

18   receives a disciplinary write-up?

19   A.    I'm not understanding your question.

20   Q.    Mr. Troutman was written up for fighting,

21   correct?  According to this inmate note on

22   November 24th of 2015.

23   A.    We're talking specifically Inmate Troutman.

24   Q.    Correct.

25   A.    Okay.  Yes.

172

1   Q.    He was moved -- he was put on a move list to

2   be put in a single cell.

3   A.    Correct.

4   Q.    That would be consistent with LMDC's policy

5   for an inmate that was being written up for

6   fighting.

7   A.    Correct.

8   Q.    When he's placed on the move list, what is

9   the responsibility of the classification officer

10  with LMDC in regard to his placement?

11  A.    To run them through the objective

12  classification process.

13  Q.    Okay.  What does that entail?

14  A.    It is a validated screen instrument that

15  drives housing of an individual.  In this case

16  apparently Inmate Troutman, being involved in a

17  disciplinary write-up, he was moved to a

18  disciplinary single cell.

19  Q.    Okay.  When he's put on the move list, what

20  is the responsibility of the classification officer

21  when that inmate at that point in time, in November

22  of 2015, is put in a single bell -- single cell with

23  bars?

24  A.    I'm not sure if I'm -- I'm understanding your

25  question again, Counselor.  What is his

173

1    responsibility.  I'm not --

2    Q.    What is the classifications officer

3    responsibility when --

4    A.    For determining housing of that individual.

5    Q.    Right.  What's his responsibility?  What's

6    his next step once he makes that --

7    A.    To run him through that classification

8    process.  In this case it was a disciplinary

9    classification based upon an incident, a physical

10   altercation that he was in.  He placed the

11   individual in a disciplinary segregation cell.

12   Q.    Okay.  Well, he doesn't physically place it.

13   A.    Well, he --

14   Q.    He puts him on a list to be moved --

15   A.    Correct.

16   Q.    -- for that.

17   A.    Correct.

18   Q.    Okay.  You would agree that one factor in

19   increased risk of suicide is fighting among inmates?

20   A.    It -- it -- as I conveyed during --

21   Q.    Uh-huh.

22   A.    -- earlier testimony, it could be.

23   Q.    So you -- if I have -- if I understand your

24   testimony right, saying Mr. Cox was the

25   classification officer at this point in time.

174

1    A.    Correct.

2    Q.    Okay.  And you know that because you reviewed

3    the report --

4    A.    Correct.

5    Q.    -- that was generated by both -- you've

6    reviewed the reports.

7    A.    Yes.

8    Q.    All right.  So you've -- you're telling us is

9    that there's an objective classification protocol

10   for Mr. Cox to go through at this point in time?

11   A.    Yeah.  Let me be -- let me be clear about

12   that.  There is an objective classification process

13   that we go through with all inmates.  When I look at

14   Inmate Troutman, he was moved to community

15   corrections.  Okay?  And that's the minimum security

16   classification, which meant during his

17   classification process he was classified as minimum

18   security.

19        We have minimum security cells in the main

20   jail, we have minimum security cells -- housing

21   units at CCC.  CCC is not just work release, it's

22   kind of a split between work release beds and

23   minimum security classification.

24        While he was at CCC, he was involved in an

25   altercation, apparently.  Okay?  As a result of that

1    altercation, he was moved back to the main jail

2    complex.  We do not have disciplinary segregation

3    cells at CCC, so because of the altercation that he

4    was in, he was moved back to the main jail complex,

5    okay, and moved by classification into that

6    disciplinary segregation cell as a result of that

7    altercation.

8    Q.    Now, what obligation -- now, the -- the

9    cell -- let me strike that.

10         The cell that he was moved into was a single

11   cell with bars.  That's the dorm he was moved into?

12   Mr. Troutman?

13   A.    Again, I -- it -- it -- I don't have that in

14   front of me again, but it sounds like it, yeah.

15   Q.    Well, yeah.  Because that's where he wound up

16   and died.

17   A.    He was moved into disciplinary segregation.

18   Right.  Right.

19         THE REPORTER:  I'm sorry.  Say your answer

20   again.

21   A.    He was moved into disciplinary segregation as

22   a result of the altercation.  That is correct.

23   Q.    Right.  And according to the timeline, he

24   gets written up for fighting on November 24th of

25   2015.  At 15:58 hours military time, or 3:58 p.m.,

176

1      Mr. Cox, the class -- classification officer,

2      notifies -- calls down to medical to notify Nurse

3      Brown of the fact that Mr. Troutman was placed in a

4      single cell with bars --

5      A.     Correct.

6      Q.     -- correct?  Okay.  Now, the records, the

7      jail records indicate that Mr. Troutman was actually

8      moved and put in the cell on -- on the fifth floor

9      of the Hall of Justice, which was a single cell with

10     bars, at 20:32 hours, or 8:32 p.m.

11     A.     Okay.

12     Q.     And later that evening, approximately two

13     hours later, at 22:47 hours, 10:47 p.m., is when the

14     corrections officers on that unit came in and found

15     him hanging and tried to save him.

16     A.     Correct.

17     Q.     All right.  The objective classification

18     process that you're talking about, is that codified

19     anywhere?

20     A.     As a matter of policy, yes.

21     Q.     All right.

22     A.     What was different -- I guess not different,

23     but what was the case here is Mr. Troutman, Inmate

24     Troutman was housed at CCC in minimum security

25     classification, was brought back on a major

177

1      disciplinary infraction for fighting.  Okay.  As a

2      result of that fight, he was put into a disciplinary

3      segregation.

4          Now, I will compare that to, it's no

5      different if he had been in minimum security in the

6      main jail complex and involved in a fight.  He

7      would've been put into disciplinary segregation.

8      Q.    And that's where he was put.

9      A.    That's where he was put.  Correct.

10     Q.    All right.  Once he's put there, what is the

11     responsibility of the classification officer to --

12     to protect Mr. Troutman for being placed in a single

13     cell with bars based upon Mr. Troutman's history?

14         MR. OGBURN:  Objection.  Form.  Go ahead and

15     answer.

16     A.    Mr. Troutman was never placed on a no bars

17     alert.  Okay?  Mr. Troutman had been placed on

18     observation as a result of a action that occurred in

19     the booking area when he was first brought in to

20     custody.

21         As a result of that act, Mr. Troutman was put

22     on a level one observation, was assessed by mental

23     health, was cleared by mental health, and was moved

24     to general population.

25         Further, as validated by the -- the note in

1     the EMAR, he was cleared by mental health and there

2     was a notation made in that EMAR that the -- that it

3     was an attention-getting act.  I believe that's what

4     the inmate said.  Something to that effect.  "I just

5     wanted to get out of here."

6          When he is moved to CCC, gets involved in the

7     altercation -- okay.  And I can't speak for the

8     mental health professional that cleared him.  Okay?

9     But what I can speak to is policy.  Okay?

10         There was nothing on this case that alerted

11    us, that gave us pause, that gave us reason to

12    believe, based upon him just being cleared, that he

13    was actively engaged in suicidal ideation or else we

14    wouldn't have put him there.

15         Now, what apparently Mr. Cox did -- I'm not

16    going to speak for Mr. Cox and I don't know if he's

17    been deposed or not, and if he has, what he said.

18    Okay.  But there was an investigation done, okay, an

19    administrative investigation that was done, and

20    Mr. Cox was cleared in that inve -- in that

21    investigation.  There was no policy violation.

22         Pragmatically, there was nothing to indicate

23    Mr. Troutman was at risk for self-harm.  Nothing.

24         Now, one of the most devastating things that

25    ever occurs, whether you're a jail administrator or

179

1    whether you're a counselor or staff or other

2    inmates, is an in-custody death.  It upsets me

3    greatly, as well as people around me.

4    Q.    It should everyone.

5    A.    Absolutely.

6    Q.    Director, let's stick to the answer to the

7    question.

8    A.    Well, I'm -- I'm attempting to answer your

9    question, Counselor.

10   Q.    You're just making a statement.

11   A.    It's a big deal.

12   Q.    It is a big deal.  That's why we're here.

13   A.    Absolutely.

14   Q.    I'm going to show you what has been marked

15   Deposition Exhibit 12 and ask you if you recognize

16   that exhibit.

17         (Bolton Deposition Exhibit 12 was marked for

18   identification and is filed with this transcript.)

19         MS. O'REILLY:  Am I missing Exhibits 9 and

20   10?

21         MR. SIMON:  We did -- yeah.  Nine --

22         MS. O'REILLY:  I'm sorry.  It's the --

23         MR. SIMON:  You got it?

24         MS. O'REILLY:  -- PIU report and the

25   diagram --

180

```
1              MR. SIMON:  Okay.

2              MS. O'REILLY:  -- that I got.

3              MR. SIMON:  All right.

4              MS. O'REILLY:  Okay.

5              MR. OGBURN:  Right.  Right.

6              MS. O'REILLY:  All right.  I've got it.

7    Thanks.

8    Q.    Okay.  You familiar with this email string?

9    A.    No, sir.  I -- I -- I believe I -- I believe

10   that this was -- I just saw this recently.

11   Q.    All right.  Who's Kyle Ernst?

12   A.    Kyle Ernst is a --

13   Q.    At that time?

14   A.    He worked in classification.  He's retired

15   now.

16   Q.    All right.  Was he director of

17   classification?

18   A.    No.

19   Q.    Who was William Ashby?  Or is William Ashby?

20   A.    William Ashby is a -- now he's a -- he

21   started off at -- at -- at Louisville Metro as a

22   corrections officer, retired as a major, came back

23   to us in a civilian capacity.  Works now in a -- in

24   a lower level civilian capacity.

25   Q.    In November of 2000 -- excuse me.  In
```

1    January 2014, Dwayne Clark, what was his position?

2    A.    Chief of staff.

3    Q.    Eric Troutman, what was his position?

4    A.    He is a deputy director.

5    Q.    Okay.  And this was an email that was sent to

6    those individuals, they are copied to those

7    individuals, but it was sent to corrections sta --

8    classification staff, right?

