UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

STEPHANIE TROUTMAN, Administratrix of the Estate of CHARLES R. TROUTMAN, Jr., Deceased,

Plaintiff,

v

LOUISVILLE METRO DEPARTMENT OF CORRECTIONS, ET AL.,

Defendants.

Civil Action No. 3:16-cv-000742-DJH

**DEPOSITION FOR DEFENDANTS**

*** *** ***

DEPONENT: STEPHANIE TROUTMAN

DATE: NOVEMBER 29, 2017

*** *** ***

KIMBERLEY ANN KEENE, R.P.R.
P.O. Box 20516
Louisville, Kentucky 40250
502-802-6305
kimberleycourtreporter@gmail.com

INDEX

Examination by Ms. O'Reilly...................... 4
Examination by Mr. Ogburn........................ 72
Re-examination by Ms. O'Reilly................... 75
Reporter's Certificate........................... 77

EXHIBITS

None.

**INDEX TO CERTIFIED QUESTIONS AND/OR REQUESTS**

None.

A P P E A R A N C E S

FOR THE PLAINTIFF:

CHRISTINA R.L. NORRIS, Esquire
P.O. Box 386
Prospect, Kentucky 40059
christina@norrislawky.com

LARRY SIMON, Esquire
239 South Fifth Street
Suite 1700
Louisville, Kentucky 40202
larrysimonlawoffice@gmail.com

FOR THE DEFENDANT:

MEGAN O'REILLY, Esquire
Blackburn Domene & Burchett
614 West Main Street
Suite 3000
Louisville, Kentucky 40202
moreilly@bdblawky.com

J. DENIS OGBURN, Esquire
Assistant Jefferson County Attorney
531 Court Place
Suite 900
Louisville, Kentucky 40202
Denis.Ogburn@louisvillyky.gov

The deposition of STEPHANIE TROUTMAN taken on discovery, pursuant to Notice heretofore filed, in the offices of Blackburn Domene & Burchett, Suite 300, 614 West Main Street, Louisville, Jefferson County, Kentucky, on November 29, 2017, at 2:04 p.m.; upon oral examination, and to be used in accordance with the Federal Rules of Civil Procedures.

* * *

STEPHANIE TROUTMAN, after having first been duly administered an oath, testified as follows:

THE WITNESS: Yes, ma'am.

* * *

**EXAMINATION**

BY MS. O'REILLY:

Q. Good afternoon, Ms. Troutman. As I said, my name is Megan O'Reilly, and I represent the Correct Care Solutions defendants in this lawsuit today. I'm going to ask you some questions about your father, Charles Troutman.

I'm just going to ask you: Do your best to answer the best you can. If you don't know an answer, that's perfectly okay. You can just say, "I don't know."

A. Okay.
Q. It's not a memory test.
As you can see, we have a court reporter here. She's typing up everything you say and everything I say.
So if you would just be so kind as to let me finish asking my question before you start answering, and I'll try and do the same for you. That way the record will be more clear when we have to read it back later.
A. Yes, ma'am.
Q. If I ask you a question and you don't understand it, let me know. I'm happy to rephrase it.
A. Okay.
Q. Otherwise, if you answer it, I'm going to assume that you understood the question --
A. Okay.
Q. -- okay?
Finally, if you need a break at any time, just let me know and we can take a break. This is not a marathon or an endurance contest.
Just as long as there's not a question pending, we can get up and take a break --
A. Okay.
Q. -- all right?

Could you please state your name for the record?
A. Stephanie Troutman.
Q. All right. And, Ms. Troutman, have you ever given a deposition before?
A. No.
Q. All right. What is your date of birth?
A. 3-26-89.
Q. And what is your current address?
A. 2235 South Shelby Street, Apartment 3, 40217.
Q. Who do you live at that address with?
A. Myself and my children.
Q. How many children do you have?
A. Two.
Q. What are their names and ages?
A. Jordyn Haysley. She's nine. And then Peyton Haysley. And she's four.
Q. What are the last four digits of your Social Security Number?
A. 1445.
Q. What is your marital status?
A. Single.
Q. Have you ever been married?
A. No.

Q. All right. What is your mother's name?
A. Rebecca Tanaka.
Q. What is your mother's marital status?
A. Married.
Q. Who is her spouse?
A. Christopher Tanaka.
Q. And is it T-A-N-A-K-A?
A. Yes, ma'am.
Q. How long has she been married to Christopher?
A. Two years.
Q. Does your mother -- or excuse me.
Do you have any siblings?
A. I have one brother.
Q. What is your brother's name?
A. Brandon Troutman.
Q. Does Brandon have any children?
A. He has a son.
Q. And what is his son's name?
A. Braxton Troutman.
Q. And he's --
A. Six months.
Q. -- a little one, isn't he?
A. Yeah.
Q. Okay. Is your brother married?

A. No.
Q. Is Braxton's last name Troutman?
A. Uh-huh.
Q. And according to your Answers to Interrogatories, it looks like Brandon lives in the same apartment complex as you --
A. He does.
Q. -- is that right?
A. He lives in apartment 1.
Q. Okay. That's nice.
A. Yeah, kind of.
Q. Were your -- and your father was Charles Troutman; is that right?
A. That's right. Junior.
Q. Okay. Were your parents, Charles Troutman and Rebecca Tanaka, were they ever married?
A. No. Her maiden name was Orr when they were together.
Q. O-R-R?
A. Uh-huh.
Q. Okay. How long were they together, if you know?
A. Until I was around 17 or 18, I believe.
Q. Okay. Do you know what year that would have been?

A. Well, I'm 28, so 2007.
Q. Okay.
A. Ish.
Q. So, they were together until around 2007. When did they first start dating?
A. My mom -- my mom was, like, 16, so -- she was born in 1972. So --
Q. 1988ish?
A. Yeah. Around '87, '88, I think.
Q. Did your parents live together at all during that 1987 to 2007 time period?
A. Most of the time.
Q. Okay. So growing up, did you live in a two-parent household?
A. I did.
Q. Okay. What is your educational background? Where did you go to high school?
A. Shawnee High School.
Q. Did you graduate from Shawnee?
A. I didn't. I made it to the eleventh grade, and I got pregnant.
Q. Okay. Did you ever get your GED?
A. No.
Q. Okay. Have you gotten any additional training or education after the eleventh grade?

9

A. No. But next year, my youngest goes to kindergarten, and I plan on going back to school.
Q. Okay. Great.
And I ask this of everyone I depose, so please don't be offended: Have you ever been convicted of any felonies?
A. No.
Q. Okay. And have you ever been convicted of any crimes involving fraud or dishonesty?
A. No. I've never been locked up.
Q. Okay. Let's talk about your employment history.
Are you currently employed?
A. I'm not.
Q. How do you currently make money or pay your bills?
A. My mother helps me, and my ex, I guess, was helping me. Mainly my mom.
Q. So, who is -- who's the primary financial supporter of your children?
A. Well, I have sole custody of them.
Q. Okay.
A. And I just recently haven't been working.
Q. Okay.
A. I've worked, you know, since I was, like, 16.

