1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

STEPHANIE TROUTMAN,            )
Administratrix of the          )
Estate of CHARLES R.           )
TROUTMAN, Jr. deceased,        )
                               )          Case No.
              PLAINTIFF,       )     3:16-cv-000742-
                               )          DJH
v.                             )
                               )
LOUISVIVLLE METRO              )
DEPARTMENT OF CORRECTIONS,     )
et al.,                        )
                               )
              DEFENDANTS.      )

            *              *              *

      The deposition of **KYLE ROBERT ERNST**, taken

pursuant to notice by the Plaintiff on May 17, 2018,

at Simon Law Office, 239 South Fifth Street, Suite

1700, Louisville, Jefferson County, Kentucky.

TRACY P. LUNDERGAN, RMR, KY CCR
McLendon-Kogut Reporting Service, LLC
Anchorage Office Plaza
2525 Nelson Miller Parkway, Suite 204
Louisville, Kentucky  40223
(502) 585-5634
tlundergan@mclendon-kogut.com
www.mclendon-kogut.com

2

C O N T E N T S

Page

Appearances                                          3

Examination by Mr. Simon                             4
Examination by Mr. Ogburn                          136

Notary Certificate                                 139

Exhibits
Ernst Deposition Exhibit 1                           66
Ernst Deposition Exhibit 2                           75
Ernst Deposition Exhibit 3                           81
Ernst Deposition Exhibit 4                           99
Ernst Deposition Exhibit 5                          106
Ernst Deposition Exhibit 6                          106
Ernst Deposition Exhibit 7                          109

Requested Items
Check, see if Mr. Puckett has list where Mr.        129
Troutman was reviewed

Notes from the no bars alert committee meeting      131

Emails before January 2014 put out by witness       135
like Exhibit 1

*               *               *

3

1                           APPEARANCES

2

3        FOR PLAINTIFF:
         Mr. Larry Simon
4        Simon Law Office
         239 South Fifth Street, Suite 1700
5        Louisville, Kentucky  40202
         (502) 589-4566
6        larrysimonlawoffice@gmail.com
         and
7        Ms. Maureen Sullivan
         239 South Fifth Street, Suite 1700
8        Louisville, Kentucky  40202
         (502) 548-1699
9        sullivanappeals@gmail.com

10       FOR DEFENDANT CORRECT CARE SOLUTIONS:
         Ms. Megan P. O'Reilly
11       Blackburn Domene & Burchett PLLC
         614 West Main Street, Suite 3000
12       Louisville, Kentucky  40202
         (502) 584-1600
13       moreilly@bdblawky.com

14       FOR DEFENDANTS LOUISVILLE METRO DEPARTMENT OF
         CORRECTIONS, ET AL:
15       Mr. J. Denis Ogburn
         Assistant Jefferson County Attorney
16       531 Court Place, Suite 900
         Louisville, Kentucky  40202
17       (502) 574-6312
         denis.ogburn@louisvilleky.gov

18

19
                    *            *            *
20

21

22

23

24

25

4

1           KYLE ROBERT ERNST, called by the Plaintiff,

2     having been first duly sworn, testified as follows:

3                          EXAMINATION

4     By Mr. Simon:

5           (Deposition commenced at 1:05 p.m.)

6     Q.    All right.  Good afternoon.  Can you state

7     your full name, please?

8     A.    Kyle Robert Ernst.

9     Q.    All right.  And spell your last name, please.

10    A.    E-R-N-S-T.

11    Q.    And, Mr. Ernst, what's your date of birth?

12    A.    5-17-72.

13    Q.    And your address.  If we need to mail

14    something to you, where --

15    A.    71 Maple Leaf Court, Taylorsville, Kentucky,

16    40071.

17    Q.    All right.  Mr. Ernst, my name is Larry

18    Simon.  I represent the plaintiff in the case of

19    Stephanie Troutman, who's the daughter of the

20    decedent who died at corrections on -- well, he had

21    a second suicide attempt on 11-24-2015, which was

22    successful.

23          Prior to today, did you do anything to

24    prepare for this deposition?

25    A.    No.

5

```
1    Q.    Did you speak to anybody about it?

2    A.    Just today.

3    Q.    Okay.  To whom?

4    A.    Denis.

5    Q.    All right.  And to anyone else?

6    A.    No.

7    Q.    And did you review any kind of documents in

8    preparation of giving your testimony today?

9    A.    None.

10   Q.    Have you ever given a deposition before?

11   A.    I have.

12   Q.    Okay.  In what matters?

13   A.    Jail.  I worked for Metro Corrections for

14   23 years.  I've been the coordinator for the

15   majority of it, so --

16   Q.    Well, I'll be asking you some questions about

17   your experience there and the positions that you

18   held.  So about how many times you think you've been

19   deposed?

20   A.    Do what?  Say that again.

21   Q.    How many times do you remember being deposed?

22   A.    What do you mean by deposed?

23   Q.    What we're doing today, people taking your --

24   A.    Oh, a deposition?

25   Q.    Your deposition.
```

6

1    A.    Only -- only three times, and I've been to
2    court twice.
3    Q.    And during those three times, can you
4    remember what they were about?  The three
5    depositions.
6    A.    They were early on in my career.  They were
7    all for inmate/officer altercations, me being just
8    one of the people that were there, and they asked me
9    questions about it.
10   Q.    All right.  Who were they?  Do you remember
11   who was asking you questions?
12   A.    Twice, two times it was attorneys, and I do
13   not remember who they were.  The other time was PSU
14   in an investigation.
15   Q.    All right.  So for the purposes of our
16   deposition, PSU is what?
17   A.    It's our investigative team over at Metro
18   Corrections.
19   Q.    All right.  And they were investigating what?
20   An in-custody assault?
21   A.    An officer on inmate assault.
22   Q.    And the other two times you mention attorneys
23   asked you questions.  Were they related to any type
24   of civil claim?
25   A.    No, it was -- it was another -- also assaults

7

1    that the inmate -- the inmate had claimed -- made a

2    claim.  Neither one of them went anywhere, but

3    that's the -- that's the -- what it was about.

4    Q.    Okay.  When you say "the claim," was it like

5    a court claim?

6    A.    Right.

7    Q.    Okay.

8    A.    There was no -- ever no court case.  They

9    cancelled it before court.

10   Q.    So you're familiar with taking depositions.

11   Let me just go over a few ground rules.

12         It's not an endurance contest.  If you want

13   to take a break, you're -- just all you have to do

14   is tell us and we'll take time out.  And there's

15   water and real hot coffee if you really want it, but

16   I doubt it.

17   A.    No.

18         MS. SULLIVAN:  And pop.

19   Q.    And soda if you want it.

20   A.    Thank you.

21   Q.    If you would, and I'll try to do the same,

22   try to keep from talking over each other --

23   A.    Yes.

24   Q.    -- because our court reporter needs to get

25   everybody's statements down, and I'll try to avoid

8

1   that too.

2   A.    Uh-huh.

3   Q.    And at any time if I ask you a question, you

4   don't understand the question and I need to rephrase

5   it or restate it, just tell me.

6   A.    Okay.

7   Q.    Okay.  'Cause otherwise if I ask you a

8   question, you answer it, I'm going to assume that

9   you understood my question.

10  A.    Gotcha.

11  Q.    What type of employment are you engaged in

12  now, if any?

13  A.    I own my own business.

14  Q.    Doing what?

15  A.    It's an auction company, Dis&Dat Auction

16  Company.

17  Q.    This and that?

18  A.    Dis, D-I-S --

19  Q.    Oh, D-I --

20  A.    -- ampersand D-A-T.

21  Q.    Uh-huh.  Is that based in Taylorsville?

22  A.    It is.  Mount Washington area.

23  Q.    And this is a business that you own yourself?

24  A.    Yes, it is.

25  Q.    How long have you been doing auctions?

9

1    A.    Two years.

2    Q.    And what -- just tell us briefly, what -- how

3    do you operate that?  What do you actually do?  Nuts

4    and bolts what do you do?

5    A.    I buy -- I also settle estates.  I have

6    attorneys and probate attorneys and real estate

7    agents that work for me, and they contact me when

8    they need to settle estates, and I give them pro --

9    part of the proceeds.

10        And then I also buy truckloads of Amazon,

11   Wayfair, Hayneedle, furniture and stuff.

12   Q.    Now, let's go back and, if you could, tell us

13   about your educational background starting when you

14   graduated high school.  So where'd you go to high

15   school?  Where'd you graduate?

16   A.    Waggener.

17   Q.    Remember the year you graduated?

18   A.    '91.

19   Q.    And after high school, did you obtain any

20   other degrees or --

21   A.    No.  No, I --

22   Q.    -- attend college somewhere?

23   A.    Yeah, I played -- I went to college, played

24   football for Kentucky State University and Western

25   Kentucky University, both.

1    Q.    All right.  And so you were enrolled in both

2    those institutions during what time period?

3    A.    '92, '93 on both.  It was one -- end of '91,

4    beginning of '92, and then '92, '93 on the other

5    one.

6    Q.    And did you obtain any degrees from either of

7    those institutions?

8    A.    I did not.

9    Q.    All right.  So in '93, that was the last time

10   you had any formal secondary or post high school

11   education?

12   A.    Yes.  I went -- from there I went to Metro

13   Corrections in '93.

14   Q.    So you began in '93 as -- what was your

15   position?

16   A.    An officer.

17   Q.    Okay.  Can you tell us briefly, what was the

18   application process like?  What did you do, from

19   what you remember doing, in 1993?  How did you apply

20   for that position and what was the selection

21   process?

22   A.    My dad was a police -- was a police officer,

23   he ran metro -- ran the police gym over here across

24   the street, and I met Joe Payne, and Joe Payne knew

25   I was training to become a police officer, and he

1       asked me to join Metro Corrections, 'cause they were

2       hiring at that time, and once I got in the door,

3       never left, so --

4       Q.    So tell us -- this goes back to 1993.  Tell

5       us about your training prior to actually working as

6       a corrections officer.  What were your -- what was

7       your training?  How did -- what would -- what did it

8       consist of?

9       A.    We had the longest training academy ever in

10      their history, so -- I think it was 16 weeks, and we

11      did it all.  We went from driving, just -- we did

12      the same thing that the police went through, we went

13      through it.  Out at Southfield was where that

14      training was at, same place that the police did

15      their training.  And I think they were kind of co --

16      co-training kind of thing.

17      Q.    And do you remember about how many officers

18      were -- or potential officers came into your class

19      with you?

20      A.    I think it was around 25, 26.  We lost like

21      three or four on the way.

22      Q.    And in conjunction with your other police

23      training, did you receive training on suicide

24      prevention, specifically preventing inmates from

25      self-harm?

12

A.    Yeah.  Really wasn't a class, it was more
like when they do yearly -- we have a yearly 40-hour
week requirement that we have to take every year,
and they would put a small part of that as suicide
prevention into the class trainings that we did, the
40-hour week trainings that were mandatory.

Q.    And even though that -- your training and
your updates on training go back a ways, can you --
do you have some memory, from either practical
experience or your training, about the types of
behaviors that you would be on alert for as an
inmate to see -- try to determine whether an inmate
was suicidal?

A.    Yes.  Crying profusely.  We would always ask
whether they needed to see mental health or medical.
You know, it's -- basically it's a symptom of the
heart, you just see that somebody needed -- that
they're in distress in these type of way, and we
would always try to get them assistance.  Well,
that's how I was.

Q.    Now, is that -- your training, you utilized
your training when you were a corrections officer?

A.    Uh-huh.

Q.    And did you have specific instance --

A.    Yes.

13

1    Q.    Okay.  Did you have specific instances that

2    you have a memory of where you had to intervene and

3    you acted on behalf of the welfare of a -- of an

4    inmate?

5    A.    Yes.  I think his name was Sprattling, I

6    can't remember, it should be in my files, but he

7    was -- he had just taken his medication, I was

8    walking the nurse around, and he takes quite a few

9    pills, I think it was five or six, and he threw them

10   in the back of his throat, they got stuck, and he

11   started to pass out, and I went in the cell and

12   got -- gave him the Heimlich and got him back.

13   Q.    And based upon your experience as well as

14   your training as a corrections officer, would you --

15   would you be of the opinion that an actively

16   suicidal inmate is an individual that needs special

17   attention by corrections officers?

18        MR. OGBURN:  Objection, form.  Go ahead and

19   answer.

20   A.    Not by corrections officers.  They are --

21   they can re -- refer to the mental health or medical

22   unit, but corrections officers aren't trained to

23   deal with them theirselves.  They can see if

24   they're in distress in any type of way, but their

25   job is to refer those to mental health and medical.

14

1    Q.    Very good.  Now, let me go back and ask you

2    to tell us the positions that you've held at

3    corrections.  You said you were hired in '93, went

4    through 16 weeks of training with corrections as a

5    correctional officer, and so when -- you remember

6    when you started working in corrections as a -- or

7    sworn in?

8    A.    An officer?  '94.

9    Q.    And did you have any promotions during that

10   period of time?

11   A.    I did.  Well, I had hurt my back in an

12   altercation with inmates and officers.  I picked

13   everybody up and crushed my lower disc, and I had a

14   disability.

15        So from there they offered me the job of

16   records personnel.  I went into records, and in two

17   years I became a supervisor of records, then

18   another -- another three years I was the coordinator

19   running the whole area.  And then I transferred

20   over, coordinator over to classification.

21   Q.    Okay.  I'm going go back and break that down.

22   A.    Yes, sir.

23   Q.    So you're a corrections office at LMDC

24   beginning in 1994, and up until the time that you

25   had your injury, that's what your position was.

15

1    A.    Yes, sir.

2    Q.    And do you remember when that injury

3    occurred?

4    A.    I do not know the exact date or time, year.

5    Q.    Approximately.

6    A.    It was seven years after that, so I'm -- I

7    guess that was, what, 2001 or nine -- yeah.  Yeah.

8    Q.    And as a corrections officer, where -- in the

9    jail in corrections, where did you work?

10   A.    Mostly sixth floor maximum security.  They

11   put all the big guys on the sixth floor.

12   Q.    From your memory of working on that floor,

13   are there any single cells that had bars on them?

14   A.    Yes.

15   Q.    Can you estimate how many?

16   A.    I should know this.  There was eight and

17   eight and four and eight, dorms four and eight, and

18   then on the east side I think there was about 45

19   cells up on the east walk.

20   Q.    Now, when you say eight and eight, what are

21   you referring to?

22   A.    Dorms four and dorms eight.

23   Q.    And they each have, what, eight --

24   A.    About eight cells.

25   Q.    Eight single cells?

16

1    A.    Yeah.  Most -- they have eight single cells,

2    depending on how many's in operation at any given

3    time was another thing, but, yeah, there were eight

4    cells always.

5    Q.    Okay.  So we have two of those --

6    A.    Seven or eight.

7    Q.    So we had two of those cells with eight -- I

8    mean, excuse me --

9    A.    Two dorms.

10   Q.    -- two of those dorms with eight cells

11   apiece.  And then you said there were like 45 single

12   cells on the east side?

13   A.    Yes.

14   Q.    Okay.  And they would all be individual cells

15   as opposed to a dorm?

16   A.    They're all individual cells.

17   Q.    And the way that the cells in the dorms are

18   set up, can you describe for us how they're set up

19   in terms of what doors an officer would have to

20   enter in order to get inside an actual single cell?

21   A.    Yeah.  There's -- on dorm four and dorm eight

22   there's two main doors.  The two main doors have to

23   be accessed with a key.  Once you go inside to the

24   main dorm, the cells are on -- you got four on -- it

25   might -- it's either four -- I think it's seven.

17

1        It's four on the left, three on the right,

2    and then there's a shower, and you would go in and

3    you would check each -- our job as an officer was go

4    in and check each cell every 15 to 30 minutes and

5    make -- and hit a -- there would be a sheet inside

6    the cell for us to document that.  So one door going

7    in and out of that dorm.

8    Q.    Okay.  And also a locked door into each

9    individual single cell?

10   A.    Yeah.  Power door.

11   Q.    Okay.  What do you mean by that?

12   A.    It -- button.  You turn it and it powered

13   open or shut.

14   Q.    Okay.  And to your knowledge, was that the

15   same setup on the fifth floor for dorms that had

16   single cells?

17   A.    Dorms four and eight, yes.  Dorms on the east

18   walk, on five, there was Plexiglas for the longest

19   time over those bars on that side, because that was

20   considered a mental health unit for a long time.  It

21   no longer is, but when I was -- started, that's what

22   it was.

23   Q.    So were -- let me make sure I got this right.

24   On the fifth floor, going back a ways, sometime

25   between '93 and 2000 --

18

1    A.    Yes.

2    Q.    -- the fifth floor contained the mental

3    health unit or -- is that accurate?

4    A.    Yes.

5    Q.    All right.  And because there were single

6    cells with exposed bars, what you're telling us is

7    that the jail implemented some type of physical

8    change to the -- to the premises.

9    A.    Yes.

10   Q.    Okay.  So describe for us that change, if you

11   can.

12   A.    They -- we had Plexiglas put over the bars so

13   the bars were unaccessible.  Also, just so -- for

14   your reference, on dorm sixes and dorm five on the

15   fifth floor and sixth floor, the single cells on six

16   are open, meaning the -- it's clear bars you can see

17   through.  On the -- the single cells then on five

18   were a solid door with one small window, same as

19   they are on dorms four and eight on five and six.

