1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY


STEPHANIE TROUTMAN,            )
Administratrix of the         )
Estate of CHARLES R.          )
TROUTMAN, Jr. deceased,       )
                              )        Case No.
              PLAINTIFF       )        3:16-cv-000742-
                              )            DJH
v.                            )
                              )
LOUISVILLE METRO              )
DEPARTMENT OF CORRECTIONS,     )
et al.                        )
                              )
              DEFENDANTS.      )


              *              *              *


        The deposition of **JOSEPH L. SCHINDLER, BSN,**

**RN**, taken pursuant to notice by the Plaintiff on

December 19, 2017, at Simon Law Office, 239 South

Fifth Street, Suite 1700, Louisville, Jefferson

County, Kentucky.


        TRACY P. LUNDERGAN, RMR, KY CCR
       McLendon-Kogut Reporting Service, LLC
              Anchorage Office Plaza
       2525 Nelson Miller Parkway, Suite 204
              Louisville, Kentucky  40223
                    (502) 585-5634
          tlundergan@mclendon-kogut.com
              www.mclendon-kogut.com

2

1                    C O N T E N T S

                                                    Page
2    Appearances                                       2

3    Examination by Ms. Norris                         3
     Examination by Mr. Ogburn                        70
4    Reexamination by Ms. Norris                      71

5    Notary Certificate                               72

6    Exhibits
     Schindler Deposition Exhibit 1                   20
7    Schindler Deposition Exhibit 2                   34
     Schindler Deposition Exhibit 3                   54
8    Schindler Deposition Exhibit 4                   69

9              *              *              *

10                    APPEARANCES
     FOR PLAINTIFF:
11   Ms. Christina R. L. Norris
     P.O. Box 386
12   Prospect, Kentucky  40059
     (502) 899-4755
13   christina@norrislawky.com
     and
14   Mr. Larry Simon
     Simon Law Office
15   239 South Fifth Street, Suite 1700
     Louisville, Kentucky  40202
16   (502) 589-4566
     larrysimonlawoffice@gmail.com
17
     FOR DEFENDANT CORRECT CARE SOLUTIONS:
18   Ms. Megan P. O'Reilly
     Blackburn Domene & Burchett PLLC
19   614 West Main Street, Suite 3000
     Louisville, Kentucky  40202
20   (502) 584-1600
     moreilly@bdblawky.com
21
     FOR DEFENDANTS LOUISVILLE METRO DEPARTMENT OF
22   CORRECTIONS, ET AL:
     Mr. J. Denis Ogburn
23   Assistant Jefferson County Attorney
     531 Court Place, Suite 900
24   Louisville, Kentucky  40202
     (502) 574-6312
25   denis.ogburn@louisvilleky.gov

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634

3

1           JOSEPH L. SCHINDLER, BSN, RN, called by the

2      Plaintiff, having been first duly sworn, testified

3      as follows:

4                           EXAMINATION

5      By Ms. Norris:

6           (Deposition commenced at 2:57 p.m.)

7      Q.    Nurse Schindler.

8      A.    Yes.

9      Q.    Want to make sure I had your title correct.

10     Would you please state your full name and your

11     professional address for the record, please?

12     A.    My name's Joseph L. Schindler, BSN, RN.  I

13     reside at 8205 Cedar Brook Drive, Louisville,

14     Kentucky, 40219.

15     Q.    Would you please describe for me your

16     educational and employment background?

17     A.    I have been a registered nurse since 2010.

18     My BSN I acquired through Spalding University.  I

19     also graduated with my BS in psychology from

20     University of Southern Indiana.

21     Q.    Can you provide me the dates for those other

22     degrees, please?

23     A.    2004 for the degree in psychology.

24     Q.    And the BSN?

25     A.    Huh?

4

1      Q.     The BSN?

2      A.     BSN was 2010.

3      Q.     Is that the highest degree that you've

4      attained in nursing?

5      A.     Yes, it is.

6      Q.     So, Joseph -- or Mr. -- Nurse Schindler, have

7      you ever had your deposition taken before?

8      A.     No, I have not.

9      Q.     So basically what we're doing is I'm going to

10     be asking a series of questions, and the court

11     reporter is going to be taking them down, so since

12     you haven't given your deposition before, just a

13     couple of dos and don'ts.

14            First is always answer audibly yes or no

15     because uh-uh and uh-huhs get mixed up on the

16     record.

17            And then another important one is

18     colloquially we speak to each other and finish each

19     other's sentences and so forth and so on, but for

20     purposes of the deposition, it's really important

21     for you to be patient with me to completely

22     formulate my question before you answer.  Okay?

23     A.     Okay.

24     Q.     Where did you graduate from high school?

25     A.     Charlestown High School, class of 1997.

1    Q.    What did you do between your high school

2    graduation and your commencement at Spalding

3    University?

4    A.    I had worked as a CNA/mental health tech for

5    Central State Hospital.

6    Q.    Did that require any degree?

7    A.    No, it did not.

8    Q.    Would I be clear to understand that you went

9    to Central State right after high school?

10    A.    That is correct.

11    Q.    And how long did you stay at Central State?

12    A.    From 1999 to 2008.

13    Q.    What did you do between 1997 and 1999?

14    A.    I worked as a laborer for Porter Paint, and I

15    got my CNA and worked as a CNA for a nursing home.

16    Q.    Where was that nursing home located?

17    A.    Charlestown, Indiana.

18    Q.    The BSN, is that a two-year degree?

19    A.    That is a four-year degree.

20    Q.    Were you working as -- strike that question.

21    Were you working as a CNA/mental health tech

22    at Central State and also studying for your degree

23    at Spalding simultaneously?

24    A.    That is correct.

25    Q.    After you received your BSN in 2010, have you

6

1    taken any other higher education classes, courses or

2    certifications?

3    A.    At the current time, no.

4    Q.    So I've got you doing some labor work before

5    you start working as a CNA, then I've got you going

6    to Spalding.  What additional jobs did you hold

7    between 2010 and when you started at Louisville

8    Metro Department of Corrections?

9    A.    I worked for The Brook at Dupont.  I had --

10   did home healthcare for a company called Capacity

11   Care.  And then I started at Louisville Metro

12   Department of Corrections.

13   Q.    How long were you at The Brook?

14   A.    Three months.

15   Q.    And how come you were there for such a short

16   stint?

17   A.    We had figured it was not a good fit for me.

18   Q.    When you say we, you mean The Brook and

19   yourself?

20   A.    The Brook decided I was not a good fit.

21   Q.    Is it because of your skill level or was it

22   the type of work you were doing, do you know?

23   A.    I do not know.

24   Q.    Would that have been in a 90-month --

25   90-month.  A 90-day evaluation period?

7

1    A.    Yes.

2    Q.    And at the end of 90 days they determined

3    that it wasn't a good fit.

4    A.    That is correct.

5    Q.    Did you get some sort of discharge letter or

6    anything like that or an evaluation at the end of

7    that 90 days?

8    A.    Not that I know of.

9    Q.    Would that have been three months in 2010

10   that you did that?

11   A.    Yes.

12   Q.    Did you go from The Brook without a gap in

13   your employment to the home healthcare?

14   A.    I was on unemployment for six months.

15   Q.    And then did you go to the home healthcare

16   position?

17   A.    Yes, I did.

18   Q.    How long did you work at Capacity Care?

19   A.    From 2011 to 2014.

20   Q.    What were your job duties at this employment?

21   A.    I was a companion/wound care nurse.

22   Q.    Was that in a home health setting or was --

23   A.    Yes.

24   Q.    Not nursing home.

25   A.    That is correct.

8

1    Q.    You started with Louisville Metro Department

2    of Corrections in 2014?

3    A.    2013.

4    Q.    '13.  If I understand your chronology

5    correctly, would you have overlapped some time

6    between the Capacity Care and Louisville Metro?

7    A.    I worked for Capacity Care and Louisville

8    Metro at the same time for six months.

9    Q.    When you went to Louisville Metro Department

10   of Corrections, were you hired by LMDC or were you

11   hired by a different agency?

12   A.    I was hired by Corizon.

13   Q.    What is Corizon?

14   A.    Corizon is an agency that hires nurses to

15   work in the prisons and correctional settings.

16   Q.    What was it about working in the correctional

17   setting that was interesting to you, Nurse

18   Schindler?

19   A.    I felt I was able to provide healthcare and

20   benefit to the inmates.

21   Q.    Was there a particular draw to the inmate

22   setting as opposed to home healthcare as opposed to

23   the type of work you did temporarily at The Brook?

24   A.    No.

25   Q.    When you took your education, your four-year

9

1    degree at Spalding, what education, if any, did you

2    get regarding inmate nursing or correctional

3    nursing?

4    A.    Did not receive any.  That was not part of

5    the curriculum.

6    Q.    Did your curriculum at Spalding address at

7    all suicides?

8    A.    Yes.  I took one semester of mental health

9    nursing.

10   Q.    Mental health nursing, is that broader than

11   just suicides?

