1

<pre>
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF KENTUCKY
 2


 3

      STEPHANIE TROUTMAN,          )
 4    Administratrix of the        )
      Estate of CHARLES R.         )
 5    TROUTMAN, Jr. deceased,      )
                                   )           Case No.
 6                 PLAINTIFF       )      3:16-cv-000742-
                                   )              DJH
 7    v.                           )
                                   )
 8    LOUISVILLE METRO            )
      DEPARTMENT OF CORRECTIONS,   )
 9    et al.                       )
                                   )
10                 DEFENDANTS      )

11

12              *              *              *

13

14         The deposition of JAMES ALEXANDER COX, taken

15    pursuant to notice by the Plaintiff on December 12,

16    2017, at Simon Law Office, 239 South Fifth Street,

17    Suite 1700, Louisville, Jefferson County, Kentucky.

18

19

20

21              TRACY P. LUNDERGAN, RMR, KY CCR
            McLendon-Kogut Reporting Service, LLC
22                 Anchorage Office Plaza
            2525 Nelson Miller Parkway, Suite 204
23               Louisville, Kentucky  40223
                       (502) 585-5634
24            tlundergan@mclendon-kogut.com
                  www.mclendon-kogut.com
25
</pre>

2

1                              C O N T E N T S

                                                                    Page
2    Appearances                                                       3

3    Examination by Ms. Norris                                         4
     Examination by Ms. O'Reilly                                     108
4
     Notary Certificate                                              110
5
     Exhibits
6    Cox Deposition Exhibit 1                                         22
     Cox Deposition Exhibit 2                                         25
7    Cox Deposition Exhibit 3                                         28
     Cox Deposition Exhibit 4                                         50
8    Cox Deposition Exhibit 5                                         58
     Cox Deposition Exhibit 6                                         60
9    Cox Deposition Exhibit 7                                         80
     Cox Deposition Exhibit 8                                         86
10   Cox Deposition Exhibit 9                                         95

11   Requested Items
     Search for incoming calls to Corrections in the                 13
12   time frame that Mr. Troutman was incarcerated
     before his suicide
13
     Search your records and provide all                             23
14   communications in and out of witness' email
     from December 1st, 2013, until the PSU report
15   and the Internal Affairs report was completed

16   Preinterview checklist in Mr. Troutman's file                   43

17   XJail report that shows when the transfer was                   73
     completed of Mr. Troutman leaving rear security
18   and physically moved up to H5D9 single cell

19   Witness' archived classification email folder                   78

20   Produce documentation to show who was being                     90
     housed in the new jail single cells and what
21   their medical status was or was not at on the
     date of Mr. Troutman's death
22
     Produce the name of the committee that now                      97
23   oversees the alert system regarding suicide
     risks
24

25              *                *                *

3

```
 1                            APPEARANCES

 2

 3      FOR PLAINTIFF:
        Ms. Christina R. L. Norris
 4      Law Offices of Christina R. L. Norris
        P.O. Box 386
 5      Louisville, Kentucky  40059
        (502) 899-4755
 6      christina@norrislawky.com
        and.
 7      Mr. Larry Simon
        Simon Law Office
 8      239 South Fifth Street, Suite 1700
        Louisville, Kentucky  40202
 9      (502) 589-4566
        larrysimonlawoffice@gmail.com
10
        FOR DEFENDANT CORRECT CARE SOLUTIONS:
11      Ms. Megan P. O'Reilly
        Blackburn Domene & Burchett PLLC
12      614 West Main Street, Suite 3000
        Louisville, Kentucky  40202
13      (502) 584-1600
        moreilly@bdblawky.com
14
        FOR DEFENDANTS LOUISVILLE METRO DEPARTMENT OF
15      CORRECTIONS, ET AL:
        Mr. J. Denis Ogburn
16      Assistant Jefferson County Attorney
        531 Court Place, Suite 900
17      Louisville, Kentucky  40202
        (502) 574-6312
18      denis.ogburn@louisvilleky.gov

19

20              *              *              *

21

22

23

24

25
```

4

1          JAMES ALEXANDER COX, called by the Plaintiff,

2      having been first duly sworn, testified as follows:

3                          EXAMINATION

4      By Ms. Norris:

5          (Deposition commenced at 1:05 p.m.)

6      Q.     Okay.  First of all, I'm going to have to

7      break my habit of calling you Officer Cox.  Mr. Cox.

8      A.     Yes.  Yes, ma'am.

9      Q.     Okay.  Would you state your full name and

10     your professional address for the record, please?

11     A.     James Alexander Cox, 400 South Sixth Street,

12     Louisville, Kentucky, 40202, Louisville Metro

13     Corrections.

14     Q.     And I learned before we went on the record

15     here today that you are not a corrections officer,

16     but you are a civilian employee of the Louisville

17     Metro Department of Corrections.

18     A.     That is correct.

19     Q.     And can you describe for me what the

20     distinction is in terms of rank, pay, contract?  How

21     those two roles diverge.

22     A.     Well, they have two -- two sets, civilian

23     staff and officer staff.  Don't have really anything

24     to do with officer staff except when we, you know,

25     work together with one another.  So as far as their

5

1    pay and everything else like that, I'm not really

2    sure of.  They're on two different unions.

3    Q.     Do you know how the particular jobs that

4    you've had with Louisville Metro Department of

5    Corrections are designated as a civilian staff

6    position as opposed to an officer staff position?

7    A.     Yes.  When it's security side, it's going to

8    be an officer -- when it's hazard pay, is best way I

9    can put that, is when -- us -- us civilians, even

10   though we're working with inmates, we don't get

11   hazard pay.  Officer staff does get hazard pay.

12   They have to respond to fights, things of that

13   nature.  We don't.

14   Q.     Would it be fair to say then that the

15   civilian staff is more of an administrative side of

16   the organization as opposed to the corrections

17   security side?

18   A.     Yes.

19   Q.     To get a little bit of background on you,

20   Mr. Cox, can you please run through your educational

21   background and your employment history?

22   A.     I have an associate's degree in criminal

23   justice at Brown Mackie College, and I have been

24   employed straight out of college with LMDC since

25   October of 2007.

6

1    Q.    So you went straight from graduation from

2    Brown Mackie into corrections.

3    A.    Yes, ma'am.

4    Q.    On the admin side.

5    A.    Yes.

6    Q.    Where's Brown Mackie College located?

7    A.    It's on Fern Valley Road, Louisville,

8    Kentucky.  Not exactly sure the number.

9    Q.    What are their accreditations?

10   A.    That I'm not sure of either.

11   Q.    Do you know whether Brown Mackie just serves

12   the educational level of associate's degree or do

13   they go on to a four-year degree as well?

14   A.    They do have bachelor's degrees there.  I

15   just never went back to get it.

16   Q.    Where did you graduate from high school?

17   A.    I got my GED.

18   Q.    Where were you in high school before you --

19   A.    Southern.

20   Q.    Southern High School?

21   A.    Yes, ma'am.

22   Q.    And I forgot to give you my little deposition

23   speech.  I oftentimes take a long time to formulate

24   a question because I'm thinking about your answer

25   and I'm thinking about the different documents I

7

1    have, so if you would be kind to let me make sure I

2    get my question out before you answer, because she's

3    taking it down and it helps us to read the

4    transcript.

5    A.    Apologize.  I didn't know I did that.  I am

6    sorry about that.

7    Q.    That's okay.  It's very common in colloquial

8    speech.  It's just a little bit different here.  We

9    kind of slow things down a little bit here.  Okay?

10   A.    Okay.

11   Q.    And also I guess I should say if you don't

12   understand any of my questions, please stop me,

13   otherwise we'll presume that you've understood my

14   question and you've given a truthful answer to it.

15   Okay?

16   A.    Okay.

17   Q.    And if there's anything that I confuse you

18   about, it's fair game to ask me to restate the

19   question or rephrase it, because we want to make

20   sure that we understand each other in this process.

21   Okay?

22   A.    Yes, ma'am.

23   Q.    Okay.  Can you tell me what played into your

24   decision to leave Southern High School before you

25   obtained your diploma?

8

1    A.    I was having problems in high school.

2    Q.    What kind of problems?

3    A.    Mostly just with the educational part of it.

4    There was -- I got into a bit of trouble when I was

5    a teenager, nothing major, nothing on record, but

6    thought I was better off at that point to leave

7    Southern High School, which, of course, ended up

8    being a bad idea, I wish I had stuck to it, but

9    teenage years.  What can you do with them?

10          So my next best step was when I got my GED,

11   and proudest moment up until I got the job at LMDC

12   is going back to college and getting that degree.

13   Q.    And that's commendable.  Very good.  What

14   year did you get your GED?

15   A.    I want to say 2000.  Either 2000, 2001.

16   Q.    Would that have been the normal year you

17   would've graduated?

18   A.    Yeah.  It wasn't that long afterwards that I

19   did.

20   Q.    During that little bit of gap time that you

21   weren't in high school, before you got your GED,

22   what sorts of things did you do for employment?

23   A.    Odd and end jobs.  Pretty much anything that

24   would hire me.  I think while I was at Brown Mackie,

25   I was also working at two jobs, the Boys and Girls

1    Club part-time and White Castle.

2    Q.    Did you fund your own education?

3    A.    Yes.  As far as like are you meaning student

4    loan type or did somebody else pay for it?

5    Q.    (Ms. Norris nodded head.)

6    A.    Yes.  Yes, then I did.  Yeah.

7    Q.    You funded it through student loans and --

8    A.    Right.

9    Q.    -- working and so forth.

10   A.    Uh-huh.

11   Q.    That's a yes?

12   A.    Yes.

13   Q.    So that, I guess, answers my employment

14   history background, because you've been with

15   Louisville Metro Department of Corrections as a

16   civilian employee since October of 2007.

17   A.    Yes, ma'am.

18   Q.    All right.  So walk me through your entry

19   level position and what different positions you

20   would've had at Louisville Metro 'til you got to

21   your position in 2015 as a classification officer

22   or --

23   A.    The actual -- the name of the title is PCI,

24   prisoner class interviewer --

25   Q.    Okay.

10

1    A.    -- is what that is, but I didn't start off

2    there.

3    Q.    Okay.  Walk me from 2007 forward.

4    A.    From 2007 I started as what they call a

5    corrections technician.  It's the very first, pretty

6    much the lowest paying job they have at Corrections

7    entry level way to get -- pretty much get your foot

8    in the door.

9         Couple years went by and I went to what they

10   call a senior corrections technician.

11   Q.    So about 2009?

12   A.    Yes.  I believe that.

13   Q.    Okay.

14   A.    Senior correction technician, and it wasn't

15   until I would believe early part spring 2015 that I

16   moved over to classification.  Different job title,

17   same pay as senior corrections tech.

18   Q.    What were your job duties as a corrections

19   technician?

20   A.    Correction technician, answer the phone from

21   the public and also monitor video visits, sign

22   people up for video visits to visit their -- whoever

23   they wanted to visit, and file folders.

24   Q.    As this corrections technician, make sure I

25   understand, if I have a family member or a friend

11

1    who's in Louisville Metro and I want to get a

2    message to either my inmate or to mental health or

3    to some other part of Corrections and I Google the

4    number and get a general number for Corrections,

5    call, would it be you that I would be talking to, a

6    civilian employee?

7    A.    Yes.  That would put probably more along the

8    line of operator, phone operator of the jail for the

9    public information line.

10   Q.    Okay.  So when I call in and talk to you and

11   I say, "I need to get a message to my inmate," how

12   do you document that call?

13   A.    Really isn't no -- any documentation on part

14   of the correction technician.  Now, say they needed

15   to get a message to that particular inmate directly.

16   Is that what I'm understanding?

17   Q.    Yes.

18   A.    That -- we would transfer that phone call to

19   a counselor.  If it's 3:00 to 11:00 shift,

20   counselors are not going to be there, so we would

21   have them call the same number back but in the day

22   shift.  But only a counselor can actually talk to an

23   inmate direct right now.

24         If it's a family emergency, that's when we

25   give them the chaplain's phone number so they can

1    call the chaplain and they can go about that area

2    with him.

3    Q.    Okay.  So let me make sure I understand.  Did

4    I understand you to say that on the 3:00 to 11:00

5    shift there is no counselor available?

6    A.    There is no counselor.  They work from

7    7:00 a.m. to 3:00 p.m.

8    Q.    They don't then come -- they're basically

9    first shift employees only.

10   A.    And they only work Monday through Friday, I

11   should add.

12   Q.    Make sure that I have an affirmative answer

13   on the record.  I saw you nod your head.

14   A.    I'm sorry.

15   Q.    That's okay.  It's correct in my

16   understanding that the counselors only work first

17   shift, 7:00 a.m. to 3:00 p.m., and then -- that's

18   correct.

19   A.    Yes.

20   Q.    And then they only work Monday through

21   Friday.

22   A.    Yes.

23   Q.    And are the counselors, to your knowledge,

24   Louisville Metro Department of Corrections employees

25   or are they contract staff for the medical?

13

1   A.    They're with classification with Louisville

2   Metro Department of Corrections.

3   Q.    The calls that come in -- came in to you as a

4   corrections technician, are those recorded?

5   A.    I believe they have told us they have been,

6   but I have never actually experienced one being

7   played.

8   Q.    So it would be your understanding when you

9   were trained, I guess, that all of the calls

10  incoming to you from the general public --

11  A.    Uh-huh.

12  Q.    -- would be recorded.

13  A.    Uh-huh.

14  Q.    That's yes.

15  A.    Yes.  Yes.

16        MS. NORRIS:  I'm going to restate our

17  request, Denis, that a search be done for these

18  incoming calls to Corrections in the time frame that

19  Mr. Troutman was incarcerated before his suicide.

20  Okay?

21        MR. OGBURN:  Okay.

22  Q.    And if the counselor wasn't available when

23  the call came in, who did you say you would direct

24  it to?