9    A.    Yes, it looks that way.

10   Q.    Okay.  I'm going to show you Exhibit --

11   Deposition Exhibit 13, ask you if you recognize this

12   exhibit.

13   A.    Yes, sir.

14         (Bolton Deposition Exhibit 13 was marked for

15   identification and is filed with this transcript.)

16   Q.    Okay.  What is it?

17   A.    Says policy 03-3.01 titled Special Management

18   Unit.

19   Q.    Individuals that are in disciplinary

20   segregation, are they included in the categories in

21   that policy?

22   A.    Yes.

23   Q.    All right.  And the last page of that

24   exhibit, can you go to that exhibit on the last

25   page?  You see the form that's included?

1    A.    Yes, sir.

2    Q.    Okay.  Does that form seem to match the

3    information that's in the email in Exhibit 12?

4    A.    Appears similar, yes.

5    Q.    All right.  And by the -- by the notations on

6    the last page of Exhibit 13, does it appear that

7    that form was incorporated into the -- the policy as

8    stated in division -- as stated in Exhibit 13?

9    A.    Restate the question, please.

10        MR. SIMON:  Could you repeat it, please,

11   Tracy?

12        THE REPORTER:  Sure.

13        (Reporter read from the record as requested.)

14   A.    I don't know the answer to that, and I'll

15   tell you why.  I -- without reading the entire

16   policy, I don't know if this form -- there's nothing

17   on this form to indicate that it is a ancillary

18   report or document pursuant to 03-3.01.  I don't

19   know that.  It's attached to it, but, again, I don't

20   know if it's part of the policy or not.

21   Q.    On that document on the last page --

22   A.    Yes, sir.

23   Q.    -- does it -- does it make reference to the

24   same numbered policy as -- that it's attached to?

25   A.    Left-hand corner?

183

1      Q.     No.

2      A.     Yeah, left-hand corner down here?

3      Q.     Yeah.

4      A.     Okay.  03-3.01 dash -- yeah, I'm not sure --

5      sure what the dash -- the dash two is, but certainly

6      the first part of that, yes.

7      Q.     All right.  Now, I'm going to take you back

8      to Exhibit 12.

9      A.     Okay.

10     Q.     The date on that email, what is the date on

11     that email?

12     A.     Looks like January 13th, 2014.

13     Q.     And what is the directive of that email?

14     A.     Basically what this email states is that the

15     classification supervisor is advising classification

16     staff anytime that you are requesting or need to use

17     a single cell, let them know that you'll call them

18     back, meaning custody staff, because you need to

19     find out if there are any medical conditions that

20     classification needs to make security aware of

21     before moving that person into a single cell.

22     Q.     Okay.  Now, an inmate that was actively

23     suicidal, would that qualify as a medical condition?

24     A.     If a person was actively suicidal, yeah.

25     Q.     So this is a directive to the classification

184

1        officer that requires him to communicate with

2        medical, correct?

3                MR. OGBURN:   Objection.   Form.   Go ahead.

4        A.      There's nothing to indicate that this is

5        embedded in policy, but, again, it was a --

6        obviously a best intention to mitigate risk.

7        Q.      How was -- how was this directive

8        communicated to classification staff?

9        A.      I'm not sure I understand your question.

10       Q.      Other than this email, do you know of any --

11       other than this email, during this time period in

12       November of 2014, would this have been communicated

13       to the classification staff in any other manner?

14       A.      I don't know that, sir.

15       Q.      What's that?

16       A.      I have no way of knowing that.

17       Q.      In the report, in the PSU report --

18       A.      Correct.

19       Q.      -- it indicated that the Classification

20       Officer Cox was not aware of this requirement --

21       A.      Yes, sir.

22       Q.      -- that he contact -- he get affirmative

23       information from medical that he can pass on to the

24       sergeant about whether this inmate should be moved

25       to a single cell with bars, correct?

185

1  A.  Correct.

2  Q.  And the reason that Classification Officer

3 Cox did not get that information is that it was not

4 in his materials when he assumed the position of

5 classification prisoner interviewer.

6  A.  I don't know that, Counselor.

7  Q.  That's what his testimony was.

8  A.  Okay.  Well, I -- okay.

9  Q.  Okay.  If that's what his testimony was --

10 strike that.

11   What -- what are your expectations -- or what

12 were your expectations in September -- excuse me,

13 November of 2015 for the classification officer to

14 communicate with medical about Mr. Troutman in that

15 situation?

16  A.  I -- I don't know what my expectations were

17 on -- on November 15th, 2014, Counselor.

18  Q.  Let's go back.  Whose responsibility was it

19 that Mr. Cox, as the classification prisoner

20 interviewer, had that directive?

21  A.  I'm not sure I understand your question.

22  Q.  The report, the PSU report by corrections --

23  A.  Yes.

24  Q.  -- indicates that Mr. Cox was unaware of the

25 directive to communicate with medical about putting

186

 1    a -- an inmate in a single cell with bars in this

 2    situation.

 3    A.    I believe what it says pursuant to this email

 4    of January 13th, 2014, as we have already discussed

 5    and -- and talked about, the email from Mr. Ernst

 6    is -- is advising his staff, based on what I see

 7    here, that that's that he wishes them to do.

 8    Q.    All right.  But according to Mr. Cox, he

 9    didn't receive that information.

10    A.    Okay.

11    Q.    Okay.  Whose responsibility was it that

12    Mr. Cox receive that important information?  Did

13    somebody have that responsibility?

14    A.    Well, it looks like the email was sent from

15    Mr. Ernst to Mr. Cox.

16    Q.    The email was sent to Metro Corrections

17    classification and others apparently at a time,

18    according to Mr. Cox and the PSU investigation,

19    before Cox assumed that position.

20    A.    Okay.

21    Q.    Mr. Cox testified that he was unaware of this

22    directive at the time that he was filling that

23    position and in communicating this information

24    regarding Mr. Troutman.

25    A.    Okay.

1    Q.    So who has the responsibility to make sure

2    that a classification officer that assumes that

3    position as a new hire is told about changes in

4    policy?

5    A.    My understanding is Mr. Cox -- my

6    understanding is that Mr. Cox contacted medical.

7    That's my understanding.

8    Q.    He contacted them, all right, but he didn't

9    get a -- didn't get a response back from medical

10   regarding Mr. Troutman.

11   A.    Okay.  Again, it -- it -- my understanding is

12   Mr. Cox contacted medical.  Now, whether or not

13   medical contacted him back, I don't -- I don't know

14   that.  It doesn't --

15   Q.    Well --

16   A.    It sounds like maybe that didn't occur.

17   Q.    Well, we're going to talk about that in a

18   minute, but who had the responsibility for informing

19   Mr. Cox of the policy?

20   A.    It's not a policy.  It was not writ -- it's

21   not recorded in the policy.  That practice is not

22   recorded in the policy.

23        MR. SIMON:  Have we marked this yet?

24        MS. NORRIS:  Uh-huh.

25        MR. SIMON:  Okay.  What --

188

1      A.    Looking for special management?

2      Q.    Yeah.

3      A.    Right here, Exhibit 13.

4      Q.    Okay.  Okay.  What's the effective date of

5    Exhibit 13?

6      A.    It looks like 4-17 of '14.

7      Q.    And under the definition of Disciplinary

8    Segregation, was Mr. Troutman -- at that point in

9    time, on November 24th of 2015, was he in

10   disciplinary segregation or pre-hearing confinement?

11     A.    According to the Exhibit 11 from Mr. Cox, the

12   inmate was moved pending disciplinary, notified

13   Nurse Brown of single cell use, waiting to hear back

14   from medical on that.

15     Q.    Okay.  Who in Louisville Metro Corrections is

16   obligated to make sure that Cox knows about this

17   directive?

18     A.    Well --

19           MR. OGBURN:  Objection.  Form.  Go ahead.

20     A.    Again, it looks like -- and -- and again, I

21   don't -- I don't know what Mr. Cox said or didn't

22   say, but what I see in the documentation is that

23   Mr. Cox notified Nurse Brown of single cell use and

24   then waiting -- was waiting to hear back from her on

25   that.  It looks like that notification was made.

189

```
 1          Now, whether Mr. Cox says he knew or didn't
 2    know about a memo that came sometime in
 3    January 2014, I don't know about that, but from
 4    Mr. Cox's entry on the movement report, it looks
 5    like he did just that.
 6    Q.    Where did he get -- where did Mr. Cox get a
 7    response from medical, receive a response from
 8    medical that would allow him to continue to keep Mr.
 9    Troutman on the move list?
10    A.    Again, I -- and, again, I don't have the
11    investigative report in front of me, so maybe I can
12    defer to that, but it's clear that he notified Nurse
13    Brown of single cell use and was waiting to hear
14    back from Nurse Brown on that.  Apparently he never
15    heard back from Nurse Brown.
16    Q.    Okay.
17    A.    Okay?  That's what I'm ascertaining.  And
18    again, I don't have the investigative --
19    investigation in front of me from -- that I read
20    January of last year.
21    Q.    Okay.  On Ernst's email --
22    A.    Yeah.
23    Q.    -- would you read again the first paragraph
24    where it says Staff?
25    A.    (Reading) Staff, from this point on -- from
```

190

1    this point on, anytime a sergeant calls you for a

2    single cell, let them know you will call them back.

3    You are to call Medical and speak with a supervisor

4    and say, I have an inmate that has to be housed in a

5    single cell.  Is there any medical condition that

6    classification needs to make Security aware before

7    moving to that cell?

8    Q.    Okay.  Continue.

9    A.    (Reading) PCI will then notify the sergeant

10   that the inmate can or can't be housed in a single

11   cell, at the same time updating the notes with who

12   you spoke with in medical and what the condition, if

13   any, who in security you notified.  This is to be

14   documented on the inmate notes.