10

Q. Okay.
A. And I sometimes, on the side, help my mom clean houses with her business.
Q. Okay. What is your ex's name? Mr. Haysley, I assume?
A. Well, their father's name is Joe Haysley.
Q. Oh, Joe Haysley?
A. Joey.
Q. Joey?
A. Uh-huh.
Q. What is the last job that you had?
A. Family Dollar. I was a manager about a year ago.
Q. Okay. How long did you work at Family Dollar?
A. For about six months.
Q. From what time period to what time period, approximately?
A. It was summertime, I know that. So, maybe April, and then for six months.
Q. April of 2016?
A. Yes. To about September or October, yeah.
Q. Okay. What about before Family Dollar? What did you do?
A. I had a job at White Castle. Not for very

11

long. Maybe two months there. And I don't remember dates. I know it was before my father passed away.
Q. Okay. And what about before White Castle?
A. Better Way Food Mart. I worked there for quite a while, like a couple of years.
And I also worked at Annie's Pizza. Both of them jobs kind of mesh together. Like I would work at one place, and then that one, and I kind of went back to both of them.
Q. Okay. So off and on between Better food market and Annie's Pizza around the same time period?
A. Yeah, from -- from the time my oldest was born. So, from 2000 and -- about 9 or 8 on for a couple of years.
Q. Okay. Until around 2015?
A. Till around 2014 probably.
Q. All right. Any significant employment for any length of time prior to 2008?
A. No.
Q. Okay. Was your father ever providing financial support for your children?
A. He helped with my children a lot. Their father is an absent father.
Q. Okay.

12

 A. Yeah. He helped with my kids a whole lot, actually.
Q. Did he provide financial support or more --
A. Both. He worked on a daily basis, kind of -- anything you needed him to do, trees or houses or -- he was kind of a jack of all trades. So, yeah, both financially and, I guess, physically and emotionally.
Q. Currently, aside from -- well, never mind.
At the time of your father's death, in November of -- well, until the time he was incarcerated in November of 2016 -- or '15, excuse me -- where was your father living?
A. He had a house that he was living in for about a year before he passed away. Oh, well, about eight months before he passed away, in Portland. And then before that, it was kind of just everywhere. He was a rolling stone, I guess.
Q. Okay. When he was living in the house in Portland, I think --
A. I know it was on Alford Avenue.
Q. Okay. Alford Avenue.
Was he living with anyone in that house?
A. My brother stayed with him sometimes.
Q. Anyone besides your father and Brandon at

that address?
A. No.
Q. And you said prior to that, he would kind of go from place to place in terms of living?
A. Either he would have an apartment or he would stay with somebody or -- yeah.
Q. Okay. So, he would either have an apartment that he rented, or he would stay with friends?
A. Yeah. From the time him and my mom split up until -- yeah.
Q. Okay. When he lived with your mother, did they own a home or did they rent an apartment or --
A. They rented a home.
Q. Okay. They rented a home --
A. They rented a couple of homes, but --
Q. Okay.
A. -- for the most part of my childhood, his parents owned a home, and we lived there, because they -- you know, his parents had passed. We lived there till I was, I don't know, around seven or eight. We stayed in Portland my entire childhood, though.
Q. Okay. What does your mother do?
A. She cleans houses.
Q. Okay. In November of 2015, was your father employed?

A. Not like a real job. Not like a tax-paying job, no.
Q. Okay.
A. But he did work.
Q. Okay. What types of things did he do?
A. At that time, right before he got locked up, he was actually rebuilding a house for the guy that he was working for, which is the -- also the owner of the house that he lived in.
Q. Okay. What was that person's name?
A. Stephen Cockerell.
Q. C-O-C-K-R-E-L?
A. I think so. I think there's two "Ls."
Q. Okay. So, he was building a house for Stephen Cockerell at the time he was incarcerated?
A. Remodeling a house.
Q. Remodeling?
A. Yeah.
Q. Okay. Did he have his own business, or was this something he did on the side?
A. Uh-huh. Yeah, he did it on the side. He had no business.
Q. Okay. Did you -- do you know how long he was -- he had been doing that remodeling work for Mr. Cockerell?

A. A couple of months.
Q. And do you know if your father filed any -- a W-2 or W-4? I don't know the right forms for that, but for that type of employment.
A. Not in some years.
Q. Okay. Was your father in a romantic relationship with anyone in November of 2015, or leading up to that time period?
A. Nothing serious.
Q. Okay. So, would that be no or --
A. That would be no.
Q. Okay.
A. Yeah, he -- he didn't have time for relationships.
Q. Okay. Do you know the last technical employer that your father had where he --
A. See, I didn't --
Q. -- would have received a paycheck?
A. -- I didn't know that I was supposed to remember all of this stuff when it was happening, you know.
Q. Sure.
A. So, it's kind of hard for me to recall.
But he worked for a drywall business. I know the owner's name is Eddie Flinner. He worked there

for a while, but this was probably 2013 or so.
Q. Okay. Well, could that have been Advanced Drywall?
A. Yeah, I think it was.
Q. Okay. Okay. You also listed in your Answers to Interrogatories that your father may have worked at Frederick Roofing?
A. Yeah, he did work there.
Q. Do you know when that --
A. That was a long time ago.
Q. Okay. So, more than ten years ago?
A. Maybe not more than. That would be cutting it close.
Q. Okay.
A. Maybe around ten years ago.
Q. Okay.
A. Give or take a few years. His sister's husband's brother owns that.
Q. Okay. What's his name?
A. Freddie Hinkle.
Q. You also mentioned an American Roofing Company in your Answers to Interrogatories.
Do you know when your father would have worked there?
A. I think my mom or my dad's sister told me

about that place.
Q. Okay.
A. So, I'm not sure.
Q. Okay. So, that's not something that you have firsthand knowledge of?
A. Well, I mean, I would have known that he worked there, but I wouldn't have remembered the name of it or anything.
Q. Okay. So, you don't know when that would have been?
A. No.
Q. Okay. Do you recall if your dad ever worked for any tree services?
A. He worked for Turner Tree Service. He worked for his friend, Dwayne Cockerell's tree service. I don't know exactly what that was called.
Q. Is there one called C&C Tree Service? Does that --
A. Yeah, maybe that was one of them. He's worked at a lot of places. He's worked for a lot of tow truck places.
Q. Do you have any knowledge of when he would have worked for the tow truck companies?
A. I was younger.
Q. Okay.

A. I was a teenager.
Q. Okay. What about the tree services?
A. Probably when I was a teenager.
Q. Do you know what he did for the tree services when he worked for --
A. He would climb them trees and cut them down.
Q. Okay. What about the tow truck companies? What did he do for those?
A. Usually he drove a flatbed and would pick up, like, the big cars and vehicles and trucks.
Q. Do you know what he did for Advanced Drywall?
A. They just went in and drywalled homes.
Q. Okay. So, he was a laborer?
A. Yeah. He was very good with his hands.
Q. Okay. Did your father graduate high school?
A. No.
Q. All right. Did he -- do you know if he ever received his GED?
A. No.
Q. No, he did not?
A. He did not.
Q. Do you know -- or did your father ever

receive any vocational training or any other type of education after he left high school?
A. I don't believe so.
Q. Okay.
A. I think he was maybe going to get his -- the license that you have to have to drive big trucks.
Q. Uh-huh.
A. I think he maybe went to school for that for a little while, but I'm not sure what happened.
Q. Okay. To your knowledge, he never got that?
A. No, not to my knowledge.
Q. Okay. Do you have any knowledge about your father's medical history, whether he had any chronic conditions?
A. He didn't really go to the doctor a lot, so I don't believe he had any chronic conditions.
Q. Okay. Nothing like diabetes or anything like that?
A. No. No. He was pretty healthy.
Q. Do you know if your father had a primary care physician?
A. He didn't.
Q. Okay.
A. If it -- if he did, it would have been Family

Health Center, which is where we -- my whole family goes.
Q. Is that in Portland?
A. It is.
Q. Are you aware of any hospitalizations that your father may have had?
A. Prior to -- a year prior to his death, he was in the hospital for quite a while.
Q. And what was he hospitalized for?
A. He was in an altercation, and someone hit him in the head with a bat a couple of times. And he had some seizures, and he was in a coma for around two weeks. When he woke up, he had aphasia and traumatic brain injury. He was completely different emotionally after that.
Q. Okay. Do you know who assaulted him in that fight?
A. Yeah. The guy was arrested. Leslie Redfern.
Q. Leslie Redfern?
A. Uh-huh.
Q. Did your father know Leslie Redfern?
A. Yeah. We've known him my entire life.
Q. Do you know what caused Leslie Redfern to assault your father?