20   Q.    All right.  And what were the numbers of

21   those again on five?

22   A.    It was the same.  It's seven -- should be

23   there were seven -- it was four and three, I do

24   believe.  I -- like I said, I've been gone for

25   two -- over two years, but it's four and three on

1    dorms four and eight, and then on the -- I think

2    there was -- there was a little less cells than

3    there was on six.  I think it was like 38 cells on

4    fifth floor, single cells.

5    Q.    So you told us you had the injury to your

6    back around 2000 --

7    A.    One.

8    Q.    -- 2001, and tell us again, I'm sorry to make

9    you repeat, what was the process of you going into

10   another -- another area or having another job

11   description within LMDC?

12   A.    I had an inmate that received a large rock of

13   cocaine and he did not want to give it up, and so we

14   went into the medical walk, where we asked the

15   inmate to give me the -- his -- I said, "I need you

16   to hand that over and take it out of your pocket."

17         And Kiwan Woods said, "No, I'm not taking

18   this out of my pocket."

19   Q.    Was that the inmate?

20   A.    That was the inmate's name.

21   Q.    Go ahead.

22   A.    And he ran over the sergeant that was

23   standing in the doorway to try to make it to the

24   toilet to flush it, and that's where the altercation

25   led, but this is a four-by-eight cell or four-by --

1      it's very small, and there was five officers and

2      then this inmate.

3           So I tried to -- us, we were fighting against

4      each other, so I took him to the bed.  Picked him

5      up, took him to the bed, but I also picked up the

6      officers, and when -- in doing that, my vertebrae

7      crushed, when I turned, it crushed my -- crushed

8      my -- the cartilage in between.

9      Q.    How long were you off work?

10     A.    A year.

11     Q.    And when you returned, you moved into another

12     position --

13     A.    They offered me a job as civilian coord --

14     civilian -- records person making the same money.

15     Q.    So what was -- what was your title as that

16     civilian records person?

17     A.    Senior corrections tech.

18     Q.    And that would've been like sometime later in

19     2001 --

20     A.    Yeah.

21     Q.    -- that you would've began that --

22     A.    Yeah, it was either 2001 or beginning of 2002

23     when I accepted the job, 'cause they wouldn't let me

24     come back as an officer 'cause I had a disability.

25     Q.    Right.  So as senior corrections tech, what

1    were your job responsibility?

2    A.    Entering in data.  Data entry, basically, on

3    every inmate that came through the facility.

4    Documenting their courts and making sure they get to

5    court, and documenting -- basically just court cases

6    and the outcomes of court every day.  I processed

7    the paperwork that came from the courts.

8    Q.    So did you, like, work in the records unit?

9    A.    Did I like it?

10   Q.    No.  No.  Did you work in the records unit?

11   A.    Yes.

12   Q.    All right.  Did you like it?

13   A.    Yes.

14   Q.    Okay.  And at that time, this is like 2002,

15   what was the -- what was the computer system that

16   you-all used?  Did it have a particular name?

17   A.    IMS.  Oh, that was -- that was JIS.  IMS came

18   later, and then came what we use cur -- what they

19   currently still use, I understand.

20   Q.    What -- which is called?

21   A.    XJail.

22   Q.    Which is the current usage.  And I take it

23   you became proficient in all three forms of, what,

24   data management systems?

25   A.    Yes, sir.

22

1    Q.    So tell us how long you were a senior

2    corrections tech.

3    A.    It was either two to three years before I was

4    promoted to records supervisor.

5    Q.    And that would've taken us up to

6    approximately what year?

7    A.    '4 or '5.

8    Q.    2004 or 2005?

9    A.    Yes.

10    Q.    Thank you.  And tell us your job description

11    as records supervisor.

12    A.    I will oversee the whole unit, make sure that

13    all the paperwork was processed, make sure that

14    staff, the staffing was adequate.

15        I also -- you know, after a while I took over

16    the ID department as well, because they merged those

17    two and -- while I was over there, and they merged

18    the two areas into one.  And so I made sure that

19    inmates were processed properly, inmates were IDed

20    properly.  All that was in my job description.

21    And --

22    Q.    So when you say you were in charge of the ID

23    department, did that include like fingerprint

24    identifications?

25    A.    At the time that I took it over, they did

23

1       away with fingerprinting, we use Live Scan.

2       Q.      And that would be, what, all computerized

3       entries --

4       A.      It is.

5       Q.      -- for both fingerprints and photographs?

6       A.      Yes.

7       Q.      And when was that implemented?

8       A.      Oh, gosh.

9       Q.      The scan as opposed to the ink.

10      Approximately.

11      A.      I'm not sure on the date on that.

12      Q.      So you were in the position of records

13      supervisor from 2004 up to 2015?

14      A.      I think it was seven years as well.

15      Q.      Well, did you --

16      A.      Let's see.

17      Q.      Let me -- go ahead.

18      A.      No, 'cause I'm trying to remember when I

19      got -- I got promoted to coordinator.  So I got

20      promoted again in that time, and I think I was a

21      supervisor/coordinator for eight, nine years.  So it

22      would've been in probably four year -- three to four

23      years in records and -- before I got promoted to

24      classification coordinator.

25      Q.      So would the proper title be Classification

24

1    Coordinator?

2    A.    That is -- was the current title that I

3    retired out on.

4    Q.    Which was when?  When was your last day?

5    A.    March of '15.

6    Q.    And your testimony, if I got it right, you

7    would've been classification coordinator for

8    approximately how long before your retirement in

9    March of 2015?

10   A.    It was either four or five years.  I couldn't

11   tell you exact time.

12   Q.    And tell us, what was your job description as

13   classification coordinator?

14   A.    Basically I oversee policies, oversee staff,

15   I had -- I think I had one, two -- four or five

16   supervisors that worked under me, made sure that

17   all -- ever staff were trained properly, that the

18   supervisors did that part of it, and that -- just

19   oversee the -- learn -- learn all the new processes

20   and rewrite policies and update the -- my boss, who

21   was Martin Baker, on day-to-day activity.

22        We dealt with most of the main incidences.  I

23   dealt with them updating him on each incident daily.

24   Q.    And was the description that you described,

25   all these responsibilities, were they all constant

25

1   during the period of time up until March of 2015

2   when you had that position?

3   A.    Yes.

4   Q.    So you said you had approximately four

5   supervisors that worked under you in classification.

6   Are those people -- or were those people on

7   different shifts?

8   A.    Yes.  Well, most of them on day shift except

9   for we had -- no, they all got moved to day shift

10  when I got over there, so they were all on day

11  shift.

12  Q.    And would there be any supervisory people in

13  classification on the second or third shift?

14  A.    There was not.

15  Q.    And then was the number of other folks that

16  worked in classification, was that pretty much a

17  constant number or was in flux during the period of

18  time that you -- whereas -- in the capacity as a

19  classification coordinator?

20  A.    It changed due to staffing, and we -- it's a

21  job that not many people can handle, so it changed

22  quite frequently.

23  Q.    Tell us why that's a difficult position to

24  fill, if I -- that's the way I interpreted your

25  answer, but --

26

1   A.    Yes.

2   Q.    -- you tell me.

3   A.    Dealing -- dealing with -- dealing with

4   inmates on a day-to-day basis is very difficult for

5   some people.  Especially when you're dealing with

6   them on the booking floor, they come in drunk, high,

7   and very irritable, because they have been dealing

8   with the police and they -- and they make the job

9   very difficult.

10  Q.    And the job of the classification interviewer

11  is to obtain the information that the jail needs

12  from the inmate?

13  A.    We are to -- we are -- we are to classify

14  this inmate.  Our job is to go through his history

15  of arrests and find out where he had been housed

16  previously, what -- if he had any incidences in his

17  past, and to get him housed accordingly.

18        Find out if he's aggressive, if he's

19  nonaggressive, if he's -- you know, and then we --

20  we specify them and break them down by our

21  classification policies.

22  Q.    And during the time that you worked in

23  classification and were classification coordinator,

24  was there a portion of the interview process

25  utilized for determining whether an inmate had

1    mental health issues?

2    A.    Yes.

3    Q.    Tell us what you know about that.

4    A.    We didn't do any determination whether the

5    inmate had mental health issues.  We referred them

6    if we saw any incident or the inmate told us -- a

7    lot of times when we're one on one with the inmate,

8    we -- one of our questions is, "Do you have any

9    thoughts of suicide, thoughts of self-harm, thoughts

10   of" -- and that's the question we ask.

11         Any of those questions that we receive a yes

12   or no on, we act on that.  We work hand in hand with

13   medical on the booking floor, so if we have an

14   incident, it's automatically documented and sent

15   over.

16   Q.    So an incident that would be observed by a

17   classification employee, an employee in

18   classification, they could observe something and

19   they would pass that information on to mental

20   health?

21   A.    Yes.  If they -- if they had -- if they saw

22   somebody crying and thought that it needed to be

23   addressed or they were just crying 'cause they got

24   locked up, it's hard to make that determination

25   'cause they're not trained that way.

1       If they're crying profusely and they ask them

2    the question, "Do you feel like you're going to harm

3    yourself?" that's one of our questions that we come

4    in, and they identify to that person, yes, we are,

5    or we don't know, I'm not sure, then immediately

6    that's passed on.

7       So that would be their main thing that

8    they -- where their determination ends.  It's pretty

9    much through the questions that are asked how they

10    would determine -- make a true determination of

11    whether this person could hurt himself or not.

12    Q.    Would it be part of the training for

13    individuals in classification that are inmate

14    interviewers at that stage to be trained to pass on

15    that information to medical if they had a question

16    in their mind about whether or not an inmate might

17    be so depressed, might --

18    A.    Yes.

19    Q.    -- cause themselves harm?

20    A.    Yeah, they are not determined to identify it

21    through their acts, but, yes, through the

22    questioning, yes.

23    Q.    All right.  And they have the responsibility

24    to report that too.

25    A.    To pass it -- report it on and pass it on

1    immediately.

2    Q.    Very good.  Now, you also said part of your

3    job description as classification coordinator is to

4    oversee and, if necessary, rewrite policies.

5    A.    It is.

6    Q.    All right.

7    A.    Yes.

8    Q.    So what are we talking about?  What type of

9    policies are we talking about overseeing and

10   rewriting when necessary?

11   A.    Anytime I see an area that I feel we can

12   better through knowledge of common practice for us

13   and I can see I can make it better, like

14   implementing the list that we've implemented there,

15   which was no bars alert, which I started, that we

16   started that to make sure that inmates that have

17   been past identified as a -- as a history, we make

18   sure they get checked prior to -- prior to being

19   moved to a floor and being misplaced in the wrong

20   cell where they could hurt themselves.

21         But writing policies was my -- I made changes

22   to quite a few policies when I got over there,

23   because a lot of them were outdated and used from

24   old past practices.

25   Q.    Mr. Ernst, I'm going to go back to asking you

30

1    questions about the no bars alert, but I want to

2    just ask you some question -- general questions

3    right now if that's all right.

4    A.    Uh-huh.

5    Q.    As you said, you oversee and amend or change

6    or correct or update policies when necessary.

7    Besides the no bars alert that you started, what

8    other policies do you have a memory of that you

9    changed or recommended to be changed?

10   A.    There was quite a few.  From documenting

11   paper, adding paper trails instead of just relying

12   on a computer, to the day-to-day practice at CCC,

13   because it was all -- the practice that was at CCC

14   was antiquated and no longer use.

15         A lot of things we used were the old

16   messenger service, and now we had a computer system,

17   we needed to update our practices and get into

18   the -- to the 20th century.

19   Q.    Okay.  So there's no confusion, CCC stands

20   for?

21   A.    Community Correction Center.

22   Q.    Located on East Chestnut Street?

23   A.    Yes, sir.

24   Q.    All right.  And when you say the outdated

25   practices involving messengers, what are you talking

1    about there as it relates to classification?

2    A.    A lot of things that we used to do were all

3    done through paper, and they were sent over and, you

4    know, there would be a little bit of documentation,

5    but we took a lot of that out and made room for more

6    documentation into the XJail system, where we could

7    document better.

8    Q.    And again, I'm going to follow up on that

9    in a little bit when we get a little farther along.

10         Tell us about the daily incident reviews.  I

11   may not be saying the exact nomenclature.

12   A.    No, I know --

13   Q.    What -- what --

14   A.    I understand what you're saying.

15   Q.    What was that, and, if you -- if you know,

16   when were that type of review, the daily type of

17   review implemented?

18   A.    Are you asking about the no bars review?  Are

19   you -- 'cause it was done differently.  Are you

20   asking about the daily review that I relayed to

21   Martin Baker?

22   Q.    Let's do the daily review that you relayed to

23   your boss, Martin Baker.

24   A.    That was every morning.  When I got to work,

25   I would get there before pretty much Martin Baker

32

1    got there.  He got -- he arrived at 9:00, I'd

2    normally get there around 7:00, 6:00 to 7:00, and I

3    would review the night's incident reports, and

4    anything that he needed updating on to be able to

5    relay to the directors upstairs, I would update him

6    on all that information.  I would go through the

7    notes, update him on what happened as far as it was

8    documented, and give him all that information.

9    Q.    A fair statement, when you came in to work in

10   the morning, you would be notified through XJail of

11   extraordinary incidence items that were reported by

12   the line staff?

13   A.    Yes.

14   Q.    And what was the manner in which you received

15   that information?  What was the -- what was the

16   mechanism in which you received that information?

17   A.    XJail, and me being part of the admin,

18   emails.

19   Q.    Admin, you mean --

20   A.    Administration.  I received -- whenever

21   emails were sent to an altercation or an incident,

22   they would include administration, and I was

23   included in the administration.

24   Q.    Can you -- just going sideways for a second.

25   Do you remember the time period when XJail was

33

1    implemented, took over from the previous system?

2    A.    Oh, gosh.  I'm going to say 2010, maybe.  '9,

3    '10.

4    Q.    So Mr. Baker, your boss, what was his job

5    title?

6    A.    He was the -- what's the -- he was a

7    coordinator as well, but he was the head

8    coordinator, I guess, of what we put it at.  I ran

9    the area for about six months until they hired him.

10   I was from -- I was the acting coordinator, and then

11   he was promoted to the head coordinator.

12   Q.    All right.  So as acting coordinator, would

13   there be another employee that would give you an

14   update?

15   A.    No, I knew how to obtain all that

16   information.

17   Q.    And during that period of time where you were

18   the acting head coordinator, before Mr. Baker got

19   there, what did you do with that information?

20   What went on there?

21   A.    Daily briefing, you have to be ready to

22   advise the directors.  All units, all heads of all

23   units that run Metro Corrections are at this daily

24   briefing, and you have to update those heads on

25   whatever classification role played in that part of

1    that in -- of -- if it was an incident or that --

2    involving an inmate, if it was an incident involving

3    officer versus inmate, whatever part classification

4    played I would have with me.

5    Q.    All right.  And who else would be at

6    attendance -- in attendance at a daily briefing?

7    A.    One of the directors always, the major, the

8    captains, all captains in all different areas

9    except -- unless they worked the night shift or

10   something.  Head of medical, head of mental health.

11   Trying to think of everybody else that's there.

12   Head of classification, head of records.

13   Q.    So would it be a fair statement, essentially

14   all the supervisors of all the critical section --

15   A.    Areas; yes, sir.

16   Q.    -- sections, area of the jail would be in

17   attendance at those daily meetings?

18   A.    Uh-huh.

19         THE REPORTER:  Yes?

20   A.    Yes.

21   Q.    And tell us when -- well, strike that.

22         After Mr. Baker was hired as head

23   coordinator, did you on occasion attend these daily

24   meetings?

25   A.    I still was required to attend even though

1      Baker was hired.

2      Q.     All right.  So you were there in attendance

3      too.

4      A.     I was still there.  I didn't -- I didn't do

5      none of the talking once Baker was there, I let

6      Baker handle it.  They still wanted me to attend,

7      though.

8      Q.     Who conducted the meetings?

9      A.     The directors through daily briefing, and

10     those notes were prepared through incidents that

11     happened every night.

12     Q.     And --

13     A.     Within a 24-hour period.

14     Q.     I'm sorry, I didn't --

15     A.     Within a 24-hour period.  They document that

16     and put it on a spreadsheet, and that's what we --

17     what he discussed every day.

18     Q.     And that would be like the agenda for that

19     meeting?

20     A.     You got it; yes, sir.

21     Q.     And anyone that had a -- any -- let me

22     rephrase that.

23            If an incident occurred that involved a

24     particular department that was represented at the

25     meeting, that department head would be called on and

1    what would happen at that point?

2    A.    If -- any of the -- any of the questions that

3    the directors or assistant directors had, or the

4    major, they would address with the department heads,

5    why did this happen, how did this happen, explain to

6    me what the process was or -- that's what the

7    questions would be.

8    Q.    So you did -- basically the group of

9    supervisors did some fact-finding?

10    A.    Uh-huh.

11    Q.    And as a result of that did anything else

12    develop?  I mean, would there be any type of

13    recommendations that would come out of the meetings

14    when you were present?

15    A.    That's where the recommendation for no bars

16    alert came from.

17    Q.    Okay.  Again, I'll get back to that, but I do

18    want to ask, would that be an outcome of the

19    meeting, an anticipated outcome of the meeting if

20    you saw a problem recurring over and over again?