12   A.    Yes.

13   Q.    What kind of subjects did it cover?

14   A.    The full spectrum between bipolar,

15   depression, schizophrenia, schizoaffective disorder,

16   anxiety, and personality disorders.

17   Q.    What was the last one?

18   A.    Personality disorders.

19   Q.    Do you believe, Nurse Schindler, that that

20   semester at Spalding equipped you to understand and

21   recognize these different types of disorders?

22   A.    Yes.

23   Q.    Do you -- strike that question.

24         What aspect of this semester was dedicated to

25   suicides?

1    A.    One quarter of it.

2    Q.    And Spalding is a two-semester-a-year

3    program?

4          Let me rephrase the question.  Does Spalding

5    track the typical semester system of a fall semester

6    which runs from, say, September 'til Christmas, and

7    then a spring semester that runs from the New

8    Year's 'til May or so?

9    A.    No, Spalding is a six-week fast track

10   program.  It is for advance degree pro -- people who

11   have a second -- they are going for their second

12   degree.

13   Q.    Where did you obtain your BS in psychology?

14   A.    BS in psychology was from University of

15   Southern Indiana located in Evansville, Indiana.

16   Q.    That was the four-year program.

17   A.    The four-year program was for USI, then the

18   four-year program was also at Spalding.

19   Q.    So did you get eight years total of post high

20   school education?

21   A.    Six years.

22   Q.    Six years.

23   A.    Because the program that Spalding has is

24   advanced, so it's every six weeks you'll get in --

25   it's a four-year program wrapped up into two and a

1    half years.

2    Q.    So it's accelerated.

3    A.    Accelerated.

4    Q.    Okay.  So to understand the suicide training

5    or study that you received you said was one fourth

6    of the semester on mental health nursing.  So that I

7    understand this completely, that would've been six

8    weeks of mental health nursing --

9    A.    Yes.

10   Q.    -- that you received?  And about a week and a

11   half would've been dedicated to suicide, correct?

12   A.    That is correct.

13   Q.    What did you learn about suicide in that --

14   in that program?

15   A.    It affects all ages.  Lately there has been

16   an increase in childhood suicides, and you will have

17   a lot of older adults after losing a loved one

18   become more prone to suicide as well.

19   Q.    Did you graduate with any special honors or

20   anything?

21   A.    No, I did not.

22   Q.    Did you have any special instruction during

23   this week and a half on how the incarcerated

24   population, what their statistics are for suicide

25   versus the general population as a whole?

12

1    A.    I don't remember.

2    Q.    Did you have any special instruction on how a

3    traumatic brain injury might affect suicidal

4    ideation?

5    A.    Yes, I have.

6    Q.    What did you learn?

7    A.    I received training on TBIs through Capacity

8    Care.

9    Q.    Through?

10   A.    Capacity Care is where I got my training from

11   for TBIs.

12   Q.    What did you learn in that training?

13   A.    That it can increase the likelihood of a

14   suicide.

15   Q.    When you came on with the first group that

16   was at Louisville Metro, Corizon, when you came on

17   with Corizon, did you receive any specialized

18   training in mental health issues that affect the

19   inmate population?

20   A.    Yes.

21   Q.    What training did you receive from Corizon?

22   A.    The times that you need to be very cautious

23   when an inmate comes in that could have an affect on

24   their well-being.

25   Q.    Anything else?

1    A.    Some of the times it would include is around

2    their court date, changes in status.

3    Q.    What does that mean?

4    A.    From a judgment or anticipating the judgment

5    of the court case.

6    Q.    Anything else?

7    A.    A move.

8    Q.    What do you mean by a move?

9    A.    From one floor to another.

10    Q.    Okay.  Anything else that you recall from

11    that training?

12    A.    I don't recall anymore.

13    Q.    Do you recall from your training why these

14    particular issues might increase an inmate's

15    propensity towards suicide?  For example, why when

16    coming into the institution they may be at higher

17    risk than later, why around a court date may

18    increase their risk, why their change in status.

19    What did you learn about these different factors

20    that make them higher risk to the inmate for

21    suicide?

22    A.    Vulnerable -- vulnerability --

23    Q.    Can you explain --

24    A.    -- was a major factor.

25    Q.    Explain that for me, please.

14

1    A.    They are exposed to different thoughts.

2          THE REPORTER:  Different what?

3    A.    Different thoughts.

4    Q.    Would I be clear in my understanding that,

5    for example, the court dates, the change in status

6    would contribute to perhaps a sense of helplessness?

7    A.    There is that possibility.

8    Q.    At some point did your employer change from

9    Corizon to another mental health medical provider?

10   A.    Yes.  2013 of December CCS took over.

11   Q.    At that point you had been with corrections

12   since --

13   A.    Six months.

14   Q.    For six months?  Thank you.  Do you have any

15   knowledge, from being with Corizon and in

16   corrections for that six months, why there was a

17   change in the contractual provider for the medical

18   care?

19   A.    That was beyond my knowledge.

20   Q.    When CCS came on, what, if anything, changed

21   with regard to your employment status?

22   A.    I was hired on by CCS.  That's all that I

23   remember.

24   Q.    I'm trying to figure out how that transition

25   took place, so I'm going to give you a hypothetical.

1    You can tell me I'm crazy and it's different, but

2    I'm going to try and figure out.

3         So you're working for Corizon.  Did you-all

4    hear that there was going to be a change in the

5    medical provider from Corizon to CCS as you were

6    employees?

7    A.    There were talk, but it was up in the air.

8    Q.    So was there talk that Corizon was out and

9    somebody new was coming in or was there talk that

10   re -- there's just going to be a change?

11   A.    There was just going to be a change.

12   Q.    Were you left up in the air as to whether you

13   would have ongoing employment or was there

14   communication to you as to how you could perfect

15   ongoing employment with the new provider?

16   A.    Per my DON --

17   Q.    That's Director of Nursing?

18   A.    Correct.  There was not going to be a change.

19   Q.    What do you mean?

20   A.    That we have a job guaranteed.

21   Q.    And did that work out that way for you?

22   A.    That is correct.

23   Q.    And from your recollection -- well, let me

24   back up a little bit.  What particular unit at LMDC

25   do you serve?

16

1    A.    Please clarify.

2    Q.    Pardon me?

3    A.    Please clarify.

4    Q.    Are you assigned to a particular unit, like

5    mental health, medical, psychology, social work?

6         MS. O'REILLY:  Do you mean -- sorry.  Do you

7    mean back in 2013 or 2015?

8         MS. NORRIS:  I mean back when he was working

9    for Corizon.

10    A.    When I was with Corizon, I was a booking

11    floor nurse.

12    Q.    And as I understand that, when inmates come

13    in, do you do the mental health screening?

14    A.    When the inmates would come in, I was the

15    first person that they were greeted by for the

16    medical department.  We would do screening on both

17    the medical and we would do screening for suicide,

18    homicide, and drug related issues.

19    Q.    When you converted over to CCS, what was your

20    position?

21    A.    Still was the floor -- I still was the

22    booking floor nurse.

23    Q.    Now, did you sit in a little cubicle down

24    there in the booking area?

25    A.    Yes, I did.

1    Q.    Do you feel that you learned sufficient

2    information in your accelerated program at Spalding

3    to be able to screen for suicide -- suicidal

4    ideation?

5    A.    From the training I received from Spalding,

6    from the training that I received from Central

7    State, The Brook, Capacity Care, and the on-boarding

8    training that I received from Corizon and CCS, yes,

9    I do.

10   Q.    You believe you had the skills that you could

11   identify somebody with suicidal ideation.

12   A.    Yes.

13   Q.    What additional training on this issue did

14   you receive from CCS?

15   A.    I don't remember.

16   Q.    Were you provided the policies and procedures

17   from Louisville Metro Department of Corrections as

18   they relate to suicidal prevention?

19   A.    Yes, I was.

20   Q.    Okay.  What do you recall, if anything, about

21   those policies and the placement of a previously

22   suicidal inmate in a single barred cell?

23   A.    We were -- we were not to place them in a

24   single barred cell.  If they were to become

25   suicidal, they were placed in a turtle suit on

18

1    observation in the mental health block.

2    Q.    What's a turtle suit?

3    A.    It is a smock that is made of the heavy

4    fabric that the inmate wears and covers their body.

5    Q.    Does it have arms and legs?

6    A.    No.

7    Q.    Going to restate my question to make sure

8    we're on the same page, Nurse Schindler.

9         If an inmate had a prior suicide attempt, did

10   the Louisville Metro Department of Corrections

11   provide you any guidance as to whether that inmate

12   should be placed or could be placed in a single

13   barred cell?

14   A.    They provided information, and we would go

15   through the records and look if there has been any

16   previous SI attempts or --

17   Q.    SI is suicide?

18   A.    Suicide attempts or suicidal ideations.

19        MS. O'REILLY:  And I just want to make sure

20   that the record is clear, because -- I guess we can

21   clarify that later.  Did you mean on the booking

22   floor or --

23   Q.    My question was once there was a suicide

24   attempt, if there was anything in the Louisville

25   Metro Department of Corrections policies that gave

19

them guidance about whether or not the inmate should

be placed in a single barred cell.  So I think by

inference we're talking about after booking.