25  A.    We would have that person call us back at the

1   number they reached us at during the day shift

2   hours.  If it further got escalated, which many

3   times it did, we would transfer it to our

4   supervisors at that point.

5   Q.    Gotcha.  So if somebody called in needing to

6   speak to a counselor and it was not Monday through

7   Friday from 7:00 a.m. to 3:00 p.m., your instruction

8   to the individual would be to call back tomorrow --

9   A.    Uh-huh.

10   Q.    -- assuming it was a weekday, correct?

11   A.    Yes.

12   Q.    And then at that point, when they called back

13   during the proper shift window, you could then

14   transfer them to a counselor.

15   A.    Yes.

16   Q.    And then it's the counselor who has the

17   direct interface with the inmate.

18   A.    Yes.

19   Q.    And if somebody called in on a Friday, they

20   would need to wait 'til Monday to have that contact

21   with the counselor so that they could have the

22   message taken to the inmate, correct?

23   A.    Yes.

24   Q.    However, if you thought it was urgent enough,

25   you could step it up to your supervisor.

1     A.     Yes.  Such as death in the family, that kind

2     of situation, that's when we would contact --

3     contact the chaplain or get ahold of our supervisors

4     in that case also.

5     Q.     And it would be your supervisor or the

6     chaplain who would then have the direct interface

7     with the inmate.

8     A.     Supervisor would, not so much as Chaplain

9     Whitlow.

10    Q.     Chaplain Whitlow?

11    A.     Yes.

12    Q.     Again, assuming somebody called in and needed

13    to convey a message to medical regarding their

14    inmate, how would you handle that?

15    A.     I would -- 'cause a lot of times it's not

16    listed, I would give them the phone number to the

17    medical department and I would also transfer them up

18    there.

19    Q.     Would there ever be an occasion, Mr. Cox,

20    when you transferred a call up to medical, that

21    perhaps medical was unable or didn't pick up, would

22    it then ring back to you to take a message?

23    A.     Unfortunately they have -- they set up new

24    phones and they still don't do it, but even back in

25    the old days the only way we could transfer is what

16

1    they would call a code transfer, and lot of --

2    that's why I ended up giving them the number so they

3    can try again if somehow they didn't get an answer

4    or it was a busy signal, 'cause there's no way we

5    could do anything but that with our phone system.

6    Q.    So if the person was transferred to medical

7    and it rang and rang and rang and rang and rang,

8    their next step would be to hang up and then call

9    that direct dial number that you had given them.

10   A.    Yes.

11   Q.    Is the senior corrections technician

12   basically the supervisor for the corrections

13   technician?

14   A.    No.

15   Q.    Okay.  What does a senior corrections

16   technician do?

17   A.    Senior correction technician does a lot.

18   Handles all the paperwork of every inmate that comes

19   into the jail, whether it comes from the judges, the

20   officer who brought them in, the court, anything to

21   do with that particular person in that jail, it has

22   a file folder, and that SCT, senior correction

23   technician, takes care of that folder.

24   Q.    And would you handle that folder from the

25   date the inmate comes into the jail until the date

1    that the inmate is discharged by a court order?

2    A.    Yes.  Until that person leaves our custody,

3    then that person has a folder that's maintained.

4    Q.    So when you came on as a civilian employee,

5    Mr. Cox, can you describe for me what type of

6    training you would have received?

7    A.    Is this back when I was a CT or a

8    classification?

9    Q.    When you started out, when you first started.

10   A.    Very first started out?

11   Q.    Uh-huh.

12   A.    It was about a minimum of about four -- four

13   months training at the time of one-on-one with

14   another correction technician and the supervisor

15   signing me off, training me on what to do in those

16   cases and any case that happens there on what they

17   did as a CT.

18   Q.    That's what I would call on-the-job training.

19   A.    Yes.

20   Q.    Besides on-the-job training, were you given

21   any manuals to read or -- with policies and

22   procedures about corrections?

23   A.    Yes.

24   Q.    Okay.  And what were you instructed with

25   respect to the review of these manuals on policies

18

1      and procedures?

2      A.    I'm sorry.  I'm not sure if I understand the

3      question.

4      Q.    Bad question.  Let me back up.

5            When you were given the manual with the

6      policies and procedures, were you given any

7      instruction about a time frame within which to

8      review it and were you -- then was there any

9      indication that you would be tested on it?

10     A.    Yes.

11     Q.    Okay.  Tell me about that.

12     A.    It had a questionnaire that you had to fill

13     out with the supervisor, and once that -- general

14     information questionnaire that you would fill out

15     with the supervisor, and then they would pretty much

16     test you on it, go over it with you.

17           If they had any discrepancies of anything

18     that would come up that was wrong and you wasn't --

19     or wasn't sure of, there would be time to go over it

20     again.

21     Q.    I'm going to try and make sure I understand

22     what you're saying.  You're given the policies and

23     procedures manual.  I'm assuming you're instructed

24     to read it front to back --

25     A.    Uh-huh.

19

1    Q.    -- correct?

2    A.    Yes.

3    Q.    And then would you fill out a written

4    questionnaire about the different policies and

5    procedures, like a written test?

6    A.    It was more of a checkdown list of things

7    dealing with policy and procedures and how to do

8    them, and they would go down the list checking

9    everything that -- more like a true or false bubble

10   question, that kind of thing.

11   Q.    Would it be an oral quiz?

12   A.    No, it was on paper, but some of it was oral

13   too, just questions that they would bring up that --

14   if anybody knows anything about corrections,

15   sometimes you get some off the wall stuff that would

16   happen, and they would quiz you on how would you

17   handle that.

18   Q.    Did you have throughout your tenure training

19   updates on these policies and procedures?

20   A.    If I understand the question correctly, we

21   did and we got them usually by email of any kind of

22   new policy and procedure that we was to implement

23   instead of doing it the way we was.

24   Q.    So basically if there was a change in a

25   policy, procedure, that would be disseminated to you

20

1      via email.

2      A.     Yes.  And that's the only way it would become

3      policy and pro -- it would become then as good as

4      policy and procedure in the eyes of the

5      administration.

6      Q.     And when you got those email changes to

7      policies and procedures, am I correct in my

8      understanding that you were to implement those

9      changes as soon as you got that communication?

10     A.     Immediately.

11     Q.     Your next move was in the spring of 2015, you

12     said, to classification; is that correct?

13     A.     From SCT --

14     Q.     Yes.

15     A.     -- or from CT?

16     Q.     Did I understand you went from corrections

17     technician to senior corrections technician to

18     classification specialist?

19     A.     No.  Went from senior correction -- and it's

20     different departments --

21     Q.     Okay.

22     A.     -- we can bid to.  From cla -- let me see if

23     I can explain this.  From correction technician you

24     go on to senior correction technician, and that kind

25     of opens up about four different areas that you can

1    work at.

2        I was working in the records department at

3    the time when I transferred over into what they call

4    intake, which is more of an identification process

5    for any inmate that's coming in.  Fingerprints,

6    NCIC, things of that nature.  And from intake and

7    release, then I went over to classification.

8    Q.    Is intake and release one area?

9    A.    Yes.

10   Q.    And from intake and release you went to

11   classification specialist, correct?

12   A.    Yes.

13   Q.    And that was in spring of 2005[sic], to the

14   best of your recollection.

15   A.    To the best of my knowledge, yes.

16   Q.    Let me ask you this, Mr. Cox.  When you've

17   come on with Corrections as a civilian employee for

18   the first time, do they give you a complete jail

19   tour?

20   A.    A month after I first originally started,

21   yes, we was taken on a tour.

22   Q.    And help me remember, 'cause I have been in

23   Louisville long enough to watch the new jail being

24   renovated and the new courthouse be built.  When you

25   came on in 2007, were you still just in the Hall of

1    Justice or did they have the new jail over there at

2    Sixth and Liberty?

3    A.    Yes.  The new jail was being implemented.  It

4    got implemented in 2000.

5    Q.    Thank you for helping me on that.

6          I'm going to show you what I'm marking as

7    your Deposition Exhibit Number 1.

8          (Cox Deposition Exhibit 1 was marked for

9    identification and is filed with this transcript.)

10   Q.    And ask you to -- if you can identify this

11   exhibit for the record.

12   A.    This is an email we receive when there is an

13   opening in a particular position.  This being a

14   prisoner class interviewer, PCI.

15   Q.    And is this the -- is this -- strike that

16   question.

17         Where was this job in your progression

18   through Corrections?

19   A.    This is the job I am at now.

20   Q.    So this was posted it looks like July 10th,

21   2014; is that correct?

22   A.    That is.  Yes, that is correct.

23   Q.    Okay.  And would you have received this

24   through your email system?

25   A.    Yes.

1    Q.    Do you have a private email in box for

2    Corrections?

3    A.    This was sent to everyone, so, yeah, it

4    comes -- you mean my own email?

5    Q.    (Ms. Norris nodded head.)

6    A.    Okay.  Yes.  I'm sorry.

7    Q.    What is your email account?

8    A.    James.Cox@Louisvilleky.gov.

9    Q.    And has that been your email address since

10    the day you started in 2006 to the present?

11    A.    Yes, ma'am.

12        MS. NORRIS:  Denis, at this time we would ask

13    that you do a search of your records and provide us

14    with all communications in and out of Mr. Cox's

15    email from December 1st, 2013, until the PSU report

16    and the Internal Affairs report was completed.

17        MR. OGBURN:  Yeah.  If you can provide that

18    request in writing for me.

19        MS. NORRIS:  She's taking it down for us

20    again.

21    Q.    What interested you about this job, Mr. Cox?

22    A.    Well, I got into the correctional -- I guess

23    you would go back as far as why I went through the

24    criminal justice courses in college.  To help

25    people.

1      Physically I'm limited to not being able to

2      be an officer, but at the time I still wanted to get

3      in there, to have a stable job, a good job that at

4      the time was paying pretty nicely, but at the same

5      time helping the public is what I had dreamed of.

6      Q.    And I don't mean to be intrusive at all,

7      Mr. Cox, I'm just trying to be complete in my

8      examination.

9      A.    Uh-huh.

10      Q.    Is it a physical classification that

11      Corrections says you can't be a corrections officer

12      because of X?

13      A.    No.  It's more along my -- I would've been

14      able to been -- I haven't even put in for it, I

15      should state.  It's just due to I know my own

16      medical limitations that I did not even attempt.

17      Q.    Because I did notice in your personnel file,

18      there was one stint there where you had some --

19      looked like some medical issues and some off time,

20      and then a -- and then a write-up for some off time

21      when you took -- a write-up for taking a phone call

22      from your doctor, so are those the medical

23      limitations you're referencing?

24      A.    I don't -- I know I've gotten write-ups

25      before, but I don't remember the write-up from

1  taking a phone call from a doctor.  I have taken off

2  FMLA, but I don't remember getting a write-up for

3  it.

4  Q.    I'll just -- so we can get this cleared, I'll

5  give you something to refresh your recollection.

6  A.    Sure.

7       MR. NORRIS:  We'll mark this Exhibit Number

8  2.

9       (Cox Deposition Exhibit 2 was marked for

10  identification and is filed with this transcript.)

11  Q.    And take your time to review this to refresh

12  your recollection, then we can talk about it real

13  briefly.  Don't want to belabor the point, just want

14  to understand.

15  A.    Oh, a DAN.

16  Q.    Which is -- a DAN is a Disciplinary Action

17  Notice?

18  A.    Yeah.  What they would call a verbal writing.

19  And at that time, yes, during -- I remember four --

20  2000 -- yeah.  4-23-2014.

21  Q.    Does this have to do with the medical

22  limitations that you describe as limiting you from

23  being a corrections officer?

24  A.    No.  This was more of I had doctors'

25  appointments due to other things, nothing that would

1    limit me, but it was more along this, like this --
2    especially this note, which now looking at it I'm
3    embarrassed by, but it was more along the stress
4    that everybody is going through in records.  At the
5    point it was -- we was all pretty much stressed out.
6    Q.    What contributed to your stress in --
7    everyone's stress in records at that point?
8    A.    Overabundance of work and not enough people
9    to do it and a lot of mandatory overtime where they
10   would force you to work.  If you didn't take your
11   force, there would be a suspension day.
12        And so pretty much tired and ready to move
13   on.  I was like I'm not doing too -- I'm good at the
14   job, but it's going -- needed to find something
15   else, and that's one of the reasons I had put in for
16   the classification job.
17   Q.    Okay.  And -- because I want to make sure
18   that your handwriting is transcribed properly, what
19   was your response to this Discipline Action Notice
20   of 4-23-14 which is now marked as Exhibit Number 2?
21   A.    At that time I thought it was petty.
22   Q.    Okay.  Fair enough.
23   A.    I thought it was just pretty much picking on
24   me.  At the time we wasn't -- I wasn't ignoring
25   calls from my recollection, I wasn't -- it was

1    during a slow period, might even have been during

2    the weekend, if I can remember correctly, where

3    there was hardly anything coming in, and I had

4    called my doctor to set up an appointment, and they

5    were calling me back to confirm, I believe.  It was

6    probably a good one minute at the most, and because

7    of that I was -- yeah, I took it as more petty than

8    anything.

9    Q.    And they were fussing at you because you had

10   taken a call --

11   A.    Yeah.

12   Q.    -- I guess on your personal cell phone?

13   A.    Yeah.  At that time they hadn't made the rule

14   where no cell phones were allowed in the records

15   department.

16   Q.    Has that rule changed?

17   A.    Yes.

18   Q.    What's the rule now?

19   A.    Cell phones are to be on silent and not used

20   at all.

21   Q.    Would that be true in your present position

22   as classification specialist?

23   A.    Cell phones are not allowed past the security

24   perimeter there.  They're actually left in the

25   locker rooms.

28

1    Q.    Okay.  And do I read your response to this

2    as, quote, if it happens again the same thing and

3    way I will do it again?

4    A.    Yes.

5    Q.    Meaning if your doctor calls, you're going to

6    take the call.