15   Q.    So at that point in time, in November of

16   2015, an individual like Mr. Troutman could be

17   placed in a single barred cell --

18   A.    Uh-huh.

19   Q.    -- and actually moved into a single barred

20   cell --

21   A.    Uh-huh.

22   Q.    -- before there would be information given

23   back to classification that would allow him to be

24   placed there.

25   A.    I -- again, Counselor, I have not seen this

1    up until just within the last week or so, this --

2    this email from Mr. Ernst.  I'm not aware of it.

3         What I can tell you, based upon my review of

4    this case from a higher level, in reading the -- the

5    investigation at the time, Inmate Troutman was moved

6    into a disciplinary segregation unit based upon an

7    incident that occurred.  Okay?

8         There was nothing to indicate that he was

9    engaged in -- in -- in active suicidal ideation.

10   There was nothing to indicate -- there was -- there

11   was nothing to indicate, we did not know that he was

12   going to hurt himself.  There was nothing to

13   indicate that.

14   Q.    And you base that upon what?  You base

15   upon --

16   A.    I'm basing that upon, number one, there was

17   nothing to indicate in any of the notes, okay, that

18   he was a threat to self or others.  He had just seen

19   a mental health professional, I think it was about a

20   week before, where he was cleared from observation

21   to general population, and then there was further an

22   indication in the medical note that the -- that the

23   issue that triggered the observation to begin with

24   was nothing more than attention getting on his part

25   to begin with.  He wrapped gauze from his hand

192

1     around his neck.

2     Q.     You've testified to that.

3     A.     And -- and -- and you asked me to repeat it

4     and I am.

5     Q.     On the XJail information --

6     A.     Uh-huh.

7     Q.     -- it indicates that that inmate made a

8     suicide attempt and he's moved to observation one,

9     correct, on November 13th?

10    A.     Yes.

11    Q.     And that information would've been known to

12    Mr. Cox?

13    A.     It would've been known, sure.

14    Q.     Okay.  And according to Mr. Cox, it was known

15    to Mr. Cox.

16    A.     Right.

17           MR. SIMON:  Okay.  Let's take a break.

18           THE VIDEOGRAPHER:  We are off the record at

19    4:45 p.m.

20           (Recess from 4:45 p.m. to 4:56 p.m.)

21           THE VIDEOGRAPHER:  We are back on the record

22    at 4:56 p.m.

23    Q.     All right, Director.  What I want to do at

24    this time, I want to take you through the inmate

25    suicides that occurred at LMDC starting in October

193

1      of 2013.

2           On October 19th of 2013 a Mr. Mahmoud Hindi

3      hanged himself in a single cell with bars on the

4      fifth floor of the Hall of Justice.  You are aware

5      of that as director?

6      A.    Yes, sir.

7      Q.    What do you know about Mr. Hindi's suicide?

8      A.    What's the date again?

9      Q.    October 19th, 2013.

10     A.    It's four and a half years ago.  Just that I

11     believe Mr. Hindi was in custody on a -- kind of a

12     high profile double homicide case, I believe, and I

13     don't recall much else in terms of mental health or

14     him being a problematic inmate.

15     Q.    But the location where he was found and the

16     manner and instrumentalities of his suicide, that's

17     correct, he was hanging in a single cell with bars

18     with ligature?

19     A.    I -- I -- if you say so.  Again, I don't

20     remember exactly where he was found.  But as I

21     pointed out, I mean, I -- I've seen inmates --

22     Q.    Right.

23     A.    -- commit suicide by a variety of methods.

24     Q.    All right.  And Mr. -- and Mr. Hindi had been

25     cleared by mental health prior to being placed in

194

1     that single cell with bars?

2     A.     I don't know, sir.

3     Q.     You don't know?

4     A.     I -- I do not know about a case that occurred

5     almost five years ago.

6     Q.     After Mr. Hindi's suicide, did you institute

7     any policy changes regarding single cell use by

8     inmates with indications being high risk for

9     suicide?

10    A.     We -- as I -- as I attempted to convey

11    throughout this testimony, throughout this

12    deposition, that we are -- constantly review and try

13    to improve how we handle complex cases, how we

14    handle suicides, serious suicide attempts, use of

15    force.

16         (Ms. Norris left the deposition room.)

17    Q.     Okay.  That -- and that's why you do a

18    mortality review after an event like this, right?

19    A.     That's why we do after action reviews on a

20    lot of different things, yes.

21    Q.     All right.  And after Mr. Hindi's suicide on

22    October 19th, 2013, did that result in any change of

23    policy by corrections?

24    A.     Counselor, I -- again, it's almost five years

25    ago.  I don't know exactly.

195

1    Q.    Laron Moore is a person that hanged himself

2    with a ligature in a single cell with bars.  This

3    took place -- actually he made an attempt on

4    August 6th of 2013.

5    A.    Uh-huh.

6    Q.    All right.  Then he was released to the

7    general population in -- later in August of 2013,

8    and he committed suicide, he was successful on that

9    suicide attempt on January 3rd of 2014.

10   A.    Okay.

11   Q.    Are you familiar with Mr. Laron Moore's

12   suicide?

13   A.    I'm familiar with -- I am familiar with Laron

14   Moore --

15   Q.    All right.

16   A.    -- and the fact that he committed suicide,

17   yes.

18   Q.    All right.  Now, the other facts that I

19   mentioned to you about his previous attempt and

20   being cleared and then where it happened and with a

21   ligature in a single cell with bars, is that all

22   consistent with what your memory is of that event?

23         (Ms. Norris reentered the deposition room.)

24   A.    Can you -- can you rephrase the question,

25   please?

1    Q.    The facts that I told you surrounding

2    Mr. Moore at the jail about the method in which he

3    died --

4    A.    Uh-huh.

5    Q.    -- where he was housed, the type of unit that

6    he was housed in --

7    A.    Uh-huh.

8    Q.    -- and the fact that he was -- made two

9    suicide attempts, is that consistent with what your

10   understanding is about that -- about that suicide

11   and that inmate?

12   A.    Again, without -- without reviewing that

13   case, I certainly do remember the Larama -- the

14   Laron Moore suicide, and from a -- from a practical

15   perspective, it is the after action reviews, in --

16   inclusive of the mortality reviews, that create

17   opportunities for us to debrief and make

18   improvements.

19   Q.    So what did you do --

20   A.    And it was --

21   Q.    -- after Laron Moore's death?  Did you do --

22   A.    I can't tell you exactly what we -- exactly

23   what we did four or five years ago.  What I can tell

24   you is what we did then and what we do now are two

25   different things, and I think that -- that some of

1    the progress and some of the metrics bear that out.

2         And that is everything from -- from

3    implementing things like no bars, doing more

4    training, doing cross systems training, taking a

5    look at what works and what doesn't work.

6         You know, we haven't -- we haven't just sat

7    on our thumbs and had these things happen and not

8    been responsive to trying to make them and do

9    better.

10   Q.    Do you have Exhibit 12?  This is the email?

11   A.    I do.

12   Q.    Okay.  Isn't that something that was

13   instituted by corrections after Mr. Moore's suicide?

14   A.    Mr. -- Mr. Moore died when?

15   Q.    His second and successful attempt was

16   January 3rd of 2014.

17   A.    Okay.

18   Q.    All right.  And the date of this email that

19   was sent out by Mr. Ernst was what?

20   A.    Ten days later, on January 13th.

21   Q.    All right.  So are you telling us that this

22   was a measure that was taken in response to

23   Mr. Moore's suicide?

24   A.    I --

25         MR. OGBURN:  Objection to form.  Go ahead and

1    answer.

2    A.    I would say based upon the timing and the

3    dates that you just provided me, the -- the -- the

4    timing certainly looks as if that may be congruent.

5    Q.    And if you made this change that's reflected

6    in the email that's in Deposition Exhibit 12 --

7    A.    Uh-huh.

8    Q.    -- what steps did corrections do to make sure

9    that their classification staff understood that

10   directive?

11        MR. OGBURN:   Objection.   Form.   Go ahead and

12   answer.

13   A.    I'm -- I'm really having a tough time with

14   your question.   Your question is not making a whole

15   lot of sense to me.

16   Q.    All right.   I'll rephrase it.

17   A.    Okay.

18   Q.    The -- the methodology that is set out in

19   that email by Mr. Ernst --

20   A.    Yes, sir.

21   Q.    -- that is to accomplish what?   What is the

22   purpose of that?

23   A.    It appears that the purpose of this email

24   was -- and I think I pointed this out earlier in the

25   deposition, was to give guidance to classification

```
 1        staff when a sergeant calls for a single cell, let
 2        them know you're going to call them back, that
 3        you're going to check with medical.  And again, I --
 4        I can -- I can read this again if you wish.
 5        Q.    No, but what's it --
 6        A.    I under -- I understand what this says.
 7        Q.    Yeah.  Okay.  What's the import --
 8        A.    I don't understand your question.
 9        Q.    Why is that important?  Why is that an
10        important directive for classification officers to
11        follow?
12        A.    Well, again, I -- I didn't write this and I
13        didn't send it, I'm not aware of it, nor am I on the
14        distribution of this memo, but what I can tell you
15        is that if there are ways that we can mitigate risk
16        in self-harm, we're going to attempt to do that.
17        Q.    And this was a manner in which you attempted
18        to do that, right?
19        A.    This was a manner in which Mr. Ernst
20        communicated to his classification staff.  This is
21        not a policy, nor is it embedded in a policy.  This
22        was a communication, this was an internal
23        communication.
24        Q.    Well, it's in a -- would you say as a --
25        would it be a fair statement to say that it was a
```

200

1       communication for the purpose of fulfilling a -- an

2       objective of your policy?

3       A.      It was a communication guiding subordinate

4       staff to do something to mitigate risk.  That's why

5       this was done, to mitigate risk.

6       Q.      Right.  All right.  Continuing with the

7       suicides, the next is a Mr. Wright on October 27th

8       of 2014.  Do you remember that -- that suicide of

9       that inmate?

10      A.      No, I do not.

11      Q.      Did you -- were you involved in the -- the

12      after action review of Mr. Wright's suicide?