A. It was a misunderstanding. And the guy was under the influence of something, so he wasn't being very rational.
Q. Do you know what the misunderstanding was over?
A. They thought my father stole something. And he didn't. I'm sorry.
Q. Leslie?
A. He -- he thought, yeah, Leslie thought, that my father stole something.
Q. Was that altercation drug related, if you know?
A. No. I mean, besides that Leslie was under the influence and was impulsive and not clear-headed.
Q. Okay.
A. Other than that, no.
Q. So to your knowledge, your father was not on drugs at that time, during the assault?
A. Well, no. He wasn't like -- I don't believe so.
Q. Okay.
A. He wasn't belligerent or anything. He -- from what I heard -- I wasn't there, but from people that were there, he was trying to calm the situation.

Q. Okay. And I apologize if I'm asking kind of uncomfortable questions.
A. You're okay.
Q. I just have to get --
A. Yeah.
Q. -- you know, I have to get my questions answered --
A. You're fine.
Q. -- so I apologize if it seems a little intrusive.
Your father was taken to University of Louisville Hospital after that altercation; is that right?
A. Yes, he was.
Q. Okay. How were you notified that the altercation occurred and that your father was in the hospital?
A. I lived with my mother, and they called my mother's phone, the hospital did, and told us to come up there.
Q. Okay. Do you know how they had your mother's name?
A. I think she was his emergency contact from forever ago.
Q. Okay.

A. And if it wasn't that, then it was all of the people that were there. Because it was in Portland, so we knew a lot of people.
Q. Okay. You said your father was hospitalized for about two weeks -- or in a coma for two weeks?
A. Yes.
Q. In pretty bad shape --
A. Yes.
Q. -- after that assault?
A. It damaged the left side of his brain. So, he couldn't put together a coherent sentence or write down anything that looked remarkably like a word, which it frustrated him.
Q. Uh-huh.
A. He had to have a feeding tube afterwards, and it -- for a man that didn't really go to the doctor, it was a lot. For anybody it would have been a lot.
Q. Sure. And he was ultimately discharged from U of L?
A. Yes.
Q. And how -- do you know how long, ultimately, he spent in the hospital after that incident?
A. I think it was a total of, like, 14 days or 15 days.
Q. Okay. Was he discharged home after that, or

did he go to --
A. He --
Q. -- transitional living?
A. He had to go live with a friend. They made him go live with somebody who could take -- like help him take care of himself.
Q. Okay. Whose friend -- which friend did he go to?
A. Michelle Campbell.
Q. And who is Michelle Campbell?
A. My mom's best friend of -- since they were kids.
Q. And was Michelle and your father, were they friendly as well?
A. Yes.
Q. Okay. So, Michelle volunteered to assist your father rehabilitate after this incident?
A. Yes, she did.
Q. Okay. How long did your father live with Ms. Campbell after that assault?
A. For the better part of a year, until a -- well, no. No. He lived with her for maybe six months or so, because her father had just passed away, also, so it kind of wasn't an ideal environment.
Q. Okay. Did anybody else live in the house

with Michelle and your father during that time?
A. No.
Q. Okay. You said after that incident, your father changed emotionally.
Could you tell me what -- what you mean by that?
A. He was more impulsive. He would get angry and aggravated and not even have, like, a valid reason for it. Maybe 20 minutes later, he would say he was sorry. "You know, I don't know why I was so upset." He got flustered easily. Just, I would say, really impulsive.
Q. Any other emotional changes that you recognized in your father after that assault?
A. He -- depression a little bit, I think. Anger a little bit, I think, but not terrible, you know. Just, I think, bouts of anger. That would be about it.
Q. Did the doctors at the hospital tell you anything about what to experience or what someone with a traumatic brain injury might experience after?
A. They told me that they were all completely different, and some of the -- you know, the symptoms would be different. And they told me what to expect with the aphasia.

Q. Okay.
A. But as far as the brain injury, they -- they really couldn't -- maybe generally they told me, but nothing specifically.
Q. Okay. Did your father receive any follow-up care after leaving the hospital for that assault?
A. I think that he was supposed to go to, like, an outpatient rehab. But, of course, he didn't. They went -- they took his feeding tube out. Other than that, no.
Q. Okay. Do you know -- or did your father receive any mental health treatment after that assault?
A. No.
Q. Okay. Was Leslie Redfern convicted for assaulting your father?
A. I'm not exactly sure how it happened, but I know that he was arrested the day that it happened, and he stayed in jail until after my father passed away. So, he is released now, though, I know that.
Q. Okay. Was your father, as far as you know, ever on disability?
A. No.
Q. Prior to the assault in December of 2014, is when that took place?

A. That was -- that's close. That sounds about right.
Q. Okay. Were -- are -- were you aware of any mental health issues that your father had?
A. No.
Q. Okay.
A. He was a get up and drink coffee and listen to the birds kind of guy.
Q. Do you mean that he was a pretty easygoing person?
A. Yeah. He was happy and very easygoing.
Q. So prior to about November or December of 2014, you are unaware of any issues your father may have had with depression?
A. Correct.
Q. Okay. And similarly, are you aware of any suicide attempts by your father prior to November or December of 2014?
A. No. I know everybody says that they're surprised by suicides, but we were completely taken off guard.
Q. And that probably answers my next question, but you're unaware of any counseling or psychiatry treatments, or anything like that, that your father would have gotten prior to December of 2014?

A. Right. I'm unaware of any.
Q. Okay. I would like to move on just for a minute to any substance abuse that your father may have been -- had struggled with.
Were you aware of any times in your life that your father struggled with substance abuse problems?
A. Yes. Most of my life he did.
Q. Okay. What substances did your father abuse, or did it differ depending on the year?
A. Well, mainly it was -- it started out with cocaine, I think, because it was cool back when they were teenagers, and he just didn't stop.
Q. Okay.
A. And then the last year, year and a half of his life, he started using heroin.
Q. Do you know when your father started using heroin?
A. Maybe 2013, 2014, to my knowledge. He wasn't extremely open about it.
Q. Sure. Would it have been before the incident where he was assaulted?
A. Possibly a little bit before, but I know that it got really bad afterwards. He got clean -- he -- he wasn't on anything for a couple of months afterwards, I think while he lived with Michelle.