21    A.    Anything that we could fix, that we could as

22    administrators fix or have a better work -- working

23    knowledge of to make it work better we would come up

24    with in that meeting, and then from that meeting the

25    director would assign us to do smaller -- smaller

1    groups to work on that idea, and they wanted us to

2    come -- we'd have a couple weeks to come up with an

3    idea for that.

4    Q.    Besides the no bars alert that you mentioned,

5    what other types of policies, procedures or

6    practices were either amended or instituted that you

7    can remember?

8    A.    Just some -- there's -- there was quite a few

9    over the time, but how we classified inmates changed

10   through this -- through this meeting.  We came up

11   with a different classification than we were using

12   in the old systems.  How we housed transgender, how

13   we housed homosexual inmates or lesbian inmates.

14        We -- you know, in the past practice, our

15   past practice was separate, and then we got

16   in are -- do you feel safe, and then -- and

17   integrate it.  That's how we -- that's just some of

18   the stuff I can think of off the top of my head.

19   Q.    Very good.  And I know that the gender

20   separation and that type of issue is a part of

21   classification, right?

22   A.    Uh-huh.

23   Q.    What types -- what other subsets, I guess,

24   for lack of a better term, of classification

25   protocols may have been instituted as a result of

1    these daily meetings?  You said there were different

2    classifications or you changed up the way prisoners

3    are classified?

4    A.    Right.

5    Q.    Okay.

6    A.    Yeah.

7    Q.    Tell us about that.

8    A.    Well, from -- you know, used to be maximum

9    security, we came up with a new system, a system

10   that had been tried in other places with XJail,

11   where it asked -- we asked the questions, we go

12   through and fill out these -- the questionnaire, and

13   it tells us where this inmate falls on a -- on a

14   scale, and then that's how we hou -- we started

15   housing inmates, through this scale.

16        It was -- whether they be aggressive, young

17   and aggressive, old and aggressive, that's the

18   kind -- that's what it broke down for us.  Old and

19   nonaggressive.  And then it broke it -- that's how

20   we broke it down.

21   Q.    So did you -- you being other classification

22   officers, did you use like a particular instrument

23   or a --

24   A.    Yes, we did.

25   Q.    All right.  So tell -- just describe for us

```
 1        the instrument that you used.  Or at the time that
 2        you left and finished at corrections, what was the
 3        instrument that you used?
 4        A.    It was XJail.  It was a question --
 5        classification -- it's -- like I said, it's a scale,
 6        there is an actual scale, and you fill out the
 7        questions and you go through the inmate's history
 8        filling in those things, and it gives you -- tells
 9        you where this inmate falls on the scale.
10        Q.    And the time period that you're talking about
11        is when in 2015?  When you left?
12        A.    Yeah.  2010 through when XJail was
13        implemented, I think that's around the date it was
14        implemented through 'til I left.
15        Q.    Okay.  Which was when in 2015?
16        A.    March.
17        Q.    So the instrument that is -- that was
18        utilized from 2010 to 2015 was incorporated into the
19        XJail system?
20        A.    Yes.  Yes.  As well as we're -- over time,
21        and I couldn't tell you a date or anything, but over
22        time we added no bars, we added medical alerts.
23              There was already medical alerts that medical
24        added, but we added some if there was something in
25        the inmate's history where we need to let medical
```

1    know that this inmate had an issue of some kind that

2    we've pulled up in -- from the past in reviewing the

3    inmate's history.  Medical did the same thing too

4    just to -- we -- it's a check and balance.

5    Q.    So when it was a medical issue that would

6    qualify for alert, how would it -- how would that

7    information be introduced into XJail where it could

8    be reviewed by other --

9    A.    It would be added through medical.  Medical

10   alerts were added through medical.  Mental health

11   alerts were added through mental health.  The only

12   thing that we would do as a -- as a team, as a group

13   effort was the no bars alerts and things of that

14   nature.  I couldn't even tell you all the alerts

15   anymore, what they are.

16   Q.    But no bars alert was one of the types of

17   alert that was --

18   A.    Yes, that was added over the time.

19   Q.    Over a period of time.

20   A.    I couldn't tell you it was added in 2010, but

21   it was added, because that was something we found

22   that -- that I found that needed to be done to

23   improve the process.

24   Q.    Okay.  Well, why did you have that opinion?

25   A.    Why?  Because over the time that I was --

41

1      from 2010 I think there may have been -- there was

2      quite a few attempts, but only -- very few

3      successful, and I thought, you know, some of these

4      were prior attempts, so we would make sure that they

5      got checked and the only way they could be cleared

6      was through a committee of people through this no

7      bars meeting.

8      Q.    Again, just as a matter of clarification, the

9      instrument that you used to determine whether

10     somebody was -- should be on some type of alert, and

11     when I'm saying you, talking about classification --

12     A.    Classification.

13     Q.    -- as opposed to medical.

14     A.    Medical.

15     Q.    All right.  This instrument, it's -- what,

16     it -- does it just do a number scale, and when you

17     hit a certain threshold or a number and you exceed

18     or meet the threshold, then the alert gets put on or

19     what?

20     A.    It was through letters.  It was bro -- I

21     think it's a letter scale, AB, AC, and how we do the

22     questionnaire would tell us where they fall on that

23     grid.

24          And from -- and we have the -- we have the

25     ability to override that grid.  If it says this

1    inmate is nonaggressive, but the last two arrests he

2    was very aggressive when he came into the jail, we

3    can override that, but for the most part we went

4    by -- my staff went by the scale from stuff that I

5    investigated back in that time.

6    Q.    All right.  And who would be the person in

7    corrections that would be the best source for

8    identifying that scale, the current scale and the

9    previous scales that were used so --

10   A.    Steve Flener currently.

11   Q.    Okay.  Like F-L-E-E-N-E-R?

12   A.    F-L-E-N-E-R.

13   Q.    All right.

14   A.    He's the current supervisor over the area,

15   coordinator since I left.  And he's the longest

16   supervisor of classification in that area.

17   Q.    Okay.  Had he been a supervisor when you

18   started?

19   A.    Yes.  He worked for me, actually.

20   Q.    Now, the actual instrument, was that

21   developed internally by LMDC or did you-all like go

22   out and find a vendor that developed the instrument?

23   A.    It was a vendor, one that they felt had --

24   that the director felt -- the director had actually

25   chosen this, this system through -- I cannot tell

1    you the gentleman's name who designed it, but he

2    used to make frequent visits to the -- to the Metro

3    Corrections to help us understand.

4    Q.    All right.  And so the outside developer,

5    that was an outside developer, was a representative

6    of a company that manufactured or put together this

7    instrument.

8    A.    Yes.

9    Q.    All right.  And the director, this Director

10   Bolton?

11   A.    Yes.

12   Q.    Okay.  He became acquainted with this

13   instrument and it was, I guess, purchased or

14   acquired.

15   A.    At the time I -- the coordinator over the

16   area was Jamie Allen.

17   Q.    Uh-huh.

18   A.    And she is the one that worked along the

19   director and had -- and felt that this was the best

20   way to go, so that's as far as I know.

21   Q.    And the individual that you talked about, the

22   vendor, that person would come on site and help

23   train correct --

24   A.    Help us answer questions --

25   Q.    All right.

44

1    A.      -- that we had with the system, the

2    supervisors.

3    Q.      Now, would they work with corrections staff

4    or administrative staff?

5    A.      Supervisors.

6    Q.      With supervisor.  And so was it the

7    responsibility of the supervisors to pass down that

8    information to classification staff?

9    A.      Yes, to build -- to -- well, it was our job

10   to build the policy to go -- to go around that.

11   Q.      Now, do you know whether or not the policy

12   that accompanied this instrument utilized for

13   classification purposes, was that codified?  Was

14   that written anywhere?

15   A.      Yeah, it was documented.  Policies are always

16   documented.  A lot of them were still in -- when I

17   left there was still a ton that the directors hadn't

18   signed, so they hadn't been made -- put into order

19   yet, so they were still being reviewed by -- they

20   had -- it has to go through a process, our

21   attorneys.

22        Once we're done with it, it has to go through

23   the person that writes them, then it goes through

24   our area that deals with those, then it has to go to

25   a coordinator or one of the directors, they review

45

1      it, they write it, then it has to go to the

2      attorneys, then it has to -- so it's a long process

3      to get -- to get it passed.

4      Q.     And was it your experience at LMDC, when you

5      were in that classification/coordinator position,

6      that after this review process was completed, there

7      would be an amendment and an actual change to the

8      written policy?

9      A.     Yes.

10     Q.     And that was the normal operating procedure

11     of corrections?

12     A.     (Witness nodded head.)

13            THE REPORTER:  I'm sorry?

14     A.     Yes.

15     Q.     All right.  Let's go ahead and talk about the

16     no bars single cell inmate alerts and -- that you

17     started in your position as classification

18     coordinator.

19     A.     Uh-huh.

20     Q.     All right.

21     A.     Yes.

22     Q.     So tell us why you came up with this alert.

23     A.     Well, we noticed that a lot of the same

24     inmates were having the same issues.  Now, with that

25     being said, a lot of these inmates were inmates that

1    were just trying to manipulate the system that

2    didn't want to be in the dorm, so every time they

3    got locked up, they would say, "I'm going to kill

4    myself," just so that they could get a single cell

5    and not have to deal with the population.

6         So it -- even though it was a system to try

7    to fix the problems, it still had its own flaws as

8    well.

9         But what we did was any inmate that had a

10   past attempt that came into the facility, we would

11   want them cleared if they had a past attempt or a

12   past no bars for whatever reason.  We would ask --

13   we would pass that on to let medical or mental

14   health know that, hey, this inmate has -- used to

15   have a no bars alert and is he cleared, and they

16   would let -- give us the yes or no.

17   Q.    Go back.  When you say a past attempt, what

18   type of attempt are you talking about?

19   A.    It could be any -- it could be a suicide, it

20   could be a suicide attempt, it could be a -- where

21   he just tied a sheet around his neck or just put

22   shoestrings around his neck or whether he actually

23   said, "I'm going to kill myself," any of those types

24   of attempts.

25   Q.    The information that we would see when we

47

1      look at corrections records of extraordinary

2      incidents, would that be the type of documented

3      attempt that you're referring to?

4      A.    Yes, sir.

5      Q.    All right.  Now, would the incident that

6      we're talking about in this category, past attempts,

7      potentially suicide attempts, would they include

8      incidents that happened both prior to a person's

9      arrest and admission to corrections and also while

10     they were a --

11     A.    Yes.

12     Q.    -- while they were an inmate?

13     A.    Yes.

14     Q.    So pertains to both.

15     A.    Both.

16     Q.    All right.  And so how would corrections

17     administrators, like in classification, how would

18     they find out about, say, a previous suicide attempt

19     or another -- other factors that would weigh in on

20     putting someone on the no bars list?

21     A.    As classification that's our job.  We are to

22     review the inmate's history, and in those histories

23     it will have the alerts -- or the past alerts or the

24     past notes.

25           Our job is to reflect on the inmate's notes,

48

1    and we reflect on notes to show whether there would

2    be a -- it would show in there if there was a past

3    attempt or -- and then the alert's added, which is a

4    bright alert, big red alert that would be on the

5    inmate's -- anybody who pulled up an inmate's page,

6    it would show that.

7    Q.    Okay.  And when you say an inmate's page,

8    you're talking about what?

9    A.    Through XJail.

10   Q.    And when this no bars inmate alert was

11   developed, during the time that you were there as a

12   classification coordinator, was there a progression

13   of that policy or was it always the same?

14   A.    Policy -- policies are always changing.  When

15   we first started, it would be -- it was the call of

16   mental health, and then it was the call of the --

17   this -- our group as a whole.  We do -- came up with

18   that we met once a week and went over every inmate

19   that was in a single cell.

20        It was called inmate review, and we would

21   review it as a team, all -- the heads of certain

22   areas would review it, meaning captains, the --

23   sometimes there would be a major or a director

24   there, but a lot of times it was just the department

25   heads of class -- me, classification, me and Martin

49

1    Baker, medical always had someone in attendance,

2    captains were there, some lieutenants, and -- on

3    first shift, and some -- most of the times a

4    director or the major was there.

5    Q.    All right.  So what you said at the

6    beginning, okay, at the beginning it was mental

7    health's call, and you remember the time period that

8    Correct Care Solutions was hired by Metro Government

9    to be the healthcare provider?

10   A.    I don't know the exact date.  It was -- they

11   hadn't been there but -- very long from the time I

12   left, so I couldn't tell you the exact date.  '14,

13   '13.  I don't know.

14   Q.    Were they the medical -- the medical entity

15   that was contracted with by Metro Government at the

16   beginning of the establishment of the no bars alert?

17   A.    They may have came in during the no bars

18   alert.  I can't remember.  I couldn't tell you.

19   Q.    And do you know the time period that we're

20   talking about, when the no bars alert was initiated

21   at the very beginning?

22   A.    It wasn't -- probably '12 or '13.  It wasn't

23   long after that I was promoted that I looked and

24   started looking at the processes.

25   Q.    All right.  When you say '12 or '13, you're

50

1      talking 2012 and 2013?

2      A.      2012 and 2013.

3      Q.      All right.  So what are you saying when you

4      say initially or at the beginning it was mental

5      health's call?  What were you referring to?  What

6      are you talking about?

7      A.      Whether an inmate was put in behind -- in a

8      single cell with bars or not through their interview

9      process.

10     Q.      And are you saying that changed?

11     A.      Well, once we developed the committee as a

12     whole, we discussed these as a whole, it wasn't just

13     one area, it wasn't put on one area as much, you

14     know, as a whole now, we as a unit.

15     Q.      Okay.  You've identified the individuals that

16     would be at those committee meetings.

17     A.      Yes, sir.

18     Q.      Now, are these meetings the same as the

19     meetings that you described earlier?

20     A.      Briefing?

21     Q.      Yeah.

22     A.      No, they're different.

23     Q.      These are different.  Okay.  So how often

24     would these committee meetings take place?

25     A.      Once a week.

1      Q.     Okay.  I'm referring -- I just -- I'm

2    repeating what you're telling me, but I want to be

3    accurate.  The meetings that are the daily meetings

4    that you described earlier in your testimony where

5    you as a corrections supervisor, involving all these

6    different supervisors, would go over extraordinary

7    incidents from the previous 24 --

8    A.     Twenty --

9    Q.     -- hours, you call those meetings what?

10   A.     Daily briefing.

11   Q.     Those are daily briefing.  Now, the topic

12   that we're talking about now, these committee

13   meetings, once per week meetings, what would you

14   name that --

15   A.     No bars.  It was a no bars meeting.  Single

16   cell management, no bars meeting.

17   Q.     And would they take place on any particular

18   day of the week?

19   A.     I can't remember the exact date.

20   Wednesday -- it's been so long, I don't know if

21   they've changed -- Tuesday or Wednesday I think is

22   what it was.

23   Q.     All right.  Okay.  And again, you're telling

24   me department heads, both on the administrative side

25   and the corrections officer side or the --

52

1      A.      Security.

2      Q.      -- security side, they would be in

3      attendance.

4      A.      Yes, sir.

5      Q.      Okay.  Mental health and medical would be in

6      attendance.

7      A.      Yes, sir.

8      Q.      Okay.  The director or someone direct --

9      designated by the director would be in attendance?

10     A.      Yes, sir.

11     Q.      All right.  And who set the agenda for those

12     meetings?

13     A.      David Puckett.

14     Q.      Okay.  And who's David Puckett?

15     A.      He's the floor supervisor over the single

16     cells.

17     Q.      And is he a civilian employee?

18     A.      Civilian supervisor.

19     Q.      What was -- what was his title?  I know you

20     said he's the supervisor over single cells, but did

21     he have another title?

22     A.      No, that was it.  It was just classification

23     supervisor.

24     Q.      Okay.  All right.  Did he have any staff

25     under -- directly reporting to him?

53

1    A.    He did.  We had -- also had a single cell

2    management person that worked with David, and her --

3    at the time when I left, it was Stacey Ayers.

4    Q.    How do you spell Stacey's last --

5    A.    A-Y -- S-T-A-C-Y A-Y-E-R-S/Fitzpatrick.  That

6    was her maiden name.

7    Q.    Okay.  So it's a female Stacey, right?

8    A.    Yes.

9    Q.    And can you tell us the time frame that Mr.

10   Puckett was the supervisor over single cells?

11   A.    Probably '13 to '15.

12   Q.    2013 to 2015?

13   A.    To 2015; yes, sir.

14   Q.    Was he in that position when you left?

15   A.    He was; yes, sir.

16   Q.    And if he was in that position in 2013, did

17   he have a predecessor there?  In other words, was

18   there a supervisor of single cells prior to

19   Mr. Puckett?

20   A.    It -- Steve Flener.

21   Q.    Would people wear like different hats that

22   were in classification, might be a supervisor of a

23   couple of different things?

24   A.    Uh-uh.

25   Q.    No?

54

1    A.    No, that -- I don't -- they did -- I

2    don't know what -- not understanding.  A different

3    hat, they -- were they -- oh, you mean over

4    different areas?

5    Q.    Yeah.

6    A.    Same person over the same -- diff -- yes.

7    Q.    Yeah.  Okay.  Well, let's -- let me ask the

8    question so we're clear.