A.    Okay.  That was the -- that was determined by

the supervisor.

Q.    Which supervisor?

A.    The nursing supervisor.  They would determine

whether they are cleared to go into a single cell

with bars or without bars, if they had to have a

watcher for any reason, whether it be medical or

mental health or chemical, such as a detox.  If they

were in any type of situation like that, they would

be placed with a watcher to be observed.

Q.    And that question was specific to Louisville

Metro Department of Corrections policies and

procedures as you understood it.

       Now I'm going to state the same --

       MR. OGBURN:  Objection to form.

Q.    I'm going to state the same question with

respect to your training with Correct Care

Solutions.

       Did you receive any training from Correct

Care Solutions on the issue of whether it was

indicated or contraindicated to place an inmate who

had had a prior suicide attempt in a bar -- in a

20

1    barred single cell?

2    A.    They had the same policy as Louisville Metro.

3    Q.    I'm going to show you what I've marked for

4    purposes of identification as Exhibit Number 1 to

5    your deposition, Nurse Schindler.  Can you look at

6    that for me and tell me if you are familiar with

7    that program?

8    A.    I do not recall ever receiving this.

9          (Schindler Deposition Exhibit 1 was marked

10    for identification and is filed with this

11    transcript.)

12    Q.    Okay.  It purports to be a training module

13    for Correct Care Solutions.  It does reference the

14    Kansas State Board of Nursing, but I'm wondering if

15    you ever received --

16    A.    We received on-boarding training, but -- it

17    may have been similar to this, but I'm trying to

18    find a date for when this came out, and I'm not

19    seeing the date.

20    Q.    Okay.  Well, what I wanted to ask you about

21    was whether the concepts that are in there are

22    concepts that you also learned in your training with

23    CCS.  Okay?

24    A.    Okay.

25    Q.    I'm going to reference you first to page 2

1      where it talks about statistics of inmate suicide,

2      and at the bottom of the page indicates that the

3      research indicates that inmates commit suicide at a

4      higher rate than the general population as a whole,

5      and that that is approximately three times greater

6      than in the community.

7           Did you learn that either in your Spalding

8      studies or from your training?

9      A.    Yes.

10     Q.    Where did you learn that?

11     A.    From the -- from Central State.  We had -- we

12     would receive inmates as patients, and we would

13     have -- the training that we received there

14     indicated there is a higher percentage.

15          Such as when an inmate knows that they are

16     going to go back to jail, they have a tendency to

17     act up or become more solemn or depressed, so we

18     need to watch them.

19     Q.    So do I understand your testimony that those

20     inmates require special observations, special

21     alertness?

22     A.    We will sometimes -- or not -- the doctor

23     will sometimes place them on a higher alertness or

24     higher level.

25     Q.    And how would the doctor know -- I'm trying

1    to figure out in the movement structure of things,

2    how would the doctor be alerted that the inmate was

3    going through -- going to go to one of these high

4    risk situations?

5         MS. O'REILLY:  Objection.  Form.  Foundation.

6    A.    Can you clarify?

7         MS. NORRIS:  Can you reread the question,

8    please?

9         THE REPORTER:  Sure.

10         (Reporter read from the record as requested.)

11   A.    The treatment team has the psychologist, the

12   psychiatrist, the nurse, activity therapist included

13   in daily meetings.  When they meet the -- meet

14   qualifications for discharge, they are discussed,

15   and if that -- they determine that the patient/

16   inmate is potential for SI risk, either they would

17   not be told that they were being discharged or they

18   would be placed under a higher acuity.

19   Q.    Okay.  And when we're talking about

20   discharge, are we talking about discharge from the

21   mental health floor?

22   A.    Mental health to -- back to the jail.  Or

23   back to the facility that they came from.

24         MS. O'REILLY:  And I just want to make sure

25   we're clear.  Are you talking about Central State?

1    A.    Yes.

2          MS. NORRIS:  Thank you.

3    Q.    Okay.  I'm talking about --

4          MS. NORRIS:  Thank you for stopping that

5    train before it jumped off the track.

6    Q.    I'm talking about at Louisville Metro

7    Department of Corrections.  In the movement scheme

8    of things, how would we -- or how would jail staff

9    appreciate when an inmate might be at higher risk of

10   suicide than at other times?

11         MS. O'REILLY:  Objection.  Foundation.

12   Q.    For example, is that something they're

13   trained on, to your knowledge?

14   A.    The jail staff is trained, yes.

15   Q.    Okay.  And to your knowledge, does the jail

16   staff receive the same training as you on suicide

17   prevention and suicide risk?

18         MS. O'REILLY:  Objection to foundation, form.

19   Q.    You may answer.

20   A.    Beyond my scope of practice.

21   Q.    Well, let me see if we can't break this down

22   a little bit.  I think you said that the CCS

23   practices -- CCS training on suicide risk, you

24   receive that, correct?

25   A.    Yes.

1    Q.    And you receive the policy, procedure from

2    corrections.

3    A.    Yes.

4    Q.    And they were same or similar?

5    A.    Similar.

6    Q.    Okay.

7    A.    The COs and the jail staff, I am not for sure

8    what training they received.  I can --

9    Q.    But they cer -- I'm sorry.

10   A.    I can only give information on my training.

11   Q.    Correct.  And I guess what I was trying to

12   get at is are the -- were there any times where you

13   were trained contemporaneously with the direct jail

14   staff on anything?

15   A.    No.

16   Q.    Would you agree with the statement in the CCS

17   training materials that minimizing the risk of

18   suicide and self-harm among patients is one of the

19   most important tasks you do?

20   A.    One of the most important.  Not everything,

21   but it is one.

22   Q.    If you look at page 4 and 5 of this CCS

23   document.  There are some risk factors at the bottom

24   of page 4 and at the top of page 5.  And while this

25   particular module may not have been directed at you,

1       did you learn about these risk factors in your

2       training with CCS?

3       A.     These were built into the assessment

4       questions that were asked at the booking floor.  We

5       would ask if there's ever been any thoughts of

6       suicide in the past, ever -- any suicide attempts,

7       have there been any history of family committing

8       suicide or mental health issues that could be linked

9       to a greater chance of suicide.

10      Q.     And would -- and that question there, would

11      that also include whether there had been any

12      traumatic brain injuries or any head injuries?

13      A.     We would ask if there's any medical issues

14      that we need to know about.  If the inmate would

15      choose to answer, we would -- we would chart it, but

16      there are times that an inmate would not choose to

17      answer.

18      Q.     Is his -- what is the import of the history

19      of alcohol and substance abuse on suicide risk

20      factors?

21      A.     Excuse me.  I didn't quite hear you.

22             MS. NORRIS:  I'm sorry.  Would you reread the

23      question, Tracy?

24             THE REPORTER:  Sure.

25             (Reporter read from the record as requested.)

1    A.    There is a greater chance.

2    Q.    What is it about the substance abuse factor

3    that increases the risk of suicide?

4    A.    I don't -- I don't remember the correlation,

5    but I know that when we detox patients, we ask are

6    there any thoughts of suicide at the current time.

7    For every time we would detox a person or go to the

8    inmate on a routine basis, we would ask.

9    Q.    Do you recall whether you received eight

10   hours of initial suicide prevention training when

11   you came on with CCS?

12   A.    I can't clarify on how many hours we

13   received.

14   Q.    Okay.  Did you do a follow-up course on that

15   every year?

16   A.    We did follow-up training on all the -- on

17   all the strategic courses.

18   Q.    When the inmate's prior suicide attempt is

19   actually -- actually occurs in the correctional

20   facility, are you trained on whether that puts that

21   inmate at a greater risk of harm for suicide during

22   the continuing incarceration?

23   A.    There is a greater risk.  That is why we have

24   the checks and balances.

25   Q.    What are those checks and balances?

1    A.    The nurse supervisor will look into their

2    file and see if there's been any reports of suicidal

3    ideations, any reports of previous attempts, any

4    reports of gestures relayed from the officers or

5    other nursing staff or other medical or mental

6    health staff.

7          Then if -- they would either clear the

8    patient for -- either clear the patient for a single

9    cell or they would determine whether the person

10   needs a watcher.

11   Q.    Who was the nurse supervisor in November of

12   2015?

13   A.    I was one of the nurse supervisors in 2015.

14   Q.    Who else was?

15   A.    Penny Mucker-Williams.

16   Q.    Penny?

17   A.    Mucker-Williams.

18   Q.    M-U-C-K-E-R?

19   A.    Yes.

20   Q.    Hyphenated Williams?

21   A.    Yes.  She worked first shift, I worked the --

22   she did the morning and day shift, I did the evening

23   and night shift.

24   Q.    So at that point were you on two 12-hour

25   shifts?  6:00 A to 6:00 P and 6:00 P to 6:00 A?