7    A.    I'm going to take the call.

8    Q.    Well, since we're on this subject, let's go

9    ahead and move through it.  You had another

10   disciplinary action write-up which I'm going to mark

11   as Exhibit Number 3 just a couple of day -- like the

12   next day.  I'd like you to read that and refresh

13   your recollection about that.

14          MS. NORRIS:  Mark that Exhibit 3.

15          (Cox Deposition Exhibit 3 was marked for

16   identification and is filed with this transcript.)

17   Q.    This Band-Aid is hindering my document

18   production.

19          Does reading this refresh your recollection

20   of what incident resulted in this Disciplinary

21   Action Notice which is marked as Exhibit Number 3?

22   Appears to be during the same stressful period.

23   A.    Uh-huh.

24   Q.    Yes?

25   A.    Yes.

29

1    Q.     And do you remember the incident that caused

2    your bit of an outburst?

3    A.     I do.

4    Q.     Will you explain it to me, please?

5    A.     It was records.  It was pretty much just

6    building off of being there too long and not being

7    able to take records anymore.

8    Q.     Meaning taking records, meaning taking the

9    job was too --

10   A.     Taking the job and being able to do it at a

11   professional standard that they require, because

12   even though you're not dealing with them, you're

13   still responsible for a lot of the things that the

14   inmates have there, you're responsible for a lot of

15   their livelihood, and I found myself at that point

16   to where I was getting so stressed out by the work,

17   the paperwork, that it was just not -- it was just

18   not working out.

19   Q.     Do you remember what caused you to kind of

20   pop off at this coworker?

21   A.     I do remember that -- I think I -- I think

22   the actual wording was later, once I got up into

23   Mr. Clark's, assistant director's office, for the

24   actual recommended action of one suspension day.

25          It was later explained that -- that it wasn't

1        necessarily -- I can't remember the exact word, but

2        it wasn't the words used on that, and that pretty

3        much -- that's really all I remember about it.   It

4        was quite a period ago.

5        Q.      Okay.   Thank you for --

6        A.      Even talking with Arnetta, the person who

7        was -- who's at the bottom here who had printed this

8        out --

9        Q.      Yeah.

10       A.      -- the best move, 'cause she didn't want me

11       to move from records, I knew what I was doing there,

12       I knew the job, it was just -- it was getting way

13       too stressful at that point for me to handle.

14              And it's a different kind of stress.   One, I

15       can handle easily talking to -- up to 50 inmates per

16       shift that I end up talking to one-on-one, but when

17       it comes to records, it's a whole different type.

18       Q.      So when you moved out of records, is that

19       when you got into the intake and that's when you

20       would be talking to inmates, about 50 per shift, to

21       do their intake?

22       A.      No, intake and release, what they would do is

23       when fingerprints came over from the booking

24       floor --

25       Q.      Yeah.

1    A.    -- they would go into -- now, mind you, when

2    I say intake and release and records are two

3    different situations.  I want to make sure that you

4    know that they're actually in the same room and

5    there's a -- not -- very little barricade separating

6    the room, so it's the same area of the jail.

7         They would go and pretty much verify that

8    inmate is who they say they are.  Fingerprints would

9    come back and then we would run them for warrants,

10   and if that inmate came back with warrants, we would

11   have the front desk officer serve them.  And we'd

12   also check them for -- once they get released for

13   wants and warrants also.

14        And also they went on HIP.  Pretty much if

15   they moved outside of that jail, HIP, CCC, work

16   release, then they would get checked again for

17   warrants.

18   Q.    To be clear then, was it while you were in

19   the records room that you got this next write-up,

20   which is Exhibit Number 3?

21   A.    This one right here?

22   Q.    Yes.

23   A.    Yes.

24   Q.    Okay.

25   A.    Yes, I was still in -- you know, can I --

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634

1    wait a second.  Can I take that back?

2    Q.    You can check --

3    A.    'Cause I don't think I was, actually, now

4    looking at it.  I was -- it was -- I think I was

5    over at intake.

6    Q.    Okay.  So you would've been at intake

7    through --

8    A.    'Cause this was 2014, and I know I was there

9    at least about a year, year and a half over in

10   intake before the mutual decision was made that --

11   and I talked it over with Arnetta and Mr. Clark, and

12   it was -- they agreed with me that maybe I would be

13   better off in class.

14        Not that they was punishing me to move me

15   over there.  It just seemed like the stress of all

16   the paperwork, all the phone calls that records has

17   to deal with, and the amount of overtime that's

18   mandatory was finally piling up on me after years of

19   working there.

20   Q.    Okay.  So these two -- just to make sure my

21   time frame is correct, these two Disciplinary Action

22   Notices, one April 23, 2014, which is Exhibit 2, and

23   one April 24, 2014, what department were you in at

24   that time?

25   A.    I would say this would have to have been in

33

1    intake.  Now, the same supervisor is the reason

2    there's -- I'd have to go back and look at the time

3    frame.  The same supervisors and Arnetta Al-Amin,

4    also coordinator of both records and intake and

5    release, so they're -- they're the bosses.  Same

6    bosses, different jobs.

7    Q.    Okay.  So --

8    A.    That's where I'm getting confused at right

9    there, 'cause I'm pretty -- I want to say, though,

10   that 4-23-14, it'd have to have been over in intake

11   because of that.  I was there at least a year.

12   Q.    This is a completely random question.  I'm

13   noticing your tie clip, which I find very

14   interesting.  JW.org, what is that?

15   A.    It's JehovahWitnesses.org.

16   Q.    Okay.  I appreciate you clarifying that for

17   me.  So that would be your church of choice, your

18   faith choice?

19   A.    Yes.  For the past year now.

20   Q.    Very good.  So we're going back to Exhibit

21   Number 1, which is the job post for the personal

22   classification interviewer or specialist --

23   A.    Uh-huh.

24   Q.    -- that you applied for after you received

25   this email on July 10th, 2014, correct?

34

1    A.    Yes.

2    Q.    What are the essential functions -- don't --

3    strike that question.

4          So I'm clear, what was the application

5    process for getting this next step up at Corrections

6    as a civilian employee?

7    A.    When you go from CT to SCT, it's more of a

8    process because of pay grade than it would be going

9    from an SCT to PCI.

10   Q.    Okay.

11   A.    That's pretty much the case.

12   Q.    You kind of triple-speaked that for me.  So

13   you were going from a senior classification

14   technician to a prisoner classification interviewer,

15   correct?

16   A.    Right.  That's -- now, that's from the

17   records pos -- from the intake position, I should

18   say, over to classification, yes.

19   Q.    Okay.  And did you have to do any kind of

20   interview to get this position?

21   A.    No.

22   Q.    Do you know how many people applied for this

23   position?

24   A.    No.

25   Q.    But what you do know is that you were the

35

1     individual that was hired for this position.

2     A.     Yes.

3     Q.     How many personal classification interviewers

4     are there as civilian employees at Metro

5     Corrections?

6     A.     Believe there's about nine or ten.

7     Q.     Spread across three different shifts?

8     A.     Yes.

9     Q.     And your shifts are?

10    A.     3:00 to 11:00.

11    Q.     And then 11:00 to 7:00 and 7:00 to 3:00?

12    A.     Yes.

13    Q.     So second would be the 11:00 to 7:00

14    position, 11:00 p.m. to 7:00 a.m.?

15    A.     Yes.

16    Q.     And is that the shift that you were working

17    on in November of 2015 when Mr. Troutman passed

18    away?

19    A.     3:00 to 11:00, yes.

20    Q.     You were working 3:00 to 11:00.

21    A.     Yes.

22    Q.     When did you actually move into this prisoner

23    classification interview position after you received

24    the notice that it was open?

25    A.     Believe it took a couple months for them to

1    actually find a replacement for me in intake and

2    release, and because of having to do that first, it

3    took them a little bit.  That's why -- I remember it

4    being early spring of that year, 2015, but exact

5    times I couldn't tell you.

6    Q.    Okay.  What training, additional training, if

7    any, did you receive for this assignment?

8    A.    There was a -- there was about the same as

9    you would going into any position over there, would

10   be another six weeks.  Six months is when we first

11   started.  They have since moved on and from now it's

12   only -- now it's narrowed down big time.  It's no

13   longer six months.  It used to be mandatory six

14   months of training, but now it's more along the

15   lines of six weeks, and that's what it was over

16   there in classification.

17   Q.    So your on-the-job training had shrunken from

18   a six-month time table to a six-week timetable at

19   the time that you were awarded this prisoner

20   classification interview position.

21   A.    Yes.

22   Q.    Who did you work with in that six weeks?

23   A.    It would be Samantha Arriaga was my FTO,

24   which is field training officers, but she's also not

25   an officer, though.  It's just the title when

1    they're training.

2    Q.    She's on the civilian side?

3    A.    Yes.

4    Q.    How long had Samantha been doing that job

5    before she gave you on-the-job training?

6    A.    She had been over there I would almost --

7    yeah, I would say about five years at that point.

8    Q.    Is she still there?

9    A.    She has now moved on to classification

10   supervisor.  So she is no longer a PCI, but she's my

11   boss on 3:00 to 11:00.

12   Q.    Was she your boss also during the time frame

13   that Mr. Troutman took his life?

14   A.    No.

15   Q.    Who was your supervisor then?

16   A.    That would have been -- we didn't have a

17   second shift supervisor.  It would've been direct up

18   to Steve Fleenor, our coordinator, and Martin Baker,

19   our head coordinator.  Any kind of problem that

20   happened that would require them, we would call them

21   on the cell phone.  We didn't have a supervisor at

22   the time.

23   Q.    When you say you would call them on the cell

24   phone, you would call their cell phone?

25   A.    Their cell phone.  They were on call 24/7.

1    Q.    What were the essential functions -- or what

2    are the essential functions of a prison

3    classification interviewer?

4    A.    There's two different sections that we work

5    at on the booking floor.  One's on the booking floor

6    directly at a station, and there's another one in

7    the back office, which is back in rear security,

8    where people who are going to arraignment court are

9    waiting, usually overnight, until they go to

10   arraignment court.

11        If I was out on the booking floor, it would

12   be to once that inmate gets brought into the jail, I

13   would screen them, see if they have any fears for

14   their safety, if they're suicidal, if they have any

15   kind of problems that might hinder them from going

16   into GP, general population.

17        And then go over the PREA question, which is

18   the Prisoner Re -- Prison Rape Elimination Act, and

19   also now an updated version is to sign them up with

20   a Securus telephone to make sure they got a

21   telephone account set up.

22        If I was in the back, it would be getting

23   emails from records, moving people from either H --

24   to HIP, CCC, wherever the judge at that time wanted

25   them to go.

1          And also clearing out rear security of people

2     who are no longer needed for arraignment court and

3     can go up to general population up on the floors.

4     Q.     So when an inmate is going to arraignment,

5     they're kept in a certain holding area that you have

6     to supervise, and then when -- or that you move them

7     to, and then when they're coming back from

8     arraignment, they're in that area, then you have to

9     move them back to wherever they're directed.

10    A.     Yes, but not supervise them.

11    Q.     Not supervise.  My bad.

12    A.     Yeah.  When -- and when I say move them, it's

13    us putting them on the actual move list to go up to

14    that floor.  It's -- once we're done with what we

15    call the move list, we notify the officers and they

16    actually do the physical movement.

17    Q.     You said that you were in charge of screening

18    them for safety and for suicide.  Tell me, Mr. Cox,

19    what particular training you received that would

20    give you the skill set to do that type of screening.

21    A.     Mostly with Samantha it was with -- on the

22    job.  I would sit back and watch her interview.  Any

23    questions, I would ask them.  And every once in a

24    while she would let me do an interview so I get the

25    flow pretty much of how the interview goes.  Once

1    you work up a flow, you can go from there.

2    Interview kind of goes with itself.

3    Q.    What did you learn from Samantha in terms of

4    the types of questions that might elucidate a

5    suicide risk?

6    A.    Wasn't really anything learned from Samantha

7    per se, because once we pull up an inmate to be

8    interviewed, a screen pops up with a checklist of

9    those type of questions.  Do you fear for your

10   safety, yes or no you put in; do you have any

11   enemies, yes or no; any gang affiliation, yes or no.

12         And then the last one would be do you have

13   any feelings of suicidal behavior or harming

14   yourself, yes or no.  And that would be the end of

15   it.  Say they said no, that would be the last

16   question pertaining to suicide.

17   Q.    Did you have any -- strike the question.

18         Did Samantha indicate to you during this

19   on-the-job training whether there were any

20   particular risk factors that an inmate might come

21   into the facility with that might be indicative of

22   suicide even though they might deny that they --

23   they might audibly deny that they weren't suicidal

24   or they didn't have any suicidal ideation or they

25   didn't have any intent to harm themselves?

1    A.    Later on during the -- that was the initial

2    prescreening that we went over those questions with.

3    Later on during the screening is what we call the

4    PREA questionnaire, and a lot of them are our visual

5    cues, do we see anything that would be abnormal, any

6    kind of mental health that you think he needs to be

7    seen by.

8         A lot of -- there has been times where I saw

9    people with deep scars on them that I would refer

10   them to mental health, especially around the arm

11   area.  But other than that, no, no other -- we're to

12   answer those questions once we go to that section in

13   our computer with yes or no.

14   Q.    And would that be true whether you're working

15   the front end on the booking floor or rear security?

16   A.    Rear security would not have anything going

17   on like that.

18   Q.    No questioning of the inmate whatsoever?

19   A.    No.

20   Q.    That's a no, you didn't have any questioning.

21   A.    None -- none at -- none at that time, no.

22   Q.    And when we're talking about at that time, to

23   be clear for the record, what time frame are you

24   using for not at this time?