13      A.      Counselor, I -- I think I just pointed out I

14      don't recall that suicide, so if I don't recall that

15      suicide, I'm certainly not going to recall being

16      involved in the -- in the after action review.

17      Q.      Okay.  What -- what changes in LMDC policy

18      came about after Mr. Wright's suicide on

19      October 27th of 2014?  Do you know of any?

20      A.      No, but I know that -- I -- with an -- with

21      any critical incident -- and I do not recall the

22      Wright case specifically.  Should I get the

23      opportunity to review that case, I'm sure it may

24      come back to -- may come back to me.

25              Again, we look at every bad outcome as an

1   opportunity for improvement.  What exactly we did as

2   a result of that, I don't recall.  I don't recall.

3   Q.    There's an indication that there was an

4   inmate named Robert Workun, spelled W-O-R-K-U-N, was

5   an inmate suicide on February 26th of 2015.  Are you

6   familiar with that name --

7   A.    No.

8   Q.    -- as an inmate suicide?

9   A.    It's not ringing a bell, Counselor.

10  Q.    Going to show you an email -- or a document

11  that I've labeled Deposition Exhibit 14 and ask you

12  if you can identify that email.

13  A.    I can identify who the principals are and the

14  date.

15  Q.    Okay.  Who are the principals?

16  A.    Jennifer Eubanks.

17  Q.    And who -- what is her position with

18  corrections?

19  A.    She was a lieutenant over our Professional

20  Standards Unit who's since retired.

21        (Bolton Deposition Exhibit 14 was marked for

22  identification and is filed with this transcript.)

23  Q.    And she sent --

24  A.    Kevin Despain.

25  Q.    Yeah.  She spent -- sent this to Mr. Despain.

1       Who is Kevin Despain?

2       A.      Kevin Despain is a retired sworn, I believe,

3       sergeant with the Public Integrity Unit.

4       Q.      And that is part of -- that's corrections'

5       Public Integrity Unit?

6       A.      Yes, sir.

7       Q.      And the subject is the death re -- is death

8       reports for three inmates, correct?

9       A.      Correct.

10      Q.      All right.  And one of the inmates on the

11      list is Robert Workun with a date of death of

12      2-26-15.

13      A.      Correct.

14      Q.      And you're telling us you don't have any

15      information, any knowledge about that person's

16      death?

17      A.      What I'm telling you, Counselor, is I don't

18      recall.  That could've been an HIP person too.

19      Q.      Okay.  Well, what I'm saying is we have no

20      documents whatsoever in terms of discovery on

21      Mr. Workun's death, so can you provide --

22      A.      Yeah, you know why?  And again, I -- if I

23      may.

24      Q.      Sure.

25      A.      I -- and I don't know that, but I believe

1      that he may have been a HIP participant.

2      Q.    All right.  Can you give us --

3      A.    Now, if it's an HI -- if it's -- if it's an

4      HIP participant, it's not an in -- in-custody death

5      investigation.

6      Q.    I'd agree with that.  My que -- my -- my --

7      A.    I'm not asking if you agree, I'm telling you

8      what it is.

9      Q.    Okay.  So are you saying that's what it was?

10     A.    What I'm saying is --

11     Q.    Know that for sure?

12     A.    What I'm saying is --

13            THE REPORTER:  Gentlemen, I need one at a

14     time.  You're starting to overlap.

15            THE WITNESS:  All right.  Gotcha.

16     Q.    All right.  Let me ask the question.  Do you

17     know whether Workun was an HIP participant when

18     he -- when he died?

19     A.    I do not know that, but that name is not

20     familiar.  If it's not familiar, I'm thinking that

21     it could be.

22     Q.    Can you provide us that information?

23     A.    We can get that, yeah.

24     Q.    All right.  On February 16th of 2015, an

25     inmate, last name of Bolton, died by hanging from a

204

1    ligature point in a single cell with bars.

2    A.    Uh-huh.

3    Q.    Are you familiar with Mr. Bolton's suicide at

4    corrections?

5    A.    I'm familiar with that name.

6    Q.    Well, I know the name, but do you remember

7    the suicide?

8    A.    I -- I'm familiar with an individual with

9    that name committing suicide, yes.

10   Q.    All right.  This is an individual, records

11   show that he was booked on December 24th of 2015,

12   had a history of bipolar, PTSD, other psychological

13   issues, but -- and that he was placed in a single

14   cell with bars following threats to another inmate.

15   Would that -- would you have any information that

16   would contradict that?

17   A.    Not off the top of my head, no.

18        MS. NORRIS:  Just correct the date.  I think

19   you said booked 2-24-15.  It would be booked

20   2-24-14.

21        MR. SIMON:  '14.  You're right.  I apologize.

22   Q.    His date of death is 2-16-15.  Okay.  With

23   that correction, you have any information that would

24   contradict what I stated --

25   A.    Not off --

205

1    Q.     -- about his suicide?

2    A.     -- the top of my head, no.

3    Q.     Okay.  After -- this is Franklin Bolton's,

4    his full name.  After Mr. Bolton's suicide on

5    February 16th of 2015, can you tell us of any policy

6    changes that you made at LM -- LMDC regarding the

7    placement of inmates in single cells with bars?

8    A.     As -- as I've already stipulated, if I may

9    stipulate, previous testimony in this deposition, we

10   use all critical incidences as an opportunity to

11   make improvements, improvements our dynamic, and we

12   continue to look at making improvements --

13   Q.     Can you --

14   A.     -- that are within a --

15   Q.     Can you --

16   A.     Let me finish.

17   Q.     -- point us -- can you point us to any change

18   in policy that took place --

19   A.     Uh-huh.

20   Q.     -- after Mr. Bolton's suicide by corrections?

21   A.     Yeah.

22   Q.     Tell us.

23   A.     Yeah.  One change in policy would be we have

24   moved towards realtime constant supervision on level

25   ones observation, and not just relying upon a 15- or

1          20-minute officer watch.  The level ones are now

2     under constant supervision vis-à-vis remote

3     surveillance in a control room.

4     Q.     Was that in response to Mr. Bolton's suicide?

5     A.     That is in response to a challenge.  That's

6     what that's in response to.  So if your -- if your

7     question is, and I believe it was, what have we --

8     what are we doing or what have we done relative to

9     this arena, that's one of the things that we have

10     done.

11     Q.     Okay.  Could you have done that after an

12     earlier suicide?

13     A.     Yeah, we can Monday morning quarterback a lot

14     of things.

15     Q.     I'm just asking you the question.  Is it

16     possible that corrections could've -- could've

17     implemented that policy, do the realtime observation

18     of inmates on observation one at a time before

19     Mr. Bolton's suicide?

20     A.     I don't know if Mr. Bolton was on level one

21     observation at the time of his suicide, number one.

22     Okay.  But, yeah, we could've -- technology is

23     advancing every day, and the technology that we

24     re -- recently implemented is very new technology.

25     We are actually going to be expanding that

1    technology even further.  We have some significant

2    plans.

3         So you ask if we're doing anything.  We've

4    got several things that are --

5    Q.    All right.

6    A.    -- in the -- in the cue.

7    Q.    Director, let me ask you questions.  Okay?

8    A.    Okay.

9    Q.    Mr. Ashby was a inmate that committed suicide

10   in a single barred cell on the sixth floor of the

11   Hall of Justice on October 4th of 2015.  Do you

12   remember, you have a memory of Mr. Ashby's suicide

13   in corrections?

14   A.    I do.  I do.

15   Q.    Okay.  Tell us what else you remember about

16   it.

17   A.    That's about all I recall.

18   Q.    Do you recall that he was placed in a single

19   cell with bars as a matter of disciplinary

20   segregation after a fight with an inmate?

21   A.    No, I don't recall that.

22   Q.    Okay.  Would you have any information to show

23   that was not correct?

24   A.    No.

25   Q.    After Mr. Ashby's suicide on October 4th of

208

1       2015, can you point us to a change in policy or

2       procedure that came about because of that?

3       A.      I believe that, again, when you look at

4       things in total, certainly migrating towards

5       alternative housing and trying to figure out a way

6       to house people in a jail that's full of bars to try

7       to mitigate that, well, that is certainly one thing.

8       That's how this protocol developed with the -- with

9       the no bar -- bars alert.

10          Again, utilizing technology on level ones for

11      realtime observation again is another, and we have

12      some additional technology we're going to be adding

13      this year --

14      Q.      Okay.

15      A.      -- which would be much more --

16      Q.      You've mentioned that before.

17      A.      Right.  Well, you asked me again.

18      Q.      Can you -- okay.  But can you point us to any

19      particular policy or procedure that was changed as a

20      result of Mr. Ashby's suicide?

21      A.      I think I've answered that question.

22      Q.      Which is no.

23      A.      No, that's not what I said.

24      Q.      Tell us again what you said.

25      A.      Okay.  What I -- what I said is that we use

1    every critical incident as a opportunity for

2    improvement.  In -- in these cases that we have

3    discussed, we have implemented things like the after

4    action review, mortality review, in-depth

5    investigations on in-custody death.  We have

6    implemented additional training.  We had no training

7    in mental health prior to 2 -- 2008.  We've added

8    training on suicide mitigation.  We have done a

9    number of things.

10         If you're asking me specifically on the fly,

11   I'm not going to be able to give you dates, I'm not

12   going to be able to respond to incidents that

13   occurred three, four, five, six years ago, but I can

14   tell you that as a -- as a general response to your

15   questions, we have done a lot of things, including

16   the no bars protocol, to the point where in 2016 we

17   had no suicides and no in-custody deaths.  Zero.

18   Q.    And the no bars protocol -- strike that.

19         When you instituted the no bars protocol,

20   would it be a fair statement is that you could've

21   instituted that at an earlier point in time?