Q. Okay.
A. And then after, about three months after it happened, yeah.
Q. Do you know if your -- strike that.
Did your father ever partake in any substance abuse programs?
A. He was in a methadone clinic at one point. I don't know when. Like 2010 or 11 maybe, because my oldest was around three, I guess. And when I was a child, around '92 or '93, he went to a rehab. That's all I know of that.
Q. Do you know which methadone clinic he went to in 2010 or 2011?
A. I think it might have been Indiana. I'm pretty sure it was Indiana.
Q. Okay.
A. I don't know the name of it.
Q. Okay. If you think of it at a later date, if you could just tell your attorneys.
A. I could probably Google it and find out.
Q. Okay. That would be great. Thank you.
And do you -- I assume you were very young, but do you know what rehab he went to in '92 or '93?
A. No, but I know it was in E-town.
Q. Okay.

A. My mom would know probably.
Q. Okay. You said that after the assault that occurred in December of 2014, his -- he had a period of time where your father got clean and he was recovering from that injury, and then after that, it -- you said it got pretty bad?
A. Yes. I had never known my dad -- he didn't even have a tattoo. He was petrified of needles. And he was shooting up heroin. So, it got fairly bad after that.
But not to the point where he was -- he still worked every day. Like I said, most of my life, he had some kind of substance problem, so that didn't hinder his work ethic. He still worked every day -- well, probably five days a week, six days a week. A lot.
Q. I've heard the term "functioning alcoholic."
Does that sort of --
A. Kind of. Yeah, that kind of described him.
Q. Okay. How would you know that your father was on heroin?
A. We talked about it, you know. And Portland is a little town. Everybody knows everybody's business. That's how I think I found out. But we talked about it. We were pretty close.

Q. So, would your father exhibit any behaviors when he was on heroin, when he would be around you or your children, to where you would say, "Oh, he must be on heroin right now"?
A. No. I mean, he mainly just worked all the time. We would go see him at, like, where he was working, because it was typically in Portland. And, you know, he would take a little lunch break and hang out with the girls. And he really wasn't much different.
Q. Okay.
A. Maybe a little bit more energetic.
Q. Okay. And when you would say he would be working, was he doing sort of side jobs, like the --
A. Right.
Q. -- roofs or trees that you mentioned?
A. Right. Roofs or trees or something.
Q. Okay. Did you ever suggest or recommend to your father that he seek substance abuse treatment?
A. Yes.
Q. Okay.
A. Quite often.
Q. And was he ever receptive to that?
A. He knew that it was a problem, he knew that he shouldn't be doing it, but he wasn't ready to get

help, I guess.
Q. Okay. Your father was arrested in November of 2015; is that right?
A. Yes.
Q. Do you know what your father was arrested for?
A. I do not know the specific charges, but he was in a drug house, and the drug house got raided by police, I guess is the right word to use.
Q. Had your father had trouble with the law prior to November of 2015?
A. Nothing major, but, yeah, he had. He had been arrested a couple of times in my life.
Q. Do you know why he had been arrested previously?
A. No, I don't know exactly. And I remember one time him and my mom got into an argument because I think they had just split up and she had a guy friend at the house, and my dad wasn't receptive to that very good. So, he got in trouble for that one time.
Different things. I really don't know. He really kind of wasn't like, "Hey, I went and stole a car today, so I got locked up." But I do know of a couple of times he got locked up.
Q. Okay. And you're not entirely clear on the

reason for that?
A. Right.
Q. Okay.
A. I don't think it was anything ever major. He was always out within a couple of weeks or months.
Q. Okay. How did you learn that your father had been arrested in November of 2015?
A. The people in Portland told me.
Q. Okay.
A. And then he called me a couple of days after he had been there and confirmed it.
Q. Okay. Do you recall who specifically told you that your father had been arrested?
A. I believe Crystal Redfern.
Q. Is she related to Leslie Redfern?
A. It's her brother.
Q. So, you were still in -- on speaking terms with the family?
A. With Crystal.
Q. Crystal?
A. Yeah, with Crystal. Not with Leslie.
Q. Okay. So, Crystal called you and told you that your father had been arrested?
A. Correct, I believe.
Q. Okay. Anything else that was discussed

during that conversation?
A. With Crystal?
Q. Yes.
A. No.
Q. Okay. Did she know why he had been arrested?
A. Yes. It was, like, two doors down from her house.
Q. Okay. Once you learned that your father had been arrested, did you attempt to contact the jail or reach him or --
A. I online tried to look up his name and see if it was on there, because I knew that he would be in some kind of -- well, I thought that he would be in some kind of -- like a hold for, like, a drug withdrawal or something, so I knew I couldn't call. So, I did try to see if he was locked up, which, I mean, I knew that he was. They seen him being arrested.
Q. Okay. And did you learn anything when you went online?
A. I don't think his records really were released at that time.
Q. Okay. You said at some point, you did speak to him when he was in jail?

A. Yes.
Q. Do you recall when that was?
A. Two days after he got there.
Q. Okay. I want to make sure I have the right date. That's what I'm looking for.
Okay. I think your father was arrested on November 12, 2015.
Does that sound right?
A. I don't think that --
MS. NORRIS: I think it was the morning of the 13th.
MS. O'REILLY: Okay.
MS. NORRIS: Right at midnight or something.
THE WITNESS: Yeah, because he -- yeah, that sounds right.
MS. O'REILLY: Yeah. According to the Complaint, it says he was arrested on November 12, 2015, and booked on the 13th.
THE WITNESS: Yes.
MS. NORRIS: All right. Thank you.
BY MS. O'REILLY:
Q. So the 13th is when he was booked into jail, so you believe you may have spoken with him on the 15th of November?

A. Yeah, around then.
Q. Okay.
A. Whenever he was released from his hold.
Q. Did your father call you?
A. He did.
Q. Did he call you on your cell phone?
A. He did.
Q. You provided, in your Answers to Interrogatories, your cell phone number that is area code 502-938-9205.
Is that --
A. Yes, ma'am.
Q. Is that still your number?
A. No.
Q. It's not. Okay.
All right. And was that with Cricket?
A. Yes, ma'am.
Q. And that would have been the phone number that he would have called you on?
A. Yes.
Q. Do you recall what time of day your father called you that first time that he called you from jail?
A. I believe it was in the morning.
Q. How long did you speak to your father that

first time?
A. As long as the jail call is allowed. I think it's around five or ten minutes.
Q. What did your father say to you during that conversation?
A. I asked him if he tried to kill himself. And he said, "Yeah." We pretty much talked about that.
Q. How did you know to ask him that question?
A. I heard from somebody that -- somebody else was locked up in there with him, and they told somebody else. It was hearsay, so that's why I wanted to ask him and see if it was true.
Q. So, somebody told you that your father had a suicide attempt while he was in jail?
A. Yeah. They heard from somebody who was locked up with him.
Q. Okay. Do you know who that person was?
A. No.
Q. Okay. Do you recall who told you that?
A. I don't remember.
Q. So, you asked your father if he tried to kill himself, and your father said, yes?
A. Yes.
Q. Did your father say why he tried to do that?