9         So Mr. Puckett, all right, your testimony is

10   that from 2013, 2015 he was a supervisor over single

11   cells.

12   A.    Yes.

13   Q.    All right.  And just following up on that, so

14   he had -- what was his responsibility as supervisor

15   over single cells?

16   A.    He was to check -- he talked to those inmates

17   on a day-to-day basis, he'd make rounds with those

18   inmates.  Anytime an inmate got moved -- a new

19   inmate got moved into a single cell, he'd make

20   rounds to check on the inmate, check the status

21   through XJail, and make sure the classification was

22   correct, make sure that the inmate didn't need to be

23   moved, redirected to somewhere else.

24   Q.    And so you're saying he had a face-to-face

25   conversation with --

1      A.     A lot of times, yes.

2      Q.     Okay.  You know whether he did that all the

3      time or do you know?

4      A.     Every day.  He was -- five days a week,

5      Monday through Friday.  His job was to check the

6      classification of any inmate in a single cell and

7      review it.

8      Q.     So during this time period, 2013 to 2015

9      while you're there, can you estimate the number of

10     inmates that were in single cells with bars?

11     A.     I couldn't give you a correct ex --

12     Q.     Well, we know jail keeps really good records

13     in terms of statistics, right?

14     A.     Pretty good.

15     Q.     All right.  I mean, from day to day they --

16     you could go back, you being a corrections

17     administrator, you -- there's an instrument that you

18     could check -- this is a question.  Is there an

19     instrument that you can check or statistics that you

20     can check and you -- and know the jail population

21     for a particular day?

22     A.     Yes.  Through XJail.

23     Q.     Okay.  Would XJail be able to tell you on any

24     particular day who's on the no bars single cell

25     list?

56

1    A.    Yes.  You can print a list for that as well.

2    Q.    All right.  As well as the medical list that

3    would prevent someone --

4    A.    Medical unit list, they can print that list

5    as well.

6    Q.    And from the XJail information, it could be

7    determined -- or could it be determined that you can

8    come up with a number of how many inmates are in

9    a -- in single cells with bars?

10   A.    Through the housing unit.  Through the

11   housing unit.

12   Q.    Okay.  You can see which cells are occupied

13   and which aren't.

14   A.    And it will show you the name and everywhere.

15   Q.    And that can be done on a day-by-day

16   breakdown?

17   A.    Day-by-day basis.

18   Q.    All right.  And that's the type of -- would

19   that be the type of information you would be looking

20   at or have in front of you when you had the no bars

21   meetings --

22   A.    Yes.

23   Q.    -- once a week?

24   A.    Yes.

25   Q.    All right.  Let me -- let me take you through

1    the list and the dates of previous suicides or

2    suicide attempts from individuals, inmates at the

3    jail, and ask you if you have a memory of those

4    specific incidents.

5         On October 19th, 2013, on a -- in a single

6    cell on the fifth floor, there's an inmate named

7    Mahmoud, M-A-H-M-O-U-D, Hindi, H-I-N-D-I, who I

8    believe was in administrative segregation.  Are you

9    familiar with that --

10   A.    I remember the name.

11   Q.    Okay.  Are you familiar with that suicide,

12   any of the details involving Mr. Hindi?

13   A.    Just -- the only thing that I remember is

14   that the inmate had came back from court, and when

15   the inmate came back from court, it was -- 'cause

16   Mr. Hindi had no -- I don't think any past suicide

17   attempts, and so there was no notification other

18   than the court, that he had court, why he would

19   do -- commit suicide.  That was the only change in

20   his day to day.

21   Q.    And based upon your training and experience,

22   an inmate that has, say for lack of a better term, a

23   bad day in court, receives bad news about their

24   case, all right, could that be a contributing factor

25   to an individual considering self-harm?

1          MR. OGBURN:  Object to form.

2     Q.     You can go ahead and answer.

3     A.     When I worked in records department, any

4     inmate that records was notified of that had a life

5     sentence or death penalty, it was immediately sent

6     to mental health, documented on the folder that this

7     was -- this was an incident and -- so the inmate can

8     be spoken with, observed, and moved, if necessary.

9     Q.     And to a lesser degree, based upon your

10    training and your experience as both a corrections

11    officer and a classification supervisor, an inmate

12    that receives bad news or news of a long sentence,

13    may not be a life sentence or a capital case, but an

14    inmate that receives bad news through a sentencing

15    that he experienced, could that be a factor in

16    whether or not that would -- that inmate might

17    consider self-harm?

18    A.     There's a -- the problem with that process is

19    that inmate passes through too many hands.  The

20    people in records department can only see the piece

21    of paper.  The officer that sees the inmate knows if

22    he's distressed or not.

23           The -- he may hand him off -- he -- the

24    officer that takes him to court where he's with all

25    the other inmates, he may not show distress until he

59

1      gets into his cell, and that would be a floor

2      officer.

3             You're -- there's too many hands involved

4      for -- to determine each court case, whether he got

5      10 or 15 or 20 years, whether that inmate is truly

6      in need of some assistance.

7      Q.     The floor officer example that we're talking

8      about in this hypothetical situation, from your

9      experience are those floor officers at LMDC at the

10     time that you were there, were they trained to

11     observe that type of behavior?

12     A.     It's in their four -- it's a two- to

13     three-hour class in their 40-hour yearly training.

14     Q.     And would that individual, if that type of

15     behavior, that type of observation is indicated in

16     the inmate, what is -- what is the corrections

17     officer's responsibility at that point?

18     A.     They would no -- either notify classification

19     or mental health or medical that -- that's -- I'm --

20     I don't know 'cause I'm not -- I'm not security.

21     Q.     Uh-huh.

22     A.     At that time I'm over classifications, and I

23     can pretty much tell you what their process is and

24     how I would tell my staff to --

25     Q.     Well, would that be something anticipated

60

1    from both your training, your experience as a

2    corrections officer, and in classification, that if

3    that's the type of observation that's observed by

4    the line staff, that they know to pass that on to --

5    A.    Distress should be -- crying, visible

6    distress.  They're not going to know it in the voice

7    or how the inmate's hanging his head unless they

8    know the inmate.

9         The only -- the transport officer doesn't

10   know the inmate like the floor officer is going to

11   know the inmate.  The floor officer doesn't know the

12   inmate like maybe classification knows the inmate.

13   So it's all relative, it's different.

14   Q.    Sure.  But that would be part of the training

15   to observe outward signs of -- outward signs of how

16   the inmate is acting.

17   A.    Distress or upset, yes.

18   Q.    Okay.  And that could be exhibited by yelling

19   or kicking on the doors or making threats.  There's

20   all kinds of things that could fall into that

21   category.

22   A.    Could hap -- right.

23   Q.    Okay.  I know you're the person giving the

24   deposition, but I'm throwing out these examples.

25   Can you think of any other examples that are

61

1    noticeable conduct by an inmate that might fall in

2    that category?

3    A.    Anything that the inmate is not normally

4    known for.  It wouldn't be per se -- I'm trying to

5    think off the top of my head.  It would just be

6    something -- if the inmate's normally calm and

7    quiet, not a problem, and he's -- now he's

8    hitting -- hitting his head against the wall, that's

9    a pro -- there's a problem there, you need to

10   have -- you need to pass that along.

11          But if the inmate's just -- if he gets in an

12   altercation with another inmate, that's not an

13   indication, 'cause all it takes is a word for some

14   of these inmates.  You know, the wrong thing said

15   about somebody's mama in jail gets you whooped,

16   so --

17   Q.    Understood.  Let's move on to next inmate

18   suicide and suicide attempt on the list that I have.

19   Laron Moore, the information we have is that he

20   attempted sui -- made an attempt of suicide in

21   August, August 6th of 2013, and his second attempt,

22   which turned out to be successful, was on

23   January 3rd of 2014.  On both cases he was in a

24   single cell on the fifth floor of the main jail

25   complex.

1          Do you have any memory of Laron Moore's

2     suicides?

3     A.     Not off the top of my head on Laron Moore.  I

4     know the name because it came -- it comes up in

5     those meetings and the same people came up every

6     time.  Like those were -- lot of those inmates that

7     you're -- so far the first two have been -- were

8     incarcerated around the same time, so those names

9     come up together, you know.

10    Q.     Okay.  When you say their names came up at

11    the same time and over and over again, was that at

12    the no bars meeting?

13    A.     No bars meeting.

14    Q.     All right.  Next on my list I had an inmate

15    named Jonathan Wright, W-R-I-G-H-T.  Records reflect

16    that he committed suicide on October 27th of 2014.

17    He was lodged in a single cell dorm on the fifth

18    floor.

19          Do you have any memory of Jonathan Wright?

20    A.     None on -- none on Mr. Wright.

21    Q.     Next was an inmate named Franklin Bolton,

22    B-O-L-T-O-N.  The date of his suicide, which was

23    successful, was February 16th of 2015, and he was

24    lodged in a single cell on the fifth floor of the

25    main jail complex.

63

1          Do you have any memory of Mr. Bolton's

2     suicide?

3     A.     I don't remember the details, but I know the

4     name.

5     Q.     Any other memory other than just his name?

6     A.     No, not off the top.

7     Q.     Now, the next in-custody death that preceded

8     Mr. Troutman's was a James Ashby.  That was on

9     October 4th of 2015.  Were you still at the jail

10    then?

11    A.     No.

12    Q.     Still working for corrections?

13    A.     October?  No.

14    Q.     Okay.  'Cause you were gone in --

15    A.     March.

16    Q.     -- March.  All right.  So Bolton was the last

17    inmate in-custody suicide that would've occurred

18    according to what I have on the list.

19    A.     Yes, sir.

20    Q.     All right.  So tell us, prior to Mr. Hindi,

21    do you have any recollection of an inmate in-custody

22    suicide in a single cell with bars?

23    A.     I can't think of any names off the top of my

24    head.

25    Q.     From your memory, was the fact that there --

1    strike that.  Let me rephrase it.

2        If Mr. Hindi's suicide attempt or if his

3    suicide attempt was in mid October of 2013, do you

4    know whether or not the no bars meetings were

5    instituted prior to that date?

6    A.    Yes.

7    Q.    Okay.  And were they instituted as a re --

8    what were they instituted as a result of?  What

9    caused that to be developed?

10   A.    It was another inmate, I couldn't tell you

11   the name, numerous attempts in his past history,

12   that got moved into a single cell on the night shift

13   without -- prior to being noti -- from medical or

14   classification to be notified, security just moved

15   the inmate into the cell, and then the inmate had

16   hung himself.

17       So we put that in place to stop that from

18   ever happening again.  Without anybody knowing, you

19   just can't put an inmate in a cell.

20   Q.    All right.  And that was at some point in

21   time prior to Mr. Hindi's suicide.

22   A.    Yes.

23   Q.    All right.  And do you have a memory -- you

24   may not remember that exact inmate, but do you

25   remember why that inmate was moved into a single

65

1    cell that would -- had bars?

2    A.    I don't.

3    Q.    Tell us, what are some of the common reasons

4    that an inmate would be moved into a single cell?

5    A.    Assault an officer, assault with another

6    inmate.  We do put inmates with medical conditions

7    such as wheelchair.  Gosh, there's a ton.  It's just

8    been a while since I've been -- there's all kinds of

9    reasons that we use -- that we would check on an

10   inmate, but most of it was assaults, previous

11   assaults.

12         Sometimes if an inmate came in and we knew he

13   was going to assault anybody, we'd stop it before it

14   happened and put him straight back into the single

15   cell that he left.

16   Q.    Could it be something short of an actual

17   assault of conduct, like threats?

18   A.    We -- I can't say we.  I would ask them not

19   to put an inmate in a single cell for threats.  You

20   could pull them out, let them cool off, but not put

21   them in a single cell due to threats.  We don't have

22   that kind of single cell space.

23         MR. SIMON:  I'm going to start marking

24   exhibits here, but it might be a good time if

25   you-all want to take a break.

1          MR. OGBURN:  Yeah, let's go ahead and take a

2     break.

3          MR. SIMON:  Yeah, let's go off record.  Thank

4     you.

5          (Recess from 2:24 p.m. to 2:37 p.m.)

6     Q.    All right.  Mr. Ernst, I'm going to show you

7     what I've marked as Deposition Exhibit 1.

8          MR. SIMON:  Pass these around if they need

9     those.

10    Q.    Which purports to be a photocopy of an email.

11    Do you recognize the email?  Particularly where it

12    says from Kyle Ernst, but go ahead.

13    A.    Uh-huh.

14    Q.    All right.  Your answer is yes, you recognize

15    it?

16    A.    Yes.  Yes.  Yes.

17         (Ernst Deposition Exhibit 1 was marked for

18    identification and is filed with this transcript.)

19    Q.    And is this an email that you wrote yourself?

20    A.    The bottom part, yes, it is.

21    Q.    And to whom did you send this email?

22    A.    Metro Corrections classification and the

23    administration and medical as well.

24    Q.    Tell us the reasons for this email being

25    emailed.

1     A.     Actually I remember this email.  Sergeants
2     told my classification staff that they would -- they
3     are going to move the inmate and that medical -- I
4     mean that classification's responsible for -- that
5     they don't have time to wait for classification to
6     get clearance, that they got to move this inmate,
7     they can't just stand -- hold him up there, and --
8     Q.     This is a sergeant telling you this?
9     A.     This -- no, this is -- yeah, this was a
10    lieutenant that sent an email out prior to this one
11    and saying that they cannot wait on classification.
12           And I said -- so I sent this out to my staff,
13    and -- 'cause my staff was getting yelled at by this
14    lieutenant, and I was -- sent this out to let that
15    lieutenant know, as well as the administration, that
16    they will wait for the clearance, because we --
17    that's -- that -- we don't want any incidences, so
18    we're going to wait 'til we get all that clearance.
19    "You will wait" was basically what I said.
20    Q.     Now, this email was sent on January 13th of
21    2014?
22    A.     Uh-huh.
23    Q.     And when you sent it, it says sent to Metro
24    Corrections Class.  So who was supposed to get that
25    email?

```
 1      A.     That's everybody that works in
 2      classifications is under that title.
 3      Q.     All right.  And the other individuals that
 4      were copied on this list, can you just go down the
 5      list?  Who are they?
 6      A.     Ashby was the head of security, Eric Troutman
 7      and Dwayne Clark were the two directors that I
 8      included, and Metro Classification Medical, just to
 9      let them -- give them a heads-up.  I try to include
10      as many people as I can.
11      Q.     Now, this email was generated about ten days
12      after Laron Moore's suicide, his second suicide
13      attempt, which was successful.  Do you know whether
14      or not this email was a result of Mr. Moore's
15      suicide or not?
16      A.     No.  This was a result of a lieutenant who
17      sent out a nasty email and yelled at some of my
18      staff for not moving faster.
19             He said, "I'm going to stay on this phone and
20      you're going to move this inmate now, and I'll wait
21      for you to get the clearance," or whatever.
22             And the medical -- medical, they work fast
23      for us, but they couldn't do it that quick.  He --
24      we'd have to hang up the phone, call, they'd have to
25      do their research on their end, we'd do our research
```

1    on our end, and then it was sent to the -- back to

2    the sergeant where he could be moved, and they

3    didn't want to wait.

4    Q.    So just describe for us, if you would, I

5    understand what you're saying, but what was the

6    protocol, what was the procedure and LMP -- LMDC

7    policy about moving inmates into a single cell prior

8    to this email?

9    A.    You are to re -- it was -- it was the same.

10   It's always been the same.  You have to -- ever

11   since I told you about the one inmate, it's always

12   been you have to clear an inmate every time he gets

13   moved, either whether it be from a facility to a

14   single cell or anytime he gets put into a single

15   cell.  Even in rear security you're supposed to

16   clear an inmate before he goes into one of those

17   single cells.

18   Q.    Okay.  And when you say clear, what are you

19   referring to?  What --

20   A.    Through -- through medical and mental health,

21   a phone call has to be made and they have to give

22   you the green light in order for them to be housed

23   in that location.

24   Q.    All right.  So are you saying that the

25   previous policy of LMDC for placing an inmate in a

1    single cell with bars was that you'd have to get

2    positive clearance?

3    A.    It --

4          MR. OGBURN:   Objection, form.

5    A.    It's a common practice.  It was common

6    practice.  It was trained.  I don't -- I can't say

7    that it's in policy 'cause I don't have the policy

8    in front of me, but I can tell you that it was

9    trained -- it was supposed to be trained at any time

10   and it was common practice.

11   Q.    Okay.  So if it wasn't written down as an

12   actual policy, it was a trained practice?

13   A.    Yes.

14   Q.    Okay.  And your -- that's -- your staff

15   would've been trained in that manner.

16   A.    Yes.

17   Q.    To get clearance from medical for this type

18   of move?

19   A.    Right.  We would notify them and let them

20   know the inmate, and if they needed a history, they

21   would tell them, hey, this inmate's been on a no

22   bars, can you have this checked out, and they would

23   check it out.

24         Normally mental health would come down, talk

25   to them before we place them.  They'd be put up for

1    review on a no bar -- on the no bars list.

2    Q.    And you were in the position that you told us

3    before in your -- before we took our break of being

4    records supervisor like from 2004 to 2000 -- well,

5    before you were classification coordinator, right?

6    A.    Yes.

7    Q.    Okay.  And you were classification

8    coordinator for about four or five years; is that

9    right?