28

1     A.    That is correct.

2     Q.    So you would be 6:00 P to 6:00 A.

3     A.    Correct.

4     Q.    How long had you been working that shift in

5 November of 2015?

6     A.    We had just started.

7     Q.    And when you say just started, had you just

8 modified your shift module to go from three sevens

9 to two twelves?

10     A.    As far as I know, yes.

11     Q.    Were you trained, Nurse Schindler, insofar as

12 suicide risk and evaluation is concerned, that this

13 is a continuing process?  In other words, that you

14 don't just evaluate the patient on day one and say

15 they're good to go, but it's an ongoing process

16 while the inmate is in incarceration?

17     A.    Yes, we do.  We do that, yes.

18     Q.    And how do you perform that process of doing

19 ongoing risk assessment with a -- with an inmate who

20 has demonstrated prior suicidal attempts?

21     MS. O'REILLY:  Objection.  Form.  Foundation.

22 Do you mean how did he as a nurse supervisor?

23     MS. NORRIS:  Pardon me?

24     MS. O'REILLY:  Do you mean how did he as a

25 nurse supervisor do that?

1      Q.     Let me see if I can cure her objection.

2             Were you trained on how to do those -- how to

3      do ongoing assessment for individuals with prior

4      suicide attempts?

5             MS. O'REILLY:  Same objection.

6      A.     I was trained, but that was more in the realm

7      of the mental health department.

8      Q.     What do you mean by that?

9      A.     They would -- they would follow up.

10     Q.     How would they follow up?

11            MS. O'REILLY:  Objection.  Foundation.  If

12     you know.

13            THE WITNESS:  Huh?

14            MS. O'REILLY:  If you know.  I don't want you

15     to guess.

16     A.     They would have logs.

17     Q.     Explain that to me, they would have logs.

18     A.     They would have logs of -- for files of

19     people that have -- they've seen and they would

20     follow up during their entire stay.

21     Q.     And whose responsibility would that be?

22     Would that be a qualified mental health professional

23     from the mental health department?  Would that be a

24     nurse from medical?  Could that be you as a nurse --

25     as a nurse supervisor?

1          MS. O'REILLY:  Objection.  Form.  Foundation.

2    A.     I don't know how they followed up.

3    Q.     Okay.  Did you ever follow up?

4    A.     When a patient would request to see a mental

5    health worker, I would follow up with the mental

6    health workers or I would delegate it to my nurses.

7    Q.     So if I understand you correctly, if you got

8    a patient request or an inmate request, you would

9    talk to a mental health worker to go out and follow

10   up with that patient?

11   A.     Yes.

12   Q.     And if that mental health -- a mental health

13   worker was not available, you would direct one of

14   your nursing staff to follow up with that patient

15   inmate.

16   A.     That is correct.

17   Q.     And would either of those individuals, either

18   the mental health worker or the nurse, have the

19   authority to direct that inmate to come back to

20   mental health and be reassessed?

21   A.     The mental health worker or the nurse would

22   have the ability to bring that inmate back down to

23   the mental health ward.

24   Q.     And if an inmate that was previously

25   suicidal -- strike that question.

1        If --

2    A.    Can I go to the bathroom?

3    Q.    Yes.

4        (Recess from 3:53 p.m. to 4:06 p.m.)

5    BY MS. NORRIS:

6        (Reporter read from the record as requested.)

7    Q.    And if you receive -- if you as the nurse

8    supervisor received a communication that an inmate

9    that was previously suicidal was about to be placed

10   into a single barred cell, could you as the nurse

11   supervisor again instruct a mental health worker or

12   one of your nurses to go up and check on that inmate

13   in that situation?

14   A.    Yes.

15   Q.    When you were hired by Corizon to work with

16   them as the mental health provider to LMDC, were you

17   given a tour of the jail?

18   A.    I was given a tour of the jail, yes.

19   Q.    Was that tour recreated for you under CCC --

20   CCS?  In other words, did you go on it again?

21   A.    No.

22   Q.    Were you --

23   A.    But --

24   Q.    Go ahead.

25   A.    Any new hire received a tour of the jail.

32

1    Q.    Were you familiar with H5D9?

2    A.    Yes, I was.

3    Q.    What is H5D9?

4    A.    It is a dorm of single cells on Hall of

5    Justice that was used for disciplinary at times.

6    Q.    What is a disciplinary?  What does that mean?

7    A.    It is a term used by the jail to discipline

8    an inmate that has caused problems, whether it be a

9    fight or other issue in the dorm.

10   Q.    Do you agree with this statement in the CCS

11   training materials that suicide prevention begins at

12   the point of arrest and continues throughout

13   incarceration.  Effective management of an at-risk

14   individual requires a seamless process for sharing

15   relevant information between all relevant

16   disciplines?

17   A.    Yes, I do agree.

18   Q.    And would I understand that to mean that the

19   arresting officer should provide corrections

20   relevant information that they -- they glean from

21   the inmate during the time of arrest and transport,

22   and then booking should provide any information to

23   mental health that they glean at the time of

24   screening, and if the patient goes into mental

25   health and has mental health issues, that the mental

33

1    health department should then make sure that

2    corrections is informed of all of the relevant

3    information that they glean during mental health?

4    A.    That is why we have handoffs of information.

5    Q.    And how do you do that handoff of

6    information?

7    A.    It would be reporting back to each department

8    on what is going on with an inmate and if there are

9    any precautions that need to be taken place.

10    Q.    This training material further states, quote,

11    communication pathways between security,

12    classification, and healthcare staff should be well

13    documented in policies and procedures.

14    Beyond being well documented in the policies

15    and procedures, how are those communications

16    documented between security and classification and

17    the healthcare staff so each one of those entities

18    has all the pertinent information about an inmate?

19    A.    We have -- we were given EI forms.

20    Q.    That --

21    A.    Stood for extraordinary events that was

22    created by security, and it encompassed both medical

23    and classification as far as I know.

24    Q.    So if I understand you, if an Extraordinary

25    Incident Report is filled out, do I understand that

34

1       should be documented in security file, in the mental

2       health file, and in the classification file?

3       A.      As far as I know, yes.

4               MS. NORRIS:  We on 2?

5               THE REPORTER:  Uh-huh.

6       Q.      I'm going to show you Exhibit Number 2 and

7       ask you to review that, Nurse Schindler.

8               (Schindler Deposition Exhibit 2 was marked

9       for identification and is filed with this

10      transcript.)

11      Q.      Are you familiar with this form, Nurse

12      Schindler?

13      A.      Something similar.  Not in this format.

14      Q.      What format are you familiar seeing?

15      A.      I'm used to seeing it on computer, so it does

16      look a little -- but, yes, I do remember -- I do

17      remember seeing forms like this.

18      Q.      On the computer.

19      A.      Yes.

20      Q.      And this appears to be a printout from the

21      computer?

22      A.      As far as I know, yes.

23      Q.      Okay.  Were you familiar with Inmate Troutman

24      before November 24th, 2015?

25      A.      No.

1    Q.    When did you first learn of anything about

2    Inmate Troutman?

3    A.    The day we got a phone call from security

4    saying there's a stat call on unit H -- or not unit

5    H, but Hall of Justice, dorm nine.

6    Q.    You responded to that call.

7    A.    That is correct.

8    Q.    And that would've been the first time as an

9    employee of Correct Care Solutions that you laid

10   eyes on Mr. Troutman?

11   A.    That is correct.

12   Q.    And at that point he had hanged himself.

13   A.    At that point he was on the floor with the

14   corrections officers performing CPR.

15   Q.    And was it your understanding that he had

16   hanged himself in a single barred cell at the Hall

17   of Justice, dorm nine, cell two?

18   A.    I didn't know what had happened.

19   Q.    Okay.

20   A.    I had just -- using my nursing judgment, I

21   saw him laying on the floor in an emergency, so I

22   didn't look around to see if he had been hanging or

23   what.  I immediately went into first aid mode.

24   Q.    Then you responded as a first aid nurse

25   person and rendered CPR and so forth?

36

1    A.    Yes.  That is correct.

2    Q.    As we walk through this document that's shown

3    in Exhibit Number 2 from the first entry to the last

4    entry, do you see that on November 13th, 2015, at

5    18:06 that it is documented that Mr. Troutman tried

6    to hang himself on the booking floor in Hold 2?

7    A.    I do observe that.

8    Q.    What does that inform you about Mr. Troutman

9    given your nurse's training and other on-the-job

10   training in terms of his risk in general population?

11   A.    He was a higher risk for suicide.

12   Q.    It also indicates that he was transferred to

13   observation one for detox per Nurse Denning.  Does

14   the detox detail also provide you an additional risk

15   factor for Mr. Troutman in terms of potential future

16   suicide?

17          MS. O'REILLY:  Objection.  Form.

18   Q.    You may answer.

19   A.    Per the guidelines, it would -- it would

20   provide a risk.

21   Q.    Okay.

22   A.    That does not mean that it's going to happen.

23   Q.    Correct.  But it's a risk factor you

24   consider.