25   A.    Back in the day, I would say it was -- oh,

1    shoot.  Again, I'd have to get with Baker in order

2    to give you the exact date and time they changed it

3    over.  We would only go through the preinterview,

4    what they call the preinterview, which was basic

5    demographic, statistics, who they want as their

6    emergency contact, where they were born at, how many

7    children they might have, those kind of things.

8         If they were to be arraigned tomorrow, then

9    we would leave the PREA questions for tomorrow, and

10   at that time they would be lined up in the office in

11   the back and brought in during first shift and

12   interviewed back there for the PREA questions.

13        They have since cancelled that, and now

14   everything, the full interview, is done at the front

15   main booking floor and no interviews take place in

16   the back office whatsoever.

17   Q.   Do you know when that policy changed?

18   A.   Exact dates I'd have to get with Martin Baker

19   on.  I'm not exactly sure on that.

20   Q.   So when I'm reading this job post from

21   July 10th, 2014, which is Exhibit Number 1 to your

22   deposition, and it says under Examples of Work you

23   are to interview inmates and assess their

24   behavioral, medical, sociological, psychological,

25   and economic backgrounds to determine their prior

43

1    living quarters within the correctional facility,

2    close quote, do I understand that to mean that it

3    was your job in this interview to determine whether

4    to direct an inmate to mental health because of

5    self-harm, suicide or other concerns, or whether you

6    were to direct an inmate to general population?

7    A.    Yes.  Based on the initial interview we had

8    with them, we would get with mental health.  Say

9    they answered the suicide question with a yes, then

10   we would get with mental health before they are

11   moved off that booking floor.

12   Q.    And your training for that, from what I

13   understand it, is on-the-job training under your

14   then --

15   A.    FTO Samantha Arriaga.

16   Q.    Yes.  Correct?  You didn't get a PowerPoint

17   to review at any time before you did this job?

18   A.    It was more along the lines that checklist.

19   Do you -- what do you do in this situation, show me

20   how you conduct an interview, check it off as they

21   go.

22        MS. NORRIS:  And, Denis, would I be clear

23   that you would have sent us that preinterview

24   checklist in his file, in Mr. Troutman's file?

25   Would that be part of his general file?

1          MR. OGBURN:  I don't know if that's part of

2     his general file or not.

3          MS. NORRIS:  Okay.  Put that on as a request

4     list.  We'll verify, but for the time being put it

5     on as request list.

6     Q.    Okay.  And back to my line of -- my line of

7     thought, Mr. Cox.  So before you took this job on,

8     you didn't see a PowerPoint about jail suicide.

9     A.    No.

10    Q.    You didn't see a PowerPoint about risk

11    factors for jail suicide.

12    A.    No.

13    Q.    You didn't meet with mental health staff and

14    have them give you instruction on what to look for

15    for a potentially suicidal individual.

16    A.    And you're saying prior to my job?

17    Q.    Prior -- yeah, prior to your job.

18    A.    Then that would be no.

19    Q.    Okay.  Then when you started your job, you

20    didn't do any of those things, get a PowerPoint,

21    correct?

22    A.    Right.

23    Q.    You didn't get a manual or booklet about it?

24    A.    I cannot remember a manual or booklet, no.

25    Q.    Okay.  And you weren't instructed by anybody

1   from mental health staff of the high risk factors

2   for jail suicide.

3   A.    No.  That hasn't came about until many -- a

4   year or so later, at least, when they started doing

5   in-service training.

6   Q.    And was that before or after Mr. Troutman's

7   suicide?

8   A.    I can't recollect anything before him.

9   Q.    Thank you, sir.  What is -- it says here that

10  one of your duties under General Supervision is to

11  coordinate inmate movement to and from disciplinary

12  segregation.  Can you tell me what disciplinary

13  segregation is, Mr. Cox?

14  A.    It's -- back at that time it was if anybody

15  was put into any type of disciplinary, if they was

16  wrote up for anything, could be a minor infraction

17  of just horseplay or it could be a major infraction

18  of fighting with the officers.  They were moved to a

19  disciplinary single cell.

20  Q.    And before that inmate was -- and let's --

21  let me -- strike that question.  Let me break this

22  down into a time frame.

23        Mr. Troutman was arrested on November 13th,

24  2015, and he was successful in his suicide on

25  November 24th, 2015.  So keeping that date in mind

1      of his date of suicide, before an inmate was moved

2      to dis -- dis -- sorry, easy for me to say,

3      disciplinary single cell in November of 2015, did

4      you have to take any special measures with respect

5      to that inmate?

6      A.    Are you talking about mental health inmates?

7      Q.    I'm talking about any --

8      A.    Particular about it?

9      Q.    I'm talking about any inmate.

10     A.    Any inmate?  Then, yes, there would be

11     special arrangements made we would notify.  Because

12     of HIPAA laws, we are not privy to what medical has

13     on their file for that inmate.  Diabetics, he might

14     be on a seizure medicine, we don't know, and so we

15     all -- we would notify medical of any kind of

16     problems he would have along that line, our -- that

17     we was moving him, so if he had any problems along

18     that line, they would be able to address it by

19     either, no, we need him down here in a medical

20     single cell or we need to put a watcher on him to

21     make sure he's out -- has eyes on him all the time,

22     one of those things.

23     Q.    So at the time of Mr. Troutman's suicide in

24     November of 2015, do I understand your testimony to

25     be that Mr. Troutman's medical file per se would've

1    been inaccessible to you as the classification

2    interviewer, and you would have to seek input from

3    the medical provider as to what his medical or

4    mental health needs were to know what cell to put

5    him in?

6    A.    And as far as that would go, it would be

7    basically is he clear for general population or is

8    he not clear for general population.  We didn't

9    really get into the necessities of why he would not

10   be clear for general pop.  All we would do is go by

11   what that nurse had put down, and that's how we

12   would go from there.  We would go based on their

13   word.

14   Q.    Right.  So I asked a multifaceted question.

15   I'm going to break it down.

16         You told me that because of HIPAA we are not

17   privy to what medical has on an inmate, correct?

18   A.    Correct.

19   Q.    So at the time of Mr. Troutman's suicide,

20   when you got notification that he was -- he had a

21   disciplinary issue, you would not have had his

22   medical file to know any of his medical or mental

23   health particulars.

24   A.    Not all of it.  Not all of it.  Now,

25   something such as a suicide attempt, where it would

48

1    be deemed where he would be put into special areas

2    of the jail, that we would -- we would be.  Yeah,

3    that we would be.

4    Q.    Okay.  So --

5    A.    I misunderstood you on that.  I apologize.

6    Q.    That's okay.  And I am very impressed with

7    the fact that when you realize that you've made a

8    misstatement, you go back and clear it up so we

9    don't have any confusion.

10          So in this particular case you did, in fact,

11   know that Mr. Troutman had had a prior suicide

12   attempt in the jail, correct?

13   A.    Correct.

14   Q.    So with that knowledge -- or how did you have

15   that knowledge?

16   A.    I can't remember interviewing him on the

17   booking floor, I think my partner did at that time,

18   but I do remember being on the booking floor when he

19   attempted it the first time.  And, of course, with

20   that happening, then classification is notified on

21   what's going on and what to do with him.

22   Q.    And after this first attempt, which was

23   November 13th, 2015, he was directed straight to

24   mental health, correct?

25   A.    Correct.

1    Q.     And at some point he ends back up in general

2    population, correct?

3    A.     Only by release of them.

4    Q.     Medical.

5    A.     Yes.

6    Q.     And at some point you get notification that

7    he has a disciplinary issue.

8    A.     Yes.  Once he was released from medical he --

9    mental health or medical, we try to find him a spot

10   in general population.  Where that spot was was over

11   at our CCC facility on East Chestnut Street, where

12   not even a day had gone by when he had gotten into a

13   fight with another inmate, and so he was brought

14   back over pending disciplinary at that time to the

15   new -- main jail.

16   Q.     Okay.  So we know he's had one suicide

17   attempt, we know that he's had a fight at CCC,

18   you're the prison classification interviewer, you

19   are now charged with putting him someplace, correct?

20   A.     Yes.

21   Q.     And the normal policy and procedure, as I

22   understand it, as you understood it at the time, was

23   to move him to a single cell.

24   A.     Yes.

25   Q.     And at what point in that process do you make

50

1    contact with medical, if you do, to find out if that

2    single cell placement is appropriate?

3    A.    If the notes -- we have notes, which I'm sure

4    you have a copy of.

5    Q.    I don't want to make this a guessing game.

6    Let me see if I can give you a document --

7    A.    Sure.

8    Q.    -- that will help.  Going to give you what

9    I'm marking for purpose of identification as Exhibit

10   Number 4.

11        (Cox Deposition Exhibit 4 was marked for

12   identification and is filed with this transcript.)

13        MS. NORRIS:  Off the record a moment.

14        (Recess from 2:14 p.m. to 2:23 p.m.)

15   BY MS. NORRIS:

16   Q.    Mr. Cox, I did forget to tell you when we

17   started here that any time you need a break or need

18   water, anything like that, I try and be very, very

19   conscientious of what my witness' needs are, but

20   sometimes I get so focused I overlook that, so don't

21   hesitate to ask for a break.  Okay?

22   A.    Okay.

23   Q.    Before we move on to this, one quick

24   question.  You said that when Mr. Troutman made his

25   first suicide attempt on November 13th, 2015, you

1    can't remember if you did the intake interview on

2    him or if you were just there when the incident

3    occurred, correct?

4    A.    Correct.   There's two of us at that time.

5    Q.    Is it possible that he didn't even get to

6    this -- to the point of having an interview?

7    A.    Very possible.

8    Q.    Okay.  Getting ready to show you what I've

9    marked as Exhibit Number 4 to your deposition.

10        MS. NORRIS:  Sorry, Megan.

11   Q.    And this is a document that's titled

12   Troutman, comma, versus Charles Ralph Jr., it has

13   his date of birth and so forth and so on, other

14   identifying information at the top, then it has

15   something called Note Entry and then it's styled

16   Inmate Movement.

17        Can you describe for the record exactly what

18   this exhibit portrays and how it's created and how

19   it's housed in Corrections?

20   A.    The very first note that you see at the

21   bottom of the page --

22   Q.    Yes.

23   A.    -- created by user Vinese Holt, that is --

24   would be the person that screened him at

25   7:00 o'clock.

1    Q.    Okay.

2    A.    It looks like 7:00 a.m.

3    Q.    Okay.

4    A.    And -- yes.  When he came in -- or when I

5    came in to shift at 3:00 p.m., he was already in

6    Hold 2, and that -- at that point is where he tried

7    to hang himself, and that's when the sergeant, Nurse

8    Stith and Denning --

9          THE REPORTER:  I'm sorry.  Sergeant?

10   A.    Sergeant?  I'm not sure who the name of the

11   sergeant was if that's what you're -- I'm sorry.

12   The sergeant and Nurse Stith and Nurse Denning.

13         MS. NORRIS:  That's S-T-I-T-H.

14         THE REPORTER:  Thank you.

15   A.    Determined him to be mental health and also

16   detox.

17   Q.    Would you have been in the vicinity of Hold 2

18   when Mr. Troutman made his first suicide attempt on

19   November 13th, 2015, at 18:06?

20   A.    Yes, it's on the booking floor.

21   Q.    Did you have any -- did you personally

22   observe any of the commotion associated with this

23   first suicide attempt?

24   A.    No.  As far as the desks are situated, I'd

25   have to be standing up to see where he was -- what

53

1    he was doing in there.

2    Q.    I'm going to give you a piece of paper and a

3    pen and ask you if you can sketch out for me the

4    booking floor and where Hold 2 was that Mr. Troutman

5    was held in at this first suicide attempt.

6    A.    (Witness did as requested.)

7    Q.    Would you sign and date that for me, Mr. Cox?

8    A.    Won't be on eBay, would it?  No.

9    Q.    Maybe after this case.  Date it for me,

10   please.

11   A.    Oh, what is today?  Today's the 12th, right?

12         MR. SIMON:  12th.

13   Q.    Yes.  We're going to be talking about this

14   for a few minutes.

15   A.    Sure.  I'm sorry.

16         MS. NORRIS:  So to -- let the record reflect

17   that he's drawn a large square and put some

18   squigglies in it and indicated that was male inmates

19   and female inmates.

20   Q.    Can you describe for the record what the

21   squigglies are intended to --

22   A.    Those are going to be seats for where the

23   male inmates would be sitting at and where the

24   female inmates would be sitting at with a divider in

25   between them.

54

1    Q.    Is it just like a divider that would divide

2    like a secretarial cubicle from another secretarial

3    cubicle?

4    A.    No, this is a stone divider.  The female have

5    their phones on the divider.  It's not -- if you

6    stand up you can see over it, but it's just a

7    divider.

8    Q.    Like a half wall?

9    A.    Yeah.

10   Q.    And does it run the full length of that room?

11   A.    No.  Just the rows that the females are

12   sitting at.

13   Q.    Okay.  And you put yourself as "me" in a

14   little cubicle, it looks like.

15   A.    Yes.

16   Q.    Would --

17   A.    Very end.

18   Q.    Pardon me?

19   A.    At the very end of the cubicles.

20   Q.    How many cubicles were there?

21   A.    There are seven cubicles altogether.

22   Q.    And would each one of those cubicles have a

23   classification interviewer in them?

24   A.    No.  Just the last two --

25   Q.    Okay.

1    A.    -- are designated for us.

2    Q.    And the other ones, what do they do?

3    A.    Four are -- yeah, four and five are medical,

4    and one, two, and three are pretrial.

5    Q.    Would you just write that on there for me?

6    A.    Sure.  And I did not do that.  I did too many

7    lines.

8    Q.    That's okay.

9    A.    Sorry about that.  Six and seven.  One, two,

10   and three pretrial.

11   Q.    And you say those other ones are too many?

12   Too many boxes?

13   A.    Yes.

14         MS. NORRIS:  The witness struck out the

15   superfluous boxes.