22   A.    We implemented it when we implemented it.

23   Q.    Okay.  According to what we've learned in the

24   case, after Mr. Troutman's suicide in -- on

25   November 24th of 2015, corrections no longer placed

210

```
 1        any inmate that was being handled for a

 2        disciplinary -- in a disciplinary manner in a single

 3        cell with bars.  Is that a change in policy that

 4        came about after Mr. Troutman's suicide?

 5   A.        Can you repeat the question again?

 6             MR. SIMON:  Could you restate it, please?

 7             THE REPORTER:  Sure.

 8             (Reporter read from the record as requested.)

 9   A.        That's not --

10             MR. OGBURN:  Objection.  Form.  Go ahead and

11        answer.

12   A.        Yeah, that's not a correct statement.

13   Q.        Okay.  Let me ask that question again.

14             Was there a change in policy by corrections

15        after Mr. Troutman's suicide that prohibited an

16        inmate who had a prior suicide attempt in custody

17        from being placed in a single cell with bars?

18   A.        No, that's not correct.

19   Q.        How do you know that's not correct?

20   A.        Because it's not correct.

21   Q.        So if members of Metro Corrections --

22   A.        Uh-huh.

23   Q.        -- are of the opinion that that is the policy

24        of -- of their employer, are they incorrect?

25   A.        Counselor, let's be real clear.  Okay.  I
```

1    don't know what -- what -- what others -- what --

2    what other individuals may have said.  What I'm

3    telling you is the fact of the matter.  Okay?

4        If there is a no bars alert on an individual,

5    he will not be placed in a no bars administrative

6    segregation housing.  Okay?  A no bars alert can

7    come off of an individual and sometimes it will stay

8    on an individual.  Okay?

9        A no -- just because a person gets released,

10   that no bars alert may or may not come off.  Okay?

11   There's a variety of -- of factors that drive that

12   process, but it's not absolute and it's not

13   everybody all the time.  It is on a case-by-case

14   basis.

15       But if you have a no bars alert in your

16   record and that's the -- and that has not been

17   removed for whatever reason, you should not be

18   placed in a bars segregation unit.  That I can tell

19   you.

20   Q.    If we learn during the course of this lawsuit

21   that corrections personnel believe that the policy

22   of LMDC is to prevent -- or would prohibit an

23   individual with a prior suicide attempt while in

24   custody from being placed in a single cell with

25   bars, would that person be incorrect about the

1     policy?

2          MR. OGBURN:  Objection to form.  Go ahead and

3     answer the question.

4     A.    I'm going to ask you to rephrase your

5     question.

6     Q.    I'm going to -- you want me to rephrase it?

7     A.    I want you to rephrase it.

8          MR. SIMON:  Tracy, read that back, please.

9          THE REPORTER:  Sure.

10         (The Reporter did not read back.)

11         MR. SIMON:  All right.  Let's take a break.

12         THE VIDEOGRAPHER:  We are off the record at

13    5:28 p.m.

14         (Recess from 5:28 p.m. to 5:36 p.m.)

15         THE VIDEOGRAPHER:  Okay.  We are back on the

16    record at 5:36 p.m.

17    Q.    Director, I'm going to ask you again if you

18    would look at the inmate movement notes on Mr.

19    Troutman.  Trying to remember the number on that.

20    A.    Exhibit 11?

21    Q.    Yes.  Eleven.

22    A.    Yes, sir.

23    Q.    All right.  So what's established from these

24    entries is that there's a notation by your staff

25    that Mr. Troutman was suicidal at -- soon after he

213

1    arrived at corrections, correct?

2    A.    I believe what the -- what the document

3    conveys is that the inmate tried to hang himself on

4    the booking floor.

5    Q.    All right.  That's what it says?

6    A.    Correct.

7    Q.    All right.  And as a result of that, he goes

8    to mental health and he's on observation one for

9    three days, correct?

10   A.    Looked like he was cleared for GP on

11   November 17th, but it says -- it says cleared from

12   detox.

13   Q.    Okay.  All right.  J2W/OB1 --

14   A.    I'm sorry?

15   Q.    -- is that -- on that entry, is that detox or

16   observation or is it just both?

17   A.    It looks like it's observation one, so that

18   would be inclusive of detox.

19   Q.    When he's discharged to general population on

20   the 17th of November --

21   A.    Yes, sir.

22   Q.    -- he could be discharged in one of two ways.

23   He could be put on a no bars list that there was

24   testimony about and -- that's Deposition Exhibit 7?

25   A.    No, I -- unless I'm hearing you correctly,

214

1    that's not correct.

2    Q.    He could not be put on a no bars list if he

3    was discharged --

4    A.    He was -- he was --

5    Q.    -- from detox?

6    A.    This -- in this particular case he was

7    cleared for general population.

8    Q.    Right.  But hypothetically he could've been

9    put on a no bars list.

10         MS. O'REILLY:  Objection.  Form.  Foundation.

11   A.    Okay.

12   Q.    Are you agreeing with me?

13   A.    No, I'm -- I'm -- I'm not really

14   understanding the breadth of your question or your

15   comment.

16   Q.    Let's just talk about inmates in general.

17   A.    Uh-huh.

18   Q.    An inmate that would be -- come into the jail

19   would have a situation where he tried to hang

20   himself according to LMDC officers' reports and he

21   goes to observation --

22   A.    Uh-huh.

23   Q.    -- for a period of time.

24   A.    Uh-huh.

25   Q.    When he comes out of observation, when he's

1      cleared from observation --

2      A.      Uh-huh.

3      Q.      -- by medical, he can either be placed on a

4      no bars alert list or he could be released to the

5      general population without that designation.

6              MS. O'REILLY:  Objection.  Form.  Foundation.

7              MR. OGBURN:  Same objection.

8      A.      Okay.

9      Q.      I mean, are you agree --

10     A.      I'm -- I'm not -- I -- I -- I --

11     Q.      Are you agreeing with me?

12     A.      No, I'm -- I'm -- I'm really not clear with

13     what you're trying to ask me, Counselor, so I'm not

14     going to try to put words in your mouth, I'm -- I'm

15     going to ask you to -- to rephrase the question.

16     Q.      When an individual is released from

17     observation --

18     A.      Okay.

19     Q.      -- during this time period at LMDC, he can be

20     released from observation by being put on a no bars

21     single cell alert or he can be released without that

22     alert.  Would that -- is that correct?

23     A.      I -- I -- I -- I guess that hypothetically

24     could happen.

25     Q.      Let me see.  Exhibit 7 is the -- here,

1    Exhibit 7 was the no bars alert.

2    A.    I've got it.  Yeah.

3    Q.    All right.  Now, this was an alert and a

4    procedure that was available at the time that Mr.

5    Troutman was released from observation, was it not?

6    A.    I'll stipulate that, yes.

7    Q.    Okay.  If an inmate is discharged into the

8    general population and a disciplinary matter came up

9    and discipline -- the disciplinary policy at the

10   time required that inmate to be placed in a single

11   cell --

12   A.    Uh-huh.

13   Q.    -- and there were no single cells available

14   without bars, what was the policy at corrections for

15   that inmate?

16   A.    I'm -- I'm going to have to have you repeat

17   the question.

18         MR. SIMON:  Tracy, can you repeat the

19   question?

20   A.    You -- you're speaking in a language that I'm

21   not understanding, Counselor.

22   Q.    Uh-huh.  I'll have her repeat the question.

23         THE REPORTER:  Sure.

24         (Reporter read from the record as requested.)

25   A.    I -- again, I'm not -- I'm not assimilating

217

1    the question.  I'm not getting it.

2    Q.    When an inmate is put in a single cell with

3    bars during this time period --

4    A.    Uh-huh.

5    Q.    -- and he is -- strike that.

6          When an inmate is put into a single cell with

7    bars at corrections during this time period, what is

8    the directive to the classification officer

9    regarding the movement of that inmate as indicated

10   in the email from Mr. Ernst?

11   A.    I know what the email from Mr. Ernst says.

12   Q.    Does that apply to that inmate's situation?

13   A.    No, these are -- these -- these are two

14   different things or could be two different things.

15   Q.    Right.  Explain why --

16   A.    This -- this --

17   Q.    -- they're two different things.

18   A.    -- this specifically says anytime a sergeant

19   calls, okay, anytime a sergeant calls, okay, an

20   individual that is involved in a -- for example, is

21   involved in a altercation at CCC and moved back to

22   the main jail complex, a sergeant may or may not

23   call, it may or may not happen.  Okay?

24         Now, again, remember, we do not have single

25   segregation cells at CCC.  That is a minimum custody

1    facility.  Okay?  So if there was a disciplinary

2    incident over at CCC and the CCC commander or shift

3    commander directs that that person return to the

4    main jail complex because of that disciplinary, it

5    sounds in thi -- like in this case a sergeant never

6    called.

7         Now, what James Cox did in this situation,

8    okay, is that it sounds like, and again I don't have

9    the report in front of me, but he may have spoke

10   with somebody.  I don't know if he spoke with a

11   sergeant or not.  He may have spoke with a captain,

12   he may have spoke with a lieutenant, he may have

13   spoke with just an officer.  I don't know.

14        But what it sounds like he did in this

15   situation is based upon being moved back and the

16   physical altercation that he was in, okay, he made

17   the decision to move him into a disciplinary

18   segregation status.  Okay?

19        It sounds like what he attempted to do is he

20   attempted to call mental health or medical staff.

21   It sounds like that, and it -- it's documented in

22   the movement report and in the case notes.

23   Q.    And his testimony, what we learned from his

24   testimony, is that he called to medical --

25   A.    Uh-huh.

1    Q.    -- for the purpose of communicating the fact

2    that he was -- he had placed Mr. Troutman on a move

3    list and he would soon be placed in a single cell

4    with bars.  That's what we learned from Mr. Cox's

5    testimony.

6    A.    Okay.

7    Q.    And Mr. Cox --

8    A.    Are you -- are you asking me to stipulate

9    that?

10   Q.    No.  I'm just telling you that we learned

11   that from Mr. Cox.  And Mr. Cox also said that he

12   had told Nurse Brown, who is a staff member with

13   CCS, of that fact.

14        Now, what would be your expectations of

15   medical to get information to mental health as to

16   the propriety of Mr. Troutman being placed in a

17   single cell with bars?