A. He got angry.
Q. Did he tell you how he tried to kill himself?
A. He did.
Q. What did he tell you?
A. Sorry.
Q. That's okay. Take your time.
A. He said he tied a gauze around his neck, and that was -- that -- that was it, or some kind of medical something.
Q. Did he tell you anything about whether he was -- and I know this is hard, so I apologize.
Did he say that he was, you know, upset that it didn't work or that he was happy that it didn't work?
A. He promised he wasn't going to do it again, but I don't -- he didn't express his feelings one way or the other. I think he was kind of ashamed.
Q. Why do you think he was ashamed?
A. He kind of wanted to dance around the topic a little bit. He was crying. He was just upset about the entire situation in general.
Q. Upset about the suicide attempt or --
A. Everything. Be arrested, the suicide attempt, me happen to find out the way that I found .

out, or I guess find out, period.
Q. Okay. So, he was just upset with everything that was going on?
A. Yeah.
Q. Okay. And what did you say to him during that conversation?
A. I don't remember specifics, but I do know that I told him that we loved him and we didn't want him to do that. We wasn't mad at him for being arrested or anything. I asked him if they were taking care of him and just -- I guess after the suicide talk that we -- we talked about, it was just general questions, general to make sure he was okay.
Q. Okay. Did you ask him anything about the treatment that he was getting in jail on that phone call?
A. No, I don't believe so.
Q. Okay.
A. I was just mainly concerned about how he felt.
Q. Sure. And did he tell you anything about the treatment that he received or any medical providers he talked to or --
A. He said that he had to lay in a room with a lead -- with nothing but, like, a lead thing on for

two days after he tried to do that. That's all he said about it.

MS. NORRIS: Madam court reporter, can you read back that last answer?

(Previous answer was read back by the court reporter commencing as follows:

Answer: He said that he had to lay in a room with a lead -- with nothing but, like, a lead thing on for two days after he tried to do that. That's all he said about it.)

MS. NORRIS: Thank you.

THE REPORTER: You're welcome.

BY MS. O'REILLY:

Q. During that phone call, did the issue of his bond come up?

A. Sure.

Q. Okay.

A. The issue of his bond come up almost every phone call.

Q. Okay.

A. He wanted to get out of there.

Q. Okay. And what did you tell him during that first phone call about his bond?

A. I was working on it.

Q. Do you remember what his bond was, what you

needed to post?

A. No, I don't. I don't remember.

Q. Do you know if it was more than $500 or less?

A. Yes, it was more than 500. And I don't think at that time he had had his hearing yet, so I don't even know if we knew a bond then.

Q. Okay. Aside from telling you, during that first phone call, that he had to lay in a room with a lead-type vest on for two days and nothing else, did he discuss any other type of medical or mental health treatment he received?

A. On that first phone call?

Q. Yes.

A. No, not to my knowledge.

Q. Okay. During that first phone call, did he tell you about an altercation that he had been in?

A. He did.

Q. Okay.

A. He -- yeah, he did. He told me that he had gotten into an altercation with another inmate in the -- the room that they put them all in before they get, like, booked.

Q. Okay.

A. And then he had to be put in a holding cell afterwards, like, I guess, a -- a -- in a -- an

in-trouble cell.

Q. Okay. Anything else you talked about during that first phone call?

A. Not to my knowledge.

Q. Okay. When is the next time that you spoke with your father?

A. The next day.

Q. Okay. And that would have been approximately November 16th?

A. Yes.

Q. Okay. Do you recall what type of -- time of day the second phone call occurred?

A. I don't recall.

Q. Did your father call you during that second phone call?

A. Yes.

Q. And did you talk for five to ten minutes again?

A. Whatever the allotted amount of time was, yes.

Q. Do you recall what was discussed during the second phone call?

A. It's hard for me to remember exactly. I -- I just know that he was still pretty upset.

Q. Okay.

A. He wanted to be out of jail. He wanted to check on the kids and my brother. My kids when I say "the kids." He was just upset. He just didn't want to be in there. He thought that he had to do, like, 20 years because he was getting charges that the other guys had gotten. He was just really upset.

Q. Okay. So, did it seem that he was -- the -- the primary basis for his, I guess, being upset was that he was worried he was going to get 20 years for --

A. Yeah. He thought that he was going to have to be in there for a long -- well, go to, like, a prison for a long time.

Q. Did your father have a lawyer?

A. He did. I don't remember his name.

Q. Okay.

A. And he had been in there for quite a while, so he was sober. So, I think he was reflecting back on all of that drug usage. He was just -- it was just a bad time for him.

Q. Okay. So that second time when you talked to him, did he seem depressed to you on the phone?

A. He did.

Q. Did you ask him again about his mental health and suicide attempt?

A. I did. I don't think we talked about the suicide attempt, but I did ask him how he was feeling, because he was crying. And I didn't even know that he was crying because I've never heard him cry on the phone. He doesn't cry a lot, you know, so he was -- he was upset.

I asked him if he had a counselor or something like that, or to that effect, and he was telling me that the counselor kind of just made her way around the jail, like really didn't in-depth talk to him, at least. He -- he said that was kind of a waste of time.

Q. Okay. Did he say how long he spoke to the counselor?

A. No, he didn't, but I know that it was in, like, a general population room. It wasn't like -- to my knowledge, I don't think that it was like a one-on-one in a room.

Q. So, he just basically said it was kind of a waste of time?

A. Yeah.

Q. Okay. Did he say anything else about the meeting with the mental health person?

A. No.

Q. Okay. Did he tell you that he wanted to

speak to somebody about his feelings?

A. I don't think that he wanted to speak to anybody professionally. I think he wanted to speak to people he cared about or cared about him.

Q. Uh-huh. Like you?

A. Yeah. But he would have probably opened up or talked a little bit, at least, if given the chance.

Q. Okay. Anything else that you-all discussed during that second phone call?

A. Not to my knowledge. It was mainly him upset and him wanting to get out of there, and crying on both ends.

Q. Okay. When is the next time you spoke to your father?

A. I believe we talked every day up until the 24th.

Q. Okay. At any time during the next several days, during the conversations that you had with your father, did he ever discuss with you any of the mental health treatment he was receiving in jail?

A. Just the same about the counselor, kind of. He -- I think he had given up on that. But he --

Q. Okay.

A. It was mainly the same kind of conversations

over and over. He was upset. He wanted to get out of there. He cried a lot. Talking about how much time he thought he was going to get. He was going to miss out on my kids' life. And he was just not happy.

Q. Okay. Did he ever tell you that he met with a psychiatrist?

A. He didn't tell me that I recall.

Q. Okay. Did he tell you ever that he had any one-on-one discussion with a mental health technician or other type of counselor?

A. Not to my knowledge.

Q. Okay.

A. I don't -- I don't remember him telling me anything like that.

Q. Okay. Is that something that your father would have told you?

A. Maybe not if he didn't feel it was relevant. In his -- in his state of mind, I don't think that he would have found it relevant, if he did speak to somebody, to tell me about it, you know.

Q. What was the -- the bulk of your conversation? Was it talking about you and the kids, or was it more talking --

A. Talking about me and the kids. Also talking about his case --

Q. Okay.

A. -- his release. That was probably about it.

Q. At some point during the time that your father was in jail, did you find out how much bond needed to be posted?

A. Yes, I did. I went to his hearing and found out.

Q. And you don't recall what that amount was?

A. I don't.

Q. Do you know if it was more than a thousand dollars?

A. Yeah, I think it was around -- yeah, it was more than a thousand dollars.

Q. Okay.

A. I'm not sure.

Q. Okay. That's okay. I'm -- I'm just trying to get a sense.

But that's money that you were trying to come up with to post for him?