10    A.    Uh-huh.  Yes.

11    Q.    All right.  Was the policy that you're

12    talking about, getting clearance of that manner --

13    in that manner, was that the policy, was that the

14    trained practice of LMDC about moving an inmate into

15    a single cell prior to your becoming classification

16    coordinator?

17    A.    That would be a Jamie Allen question.  I

18    couldn't answer.

19    Q.    Do you have a memory of whether or not that

20    trained practice of getting clearance before an

21    inmate's moved into a single cell, you have any

22    memory of if that was instituted during the four or

23    five years that you were classification coordinator?

24    A.    No, I don't think that was -- I think it was

25    already in place when I came.

1    Q.    So you said that really nothing had changed

2    even though you sent out this email?

3    A.    Yeah, this email was a reiteration to -- more

4    to security, and I do believe if -- well, that ain't

5    it.  I don't know if this is it or not.  I don't

6    know if that's the same lieutenant at the time as

7    Calhoun, if not, that I -- but there was an issue

8    with a -- with a previous lieutenant that had a

9    quite -- was trying to rush my staff, and I need

10   them to make the correct decision, so I sent this

11   out.

12   Q.    Okay.  In Deposition Exhibit 1, are you

13   referring to the person at the top, Michael

14   Callahan?

15   A.    Yes.

16   Q.    Is that who you were talking about as to --

17   A.    Yeah, it might've been him.  I'm not sure.

18   But this was two years later, so it might not have

19   been him.  But he was a lieutenant on another shift,

20   and that's why it was sent to Ashby, who was head of

21   security, that's why he was first, 'cause he was

22   head of that area, and I --

23   Q.    All right.  In the email that was sent out

24   that is Deposition Exhibit 1, did this type of

25   policy -- let me rephrase that.

1    The email that's demonstrated or shown in

2    Deposition Exhibit 1 that was sent on January 13,

3    2014, did the proper practice of placing an inmate

4    in a single cell, did that only include moves that

5    were initiated by sergeants?

6    A.    Sergeants were the ones that made the calls

7    that they needed an inmate moved due to an

8    altercation, due to -- officers couldn't make that

9    call.  And I will tell you, reading, I just reread

10   the bottom of this --

11   Q.    Uh-huh.

12   A.    -- "These calls are to be handled by staff on

13   the Move List/OOC."  So other than 11:00 to 7:00

14   shift, which 11:00 to 7:00 shift all worked out

15   front as prescreening staff.

16       Prescreening is the people that worked in the

17   back of the building.  Okay?  There's classification

18   out front that did the initial, and there's

19   classification in the back that did the final, where

20   they moved them to the floors, mostly move list

21   people and stuff like that.

22       This email was put out due to an altercation

23   between one of my staffs that worked in the back and

24   a lieutenant, where the person in the back

25   transferred the phone call to the front, and the

1    lieutenant did not want to be transferred.

2         He said, "You do it, you put this inmate in a

3    single cell."

4         But that wasn't their job in the back.  Their

5    job was that -- they had a different job

6    description.  It was done by the front area.

7    Q.    I'm just going to try to break down your

8    answer a little bit and ask you some questions about

9    it.

10   A.    Uh-huh.

11   Q.    When you said there's -- I believe you meant

12   classification staff in the front and in the back?

13   A.    Yeah.  There's a front and rear -- the people

14   in the back --

15   Q.    Sure.  Wait, wait, wait.  I'll give you a

16   piece of paper and --

17   A.    That'd be great.

18        MR. SIMON:  Why don't we do this?  Let's go

19   off record.

20        (Off-the-record discussion.)

21        MR. SIMON:  All right.  Let's go back on.

22   Q.    Mr. Ernst, I'm going to hand you a blank

23   piece of paper, piece of white copy paper marked

24   Exhibit 2.  You're going to draw us a diagram what

25   we mean by classification personnel in the front and

1      back.

2      A.     Yes.

3             (Ernst Deposition Exhibit 2 was marked for

4      identification and is filed with this transcript.)

5      A.     So prescreening, which was -- is the name for

6      an inmate that is brought in from either another

7      facility or fresh arrest, they are prescreened

8      always, always, always.

9             We have two areas right here with

10     prescreening, and we work hand in hand with medical.

11     They have a prescreening area and it's -- their area

12     is here, and our area as classification is here

13     (indicating).  And that's the prescreening.  That is

14     where we decide what classification the inmate is.

15     Q.     Is that on the first floor of the main jail

16     complex?

17     A.     First floor main jail.

18     Q.     All right.

19     A.     Then in rear security, which is off to the

20     back, is where we house inmates and do their final

21     classification when they come back from court.  So

22     this is court hold, this is arraignment court here

23     just so you know, and this is arraignment, when I

24     talk about rear.  That's arraignment court.  And

25     this -- these are the holds (indicating).

1          So when inmates come back from arraignment,
2     they're set in chairs right here and they are
3     classified before they're housed.  That's what I
4     mean by -- so the issue was the sergeant didn't want
5     to wait on these people to house, they wanted
6     this -- the inmates to be housed immediately, but
7     the inmates had to be cleared up here through
8     classification working with medical, and that's why
9     the process takes a little bit of time.  That's what
10    that email was put out for.  I remember it clearly.
11    Q.    Okay.  Notwithstanding that, what you said
12    before, let me make sure this is correct.  The
13    training of corrections staff and the training of
14    administrative staff would be that before an inmate
15    was moved into a single cell with bars during this
16    time period, and we're talking going back to 2013
17    easy.
18    A.    Easy.
19          MR. OGBURN:  Objection, form.
20    Q.    All right.  Would that be a fair statement,
21    going back to 2013?
22    A.    It go -- yeah, it goes back past -- yes, from
23    when I was there.
24    Q.    All right.  And through the entire time that
25    you were there.

77

1    A.    Yes.

2    Q.    All right.  That it was necessary to get

3    clearance from medical before that move could be

4    made.

5    A.    Correct.  Common practice.

6    Q.    All right.  So even though this email says,

7    well, if a sergeant calls you to place somebody in a

8    single -- place an inmate in a single cell, the

9    trained practice of corrections was that anytime an

10   inmate would be moved into a single cell with bars,

11   it would be necessary to get that type of clearance

12   before moving them?

13   A.    Yes.

14   Q.    Now, the email, which is Deposition Exhibit

15   Number 1, has a form at the bottom that apparently

16   may match up with a numbered policy of Louisville

17   Metro Corrections.  Would that be a fair statement?

18   A.    It is.

19   Q.    All right.  So who developed that form where

20   it says Louisville Metro Department of Corrections

21   Special Management Unit Medical Notification?

22   A.    I did that.

23   Q.    And what was the reason -- what was the

24   reason for doing that?

25   A.    This was to document -- this was -- I'm

1    trying to think of the date.  This was in '14.  But

2    they never -- I implemented this so that we have

3    paper documentation instead of just having XJail

4    documentation, but for the most part nobody used it.

5    Q.    How come?

6    A.    Because I guess they felt that XJail kept

7    pretty good documentation, there was never any issue

8    of lost information, so I guess it was a little

9    harder for them to use this than it was that, so --

10   I mean, it takes a while to get put into service, I

11   couldn't tell you the exact reason, so that would be

12   through the administration, but they found that it

13   was easier to use -- it should've been taken out,

14   'cause I think they found out it was easier just to

15   keep track of it in XJail with XJail having no

16   issues and being backed up.

17   Q.    Well, who is they when you talk about --

18   A.    Inmate -- directors.

19   Q.    Would the directors, would they be the ones

20   that would have the authority to say or -- let me

21   rephrase that.

22         Where on the hierarchy from your experience

23   and time at LMDC would an individual in corrections

24   have the authority to basically say it was okay to

25   ignore this type of directive?

1    A.    In policy -- if it's in policy, it's supposed

2    to be followed, so I can tell you that my -- down --

3    I can't tell you about security, I couldn't tell you

4    what their -- what their directives are, anything,

5    all I can do is tell you about classification, and I

6    told them to document these incidents, and they did

7    document them through another piece of paper, but I

8    don't know if it was this one anymore.

9        We had another documentation, like a ledger

10   downstairs that we kept all those records in when

11   inmates were moved.

12   Q.    And was that -- that ledger was in use while

13   you were classification coordinator?

14   A.    Yes, it was like a -- it's the -- it's the --

15   everybody that they classify on the booking floor,

16   they keep a running ledger of who they've classified

17   and where they -- you know, what they've done with

18   the inmate.

19   Q.    Would that ledger include updates of

20   classification --

21   A.    Just for initial only.

22   Q.    Okay.  The ledger's for initial

23   classifications only.

24   A.    Right.  Everything else is done through

25   XJail.

80

```
1     Q.    So if it isn't documented on XJail, if a move

2     is not documented on XJail, it wouldn't be

3     documented anywhere else?

4     A.    You're talking about --

5     Q.    Well, let me rephrase --

6     A.    -- for what inmate?

7     Q.    Let me rephrase the question.

8           If an inmate is to be moved --

9     A.    Uh-huh.

10    Q.    -- where would that move be documented if it

11    wasn't the initial classification?  Talking about

12    being entered in the ledger that you talked about.

13    A.    That's through the -- that's -- the ledger

14    that we keep out front is for everything that we do

15    with the inmate where he's -- when he comes fresh

16    arrest.

17          The inmates -- in the rear security we also

18    keep documentation for the courts, what happened in

19    court, stuff like that.  But initial moves are all

20    done through the system now, XJail.

21          I couldn't tell you how this fell off or why

22    it fell off or if there was anything ever put out.

23    Q.    We have previously taken the deposition of

24    James Cox --

25    A.    Uh-huh.
```

1       Q.      -- who is in the position of a classification

2       interviewer.

3       A.      Yes.

4       Q.      And before doing that, let me go ahead and

5       mark this exhibit.  It's going to be Deposition

6       Exhibit 3.

7               (Ernst Deposition Exhibit 3 was marked for

8       identification and is filed with this transcript.)

9               MS. SULLIVAN:  Excuse me.  Can I have two of

10      those, please?

11      Q.      I'm going to show you what we've marked

12      Deposition Exhibit, 3 and ask you to look at that

13      and see if you can -- see if you recognize that.

14      A.      Yes, this is a -- looks like half a page of

15      the inmate's notes.

16      Q.      From XJail?

17      A.      Uh-huh.  Yeah, there it is at the top.  It's

18      actually just a printout.

19      Q.      And so that would -- the information that's

20      on this page, Deposition Exhibit 3, that would be

21      information or would that be information that is

22      contained in XJail?

23      A.      It is.

24      Q.      And that could be accessed by who?

25      A.      Anyone.

82

1    Q.    Anyone being who?

2    A.    All the officers, securities, nonsecurity,

3    anybody that has access to XJail can pull this

4    information.

5    Q.    All right.  Would that include medical staff?

6    A.    Medical can pull this information, medical --

7    notes, they have access to notes.

8    Q.    And from the entries that are on this inmate

9    note per -- that pertain to Mr. Troutman, the

10   decedent in this lawsuit, is it possible to go back

11   and determine his placements while he was in

12   corrections?

13   A.    You mind saying that again?

14   Q.    By looking at the information that is on

15   Deposition Exhibit 3 and -- which are -- which would

16   be contained in XJail, is it possible to go back and

17   review the movements of this particular inmate while

18   he was in corrections?

19   A.    Yes.

20   Q.    On Deposition Exhibit 3, it says created

21   users, there's different people's names there.

22   Are -- who are those people?  What part of the staff

23   are they?  What division of staff?

24   A.    James Cox, classification.  Ashley Adams is

25   classification.  Jeffrey Kassinger is a disciplinary

83

1 officer.  Stacey Ayers is the floor counselor.

2 Venus Bailey is a booking floor -- was a booking

3 floor counselor, as well as James Cox and Ashley

4 Adams.

5   Those names are the booking floor -- an

6 original photo that I showed you right here, these

7 are the booking floor classification staff, and

8 Stacey Ayers is the floor staff that worked on the

9 floor the inmate was housed on at one -- at one time

10 or another.

11 Q. The entries -- the entries on the inmate

12 note --

13 A. Uh-huh.

14 Q. -- that are in the note type of inmate

15 movement, who has authority to make those entries?

16 A. Any staff that have dealing with -- they're

17 supposed to use it, any staff that has dealing with

18 the inmates that need to update a day-to-day on this

19 per said -- per said inmate.

20 Q. Does an entry under inmate movement similar

21 to the inmate notes in Deposition Exhibit 3, do

22 they -- are those the entries that initiate

23 movements of inmates from one part of the jail to

24 another?

25 A. They don't initiate movement.  They're just

84

1    documentation of movement.

2    Q.    Okay.  They -- the corrections staff that

3    actually moves inmates are -- what people are those?

4    A.    That's done off of a move list.  That is a

5    move list that's generated for inmates to be moved

6    by my staff in rear security.  The one I showed you

7    a picture in rear, they're -- they design the move

8    lists.

9    Q.    Okay.  Well, distinguish for us what you've

10   described as the move list from the inmate notes

11   that we're looking at in Deposition Number --

12   Deposition Exhibit Number 3, which is part of XJail.

13   A.    It looks like Cox was working -- they work in

14   the same capacity, front or rear.  Looks like he was

15   working in rear on 11-24-15 when he was doing the

16   movement for this inmate.  'Cause these are all from

17   the same day.

18   Q.    Well, going from the entries that are on Mr.

19   Troutman's inmate notes for inmate -- well, going

20   from the entries that are on Mr. Troutman's XJail

21   entries, on 11-24 of 2015 at 12:58, there is an

22   entry that's under the heading Disciplinary Officer

23   notes.  What does that --

24   A.    Yes.

25   Q.    What does that mean?

1      A.     That means that this officer talked to the

2      inmate regarding his write-up.  That's what his job

3      is.  Now, looks like he just put in inmate has a

4      write-up for fighting pending, that he didn't --

5      when he meets with that inmate, he'll put in the

6      notes, this is what was determined, I -- he had five

7      days to serve, ten days to serve.  He just put in

8      that he received the write-up.  That's just to

9      indicate, hey, I got the write-up and I know that

10     he's got one.

11     Q.     Okay.  And what you can deduce from that,

12     that this Kassinger is a disciplinary officer?

13     A.     Yes, he is.

14     Q.     So he doesn't necessarily have to be a

15     sergeant, or does he?

16     A.     No.

17     Q.     All right.  And what is -- what is he doing?

18     Is he just documenting that?

19     A.     That he received the write-up.  He's letting

20     everybody know that, hey, I got the write-up and

21     I'll do the investigation on that write-up and do

22     the recommendation for the disciplinary.

23     Q.     All right.  So some -- you're familiar with

24     Kassinger, his position at corrections at that time?

25     A.     Yes.

86

1    Q.    All right.  And he was not a sergeant, right?

2    A.    No, he was not.

3    Q.    All right.

4    A.    He was just an officer.

5    Q.    Okay.  So he was just documenting something.

6    A.    Yes.

7    Q.    All right.  And what you said about sergeants

8    having the authority to move an inmate or make a

9    request --

10   A.    Right.

11   Q.    -- to move, has to be a sergeant of that --

12   has to be a sergeant or a higher level?

13   A.    Sergeant or higher, yes.

14   Q.    So when we -- when we look at Deposition

15   Exhibit Number 1, your email.  Okay?

16   A.    Uh-huh.

17   Q.    Where it says, "From this point on anytime a

18   sergeant calls you for a single cell," this

19   practice, trained practice would apply to all moves,

20   all movements of inmates into single cells.

21   A.    Yes.

22         MR. OGBURN:  Objection, form.

23   Q.    Or I -- let me ask it, would it apply to all

24   inmate movements into a single cell?

25   A.    Yes.

1              MR. OGBURN:   Same objection.

2     Q.    In that part of your email, the separate

3     paragraph where it says, "These calls are to be

4     handled by staff assigned to Move list/OOC," what

5     are you talking about there?

6     A.    That's the -- what I was telling you the

7     work -- in the back their job is to handle the move

8     list, their job is to class -- after inmates have

9     been fully classified, they handle the movement of

10    the inmate, where they're supposed to be housed

11    properly.

12    Q.    Okay.   What does OOC stand for?

13    A.    Shoot, I can't remember.

14    Q.    Is it associated with the people that put

15    together the move list?

16    A.    Yeah.   I think it's order of commitment, but

17    I'm not sure.   It's been so long, so --

18    Q.    For an inmate that had been incarcerated at

19    LMDC for a period of time and then was put on a move

20    list, is it -- are you telling us that there would

21    need to be verifica -- not -- let me rephrase that.

22          You told us that the staff assigned to the

23    move list are on the rear -- the rear part of the

24    first floor for -- rear part of the first floor of

25    the jail.   All right.

88

1    A.    Yes, sir.

2    Q.    All right.  Those individuals, they determine

3    assignments, cell assignments for inmates after they

4    come back from arraignment court if they're going to

5    stay in custody?

6    A.    Yeah, or if it's just house them in

7    disciplinary or whatever, they're responsible for

8    that.

9    Q.    Okay.  So they would -- they would have the

10   responsibility of adding people to the move list,

11   say, that were being written up for disciplinary

12   reasons.

13   A.    If they receive the call, yes, they are.

14   Q.    All right.  The individuals that receive that

15   call, where -- what's the next department that they

16   contact to make the move of that inmate a reality?