25   A.    Yes, ma'am.

1    Q.    The next entry, 11-17-2015 at 2:46 p. -- oh,

2    a.m.  I guess because we use military time?

3    A.    Uh-huh.

4    Q.    Inmate Troutman was cleared from detox.  Does

5    that entry provide you information as to what his

6    suicide status was at that point?

7    A.    No.  'Cause it just states that he is no

8    longer being observed for withdrawal symptoms.

9    Q.    If you were to read this in the computer,

10   would you still have concerns about his suicidal

11   risk?

12   A.    It would be a caution, but he had been -- at

13   the current time he was cleared for mental health as

14   well.

15   Q.    Where do I see that?

16   A.    Cleared from detox and for -- is cleared to

17   go into GP, so general pop.

18   Q.    Okay.  So would it be your understanding in

19   reading this, because he was cleared for general

20   population, he was cleared from any suicide

21   concerns?

22   A.    There's always a suicide concern.

23   Q.    Okay.  Fair enough.  But he was stable enough

24   to be put into general population.

25   A.    That is correct.  According to this

1       statement.

2       Q.      There's an indication that on 11-17 at

3       8:46 a.m. his daughter called.  Do you see that?

4       A.      Uh-huh.

5       Q.      And -- that's a yes?

6       A.      That is correct.

7       Q.      Why is it important to give information like

8       a contact from a daughter to the inmate?

9               MS. O'REILLY:  Objection.  Foundation.

10      Q.      Or -- let me rephrase.

11              Is it important in your -- in your opinion,

12      Nurse Schindler, to make sure that the inmate is

13      informed of any family conflict?  Conflict.

14      Contact.

15      A.      It is important 'cause I would want the same

16      thing given to me.

17      Q.      It gives the inmate assurances of family

18      connectivity?

19      A.      Correct.

20      Q.      And that's important particularly when

21      they're in a suicidal ideation state.  Is that

22      important to know that they're not isolated?

23      A.      Yes.

24      Q.      If the daughter called in to make mental

25      health aware that her father had been attacked, was

1    in a coma, and had a traumatic brain injury, would

2    that be information you would like to know about and

3    have in his mental health file?

4    A.    If I were to have received information in

5    regards to that, I would relay the message to mental

6    health and they would process it from there.

7    Q.    Classification Specialist Cox testified that

8    when he was on the general telephone, and family

9    would call in and want to relay important

10   information like that to mental health, he would,

11   one, give the family member the direct dial

12   information to the medical office and he would

13   transfer them into the medical office.

14        Would you expect if someone were transferred

15   to the medical office -- let me ask you this:  Who

16   takes messages in the medical office?

17   A.    Anybody.

18   Q.    And anybody, would that be a nurse?  Mental

19   health?

20   A.    (Witness nodded head.)

21   Q.    Who else?

22   A.    Nurse, mental health, CNA.

23   Q.    And if information came into the medical

24   office of that nature, would you believe it would be

25   important to document the inmate's file with that

1    information?

2    A.    We would document.

3    Q.    And am I correct in my understanding that the

4    reason you would document because, again, a brain

5    injury is yet another risk factor for future

6    suicidal ideation?

7    A.    That is correct.

8    Q.    And if in the same communication the daughter

9    related to whoever picked up the phone that his

10    emotional state was, quote, out of control, that he

11    was very impulsive, and he was crying repeatedly

12    when he talked to his daughter, would that be

13    important information to know about the inmate?

14    A.    Yes, that would be important.  We would

15    follow up also.  If I would have received a phone

16    call stating this, either I would follow up with

17    mental health, I would delegate it to one of my

18    nurses, predominantly the mental health nurse.

19         However, if mental health nurse was not

20    available, I would go down there itself and assess

21    due to my training from working at Central State,

22    working with traumatic brain injury patients, and

23    due to me having the role of supervisor to follow

24    up of them.

25    Q.    And do I appreciate from your answer, Nurse

1    Schindler, that the reason you would take those

2    steps is because these are additional risk factors

3    that are being reported that would indicate that Mr.

4    Troutman is at serious risk of future suicide?

5         MS. O'REILLY:  Objection.  Form.

6    Speculation.

7    A.    I don't know.

8    Q.    The change in mood is a risk factor, correct?

9    A.    (Witness nodded head.)

10   Q.    Is that correct?

11   A.    Yes.

12   Q.    The crying uncontrollably is a risk factor?

13   A.    Yes.

14   Q.    The TBI is a risk factor?

15   A.    Yes.

16   Q.    The prior suicide attempt is a risk factor?

17   A.    Yes.

18        MS. O'REILLY:  Are you saying just -- these

19   are hypotheticals, correct?

20        MS. NORRIS:  Those are risk factors --

21        MS. O'REILLY:  Yeah.

22        MS. NORRIS:  -- that are in the material that

23   he's already identified, and these are risk factors

24   that the daughter identified to mental health

25   according to her testimony.

1        MS. O'REILLY:  No, that was not her

2   testimony.

3   Q.     These risk factors, once we start adding them

4   together, Nurse Schindler, does that give us a

5   heightened concern for Mr. Troutman --

6        MS. O'REILLY:  Objection.  Form.

7   Speculation.

8   Q.     -- based upon your training -- your

9   education, your training, and your work experience,

10  Nurse Schindler?

11       MS. O'REILLY:  Objection.  Form.

12  Speculation.

13  Q.     You may answer.

14  A.     Hypothetically, if this was the situation, we

15  would follow up.

16  Q.     Because he is at a greater risk for future

17  suicide, correct?

18  A.     There's that -- there's that possibility.

19  Q.     Okay.  And the more risk factors you get,

20  Nurse Schindler, would you agree with me that we

21  move closer to probability and away from

22  possibility?

23       MS. O'REILLY:  Objection.  Form.

24  A.     There's a possibility.

25  Q.     Would you agree with me, Nurse Schindler,

1       that the more risk factors that are identified, the

2       more diligent the institution should become?

3               MS. O'REILLY:  Objection.  Form.  Foundation.

4       Q.      Based upon your education, your training,

5       your on-the-job training with The Brook, Central

6       State, the TBI group.

7               MS. O'REILLY:  Same objection.

8       Q.      You may answer.

9       A.      There's always that possibility.  Yes.

10      Q.      Continuing on Exhibit Number 2, we see on

11      11-18-2015 at the hour of 21:37 that Inmate Troutman

12      was involved in a verbal altercation with another

13      inmate which prompted a move of Troutman to CCC.

14              Is there anything in this entry that raises

15      red flags to you insofar as Mr. Troutman is

16      concerned?

17      A.      There is information regarding him having

18      altercations.

19      Q.      What does that tell you about -- or how does

20      that inform you about Mr. Troutman given your

21      education and on-the-job training on suicide

22      prevention and risk factors?

23      A.      With that statement in this EI, I would be

24      unable to judge.

25      Q.      I'm sorry.  I don't understand your answer.

1    A.    I would -- it just states an altercation.

2    Doesn't state suicidal tendency, doesn't state

3    anything involving harm to himself.

4    Q.    Does it suggest volatility?

5    A.    It does show that he is volatile.

6    Q.    Is that another risk factor when you're

7    considering an inmate that has had a prior suicide

8    attempt and you're assessing risk factors for a

9    potential future suicide attempt?

10   A.    Yes.

11   Q.    In the next entry approximately three days

12   later on 11-21-15 at 22:15 in the evening, we have

13   another report that he received a write-up.  Is that

14   a disciplinary?

15   A.    That would be a disciplinary action.

16   Q.    "And needs to be moved back to MJC."  What's

17   MJC?

18   A.    Main Jail Complex.

19   Q.    Would that be Hall of Justice?

20   A.    No.

21   Q.    Just back to the main jail?

22   A.    Just back to the main jail.

23   Q.    Okay.  Does that, again, suggest volatility?

24   A.    Yes.

25   Q.    The next entry on this inmate move log of

1    11-24-15 at 12:58 p.m. shows that inmate has been

2    written up again for fighting, and it says that he

3    will -- it says Note Type, disciplinary.  What does

4    that tell us about what's going on here on the 24th?

5         MS. O'REILLY:  Objection.  Form.

6    A.   By the best of my knowledge, he is having

7    problems with peers.  That does not mean that he's

8    suicidal at that current time.

9    Q.   Does it suggest volatility?  We have, one,

10   two, three of these incidences pretty close in time.

11   A.   It does suggest that he is volatile.

12   Q.   And how does that volatility factor into your

13   assessment of his risk at this point?  We've had a

14   prior suicide, we've got a report from his daughter,

15   he's come out of detox, and he's been in a number of

16   altercations that have ended up on -- causing him to

17   be moved within the jail complex.

18        MS. O'REILLY:  Objection.  Form.

19   Speculation.

20   A.   I don't know how to answer that.

21        MS. NORRIS:  Would you re -- would you reread

22   the question, please?

23   Q.   It was a long question and we'll go at it

24   again.

25        THE REPORTER:  Sure.

1           (Reporter read from the record as requested.)