16   Q.    And would I be correct in my understanding

17   that you would call the inmate by name and they

18   would come up and they would sit in your cubicle and

19   you would do that interview that you described to

20   us?

21   A.    Yes.

22   Q.    Now, Hold 1, 2, and 3, tell me if that's

23   north, south, east or west side of the jail.

24   A.    From where I'm facing, it's on the left.

25   Q.    So to your left.

1    A.    Yes.

2    Q.    And the hold cells, do they just have one

3    inmate in them at a time?

4    A.    Yes.

5    Q.    And do we know why Mr. Troutman was in a hold

6    cell and not in this general area?

7    A.    No.

8    Q.    What is the configuration of the hold cell,

9    meaning bars, windows, doors?

10   A.    There's no bars.  There is windows and one

11   door leading in and out.  Also bench and a toilet.

12   Q.    Where would the window be in Hold 2?

13   A.    The very front (indicating).

14   Q.    So you marked that on Hold 1, so mark me a

15   window on Hold 2.

16   A.    (Witness did as requested.)

17   Q.    So no bars whatsoever in this holding cell.

18   A.    Right.

19   Q.    How big is the window?

20   A.    Just to give a perspective, it's about the

21   size of that and that one  combined (indicating).

22        MS. NORRIS:  Okay.  Okay.  So we are in the

23   conference -- front conference room at Hummel Coan &

24   Sage, and the witness is indicating that the window

25   in the holding cell number two is the equivalent to

1      the con -- two conference room windows combined, and

2      we will get those dimensions and supply them to the

3      court reporter.

4           Would it be fair to say, then, as you're

5      sitting in cubicle seven, you can see into Hold 2?

6      A.    No, I cannot.

7      Q.    Okay.  Why is that?

8      A.    Sitting down, there's a divider that raises

9      up probably about shoulder length when I'm standing

10     up that blocks my view when I'm sitting down.

11     Q.    Can the inmates that are sit -- that are in

12     the general area see into Hold 2?

13     A.    Yes.

14     Q.    Are there corrections officers that migrate

15     around and kind of keep an eye on the inmates in

16     that general area?

17     A.    In this general area right here and they walk

18     around also (indicating).

19     Q.    And is part of their duty to observe into the

20     holding cells as they pass them?

21     A.    From my understanding, every 15 minutes.

22     Q.    And the windows that we've identified, do

23     they go floor to ceiling or is there a gap between

24     the floor and the bottom end of the window?

25     A.    There's a gap.

1        Q.      How tall -- how far off the floor would you

2    say the window is?

3        A.      I would say about two to three feet.

4        Q.      Do you know who discovered Mr. Troutman in

5    his first suicide attempt?

6        A.      No, I do not.

7        Q.      When he was discovered, do you recall what

8    the response was by Corrections?

9        A.      Officers opened the door and got him down.

10   Got him -- not down, but helped him from what I was

11   hearing.  As far as that, I did not stand up at that

12   point.

13       Q.      Do you know who those officers were?

14       A.      No.

15       Q.      Okay.  We were talking about -- did I give

16   you Cox Exhibit 4?  We'll make this Cox Exhibit 5 to

17   your deposition.

18              MS. NORRIS:  If you put that little --

19       A.      I'm sorry.

20              MS. NORRIS:  -- tag on there.  Thank you.

21       A.      There you go.

22              (Cox Deposition Exhibit 5 was marked for

23   identification and is filed with this transcript.)

24       Q.      We're talking about Cox Exhibit 4, and you

25   were going to walk me through how these entries --

1     well, first of all, how was this document housed?

2     Is it a computer document?

3     A.     Yes.

4     Q.     And who has access to make entries in this

5     computer document?

6     A.     Classification officers and medical.

7     Q.     So medical can access the computer and make a

8     note about Mr. Troutman or a classification officer

9     can access the computer and make a notation about

10    Mr. Troutman, correct?

11    A.     Yes.

12    Q.     Okay.  Do you know who made the note entry at

13    the very top of this that says it's created

14    11-13-2015 at 18:06?

15    A.     11-13 18:06.

16    Q.     The very top entry.

17    A.     Yes.  That was me.

18    Q.     If you were doing your work in cubicle seven

19    when this occurred, how would it be, Mr. Cox, that

20    you would've been called upon to make this entry?

21    A.     Once everything is settled down and they have

22    him secured, that's when either the sergeant or

23    looks like at this point it was Stith and Denning

24    came over back to their seats and let me know that

25    they are moving him to OBS one, he just tried to

1    hang himself, and so that's when I put that note in.

2    Q.    And Nurse Denning and Stith, were they in

3    cubicles four and five?

4    A.    Yes.

5    Q.    You want to write who was who, who was where,

6    if you remember?

7    A.    Not really sure exact position.

8    Q.    If you don't know, just -- just --

9    A.    Not sure about exact position.

10   Q.    -- just identify that Nurse Denning and Stith

11   were occupying medical.

12   A.    (Witness did as requested.)

13   Q.    Now I'm going to give you what I'm marking

14   for purposes of comparing and contrasting Deposition

15   Exhibit Number 6, Mr. Cox.

16         (Cox Deposition Exhibit 6 was marked for

17   identification and is filed with this transcript.)

18   Q.    And you will see that the inmate movement,

19   that top note has changed.  Would you read inmate --

20   no.  Strike that question.

21         Can you tell me, is there any specific

22   importance to this top window on the -- in Exhibit 4

23   you make an entry that Mr. Troutman tried to hang

24   himself in Hold 2, but in Cox Number 6 it has an

25   inmate that he simply has a disciplinary issue and

1     you've notified Nurse Brown.

2     A.     Yes.  In between those notes he had been

3     cleared by our mental health staff for general

4     population.

5     Q.     So from your perspective, once mental health

6     cleared him, this notation as to the first suicide

7     is cleared out of the system.

8     A.     Yes.  As far as movement in the jail.

9     Q.     Okay.

10           MS. O'REILLY:  Can we go off the record?

11           MR. OGBURN:  Yeah.

12           (Off-the-record discussion.)

13    BY MS. NORRIS:

14    Q.     To clear up the confusion, in Cox Number 4

15    and in Cox Number 6, the questioning is focused on

16    the top window called Note Entry.

17    A.     Yes.

18    Q.     Okay?  And it's my understanding from our

19    prior discussion, Mr. Cox, that once Mr. Troutman

20    was cleared by medical, you basically erased this

21    note out of the top window.

22    A.     No, that note stays with them for the rest of

23    the tenure.

24    Q.     Right.  It's down here in the -- in the

25    chronology, but in Cox Number 6 it doesn't reference

62

1    the suicide.  That's what I'm confused about.

2    A.    What it does -- I see what you're saying.

3    I'm sorry.

4    Q.    Okay.

5    A.    Right here is where on 11-13-2015 I put that.

6    Once I click, you can't see it on this paper, but if

7    it was on the computer, you would be able to see a

8    save icon.  It saves it and moves it down there,

9    erasing it altogether and just moving it straight

10   down.

11       Other people have came behind me and started

12   adding their notes up to the point where I did the

13   movement at and then saved it, therefore erasing it

14   from that blank slate again.

15   Q.    Okay.  'Cause -- and here's where I'm

16   confused, and I know you can help me.  You make --

17   on Cox 4 you make the 11-13-15 suicide entry,

18   correct?

19   A.    Uh-huh.

20   Q.    11-13.

21   A.    Yes.

22   Q.    And then on the running chronology

23   underneath, under Inmate Notes we have an 11-17

24   entry about being cleared from detox --

25   A.    Uh-huh.

63

1    Q.    -- at 2:46.  We have another 11-17 entry at

2    8:46 noting that the -- that Mr. Troutman's daughter

3    had called and was asking for his -- for her phone

4    number to be given to the inmate.

5         Then we have an 11-18 entry at 21:37 that

6    says, "Inmate per Officer Barth involved in a verbal

7    altercation with another inmate," which you made

8    that entry.

9         We have an 11-21-15 entry, "Per Lieutenant

10   Fugate, the inmate is receiving a write-up and needs

11   to be moved back to MJC"?

12   A.    Metro Jail Complex.

13   Q.    Okay.  "Placed on ML to passive"?

14   A.    Yes.

15   Q.    Move list to passive?

16   A.    Yes.

17   Q.    Then we have an 11-24 entry at 12:58 that

18   says, "Inmate has a write-up for fighting pending."

19        And then we have the 11-24-15 note at 15:58

20   that says, "Inmate moved to H5D9 pending

21   disciplinary.  Notified Nurse Brown of single cell

22   use and waiting to hear back from the medical on

23   that."

24        So after that long dissertation of what's on

25   this sheet, still your 11-13 note is at the top.

64

1    A.    That's because somebody clicked on it, and

2    that once when they click on that note on the

3    screen, it goes up and highlights itself up here,

4    and they did that whenever they just printed it out.

5    Q.    Okay.  So on -- this was printed on

6    10-11-2017 --

7    A.    Yes.

8    Q.    -- by somebody Durham.

9    A.    Steve Durham.

10   Q.    And who is Steve Durham?

11   A.    Assistant director.

12   Q.    Of the Metro Department of Corrections?

13   A.    Yes.

14   Q.    So when Mr. Durham printed this, he actually

15   clicked on this description --

16   A.    He clicked on it, therefore bringing it up on

17   that.  If he would've clicked on any of the other

18   ones, they would've been up there.

19   Q.    Thank you so much for explaining that to me.

20         And so on 11-24-15, this would've been -- so

21   this Cox Exhibit 6 is the one that's really

22   contemporaneous with your work.  'Cause it's printed

23   on 11-25-15, it shows your last entry before he was

24   put in the single cell and committed suicide.

25   A.    Yes, the very top one.

1    Q.    Okay.  So before our break we were talking

2    about how you had only limited information about Mr.

3    Troutman's medical because of HIPAA requirements,

4    but you did know, obviously, of his suicide attempt

5    on November 13th, 2015.

6    A.    Yes.

7    Q.    You knew it for two reasons.  You knew it

8    because, one, you were there, you witnessed it; you

9    knew it, two, because you put it in classification.

10   A.    Yes.

11   Q.    And number three, if you hadn't done -- been

12   there for one or been there for two to enter it, you

13   would've been able to read this on this running

14   summary as a classification specialist before you

15   did -- took any additional movement or did any

16   additional moves for Mr. -- for Mr. Troutman,

17   correct?

18   A.    Yes.

19   Q.    And as I understand it, Mr. Cox, you rely

20   upon medical to inform you if there's any particular

21   limitations you should be cognizant of regarding

22   where he should be moved or placed, whether it's

23   general population, whether it's a single cell,

24   whether it's a barred single cell, whether it's a

25   medical hold.

```
 1              MS. O'REILLY:  Objection.  Form.  Foundation.
 2      Q.      Let me see if I can cure the question.
 3              Do you rely upon medical to -- strike the
 4      question.  Start over.
 5              You indicate here that you notified Nurse
 6      Brown that Mr. Troutman was going to be moved to
 7      H5D9 pending disciplinary, correct?
 8      A.      Yes.
 9      Q.      Okay.  Question number one:  What is H5D9?
10      A.      Hall of Justice, dorm five -- or floor five,
11      dorm nine.  Was and still is a single cell unit.
12      Q.      With barred windows.
13      A.      Yes.
14      Q.      And why did you notify Nurse Brown of this
15      impending move?
16      A.      In case they had any objection to it.
17      Q.      What might their object -- what -- strike the
18      question.
19              As a classification officer, what objections
20      did you think medical might have or what objections
21      did you consider medical might have with respect to
22      this move?
23      A.      If he needed a watcher for medical reasons,
24      if they wanted him instead in a medical single cell
25      for medical reasons at that time.
```

67

```
 1    Q.    And what prompted your questioning yourself
 2    that he might need a watcher or he might need to go
 3    to medical as opposed to the single cell?
 4    A.    It's a common occurrence in the jail for
 5    stuff like that to happen.  Seizures are a common
 6    thing.  Especially if you look down 11-17-2015, he
 7    was just taken off of detox.  My experience just
 8    taught me that they a lot of time have seizures.
 9          But just out of a general courtesy at the
10    time, we would call them and, "Hey, we're moving
11    him," so they don't lose track of him, in case he's
12    on any type of prescriptions that they need to keep
13    track of.
14    Q.    So would I be clear in my understanding of
15    your answer that your particular concern at that
16    point was a seizure risk and not a suicide risk?
17    A.    Right.
18    Q.    And the reason you didn't consider him a
19    suicide risk at this juncture was why?
20    A.    Because Nurse Temple had cleared him from
21    suicide risk.
22    Q.    After you -- strike the question.
23          Do you know whether you notified Nurse Brown
24    in writing via email or whether you would've
25    telephoned Nurse Brown?
```

1     A.     Telephone.

2     Q.     And was that the general protocol at the

3     time?  Make a call to medical?

4     A.     Yes.

5     Q.     And you spoke specifically to Nurse Brown?

6     A.     Yes.

7     Q.     And you told her specifically, "I have put

8     Inmate Troutman on the move list to go to dorm nine,

9     floor five to a single cell with bars."

10    A.     Yes.

11    Q.     She --

12    A.     Not with the bars part, but just, "We're

13    moving him to a single cell."

14    Q.     Okay.  Do you know as we sit here today,

15    Mr. Cox, whether Nurse Brown would've known when she

16    received that call that H5D9, cell two was a single

17    barred cell?

18    A.     No, I do not.

19    Q.     So of your protocol at this time frame,

20    Mr. Cox, you've called Nurse Brown, you've notified

21    her.  Do you remember what her response was to you?

22    A.     That she will have this information wrote

23    down and given to a charge nurse.

24    Q.     Do you know who the charge nurse was?

25    A.     Not at that time, no.

1    Q.    Do you know who it is as we sit here today?

2    A.    Depending on who was on shift.  They're not

3    all the -- all the time all the same.  They rotate.