18        MS. O'REILLY:  Objection.  Form.  I think it

19   misstates testimony and it assumes facts not in

20   evidence.

21        MR. OGBURN:  Same objection.

22   Q.    Go ahead.

23   A.    My expectation is that Louisville Metro has a

24   contract with Correct Care Solutions.  We have that

25   contract for a reason.  Within that contract there's

1       a scope of work, and the expectation is that Correct

2       Care Solutions is going to comply with the terms and

3       conditions of that contract.  My expectation is is

4       they'll do just that.

5       Q.     And you have policies that deal with

6       communicating with your healthcare -- care provider?

7       LMPD --

8       A.     I --

9       Q.     LMDC does have policies that deal with

10      communicating with their healthcare provider?

11      A.     We have -- we have a litany of -- of

12      corrections policies, and Correct Care Solution has

13      their own set of independent policies.

14      Q.     Right.  When you --

15      A.     There are accreditation standards.

16      Q.     When they're -- when they were approved as

17      the healthcare provider --

18      A.     Uh-huh.

19      Q.     -- would one of the things that would've been

20      reviewed were their policies about communication?

21      A.     Not necessarily.

22      Q.     Would that be one of the performance points

23      that you would look at in evaluating a healthcare

24      provider?

25      A.     What I would look at and what I do look at in

1    evaluating a healthcare provider is how they -- how

2    have they performed in other jurisdictions, what

3    does their litigation history look like, what is

4    their SME qualifications, how does the scope of work

5    comport with a community care standard of -- of --

6    of medical correctional healthcare.  I mean, there's

7    a lot of things that we're going to look at.

8    Q.    Okay.  The HSA of CCS, Ms. Wallace, we

9    learned during the course of this lawsuit that she

10   believed that the information, the communication

11   handoff between the classifications officer and the

12   medical staff was a critical -- critical step.

13   Would you agree with her on that?

14         MS. O'REILLY:  Objection.

15         MR. OGBURN:  Objection.

16         MS. O'REILLY:  Form.

17   Q.    Let me rephrase it.

18         We learned during the dep -- deposition of

19   the HSA of CCS during this time period when

20   Classification Officer Cox called down and left a

21   message for mental health to weigh in and give

22   clearance to whether or not Mr. Troutman would

23   remain or be moved in a single cell with bars.  She

24   believed that that was a critical piece of

25   information that should've been communicated to

222

1    mental health.  Do you agree with that assessment?

2          MR. OGBURN:  Objection.  Form.

3          MS. O'REILLY:  Same objection.

4    A.    No, I really don't, but based upon -- and

5    again, I -- I'm not sure exactly what -- what Ms.

6    Wallace said or didn't say or how what she said may

7    have been assimilated, but I've been in this

8    business almost 40 years and communication is always

9    really, really important.

10         What I can tell you with a high degree of

11   certainty is that based upon Inmate Troutman, based

12   upon the behavior that -- that triggered the

13   evaluation in the first place was not the type of --

14   of -- was not suicidal ideation that I would

15   classify as acute.

16         Let me finish, if you would.

17   Q.    Go ahead.

18   A.    Or -- or not.  It's up to you.  And that is

19   based upon the mental health evaluation and that is

20   based upon the case notes that I read in the

21   electronic medical record.

22         Now, Mr. Troutman was cleared from medical to

23   go to GP.  Okay?  He was brought back for a

24   disciplinary infraction.  There was nothing to

25   indicate at the time of his return that he was

223

1   actively in -- there's nothing to indicate this,

2   that he was actively acutely suicidal.

3   Q.    Now, you --

4   A.    Nothing in the record to indicate that,

5   Larry.

6   Q.    Let me ask you this:  What's indicated in the

7   record is he's fighting with another inmate,

8   correct?

9   A.    Correct.

10  Q.    You have previously identified that as a

11  factor, a high risk factor of -- of a acutely

12  suicidal inmate.

13       MR. OGBURN:  Objection.  Form.

14  A.    I -- I -- I -- I didn't, and you can go back

15  and you can check the transcripts of what I said,

16  and I did not say that.  What I said, that is one of

17  many that could be.

18  Q.    Yes.

19  A.    That could be.  Not that is, that could be --

20  Q.    Right.

21  A.    -- based upon a compilation of a lot of

22  different things.

23  Q.    Right.  And among those lot of different

24  things would be the fact that this inmate made a

25  suicide attempt while he was in custody, it was

224

1      reported in an Extraordinary Incident Report by a

2      sergeant that you're familiar with.

3      A.     It was reported by a corrections officer, not

4      a mental health professional.  Okay.  That

5      corrections officer, those sworn corrections

6      personnel, did a great job of what we call due

7      diligence.  Okay?  Based upon what they saw and what

8      they observed, not as mental health professionals,

9      but they saw enough to see that this person needed

10     to be evaluated.

11     Q.     Bear --

12     A.     Okay?

13     Q.     I agree.

14     A.     And it was up to the mental health

15     professional to make the determination to either

16     continue them on observation, okay, to refer that

17     case to the psychiatrist or the nurse practitioner,

18     to develop a historical profile on that individual

19     based upon that assessment, okay, and develop a

20     treatment plan, to assess the incident in the --

21     in -- in how in-depth that incident was and how

22     serious it was, okay, and what that mental health

23     professional, what that medical professional did is

24     that based upon their evaluation with that inmate

25     and what their statement is with respect to that

225

1       inmate, he is cleared for GP, and this act, based

2       upon what is in the medical note, okay, was I'm

3       trying to get attention, I just want to get out of

4       here, I wasn't trying to harm myself.

5            Now, that's what we do know.  Okay.  There

6       was nothing that --

7       Q.    Do you know --

8       A.    Let me finish 'cause you asked me the

9       question.  What we do know, and there's -- and --

10      and there's nothing to -- to -- to -- to counter

11      this, is when Mr. Troutman was brought back from

12      CCC, minimum custody for a violation of behavioral

13      inmate guidelines, okay, there was nothing to

14      indicate at that point in time, a week later, just a

15      week after, okay, he was cleared by mental health

16      for general population, there was nothing to

17      indicate that he was actively or acutely had

18      thoughts of wanting to harm himself.  Because if he

19      had and based upon every case that we went over,

20      okay, we took appropriate action based upon what we

21      knew at the time.

22           We don't have a crystal ball, we do the best

23      we can with what we know at the time, and we do a

24      pretty good job of it.  What I can tell you, there

25      was nothing to indicate that this inmate had --

226

1    was -- was -- was going to kill himself.  If -- if

2    there was, we would've done something about it.

3    Q.    Okay.  As part -- part of the training, part

4    of your experience in all your years, are inmates

5    mani -- manipulative?

6    A.    Oh, course they are, Counselor.  Absolutely.

7    Q.    Thank you.

8    A.    If -- if -- you know why?  They are so

9    manipulative --

10   Q.    I didn't ask you why.  I said are they

11   manipulative or not.

12   A.    Well, if you want to ask me why, I'll -- I'll

13   answer that question for you.

14         (Ms. Norris left the deposition room.)

15   Q.    Can you tell us what you learned from your

16   after action review following Mr. Troutman's

17   suicide?

18   A.    On this specific case, I don't recall

19   exactly.  It's been a number of years.

20   Q.    And will you provide us that review, a copy

21   of that review?

22   A.    We don't administer that review process.

23   Q.    Okay.  That review goes to -- that --

24   A.    That review process, I believe I convicted

25   this earlier on in my deposition.  It's administered

227

1    by the contract medical provider.

2    Q.    All right.  Which is CCS.

3    A.    Yes, sir.

4    Q.    And do they provide you with a copy of that

5    review when it's completed?

6    A.    I don't recall.

7    Q.    Who would know whether or not you were

8    provided with a copy of that review?

9    A.    The contract provider, CCS would know that.

10    May know that.

11    Q.    What -- excuse me?

12    A.    May know that.

13    Q.    All right.

14    (Ms. Norris reentered the deposition room.)

15    Q.    The -- the outcome of Mr. Troutman being

16    placed in a single cell with bars obviously resulted

17    in his death.

18    A.    Is that a question or a statement?

19    Q.    That's the beginning of a question.

20    No, strike that.

21    MR. SIMON:  All right.  Let's go off record

22    for a sec.

23    THE VIDEOGRAPHER:  We are off the record at

24    6:02 p.m.

25    (Recess from 6:02 p.m. to 6:19 p.m.)

1          THE VIDEOGRAPHER:  We are back on the record

2     at 6:19 p.m.

3     Q.     All right.  Director, earlier you stated that

4     one suicide in the jail by an inmate is too many?

5     A.     Yes, sir.

6     Q.     Okay.  You still stand by that statement, I

7     assume.

8     A.     Absolutely.

9     Q.     And the time frame that is referenced by this

10    case, from October of 2013 until November of 2015,

11    when Mr. Troutman hanged himself in a single cell

12    with bars, you had six in-custody suicide deaths at

13    your facility.

14    A.     That sounds correct, yes.

15    Q.     What steps did you take after Mr. Troutman's

16    suicide to try to achieve an outcome of zero

17    suicides?

18    A.     Counselor, I believe that's a repetitive

19    question, but I'll -- I'll go ahead and -- and --

20    and respond again.

21         2016, by way of comparison, we had no

22    in-custody deaths, no suicides.  And as I have

23    stated I believe on multiple occasions throughout

24    this deposition, that we look at every critical

25    incident as a -- as an opportunity to improve, and I

229

1       think the -- the results of -- of using those

2       opportunities and developing measures, protocols,

3       and practices like the no bars alerts, like enhanced

4       technology that is constant observation --

5       observation on level one, by engaging in daily

6       briefings inclusive of our mental health staff and

7       enhancing communication, by improving and adding

8       training by being more mindful as to the skill set

9       of our mental health staff and looking for the best

10      that we can find are -- are all things that we have

11      engaged in over the years that we feel has -- has

12      driven the -- the -- the obvious metric of -- of

13      continuous improvement.