A. I was trying to come up with ideas to get the money, yeah.

Q. I mean, that's a lot of money.

A. Yeah.

Q. Do you know if your dad called anybody else

while he was in jail aside from you?
A. I don't know.
Q. Okay.
A. I know that he spoke to my brother one time on my phone.
Q. Okay. Did you ever visit your father while he was in jail?
A. No. I asked him if I could. He told me that he wouldn't be able to watch us just walk away.
Q. Okay. Do you know if anyone visited your father in jail?
A. No, they didn't.
Q. Okay. And that was your father's wishes?
A. Yes.
Q. Did your father tell you when -- during his conversations with you, that he was in, like, a mental health area of the jail?
A. No. I think he -- for the most part, he was in general population.
Q. Okay. So, he -- did he ever tell you that he was moved from one place to another?
A. He got moved jails, I believe, from one jail to another, then back to that jail.
Q. Do you know why your father was moved from one jail to another and then back to the --

A. He had an altercation with somebody, I believe.
Q. Okay. Do you know where your father started out --
A. I think he --
Q. -- after his first suicide attempt?
A. I think he started out at the old jail, and then he went to the one on -- the new jail. I don't -- I don't know what they're called or anything.
Q. That's good that you don't know what they're called.
A. Yeah.
Q. So, he started out in the old jail as far as you know?
A. Yes.
Q. Do you know where within the old jail that he was housed?
A. No.
Q. Okay.
A. No.
Q. You don't know if it was a medical area or a nonmedical area?
A. Pretty sure it was a nonmedical area.
Q. Okay. And then for some reason, he was moved from the old jail to the new jail?

A. Yes.
Q. Which I believe is CCC.
A. Yes.
Q. Okay. Do you know why he was moved from the old jail to CCC?
A. I'm not sure.
Q. Okay.
A. He may have told me, but I don't remember.
Q. That's -- that's fine.
You said that when he was in the new jail, CCC, that's when he had an -- another altercation?
A. Yes, I believe so.
Q. Okay.
A. I believe. I believe that's why he got put back into the old jail. I think maybe he got moved to the CCC. I think that's like a -- a better step.
Q. Uh-huh.
A. And then I believe he got into an altercation with somebody in general population and got moved back to the old jail.
Q. Okay. Did he tell you -- were you able to speak with him after the altercation in CCC?
A. I don't remember.
Q. Okay.
A. I think so.

Q. Okay.
A. I think I spoke with him while he was sitting -- I think a corrections officer let him call me before he got put into his holding cell.
Q. Okay. Do you recall what day that was?
A. The 24th, I think. Or the 23rd, probably.
Q. Do you recall what time of day that was?
A. I don't. I think it was nighttime.
Q. During that conversation, did he tell you that he was involved in an altercation?
A. Yes, he did.
Q. Okay. Did he tell you why he was involved in an altercation?
A. Some guy stole his food that he bought with the money that I put in his account, and he said, "When you're in jail, you can't let somebody, like, punk you, kind of, because then everybody will."
So, I think he confronted the guy, and then the guy got physical, and then my dad got physical.
Q. Okay. And then he was taken back to the old jail?
A. Yes.
Q. Okay. So, you believe you spoke to him after he had been moved?
A. I know he told me about the altercation that

ultimately landed him in that holding cell where he took his life.
Q. Okay.
A. So, I knew that he was going -- I knew that he got in trouble again.
Q. Okay.
A. He told me.
Q. How was he on the telephone the last time you spoke with him?
A. Angry.
Q. Okay.
A. Angry.
Q. And what was he angry about?
A. The altercation, the fact that he was having to be put into a holding cell and moved back to the other jail.
Q. Did he cry at all on the phone during that conversation?
A. I don't recall.
Q. Did he seem depressed to you on that phone call?
A. He seemed very upset in general. Maybe depressed and angry.
Q. Did he make any promises to you during that phone call about suicide?

A. No.
Q. Did that --
A. We didn't talk about it.
Q. You didn't talk about the suicide at all.
Did you discuss what was going on with his bond?
A. Yeah. I had believed that he was going to be out within a couple of days. I was pretty sure I had the money lined up.
Q. And you told him that?
A. I did.
Q. Did he seem happy about that?
A. He seemed anxious about it. I mean, he -- I don't think that he wanted to get happy that early.
Q. Yeah. Would you say he was hopeful about that?
A. Yeah, hopeful, maybe.
Q. Cautiously optimistic?
A. Yes. That's perfect.
Q. Okay. So, that was at some time on the evening of November 23rd, you believe?
A. I believe.
Q. And I'm not holding you to these dates, so --
A. Thank you.
Q. Did you speak to your father again after

that?
A. No.
Q. Okay. At some point, I take it you learned that your father attempted suicide again?
A. Uh-huh. Yes, I did.
Q. Okay. When did you learn that?
A. The night that he did it. The hospital called me. Well, called my mother's phone again.
Q. Okay. So -- and that's U of L hospital?
A. Yes, ma'am.
Q. Okay. And they called your mom because, as far as you know, she was the emergency contact?
A. Yeah. It was the -- I don't know what -- what they call him at the hospital, but the priest that talks to all of the families, he's the one that called.
Q. Okay. And do you know what was said on the phone?
A. I know they told me he was on -- when I got on the phone and talked to him, he was on life support and we needed to get up there.
Q. Did you go to the hospital at that point?
A. I did.
Q. Did you go with anyone to the hospital?
A. My mother.

Q. When you got there, were you able to see your father?
A. He had a corrections officer there with him, because he was legally still detained, but the corrections officer let my mom go in. So, yes.
Q. Okay. Did the doctor speak with you?
A. I think as soon as they learned I was there they did, yeah.
Q. And what did they tell you?
A. He had no brain function. His brain was deprived from oxygen for too long, but they were still going to do more tests.
Q. Okay. At some point, the decision was made to take your father off life support; is that right?
A. The 28th.
Q. Okay.
A. Or the 27th we -- I don't remember which day we made the decision, but, yeah. Had to sign papers, and his sister and my brother had to sign papers that I could sign the papers.
Q. Okay.
A. We had, like -- I think there was four neurologists that spoke to me and told me that his brain was just mush.
Q. Uh-huh.

A. There was nothing there.
Q. And so --
A. So, ultimately, I decided -- yeah, it was -- well, we decided together it was the best thing to do.
Q. Okay. Who was involved in that decision?
A. Me and my brother mostly. Everybody wanted to kind of just leave it up to us, and he really didn't have much to say about it.
Q. Were his siblings there?
A. His sister, Laurie, and his brother, Jeff, were.
Q. And you and Brandon?
A. Me and Brandon and my mother and her husband. Well, he wasn't her husband at the time.
Q. Okay.
A. Friends came and seen him. You know, they came and gone.
Q. And were you present when he passed away?
A. Yeah.
Q. I'm sorry for your loss.
A. Thank you.
Q. After your father passed away, did you ever speak to anybody at the jail regarding his care or mental health treatment?