17   A.    Who's that?  Who are you asking to make that

18   call to have that move done?  Who's going to make

19   that call?

20   Q.    Yeah.

21   A.    That would be like this right here.  It's the

22   lieutenant.  Lieutenant called to let the inmate --

23   let us know that the inmate needed to be moved back

24   to the main jail complex.

25   Q.    So when the lieutenant makes the call saying,

1      we're going to move this inmate back for whatever

2      the reasons were, disciplinary or otherwise, who

3      does -- who does the lieutenant communicate with?

4      A.    Rear.

5      Q.    All right.  And would it be an individual on

6      rear security?  Is that right?  Rear security?

7      A.    Yes, sir.

8      Q.    Would it be an individual on rear security

9      that makes the entry into XJail about that?

10     A.    Yeah.  Looks like that would've been James

11     Cox on that day.

12     Q.    Now, we've previously taken the deposition of

13     Mr. Cox, and he told us in his deposition that he

14     had contacted, he made a phone call down to medical

15     and talked to Nurse Brown to alert her as to the

16     request to move Mr. Troutman into a single cell.

17           If that is an accurate reflection of his

18     testimony, would the entry here on Deposition

19     Exhibit Number 3, would that be similar to the

20     testimony that he gave us?

21     A.    Says, "Inmate moved to H5 dorm 9 pending

22     disciplinary.  Notified Nurse Brown of single cell

23     use and waiting to hear back from her on medical on

24     that."

25           So it doesn't make sense to me, so I don't --

1    my thing is if an inmate is moved to H5 dorm 9

2    pending disciplinary, why -- if -- I can't tell you

3    why he did what he did.  I don't have a clue.

4          Because when I read this, it says that the

5    inmate's already been moved and -- but my question

6    is why -- then why are you calling medical and

7    waiting on them to respond if you -- the inmate

8    shouldn't have been moved into a single cell.  I

9    just don't -- I don't understand what he did.  Maybe

10   he's -- it's his words.  I don't know.

11   Q.   Well, his testimony when we took his

12   deposition is that before the inmate was moved, he

13   called down to medical, had a conversation with

14   Nurse Brown, told Nurse Brown that Mr. Troutman was

15   going to be moved, and he asked for her to

16   communicate the fact that he was planning to be

17   moved to mental health.  All right?

18          MS. O'REILLY:  Objection.

19          MR. OGBURN:  Objection.

20          MS. O'REILLY:  Form.  Mischaracterizes.

21   Q.   Nurse Brown testified that she remembers

22   receiving the communication from Classification

23   Interviewer Cox, and that she wrote that information

24   on a Post-It note and put it on the computer screen

25   of -- in the mental health office.  All right?

1          MS. O'REILLY:  Objection.  Same.

2     Q.    Ultimately the clearance from mental health,

3     there was not -- well, let me rephrase that.

4          Mr. Cox testified that he did not receive

5     word back from mental health --

6          MR. OGBURN:  Objection.

7     Q.    -- regarding Inmate Troutman as to the

8     propriety of moving him into a single cell.

9          MR. OGBURN:  Objection, form.

10    Q.    With those three statements, the proof

11    showing those three statements, do you see a -- do

12    you see a problem in that situation?

13         MR. OGBURN:  Objection to form.

14    Q.    Go ahead and answer, if you can.

15    A.    Yes.

16    Q.    What is the problem?

17    A.    You have to clear the inmate prior to the

18    inmate being put into a single cell.

19    Q.    Say that again, 'cause you were mumbling a

20    little bit.

21    A.    You have to clear the inmate prior, through

22    medical, prior to the inmate being put into a single

23    cell.

24    Q.    Okay.  When you say "you have to clear," what

25    do you mean by that?

1      A.     That you have to contact medical, medical has

2      to contact you back and say this inmate is cleared

3      for a single cell.

4      Q.     Okay.  The you is -- when you say the you,

5      Y-O-U in that, what are you talking about?

6      A.     Meaning classification.

7      Q.     All right.

8      A.     Housing a person.

9      Q.     If classification, the housing person,

10     doesn't get the affirmative clearance and it's not

11     followed up on, does that present a problem in your

12     mind based upon your experience as the

13     classification coordinator?

14            MR. OGBURN:  Objection to form.

15     A.     Yes.

16     Q.     Mr. Cox testified in his deposition that he

17     was hired on into his position about six months

18     after the email, as shown in Deposition Exhibit

19     Number 1, was sent out, and he did not see that

20     email.

21            MR. OGBURN:  Objection, form, foundation.

22     This witness wasn't at corrections during that time

23     period.

24            MR. SIMON:  That's fine.

25     Q.     Mr. Cox -- Mr. Cox says he didn't see that

1   email.  Do you have an explanation why -- if he was

2   hired on six months after the email as demonstrated

3   in Deposition Exhibit 1 was sent out by you, do you

4   have an explanation why he didn't see it?

5   A.    If he came after the fact and wasn't in

6   classification -- in the listing, which right here

7   clearly states Metro Corrections Class, if he wasn't

8   in that listing, he wouldn't have received that

9   email.  I don't know if he was or wasn't.

10  Q.    Would you have the expec -- let me restate

11  that.

12       As classification coordinator, during the

13  time that you were classification coordinator, would

14  it be your expectation that all individuals in that

15  position as classification interviewer receive that

16  directive in that email even if they're hired on

17  afterward.

18  A.    Yes.

19  Q.    How could that have been accomplished?

20  A.    Well, just reading what he wrote here, I

21  don't -- I don't -- I can't speak for Mr. Cox, but,

22  "Inmate moved to H5 dorm 9 pending disciplinary,

23  notified Nurse Brown for a single cell use and

24  waiting to hear back from medical on that."

25       If he didn't know, why would he make the

1    initial call to medical, and why would he say, "I'm

2    waiting to hear back on that" if he didn't -- if he

3    didn't know that he was supposed to get that

4    clearance?  It doesn't make sense.

5        So evidently I'm not -- I don't know, but to

6    me when I read this, it seems like he understood

7    what was going -- going on.  But I can't -- I wasn't

8    his training officer, so I can't say what he was

9    trained to do.

10       Now, they are supposed to be trained this

11   way, this is a common practice.  We do -- we do

12   this -- we do these type of moves every day all day,

13   so if he had been working there any time at all, he

14   would've known, to me if --

15   Q.    He would've known?

16   A.    How to be trained.

17   Q.    Okay.  He would've known what?

18   A.    The practice of that inmates have to be

19   cleared prior to going into a single cell.

20   Q.    And how do they know inmates have been

21   cleared?  How would a classification officer know

22   that an inmate had been cleared?

23   A.    Because you make this phone call right here

24   to medical and you wait for then to contact you

25   back, and that's what he said he was doing, but the

1    inmate was moved.  It was -- it was just a step --

2    he was a step ahead of himself.

3    Q.    What would your expectations be for a

4    classification interviewer in that position to do if

5    he was still waiting to hear back from medical?

6    A.    Make another call and document that another

7    call had been made, and let that -- let that

8    supervisor, whoever called you, to know to have that

9    inmate moved that you're still waiting on medical so

10   they can push from their end, you're pushing from

11   your end, and it gets done a lot quicker.

12   Q.    In a situation in which a follow-up call that

13   you're talking about in your answer is not made and

14   an inmate is moved, what's your opinion about that?

15   Does that create a risk --

16        MR. OGBURN:  Objection, form.

17   Q.    -- to the inmate?

18   A.    Inmate wouldn't be moved.  If I was running

19   the floor, wouldn't -- inmate would not be moved.  I

20   couldn't answer -- I just wouldn't move the inmate.

21   Q.    All right.  But moving -- strike that.

22        An inmate being moved without getting

23   affirmative clearance from medical, would that be

24   consistent or inconsistent with the training of a

25   classification interviewer when you were there at

96

1    corrections?

2    A.    Yes, it should've been the training that you

3    have to have clearance prior to moving any inmate to

4    a single cell.

5    Q.    The directive in Deposition Exhibit Number 1

6    is or is not a change in the trained practice of

7    classification when you were there?

8    A.    Well, I don't understand the question.

9    Q.    Okay.  Let me restate it.

10    You've just given us the testimony about you

11   need an affirmative answer from medical before an

12   inmate in that position should be moved; is that

13   right?

14   A.    That is correct.

15   Q.    All right.  And this email, does it say --

16   when you boil it down, does it say anything

17   different than that?

18   A.    It does not.  Says just that.

19   Q.    So the -- would it be a fair statement to say

20   that the email doesn't really change the established

21   practice of corrections for moving inmates into a

22   single cell?

23   A.    Doesn't change at all.  Just change -- well,

24   it chan -- only thing it changes is where -- who

25   takes the phone call on that move.

1    Q.     And whose responsibility is it to receive the

2    clearance before that inmate is moved?

3    A.     The office -- the classification person that

4    made the phone -- initial phone call.

5    Q.     When an individual is hired into that

6    position as classification interviewer, what

7    training does that person receive?

8    A.     At the time it was Steve Flener, they have a

9    training packet that they have to fill out, and that

10   training packet goes through not only policies and

11   procedures, but you also have to do on-the-job

12   training.

13   Q.     And during the course of their training on

14   the job and also classroom training, would they

15   be -- would they become familiarized with the

16   physical setup of the jail and all the jail

17   facilities?

18   A.     Yes.

19   Q.     All right.  So that would include CCC?  Would

20   that include CCC?

21   A.     Yes.

22   Q.     Would that include the main jail complex?

23   A.     Yes.

24   Q.     Would that include the single cells that are

25   located on the fifth and sixth floor of the main

1    jail complex?

2    A.    Yeah.

3    Q.    So the --

4    A.    Yes.

5    Q.    Would a classification interviewer be

6    familiar with how those single cells are set up?

7    A.    Yes.

8    Q.    Okay.  And would a classification interviewer

9    be familiar with the different types of doors to

10   each of the single cells?

11   A.    They might not know to pay attention to them

12   when they're seeing them.  Single cells are the same

13   in rear security, which as I've shown you right

14   here, which is right here along this wall.

15         Single cell -- so classification has a visual

16   sight of what a single cell looks like on a

17   day-to-day basis.  The only difference is there is

18   no windows here.

19   Q.    Would it be normal for a classification

20   interviewer during his or her training to be taken

21   up on the floors to see the physical layout?

22   A.    Sometimes, yes.  It's -- the floors --

23   there's two -- like I was telling you, there's

24   different kinds of classification.  There's floor

25   classification which work on each floor every day,

1    there's -- that work a 9:00 to 5:00 on those floors.

2    They're responsible for the inmates on those floors.

3         Booking floor personnel that work down here

4    are not responsible for inmates on the floor.

5    They're responsible for the inmates that are in

6    fresh arrest.

7    Q.    Okay.  I think we're up to 4.

8         (Ernst Deposition Exhibit 4 was marked for

9    identification and is filed with this transcript.)

10   Q.    Let's see.  Mr. Ernst, I'm going to show you

11   what I've marked as Deposition Exhibit 4.  That

12   appears to be a Louisville Metro Department of

13   Corrections form.  Go ahead and look at that and

14   tell me if you are familiar with this type of

15   document.

16   A.    It's a no bars alert list.  It's a printout

17   of just the alerts of no bars.

18   Q.    Now, would this have been the list that you

19   instituted while you were there at corrections?

20   A.    Yeah.  We -- I -- all we instituted, once

21   you -- we've made this no -- the no bars alert that

22   we put in the computer, it generated -- the computer

23   generates this list.

24   Q.    And is this something that the computer can

25   generate for any particular day?

1    A.    Yes.

2    Q.    Now, how does an individual inmate get his

3    name added onto this no bars single cell list?

4    A.    It's a dropdown box.  You have to go into the

5    computer and click on it.  Classification personnel

6    would have to do that.

7    Q.    And how would other individuals in the

8    Corrections Department know that an individual

9    inmate is on this list?

10   A.    It's a flashing alert on the main screen.

11   Q.    So the flashing alert on the screen, that

12   would be -- that would come up and that would be

13   something that anyone that accessed XJail would see

14   if they put the inmate's name in?

15   A.    Yes.

16   Q.    All right.  So that's available to

17   corrections officers on the floor?  On different

18   floors, I should say.

19   A.    Uh-huh.

20   Q.    Yes?

21   A.    Yes.

22   Q.    All right.  And that would be available to

23   both medical and mental health personnel?

24   A.    Yes.

25   Q.    The actual entry would be done by a

101

1    classification officer or interviewer?  Or who in

2    classification would actually make that entry?

3    A.    That they're on --

4    Q.    That they're on this list.

5    A.    Any classification that have -- deal with an

6    inmate that had a threat of suicide or a threat of

7    bodily harm or anything like that, they just go in

8    and click a box.

9    Q.    Now, the directive that goes to that

10   individual to click on that box comes from whom?

11   A.    Who -- if -- whoever calls classification

12   lets us know that this inmate had a -- had either an

13   attempt -- there's a different one, there's attempt

14   and there's a threat, the threat -- the threatening

15   of, but it all has to be reviewed by the same unit,

16   single cell management unit.

17   Q.    All right.  And that's the -- like the no

18   bars --

19   A.    Right.

20   Q.    -- alert committee --

21   A.    Right.

22   Q.    -- that you referred to earlier?

23        Okay.  Well, take us, if you would, from when

24   you have a meeting with that committee and what has

25   to happen when the folks on that committee make a

102

1    decision up until the time that a proper person

2    clicks on the dropdown box and puts that inmate's

3    name on this list.

4    A.    Once an inmate's name's on this list, the

5    only way it can come off is through that committee.

6    Okay?  So we don't really put them on the list.  We

7    just -- we are the ones that maintain the list, keep

8    track of what this inmate's been through, and keep

9    up with mental health and medical, keep us advised

10   of if there's any change in his situation, if

11   he's -- and then they tell us about it, we talk

12   about it, "Look, the inmate's never had an attempt

13   before, it's -- it was tissue paper that he put

14   around his neck, he's not really a threat," we all

15   agree that this inmate should be taken off of --

16   that's -- that -- the meeting goes similar to that.

17        All the information is obtained through David

18   Puckett, who is the floor supervisor single cell

19   management, and he would get that information from

20   the meetings, and we would all sit down, observe it.

21   He would talk to mental health prior to the meeting,

22   mental health will be there.

23   Q.    Let me use Deposition Exhibit 4, which is

24   right in front of you, Mr. Ernst, as an example.

25   Mr. Joseph Cambron is the name of an inmate who is

1       the first name on this list.

2       A.      Uh-huh.

3       Q.      And it's on -- the date of this report is for

4       November 24th of 2015.

5       A.      Correct.

6       Q.      All right.  Now, there's an entry next to

7       Mr. Cambron's name, there's a number of entries, one

8       is his inmate number, right?

9       A.      Correct.

10      Q.      The other would be -- it says cell/bed,

11      that's his housing assignment?

12      A.      Yeah.

13      Q.      And then after that is start date.

14      A.      Correct.

15      Q.      All right.  So what determines his start

16      date?

17      A.      The date he was put into a single cell.

18      Q.      And --

19      A.      On no bars alert.

20      Q.      Okay.

21      A.      Okay?

22      Q.      Well, right.  Well, go back.  'Cause it isn't

23      the day that he got put in a single cell, is it?

24      A.      No.  They get put in a single cell, it's the

25      date the alert was added.

104

1    Q.    All right.  So -- 'cause the alert's for the
2    purpose of keeping them out of a single cell with
3    bars, correct?
4    A.    Correct.  Correct.
5    Q.    So in Mr. Cambron's case, the -- we were
6    provided information by corrections indicating that
7    Mr. Cambron made a suicide attempt on the fifth
8    floor in a single cell on October 8th of 2014.  All
9    right?
10   A.    Uh-huh.
11         MR. OGBURN:  Objection, form.
12   Q.    So if that is accurate, the next day would be
13   the daily review?  Would be the extraordinary
14   incident review?  Is that the right terminology?
15   A.    You're talking about briefing.
16   Q.    Briefing.  Morning briefing.
17   A.    Yes.  If it was a -- if it was a serious
18   attempt, it would be brought up, it would be
19   addressed.  We actually address them all.  Anything
20   that goes on an incident report is what we review.
21   Extraordinary incident reports is what we review
22   every day.
23   Q.    If the proof in this case showed in the case
24   of Joseph Cambron that he made a suicide attempt in
25   corrections on October 8th of 2014, would you expect

105

1     that incident to be discussed at the daily briefing?

2     A.    It would be.

3     Q.    And as a result of the discussion at the

4     daily briefing, would it be possible to add

5     Mr. Cambron onto the inmate alert report for no bars

6     of single cell?

7     A.    It could be, yes.

8     Q.    And coming out of the daily briefing, who

9     would be the individual with the responsibility of

10    making sure that the inmate alert report was updated

11    to include an inmate that would be in that category?

12    A.    The majority of the time the inmate was

13    already -- if he was on a no bars alert, he's

14    automatically added.  So if that alert is added,

15    he's immediately added to the list.

16    Q.    Okay.  Who says, "We're adding them to the

17    list"?  Who decides that?

18    A.    It's automatically decided anytime there's an

19    incident of an attempt or a -- or a verbal al --

20    it's automatic.  So there's -- it's done through --

21    it could be anybody.  Could be classification, could

22    be an officer who received that, and they notify us

23    and we put the alert on.  Immediately.