2           MS. O'REILLY:  I believe he answered the

3      question.  He said he didn't know how to answer

4      that.

5      Q.    What's confusing you about my question?

6      A.    You're restating the same question over and

7      over.

8      Q.    Well, I'm trying to follow this timeline.

9      Okay?  So my question is -- let me see if I can

10     rephrase it to help you understand it.  Okay?

11          Do I understand, Nurse Schindler, part of

12     your job as a nurse supervisor is to appreciate and

13     understand the risk factors for preventing jail

14     suicide?

15     A.    Yes.  It is part of my job to prevent jail

16     suicide.

17     Q.    And in that prevention, it's important for

18     you to understand and identify risk factors that

19     present themselves that could culminate in an inmate

20     making a suicide attempt.

21     A.    There is always that possibility.

22     Q.    And it's your job to assess those, correct?

23     A.    That is correct.

24     Q.    So my question was:  When we get up to this

25     third altercation which results in a disciplinary

1      designation for Mr. Troutman, given your education,

2      your on-the-job training at these various

3      facilities, what is your level of concern for Mr.

4      Troutman based upon this record in terms of his

5      suicide risk?

6          MS. O'REILLY:  Objection.  Form.

7      Speculation.

8      A.    Do I have to answer the question?

9      Q.    Yes, you do.

10         MS. O'REILLY:  If you can.

11     A.    I would say, yes, he has a problem, but

12     whether it's suicide or whether it is something else

13     going on, I'm not able to make that judgment.

14     Q.    What else could it be?

15         MS. O'REILLY:  Objection.  Form.

16     Speculation.  You can answer if you can.

17     A.    It would -- it's past my scope of practice to

18     make judgment on a diagnosis.

19     Q.    I don't understand your answer.

20     A.    I'm unable to diagnose a patient.

21     Q.    Well, let me ask you this way:  If you had,

22     in fact, been following this inmate and had, in

23     fact, looked at this list of notes, would you have

24     been concerned enough to go visit Mr. Troutman

25     yourself?

```
 1          MS. O'REILLY:  Objection.  Form.
 2     Speculation.
 3     A.     If I knew about the situation, yes, I would
 4     have went down and observed the patient myself.
 5     Q.     And would your concern and desire and
 6     inclination to go visit this patient and make your
 7     own personal assessment have been heightened in any
 8     degree if you knew that the next step was to place
 9     him in a single barred cell?
10     A.     I am unable to determine which cell that they
11     would've went into, but I would've recommended he
12     had been placed in a nonbars.
13     Q.     And is that because you would be concerned
14     about the cell providing him --
15     A.     Ligature points, yes.
16     Q.     Thank you.  Now, the next inmate note on here
17     is 11-24-2015 at 15:58, which if I do my military
18     time correctly, that's almost 4:00 p.m.?
19     A.     Yes, that is correct.
20     Q.     And it shows that the inmate was moved to
21     H5D9 pending disciplinary.  What do you understand
22     that entry to mean?
23     A.     He was -- he was moved out of general
24     population and placed -- placed in a cell before
25     nursing had the chance to assess the inmate.
```

1    Q.    The inmate risk?

2    A.    Correct.  Nurse Brown was not a supervisor

3    and she had no authority to make that call.  She's

4    able to make -- she's able to take the phone call,

5    but she's unable to give a definite answer for

6    movement.

7    Q.    When Nurse Brown received this call at 15:58,

8    since she did not have the authority to make the

9    determination about his placement in the single

10   barred cell, what was her responsibility at that

11   point?

12   A.    She was to turn over the information to Nurse

13   Mucker-Williams.

14   Q.    To Nurse who?

15   A.    Penny Mucker-Williams.  Then Penny

16   Mucker-Williams would look through the file and --

17   of all his previous entries and determine by that,

18   as well as assessing the patient, to allow if -- to

19   make the judgment on whether the person should go

20   into a single cell with bars or without bars and if

21   they should have a watcher if needs be.

22   Q.    If Penny Mucker-Williams was not available

23   for Nurse Brown to consult with, what would be the

24   next level of chain of command to bring this

25   issue -- to whom this issue should be brought to?

1    A.    If the director of nursing was cur -- or was

2    there, it would go to the director of nursing.

3    Q.    Who would that have been on that shift?

4    A.    Cody Pittman.  But he works first shift.

5    Yes.

6    Q.    And if Cody Pittman were not available, what

7    would the next level in the chain of command be for

8    providing this information and getting this

9    clearance?

10   A.    Teresa Wallace, the HSA.

11   Q.    HSA?

12   A.    Yeah.

13   Q.    What does that stand for?

14   A.    Health Service Administrator.

15   Q.    Is she a CCA employee?

16   A.    CCS employee.

17   Q.    CCS?

18   A.    Yes.

19   Q.    And if she were not available, where would

20   the chain of command go to next?

21   A.    Corporate.

22   Q.    At any time would a nurse reach back to

23   mental health or the psychiatrist?

24   A.    They would report -- report to us.

25   Q.    Who is they?

1    A.    We could -- we would send the mental health

2    worker to go assess, but -- and then they would get

3    back with us to determine whether -- so we could

4    follow up with classification.

5    Q.    So when Nurse Brown got this call, if I

6    understand you correctly, she should've reported to

7    the --

8    A.    At 4:58 or --

9    Q.    At 4:00 o'clock.  3:58.

10   A.    3:58, I am not for sure if the mental health

11   workers had -- were still there or not.

12   Q.    So she wouldn't have had a mental health

13   worker to send over and check on him, correct?

14        MS. O'REILLY:  Objection.  Mischaracterizes

15   what he said.

16   Q.    Would there have been a men -- well, if there

17   wouldn't have been a mental health worker to send

18   over to check on him, would she be capable of asking

19   another nurse to go over there and check on him?

20        MS. O'REILLY:  Objection.  Form.

21   Speculation.

22   A.    It would be best for her to relay the message

23   to Nurse Mucker-Williams, and then I would -- if I

24   was in that situation, I would go assess the

25   patient.

1    Q.    And if you had this history up to this point

2    and you went to see the patient, is there anything

3    that would've convinced you, Nurse Schindler, to

4    keep him in a barred single cell?

5         MS. O'REILLY:  Objection.  Just for

6    clarification purposes, are you saying that before

7    he would make the determination as to whether

8    someone should be in a barred cell?

9         MS. NORRIS:  Read back his answer for me,

10   Tracy, please.

11        THE REPORTER:  Sure.

12        (Reporter read from the record as requested.)

13   Q.    Okay.  So my question is:  If you were in

14   that situation and you went to assess Mr. Cox who

15   had al -- no, excuse me.  Mr. Troutman who had

16   already been placed in the barred single cell, what

17   would your directive be to corrections?

18   A.    They were not supposed to move him until they

19   heard back from medical.  This movement took place

20   before medical had a chance to assess.  At least

21   this is what I'm seeing here.

22   Q.    And would I be correct -- strike that

23   question.

24        Why, Nurse Schindler, is it -- your statement

25   based upon your training and your education and your

1    knowledge of the situation, why is it that

2    corrections were not to have moved him into that

3    barred single cell until they got clearance from

4    you?

5    A.    Because I did not -- I would not have known

6    how this person would be without assessing the

7    patient, without looking through the notes.  I would

8    always send an email stating if this patient is

9    clear to go to a single cell, if this patient is

10   clear to go to single cell but has to be a watcher,

11   or if this person is not able to be moved, then

12   corrections would move the person.

13   Q.    Based upon the history that you see here,

14   even without an assessment, personally eyes on, you

15   and Mr. Troutman, what would your directive have

16   been to corrections based upon your education and

17   your work experience and your training with CCS and

18   the policies and procedures of CCS?

19   A.    I would place -- if I was to -- to make a

20   decision, I would have a watcher with him until he

21   was determined to be able to be moved.

22   Q.    Out of the single cell?

23   A.    Correct.

24   Q.    So while he was in a single cell, you would

25   want a watcher in there.

54

1    A.    Yes.

2    Q.    Is there any additional risk or stressors

3    placed on an inmate that is in this type of

4    situation during the holiday?  Thanksgiving,

5    Christmas?

6    A.    Some do have that stressor.

7    Q.    And why would you have made the decision,

8    Nurse Schindler, to have a watcher for Mr. Troutman?

9    A.    Coming from the first note to -- and then

10   from first note that carries over into 11-13.

11   Q.    So all of these notes culminated in you

12   wanting to have a watcher with Mr. Schind -- with

13   Mr. Troutman.

14   A.    Yes.

15        MS. NORRIS:  Can we take a break for a second

16   for me to get some more water?

17        MS. O'REILLY:  Sure.

18        (Recess from 4:54 p.m. to 5:07 p.m.)

19   BY MS. NORRIS:

20   Q.    Okay.  I'm going to show you what I'm going

21   to mark as Exhibit Number 3 to your deposition and

22   ask you to review this document and let me know when

23   you've had it reviewed so we can discuss it.