4    Q.    Who are the charge nurses with CCS?

5    A.    Right now it would be a Nurse Fares or a

6    Nurse Stone right now, but far as back then --

7    Q.    You don't know?

8    A.    I remember Nurse Schindler was the one I

9    mostly talked to.

10    Q.    Would you have expected Nurse Brown to do as

11    she told you she would do?  That is, take the note

12    down and get it to the charge nurse?

13    A.    Yes.

14    Q.    Do you know, Mr. Cox, whether the CCS shifts

15    were the same as the Corrections shifts and your

16    shifts?  In other words, 7:00 to 3:00, 3:00 to

17    11:00, 11:00 to 7:00?

18    A.    No, I cannot remember when they switched over

19    to 12-hour shifts.

20    Q.    So at some point in your tenure the CCS

21    employees went to 12-hour shifts.

22    A.    Yes.

23    Q.    And do you know what those time spans were?

24    A.    6:00 to 6:00.

25    Q.    6:00 a.m., 6:00 p.m., 6:00 p.m., 6:00 a.m.

1    A.    Yes.

2    Q.    Do you have any -- how long had you known and

3    worked, interfaced with Nurse Brown at the time of

4    Mr. Troutman's suicide?

5    A.    I talked to her on multiple occasions since I

6    started over there, but as far as knowing her, just

7    on a professional level.

8    Q.    Did you find her to be trustworthy?

9    A.    I hadn't had any problems.

10   Q.    In other words, when you gave her

11   information, did you expect her to do her job and

12   pass that information along and do what she said she

13   would do?

14   A.    Yes.

15   Q.    So once you conveyed the information to Nurse

16   Brown, what follow-up do you do or do you expect

17   from medical with respect to the information you

18   have conveyed?

19   A.    If at the time there was a problem with that

20   person going in that particular cell, I would have

21   expected a call back and a notification from

22   somebody saying, "No, don't move him there," and

23   giving me the reason why.

24   Q.    And that call back you would expect from

25   medical, right?

1    A.    Yes.

2    Q.    Would I be clear in my understanding, Mr.

3    Cox, that if you had gotten that call from medical,

4    don't move Mr. Troutman because of A, B or C, you

5    would have followed that directive from medical?

6    A.    Yes.  Movement would've stopped 'til further

7    review could've been done.

8    Q.    I want to make sure I have this absolutely

9    clear in my head, Mr. Cox.  At 15:58 on November

10   24th, 2015, you physically moved Mr. Troutman to

11   H5D9 because of his disciplinary and you

12   simultaneously called Nurse Brown to convey that

13   move to her.

14   A.    Yes.

15   Q.    Mr. Troutman --

16        MR. OGBURN:  Well, let -- can we clarify

17   that?  Because I don't think he --

18        MS. NORRIS:  I will not stand for a speaking

19   objection.  If you would like to go off the record

20   and ask me a question outside in the hall, I would

21   be glad to answer it.

22        MR. OGBURN:  Well, you said physically moved.

23        MS. NORRIS:  Okay.  Then if I can clarify

24   that, I will.

25        MR. OGBURN:  Right.  And he did not

1    physically move him.

2        MS. NORRIS:   Okay.

3    Q.    You didn't physically move him, correct?

4    A.    Correct.

5    Q.    So on 15:58 you put him on the move list and

6    notified Nurse Brown.

7    A.    Yes.

8    Q.    Okay.  Do you know how long it takes once you

9    put an inmate on the move list before a corrections

10   officer comes by and physically takes them from

11   point A to the designated move site?

12   A.    It varies on a day-to-day basis.

13   Q.    Okay.  Did you know how long it took --

14   strike that.

15       Does anybody call you after you make this

16   entry at 15:58 and verify for you Mr. Troutman is

17   now in the single-barred cell?

18   A.    No.

19   Q.    And where was he before you made this

20   notation to move him to H5D9?

21   A.    He was in a general population dorm in rear

22   security.

23   Q.    Pardon me?

24   A.    In rear security.

25   Q.    And what is --

1    A.    Which is in the back of the jail where --

2    what they call fresh arrest, not dressed out,

3    inmates are waiting for arraignment court.  Or if

4    they're brought back over from CCC, which is his

5    case.

6    Q.    And is that a separate cell than the general

7    population?

8    A.    No.  He's in there with 30 other men.

9    Q.    In this secured area in the back.

10    A.    In a dorm, yes.

11    Q.    Is there any record, to your knowledge,

12    Mr. Cox, of how we could time-stamp when he left

13    this rear security and was actually physically moved

14    up to the H5D9 single cell?

15    A.    There is a report in XJail that shows when

16    the transfer was completed.

17    MS. NORRIS:  Denis, I'm going to put this on

18    the request list.  We may have already have this,

19    but if we don't, we'll ask -- we want to highlight

20    that this is a document that we'll need to complete

21    our timeline.

22    Q.    Okay.  So we've already talked to Corrections

23    Officer Miller who accepted Mr. Troutman up on H5D9

24    and put him in the single cell.  He explained to us

25    that he would carry his bedsheets from where he was

1      previously and transport the bedsheets that he had

2      been using up to the single cell.  Is that your

3      understanding as well?

4      A.     As far as that goes, that's the security side

5      of things.  I saw them with bedsheets, but if that's

6      the way they do it, that would be on the officer

7      side.

8      Q.     So between the time that you made the

9      notation on 11-24-15 at 15:58 until 10:47 that

10     night, do I understand, Mr. Cox, that you never

11     heard anything back from medical concerning Mr.

12     Troutman?

13     A.     That'd be correct.

14     Q.     Am I also clear, Mr. Cox, that it would be

15     your understanding that if medical had a concern

16     about Mr. Troutman being an ongoing suicide risk,

17     they should alert you about that so that you can put

18     a stop on the move?

19     A.     Based on past experiences, yes.

20     Q.     And you never heard from the charge nurse to

21     give you any concerns that your placement of Mr.

22     Troutman was inappropriate.

23     A.     Correct.

24     Q.     What about the fact that approximately 11

25     days earlier Mr. Troutman had attempted suicide in

1    holding cell two?  Did that give you any concern?

2    A.    Not once cleared by mental health.

3    Q.    Is that because that's what you're instructed

4    in your training?  That if mental health clears

5    them, you don't have to make further inquiry?

6    A.    We are not mentally health -- mental health-

7    trained on our side, so what they say goes as far as

8    anything mental health.

9    Q.    Did you, in fact, later learn that after your

10   move -- after your placement of Mr. Troutman on the

11   move list and after his move to H5D9, cell two, were

12   you alerted of the fact that Mr. Troutman was

13   successful in his second suicide attempt?

14   A.    Believe it was either the next day or the

15   following.

16   Q.    In other words, you learned about it on the

17   25th or the 26th?

18   A.    Want to say that.  Not really sure exact

19   dates, though.

20   Q.    Is one of the things that could've been done

21   in the situation, if, in fact, a single cell was a

22   proper placement for Mr. Troutman, he could have had

23   a watcher?

24   A.    Yes.

25   Q.    Would you describe for the record what a

1    watcher is?

2    A.    It's a fellow inmate who is a work aide, and

3    what that particular work aide's job is to sit at

4    that door or window, depending on where they're at,

5    and watch to make sure nothing happens physically,

6    medically to that inmate.

7    Q.    Is that --

8    A.    And to alert the officers if something does.

9    Q.    Is that something you could've done without

10   medical instruction?

11   A.    Medical has to instruct that.

12   Q.    Do you know, Mr. Cox, whether there is a

13   policy, procedure or custom and practice that during

14   the holidays watchers should be placed more

15   prominently in the single cell areas?

16   A.    I was not aware of that policy.

17   Q.    In this particular instance, Mr. Cox, what

18   you did was you put him on a move list which

19   triggers the move and you notified medical and you

20   didn't do anything further.

21   A.    Yes.

22   Q.    Has there been a change in the policy with

23   respect to how the sequence of this transaction

24   should occur since Mr. Troutman's death?

25   A.    Is that how it's -- are you saying how it's

1    done?

2    Q.    Let me ask a better question.  Do you know

3    whether since Mr. Troutman's death you as the

4    prisoner classification interviewer has any other

5    duties or clearances that you must receive before

6    you can instigate this move to a single barred cell?

7    A.    Yes.

8    Q.    What are -- what is the difference in this

9    movement procedure since Mr. Troutman's death?

10   A.    One, he would not be put into a single cell

11   for that infraction.  He would be allowed to be on

12   disciplinary, but in general population.

13         And, two, if he had had a prior suicide

14   attempt, he would have an alert put on him and --

15   that stated that he had -- was to have a no bar

16   single cell if at all moved to a single cell.

17   Q.    When did that change come into place?

18   A.    Two to three months after this incident.

19   Q.    And how was that communicated to you?

20   A.    Email.

21   Q.    Do you still have that email?

22   A.    Do not.

23   Q.    Do you know whether your emails are archived

24   for a period of time?

25   A.    That I'm pretty sure they are.  And actually

78

1      I misunderstood the last question.  I do keep most

2      of my classification emails sent to an archive

3      folder I made up, so I should still have that email

4      labeling that from Baker.

5            MS. NORRIS:  That might make our production a

6      little bit easier, Denis, if we can get his

7      classification email folder.

8            Put that on the request list, please.

9            THE REPORTER:  Yes, ma'am.

10     Q.    So after Mr. Troutman committed suicide, you

11     received a communication that said, one, the nature

12     of Mr. Troutman's disciplinary infraction was such

13     that he didn't even need to go into a single cell,

14     correct?

15     A.    It was not labeled with his name on it.  It

16     was just a general email stating the new policy

17     stating that from here on out that only certain

18     disciplinaries would be going into a single cell.

19     Q.    And was that like the level of infraction,

20     meaning how serious it was?

21     A.    Yes.

22     Q.    And what is the lowest level of infraction

23     that puts you in a single cell now?

24     A.    Fighting with an officer.

25     Q.    So fights with another inmate wouldn't put

1    you in a single cell now.

2    A.    No, it would just get you moved to another

3    dorm.

4    Q.    And that policy changed after Mr. Troutman's

5    death.

6    A.    Yes.

7    Q.    Do you believe as we sit here today, Mr. Cox,

8    that that policy was changed as a result of Mr.

9    Troutman's death?

10   A.    Along with many others.

11   Q.    And do you believe, Mr. Cox, as we sit here

12   today that if that policy had been in effect in

13   advance of November 24th, 2015, Mr. Troutman would

14   have been spared the move to the single cell where

15   he was given the opportunity to commit suicide?

16   A.    He would not be put on that move list.

17   Q.    And he would not be put in a single cell

18   where he had the opportunity to --

19   A.    No.

20   Q.    -- commit suicide, correct?

21   A.    Correct.

22   Q.    And likewise, had you heard from medical that

23   they had concerns that because Mr. Troutman was a

24   prior suicide risk, they did not want him to be

25   placed in a single barred cell, you would've

80

1    followed that directive, correct?

2    A.    Yes.

3    Q.    I'm going to show you, Mr. Cox, what I'm

4    identifying as Exhibit Number 7 to your deposition.

5         (Cox Deposition Exhibit 7 was marked for

6    identification and is filed with this transcript.)

7    Q.    And ask you to familiar yourself --

8    familiarize yourself with this document.

9         Have you had the opportunity to complete

10   reviewing that, Mr. Cox?

11   A.    Yes.

12   Q.    Okay.  I want to direct you to the email that

13   is dated Monday, January 13, 2014, at 4:20 p.m.  It

14   was an email from Kyle Ernst.  Can you tell me who

15   Mr. Ernst is?

16   A.    Past coordinator who has since retired.

17   Q.    Coordinator of what?

18   A.    Of classification.

19   Q.    When did he retire?

20   A.    I remember it being about two months after I

21   came on, but I can't remember exact date.

22   Q.    And you said -- so about two months sometime

23   in the spring, summer of 2015?

24   A.    Yes.

25   Q.    It's directed -- or it's carbon copied to

1    William Ashby, Dwayne A. Clark, an Eric Troutman,

2    and Metro Corrections Medical.  So who is William

3    Ashby?

4    A.    At the time I believe he was the captain.

5    Q.    Of Metro Corrections?

6    A.    Yes.

7    Q.    Dwayne Clark?

8    A.    Assistant director.

9    Q.    Of?

10   A.    Corrections.

11   Q.    Eric Troutman?

12   A.    Assistant director of corrections.

13   Q.    And Met -- who is -- who was the Metro

14   Corrections medical provider at that time?

15   A.    That I'm not sure of the exact name of them,

16   but that would've went to every medical staff that

17   comes into the jail.

18   Q.    And this would've been distributed before you

19   started as the classification officer, correct?

20   A.    Yes.

21   Q.    In your opinion -- well, strike the opinion

22   question.

23         As the new classification officer, Mr. Cox,

24   who would've been responsible for disseminating this

25   communication to you?

82

1      A.      I would say an FTO either emailing me --

2      well, no, that would be the only way, emailing me.

3      Q.      In your case your FTO was?

4      A.      Samantha Arriaga.

5      Q.      And who was above her?

6      A.      That would've been Steve Fleenor as

7      supervisor and Kyle Ernst as coordinator.

8      Q.      Can you describe for the record what this

9      staff communication was to -- the staff

10     communication informs you as a corrections

11     classification officer regarding placement in single

12     cells of inmates?

13     A.      That when an officer/sergeant calls us

14     demand -- demanding to have people put into a single

15     cell, this is to be filled out and given to medical.

16     Q.      And when you say "this," are you talking

17     about this --

18     A.      Talking about the --

19     Q.      -- form at the bottom?

20     A.      -- form at the bottom.

21     Q.      Does it inform you, Mr. Cox, that under no

22     circumstances should you put an inmate in a single

23     cell until you have this form completed in its

24     entirety by medical and signed off on as approved by

25     medical staff?

1    A.    Can you say that question one more time,

2    please?

3          MS. NORRIS:  Can you read it back and see

4    if it's clear since he's restudied it?