14             You know, jails are tough places.

15      Q.    Okay.

16      A.    And certainly, you know, continuous

17      improvement is something that we strive for, and I

18      think we've seen the results, and -- and -- and I

19      stand by the fact that -- that every suicide is --

20      is -- is tragic.

21      Q.    When you say you added training, can you be

22      specific as to the training that was added?

23      A.    Yeah.  And again, I'm certainly not the --

24      not the trainer or the -- or the subject matter

25      expert, but, you know, we have enhanced and modified

1    our training curriculum to be more inclusive of

2    signs and symptoms in utilizing our -- our mental

3    health staff to deliver that training.

4        I think the -- the -- the contract provider

5    has developed a higher level of -- of training and

6    oversight from the corporate perspective of their

7    local healthcare, mental health staff.  You know,

8    I've -- I've -- I've had lengthy discussions with my

9    colleagues across the nation on suicide awareness

10   and high risk --

11   Q.    Is this --

12   A.    -- and --

13   Q.    Is this something that you've done after

14   Troutman's death?

15   A.    No, this is something that we've -- we've

16   done all along.  Continuous improvement is a -- it's

17   a daily function, and certainly -- certainly the

18   outcome with Troutman is -- is just another one of

19   those things that -- that -- that -- that -- that

20   drive putting things under a microscope and --

21   and -- and trying to improve.  It's not just

22   Troutman.

23   Q.    What have you -- what have you implemented?

24   What policies, procedures, or practices have you

25   implemented after Troutman's death --

231

1     A.     Yeah, again, I --

2     Q.     -- if you can tell us?

3     A.     Counselor, I don't know that without in-depth

4     research.

5     Q.     What do you have to research?

6     A.     Well, you're -- you're -- you're asking me to

7     equate all of these things that we have done which I

8     just rattled off, and there's more and there's more

9     coming, and you're asking me to equate that with a

10    certain event and a certain time.  I'd have to plot

11    it out.  We would have to plot that out.

12    Q.     That's --

13    A.     I think that's reasonable and makes sense.

14    Q.     In the deposition we've identified maybe four

15    policies and procedures that were listed as

16    deposition exhibits.  Does that sound correct?

17    A.     I think you've got about 14 exhibits, I

18    believe.

19    Q.     No.  Exhibits that are copies of policies and

20    procedures.

21    A.     Okay.

22    Q.     Okay.  And what those policies and procedures

23    show is that if they were revised, they were revised

24    maybe every three years or so.

25    A.     Policies are reviewed annually.

232

1    Q.    But they're actually revised, according to

2    the exhibits that are in evidence or that you

3    testified to, maybe once every few years.

4    A.    Is that a question or a comment?

5    Q.    That's a question.

6    A.    Can you --

7    Q.    Do you agree with that?

8    A.    Can you --

9    Q.    Do you agree with me?

10   A.    -- can you rephrase the question, please?

11   Q.    How often were these -- how often were these

12   policies and procedures revised?

13   A.    Policies are reviewed every year.

14   Q.    And what changes were made to these policies

15   after Mr. Troutman --

16   A.    They -- I want to look at --

17   Q.    Wait, I haven't finished my question.

18   A.    Okay.

19   Q.    What changes to these policies that you have

20   identified as exhibits in this deposition, what

21   changes came about after Troutman's death?

22   A.    I think I've already asked -- you've already

23   asked and I've answered, and I -- and I don't know

24   specifically.  We went over two or three bullet

25   points in a six-page policy.

233

1      Q.    We know from the -- the testimony of other

2      witnesses in this case that Classification Officer

3      Cox called Nurse Brown regarding Troutman being

4      placed on a move list to go to a single cell with

5      bars, correct?

6            MS. O'REILLY:  Objection.

7      A.    Correct.

8            MS. O'REILLY:  Form.

9            MR. OGBURN:  Objection.  Asked and answered.

10     Q.    Okay.  Now, we know also that Classification

11     Officer Cox never got a return call back from mental

12     health regarding the placement of Mr. Troutman in a

13     single cell with bars.

14           MR. OGBURN:  Objection.  Asked and answered.

15     Q.    Would you agree?

16     A.    Correct.

17     Q.    If mental health in a situation like that

18     doesn't receive the communication from the

19     classification officer that an individual in Mr.

20     Troutman's situation is being moved into a single

21     cell with bars, doesn't that prevent him from being

22     evaluated at that point in time by a mental health

23     professional?

24           MR. OGBURN:  Objection.  Form.

25     A.    I'm not sure how many times you're going to

```
 1     ask me the ques -- same question a different way,

 2     Counselor, and --

 3     Q.     Can you answer that one?

 4     A.     I -- I -- I -- I will answer like you've

 5     asked similar questions already that Mr. Troutman

 6     was involved in a behavior that was reported by

 7     custody staff, by officers, that he had engaged in

 8     a -- in a -- in a -- in a gesture that they

 9     perceived to be self-harm.

10     Q.     Okay.  Well, wait.  Let me --

11     A.     You're --

12     Q.     I -- I -- let me interrupt you --

13     A.     Okay.

14     Q.     -- if I might, and then go ahead and explain

15     your answer.  Can you answer that question yes or

16     no?

17     A.     It's got -- I -- I -- I believe what I just

18     said is that you have asked this question to me

19     multiple times, and I will answer it the same way

20     I've answered the question already.  So if you want

21     a yes-or-no question, you can rephrase the question,

22     ask it again and I'll attempt to give you the same

23     answer, the shortened version.

24          MR. SIMON:  All right.  Tracy, can you ask

25     the same question?  Can you read back the same --
```

235

1     the question that I asked?

2            THE REPORTER:  Sure.

3            (Reporter read from the record as requested.)

4            MR. OGBURN:  Again, note objection to form.

5     Q.    Well, do you have an answer to that question

6     yes or no?

7     A.    I've answered that que --

8     Q.    Is that the --

9     A.    I've answered that question multiple times

10    throughout this deposition.

11    Q.    Tell me your answer -- just tell me your

12    answer to that question.  Is it yes -- is it yes or

13    no?

14    A.    It's not a yes-or-no question.

15    Q.    If mental health has no idea that Mr.

16    Troutman is being moved into a single cell with

17    bars, how in the world would they be able to do an

18    evaluation of him to do their dil -- due diligence

19    about whether --

20    A.    Couple things.

21    Q.    -- an inmate -- wait, whether an inmate in

22    his position should be placed in a single cell with

23    bars?

24    A.    Okay.  We'll go back and we can retrace this

25    again, Counselor.  Okay?  Mr. Troutman, as I was

236

1       stating before you interrupted me, okay, was

2       invol -- was involved in a -- in a behavior on the

3       booking floor at the time of his admission.  It was

4       reported.  It was reported by officers, it got to

5       mental health.

6            Mental health conducted an -- an evaluation

7       on this individual.  He was cleared on that

8       evaluation.  The notes in the medical database

9       indicate that it was not a serious attempt, that the

10      inmate himself --

11  Q.    Uh-huh.

12  A.       -- stated he was just trying to get out of

13      the -- out of a lockup.  You asked --

14  Q.    I'm --

15  A.       -- a question, I'll answer it the same way

16      that I have.

17  Q.    Okay.  Well, you have.

18  A.    Okay.

19  Q.    All right?  So my question is:  We're talking

20      about November 24th of 2015.

21  A.    Okay.

22  Q.    We're not talking about the 13th of November

23      of 2015.

24  A.    Okay.

25  Q.    Okay?

237

```
1        A.      Uh-huh.

2        Q.      So would you agree with the statement that

3    the evaluation of a client -- of a client, the

4    evaluation of an inmate who has demonstrated to your

5    line staff an attempt to commit suicide in your

6    institution, who is still in your institution,

7    shouldn't that inmate be subject to a continuing

8    evaluation process?

9        A.      For the -- for the -- for maybe the fifth or

10   sixth time, okay, 'cause I'm not going to allow you

11   to put words in my mouth.  Okay?  This individual

12   was seen and cleared by mental health.  Mental

13   health made a note in the medical record, okay, that

14   the attempt was really nothing more than attention

15   getting.  The inmate himself said he -- it was a --

16   it wasn't a -- even a halfhearted attempt.

17              We can pull the record out and --

18       Q.      It's right here.

19       A.      -- and -- and -- and -- and bring it up

20   verbatim if you wish.

21       Q.      It's right here.

22       A.      Okay.  Well, if you --

23       Q.      Is that it?

24       A.      -- want to pull it out as an exhibit, let's

25   do that.
```

1    Q.    Okay.  Here it is, it's Exhibit 15.  That's

2    Mr. Troutman's inmate medical record.

3          (Bolton Deposition Exhibit 15 was marked for

4    identification and is filed with this transcript.)

5    A.    Okay.  Would you like me to read it?

6    Q.    Have -- are you acquainted with it prior to

7    today?

8    A.    I equate -- today.

9    Q.    Okay.  All right.  Does it show that Mr.

10   Troutman has a history of substance abuse?

11   A.    Yes.

12   Q.    Does it show that he had a traumatic brain

13   injury?

14   A.    I'm not seeing it.  If you would like to

15   point it out.

16   Q.    Okay.  We learned from the testimony of

17   Dr. Smith that she made that -- she made note of

18   that history.

19   A.    Okay.

20   Q.    All right?  That -- we know from the medical

21   file that Mr. Troutman had a previous suicide

22   attempt when he was 13 years old?

23   A.    Where are you seeing that?

24   Q.    That's on Bate stamp page 3.

25   A.    Prior Self-Harm Attempt, age 13 when he --

239

1    "age 13 took few asa when angry."  Angry.  I'm not

2    sure what that means.

3    Q.    Okay.  Is it documented as a prior suicide

4    attempt?

5    A.    It's documented as a self-harm attempt, not a

6    suicide attempt.

7    Q.    In Dr. Smith's testimony, according to

8    Dr. Smith, she said that she had a conversation

9    during the 30 minutes that she spent with Mr.