57

A. Not to my knowledge. Not anybody from the jail. I really don't remember. It was super hectic. I was --
Q. Sure.
A. -- planning a funeral and --
Q. Yeah, absolutely.
A. I know my mom spoke to a detective, I believe, and kind of just said, "The only thing I can tell you is he has expired." They really wouldn't say anything.
Q. Okay. Did either you or your mom or your brother, or anyone close to you, ever try to talk to any of his doctors or nurses at the jail?
A. No. At one point while he was locked up, I called and left a message for his counselor.
Q. Uh-huh.
A. But I didn't try to talk to any doctors or nurses.
Q. Okay. Do you know who his counselor was?
A. I'm not sure. I left a message with, like, a receptionist woman.
Q. Okay. Do you remember what day that was?
A. It was roughly two days after he got released from the initial hold. So, if he was arrested on --
Q. The 13th? It was -- he was booked in on the

58

13th, so -- you said the 15th?
A. It was about -- it was about the 18th, I guess. It was two days after he was released from --
Q. Okay.
A. -- that first hold.
Q. And what was the purpose of calling to try to talk to the counselor at that point?
A. Because he had told me that the counselor kind of acted disinterested, and I wanted to let him know that he had a -- a -- a previous traumatic brain injury and he was in the hospital. And I told them about that a little bit, that situation, and that he had been crying on the phone to me and he wasn't a crier normally, that he was upset.
I reminded him of his previous suicide attempt and asked if she could maybe, you know, talk to him in-depth.
Q. Okay. So, this is the message that you left with the receptionist?
A. Yes.
Q. Okay. Do you know if the receptionist was a medical receptionist or if she was a receptionist for the jail?
A. I think she was just a receptionist for the jail.

59

Q. Okay. I'm sure you don't remember her name.
A. No.
Q. Okay. But -- so, you called and spoke to a receptionist for the jail and said, "My father has a traumatic brain injury"?
A. I called and asked for his counselor.
Q. Okay.
A. But they put me on hold, and they come back and said she was busy or she was out.
Q. Okay.
A. So, they took a message.
Q. And when they took the message, those are the things you told them?
A. Yes.
Q. Okay. And you just wanted to relay that information to the counselor?
A. Yes.
Q. Okay. And you would have called on the cell phone that you had at the time?
A. Yes. Most likely.
Q. Aside from calling the jail that one time, did you ever try to speak with anyone who -- who treated your father or who may have seen your father in jail?
A. Not to my knowledge.

60

Q. Okay.
A. Not that I can remember.
Q. Okay. You said that you planned a funeral for your father?
A. I did.
Q. And that was a couple of days after he passed away?
A. Yes.
Q. Did you incur a bill for the funeral?
A. I did.
Q. Who was the funeral with?
A. It's on Main Street. I think it was --
Q. Was it Ratterman?
A. Yeah, I think so.
Q. Okay. Do you recall what the amount of that bill was?
A. I believe it was around $3,000. We had a one-day service, and he was cremated, which is what he wanted.
Q. And were you the person who was financially responsible for that bill?
A. I was.
Q. Do you know if your father incurred medical bills for the treatment he received at U of L?
A. The year before or --

Q. I'm sorry. After the suicide.
A. Oh, I'm sure he did. I never seen any.
Q. Okay. To your knowledge, you were not financially responsible for those bills?
A. Correct.
Q. Did you incur any additional bills, aside from the funeral expense and cremation expense, related to your father's passing?
A. No.
Q. Before your father went into jail in November of 2015, how often would you see him?
A. We actually spent pretty much the whole summer before then with him. If it wasn't a couple of times a week, you know, we were talking on the phone every other day. We -- we seen each other a lot.
Q. Would he come to your house, or would you go to his?
A. Either or.
Q. What did your kids call him?
A. PaPa.
MS. NORRIS: Do you need a break, Stephanie?
MS. O'REILLY: Let's take a break. And I'm almost finished, too.
(There was a brief recess.)
BY MS. O'REILLY:

Q. I'm going to kind of just ask you some questions now that might not have any rhythm to them, but just make --
A. Okay.
Q. -- kind of go through.
I'm going to show you -- which I have not marked this, but your counsel tendered this to me, and this is titled, "Plaintiff's Responses to Correct Care Solutions, LLC, Nurse Temple, Nurse Lamon, Nurse Summerfield, Nurse Brown, and Donna Smith's Interrogatories and Requests for Production of Documents to Plaintiff."
A. Okay.
Q. Have you ever seen this document?
A. I'm sure I have.
Q. Okay. And it might have looked different.
A. I've seen a lot of them that looked like that.
Q. Sure. It's basically a series of questions that we sent to you to return to us.
A. Oh, yeah. Yeah, I remember that.
Q. Okay. And it -- this is on -- page 11 of this document, is that your signature?
A. It is.
Q. Okay. In your responses, you indicated that

you were in possession of photographs and video files depicting Mr. Troutman interacting with his grandchildren.
A. Yeah.
Q. Is that true?
A. They're mostly online.
Q. Okay.
A. On my Facebook or his Facebook.
Q. Okay. Have you produced those to your attorneys?
A. No. I haven't printed them off or anything, but they're --
Q. Okay.
MR. SIMON: I'll just say for the record, this attorney in particular is so inadequate in doing that, but I will get a hold of a teenager.
THE WITNESS: Yeah. Yeah, yeah.
MR. SIMON: I'm facetious.
What we'll do, we're going to find out a way to download that information and those --
THE WITNESS: You can have my Facebook password, or whatever, and do it that way.
MR. SIMON: Yeah. We're -- we're going to find out a way --
THE WITNESS: Okay.

MR. SIMON: -- to -- some media savvy person --
MS. O'REILLY: Good, yeah.
MR. SIMON: -- so we can get those photographs.
MS. O'REILLY: Some millennial?
MR. SIMON: Yeah. I just need to figure out --
MS. NORRIS: You're looking at somebody who doesn't even have a Facebook page.
MS. O'REILLY: Oh, good for you. You're not missing out.
MR. SIMON: I'll plead guilty to that.
MS. O'REILLY: Thank you.
BY MS. O'REILLY:
Q. I also requested, in my request for production, income tax records from 2005 through 2015 for your father if you're making a claim for lost wages. So, you've indicated that Plaintiff will supplement this request.
I would just ask that it get supplemented in a timely fashion so that we have an opportunity to conduct discovery to the extent that we need to with those documents.
So if you could work with your counsel to get

those, I would appreciate it.
A. Okay.
Q. In February of 2015, which would have been soon after your father's -- the assault that happened to your father --
A. Uh-huh.
Q. -- his registration from the University of Louisville Hospital lists his employer as "disabled."
Do you have any information about why that would be listed as disabled?
A. No.
Q. All right.
A. I know that he was going to try to get disabled after that, but it never went further than a phone call.
Q. Okay. So, he never ultimately got disability --
A. No.
Q. -- as far as you know?
Okay. And on this registration form from the University of Louisville Hospital, it's U of L hospital Bates number 592, it lists his next of kin as Laurie Hinkle.
A. That's his sister.
Q. That's his sister.

And was he close with Laurie?
A. Yes.
Q. Okay.
A. I've got a couple of voicemails that he left her on her phone that I'm going to give them as well.
Q. Okay. Thank you.
In December of 2014, when your father was admitted to U of L hospital for the assault, the traumatic brain injury that occurred as a result of that, his name is listed as Ringo A. Starr.
A. Yeah.
Q. Do you know why that is?
A. He loved the Beetles, and they told us it would be better to put him under an alias --
Q. Okay.
A. -- so nobody could find out information or -- because it was an assault charge.
Q. Got you.
A. You know, an assault case.
Q. Okay.
A. They actually had homicide detectives waiting there for him. They didn't know that he was going to make the ambulance ride.
Q. Okay.