24    Q.    In the case of an inmate that is moved into

25    observation one, would that individual be placed on

1    the no bars alert list?

2    A.    Be moved into observation one for what

3    reason?

4    Q.    For a suicide attempt.

5    A.    Yes.  It's automatic.

6    Q.    Okay.  I'm going to show you two exhibits.

7    The first one I'm going to mark as Exhibit 5, and

8    the next one I'm going to mark as Exhibit 6.  Take a

9    look at both of these and then I'll ask you some

10    questions about them.

11          (Ernst Deposition Exhibits 5 and 6 were

12    marked for identification and are filed with this

13    transcript.)

14          MS. SULLIVAN:  Do you have another copy of

15    Exhibit 6?

16          MR. SIMON:  Yeah, here.

17    A.    Okay.

18    Q.    Deposition Exhibit 5 is what?

19    A.    It is an incident -- the incident report on

20    what was -- happened to Inmate Troutman.

21    Q.    And that was -- that would be an entry by

22    Sergeant Schmitt?

23    A.    Yeah.  Schmitt, number 356, and this was done

24    by Vanover 871.

25    Q.    All right.  Are you personally familiar with

107

1     Sergeant Schmitt?

2     A.    No.

3     Q.    All right.  And what Sergeant Schmitt wrote

4     down in the narrative, that is -- does that find its

5     way into XJail?

6     A.    Say that again?

7     Q.    Well, let me rephrase it.

8           Sergeant Schmitt's narrative on Deposition

9     Exhibit 5, would that narrative be found in XJail?

10    A.    Yes.

11    Q.    All right.  And would it be found under Mr.

12    Troutman's information?

13    A.    Shoot, I -- be found under Troutman's -- it

14    would have to be -- this would have to be called in.

15    The incident reports don't -- aren't shown to

16    everyone.

17    Q.    Okay.

18    A.    This would've had to been called in.  In

19    reading this, there's no notification of

20    classification staff being notified on either piece,

21    which is supposed to be there normally.  It tells

22    who they notify so that we can get that alert in

23    there.

24    Q.    All right.  Well, let me ask the question

25    this way:  A corrections officer observes an

108

1    incident similar to the -- an incident that is

2    described in Deposition Exhibit 5 by Sergeant

3    Schmitt.  What steps does the corrections officer

4    have to take in order to create this narrative?

5    A.    You mean entered as far as in XJail?

6    Q.    Yeah.

7    A.    He starts -- he starts the EI report, which

8    is the Extraordinary Incident Report.  He'd have to

9    start it, and he's responsible for starting it not

10   only for himself, but for the officer as well,

11   'cause that has to be done through a sergeant.  You

12   just can't start your own incident report.

13   Q.    All right.  So would each individual

14   officer -- strike that.  Let me rephrase it.

15         If you have an incident similar to the one

16   that's described by Sergeant Schmitt in Deposition

17   Exhibit 5, would it be standard operating procedure

18   for the sergeant to request the other corrections

19   officers that observed this incident to document it?

20   A.    Yeah.  Anything -- any -- whoever was

21   involved in -- as far as I'm concerned, when I was

22   an officer, I can only tell you what I know, anybody

23   who was there has to do a report.  Whether you came

24   in late or came in -- or just walked by it, you're

25   responsible for an EI report.

109

1    Q.    All right.  And in Deposition Exhibit Number

2    6, is that the type of report that would be

3    documented by a corrections officer?

4    A.    Yes.

5    Q.    And these narratives, both by the supervisor

6    sergeant and by the officer, do they find their

7    way -- well, strike that.

8          Do these reports and narratives by the

9    corrections officer and the sergeant, they are --

10   are they incorporated into XJail?

11   A.    Yes.  These are -- once you save this, it's

12   automatically in XJail, then it -- which prints out

13   on the daily briefing report.

14         MR. SIMON:  What are we up to?  Seven?

15   Q.    I'm going to show you what I've marked

16   Deposition Exhibit Number 7, and that consists of

17   five pages.  I'll ask you to review that.

18         (Ernst Deposition Exhibit 7 was marked for

19   identification and is filed with this transcript.)

20   A.    Okay.

21   Q.    What is Deposition Exhibit 7?  It's copies of

22   emails, but what is it?

23   A.    Let's see.  It's the move list.  It's a copy

24   of a move list on that one.

25   Q.    All right.  Well, let's go through -- we'll

1    go through that page by page in a second.

2        Let me ask you this:  On page 1 of Deposition

3    Exhibit 7, this would indicate, when we printed it

4    out, that it's an email from you that was sent to

5    your boss Mr. Baker, and Mr. Flener and Mr. Puckett

6    were copied, but it was sent on Wednesday,

7    November 25th, 2015, at 6:58 a.m.

8    A.    Uh-huh.

9    Q.    All right?

10   A.    Uh-huh.

11   Q.    Now, when I was asking you about how long you

12   were at corrections, I wrote down, and I think I was

13   asking you questions, that you thought you were --

14   ended your time at corrections in March of 2015, and

15   this is obviously later.

16   A.    Yeah, it was March of '16.

17   Q.    Okay.  Thanks.

18   A.    No problem.

19   Q.    'Cause I was -- I was really confused.

20   A.    Yeah, it's two -- two years now.

21   Q.    Okay.  No problem.  All right.

22       So if you had said earlier in your deposition

23   that your end date in -- or ending month as an

24   employee at LMDC and particularly as classification

25   coordinator, the correct answer is, "I left in March

1      of 2016."

2      A.      That is correct.

3      Q.      Okay.  So if we go back a little bit to my

4      previous questions about some specific inmate

5      suicides --

6      A.      Uh-huh.

7      Q.      -- when we talked about James Ashby was an

8      inmate that committed suicide on the sixth floor in

9      a single cell in the jail complex on October 4th of

10     2015, you still would've been there.

11     A.      Yeah.

12     Q.      Okay.  Do you have any memory of Ashby?

13     A.      I do not.

14     Q.      Or Ashby's suicide?

15     A.      Uh-uh.

16     Q.      Okay.  And then Mr. Troutman's attempt on the

17     13th of November of 2015, you were still at

18     corrections.

19     A.      Yes.

20     Q.      And that attempt is what's indicated in --

21     well, there's a narrative by the officers regarding

22     that attempt in Deposition Exhibits 5 and 6?

23     A.      This one, yes, 5 and 6.

24     Q.      And then Mr. Troutman's second suicide

25     attempt that was successful was on 11-24-15.  Again,

1    you were still employed at corrections at that time?

2    A.    I was.

3    Q.    The emails that are basically printed out and

4    photocopied in Deposition Exhibit 7, these emails,

5    were they sent before or after Mr. Troutman's second

6    attempt on November 24th of 2015?

7    A.    It was sent November 25th, so would've been

8    the day before.  It would've been briefing update.

9    6:58 a.m., so that's the briefing for the next day.

10   That's the info that's sent to them.

11   Q.    So why is it that these emails were sent by

12   you?  'Cause they're a series of emails to --

13   A.    To notify -- so when Martin Baker went into

14   briefing, he had a -- he could explain the -- how

15   the -- how the whole situation came through, that he

16   had all his information there.

17   Q.    Well, let's go through these.  And it looks

18   like -- just the way they printed out, they're like

19   bass ackwards chronologically.  You got the more

20   recent email on page 1 and the more remote -- the

21   earlier emails on the other pages.  That look right?

22   A.    Yeah, this -- Number 5, I didn't -- I have --

23   that's not from me.

24   Q.    Well, let me ask you this:  On page 4 of

25   Deposition Exhibit 7 --

113

1    A.    Neither is Number 4.  That's not from me,
2    either.  That's from Sergeant Goff.
3    Q.    All right.  Do you know who Sergeant Goff is?
4    A.    I do know Sergeant Goff.
5    Q.    Okay.  Who is he?
6    A.    Sergeant at the jail, main jail complex.
7    Q.    Okay.  Well, based upon your experience as
8    both a corrections officer and a -- and
9    classification supervisor, the information that's on
10   page 5 of this exhibit, what would that information
11   be?
12   A.    That's the exact ECI report from when
13   Charles -- Mr. Troutman had committed sui --
14   successfully committed suicide.
15   Q.    Now, going to page 2 of these photocopies,
16   there appears to be a heading under Forward:
17   Suicide Attempt from you to Mr. Baker?
18   A.    Uh-huh.
19   Q.    All right.  And if the information on page 3
20   and the top part -- well, strike that.
21          Would the information that's depicted on page
22   3 and the top part of page 4 of this exhibit, would
23   that be part of the email that you had sent to Mr.
24   Baker?
25   A.    Sure.  Yeah.  Looks like it is, yeah.

114

1    Q.    Okay.  My printer ran out of colored ink

2    before I could make too many copies, so you and

3    counsel have the color copies.  So what are

4    these -- 'cause we're looking at what appears to be

5    screen shots of XJail entries.  Is that what they

6    are?

7    A.    Yeah.  This is just the inmate's notes in the

8    inmate -- under the inmate's name.  It shows -- this

9    just shows an inmate movement and who did it in our

10   area.  This is to let Mr. Baker know who was

11   responsible for what, when he was moved to J2 1OBS

12   and why, that tells that.

13         This one -- next one tells James Cox moved

14   the inmate per Nurse Brown, but did not get

15   clearance.

16         And this tells when the initial -- on page 4

17   tells when the initial incident happened, and then

18   it just goes through.  It is backwards.  It goes

19   through and lets him know exactly what happened and

20   how it happened, so -- that just gets him prepared

21   for his morning briefing.

22   Q.    Very good.  I still want to ask you some

23   questions about that.

24   A.    Sure.

25   Q.    So let's look on -- let's go to page 4 of

1    this exhibit.

2    A.    Sure.

3    Q.    And as I said, you've got a color copy and

4    counsel have a color copy.  On the screen shot,

5    which is at the top of page 4, this is a screen shot

6    of like the XJail screen?

7    A.    Uh-huh.

8    Q.    All right.  And if this is contained in an

9    email that you sent to Mr. Baker, would you have

10   created this screen shot?

11   A.    Yeah.  It's cut and paste.

12   Q.    So basically you could take a -- you could

13   take a screen shot of the XJail screen that you have

14   in front of you in your office?

15   A.    No, I use a -- the cut and paste.  What is it

16   called?  Scissors.

17   Q.    Okay.

18   A.    Just scissors.

19   Q.    Well, basically you bring Troutman's XJail

20   records up on your computer screen, right?

21   A.    Uh-huh.

22   Q.    All right.  And you use the cut and paste,

23   whatever, mechanism, and then you incorporate it

24   into the email.

25   A.    Right.

1    Q.    All right.  And you have the ability to see

2    and reproduce the XJail information in living color,

3    right?

4    A.    Correct.

5    Q.    All right.  Now, at the top of the page on

6    Exhibit 4, it says alerts - = H.

7    A.    Correct.

8    Q.    What does that mean?

9    A.    I couldn't -- I don't remember what the H

10   means, but this was -- all these show that the

11   inmate was not on no bars at the time that this was

12   cut and snapped.  So just like -- he was not on a no

13   bars alert at this time.  That's all it shows.  H, I

14   don't know what the H stands for, and I have to pull

15   up IMS to see.

16   Q.    All right.  Who's IMS?

17   A.    I mean XJail.  Old IMS.

18   Q.    Okay.  So the -- even though it says alerts

19   in yellow --

20   A.    Uh-huh.

21   Q.    -- what's your explanation for that?  You're

22   say -- your testimony was he's not -- he, being

23   Troutman, this inmate was not on a no bars --

24   A.    Right.

25   Q.    -- alert at that time.

1      A.      Right.  He would not have been on a no bars

2      alert, that's why it's not flashing red with a no

3      bars.  It would say at the top no bars.

4      Q.      All right.

5      A.      And so --

6      Q.      Go ahead.  Go ahead.  Tell me.  Go ahead.

7      Continue.

8      A.      But that's why Mr. Cox put him in a single

9      cell, but we were wait -- we should've waited for

10     the medical, but --

11     Q.      So an individual that would be on the no bars

12     inmate alert list that we have in Exhibit -- is that

13     4?  Yes, Exhibit 4.  All right.  That would show in

14     flashing red, alternating red and white or --

15     A.      Yes, it's flashing red.

16     Q.      Okay.

17     A.      It would just show that there's an alert on

18     this inmate that he cannot be housed, and I -- if

19     I'm -- I don't remember correctly, but I think the

20     system wouldn't allow you to move them unless -- I

21     don't -- I don't -- can't remember.  I don't

22     remember how the XJail -- we were trying to do

23     something with that.  I don't remember if it's -- we

24     set it up or not.

25     Q.      All right.  Well, the purpose of having

1    flashing alerts on the XJail system is for what

2    reason?

3    A.    So that an inmate is not moved into a single

4    cell in error.

5    Q.    And that flashing alert would be available to

6    both corrections officers and medical personnel in

7    LMDC who accessed XJail.

8         MS. O'REILLY:  Objection, form, foundation.

9    Q.    Or would that -- let me rephrase it.

10        Would that flashing alert be available to

11   both corrections officers and medical personnel

12   employed by Metro Government at LMDC during this

13   time period?

14        MS. O'REILLY:  Same objection.

15   A.    Anybody who accesses this inmate will see

16   that -- that flashing.

17   Q.    Now, on the screen shot that we have that's

18   in color, would that alert be indicated anywhere

19   else on that -- on that screen?

20   A.    Well, as you can see, it's in every screen

21   you pull up, it's there.  It's on all of them.

22   Q.    Okay.  Well, some of your screen shots on --

23   A.    Cut off at the top.

24   Q.    -- this exhibit got cut off, but it's always

25   there next to this little icon --

119

1    A.     Right.

2    Q.     -- for chat?  All right.

3           Now, on the left side of this screen shot

4    there are some tabs?

5    A.     Yeah.

6    Q.     Okay.  What are -- what are the purpose of

7    these tabs?

8    A.     Just different things.  Commissary, which

9    we -- which we don't use.  Booking and cell

10   management we use.  Admin we don't use.  Admin uses

11   that.  Just different things.  Search, favorites.

12   We don't use favorites at all, anyway.  I don't know

13   why it's there.

14   Q.     And if you know, what is the mechanism that

15   changes the alert status in that box from yellow to

16   flashing red when an inmate is placed on the no

17   bars --

18   A.     You have to go into his classification part

19   of his screen and click the no bars alert.

20   Q.     And the directive for that entry in that

21   change to XJail would come from whom?

22   A.     Whoever received the call from the security

23   or whoever's saying that the inmate had a previous

24   attempt, if there wasn't one.

25          And this is the -- this is actually a copy of

120

1    the suicide attempt for that night, for the past
2    24 hours, and the inmate wasn't on it.  That's what
3    that -- copy of that is sent.
4    Q.    All right.  You're referring to page 1 --
5    A.    Page 1.
6    Q.    -- of the -- of this?  I will --
7          MR. SIMON:  Well, let's go off record for a
8    second.
9          (Recess from 4:00 p.m. to 4:15 p.m.)
10   Q.    All right.  Mr. Ernst, on Deposition
11   Exhibit 7, on the first page you had mentioned this
12   move list.  What is the move list?  What is that?
13   A.    That just shows the inmates that were put
14   on -- in OBS and the entries that were made onto --
15   going into observation.  I can't see the whole
16   screen, so I don't know what else it says.
17   Q.    Right.  We discussed off record that it
18   was --
19   A.    Oh, it shows --
20   Q.    -- compressed, but --
21   A.    It shows that the inmate was not on -- was
22   cleared from OBS.  This is probably -- if you could
23   see it, it may have the whole date of when this was
24   and when the inmate was cleared maybe.  I don't
25   know.  I can't see it.

1    Q.    Okay.  If we're able to expand that email,

2    then we'd be able to see it because the move list --

3    well, the move -- the move list shows what?

4    A.    Shows the people that were put in

5    observation, in observation cells that day, and

6    clearly he wasn't on OBS.

7    Q.    Now, in your testimony as corrected, you

8    said, you know, you were there until March of 2016.

9    Troutman, his suicide was in November of 2015, and

10   you testified that you prepared this email --

11   A.    Yeah.  Yes.

12   Q.    -- for the daily briefing?

13   A.    For daily briefing for Mr. Baker.

14   Q.    Do you have any memory of being present at

15   that daily briefing regarding Mr. Troutman?

16   A.    I do not.

17   Q.    Do you have any memory of being present

18   during the weekly no bars meeting in -- when Mr.

19   Troutman's situation came up prior to his suicide?

20   A.    No.  I don't even know what date that

21   would've been on, 'cause his original -- it would've

22   been right after his original attempt, and I think

23   they took him off.  The only thing that -- if it

24   was -- I don't know.  I don't -- honestly I couldn't

25   tell you.

1      Q.    Okay.  Well, let me break it down.  Do you

2      have any memory of being at a weekly no bars meeting

3      in which Mr. Troutman's situation was discussed

4      prior to his second suicide attempt?