24        (Schindler Deposition Exhibit 3 was marked

25   for identification and is filed with this

1    transcript.)

2    A.    Okay.

3    Q.    Okay.   Before I get to Exhibit Number 3, what

4    was that other supervisor's name?

5    A.    Penny Mucker-Williams.

6    Q.    If Nurse Brown alerted Penny Mucker-Williams,

7    would there be documentation to that effect?   In

8    other words, would she have sent her an email, or

9    how would she have done that alert?

10   A.    Word of mouth.

11   Q.    And when you told us that your understanding

12   was that Mr. Troutman should not have been put in

13   that barred single cell until he had been cleared in

14   writing from mental health or from medical, what do

15   you base that statement on?   A policy and procedure?

16   A direct communiqué from CCS?   Something from your

17   supervisor?

18   A.    Policy/procedure.

19        MR. OGBURN:   Objection to form.   Go ahead.

20   A.    And per supervisor.

21   Q.    And when you say per supervisor, your

22   supervisor?

23   A.    Yes.

24   Q.    Who was?

25   A.    Cody Pittman.

1  Q.    And how recently had you received the

2  directive from Mr. Pittman that in order for an

3  inmate to be placed in a single barred cell, there

4  should be written clearance from medical?

5  A.    I don't remember.

6  Q.    But it was common enough knowledge that --

7  A.    Yes.

8  Q.    -- you would have expected them to wait for

9  your written communication before corrections put

10  him in a single barred cell.

11  A.    Yes.

12  Q.    Okay.  I want -- you've reviewed Exhibit

13  Number 3.  Is this what we would call an

14  Extraordinary Incident Report?

15  A.    Yes.

16  Q.    And can you tell from that report that it is

17  referencing Mr. Troutman's first suicide attempt on

18  11-13-15?

19  A.    Yes.

20  Q.    Want to go back to that other train of

21  thought for just a moment.

22        If for some reason Nurse -- or Supervising

23  Nurse Pittman was otherwise detained and could not

24  get around to doing the assessment on Mr. Cox and

25  clearing him for single barred cell and shift

1     changed to you, would you have expected there to be

2     a communication from somebody that there is this

3     move pending for this inmate that was previously

4     suicidal and you need to check on that inmate and

5     give clearance?

6     A.    I would expect someone to have emailed me.

7     After I took over as supervisor, to create a paper

8     trail, I instituted where if there's a movement,

9     classification was to email me and call me.  Before

10    any movement took place, I would call them and send

11    them an email stating the three options.

12    Q.    And this protocol that you instituted, are

13    you --

14          MR. OGBURN:  Objection to form.

15    Q.    -- are you sure that that was instituted

16    prior to Mr. Troutman's death?

17    A.    Yes.

18    Q.    Okay.  Back to Exhibit Number 3.  Having read

19    that Extraordinary Incident Report, do you find that

20    to be a credible suicide attempt by Mr. Troutman?

21          MS. O'REILLY:  Objection.  Form.

22    Q.    Based upon your training, schooling and other

23    expertise?

24          MS. O'REILLY:  Same objection.

25    A.    It shows that he has an attempt.  Whether it

58

1    was a cry for help, I'm not for sure.

2    Q.    Would you have taken this attempt seriously?

3    A.    Yes.

4    Q.    And insofar as the statement that Mr.

5    Troutman made to Sergeant Schmitt that he was a

6    junkie and had no reason to live because he was

7    going to get 20 years for his charges, does that

8    provide another red flag to you concerning this

9    inmate's mental health condition?

10         MS. O'REILLY:  Objection.  Form.

11   Q.    You may answer.

12   A.    There is precautions there.  Not for sure if

13   there's -- I don't know how to word it or say it.

14   There's precautions and red flags, but to say that

15   he was going to go through with it, I'm not at

16   judgment to say.

17   Q.    Okay.  Fair enough.  It's a -- it's a red

18   flag to you, that statement.

19   A.    Yes.

20   Q.    Is this information you would like to have in

21   Mr. Troutman's mental health file?

22   A.    Yes.

23   Q.    Supervisor Pittman, she, correct?

24   A.    He.

25   Q.    He?  Is he still with CCS?

1    A.    He is currently the director of nursing at

2    Luther Luckett.

3    Q.    And how long has he been departed from CCS at

4    LMDC?

5    A.    I don't know.  I have -- I just heard through

6    hearsay.  Or through passing.

7    Q.    Would you have ever participated in a

8    morbidity review or anything with respect to a jail

9    suicide?  Examining factors that were presented and

10   the outcomes?

11   A.    No, I never took part in one of those.

12   Q.    Tell me your start date again.

13   A.    May 23rd, 2013.

14   Q.    Were you aware of Mr. Hindi's suicide on

15   10-24-13?

16   A.    I was aware of it.  It happened on first

17   shift, but I was not -- I was not on campus at the

18   time.

19   Q.    Were you aware of Mr. Laron Moore's suicide

20   in a barred cell on 1-4-14?

21   A.    That occurred on first shift.

22   Q.    Do you know whether after Mr. Moore's suicide

23   on 1-4-14 whether there were any policy changes?

24   A.    Yes.

25   Q.    What policy changes were made?

1    A.    That is when the nurse supervisor would clear

2    the pa -- or the inmate before the patient was to be

3    moved by corrections.

4    Q.    Was that a policy change internal to CCS --

5          MR. OGBURN:  Objection to form.

6    Q.    -- or was that a policy change that was

7    mandated from Louisville Metro Department of

8    Corrections?

9    A.    Clearly I am not for sure.

10   Q.    Okay.  That's fine.

11         MS. NORRIS:  I don't have additional copies

12   of this, Counsel, I'm just going to see if he

13   recognizes it.  This is what we passed around

14   yesterday, this Louisville Metro's policy.

15   Q.    I ask you if you recognize that form.

16   A.    No.

17   Q.    Okay.

18   A.    Not saying that I've seen it before, but I

19   don't recognize it.

20   Q.    What I'm trying to figure out is --

21   A.    When it took place.

22   Q.    No.  When you talk about giving written

23   communication to classification before they can move

24   an inmate into a single barred cell, whether you had

25   to use a specific form or whether you could do that

1    just through email communication.

2    A.    When I took over as supervisor --

3    Q.    Uh-huh.

4    A.    -- I had them email me.  Then I would go

5    through -- through their EIs, go through their notes

6    and -- then to make my decision, as well as

7    assessing.  I would email classification, I would

8    also call them.  Previous supervisors would just

9    call, call them.

10   Q.    And why did you feel it was important for

11   you, Nurse Schindler, to make that particular

12   protocol for you as a nurse supervisor that it had

13   to be in writing and -- both as to the request to

14   clear and as to the okay to clear for single cell?

15   A.    Because of this (indicating), of a situation

16   that might come up.  I wanted to make sure that I

17   had my ducks in a row.

18   Q.    In other words, this -- your protocol

19   occurred before Mr. Troutman's suicide --

20   A.    Yes.

21   Q.    -- correct?  And when did you become nurse

22   supervisor?

23   A.    Either September or October.

24   Q.    Of '15?

25   A.    Yes.

1    Q.    And --

2    A.    No, of --

3    Q.    Year previous?

4    A.    I was supervisor for six months.

5    Q.    Okay.  Before his suicide.

6    A.    Yes.

7    Q.    And do you know -- this protocol that you

8    instituted, do you know whether the other nurse

9    supervisors required the same thing?  In other

10   words, that it be in writing?

11   A.    I am not for sure.  I did my own thing.  I

12   tried to get other people to do it.  Whether they

13   chose to or not, that's what happened.

14   Q.    And do I understand that you wanted the

15   request in writing from Department of Corrections

16   so, A, it would be documented that they made the

17   request to you, correct?

18   A.    Uh-huh.

19   Q.    Yes?

20   A.    Yes.

21   Q.    And then, B, so that would give you the

22   opportunity to do all of your due diligence, which

23   is to look at what kind of incidents this inmate had

24   been involved, to see what red flags you might see

25   in this inmate's file before you would put your name

63

1      on the line in writing to clear that infor -- that

2      inmate for a single barred cell.

3      A.      Yes.

4      Q.      Because you would not want to be responsible

5      for allowing an inmate to be in a single barred cell

6      so that they could commit suicide.

7      A.      Yes.  I value life too much.

8      Q.      Because you recognize what a great risk that

9      presents.

10             MS. O'REILLY:  Objection.  Form.

11     Q.      Is that correct?

12     A.      Yes.

13     Q.      Did you know of the suicide of Jonathan

14     Wright in a single barred cell on 10-27-14?

15     A.      Does not ring a bell.

16     Q.      Did you know anything about the suicide by

17     Franklin Bolton on 2-16-15 in a single barred cell?

18     A.      Yes.

19     Q.      What do you know about that suicide?

20     A.      It occurred after I had went home, but as far

21     as I remember, per report, he hung himself from --

22     from the bars.

23     Q.      And he was in dorm nine, fifth floor, cell

24     five?