5          THE REPORTER:  Sure.

6    Q.    And I'll be glad to rephrase it if you don't

7    understand it the second time.

8          (Reporter read from the record as requested.)

9          MS. O'REILLY:  I'm going to object.  Believe

10   that mischaracterizes most of his -- his --

11         MR. OGBURN:  I'm, yeah, objecting as well.  I

12   don't think he said that.

13         MS. NORRIS:  Let me -- let me rephrase, see

14   if I can cure.

15   Q.    Do you understand from this communication,

16   Mr. Cox, that you should identify an inmate that is

17   going to be moved to a single cell, you should

18   identify the reason for the movement, and that you

19   should get a written authority from medical before

20   you make that move to a single cell?

21   A.    When a sergeant calls, yes.

22   Q.    Do you understand that if somebody underneath

23   has -- let me lay a foundation.

24         Is it only a sergeant that can make a

25   directive for single cell transfer?

84

1     A.     Yes, or above.

2     Q.     Okay.  So if a major calls and asks for that,

3     do you not need the form to be filled out?

4     A.     Sergeant or above can make that, yeah.

5     Q.     But if it --

6     A.     They would fill the form out.

7     Q.     Okay.  So the sergeant or above, even though

8     this refers only to a sergeant, and I don't know

9     my --

10    A.     Yes.  Yes.

11    Q.     -- my hierarchy, but sergeant, lieutenant,

12    major, chief --

13    A.     Right.

14    Q.     -- any of those people tell you move Inmate A

15    to a single cell, this form needs to be completed

16    and it needs to be approved by medical.

17    A.     Yes.

18    Q.     And that change was effective January 13,

19    2014, correct?

20    A.     Yes.

21    Q.     Did you ever see this email communication

22    before today's date?

23    A.     No.

24    Q.     If you had been given this email prior to

25    November 24, 2015, would you have moved Mr. Troutman

1      to that single cell without this form being properly

2      completed?

3      A.    Yes.

4      Q.    You would have?

5      A.    Yes.

6      Q.    If you had this email, would you have moved

7      Mr. Troutman to the single barred cell without this

8      form being properly completed?

9      A.    Yes.

10     Q.    Why is that?

11     A.    Was not a sergeant or above moving him to it,

12     it was me.

13     Q.    Explain that to me.

14     A.    It was -- this email states that a sergeant

15     calls you for a single cell, this is to be filled

16     out.  I moved him to a single cell, so that would

17     tell me that, no, this only goes for a sergeant or

18     above.

19     Q.    But to be clear, if we go back to -- if we go

20     back to Cox Exhibit Number 6, right here, Jeffrey

21     Kassinger, K-A-S-S-I-N-G-E-R, made an inmate note

22     that he was written up for fighting.  Who is Jeffrey

23     Kassinger?

24     A.    Disciplinary officer.

25     Q.    Okay.  So was it Jeffrey Kassinger's

1    directive that he be moved to the single cell?

2    A.    No.   It's a classification choice.

3    Q.    Okay.   And you did it because it was a

4    disciplinary.

5    A.    Yes.

6    Q.    And your understanding was the only place to

7    put a disciplinary was in a single cell at that

8    point in time.

9    A.    Yes.

10   Q.    I'm going to show you what I'm going to mark

11   as Exhibit Number 8 to your deposition.

12         (Cox Deposition Exhibit 8 was marked for

13   identification and is filed with this transcript.)

14   Q.    And ask you if you have ever seen this

15   Louisville Metro Department of Corrections policy

16   styled Special Management Unit.

17   A.    Yes.

18   Q.    When did you see this?

19   A.    Part of the paperwork that was gone over when

20   training in classification.

21   Q.    And it says that it supersedes 3-6-2008 and

22   it became effective 4-17-2014.   Do you see those

23   date indicia in this policy?

24   A.    Yes.

25   Q.    Can you tell me, Mr. Cox, how -- well, let's

1        lay some foundation.

2            Are you familiar enough with this policy to

3        speak to it and to compare and contrast it to what

4        might have been in effect in 2008 until this policy

5        was changed effective April 17th, 2014?

6        A.    No.   Prior to 4-17-14 I have no knowledge of

7        what was in it.

8        Q.    I'm a little bit confused because you were

9        hired in '06, correct?

10       A.    Uh-huh.

11       Q.    Yes?

12       A.    Yes.

13       Q.    And I'm assuming when you said this is part

14       of the documentation that you received at your

15       orientation, you would have received the policy that

16       was in effect in 2006, and at some point you

17       would've been supplied the policy change in 2008,

18       and then, in fact, you were given the policy change

19       in April of 2014.  Do I misunderstand that sequence?

20       A.    Yes, I was given this when I came over to

21       classification.  This --

22       Q.    Okay.

23       A.    -- would not have been shown to me while I

24       was an SCT or CT or in intake and release.

25       Q.    Fair enough.  So this would've been the

88

1    policy that you were to have familiarized yourself

2    with when you became the classification officer --

3    A.    Yes.

4    Q.    -- sometime in the spring of 2015.

5    A.    Yes.

6    Q.    And did you, in fact, familiarize yourself

7    with it at that time?

8    A.    Yes.

9    Q.    In this particular exhibit on page 1, it

10   speaks in terms of defining disciplinary

11   segregation, and am I correct in my understanding

12   that that was the type of segregation that Mr.

13   Troutman was being subjected to at the time you made

14   the move?

15   A.    No.  He was in prehearing disciplinary, which

16   was labeled down here as Pre-Hearing Confinement.

17   Q.    Okay.  And the difference between the two is

18   disciplinary segregation requires the inmate to have

19   a full hearing and due process, but prehearing

20   confinement can happen without such a hearing.

21   A.    Yes.

22   Q.    And the protocol at that time under your page

23   2, Roman numeral 6, was that even for prehearing

24   confinement they were supposed to be held in a

25   single cell.

1       A.      Yes.

2       Q.      And to your knowledge, Mr. Cox, are there any

3       single cells over there at the Hall of Justice that

4       do not have bars on them?

5       A.      To my knowledge, no.

6       Q.      So the only place to house him safely without

7       bars would've been in medical?

8               MR. OGBURN:  Objection.  Form.

9       Q.      Would the only place to house him safely

10      without bars in a single cell have been in medical?

11      A.      No.

12      Q.      Where else could you have put him?

13      A.      There are certain floors in the new jail

14      complex that has no bars.  Well, actually all cells,

15      single cells in the new jail complex have no bars.

16      Q.      And can you tell me, Mr. Cox, why he was not

17      directed to the new jail where there would have been

18      no bars and instead was put in the old jail where he

19      had access to bars?

20      A.      They were full.

21      Q.      They were full with -- strike that question.

22              Do you know whether those -- strike that

23      question.  I'm going to draw an objection.

24              Do you know whether in the new jail those

25      single cells that were full, whether those inmates

90

1     in the new jail were suicide risks or had some other

2     medical conditions that mandated that they be in the

3     new jail single cells as opposed to the old jail

4     barred single cells?

5     A.    Without giving a specific number, I know

6     there are certain inmates that had that label put on

7     by medical.

8           MS. NORRIS:  Denis, we are going to need you

9     to produce documentation to show who was being

10    housed in the new jail single cells and what their

11    medical status was or was not at on the date of Mr.

12    Troutman's death.

13          MR. OGBURN:  To the extent they're available,

14    yes.

15          MS. NORRIS:  Thank you.

16          MS. O'REILLY:  Can we take a quick break?

17          MS. NORRIS:  Yes.  Sorry.

18          (Recess from 3:27 p.m. to 3:43 p.m.)

19    BY MS. NORRIS:

20    Q.    Mr. Cox, we were discussing Exhibit Number 8,

21    which is the LMDC policy 3-3.01 regarding Special

22    Management Unit and Security and Control.  Okay?

23    And you said that you received this policy when you

24    were moved to the prisoner classification job,

25    correct?

1   A.    Yes.

2   Q.    And who provided this to you?

3   A.    FTO Samantha Arriaga.

4   Q.    Okay.  And I want to look at page 2 of 7,

5   Roman numeral 7, which talks about protocol.  And

6   would you read that into the record, please?

7   A.    "Segregation housing units shall provide

8   living conditions that approximate those of the

9   general inmate population.  Any exceptions are

10  clearly documented.  Cells/rooms utilized for

11  segregation are single occupancy and permit the

12  inmate assigned to them to converse with and be

13  observed by staff members."

14  Q.    Okay.  Have you been up to the floor and the

15  unit and the cell in which Mr. Troutman committed

16  suicide?

17  A.    No.

18  Q.    You have never been there?

19  A.    Not that particular cell, no.

20  Q.    Have you been in dorm nine and observed --

21  observed the configuration of dorm nine, floor five

22  in cell two where Mr. Troutman was?

23  A.    I'm sure back on the tour that I had when I

24  first started as a CT I was, but it's -- haven't

25  been up there since.

1   Q.    So when you moved Mr. Troutman on that date,

2   did you have any idea whether this particular -- in

3   this particular cell he could be observed by staff?

4   A.    No.

5   Q.    On page 3 of 7 of this policy, subsection C2,

6   do you know whether the XJail record of Mr. Troutman

7   showed the staff member that actually authorized the

8   administrative segregation?

9   A.    That would've been on Exhibit 4, 6, couple

10  other ones where my note was put on there.

11  Q.    Okay.  And you said that Officer Kassinger,

12  is that his name?

13  A.    Kassinger.

14  Q.    Kassinger?

15  A.    Yeah.

16  Q.    Was a disciplinary officer?

17  A.    Yes.

18  Q.    Do you know what his rank was?

19  A.    No, I do not.

20  Q.    Okay.  If his rank had been sergeant or

21  above, would then -- based upon your prior

22  testimony, is that when you believe it would've been

23  triggered that you'd have to have that medical form

24  signed off on?

25  A.    Not sure I put two and two the same.  It

1    wouldn't show up -- disciplinary officer, whoever is

2    designated as the disciplinary officer, once they

3    make the decision whether they're a sergeant or an

4    officer, then that goes, that goes right then and

5    there.

6    Q.    And you don't have to have Exhibit 7 signed

7    off on by medical staff.

8    A.    Never did.  I never did.

9    Q.    You never did in this instance or you never

10   did --

11   A.    In this instance, yes.

12   Q.    And did you ever ask anybody, Mr. Cox, if

13   your understanding of this communication and this

14   form was, in fact, correct?

15   A.    Are we talking about the email --

16   Q.    Yes, the --

17   A.    -- in particular or that specific form?

18   Q.    That form on Exhibit 7.

19   A.    'Cause I never until this day saw this email.

20   Q.    Okay.  I understand.  But you did get the

21   policy and procedure, correct?

22   A.    Right.  And that's when an officer, due to

23   unknown reasons at the time, wants the inmate put

24   into a single cell is what I understood it as.  Not

25   that he has been wrote up for anything, not that he

94

1      is pending anything.  It's for the sergeant's

2      discretion he has to go to a single cell.  Now,

3      disciplinary might come about, but it's not been

4      even hinted on yet.

5      Q.     And are you aware that what I'm going to give

6      to you as Exhibit Number 9 was part and parcel of

7      that policy and procedure?

8      A.     No, I did not.

9      Q.     If you had understood that Exhibit Number 9

10     was part and parcel of that policy, procedure, would

11     it have changed your opinion that medical was not a

12     necessary component -- that a written authorization

13     from medical was a necessary component to receive

14     that -- this Exhibit 9 before you placed Mr.

15     Troutman in the single barred cell?

16            MS. O'REILLY:  Is the document he has the

17     same document that we're all looking at?

18            MR. OGBURN:  No.  I -- I --

19     Q.     Let me see.  Whoops, I'm sorry.  I gave you

20     the wrong one, Mr. Cox.  I apologize.

21     A.     I never saw that before.  That's why I was --

22     I never saw that.

23     Q.     I'm sorry.  I want to give you the correct

24     document.

25            MS. NORRIS:  Can we withdraw that from the

1     record by agreement?

2          MS. O'REILLY:  Oh, yeah.

3          MS. NORRIS:  And I'll re -- I need another

4     exhibit sticker 9.  Thank you, Tracy.  Sorry.

5          (Cox Deposition Exhibit 9 was marked for

6     identification and is filed with this transcript.)

7     Q.    This is the proper Exhibit 9.  My apologies.

8          Were you aware that was part and parcel of

9     that policy and procedure?

10    A.    For that particular -- for that particular

11    instance that Mr. Troutman was in, no.

12    Q.    Okay.  So even knowing that this was an

13    exemplar in -- appended to Exhibit Number 8, you, as

14    we sit here today, do not believe it was incumbent

15    upon you to get written authorization from medical

16    before you moved Mr. Troutman to a single barred

17    cell.

18    A.    No.  Verbal was all we needed, and our past

19    emails or phone calls and -- which would go back to

20    those notes.

21    Q.    And do I understand, not to cover old ground,

22    but to be clear, that after Mr. Troutman's suicide,

23    did you -- were you then required by policy and

24    procedure or custom and practice to ensure that

25    somebody that had a prior suicide attempt was never

1    placed in a single barred cell?

2    A.    Yes.  They would have an alert put on them

3    preventing that, and only a director, assistant

4    director or coordinator can remove that alert.

5    Q.    And who provided you that change in policy?

6    A.    Martin Baker.

7    Q.    And that was in writing, correct, emailed to

8    your attention?

9    A.    Yes.

10   Q.    And how was the medical alert identified for

11   an inmate?

12   A.    Sorry, I don't understand you.

13   Q.    You said that they would have an alert put on

14   them.  Did they wear a bracelet?  Did they --

15   A.    No, it would be an alert in XJail that would

16   flash when you put on their -- in their information

17   and pulled them up that says no bars, single cell.

18   Q.    And that would be an alert that medical would

19   put into the record or just the fact of the prior

20   suicide would trigger that alert?