10   Troutman before she made a determination to release

11   him into the general population with no follow-up,

12   that Mr. Troutman agreed that he would enter into a

13   no self-harm contract with her.  That's what we

14   learned.  In --

15   A.    Apparently customary in the business, yeah.

16   Q.    Well, would there be some documentation of

17   that contract in an inmate's medical record?

18   A.    I don't know that.  I don't know whether the

19   medical department --

20   Q.    Have you seen that in there?

21   A.    Pardon?

22   Q.    Have you seen that in his medical record?

23   A.    Well, Counselor, what you've put -- what

24   you've given me here looks like it's probably 50, 60

25   pages, so if you want to go through that, we'll --

240

1    Q.    Okay.

2    A.    -- schedule for --

3    Q.    If --

4    A.    -- another day.

5    Q.    No.  If I told you that there's no such

6    evidence of that, no self-harm contract in the

7    records --

8          MR. OGBURN:  Note an objection to form and

9    the rambling without question.

10   A.    Your question is?

11   Q.    If I told you that there is no such

12   indication of a no self-harm contract in Mr.

13   Troutman's rec -- medical records after I've

14   reviewed this record, would you doubt that?

15   A.    I wouldn't doubt that.

16   Q.    Okay.  In the Extraordinary Incident Report

17   that was from November 13th of 2015 -- should be in

18   there someplace.

19   A.    Do you know what exhibit that is, Larry?

20   What that exhibit number is?

21   Q.    Yeah.

22   A.    These are all over the place.

23         MS. O'REILLY:  Five.

24         MR. SIMON:  Is it 5?  Yes.

25   Q.    Yeah, it's a one-page document.

241

1      A.     Yes, sir.  Got it.

2      Q.     Okay.  Is there indication in that document

3      that Mr. Troutman expressed hopelessness and fear

4      about his future?

5      A.     Specifically what the report says is that,

6      (Reading) Inmate stated he was a junkie and had no

7      reason to live because he was going to get 20 years

8      for his charges.

9      Q.     And he made the statement, almost a quote, if

10     not a quote, "Leave me there to die."  Is that in

11     there as well?

12     A.     You have to point that out to me, Counselor.

13     I don't see it.  Again, it's been a long day.  I

14     don't see it in this report, no.

15     Q.     Okay.

16            MR. SIMON:  Huh?  Oh, okay.

17     Q.     I think we had seen that in another report

18     regarding the same incident.

19     A.     Yeah, it's not in Exhibit 5 that I can tell.

20            MR. OGBURN:  He had six hours with a lunch

21     break.

22     Q.     Okay.  From the investigation of the -- of

23     Troutman's death, do you remember seeing a report

24     that Mr. Troutman was informed by Corrections

25     Officer Ramey that nobody was posting his bond?  He

242

1    had -- Mr. Troutman had made an inquiry about the --

2    about that to the corrections officer shortly before

3    he committed suicide?

4    A.    I don't recall.

5    Q.    In the LMPD report --

6    A.    You got an exhibit?

7    Q.    Yes.  Nine.

8    A.    I don't recall seeing that exhibit.  The --

9    well -- how you remember those things.  I'm not -- I

10   don't recall seeing 9, at least with what you

11   provided.  Oh, here it is.  I do have it.  I'm

12   sorry.  Exhibit 9 dated April 25th, 2016?

13   Q.    Okay.  In that report --

14   A.    Yes, sir.

15   Q.    -- if you would go to the -- there's a

16   summary of an interview with an inmate named Mitchem

17   who was in the same single cell dorm with Mr.

18   Troutman that -- that evening.

19   A.    What page are you referring to?

20   Q.    It's on 2.

21   A.    On page 2?

22   Q.    I think.

23   A.    What paragraph?

24   Q.    Okay.  The bottom paragraph where it talks

25   about Inmate Donell Mitchem.

243

1    A.    On the bottom of page 2?

2    Q.    Yeah.

3    A.    Last paragraph?

4    Q.    No.  Sorry.  Hold on.  Think it's LMDC.  It's

5    Metro Corrections' report.

6    A.    So you're talking a different exhibit.

7    You're talking --

8    Q.    Oh, no, no, no.  You may be looking at the

9    right thing.

10   A.    This is L --

11   Q.    Yeah.  Yeah.

12   A.    This is L --

13   Q.    Yeah.

14   A.    This is LMPD.

15   Q.    Right.  That's what I'm asking you.

16   A.    Okay.

17   Q.    That's what I'm asking.

18   A.    I don't see anything in the last paragraph on

19   page 2.

20   Q.    Well, no, I was looking at the wrong report.

21   I apologize.

22   A.    Okay.  If we're going to keep going, I'm

23   going to have to get something to eat too really

24   quick.

25   Q.    We'll be finished.  We'll be finished very

1       soon.  Are we looking at the same thing?  Is this --

2       A.      No.  What this is, Larry, that's the LM --

3       Q.      I know.  I know.

4       A.      -- that's the LMDC report.

5       Q.      All right.

6       A.      It's a different exhibit.

7       Q.      Okay.  Well, go to that report.  I apologize.

8       A.      Okay.  That's what I tried to tell you.

9       Q.      Well, they're in both reports, and I just

10      have the wrong page marked.

11      A.      Okay.  You are looking at Exhibit -- what's

12      the exhibit on that?

13      Q.      Eight, I believe.

14      A.      I've got my hands on Exhibit 8.

15      Q.      All right.  Now, at the bottom of page 2 of

16      that report should be a partial paragraph talking

17      about Inmate Donell Mitchem?

18      A.      Yes, sir.

19      Q.      Okay.  And it reads in part, (Reading) Inmate

20      Mitchem stated he heard Inmate Troutman ask an

21      officer to check if his bond had been paid; then

22      heard Officer Ramey, who was one of the two

23      corrections officers on duty there that evening, to

24      advise him that the bond had not been paid.  Inmate

25      Mitchem stated Troutman started to punch or kick his

245

1    cell door and cuss because his bond was not paid.

2    A.    Right.

3    Q.    Then a few minutes later, there's the next

4    paragraph, Mitchem hears a sheet ri -- a ripping.

5    A.    Uh-huh.

6    Q.    So one of the potential warning signs of

7    suicide is receiving bad news?

8    A.    I'll stipulate that, yeah.

9    Q.    Okay.  And being agitated?

10   A.    Thirty-three thousand --

11   Q.    To a lesser degree.

12   A.    -- 33,000 inmates come into our --

13   Q.    I understand.

14   A.    -- our sally port every year.  They're all

15   agitated, safe to say.

16   Q.    Let me ask you this:  Can you tell us whether

17   or not an inmate kicking on his door inside a single

18   cell dorm like the one on the fifth floor of the

19   Hall of Justice, whether that inmate's banging on

20   the door can be heard by a corrections officer who's

21   in the corrections office on that floor?

22   A.    I -- I'm -- I'm not going to -- I can't

23   universally.  I can give you my opinion.  Depends

24   upon a lot of things.

25   Q.    Okay.  What --

1      A.     Depends on -- depends on noise level, what's

2      going on at that time, depends on the officer's

3      hearing, depends on what else is going on, depends

4      on radio traffic, depends on background noise.  Be a

5      whole lot of reasons why an officer can or cannot

6      hear or maybe responded or failed to respond based

7      upon noise.

8      Q.     Okay.  We've learned during the course of

9      this case that on occasions inmates would come from

10     other areas of the jail with their bedding and take

11     it to their new placement.  Has that been your

12     experience?

13     A.     Throughout my career that's -- that -- that

14     may or may not happen, yeah.

15     Q.     So it just depends.

16     A.     It just -- yeah, it just --

17     Q.     It might happen, it may not happen.

18     A.     It depends on a lot of things.  Yeah.

19     Q.     All right.  Director, I'm going to check with

20     my co-counsel one last time --

21     A.     Okay.

22     Q.     -- and then if we're done, we will let you

23     know.

24     A.     Yeah.  I think we --

25     Q.     All right?

1    A.    -- I think we indicated we'd be done at 6:30,

2    it's almost now 7:00 o'clock, and I have got to

3    get --

4        THE VIDEOGRAPHER:  We are off record --

5    A.    -- food.

6        THE VIDEOGRAPHER:  -- at 6:49 p.m.

7        (Recess from 6:49 p.m. to 6:53 p.m.)

8        THE VIDEOGRAPHER:  We are back on -- we are

9    back on the record at 6:53 p.m.

10       MR. SIMON:  Thank you.  Director, no more

11   questions.  If counsel have any questions.

12       MR. OGBURN:  I don't have any further

13   questions.

14       MS. O'REILLY:  None for me.

15       THE VIDEOGRAPHER:  Okay.  This concludes the

16   video deposition of Mark Bolton at 6:53 p.m.

17       (Deposition concluded at 6:53 p.m.)

18               *            *            *

19

20

21

22

23

24

25

248

1     STATE OF KENTUCKY      )
                             )  SS.
2     COUNTY OF JEFFERSON    )

3          I, Tracy P. Lundergan, a Notary Public within

4     and for the State at Large, my commission as such

5     expiring 23 January 2021, do hereby certify that the

6     foregoing deposition of MARK EDWARD BOLTON was taken

7     before me at the time and place stated and for the

8     purpose in the caption stated; that the witness was

9     first duly sworn to tell the truth, the whole truth,

10    and nothing but the truth, that the deposition was

11    reduced by me to shorthand writing in the presence

12    of the witness; that the foregoing is a full, true,

13    and correct transcript of the said deposition so

14    given; that there was no request that the witness

15    read and sign the deposition; that the appearances

16    were as stated in the caption.

17         I further certify that I am neither of counsel

18    nor of kin to any of the parties to this action and

19    am in nowise interested in the outcome of said

20    action.

21         WITNESS my hand this 13th day of March 2018.

22

23    _____

24    Registered Merit Reporter
      KY CCR 20042B070
25    Notary Public, State at Large

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634