A. He was in pretty bad shape. So, they recommended that we put him under a -- a different name.
Q. Okay. And since he's a Beetles fan --
A. Yeah.
Q. Okay.
A. He woke up and was pleased about that.
Q. At that time, when your -- it was December 22nd, 2014, and I'm referencing U of L hospital Bates number 623, one of the physicians from the interdisciplinary group said that they met with the patient's daughter, Stephanie Troutman, in the waiting room, and that you indicated that the patient is homeless and goes friend to friend.
Is that -- was that -- was your father ever homeless?
A. Maybe I said that roughly.
Q. Okay.
A. When he was going from place to place. He never slept under a bridge or anything.
Q. Sure.
A. So, I mean, maybe roughly those are my words.
Q. Okay. Fair enough.
You told that person that you -- I believe it

was a social worker -- that you would like to get your father in drug rehab --
A. Sure.
Q. -- which I think you mentioned earlier?
A. Sure.
Q. Was your father receptive to drug rehab at that time?
A. What do you mean? Receptive to the idea?
Q. Yes.
A. Yeah. He wanted help, I believe. It sounded like a great idea to him.
Q. Okay.
A. But I don't know if he had what he needed to put it into motion.
Q. Okay.
A. Mentally or --
Q. He wasn't --
A. It's a hard thing to overcome, a -- a drug addiction.
Q. Sure.
A. I've seen it firsthand with him. He was scared, I think, mainly.
Q. Okay. So, he had the desire? Just wasn't emotionally ready to take the next step?
A. Yeah. Yeah.

Q. Okay. Does your father's family have any history of mental health issues?
A. Not to my knowledge. His father was a Vietnam vet, and his mom was a homemaker. I don't think there was any mental issues at all, mental health issues.
Q. And no mental health issues that you're aware of with any of his siblings?
A. No.
Q. Was your father close with your brother?
A. Yes.
Q. How often would your brother see your father?
A. Almost as often as me. I think because I had the kids, he wanted to be around the kids a little bit more than -- you know. But often they worked together. They were thick as thieves.
Q. Okay. Was your mother close with your father until his death?
A. Yeah. They remained friends, yeah.
Q. That's unusual.
A. Yeah. She actually was holding his hand when we pulled his plug. So, she was there the whole time.
It is unusual.

Q. Okay.
A. He was a likable guy.
Q. You mentioned when we first started that your father would help out with you and the kids.
Did he provide consistent financial support to you, or would you -- was it more of, like, if you needed something, you would ask him or --
A. Sometimes it was consistent, if I needed it to be consistent. Or sometimes it was just sporadic, you know, if I needed diapers or dinner, or whatever it may be. You know, sometimes I needed it to be consistent. Like when me and their father first split up, he was my main provider, the -- the kids' main provider.
Q. The -- your father was?
A. Right.
Q. Okay.
A. If I needed anything, though, I called him, and he -- he paid for it or made it happen.
Q. Okay. It wasn't like he would give you $50 a week, or something like that, on a regular basis?
A. No. There was no set --
Q. Okay.
A. -- regular basis, no.
Q. Okay. Did he baby-sit your children?

A. Sure.
Q. How often would he baby-sit?
A. Sometimes he just felt like, you know, taking them to the park. Or sometimes when I worked, it was either him or my mother watching them. And sometimes it was just a summer day, and they wanted to go down to the park and have pizza.
Q. You said you're going to go back to school next year and get your GED?
A. I'm planning on it.
MS. O'REILLY: Okay. I think those are all of the questions I have.
MR. OGBURN: Okay. I just have -- I just have a couple. And pardon my voice.
THE WITNESS: Okay.
MR. OGBURN: If you can't understand, I'll try to --

**EXAMINATION**

BY MR. OGBURN:
Q. To your knowledge, after he had his -- after your father had his brain injury, did he believe he was disabled?
A. He knew there was something wrong mentally, but he still did everything that he was doing before physically, as far as working. Like on -- he would

still be on a roof or still get in a tree. But he knew that there was something different with him.

Like if he would get upset for no reason, he would apologize and say, "I don't know why I was so upset."

Q. And do you know if he spoke with anyone regarding trying to get a disability status?

A. He had me call a lawyer at one point right after it happened, but it never -- it never went any further than that.

Q. Do you recall who the lawyer was that you called?

A. I think I just called one of them, like, 1-800 disability numbers, just to --

Q. Okay.

A. -- just to get a general knowledge of it.

Q. And with regards to -- you mentioned some altercations, just to kind of clarify, while he was in the jail.

Do you recall how many altercations he had while he was in the jail?

A. I think just two. I think the night he got there, and then the night that he got put into the holding cell on the 23rd or the 24th. I believe it was just the two.

Q. Okay. Then, to your knowledge, were both of those physical altercations?

A. To my knowledge, they -- I think the first one wasn't quite as physical as the second one. Like it was just kind of a shoving match.

Q. Okay.

A. But I think they were both fairly physical.

Q. Okay. And it's your testimony that you don't know or recall who you spoke to when you asked to leave a message for the counselor?

A. Correct. I'm sure they said their name, hello, this is blah, blah, blah, but I don't remember. I do know that she was a receptionist type of person.

Q. Okay.

A. I asked for the counselor. She put me on hold, she told me that the counselor was busy or out, and she took a message.

Q. Okay. Did she take a message in a -- in a voicemail account, or do --

A. I think she wrote it down.

Q. Okay. And do you know what number you called?

A. I'm not sure. I probably Googled a number to call. It was the jail that he was at.

MR. OGBURN: Okay. Those are all of the

questions I have.

RE-EXAMINATION

BY MS. O'REILLY:

Q. Have you ever spoken to anybody who works for Correct Care Solutions about this case?

A. I don't believe I have.

MS. NORRIS: That it? Thank you.

(Deposition concluded at 3:35 p.m.)

STATE OF KENTUCKY )
) SS: ERRATA
COUNTY OF JEFFERSON )

I HAVE READ THE FOREGOING PAGES, AND THE STATEMENTS CONTAINED THEREIN (SUBJECT TO CORRECTIONS, ADDITIONS, AND DELETIONS CONTAINED IN THE ADDENDUM ANNEXED HERETO, IF ANY), AND THEY ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

______________________________
Stephanie Troutman

SUBSCRIBED AND SWORN BEFORE ME THIS DAY BY ______________________, THIS____DAY OF__________, 2017.

MY COMMISSION EXPIRES:______________

______________________________
Notary Public

STATE OF KENTUCKY )
) SS
COUNTY OF JEFFERSON )

I, Kimberley Ann Keene, a notary public, within and for the State at Large, do hereby certify that the foregoing deposition of

**STEPHANIE TROUTMAN**

was taken before me at the time and place and for the purpose in the caption stated; that the witness was first duly sworn to tell the truth, the whole truth and nothing but the truth; that the deposition was taken before me stenographically and transcribed by me; that the foregoing is a full, true and complete transcript of the said deposition so given; that there was no request that the witness read and sign the transcript; that the appearances were as stated in the caption.

I further certify that I am neither counsel or of kin to any of the parties to this action, and am in no way interested in the outcome of said action.

Witness my signature this 12th day of December, 2017. My Commission Expires on September 16, 2020.

Kimberley Ann Keene
Registered Professional Reporter