5      A.    I could -- honestly I couldn't tell you if I

6      was or wasn't there.  I don't have a clue.  'Cause

7      he would've only been there -- most people that I

8      remember that you brought up in the past are people

9      that have been on that list for a long time or

10     that -- I don't remember.  You'd think I would, but

11     I don't.  Sorry.

12     Q.    Now, in -- regarding your answer, the people

13     that are brought up during the no bars weekly list,

14     or weekly meeting, rather --

15     A.    Uh-huh.

16     Q.    -- what are you saying about the people that

17     are --

18     A.    They're on it all -- most of the people that

19     are on it are on it regularly.  They're either

20     reoccurring, revolving customers, revolving door

21     customers that have been in and out of there and

22     they're on that list all the time.

23     Q.    When you participated in those meetings

24     before Baker, Mr. Baker took your place --

25     A.    I still -- I still ran them.

1    Q.    Well, was there any particular time period or

2    normal time period for the no bars weekly meetings?

3    How long did those things last?

4    A.    About an hour, two.  It depends.  Depends on

5    how many people's on the list.  Some weeks we may

6    have -- we review everybody that's in a single cell.

7    It's called single cell management.  That's another

8    meeting we have.  Okay?

9    Q.    In addition to the no bar?

10   A.    In addition to.  It's called single cell

11   management.  We do that first and then we do the no

12   bars after, so that we don't -- we can distinguish

13   the two, keep them separate.  So we --

14   Q.    Do they involve -- I'm sorry.  I didn't mean

15   to cut you off.  Go ahead and finish.

16   A.    So most of the time OBS are people that are

17   on -- if they're on observation, they're on the

18   medical walk, so that's on three.  The single cell

19   management unit are the inmates that are on five and

20   six.

21        We still review them if they come up and have

22   had past suicide or anything like that, but most of

23   the people that were -- that have been on the no

24   bars are on medical walk under an observation cell.

25   So we separate the two.

124

1    Q.    So how often does the single cell management

2    group --

3    A.    Same.  Once a week.

4    Q.    Once a week?

5    A.    Same.

6    Q.    Do they meet on the same date?

7    A.    I do believe so, yes.

8    Q.    Is that the same day -- I'm sorry.  Let me

9    ask --

10   A.    Wednes -- Tuesday or Wednesday.

11   Q.    Wait, wait, wait.  Let me ask the question.

12   A.    Yes, sir.

13   Q.    Do they meet on the same day of the week as

14   the single cell bars committee?

15   A.    No bars alert.

16   Q.    No bars alert committee or group?

17   A.    Yes.  I think -- yes.  If it's still done the

18   same.  We did it then.  Tuesday or Wednesday.

19   Q.    And you saw on Exhibit -- I was looking for

20   the inmate movement list.  There we go.  Deposition

21   Exhibit 3 on --

22   A.    Uh-huh.

23   Q.    -- inmate movement list.  Based upon the

24   entries of -- that are on Mr. Troutman's XJail

25   records beginning on November 13th where they have

125

1    a -- there's the notation of a suicide attempt --

2    A.    Yes.

3    Q.    -- would you anticipate that Mr. Troutman

4    would be an inmate that was talked about and

5    considered during the single cell management

6    meetings?

7    A.    He would've been talked about -- unless -- if

8    he was cleared immediately, he would've only been

9    talked about once.

10   Q.    What do you mean by immediately?

11   A.    If they felt that this was not a serious

12   attempt and felt that it was an attention grabber,

13   that -- it's not my call, that would be mental

14   health's call, but when we'd have a meeting about

15   it, they would've said, "Hey, look, guys, we talked

16   to the guy, it wasn't serious," you know, we would

17   talk -- discuss it in the meeting, and if it wasn't,

18   we'd take him off the no bars alert if he wanted to

19   go.

20         'Cause he -- a lot of times they'll say,

21   "Hey, man, I was just joking, I want to go to CCC.

22   I didn't do nothing, I ain't trying to hurt myself."

23   Q.    Is there a particular criteria or standards

24   that you-all on the single cell management committee

25   refer to in making a determination of whether or not

126

1    a suicide attempt was serious or not?

2    A.    It's not based on us, it's based on -- 'cause

3    we're not -- we're not trained to make that

4    assumption.  So if an inmate says it, we

5    automatically assume that's what he's saying, and

6    then once mental health meet with them and they get

7    their understanding of it, we make -- we make an

8    educated guess, 'cause there is no -- if an inmate's

9    going to -- if an inmate's going to attempt suicide,

10   no matter how many preventions we put, if they

11   really want to do it, they're going to do it.

12   Q.    Well, what options do corrections officers

13   and corrections staff have to prevent an inmate from

14   committing self-harm and suicide?  What options do

15   you have?

16   A.    All we can do is what -- what they do, a

17   30-minute walk-around, check them in those cells,

18   and if we know for a fact that the inmate's a danger

19   to himself, then we put an observation on him and

20   train them to watch them 24 hours a day, and they

21   sit right in front of that cell and they watch that

22   inmate.

23         But if an inmate -- we've had inmates that

24   have made attempts that have laid down on the bed

25   and there is no windows, no bars, we don't put them

127

1    in a windows and bars, but they still make the

2    attempt.  They just fall asleep on the -- on a piece

3    of string trying to suffocate themselves while they

4    sleep.

5        Or they take pills, they hoard pills, I catch

6    inmates hoarding pills, and they can take them all

7    in one night.  If you want to -- there's no true way

8    to stop an inmate that really wants to hurt himself

9    no matter how many -- how many different things we

10   put into the system to try to stop it.

11   Q.    But for a ligature hanging, okay, from a

12   spot --

13   A.    A window?

14   Q.    From a window or a place on a wall.

15   A.    Uh-huh.

16   Q.    Okay.  In terms of protecting that inmate

17   from himself, what can be done by corrections to

18   prevent that from happening?

19   A.    Just what we do, put these inmates on

20   observation, speak with the inmates, have mental

21   health check the inmates, and medical -- medical, we

22   keep notes, every -- all the areas work as one, or

23   try to, anyway.  I don't know how it is nowadays.

24   Q.    Okay.

25   A.    But we all try to work as one and try to do

1    the best we can to identify the problem, if there is

2    one.   But, you know, not everything's -- not

3    everything's preventable as much as we try.  But we

4    do put one-on-one watchers on these inmates.

5    Q.     Uh-huh.  Now, when a -- in Mr. Troutman's

6    case, Mr. Troutman was released from observation --

7    A.     Yes.

8    Q.     -- and okayed or released to the general

9    population.  In a situation like that, would it be

10   reasonable, the way that LMDC was managed at that

11   point in time in November of 2015, for him to be

12   included in the single cell management committee?

13   A.     Yes, for at least one, because right here, if

14   it's documented in the EI report the inmate tried to

15   hang himself on the booking floor --

16   Q.     Uh-huh.

17   A.     -- which it was, they automatically go on

18   that list.  Okay?  So that --

19   Q.     Is that the list to be reviewed by the

20   committee?

21   A.     By the committee.

22   Q.     Okay.

23   A.     And they would be reviewed, and looks like he

24   was only reviewed once, 'cause I haven't seen any

25   other paperwork showing where we reviewed him more

129

1      than once.

2      Q.    Okay.  Where do you see him being reviewed?

3      A.    It would've -- it would've had to be reviewed

4      if there's an incident report regarding it.

5      Q.    And do you know --

6      A.    David Puckett should have an old list of

7      that, and probably on it.

8            MR. SIMON:  All right.  I would ask,

9      Mr. Ogburn, if you can check and see if Mr. Puckett

10     has that list.

11           MR. OGBURN:  Send a written request for it.

12           MR. SIMON:  All right.

13     A.    The retention's three years, so, yeah, he

14     should still have it.

15     Q.    Okay.  You told us just now that because of

16     the attempt documented in XJail by Mr. Troutman on

17     11-13 of 2015, he would automatically be reviewed by

18     that group, the single cell management group?

19     A.    By -- well, yes.  Daily briefing and -- daily

20     briefing and -- not single cell management, but

21     the --

22     Q.    No bars alert.

23     A.    No bars alert committee.

24     Q.    No bars alert group.

25     A.    Yeah.

130

1      Q.     Okay.  Let me rephrase that, because I think

2      I misstated that in my question.

3             Based upon the documentation you have in

4      front of you, Deposition Exhibit 3, the entry on

5      November 13th of 2015 for Troutman about the suicide

6      attempt, you're telling us that he would

7      automatically -- Troutman that is, he would

8      automatically have been reviewed by the no bars

9      alert committee?

10     A.     Yeah, he can't leave this J2 1OBS cell

11     without being reviewed by that committee.

12     Q.     And that committee consists of both medical

13     and corrections individual supervisors?

14     A.     Mental health, all units, same -- yes.

15     Q.     And the de -- the person or persons that make

16     the decision on whether or not Troutman, in

17     Troutman's case, 'cause he would automatically be

18     reviewed by that committee, does one person have

19     more authority than the other in -- one supervisor

20     have more authority than the other in making that

21     determination?

22     A.     We ultimately rely on mental health's

23     evaluation.

24     Q.     And how do you receive that information?

25     A.     They're at the meetings and they have the

131

1    documentation.  Before the meeting a list is sent

2    out, and it's marked whether it's a -- what the

3    issue is, whether it's an OBS, a suicide attempt or

4    any other attempt, medical issue or whatever the

5    issue may be for review prior to that meeting so

6    that everybody can have their answers there.

7    Q.    Are any notes taken at these meetings that

8    are --

9    A.    David Puckett is responsible for all the

10   notes and all the documentation into the notes into

11   XJail system.  He documents who's at the meeting and

12   who -- and who attended and what decision was made.

13        MR. SIMON:  All right.  And I'll make that

14   request, but I will, assuming you're telling me you

15   want the plaintiff to put that in writing as to any

16   notes from the no bars alert committee meeting?

17        MR. OGBURN:  Yeah, put that --

18        MR. SIMON:  I'll do that in writing.

19   Q.    So what you're -- you're saying Mr. Puckett

20   has the responsibility of, what, keeping notes --

21   A.    He keeps the notes and updates the XJail.  He

22   does both, on paper and XJail.

23   Q.    All right.  So basically he's the person that

24   directs somebody else to update the no bars inmate

25   alert or he does it himself?

132

1    A.    No, he does it himself.

2    Q.    Okay.

3    A.    He's fully responsible.

4    Q.    All right.  So he gets into the system and

5    he --

6    A.    He takes the alert off if it needs to be

7    taken off or updated if it needs to be updated.

8    Q.    The same manner in which inmates are removed

9    from the no bars single cell alert, is that -- is

10   that based on the same type of protocol as you use

11   to put somebody on it?

12   A.    It is if -- but it also is -- can be up to a

13   supervisor's discretion.  If I see an inmate's had

14   15 attempts and the last one was more serious than

15   the one before, I'll make an assumption just to put

16   him on it just to review to make -- just for under

17   cautious of errors, just to err on the side of

18   caution.  I do that quite often when I was there.

19   Q.    Is what you're telling us, though, is this

20   like a group decision?

21   A.    On -- the one that goes on the list?  No, I

22   can -- I can make it on the booking floor.  If I'm

23   there and an inmate's crying profusely and comes in,

24   talks to me for something and says -- I can put him

25   on the list.

133

1    Q.    All right.  Well, how does it actually get

2    done if in the --

3    A.    I would do it immediately.  If it was -- if

4    it was me, I would put it on and then I would put in

5    the notes the inmate was distraught on the booking

6    floor and what the situation may have been.

7         If I'm doing -- if I'm doing the

8    classification, one of my staff's doing the

9    classification and they -- they're looking it up and

10   see that this -- last time the inmate was here he

11   almost did a successful hang, but he was cleared

12   later and then became a work aid and was a good guy

13   and stayed in jail the whole time, she still might

14   put -- that person still might refer to the

15   supervisor and say, "Hey, Steve Flener, I need to

16   put him on because -- just to check his -- how he's

17   doing with this arrest."

18        He may not be doing good with this arrest.

19        Or if the guy comes back from court, guy just

20   got 15 years and he's distraught, and records only

21   notifies you if they get something serious, anything

22   over 20, 30 years they start -- they worry and they

23   start notifying you, but if it's a 10-year, 15-year

24   sentence, nobody knows but this inmate.

25   Q.    When it comes down to -- strike that.

134

1          Are you aware of any written policy that

2     existed in corrections during this time period,

3     November of 2015, that talked about or addressed the

4     single cell management group meetings?

5     A.     No.   They could've been in the works.   I

6     don't know.   Like I said, it's been so long.

7     Q.     Similarly, are you aware of any written

8     policy within Metro Corrections regarding the no

9     bars alert committee weekly meeting?

10    A.     No.   Same.

11    Q.     And are you aware of any written policies

12    within Louisville Metro Corrections that set out the

13    criteria for either placing an inmate on the no bars

14    inmate alert list or removing him from it?

15    A.     No policy, no.

16    Q.     Are you aware of any written criteria for

17    placing an inmate --

18    A.     Just what I put out and -- just what I put

19    out.

20    Q.     And tell us what you put out.

21    A.     Just the documentation that you provided here

22    to tell --

23    Q.     In the email --

24    A.     In the email.

25    Q.     -- in Exhibit Number 1?

1    A.    Yeah.  There was probably -- prior to this I

2    know there was more than this one, so -- but it

3    would've been a long time ago, so -- when I -- when

4    I first started over there and the reason we started

5    keeping this documentation for this reason,

6    documenting this kind of stuff.

7    Q.    So you're saying you would've generated

8    emails years prior to this January 2014 email?

9    A.    Yeah.

10   Q.    Okay.

11   A.    Yes.

12        MR. SIMON:  Denis, I'll make the request for

13   those if they're not included in the group of

14   emails, and I'll put that in writing too.

15        All right.  If you-all will give me like

16   three or four minutes, let me check with Miss

17   Sullivan, make sure I've done everything I wanted to

18   ask, then I'll get you out of here.

19        (Off-the-record discussion.)

20        MR. SIMON:  Mr. Ernst, thank you.  Those are

21   all the questions I have.  Counsel may have some

22   questions for you.

23        MR. OGBURN:  Mr. Ernst, I've got a couple

24   questions for you.

25        THE WITNESS:  Yes, sir.

```
 1                        EXAMINATION
 2      By Mr. Ogburn:
 3      Q.     If you look at that Exhibit 3 on the move
 4      list, regarding the move list.
 5      A.     Yes, sir.
 6      Q.     And if you look at 11-21-2015, Ashley Adams'
 7      note?
 8      A.     Yes.
 9      Q.     On that note she was -- she moved him to
10      passive, and that would've been passive booking?
11      A.     Yeah.
12      Q.     And in passive booking where he was, that was
13      a single cell; is that correct?
14      A.     This says passive, but -- this says passive.
15      Q.     Right.
16      A.     They would've put -- if he would've went into
17      a single cell back there, which he was on the -- he
18      was on the booking floor for --
19      Q.     He was on there for three days?
20      A.     Yeah.  So that would've been -- he would've
21      had to either be put back in general pop or in a
22      single cell.  Yes.
23      Q.     All right.
24      A.     And if he receive -- received a write-up for
25      fighting, he could -- but it says, "Placed on move
```

137

1    list to passive," so I don't know.  It doesn't tell

2    me exactly.

3    Q.    Okay.  But the only place to put someone in

4    passive to keep them --

5    A.    Is general pop in the dorm or single cell.

6    Q.    Right.  But the -- okay.  But if the evidence

7    shows that he was in a single cell, then he was in a

8    single cell for three days prior to his move.

9    A.    Yes.  Yeah.  That's the maximum they can --

10   we try to keep them on the booking -- on the booking

11   floor at all times, three days the max.

12   Q.    And the PSU or -- it stands for Professional

13   Standards Unit?

14   A.    Yes.

15   Q.    And that is the unit that does investigations

16   in cases; is that correct?

17   A.    Correct.

18   Q.    All right.  And you would rely upon their

19   investigation, their outcome if you had seen it; is

20   that correct?

21   A.    Yes.  Hopefully they went through all the

22   facts, yeah.

23   Q.    Okay.  And Martin Baker is your supervisor?

24   A.    Yes.

25   Q.    And had you seen it, would you rely upon his

138

1      testimony as well?

2      A.      Yes.

3              MR. OGBURN:   Those are all the questions I

4      have.

5              MS. O'REILLY:   I don't have any questions.

6              MR. SIMON:   No more questions.

7              (Deposition concluded at 4:40 p.m.)

8                        *                *                *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

139

```
 1        STATE OF KENTUCKY     )
                                )  SS.
 2        COUNTY OF JEFFERSON   )

 3             I, Tracy P. Lundergan, a Notary Public within

 4        and for the State at Large, my commission as such

 5        expiring 23 January 2021, do hereby certify that the

 6        foregoing deposition of KYLE ROBERT ERNST was taken

 7        before me at the time and place stated and for the

 8        purpose in the caption stated; that the witness was

 9        first duly sworn to tell the truth, the whole truth,

10        and nothing but the truth, that the deposition was

11        reduced by me to shorthand writing in the presence

12        of the witness; that the foregoing is a full, true,

13        and correct transcript of the said deposition so

14        given; that there was no request that the witness

15        read and sign the deposition; that the appearances

16        were as stated in the caption.

17             I further certify that I am neither of counsel

18        nor of kin to any of the parties to this action and

19        am in nowise interested in the outcome of said

20        action.

21             WITNESS my hand this 29th day of May 2018.

22

23        _____

                Registered Merit Reporter
24              KY CCR 20042B070
                Notary Public, State at Large
25
```