25     A.      He was not in dorm nine.

64

1    Q.    Okay.  Where was he?

2    A.    Five -- or H5, east walk, three, I believe.

3    Q.    That was a barred cell?

4    A.    I believe so.

5    Q.    What do you know about the suicide involving

6    James Ashby on 10-4-15?

7    A.    I don't remember anything about it.

8    Q.    Do you know whether you were involved in any

9    way in clearing this inmate?

10   A.    I don't remember.

11   Q.    What do you know -- do you know anything

12   about a suicide by Robert Workun on 2-26-15?

13   A.    I don't remember.

14   Q.    Do you know anything about a suicide by a

15   Vernon Tucker on 3-15-16?

16   A.    I don't remember.

17   Q.    Were you ever -- did you ever take a

18   PowerPoint prepared by a CCS employee by the name of

19   Kibibi Wood-Montgomery regarding Mental Health

20   Suicide Prevention and Detox Training?

21   A.    I do remember her putting out something.  I

22   can't remember what is in it at the current time,

23   but I know that I had read through several things

24   that she had put out.

25   Q.    And you found those to be pertinent and

1    informative on that issue?

2    A.   She was -- she was very thorough and

3    informative with things.

4        MS. NORRIS:  If you give me a moment with

5    co-counsel, I may be wrapping it up.

6        (Recess from 5:32 p.m. to 5:42 p.m.)

7    BY MS. NORRIS:

8    Q.   Okay.  Nurse Schindler, I have the proverbial

9    last few questions by a lawyer, because I'm just

10    kind of confused by names and -- name, rank, and

11    serial number.

12        Okay.  On the date of this incident, please

13    say and spell the name of the nurse supervisor on

14    duty.  The date of this incident when Mr. Troutman

15    was moved to a single barred cell, who was on duty

16    as a nurse supervisor when the request came to Nurse

17    Brown that he was going to be put in a single barred

18    cell?

19    A.   Penny Mucker-Williams.

20    Q.   Is that M-U-C-K-E-R?

21    A.   That is correct.

22    Q.   Hyphen Williams, W-I-L-L-I-A-M-S?

23    A.   Correct.

24    Q.   And it's a she.

25    A.   Yes.

66

1    Q.    And her shift was 6:00 a.m. to 6:00 p.m.

2    A.    That is correct.

3    Q.    And she would've been the nurse supervisor on

4    duty when Nurse Brown got the call.

5    A.    Correct.

6    Q.    Do you know if Penny Mucker-Williams followed

7    your protocol of requiring that request to come in

8    writing and then issuing her approval or nonapproval

9    in writing?

10   A.    I don't remember.

11   Q.    Do you know, is Penny Mucker-Williams still

12   with CCS?

13   A.    No.

14   Q.    Is this the person that went to Luther

15   Luckett as a DON?

16   A.    No.

17   Q.    Okay.  Do you know where Penny

18   Mucker-Williams is now?

19   A.    No.

20   Q.    Do you know when she left CCS?

21   A.    No.  Don't remember.

22   Q.    Then it was Mr. Pittman, your director

23   nursing --

24   A.    Correct.

25   Q.    -- who is now at --

1      A.      Luther Luckett.

2      Q.      -- Luther Luckett.  And it was Mr. Pittman

3      who advised his subordinates, you nurse supervisors,

4      of a change in policy after the Laron Moore suicide

5      on --

6      A.      No.

7      Q.      Okay.  Who would've alerted you of the change

8      in policy then?

9      A.      Sharolyn Richardson.

10     Q.      S-H-E-R-L-Y-N-N?

11     A.      Yes.

12     Q.      And who was Sharolyn Richardson?

13     A.      She was the acting HSA at the time.

14     Q.      Health service?

15     A.      No, she was the DON at the time.

16     Q.      She was the DON.

17     A.      Yeah.

18     Q.      And after Leron Moore's suicide on 1-4-14,

19     did she come to you with a written policy and say,

20     "Here is the new written policy on clearing inmates

21     to single barred cells"?

22     A.      I believe we got an email, but she also

23     called us into -- called us in for a meeting.

24     Q.      I'm going to show you an email that's been

25     previously marked as Exhibit Number 2 to Dr. Smith's

1    deposition, and ask you to concentrate on the email

2    that's dated January 13th, 2014, from Kyle Ernst and

3    see if that refreshes your recollection as to

4    whether that was the communication that you received

5    that instructed you on that change in policy.

6    A.    I do remember the -- remember receiving an

7    email like this.

8    Q.    And was it as a result of the email that was

9    similar to this one that is Smith Exhibit 2 that

10   prompted you to create your own written protocol?

11        MS. O'REILLY:  I'm going to object.  I

12   don't think he said he had a written protocol.

13        MS. NORRIS:  His protocol is that he requires

14   the -- the move --

15        MS. O'REILLY:  Emails.

16        MS. NORRIS:  The emails.

17        MS. O'REILLY:  Yes.

18        MS. NORRIS:  Yes.

19        MS. O'REILLY:  I interpret that to be

20   different than a written protocol, just for the

21   record.

22        MS. NORRIS:  His written protocol, his

23   personal written protocol.

24   Q.    Is a communication that you receive like this

25   what prompted you to put in place your personal

1    protocol that you required the request for single

2    cell and the clearance for single cell to be in

3    writing?

4    A.    It had been a long time after that.

5    Q.    Okay.

6    A.    Yeah.  I was not supervisor at the time when

7    this situation happened.

8    Q.    And you're telling me that your director of

9    nursing at -- the acting director of nursing at the

10   time, Sharolyn Richardson, alerted everyone in the

11   nursing staff about this directive from Mr. Ernst,

12   who was a sergeant at LMDC, that no one is to be

13   moved to a single cell unless there is a written

14   approval from medical staff.

15        MR. OGBURN:  Objection.  Form.

16   Q.    You may answer.

17   A.    As far as I know, that is correct.

18        MS. NORRIS:  I'm going to go ahead and get a

19   clean copy of this and make it Exhibit Number 4 to

20   his deposition so the record makes sense of what

21   we're talking about.

22        (Schindler Deposition Exhibit 4 was marked

23   for identification and is filed with this

24   transcript.)

25        MS. NORRIS:  Walk -- few more seconds?

1          MR. SIMON:  Yeah.

2          THE REPORTER:  Off the record?

3          MS. NORRIS:  Yes.

4          (Off-the-record discussion, and Ms. Norris

5     and Mr. Simon left the deposition room momentarily.)

6          MS. NORRIS:  That's all I have.

7          MS. O'REILLY:  Okay.

8          MR. OGBURN:  I just have one question.

9                       EXAMINATION

10    By Mr. Ogburn:

11    Q.    And, Mr. Schindler, I'm going to tell you,

12    when -- you don't have to look at me when you

13    respond to this because the court reporter needs to

14    hear you.

15    A.    Okay.

16    Q.    I can hear you fine, so you look straight

17    ahead.  But going back to Mr. Troutman, do you know

18    the exact time Mr. Troutman was physically moved to

19    H5D9?

20    A.    No, I do not.

21    Q.    And do you know where Mr. Troutman was in the

22    jail prior to being moved to H5D9?

23    A.    No, I do not.

24         MR. OGBURN:  Okay.  Those are all the

25    questions I have.

1          MS. O'REILLY:  I have no questions.

2          MS. NORRIS:  I just will clear up on that.

3                    REEXAMINATION

4     By Ms. Norris:

5     Q.    If the records reflect that he was moved at

6     20:32, would that have been on your shift?  If he

7     was physically moved at 20:32, would that have been

8     during your shift?

9     A.    That would have been during my shift, yes.

10    Q.    Did anybody alert you in writing at 20:32

11    that they needed you to come and clear him for the

12    single barred cell?

13    A.    I never received anything.

14         MS. NORRIS:  That's all I have.

15         (Deposition concluded at 5:53 p.m.)

16              *              *              *

17

18

19

20

21

22

23

24

25

1    STATE OF KENTUCKY      )
                            )   SS.
2    COUNTY OF JEFFERSON    )

3         I, Tracy P. Lundergan, a Notary Public within

4    and for the State at Large, my commission as such

5    expiring 23 January 2021, do hereby certify that the

6    foregoing deposition of JOSEPH L. SCHINDLER, BSN, RN

7    was taken before me at the time and place stated and

8    for the purpose in the caption stated; that the

9    witness was first duly sworn to tell the truth, the

10   whole truth, and nothing but the truth, that the

11   deposition was reduced by me to shorthand writing in

12   the presence of the witness; that the foregoing is a

13   full, true, and correct transcript of the said

14   deposition so given; that there was no request that

15   the witness read and sign the deposition; that the

16   appearances were as stated in the caption.

17        I further certify that I am neither of counsel

18   nor of kin to any of the parties to this action and

19   am in nowise interested in the outcome of said

20   action.

21        WITNESS my hand this 2nd day of January 2018.

22

23        _____

24        Registered Merit Reporter
          KY CCR 20042B070
          Notary Public, State at Large

25