21   A.    That would be left on no matter if the inmate

22   had not been in ten years or what.  That would

23   always be left on that inmate from prior suicide

24   attempts or from stating to us during prescreening

25   that he was suicidal and getting mental health to

1    move them to a level one observation.  That would be

2    left on him until removed by either Baker or another

3    committee member.

4    Q.    On the correction side.

5    A.    On the correction side.

6    Q.    Not by medical.

7    A.    I think medical is part of that committee.

8    Couldn't tell you who exactly that says, though.

9        MS. NORRIS:  Denis, we would ask that you

10    produce the name of the committee that now oversees

11    the alert system regarding suicide risks.

12    Q.    And I understood you that no matter how many

13    times an inmate might cycle through Louisville Metro

14    Department of Corrections, once that suicide alert

15    is put into your XJail system, it stays there to

16    alert you as a classification officer not to put

17    that inmate in a situation where he might commit

18    suicide, which is in a single barred cell.

19    A.    Yes.

20    Q.    And that cannot be removed except by Baker or

21    by a committee that oversees that.

22    A.    Yes.

23    Q.    And in this instance had that alert been on

24    Mr. Troutman, would you have put him in the single

25    barred cell?

1    A.    No.

2    Q.    I'll show you -- did you recall ever

3    receiving a policy, procedure from Louisville Metro

4    Department of Corrections that was styled Suicide

5    Prevention and Intervention?  Is that a policy you

6    would ever have reviewed?

7    A.    Not that I remember.  I don't remember that.

8    Q.    Were you ever given a policy, procedure

9    styled Classification Assessment?

10   A.    Sounds familiar, but I'd have to see it in

11   order to recognize it.

12   Q.    Do you know off the top of your head whether

13   you had the capacity as a classification officer to

14   override a particular move of an inmate?

15   A.    Depending on the circumstances, yes.

16   Q.    You did have the capacity to do that?

17   A.    Yes.

18   Q.    Did you believe, Mr. Cox, that given Mr.

19   Troutman's prior suicide attempt, did you ever

20   consider to override that decision to put him in a

21   single barred cell?

22   A.    Due to past experiences with Nurse Temple,

23   no.

24   Q.    And why do you say that?

25   A.    'Cause she's always been reliable.

1    Q.    So because Nurse Temple in your opinion had

2    cleared him from suicide watch, you felt that that

3    was --

4    A.    The gospel.

5    Q.    The gospel.  That's a good way of putting it.

6    And how did you develop such a strong sense of trust

7    in Nurse Temple?

8    A.    After little bit of working with them and

9    them helping you out, you helping them out.  She's

10   been there -- she was there a lot longer.  I don't

11   know, pretty sure she's not there no more, but

12   everybody had always talked highly of her.

13   Q.    I'm going to ask you if you know Dustin

14   Miller, Officer Dustin Miller.

15   A.    No.

16   Q.    Do you know Officer Randall Ramey?

17   A.    I've heard of Ramey, but I don't know him.

18   Q.    Have you had any interface with him about

19   this lawsuit?

20   A.    No.

21   Q.    Do you know Clifford Marbrey?

22   A.    No.

23   Q.    Do you know Officer Pierce?

24   A.    No.

25   Q.    Do you know Officer Terry Warden?

100

1    A.    I do.

2    Q.    Do you know him with respect to this incident

3    or just generally?

4    A.    Just general.

5    Q.    Have you had any conversations with him about

6    this incident?

7    A.    No.

8    Q.    Do you know Officer J. Myers?

9    A.    No.

10   Q.    Do you know Sergeant Ernest Goff?

11   A.    Yes.

12   Q.    How do you know Sergeant Goff?

13   A.    It's professional.

14   Q.    Okay.  And we've talked about Nurse Temple

15   and Nurse Brown.  Do you know Dr. Donna Smith?

16   A.    Dr. -- Dr. Smith?

17   Q.    Yes.

18   A.    There's a male -- you say Donna?

19   Q.    Yeah.

20   A.    I know a Dr. Smith that's a -- it's a male,

21   though.  I don't know a Donna Smith, though.

22   Q.    Okay.  Do you know -- I believe you mentioned

23   you know Joseph Schindler.

24   A.    Yes.

25   Q.    And you spoke in terms of Nurse Temple's

1    clearance of Mr. Troutman from suicide watch as

2    being akin to the gospel that you could rely upon,

3    correct?

4    A.    Yes.

5    Q.    How did you feel about Joseph Schindler?

6    A.    Same.  That he -- that he is very well liked

7    there at the jail and can rely on him for a lot of

8    things.

9    Q.    Were you aware of the suicide by Mr. Hindi on

10   10-24-13?

11   A.    No.

12   Q.    Were you aware of a suicide by Mr. Moore on

13   1-4-14?

14   A.    No.

15   Q.    Were you aware of a suicide by Mr. Jonathan

16   Wright on 10-27-14?

17   A.    No.

18   Q.    Were you aware of a suicide by Mr. Franklin

19   Bolton on 2-16 of '15?

20   A.    I had heard about that one.

21   Q.    Were you aware that that was a hanging in a

22   single barred cell on -- in dorm nine, sixth floor,

23   cell one?

24   A.    No, I did not.

25   Q.    Were you aware of the suicide of Mr. Ashby,

1   James Ashby on 10-4-15?

2   A.    No.

3   Q.    Are you aware of any other suicides by

4   inmates by hanging in a single cell that I haven't

5   mentioned in those list of individuals?

6   A.    No.  Really when we get them, we don't see or

7   do anything with that particular person.  Once that

8   happens, all we do is -- we really don't do anything

9   in classification with a person who has committed

10  suicide.  Once that has happened, it's pretty much

11  done with the classification department.  We usually

12  hear it from word of mouth.  Next shift coming in

13  said, hey, such and such did this, that's how we

14  hear.

15  Q.    And I would be clear that after Mr.

16  Troutman's suicide, you did not go up and inspect

17  the site of his suicide and familiarize yourself

18  with it in any way?

19  A.    Correct.

20  Q.    What did you do to prepare for your

21  deposition today?

22  A.    I met with him and --

23  Q.    Him being Mr. Ogburn, your lawyer.

24  A.    Mr. Ogburn.  And came here.

25  Q.    Did you review --

1    A.    I read over my paperwork.

2    Q.    What paperwork did you look over?

3    A.    My PSU investigation.

4    Q.    Your statement?

5    A.    Statement, yes.

6    Q.    Okay.  And that was a sworn statement to

7    Sergeant Callahan?

8    A.    Yes.  I think he's a lieutenant now.

9    Q.    Lieutenant.  Were you ever taught that during

10   the first 24 hours of confinement that there are

11   certain key things that made an individual at a high

12   risk of suicide?

13   A.    I've heard this, but this was way after that

14   fact.

15   Q.    Was after Mr. Troutman's suicide?

16   A.    Yes.

17   Q.    Would I be safe to say that you received

18   perhaps some remedial training on suicide risk?

19   A.    Not remedial.  It was more like mandatory

20   training that everybody went through, that everybody

21   has to do once a year.

22   Q.    Okay.  And you did --

23   A.    And that was added to it.

24   Q.    You did not have that training before his

25   suicide.

104

1    A.    No.

2    Q.    So did you learn after Mr. Troutman's suicide

3    that intoxication and withdrawals created a high

4    risk of suicide?

5    A.    Yes.

6    Q.    Did you learn after Mr. Troutman's suicide

7    that bad news of any kind was a high risk for

8    suicide?

9    A.    Yes.

10   Q.    Did you learn after Mr. Troutman's suicide

11   that persons that were denied parole or did not

12   receive their bond were at a high risk of suicide?

13   A.    That I did not.

14   Q.    Did you learn that persons that are going and

15   coming from court appearances could be at high risk

16   of suicide?

17   A.    No.

18   Q.    Did you learn where an inmate's charges were

19   escalated, for example, sent up to the grand jury,

20   could create a high risk of suicide?

21   A.    No.

22   Q.    Did you learn that where an inmate was

23   involved in stressful situations such as

24   disciplinary actions, that could be a high risk of

25   suicide?

1    A.    No.

2    Q.    If you'll give me an opportunity to talk to

3    my co-counsel, we may be just about finished here,

4    Mr. Cox.

5    A.    Okay.

6          THE REPORTER:  Off the record?

7          MS. NORRIS:  Yes, please.

8          (Recess from 4:05 p.m. to 4:12 p.m.)

9    BY MS. NORRIS:

10   Q.    I just have a brief little follow-up sequence

11   of questions, Mr. Cox, and then we'll be finished.

12         You had actual knowledge of Mr. Troutman's

13   first suicide attempt on 11-13-15 because you were

14   there and you were the classification officer that

15   put the information into the system regarding that

16   first incident.

17   A.    Yes.

18   Q.    And you noted that he was transferred to

19   medical because of that incident, correct?

20   A.    Correct.

21   Q.    And do you believe, did you believe at that

22   time, that a prior suicide attempt was -- and it

23   created an excessive risk to the inmate's health and

24   safety?

25   A.    Let me see if I understand your question

1      here.  Did I believe that since he committed -- or

2      tried to commit suicide on the booking floor, that

3      when he went up for disciplinary and was getting

4      moved to a single cell, did I believe that could

5      harbor a risk of it.

6            Answer would be yes, but at the same time

7      protocol was that you're not mental health, James.

8      Mental health makes that decision.  They're

9      qualified to do that.  It might went through my

10     mind, yes, but at the same time, because they said

11     that he was cleared, he was cleared.

12     Q.    From a -- from your protocol standpoint, but

13     from your gut, did you observe that that could

14     create a risk to put him in a single barred cell?

15     A.    I have that with every single inmate that's

16     mental health or suicidal, like I'll just have a gut

17     reaction, yeah.

18     Q.    That it's a serious risk to their health --

19     A.    Not a --

20     Q.    -- and safety.

21     A.    Not -- like if they're cleared for mental

22     health, because -- I'm not sure I'm getting your

23     question.  Let me see.

24     Q.    I think you understood my question.  I'm

25     talking --

107

1      A.      I'm trying to --

2      Q.      I understand you to say if you got that

3      clearance from mental health, you rely upon that to

4      do your job.

5      A.      Yeah.

6      Q.      But from the personal internal gut reaction,

7      I think I heard you say that you understood placing

8      an inmate with a prior suicide in a single barred

9      cell could be a serious risk.

10     A.      And it wouldn't have mattered.

11     Q.      It wouldn't have mattered, what do you mean?

12     A.      It wouldn't have changed the -- nothing.

13     Having that gut reaction wouldn't have changed

14     anything.

15     Q.      It wouldn't have changed your movement?

16     A.      It wouldn't have changed his placement, no.

17     Q.      Because of what you perceived the protocol to

18     be.

19     A.      They would -- if I had called and said, "Hey,

20     I think this guy's going to commit suicide," they

21     would've came down and evaluated him, but that

22     wouldn't have changed if they put -- just by my word

23     alone, they would not have stopped it.

24     Q.      They, mental health?

25     A.      They, mental health, yes.  They would not

1    have stopped it, they would not have put him into a

2    single cell without any clothing on at that point.

3    Q.     And do you agree with me, Mr. Cox, that a

4    single barred cell with an inmate who possesses a

5    bedsheet is an opportunity for a suicidal inmate to

6    complete that suicide?

7    A.     Yes.

8           THE REPORTER:  Would you like to go off the

9    record?

10          MS. NORRIS:  Yes.

11          (Off-the-record discussion, and Ms. Norris

12   and Mr. Simon left the deposition room momentarily.)

13          MS. NORRIS:  Okay.  I tender the witness.

14   Apologize.

15          MS. O'REILLY:  I have a question, sir.

16                      EXAMINATION

17   By Ms. O'Reilly:

18   Q.     You said a minute ago that Mr. Troutman was

19   cleared by mental health, correct?

20   A.     Correct.

21   Q.     Okay.  However, on November 24th, 2015, you

22   never received confirmation from mental health

23   saying that it was okay with them for you to put him

24   in a single cell with bars, did you?

25   A.     Correct.

109

1    Q.    So you never received that, did you?

2    A.    On November the 24th?

3    Q.    You just answered correct, and I -- I was

4    looking for a yes or no, so -- I think you answered

5    my question, but I just want to make sure the record

6    is clear.  So --

7    A.    Yes, on November the 24th I never received

8    anything from mental health saying that he cannot go

9    or that he was cleared.

10   Q.    Okay.  And you never followed up with mental

11   health that day or with anyone from medical

12   regarding Mr. Troutman, did you?

13   A.    No.

14        MS. O'REILLY:  Okay.  Those are all the

15   questions I have.

16        MS. NORRIS:  Nothing further.

17        MR. OGBURN:  Nothing further.

18        (Deposition concluded at 4:18 p.m.)

19              *              *              *

20

21

22

23

24

25

```
 1        STATE OF KENTUCKY       )
                                  )   SS.
 2        COUNTY OF JEFFERSON     )

 3             I, Tracy P. Lundergan, a Notary Public within

 4        and for the State at Large, my commission as such

 5        expiring 23 January 2021, do hereby certify that the

 6        foregoing deposition of JAMES ALEXANDER COX was

 7        taken before me at the time and place stated and for

 8        the purpose in the caption stated; that the witness

 9        was first duly sworn to tell the truth, the whole

10        truth, and nothing but the truth, that the

11        deposition was reduced by me to shorthand writing in

12        the presence of the witness; that the foregoing is a

13        full, true, and correct transcript of the said

14        deposition so given; that there was no request that

15        the witness read and sign the deposition; that the

16        appearances were as stated in the caption.

17             I further certify that I am neither of counsel

18        nor of kin to any of the parties to this action and

19        am in nowise interested in the outcome of said

20        action.

21             WITNESS my hand this 18th day of December

22        2017.

23                         _____

                           Registered Merit Reporter
24                         KY CCR 20042B070
                           Notary Public, State at Large
25
```