1

1        UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF KENTUCKY

2

3

       STEPHANIE TROUTMAN,          )
4      Administratrix of the        )
       Estate of CHARLES R.         )
5      TROUTMAN, Jr. deceased,      )
                                    )        Case No.
6                    PLAINTIFF      )      3:16-cv-000742-
                                    )           DJH
7      v.                           )
                                    )
8      LOUISVILLE METRO             )
       DEPARTMENT OF CORRECTIONS,   )
9      et al.                       )
                                    )
10                   DEFENDANTS     )

11

12              *              *              *

13

14       The deposition of **TERESA MARIE WALLACE**, taken

15   pursuant to notice by the Plaintiff on February 20,

16   2018, at Simon Law Office, 239 South Fifth Street,

17   Suite 1700, Louisville, Jefferson County, Kentucky.

18

19

20

21           TRACY P. LUNDERGAN, RMR, KY CCR
          McLendon-Kogut Reporting Service, LLC
22              Anchorage Office Plaza
          2525 Nelson Miller Parkway, Suite 204
23            Louisville, Kentucky  40223
                   (502) 585-5634
24          tlundergan@mclendon-kogut.com
               www.mclendon-kogut.com
25

2

1                           C O N T E N T S

                                                              Page
2       Appearances                                              4

3       Examination by Ms. Norris                                5
        Examination by Ms. O'Reilly                            174
4
        Notary Certificate                                     177
5
        Exhibits
6       Wallace Deposition Exhibit 1                            10
        Wallace Deposition Exhibit 2                            34
7       Wallace Deposition Exhibit 3                            42
        Wallace Deposition Exhibit 4                            72
8       Wallace Deposition Exhibit 5                            73
        Wallace Deposition Exhibit 6                            76
9       Wallace Deposition Exhibit 7                            78
        Wallace Deposition Exhibit 8                           105
10      Wallace Deposition Exhibit 9                           116
        Wallace Deposition Exhibit 10                          118
11      Wallace Deposition Exhibit 11                          124
        Wallace Deposition Exhibit 12                          130
12      Wallace Deposition Exhibit 13                          133
        Wallace Deposition Exhibit 14                          136
13      Wallace Deposition Exhibit 15                          137
        Wallace Deposition Exhibit 16                          144
14      Wallace Deposition Exhibit 17                          149
        Wallace Deposition Exhibit 18                          157
15
        Requested Items
16      Nurse Kimberly Brown's training file                   47

17      Mr. Troutman's mortality review file                   47

18      Dr. Donna Smith's training file                        65

19      Examination of her staff meeting notes to              84
        determine whether there were any changes
20      implemented after Mr. Troutman's suicide re
        training regarding suicide prevention
21
        DataTrak that was available to witness on her          89
22      date of hire regarding the quality assurance
        reviews of CCS and that those quality assurance
23      reviews be produced from the date of the first
        one that was conducted after the contract was
24      entered into between LMDC and CCS to any
        quality reviews that were done after
25      Mr. Troutman's death as responsive to item
        number five in the 30(b)(6) deposition

3

| | | |
|---|---|---|
| 1 | Suicide prevention quality studies that have taken place since Mr. Troutman's death | 92 |
| 2 | | |
| 3 | The CQIP policy of 5-23-14 that was in place prior to of Exhibit 9 | 118 |
| 4 | For every policy the witness is questioned about, produce the policy that it revised | 124 |
| 5 | | |
| 6 | Requesting production of the predecessor of Exhibit 12, LMDC policy B-02 of 10-22-2015 dated 5-23-14 | 131 |
| 7 | | |
| 8 | Incident report at corporate relevant to the 11-13 suicide attempt if it exists | 135 |
| 9 | Requesting production of the predecessor of Exhibit 14, LMDC policy C-04, Health Training for Correctional Officers dated 11-17-15 | 136 |
| 10 | | |
| 11 | Email where the witness communicated to corporate the request for a training compliance nurse | 140 |
| 12 | | |
| 13 | Requesting production of the predecessor policy to Exhibit 16 and the subsequent policy to Exhibit 16, LMDC policy E-05, Mental Health Screening and Evaluation | 145 |
| 14 | | |
| 15 | | |
| 16 | Requesting production of the predecessor policy to Exhibit 17 and the subsequent policy to Exhibit 17, LMDC policy G-04, Basic Mental Health Services | 149 |
| 17 | | |
| 18 | Examine witness' records to verify the date that inmate watchers were first utilized | 156 |
| 19 | | |
| 20 | Name of the corporate psychiatrist that does the peer reviews, Damaski or Damosky | 166 |
| 21 | Ask the corporate psychiatrist to produce Dr. Smith's peer review file evaluation that he performed, if such a file exists | 167 |
| 22 | | |
| 23 | | |
| 24 | * * * | |
| 25 | | |

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634

4

```
 1                        APPEARANCES

 2


 3        FOR PLAINTIFF:
          Ms. Christina R. L. Norris
 4        P.O. Box 386
          Prospect, Kentucky  40059
 5        (502) 899-4755
          christina@norrislawky.com
 6        and
          Mr. Larry Simon
 7        Simon Law Office
          239 South Fifth Street, Suite 1700
 8        Louisville, Kentucky  40202
          (502) 589-4566
 9        larrysimonlawoffice@gmail.com

10        FOR DEFENDANT CORRECT CARE SOLUTIONS:
          Ms. Megan P. O'Reilly
11        Blackburn Domene & Burchett PLLC
          614 West Main Street, Suite 3000
12        Louisville, Kentucky  40202
          (502) 584-1600
13        moreilly@bdblawky.com

14        FOR DEFENDANTS LOUISVILLE METRO DEPARTMENT OF
          CORRECTIONS, ET AL:
15        Mr. J. Denis Ogburn
          Assistant Jefferson County Attorney
16        531 Court Place, Suite 900
          Louisville, Kentucky  40202
17        (502) 574-6312
          denis.ogburn@louisvilleky.gov
18

19
                    *              *              *
20

21

22

23

24

25
```

5

1        TERESA MARIE WALLACE, called by the

2    Plaintiff, having been first duly sworn, testified

3    as follows:

4                    EXAMINATION

5    By Ms. Norris:

6            (Deposition commenced at 9:44 a.m.)

7    Q.    Ms. Wallace, my name is Christina Norris, and

8    I am one of the co-counsels that represents the

9    estate of Mr. Charles Troutman who died by hanging

10    in the Louisville Metro Department of Corrections on

11    December 24th, 2015.

12            MR. SIMON:  November.

13            MS. NORRIS:  November.  Thank you.

14    Q.    We are here today to take your deposition,

15    and you have been designated as what we call a Rule

16    30(b)(6) deponent.  Are you aware of that?

17    A.    Yes.

18    Q.    Okay.  Can you state for me what you

19    understand your responsibilities are as a 30(b)(6)

20    deponent?

21    A.    I am to represent Correct Care Solutions.

22    Q.    Okay.  And what have you done with respect to

23    preparations for your 30(b)(6) representation of

24    the -- of Correct Care Solutions?

25    A.    I have reached out to the CCS legal team.  I

6

1     have also reached out to the training -- corporate

2     training -- I'm not exactly sure of her exact title,

3     but she does all the training for Correct Care

4     Solutions.

5     Q.    When you -- when you say you reached out to

6     corporate training, was that at the offices in

7     Nashville?

8     A.    Yes.

9     Q.    And did you get any documents from corporate

10    training to review with respect to this issue?

11    A.    No.

12    Q.    Okay.  You have not reviewed any documents?

13    A.    No.

14    Q.    You have not reviewed any training manuals?

15    A.    No.

16          MR. SIMON:  Uh-huh.

17    Q.    While Mr. Simon is looking for a document for

18    me, let's just go over some basic guidelines, Nurse

19    Wallace.  Okay.

20          MS. O'REILLY:  She's not a nurse.

21    A.    I'm --

22    Q.    Not a nurse.

23    A.    No.

24    Q.    Director of nursing?

25    A.    No.

7

1    Q.    Okay.  What is your -- what is your title?

2    A.    Health Services Administrator.

3    Q.    Okay.  Thank you for helping me out on that.

4    A.    Can I clarify something?

5    Q.    Sure.

6    A.    When you asked if I reviewed documents --

7    Q.    Yes.

8    A.    -- do you mean overall or just that -- when I

9    reached out to training and asked?

10   Q.    Overall.

11   A.    Yes, I have.

12   Q.    Okay.  What documents have you reviewed?

13   A.    I looked over the suicide prevention training

14   that is -- that was done in 2015.  I had provided --

15        MS. O'REILLY:  And you don't need to talk

16   about what we've discussed, either.  That's all

17   confidential.

18   A.    Okay.

19   Q.    You don't talk about what you discussed, but

20   I do need to know what documents you reviewed.

21   A.    It was the suicide prevention.

22   Q.    Okay.  Did you review any other

23   documentation?

24   A.    I'm trying to think.  I looked over -- no.

25   Q.    Okay.  No other policies and procedures?

8

1    A.     I've re -- I know them from prior.

2    Q.     So you're familiar with them -- familiar

3    enough with them to speak on them today.

4    A.     Yes.

5    Q.     Have you ever given your deposition before,

6    Ms. Wallace?

7    A.     No.

8    Q.     I'm sure your attorney has given you a little

9    bit of a primmer on what we're going to do here

10   today, but basically we're going to be -- I'm going

11   to be asking questions for you to provide answers.

12          If you don't understand my question, you

13   simply need to ask me to rephrase it and I'll do my

14   best to rephrase it such that you understand it.  If

15   you don't ask me to rephrase it or if you don't

16   state any misunderstanding as to the question, I

17   will assume that you have understood the question

18   and that your answer is truthful and correct.  Is

19   that fair ground rules?

20   A.     Yes.

21   Q.     Okay.  Also these lawyers spent a lot of time

22   with me over the last couple of months, and when I'm

23   in this seat asking questions, it may take me a long

24   time to formulate a question because I'm thinking

25   about what's in my documents and what you said and

9

1    how those two things might co-exist.

2        So in colloquial conversation we often have a

3    time -- we often try to finish the other person's

4    sentence because we know what the other person is

5    going to say or going to ask.  In this situation I

6    would ask if you would be patient with me and allow

7    me to formulate a complete question before you

8    answer so that the record is -- is very clear of

9    question, answer, question, answer.  Okay?

10   A.    Yes.

11   Q.    And also colloquially we often go uh-huh and

12   uh-uh, so -- or shake our head, so we need an

13   audible answer for the court reporter.  Okay?

14   A.    Okay.

15   Q.    And finally, standard question, have you

16   ingested any medication or anything today that would

17   impair your or cloud your judgment?

18   A.    No.

19   Q.    And finally, we may have a long day.  You are

20   welcome to take breaks at any time.  We probably

21   will break for lunch and come back after lunch, but

22   I often lose track of time sitting in this seat, so

23   please just ask whenever you need a break.  Okay?

24   A.    Okay.

25   Q.    I'm going to mark as Exhibit Number 1 to your

1   deposition the 30(b)(6) notice to take deposition.

2          MS. NORRIS:  Assuming counsel doesn't need

3   copies?

4          MR. OGBURN:  No.

5   Q.     And ask you if you've seen this before.

6   A.     Yes.

7          (Wallace Deposition Exhibit 1 was marked for

8   identification and is filed with this transcript.)

9   Q.     Okay.  Can you point or circle the requests

10  that you are specifically going to address here

11  today?

12  A.     You want me to circle?

13  Q.     Yeah, that's great.

14  A.     (Witness did as requested.)

15         MS. O'REILLY:  And to clarify, I think she's

16  pausing right here regarding number ten, any

17  inspections and investigations for the five years.

18         I just want to put on the record a twofold

19  caveat to this.  First of all, CCS had the contract

20  beginning in December of 2013, so to the extent this

21  information seeks anything before that time period,

22  she will not have any knowledge of that.

23         Secondly, she does not have knowledge

24  regarding any correctional facility in which CCS was

25  the medical provider, she only has knowledge with

1    respect to LMDC.  If that is an issue, we can try to

2    address it with our other corporate representative.

3    Hopefully it won't be, but I -- with that caveat, I

4    think you can circle that one.

5           THE WITNESS:  Okay.  Same with 11?

6           MS. O'REILLY:  Yes.

7           MS. NORRIS:  Same limitations on 30(b)(6)

8    number 11.

9           MS. O'REILLY:  Exactly.

10   Q.    Okay.  Okay.  Could you kindly sign the

11   bottom of that notice here on the front page and

12   date it for me, please?

13   A.    Is today the 20th?

14          MR. OGBURN:  Yes.

15   Q.    Yes, ma'am.  Let's do a little bit more

16   housekeeping, Ms. Wallace.  Would you provide for me

17   your educational background?

18   A.    How far back?

19   Q.    High school on.

20   A.    I went to West Bloomfield High School in

21   Michigan.

22   Q.    Say again?

23   A.    West Bloomfield High School in Michigan.  I

24   went to Oakland Community College and got me -- my

25   associates.  I went to Oakland University -- sor --

1    it was a general associates.  I apologize.

2         At Oakland University I received my

3    bachelor's of science in biochemistry.  And I went

4    to Walsh Business School and received my master's in

5    business administration.

6    Q.    Can you give me some dates that correspond

7    with these degrees?

8    A.    The master's I just finished in 2017.

9    Q.    Is that a two-year master?

10   A.    It was 39 credits.  It took me a little bit

11   longer than two years.

12   Q.    Okay.  And where was that?  Walsh?

13   A.    Yes.

14   Q.    Is that an online?

15   A.    It's online and in -- they have both.

16   Q.    Where is the book -- the -- the bricks and

17   mortar part of this higher education facility?

18   A.    Troy, Michigan.

19   Q.    So would I understand correctly that in

20   certain instances you would have to travel up to

21   Troy, Michigan, to do courses?

22   A.    I started out in -- in the -- the school

23   setting, and then I con -- when I moved down here, I

24   continued online.

25   Q.    And when did you start in the school setting?

13

1    2015 sometime?

2    A.    It was either 2014 or 2015.

3    Q.    Okay.

4    A.    I'm not positive.

5    Q.    And your university BS degree?

6    A.    2010.

7    Q.    And where is that institution located?

8    A.    Rochester, Michigan.

9    Q.    And the community college I'm assuming is

10   also in Rochester?

11   A.    They have multiple locations.

12   Q.    What location did you attend?

13   A.    I attended Union Lake and I also attended --

14   attended Orchard Lake.  Orchard Ridge.  So --

15   Q.    Michigan?

16   A.    -- Orchard Ridge was in Farmington Hills and

17   then the one in Union Lake, Michigan.

18   Q.    Okay.  Would that have been from 2008 to

19   2010?

20   A.    I actually started in 2003.

21   Q.    Okay.

22   A.    While I was in high school.

23   Q.    Okay.  And completed that associate's degree

24   when?

25   A.    2006.

14

1    Q.    Graduated from high school when?

2    A.    2004.

3    Q.    Now let's do the same exercise with regard to

4    your employment history.

5    A.    Dating back 'til?

6    Q.    Looks like you went -- you said you were in

7    high school and attending the community college.

8    You finished your community college degree in 2006,

9    so why don't we start about that -- that time frame

10   there?

11   A.    I worked at Sun Country Tanning until -- I

12   worked there 'til 2012.

13   Q.    Okay.  What did you do there?

14   A.    I was a manager.  And --

15   Q.    Okay.

16   A.    -- then while doing that, I also cleaned

17   houses and baby-sat, paying for school.  And then I

18   worked at Oakland County Sheriff's with Correct Care

19   Solutions.

20   Q.    When did you have that job?

21   A.    I started in 2000 -- it was 2012 as medical

22   records clerk.  And I apologize.  It was not for

23   Correct Care Solutions at the time, it was for the

24   Oakland County Sheriff.

25   Q.    Okay.

15

1    A.    I went to -- I worked at IMS Laboratory.

2    Q.    At the same time or after this?

3    A.    After.

4    Q.    Okay.  So how long did you work as a medical

5    records clerk for the Oakland County Sheriff?

6    A.    About seven months.

7    Q.    Okay.  And you left that position to go to?

8    A.    IMS Laboratory.

9    Q.    And was there any specific reason for your

10   change in employment at that point?

11   A.    I was getting kicked off my parents'

12   insurance and I needed full-time employment.

13   Q.    Okay.  So you would've started that sometime

14   late 2012, early 2013?

15   A.    I must've started that '11.

16   Q.    Okay.

17   A.    'Cause I was there for nine months.

18   Q.    Okay.  I have you at Oakland County Sheriff

19   according to your testimony at 2012.  Is that maybe

20   earlier?

21   A.    It must have been earlier, so maybe 2010.

22   Q.    Okay.  And was that a part-time job while you

23   were continuing your education?

24   A.    Yes.

25   Q.    Okay.  And then how -- you worked at IMS

16

1    Laboratory for nine months, you said?

2    A.    Yes.

3    Q.    And then where did you go from there?

4    A.    I started with Correct Care Solutions at the

5    Oakland County Sheriff's.

6    Q.    Now, to be -- to be clear so I understand,

7    the first time you were at Oakland County Sheriff,

8    was Correct Care Solutions providing contract

9    services at that facility?

10   A.    No.

11   Q.    Okay.  Do you know when Correct Care

12   Solutions began their contract with Oakland County

13   Sheriff?

14   A.    March 1st of 2012.

15   Q.    And would that be the date that you got hired

16   as well?

17   A.    Yes.

18   Q.    And what were you hired in as?

19   A.    Administrative assistant.

20   Q.    Who did you work for?

21   A.    Can you clarify the question?

22   Q.    Who was your direct supervisor?

23   A.    Mark Morrissey.

24   Q.    How do you spell the last name?

25   A.    M-O-R-R-I-S-S-E-Y.

1    Q.    Is he still with Correct Care Solutions --

2    A.    Yes.

3    Q.    -- to your knowledge?

4    A.    Yes.

5    Q.    Okay.  And how long did you continue in this

6    position?

7    A.    Until August 31st of 2015.

8    Q.    Would that have been when you were hired to

9    come work in Louisville Metro Department of

10   Corrections?

11   A.    Yes.

12   Q.    How did it come about that you transitioned

13   from the -- from Michigan to Louisville with Correct

14   Care Solutions?

15   A.    Mark Morrissey transitioned to regional

16   manager and he was over this site.

17   Q.    And to your knowledge, what qualifications

18   did you have that he thought would be beneficial to

19   Louisville Metro Department of Corrections?

20   A.    At the time I was going back for my master's,

21   and I had also worked very closely with him.

22   Q.    And as a regional manager, where was his

23   actual physical location?

24   A.    Can you clarify that?

25   Q.    Did he stay in Michigan?  Did he move to

18

1    Louisville?  Was he in Nashville?

2    A.     Michigan.

3    Q.     And is he still in Michigan?

4    A.     Yes.

5    Q.     Do you know what -- besides the Louisville

6    market, what other markets for CCS he manages?

7    A.     At that time?

8    Q.     Yes, at that time.  When he was regional

9    manager.

10   A.     It was Michigan.  Elkhart.  I think that's

11   Indiana.

12   Q.     Okay.

13   A.     And then Louisville.

14   Q.     And do you have -- do you know whether you

15   have any presence in any other municipalities in

16   Kentucky?  Does CCS have any presence in any other

17   municipal -- municipal institutions in Kentucky like

18   Lexington or Paducah or --

19   A.     They have Marion County and then they have

20   the prisons.

21   Q.     The federal prisons?

22   A.     Yes.

23   Q.     Now, when Mr. Morrissey reached out to you to

24   take a position in Louisville, what exactly were you

25   being transitioned to do here in Louisville?  You

19

1    were his administrative assistant in Oakland, so

2    what were you going to do in Louisville?

3    A.    I was going to be the health services

4    administrator.  And when I worked under him, he was

5    a health services administrator.  He was promoted to

6    regional manager.

7    Q.    Okay.  Can you give me a good detailed job

8    description for your position as a health services

9    administrator?

10   A.    I was to oversee medical, I answered

11   grievances, I answered questions that lawyers had.

12   I -- anytime the director needed anything, I was

13   with the director.  I was to attend meetings, help

14   run the day-to-day operations.  I oversaw payroll, I

15   oversaw medical records, I oversaw mental health.  I

16   administratively oversaw doctors and psychiatrists.

17   Q.    Is that an exhaustive list?

18   A.    I believe so.

19   Q.    Thank you.  When you say you helped the

20   director, that's the director of all medical at LMDC

21   for CCS?

22   A.    That was the director of the facility.

23   Q.    So that would be Director Bolton?

24   A.    Yes.  Anytime he had any questions medically

25   or anything like that, he would come to me.

20

1    Q.    When you say that you answered lawyers'
2    questions, can you just kind of generically tell me
3    what that would be about?
4    A.    He would get letters from lawyers that said
5    their clients would have this, this and this, and I
6    would -- usually they would be filtered through
7    Director Bolton, come down to me.  I'd have to look
8    into it and make sure that the client -- the patient
9    was receiving the care that he should be receiving.
10   Q.    Okay.  So if I can encapsulate that, if any
11   counsel for an inmate wrote the facility to state
12   that their client had particular medical needs,
13   Director Bolton would get that legal concern in your
14   hand, and then you would make sure that those
15   medical needs were met; is that correct?
16   A.    Yes.
17   Q.    What types of meetings did you attend?
18   A.    There was daily briefings, there was --
19   trying to think that far back.  I had a meeting with
20   Director Bolton every week.  Anytime there was -- he
21   had any question, I went up and he would ask me the
22   question.  Any of the senior staff.  We had
23   conference calls that we had to attend through CCS.
24   Q.    What would be the nature of those conference
25   calls?

21

1      A.      It would depend.  We had a regional

2    conference call, we had a regional manager

3    conference call.  Some of it was my training.  I

4    can't remember the other meetings I was at, I'm

5    unsure of.

6      Q.      So I'm clear, the formal meetings you would

7    have would be your daily briefings, correct?

8      A.      Uh-huh.

9      Q.      Yes?

10     A.      Yes.

11     Q.      And weekly meetings with Director Bolton,

12   correct?

13     A.      Yes.

14     Q.      Regional conference calls with CCS.

15     A.      Yes.

16     Q.      And regional manager conference calls with

17   CCS.

18     A.      Yes.

19     Q.      How often would those take place?

20     A.      The regional calls I believe was monthly.

21     Q.      Okay.

22     A.      And the regional manager call was once a week

23   or every other week.

24     Q.      And you would have -- you would be available,

25   I should say, to answer any number of questions that

1      senior staff from LMDC would have --

2      A.      Yes.

3      Q.      -- or Director Bolton.

4      A.      Yes.

5      Q.      And that would be just what we would call ad

6      hoc, as they came in to you.

7      A.      Yes.

8      Q.      What types of topics would you cover at the

9      daily briefing?

10     A.      It would be all the incident reports from the

11     previous day or over the weekend.

12     Q.      And that brings me to another question.  What

13     was your schedule as HSA?

14     A.      Can you clarify?

15     Q.      Did you work a specific shift, like first

16     shift?  Did you work 12 hours?  Did you work seven

17     days a week?  How was your shift structured?

18     A.      Monday through Friday, eight days.  Or,

19     sorry, eight hours.

20     Q.      Eight days.  That would be good.  I need

21     eight days.  And what were the hours?

22     A.      I usually was there from 7:00, 7:00 or --

23     between 7:00 and 9:00 to 5:00 to 6:00 depending on

24     what time I started.

25     Q.      So in the -- in the daily briefings you would

1    cover the incident reports.  Anything else?

2    A.     The count.

3    Q.     Meaning how many people were in medical, how

4    many were in mental health, how many were in general

5    population?

6    A.     It was broken up by kitchen and the different

7    facilities.

8    Q.     Okay.  And did that also include how many

9    would be in OBS one and how many would be --

10   A.     No.

11   Q.     Okay.  Anything else you would cover at these

12   daily briefings?

13   A.     If anything came up during that day, but it

14   was all incident reports.

15   Q.     And when you would go over the incident

16   reports, what would your role be in terms of what

17   the incident report contained or what happened?

18   What would -- what would your role be?  Do you

19   understand?

20   A.     No.

21   Q.     Okay.  That's a bad question.  I'm trying to

22   figure out once you learned about the incident

23   reports and you're in this meeting for a specific

24   reason, I guess 'cause you're the liaison back to

25   CCS to medical, correct?

24

1    A.    Yes.

2    Q.    Between the LMDC and in -- between -- for the

3    inmate population between LMDC and Correct Care

4    Solutions, correct?  You're that liaison?

5    A.    Yes.

6    Q.    Okay.  So when you hear about the certain

7    incident reports, are you given any particular

8    assignments from that daily briefing?

9    A.    If it come -- a medical question comes up, I

10   research it and get back with who -- for whoever

11   asked the question.

12   Q.    And what particular emphasis, if any, is

13   placed on inmates who have suicidal attempts or

14   suicidal ideation in these daily briefings?

15   A.    Can you clarify that?

16   Q.    Bad question.

17        MS. NORRIS:  Read it back, Tracy.  Let me see

18   if I can fix it.

19        THE REPORTER:  Sure.

20        (Reporter read from the record as requested.)

21   Q.    So let me go back.  So if you're in a daily

22   briefing and you've learned about an inmate that's

23   had a suicide attempt, do you have any special --

24   you personally as HSA, do you have any special

25   duties at that point?

25

1    A.    I'm not sure what you mean by duties.

2    Q.    Trying to think of a good -- better word for

3    you.  Do you have any special obligations?  In other

4    words, does LMDC say Inmate X is -- attempted

5    suicide, he's now in observation?

6          Once you receive that information, do you --

7    what's your liaison back to CCS?  Is there anything

8    special you do under those circumstances?

9    A.    Can you clarify that one more time?

10   Q.    I'll try.  If you learn in a daily briefing

11   that you've got a suicidal inmate.  Okay.

12   A.    Uh-huh.

13   Q.    What information, I guess, is important for

14   you to take back to your department, CCS, with

15   respect to that particular inmate?

16   A.    I know what you're trying to ask, but I don't

17   know how to explain it.

18   Q.    Well, if you think you know what I'm trying

19   to ask and -- why don't you explain what you think

20   and we'll -- we'll go at it that way?

21   A.    When there's a -- when there -- the incident

22   report that comes up in briefing has already

23   happened.

24   Q.    Correct.

25   A.    So then we take that and we -- the mental

1    health person who's sitting around that table will

2    take that, and the director or chief of staff or

3    who's ever in there that has a question will ask

4    them specific questions, and then they would answer

5    based on what they did after they found out what

6    happened.

7    Q.    So there's a mental health person at these

8    daily briefings as well.

9    A.    Yes.

10    Q.    And is there a subordinate medical person

11    un -- there as well under you?

12    A.    No.

13    Q.    Okay.  And who typically would be the mental

14    health person at these daily briefings in this time

15    frame?

16    A.    It would vary.  Sometimes it would be either

17    the coordinator or the mental health professional.

18    Q.    And the mental health professional doesn't

19    necessarily mean the psychiatrist, it just is

20    somebody that's a qualified mental health

21    professional with CCS.

22    A.    Correct.

23    Q.    And did the psychiatrist ever attend these

24    meetings?

25    A.    No.

1    Q.    So if there was a mental health issue that

2    needed to be addressed, such as an inmate had

3    attempted suicide, there would be a qualified mental

4    health person at the meeting.  Would my

5    understanding be correct then that it would be the

6    qualified mental health person's duty to make sure

7    that the psychiatrist was aware of the situation

8    that had -- that had occurred?

9    A.    Yes.

10   Q.    And do you ever follow up on that to make

11   sure that the qualified mental health person did, in

12   fact, transmit that information?

13   A.    Yes.

14   Q.    Do you have documentation on how you did your

15   follow-up?

16   A.    No.

17   Q.    How would you do your follow-up generally?

18   A.    I would either look in the chart or I would

19   make a phone call.

20   Q.    And if you made a phone call, would you chart

21   it?

22   A.    No.

23   Q.    You said that you oversaw mental health.

24   Could you describe for me what your particular or --

25   what your particular oversight was for mental

1      health?

2      A.     I would oversee them administratively.

3      Q.     What does that mean?

4      A.     Any issues with payroll, HR.  I was -- sat in

5      on the interview process for hiring.  If they had

6      any -- HR, payroll.  Anything that they needed

7      questions on that I couldn't answer, I would reach

8      out to the home office.

9      Q.     So you also had oversight of the doctors and

10     the psychiatrists.  Can you explain what your

11     oversight was there?

12     A.     Administratively as well.  So it would be HR,

13     payroll, any technical issues.  Any clinical issues

14     they would refer to the corporate office, the

15     corporate doctors.

16     Q.     What type of clinical issues from psychiatry

17     would be routed to the corporate office?

18     A.     If they had clinical questions that they were

19     unsure of, they would -- they have someone over them

20     to reach out for.  So any question that they have,

21     they can reach out to the home office.

22     Q.     Okay.  Can you give me a for example since

23     you're medical and I'm legal and I can't think of

24     what a psychiatrist at an institution might be

25     reaching out to corporate about?

1     A.    I cannot.

2     Q.    Okay.  Would that be a treatment type

3   question?  In other words, we have an inmate X and

4   I'm unsure of Y, can you give me guidance?

5     A.    Any questions they have, they always have the

6   opportunity to ask the home office.  That's what the

7   home office is there for.

8     Q.    And the home office is staffed with a number

9   of physicians and psychiatrists to give those --

10   the boots-on-the-ground people assistance.

11    A.    Yes.

12    Q.    Did you ever attend mortality reviews?

13    A.    Yes.

14    Q.    Okay.  Did you attend the mortality review of

15   Mr. Troutman?

16    A.    Yes.

17    Q.    Who was in that meeting?

18    A.    I do not remember.  I know -- go ahead.

19    Q.    I was going to say, if you can't remember

20   specifically, do you know generally who would attend

21   a mortality review?

22    A.    Yes.

23    Q.    Why don't you tell me that?

24    A.    Senior staff.

25    Q.    And that would be psychiatrists and nur --

30

1     and doctors?

2     A.     LMDC senior staff.

3     Q.     Okay.  Thank you.  That would be Director

4     Bolton, correct?

5     A.     Yes.

6     Q.     Assistant director?

7     A.     Yes.

8     Q.     And who else from senior staff?

9     A.     Deputy director.

10    Q.     Okay.

11    A.     Chief of staff and the major.

12    Q.     Who from the CCS side would attend a

13    mortality review?

14    A.     It would be the director of nursing, the

15    health services administrator, the mental health

16    coordinator, the regional manager, the behavioral

17    health manager, the assistant HSA, the doctor.  Or

18    providers.  So either the doctor or the

19    psychiatrist.

20    Q.     And so I can be clear on this last person,

21    the doctor, the psychiatrist, am I clear that if it

22    were a death that involved a mental health situation

23    like suicide, you would want the psychiatrist there?

24    A.     Sometime it's the doctor as well.

25    Q.     Okay.  Okay.  And what types of deaths would

31

1     the doctor be involved in?  Maybe like a heart

2     attack or purely medical issues?

3     A.     Yes.

4     Q.     Anybody else from the CCS side that would

5     attend these mortality reviews?

6     A.     Sometimes the vice president of jails.

7     Q.     That's a CCS individual?

8     A.     Yes.

9     Q.     Where does that person work?  Out of

10    Nashville or Kansas?

11    A.     Nashville.

12    Q.     You would -- you -- so specifically to Mr.

13    Troutman, you were the HSA that attended his

14    mortality review; is that correct?

15    A.     Yes.

16    Q.     Who -- do you know who the mental health

17    coordinator would've been?

18    A.     Yes.

19    Q.     Who was that?

20    A.     Laura Duke.

21    Q.     Does Laura Duke still work for CCS?

22    A.     No.

23    Q.     Okay.  The regional manager, was that

24    Mr. Morrissey?

25    A.     Yes.

1    Q.    Did he come in for this meeting?

2    A.    I do not remember.

3    Q.    The behavior health manager, who was that?

4    A.    Katherine Brown.

5    Q.    How you spell the last name?

6    A.    B-R-O-W-N.

7    Q.    Any relationship to Kimberly Brown?

8    A.    No.

9    Q.    Who was your assistant HSA?

10   A.    Regina Davis-Reese.

11   Q.    How do you spell the last name?

12   A.    R-E-E-S-E hyphen -- sorry.  Davis first.

13   D-A-V-I-S hyphen R-E-E-S-E.

14   Q.    And do you know if Dr. Smith attended Mr.

15   Troutman's mortality review?

16   A.    No, he did not.

17   Q.    There's a -- there's a female Dr. Smith.

18   A.    She was not there.

19   Q.    Okay.  Do you know what physician or

20   psychiatrist attended his mortality review?

21   A.    No.

22   Q.    Do you remember when his mortality review was

23   held?

24   A.    No.

25   Q.    Is it typically within 28 hours, 48 hours, a

33

1    week?

2    A.     Thirty days.

3    Q.     Can you tell me, Ms. Wallace, what the

4    protocol is for a mortality review?

5    A.     Can you please clarify?

6    Q.     Yes.  What steps do all these individuals

7    take during this mortality review?

8    A.     During the review.

9    Q.     Yes.

10   A.     So when we're all sitting around the table.

11   Q.     Yes.

12   A.     I myself go through the timeline.

13   Q.     Okay.

14   A.     If there's a psychological autopsy, that goes

15   through mental health coordinator.

16   Q.     Okay.

17   A.     And then -- there's a disclaimer right at

18   first, I apologize, and then the timeline.  And

19   then --

20   Q.     What's the disclaimer?

21   A.     That it's confidential.

22   Q.     Okay.

23   A.     There's a whole paragraph that we read.

24   Q.     Okay.

25   A.     And then we go through the timeline and the

1    chart, and then it gets opened up for questions or

2    clarifications.

3    Q.    Would I be correct in my understanding, Ms.

4    Wallace, that each one of these individuals on the

5    CCS side and each one of the individuals on the LMDC

6    side has done some form of due diligence about the

7    particular death and brings that information in the

8    mortality review?

9    A.    Yes.

10   Q.    Okay.  And would I be correct in my

11   understanding that your due diligence would've

12   included a review of the chart and then making a

13   timeline from when the inmate came into the

14   institution 'til the date of death?

15   A.    Yes.

16   Q.    I'm going to show you a document which I will

17   mark as Exhibit Number 2 to your deposition.  Ask

18   you if you recognize that.

19   A.    No.

20         (Wallace Deposition Exhibit 2 was marked for

21   identification and is filed with this transcript.)

22   Q.    Okay.  So that's not a timeline that

23   would've, from your understanding, come into the

24   mortality review of Mr. Troutman.

25   A.    Part of it was.

1    Q.    And Mr. Durham, Steve Durham is the assistant

2    director at LMDC and -- strike that question.

3          This appears to have been created by

4    Lieutenant Nicholas Angelini.  Do you know that

5    person?

6    A.    Yes.

7    Q.    Okay.  And crisis intervention team

8    commander, can you tell me what that role or what

9    that job duty is, to your knowledge?

10   A.    Can you clarify that?

11   Q.    You know -- you know this lieutenant,

12   correct?

13   A.    Yes.

14   Q.    Is his title Crisis Intervention Team

15   Commander?

16   A.    I am not sure.

17   Q.    Okay.  It appears that he created this for

18   Mr. Durham?

19   A.    Going by --

20   Q.    Yes.

21   A.    -- this?

22   Q.    Yes.

23   A.    Yes.

24   Q.    Okay.  And it was created on November 29th,

25   2015?

36

1    A.    That's what it says, yes.

2    Q.    Okay.  Does that refresh your recollection as

3    to whether that's when the mortality review was for

4    Mr. Troutman?

5    A.    I do not know when the mortality review was.

6    Q.    Okay.  Is this the type of timeline document

7    that you would've created from the medical records?

8    A.    This one?  No.

9    Q.    Okay.  Your timeline -- what -- how would --

10    compare and contrast your timeline to this timeline.

11    A.    Mine would be strictly medical.

12    Q.    And would it commence at the date he came

13    into the institution or would it commence at the

14    first contact that medical had with the inmate?

15    A.    It would start with when he was booked in.

16    Q.    In Mr. Troutman's mortality review, what

17    information did Director Bolton bring to the

18    meeting?

19    A.    I do not remember.

20    Q.    And I -- to be clear, I think you answered

21    this question.  You said that the regional manager

22    would sometimes sit in on the mortality reviews, but

23    not all the time, correct?

24    A.    Sometimes they'll call on the phone.

25    Q.    Okay.  But they're always in attendance,

1    either physically or telephonically.

2    A.    Sometimes.

3    Q.    Okay.  But in this particular instance the

4    regional manager did attend, although you can't

5    remember if it was in person or by phone.  What --

6    was there anything particular about this suicide

7    that -- I'm talking about Mr. Troutman's suicide,

8    that prompted the regional manager to attend this

9    mortality review?

10   A.    Can you clarify that again?

11   Q.    Sure.  Was there anything in particular about

12   Mr. Troutman's tenure at the jail or his time in

13   mental health that prompted the regional manager to

14   believe that it was important for him to come to the

15   mortality review for Mr. Troutman?

16   A.    No.

17   Q.    What is the goal of the mortality review from

18   CCS' perspective?

19   A.    We are able to come together and find out if

20   all the care that was needed was provided and if

21   there's any improvements that could be made.

22   Q.    Do you prepare a written report?

23   A.    Yes.

24   Q.    Do you recall as we sit here today,

25   Ms. Wallace, what -- let me strike that question.

1       Let me ask one more -- one more foundation question.

2              With an eye towards this goal, does everybody

3       give input into this first question of whether all

4       of the care that was needed was provided?  Does

5       everybody sitting around this table have input into

6       that issue?

7       A.     Yes.

8       Q.     Okay.  And then with respect to the second

9       prong, whether there are any improvements that can

10      be made, I'm assuming that's in terms of care or

11      response to the situation, does everybody around

12      this table provide input into that issue?

13      A.     Yes.

14      Q.     And are those mortality reviews transcribed

15      or recorded?

16      A.     No.

17      Q.     Is there what we would call a scribe,

18      somebody there taking notes?

19      A.     No.

20      Q.     Do you take notes?

21      A.     No.

22      Q.     Who is then charged with --

23      A.     Can you clarify taking notes?

24      Q.     As I'm sitting here today, I'm taking notes

25      as -- as I'm asking questions and you're answering,

1      I'm taking notes about important things that we're

2      discussing.  That type of note taking.

3      A.    Any notes that are taken in the mortality

4      review are shredded.

5      Q.    Okay.  Why is that?

6      A.    For confidentiality purposes.  In the

7      disclaimer that we read, it says that any notes are

8      collected and shredded at the end.

9      Q.    Okay.  So everybody around this table could

10     be taking notes during this mortality review, and at

11     the end of it, if I understand you, you come up with

12     a consensus with respect to issue A, was all of the

13     proper care provided that was needed, and issue B,

14     whether there are any improvements.

15     A.    Yes.

16     Q.    Okay.  Who is the scribe or the person, the

17     secretary of the meeting, who would at the end of

18     this write out the consensus as to issue one and

19     issue two?

20     A.    Myself.

21     Q.    And do you scribe the answer to these

22     questions right there at the roundtable or do you go

23     back to your office and prepare the report?

24     A.    I go back to my office and prepare the

25     report.

1    Q.    Do you retreat to your office with all of the

2    notes from the table so that you can prepare the

3    consensus and then shred them after that point or do

4    you just have your notes?

5    A.    I collect all the notes and shred them.

6    Q.    But are the notes shredded before or after

7    you create your final report?

8    A.    They're shredded -- when you walk out the

9    door, there's a shred machine there and they get

10   shredded there.

11   Q.    Okay.  But you carry your particular notes

12   back to your office so that you can create this

13   mortality review report?

14   A.    Yes.

15   Q.    Okay.  Then do you keep your notes or do you

16   shred your notes?

17   A.    Shred.

18   Q.    What was the general consensus of the

19   mortality review with respect to issue number one,

20   whether all of the care that was needed was provided

21   to Mr. Troutman?

22   A.    I do not remember.

23   Q.    How long are these mortality reports

24   maintained in the course of business for CCS?

25   A.    I do not know.

1    Q.    Do you remember the outcome of the question

2    of whether any improvements could've been made with

3    respect to Mr. Troutman's situation and his eventual

4    suicide?

5    A.    I do not.

6    Q.    Who would be in custody of these mortality

7    reports?

8    A.    The home office.

9    Q.    Turning to the 30(b)(6) deposition notice,

10   item number three, how education and training of CCS

11   hirees and staff was conducted, to include

12   continuing education for CCS staff and the

13   preparation of any continuing education materials

14   and modules related to jail suicide and prevention.

15        Please tell me, Ms. Wallace, what you know

16   about that particular topic.

17   A.    Can you clarify?

18   Q.    You were called here today to tell us the

19   company's position, the organization's position with

20   respect to how CCS performed its education and

21   training of new hirees and staff.

22   A.    The new hires received by -- received the

23   information, and they were to read it and sign.

24   Q.    Okay.  What information were they to have

25   received?

1      A.     Suicide and risk -- suicide prevention and

2      risk management.  Along with others.

3      Q.     What other things were they to have received

4      and read?

5      A.     The policies and procedures, the medication

6      administration, the harassment in the workplace,

7      PREA, dental.  I know I'm missing one or two, but I

8      can't remember the rest.

9      Q.     Well, this particular request focuses on jail

10     suicide and prevention.  I'm going to show you a

11     document which I am going to mark as Exhibit Number

12     3 to your deposition.

13          MS. NORRIS:  Counsel, I believe you-all have

14     multiple copies of this.

15          (Ms. O'Reilly nodded head.)

16          (Wallace Deposition Exhibit 3 was marked for

17     identification and is filed with this transcript.)

18     Q.     And ask you, is that the training material on

19     Suicide Risk Reduction that the new hires and staff

20     would have received with regard to jail suicide

21     prevention?

22     A.     Yes.

23     Q.     Now, burning question that I have is this

24     talks about -- it was produced by your counsel in

25     response to what the training materials were, and so

1     I'd like a clarification as to why this references

2     Kansas State Board of Nursing Provider Number so and

3     so.

4     A.    I do not know.

5     Q.    Okay.  But we are clear that even though

6     these are -- indicate that they're for relicensing

7     for Kansas State Board of Nursing, these are the

8     materials that you used in Louisville Metro

9     Department of Corrections.

10    A.    Yes.

11    Q.    Can you tell me the essence of those

12    materials?  What is it -- my question being, what is

13    it that you expect your new hires, your medical and

14    your mental health staff, to learn from reading,

15    reviewing, and signing off that they have read these

16    materials?

17    A.    Can you clarify?

18    Q.    Well, you told me that all new hires in terms

19    of training are given certain materials, and right

20    now we're focusing on Exhibit Number 3 --

21    A.    Uh-huh.

22    Q.    -- which is the jail suicide -- can't read

23    upside down.  The Suicide Risk Reduction materials.

24    A.    Yes.

25    Q.    Okay.  I'm presuming that you have some

44

1    expectation that the new hires and the employees

2    gain information from that pamphlet, from that

3    packet of material.

4    A.    Yes.

5    Q.    What is your goal in terms of what you expect

6    the employees and the new hires to gain from this

7    training module?

8    A.    Different ways to reduce the risks of suicide

9    in our jail population.

10   Q.    Is my understanding correct that this is a

11   self-administered education pamphlet of materials?

12   A.    Yes.

13   Q.    How do you test the employee for purposes of

14   proficiency after they have received and signed off

15   that they have read these materials?

16   A.    There is a test that goes along with the

17   pamphlet.

18   Q.    Do you administer that test?

19   A.    No, it goes with the pamphlet.

20   Q.    So in other words, it's a self-test as well?

21   A.    Yes.

22   Q.    Does the employee -- strike that question.

23         Do you then take custody of the test results

24   and review them to ensure to your satisfaction that

25   an employee has read, understood, and can implement

45

1       the information that is contained in that education

2       pamphlet or booklet?  It's more of a booklet.  It is

3       19 pages long.

4       A.    Can you repeat the question?

5            MS. NORRIS:  Can you reread it for me, Tracy?

6            THE REPORTER:  Sure.

7            (Reporter read from the record as requested.)

8       A.    Yes.

9       Q.    Okay.  And where do you maintain those test

10      results?

11      A.    In a training file.

12      Q.    Is a training file separate from the

13      employee's general employment file?

14      A.    Yes.  Can we take a break?

15      Q.    You certainly may.

16      A.    Okay.

17      Q.    I told you to tell me whenever you needed a

18      break.

19           THE REPORTER:  Off the record?

20           MS. NORRIS:  Yes.

21           (Recess from 10:45 a.m. to 10:59 a.m.)

22      BY MS. NORRIS:

23      Q.    Okay.  We are talking about Exhibit Number 3.

24           MS. NORRIS:  And, Tracy, if you will be kind

25      enough to reorient us by reading the last question

46

1      and answer.

2              THE REPORTER:  Sure.

3              (Reporter read from the record as requested.)

4              MS. NORRIS:  And one question before that

5      about proficiency testing.  Or one or two, whenever

6      the proficiency question was.

7              THE REPORTER:  Sure.

8              (Reporter read from the record as requested.)

9      Q.     Okay.  And then I believe you said that you

10     keep those tests in the employee's what was it

11     called?  Testing file?

12     A.     Training.

13     Q.     Training file.  How long do you maintain the

14     training files on the employees?

15     A.     'Til -- while they're with CCS in our

16     facility.

17     Q.     So you're familiar with Nurse Kimberly Brown?

18     A.     Yes.

19     Q.     Okay.  Let me ask you another question.

20     Would I be clear in my understanding, like other

21     professionals, lawyers, doctors, CPAs, that you have

22     continuing training obligations or your employees

23     have continuing training modules that they take

24     throughout their tenure with you?

25     A.     Yes.

47

1    Q.    And how often would they retake the suicide

2    risk reduction training?

3    A.    Yearly.

4    Q.    And would you have a proficient --

5    proficiency test for each year?

6    A.    Yes.

7    Q.    And you said you know Kimberly Brown.

8    A.    Yes.

9    Q.    She's one of your nurses?

10   A.    Yes.

11   Q.    I would like to ask you to produce her

12   training file.  It's a request that we'll figure out

13   amongst ourselves, but it's to keep it in my mind

14   that you have it and I want it.

15   A.    Okay.

16   Q.    Okay.  Likewise I would like you to produce

17   Mr. Troutman's mortality review file.  It's still in

18   existence, correct?

19        MS. O'REILLY:  And we've already objected to

20   that, which is being taken up with the judge, so --

21        MS. NORRIS:  Well, I'm -- are you continuing

22   your objection?

23        MS. O'REILLY:  Oh, yes.

24        MS. NORRIS:  Okay.  Slight -- short break.

25        (Recess from 11:02 a.m. to 11:05 a.m., and

1        Mr. Simon left the deposition momentarily.)

2    BY MS. NORRIS:

3    Q.    Did you review Mr. Troutman's mortality

4    review before you came here today?

5    A.    No.

6    Q.    Okay.  So back to Exhibit Number 3.  If we

7    look at page 4 of Number 3, would I be correct in my

8    understanding, at bottom of page 4 and top of page

9    5, you would expect your nurses and your mental

10   health staff to be familiar with these risk factors

11   for suicide behavior?

12   A.    Yes.

13   Q.    Do you expect your staff to do any

14   independent research or look at any -- any of these

15   resources that are referenced in here?

16        For example, it references the American

17   Correctional Association, the American Psychiatric

18   Association to research outside of this pamphlet to

19   see what these particular institutions or agencies

20   provide or teach with respect to the standards of

21   care.

22   A.    Can you repeat the question?

23   Q.    Do you expect your employees that are being

24   trained under suicide risk prevention, do you expect

25   them to do any independent research, look at any

1   resources that are referenced in here, like the

2   American Psychiatric Association, materials on

3   suicide prevention?

4   A.    No.

5   Q.    Okay.  On page number 6 it talks about

6   identification of persons who might have suicide

7   risk factors.  Do you see that?  It's middle of page

8   6 and top of page 7.

9   A.    Yes.

10  Q.    Okay.  Do you expect your employees who are

11  working with the jail population who take this

12  training to be familiar with all of these risk

13  factors?

14  A.    Yes.

15  Q.    And would I be clear in my understanding that

16  these particular risk factors aren't static, meaning

17  they don't just appear when the inmate is taken --

18  brought in and the intake is done, but these risk

19  factors are transient and stay with the inmate as

20  they move throughout the inmate population?

21  A.    I am not clinically inclined to answer that

22  question.

23  Q.    Let me see if I can phrase it in a way that

24  would be within your realm of knowledge.

25        Did you take this training?

1    A.    Yes.

2    Q.    And having taken this training, what do you

3    understand about these risk factors?  Do you

4    understand that this is a snapshot in time or that

5    these are risk factors that are inherent to the

6    particular individual?

7    A.    My understanding are these risk factors can

8    come at any time.  It depends on the person.  You

9    can't -- you -- it's a case-by-case basis.

10   Q.    On page 7 there's a statement after the risk

11   factors that starts the paragraph, because --

12   "Because jail and prison suicides may also occur

13   after intake, ongoing observation is necessary to

14   prevent suicide at any point during incarceration."

15        Do you agree with that statement?

16   A.    Yes.

17   Q.    Okay.  The following sentence says, quote,

18   once the patient completes the intake process,

19   healthcare staff should remain alert to behavioral

20   indi -- behaviors indicating a possible self-harm

21   episode.

22        Do you agree with that statement?

23   A.    Yes.

24   Q.    We talked earlier, Ms. Wallace, about your

25   job duties, and my understanding is as HSA you're

1   over both nursing and mental health; is that

2   correct?  Your obligations, your oversight

3   obligations go to both types of professionals.

4   A.    Yes.

5   Q.    At the Louisville Metro Department of

6   Corrections, is there a black line distinction

7   between what the nurses' duties are versus what the

8   mental health duties are?

9   A.    What do you mean?

10  Q.    Is there a specific distinction as to what

11  particular things a nurse is supposed to take care

12  of in a given day and what specific things mental

13  health is supposed to take care of in a given day?

14  A.    Yes.

15  Q.    Okay.  Do those two disciplines, nursing and

16  mental health, ever cross over?

17  A.    Yes.

18  Q.    Okay.  And how do they cross over?

19  A.    What do you mean?

20  Q.    In terms of what duties they perform at the

21  facility.

22  A.    Mental health is there only until a certain

23  period of time.

24  Q.    Okay.

25  A.    So nursing can go and assess those patients.

1    Q.    And when does mental health leave for the

2    day?

3    A.    11:30.

4    Q.    P.m.?

5    A.    Yes.

6    Q.    And would I be correct in my understanding,

7    then, after 11:30 p.m. the nursing staff picks up

8    the job duties that mental health would normally be

9    doing throughout the facility?

10         MS. O'REILLY:  Objection.

11   A.    I was going to say, can you clarify that?

12   Q.    Would I be correct in my understanding that

13   once mental health is gone for the day, for example,

14   if a particular inmate needed ongoing observation

15   and mental health is not in the facility, would it

16   be the nurse's responsibility to ensure that there

17   was ongoing observation for a particular inmate?

18   A.    Nurses don't -- nurses can place people --

19   patients on observations, but they don't sit and

20   observe them.

21   Q.    Okay.  So following along the training that

22   we have here, would I be correct in my understanding

23   that it is just as much a nurse's responsibility

24   after intake to provide ongoing observations for the

25   inmates and to remain alert of -- to behaviors that

```
 1    might indicate suicide, that's just as much of a
 2    responsibility of a nurse as it is a mental health
 3    individual?
 4         MS. O'REILLY:  Objection.  Form.
 5    A.    I'm not sure what you mean by ongoing
 6    observation.
 7    Q.    Okay.  Well, we both -- you agreed with me
 8    that -- you agree with the statement that because
 9    jail and prison suicide may also occur after intake,
10    ongoing observation is necessary to prevent suicide
11    at any point during incarceration, and that once a
12    patient completes intake, the healthcare staff
13    should remain alert to behaviors indicating a
14    possible self-harm episode.
15         You agree with those statements.
16    A.    Correct.
17    Q.    And those directives, this teaching tool, is
18    just as important for nurses as it is for mental
19    health, qualified mental health professionals.
20         MS. O'REILLY:  Same objection.
21    A.    Can you rephrase -- rephrase that?
22    Q.    Is this teaching from your materials that you
23    give your nurses and your qualified -- let me -- let
24    me lay a foundation.
25         Do the nurses take this training?
```

54

1    A.    Yes.

2    Q.    Okay.  And qualified mental health

3    professionals take this training.

4    A.    Yes.

5    Q.    And they're both assessed as to their

6    proficiency with regard to this training.

7    A.    Yes.

8    Q.    Okay.  So my -- if I am a nurse and I am

9    learning that this is -- that there's an ongoing

10   observation of inmates required of me, and that I as

11   healthcare staff must remain alert to behaviors

12   indicating a possible self-harm episode, that is not

13   specific to just qualified mental health

14   professionals; isn't that true?

15   A.    Correct.

16   Q.    Okay.  Nurses need to take this

17   responsibility on as well; isn't that true?

18   A.    Yes.

19         MS. O'REILLY:  Objection.

20   Q.    Okay.  I'd like you to look at the factors

21   underneath that general statement, factors one

22   through 14 on page 7 of Exhibit Number 3, and

23   familiarize yourself with those statements.  Are you

24   familiar?

25   A.    Yes.

1    Q.    Okay.  Do you expect your nurses as well as

2    your mental health people to be and understand these

3    14 factors?

4    A.    Yes.

5    Q.    And am I clear that if a nurse observed or

6    experienced any of these issues in one through 14,

7    that that nurse has as much responsibility to report

8    that inmate to mental health as a mental health

9    professional would?

10         MS. O'REILLY:  Objection.  Form.  Foundation.

11   A.    What do you mean by report?

12   Q.    If a -- if a nurse observes an inmate with

13   any of the risk criteria, how would that nurse make

14   sure that that inmate was safe?

15   A.    They can either bring them down to the

16   observation, they can call the mental health

17   professional and ask what to do, I have this

18   situation, what do -- what do I need to do.  We do

19   have mental health on call.

20   Q.    It says, "Health care staff that identifies

21   an 'at-risk' patient should follow the established

22   procedure for referral."

23         What is the established procedure for

24   referral?

25   A.    We have a referral that they can -- that is

1    generated in our medical record chart that goes to

2    mental health and they are scheduled based on the

3    referral they can do.   There's different categories

4    of it.

5         They can also -- if mental health is there,

6    they can call and say, "Hey, I've put in this

7    referral, I need this patient seen."

8         And then they usually -- they can -- they

9    send an email as well.  And, of course, they chart

10   in their -- the patient's chart.

11   Q.    On page 9 of your training materials,

12   Ms. Wallace, it talks about housing and monitoring.

13   What do you understand -- or what do you teach your

14   staff about housing and monitoring persons with --

15   who have indicia of suicide risk?

16   A.    The new hires actually shadow a nurse.

17   They're with a nurse for anywhere from four to six

18   weeks getting on-the-job training.

19   Q.    Do the nurses also shadow mental health?

20   A.    No.

21   Q.    Okay.  Do they shadow nurses after -- in the

22   time frame when mental health wouldn't be there so

23   they would know how to handle a mental health

24   situation in mental health absence?

25   A.    Yes.

57

```
 1      Q.    What are you taught with respo -- with re --
 2   strike the question.
 3          What is taught with respect to training in
 4   placement of prior suicidal inmates into single
 5   cells with bars?
 6      A.    Can you say the question again?
 7          MS. NORRIS:  Can you read it back, Tracy,
 8   please?
 9          THE REPORTER:  Sure.
10          (Reporter read from the record as requested.)
11      A.    Can you clarify that?
12      Q.    Well, let me ask you, do you have any
13   training for your nurses and mental health
14   professionals as to any restrictions, if there are
15   any, about placing inmates who were previously
16   suicidal into single cells that have bars?
17      A.    Yes.
18      Q.    What is that training?  And let's be
19   specific.  What was that training in 2015, if you
20   recall?
21      A.    Anytime anyone is placed in a single cell,
22   they have to call the charge nurse and get
23   clearance.
24      Q.    What -- this is going to be a -- 'cause I
25   don't know -- it's going to a multifaceted question
```

58

1    so you can -- you can focus me a little bit.

2         Do you have a policy and procedure, a

3    protocol, or do you provide training on the

4    communication between LMDC and your medical staff

5    when they receive a call about a prior suicidal

6    inmate who is going to be placed in a single cell?

7    A.    Okay.  Clarify that question.

8    Q.    A long question.

9    A.    Yes.

10   Q.    Okay.  So you just told me that anytime

11   anyone is to be placed in a single cell if they were

12   previously suicidal, correct?  That they need to

13   call the charge nurse and get clearance.  Right?

14   A.    Correct.

15   Q.    Am I to understand that correctly?  Okay.

16        Maybe an easier question is how is that

17   communication to take place or how is it to be

18   documented, how are you to ensure that that request

19   from corrections gets properly routed to -- is it

20   the charge nurse?

21   A.    It's practice that classification calls the

22   charge nurse.

23   Q.    So I understand, is the charge nurse -- does

24   the charge nurse have a specific office and hotline

25   or some kind of direct line that corrections would

1    have so that they could ensure that this question is

2    properly routed to that person?

3    A.    No, they do not have an office.

4    Q.    Okay.  So where would that call come?

5    A.    The nurse's station.

6    Q.    Is there a particular nurse who is to staff

7    the nurse's station at all time?

8    A.    No.

9    Q.    So if there's no one staffing this phone,

10   does it roll over into a voice mail?

11   A.    No.

12   Q.    If there's no one staffing this phone and

13   corrections is in the process of moving a prior

14   suicidal inmate to a single barred cell, how do --

15   how does medical ensure that the communication gets

16   to the charge nurse so the charge nurse can make the

17   assessment and make the decision about that

18   placement?

19   A.    They can call management or there's a nurse

20   at the nurse's station that answers and takes a

21   message.

22   Q.    What training do the nursing staff have or

23   does a nursing staff have with respect to when they

24   receive these calls about placement of a prior

25   suicidal inmate into a single barred cell?  Do they

60

1   have any training about the urgency of those types

2   of communications?

3   A.      I'm sorry.  Say that question again.

4   Q.      It's a bad question.  Hard question to ask.

5           Okay.  Does the nurse -- or does your nursing

6   staff have any particularized training or do you

7   have a policy and procedure that says when you

8   receive a call from classification regarding

9   placement of a prior suicidal inmate into a single

10  barred cell, you should do ABC within XYZ time?

11  A.      It's standard practice.

12  Q.      What is the standard practice?

13  A.      That they locate the charge nurse to get the

14  single cell clearance.

15  Q.      Can you tell me if there -- you say it's

16  standard practice that when a call comes in from

17  classification on this issue that we've been

18  discussing, that the nurse is to locate the charge

19  nurse to get the single cell clear -- single cell --

20  single cell clearance, correct?

21  A.      Yes.

22  Q.      Okay.  And is there a time frame within which

23  you would expect your nurse who takes that call to

24  locate and inform the charge nurse?

25  A.      Say that one more time.

61

```
 1              MS. NORRIS:  Can you read back the question?
 2              THE REPORTER:  Sure.
 3              (Reporter read from the record as requested.)
 4    A.    That I expect?
 5    Q.    Uh-huh.
 6    A.    As soon as they locate the charge nurse.
 7    Q.    Let me see if I can make a clearer question.
 8              Is this considered an important communication
 9    from corrections?
10    A.    Yes.
11    Q.    Is this considered a communication that
12    requires immediate attention?
13    A.    Yes.
14    Q.    So would I be correct in my understanding
15    that if the nurse takes a call from classification
16    that we are moving Inmate X to a single barred cell,
17    he was previously on your unit, he was previously
18    suicidal, you would expect that nurse to immediately
19    find the charge nurse to report back to
20    classification whether that inmate could, in fact,
21    be moved to that situation?
22              MS. O'REILLY:  Objection.  Form.
23    A.    Can you rephrase the question?
24              MS. NORRIS:  Can you reread the question,
25    please?
```

62

1          THE REPORTER:  Sure.

2          (Reporter read from the record as requested.)

3          MS. O'REILLY:  Same objection.

4    Q.    Do you understand the question now?

5    A.    Yes, but is -- can you --

6    Q.    I don't know how much more clear I can be.

7    A.    I'm sorry.  Read that one more time.

8          THE REPORTER:  Sure.

9          (Reporter read from the record as requested.)

10   A.    Yes, as long as there's not an emergency

11   going on.

12   Q.    And we have some policies and procedures that

13   were provided to us by CCS.  Do you know whether

14   that information, what you call the standard

15   practice, is what I'll call codified in a policy and

16   procedure of CCS?

17   A.    Not to my knowledge, no.

18   Q.    Okay.  But that is something they're trained

19   upon?

20   A.    On-the-job training, yes.

21   Q.    It's on-the-job training.  Okay.  Not

22   something I find in here, in Exhibit Number 3, but

23   something you expect a nurse to get on the job.

24   A.    Yes.

25   Q.    To understand and appreciate that these are

63

1    very important calls.

2    A.    Yes.

3    Q.    That require immediate attention.

4    A.    Yes.

5    Q.    Are you -- do your training materials also

6    address for your medical staff the situation that

7    suicidal inmates can deny suicidal ideation but

8    still have risk factors?

9         In other words -- let me see if I can state

10   it more simply.  Do your nurses or your medical

11   staff receive training that just because an inmate

12   denies suicidal ideation, that does not necessarily

13   mean it's an all clear for that inmate?

14   A.    It's based on their nursing judgment.

15   Q.    Okay.  And what factors would you expect the

16   nurse to take into consideration within their

17   nursing judgment to assess whether an inmate that's

18   denying suicidal ideation is, in fact, all clear or

19   does, in fact, continue to have ongoing risk?

20        MS. O'REILLY:  Objection.

21   A.    That again would be the nurse's judgment.

22   Q.    Okay.  Are your -- is your medical staff

23   trained about whether inmates who have a prior

24   suicide attempt in the facility is more at risk for

25   a subsequent suicide attempt?

64

1          THE WITNESSS:  Can you repeat the question,

2     please?

3          THE REPORTER:  Sure.

4          (Reporter read from the record as requested.)

5     A.    Yes, it's --

6     Q.    Yes, they are trained that?

7     A.    Yes.

8     Q.    And are -- is the medical staff then trained

9     that the individual that has a prior suicide attempt

10    that is more at risk as a subsequent suicide attempt

11    should have more observation than just an inmate

12    that's going into general population?

13         MS. O'REILLY:  Objection.

14    A.    Say that again.

15    Q.    Are your -- is your nursing staff trained --

16    or your medical staff.  I shouldn't say nursing,

17    because you're over both, medical and mental health.

18         Is your medical staff trained that an

19    individual that has a prior suicide attempt that is

20    at risk for -- that is at a higher risk for

21    subsequent suicide attempt should have closer

22    observation once placed in the general population?

23    A.    It's based on an individual basis.  It's

24    what's ordered.

25    Q.    Okay.  What's ordered by whom?

1    A.    It would be by the psychiatrist.

2    Q.    Do your psychiatrists and physicians

3    participate in any -- in this particular training as

4    provided in Exhibit 3?

5    A.    Yes.

6    Q.    So they also have a training file in your

7    department?

8    A.    Yes.

9    Q.    Okay.  I'd like you to produce Dr. Smith's,

10   the female Dr. Smith, whose first name Donna Smith,

11   Dr. Donna Smith's training file, please.

12         On page 14 of your training materials in

13   Exhibit 3, you -- there are listed a number of

14   factors that an author by the name of Hayes provides

15   as guiding principles for suicide risk reduction.

16   And it says, (Reading) These principles are relevant

17   in correctional healthcare safety.

18         I'd like you to read through these risks --

19   or this -- this -- these principles of suicide risk

20   reduction and -- strike that question.

21         With respect to these -- this list of suicide

22   risk reduction factors, do you expect all of your

23   medical staff to be aware of these guiding

24   principles?

25   A.    Clarification, please.

1    Q.    Your medical staff, your nurses, your mental

2    health, qualified mental health persons, your

3    doctors, your psychiatrists that take this

4    training --

5    A.    Uh-huh.

6    Q.    -- module, do you expect them to have an

7    ongoing familiarity with these guiding principles

8    for suicide risk reduction?

9    A.    Yes.

10   Q.    In particularly, I'm looking at factor one,

11   two, three, four, five, six down, (Reading) Do not

12   rely exclusively on the patient's denial of suicidal

13   feelings, as they might not tell you the truth about

14   their feelings.  Be inquisitive and invite

15   conversation about the topic.

16         Do you agree that that's an important guiding

17   principle for suicide risk reduction?

18   A.    That would be up to the nurse's judgment.

19   Q.    Right.  But it's an -- it's a principle that

20   should be followed whether it's a principle they're

21   trained on.

22         MS. O'REILLY:  Objection.  Form.

23   A.    It would be up to the nurse's judgment --

24   Q.    I understand --

25   A.    -- qualified mental health or a psychiatrist.

67

 1     Q.    I'm not asking -- I'm not asking you a

 2     judgment question.  I'm asking whether it's --

 3     whether you believe it's important for your medical

 4     staff to know this guiding principle and to adhere

 5     to it.

 6     A.    Yes, but, again, that would be on the

 7     judgment of who's examining them.

 8     Q.    Okay.  We were looking at your education and

 9     training on jail suicide prevention.  We've gone

10     over Exhibit Number 3 very thoroughly.  Are there

11     any other training modules on suicide, jail suicide

12     and prevention?

13     A.    No.

14     Q.    Okay.  'Cause I'm -- I'm curious because I've

15     been produced also --

16           MR. SIMON:  Oh, yeah.

17     Q.    I'm going to --

18           MR. SIMON:  Yeah, I know.  Might be in

19     another file.

20     Q.    Does this look familiar to you (indicating)?

21     I'm showing you something called the Mental Health

22     Suicide Prevention and Detox Training.

23     A.    Can you flip through it, please?

24     Q.    I'm going to get you a clean copy so that you

25     can flip through it.  Okay?

1    A.    Okay.

2         MR. SIMON:  You want to click it out of

3    there?  I may have copies in my office.

4         MS. NORRIS:  Let's go off the record a

5    moment.

6         (Off-the-record discussion.)

7    BY MS. NORRIS:

8    Q.    I've just handed you a pretty voluminous

9    compilation that looks like a PowerPoint to me.

10   It's titled Mental Health Suicide Prevention and

11   Detox Training by Correct Care Solutions, Kibibi

12   Wood-Montgomery, CSW.  And ask you if you've ever

13   seen this before, if you recognize it, if you use it

14   in your training.

15   A.    Yes, I've seen it before, yes, I recognize

16   it, and it's not for Correct Care Solutions

17   training.

18   Q.    Okay.  Who -- who -- yes, you've seen it

19   before.  When?

20   A.    It was a while ago.

21   Q.    Do you know whether it was in place in 2015?

22   A.    Yes.

23   Q.    Is it, in fact, a PowerPoint?

24   A.    Yes.

25   Q.    Okay.  And you said it wasn't for Correct

1    Care Solutions.  Who was it for?

2    A.    Officers.

3    Q.    This would be the training module that

4    Correct Care Solutions prepared to train officers on

5    the same types of, excuse me, suicide risk

6    prevention that we just discussed in Exhibit Number

7    3?  Excuse me.

8    A.    A shortened version, yes.

9    Q.    This is a shortened version.

10   A.    The suicide part.

11   Q.    Okay.  And in your position as HSA, can you

12   tell me, from when you came on in 2015, was CCS

13   providing corrections officers and corrections staff

14   this training module?

15   A.    Yes.

16   Q.    And in your position, can you tell me why CCS

17   was also providing a jail suicide prevention

18   training module to Louisville Metro Department of

19   Corrections?

20   A.    Can you clarify that?

21   Q.    Do you know why you were -- why CCS was

22   charged with providing training to officers on

23   suicide prevention?

24   A.    I'm not sure what you mean by that.

25   Q.    Do you know why CCS was required, or was it

70

1    required or was it something they decided to do on

2    their own, do you know, as the CCS person

3    responsible with having knowledge about training of

4    LMDC officers?

5    A.    I do not know.

6    Q.    Okay.  Do you know who within your

7    organization would know about the training

8    requirement between CCS and LMDC?

9    A.    I do not.

10   Q.    Do you know whether that PowerPoint was done

11   in a classroom setting or whether that was

12   self-administered, much like the testing for your

13   medical staff?

14   A.    Classroom.

15   Q.    Do you know who taught it?

16   A.    Yes.

17   Q.    Who taught it?

18   A.    One of the mental health professionals.

19   Well, the mental health professional employees went

20   over there and taught it.

21   Q.    And to be clear, when we talk about mental

22   health professional employees, do I understand that

23   to be a distinction separate and apart from

24   psychiatry?

25   A.    Yes.

71

1    Q.    And if you -- can I see my document a minute?

2    A.    (Witness indicated.)

3    Q.    Thank you?

4          THE WITNESS:  Your microphone moved.

5          THE REPORTER:  It's okay.  Thank you.

6    Q.    I'm recircling back around to make sure I

7    heard something properly.  Did you say that this was

8    a more simplified version of suicide prevention

9    training than your medical staff receives?

10   A.    Yes.

11   Q.    Are your nurses and mental health

12   professionals, anybody that takes your training,

13   also taught that substance abuse and depression are

14   risk factors for persons with suicidal ideation?

15   A.    Yes.

16   Q.    Are you trained -- are your staff trained

17   with respect to traumatic brain injuries and what

18   impact they might have on suicidal ideation?

19   A.    I am not sure.

20   Q.    As we sit here today, do you have an

21   individualized knowledge about what impact a

22   traumatic brain injury might have on a person

23   with suicidal ideation?

24   A.    I am not.

25   Q.    And you just avoided that folder.

72

1          I'm going to mark this Exhibit Number 4.

2          (Wallace Deposition Exhibit 4 was marked for

3     identification and is filed with this transcript.)

4     Q.    You agree with me I'm taking it out of the

5     compilation of PowerPoints that we've been

6     discussing?

7     A.    Yes.

8     Q.    Okay.  And ask you if you recognize those

9     suicide risks and if your staff is trained with

10    respect to those suicide risks.

11    A.    I recognize this slide, but I am not sure

12    if -- no, I'm not sure.

13    Q.    You're not sure if your medical staff is

14    trained about those statistics?

15    A.    No.  I would have to look through the

16    training.

17    Q.    Do you recognize those statistics?

18    A.    Yes, from the slide.

19    Q.    In other words, it's something you know about

20    about suicide in the jail population.

21    A.    Yes.

22    Q.    I'm going to give you what I'm going to mark

23    as Exhibit Number 5, which can you agree with me

24    also came out of the slide presentation that we've

25    been discussing?

73

1    A.    Yes.

2          (Wallace Deposition Exhibit 5 was marked for

3    identification and is filed with this transcript.)

4    Q.    Okay.  And ask you if you recognize those

5    statistics about suicide.  You don't have to

6    necessarily focus on the ones that I have

7    highlighted, but those are the two important

8    statistics that I want to question you about.

9    A.    I'm sorry.  Restate the question again.

10   Q.    I want to ask you what -- do you recognize

11   these particular facts about suicide?  Do you have

12   general knowledge about those particular facts about

13   suicide?

14   A.    Yes, I wasn't sure on the percentage, but

15   yes.

16   Q.    Okay.  And are those particular facts about

17   suicide something that you train your medical staff

18   about?

19   A.    I'm not sure.

20   Q.    Okay.  What would you have to look at to

21   become sure?

22   A.    I'd have to look through the training.

23   Q.    Okay.  Would that be the training, Exhibit

24   Number 3?

25   A.    Yes.

74

1      Q.     Okay.  Feel free to do that.

2             MS. NORRIS:  I'm actually going to make

3      Exhibit Number 4 three pages, because it's three

4      continuous slides of the same topic.  Do you want to

5      see them?

6             MS. O'REILLY:  You mean Exhibit 5.

7             MS. NORRIS:  No.  Did I -- is that Exhibit 4?

8             MS. O'REILLY:  Exhibit 5 (indicating).

9             MS. NORRIS:  Exhibit 5.  I'm sorry.

10     Exhibit 5 comprised of three pages.  Thank you.

11     A.     Those are not in this training.

12     Q.     Okay.  Did you tell me, however, that as

13     reflected on Exhibit Number -- no, I don't think you

14     answered the question yet.

15            Did you know personally from Exhibit Number 5

16     that 94 percent of suicides in jails are by hanging?

17     A.     I did not know.

18     Q.     You did not know that?  And did you know that

19     75 percent of victims are detained on nonviolent

20     charges?

21     A.     No.

22     Q.     Okay.  Do you know what Mr. Troutman's

23     charges were?

24     A.     I do not.

25     Q.     Okay.  You do know that he committed suicide

75

1    by hanging?

2    A.    Yes.

3    Q.    And you -- did you know on page 2 of

4    Exhibit 5 compilation that prior attempts increase

5    the risk of suicide in a jail by 33 percent?

6    A.    Not the percentage, but yes.

7    Q.    Okay.  And were you aware that Mr. Troutman

8    had a prior attempt?

9    A.    Yes.

10   Q.    And were you aware that Mr. Troutman was

11   placed in a single barred cell?

12   A.    Yes.

13   Q.    And were you aware that Mr. Troutman was

14   placed in a single barred cell with bedsheets which

15   created the ligature for his hanging?

16   A.    Not off the top of my head now, but back then

17   I'm assuming I would have.

18   Q.    Okay.  Were you aware that there had been a

19   call placed from classifications to the nursing

20   desk, specifically Nurse Brown?

21        MS. O'REILLY:  Objection.  Form.  Foundation.

22   A.    At the time when we went over it I could

23   have, but I don't remember.

24   Q.    Okay.  All right.  And -- okay.  We'll get --

25   circle back around to that.

76

1          I'm going to give you what is a compilation

2     of three pages which I'm going to mark as Exhibit

3     Number 6.  Do you agree with me that this is still

4     information coming from the PowerPoint provided by

5     CCS to corrections employees?

6     A.     Yes.

7          (Wallace Deposition Exhibit 6 was marked for

8     identification and is filed with this transcript.)

9     Q.     Okay.  Would you read through those risk

10    factors, you can read to them -- through them

11    yourself, and let me know whether you -- whether

12    having reviewed Exhibit Number 3 just a moment ago,

13    whether these are risk factors that you train your

14    medical staff about with respect to suicide

15    prevention.

16    A.     All three pages?

17    Q.     Yes.

18         (Off-the-record discussion.)

19    A.     Some of them, not all of them.

20    Q.     Okay.  If we could share Exhibit Number 6 for

21    a moment.

22         Exhibit Number 6 refers to the high risk

23    factors in this PowerPoint prepared by CCS for LMDC.

24    As you read through these risk factors, do you --

25    did you agree that those are factors, risk factors

1    that are common to individuals who come into the

2    inmate population that need to be observed for

3    suicidal ideation?

4         MS. O'REILLY:  Objection.  Form.  Foundation.

5    A.    That would be on the nurse or the mental

6    health professional's judgment.

7    Q.    Correct.  But as oversight of training, do

8    you understand these to be high risk times for

9    incarcerated individuals?

10   A.    Yes.

11   Q.    Okay.  And while they might -- some of them,

12   but not all these factors are included in the

13   training, would you expect your medical staff to

14   have a general knowledge of these high risk times?

15   A.    Yes.

16   Q.    Okay.  And would you expect your medical

17   staff to have a general knowledge of the risk

18   factors that are found on page 2 and page 3 of

19   Exhibit Number 6?

20        MS. O'REILLY:  Objection.  Form.  Foundation.

21   A.    Can you state the question again?

22   Q.    Would you expect your medical staff to have a

23   working knowledge of the risk factors for suicide

24   that are depicted on Exhibit Number 6, pages 2 and

25   pages 3?

1    A.    Yes.

2    Q.    Okay.  In other words, if you're training

3    corrections officers to have this generalized

4    knowledge, would it be fair to say that you would

5    expect your nursing staff to have at least this

6    generalized knowledge?

7    A.    Yes.

8    Q.    I'm going to mark Exhibit Number 7 something

9    called Tips with respect to suicide.  Do we agree

10   that this came out of the same PowerPoint

11   production?

12   A.    Yes.

13         (Wallace Deposition Exhibit 7 was marked for

14   identification and is filed with this transcript.)

15   Q.    Okay.  If you would read through those in

16   comparison to your training module, are your medical

17   staff trained on those particular tips?

18   A.    Clarify that question again.

19   Q.    As with the other questions regarding this

20   particular training module from CCS to LMDC, are

21   these particular tips that you would -- that you

22   train your medical staff about to recognize when

23   dealing with a suicidal inmate?

24         MR. OGBURN:  While she's looking, I need to

25   make a quick call here.  You-all can go on.

```
1              (Mr. Ogburn left the deposition room
2      momentarily.)
3      A.     Will you repeat the question one more time?
4      Q.     I was just going to ask her to orient us back
5      to the question.
6              THE REPORTER:  Sure.
7              (Reporter read from the record as requested.)
8      A.     It's not -- some of them are in here, some of
9      them would be on-the-job training.
10     Q.     Okay.  But stated another way, that -- those
11     particular tips you would expect your medical staff
12     to know.
13     A.     Yes.
14     Q.     And the last one is emphasized not just by my
15     highlighting, but it's emphasized by a larger font
16     size than the ones listing -- listed above, and it
17     says, "Always err on the side of caution."
18             Is that something you expect your medical
19     staff to adhere to?
20     A.     It would be their nursing judgment.
21     Q.     But you would expect them to follow that tip,
22     to err on the side of caution, meaning -- so make
23     sure that you and I are on the same page, meaning to
24     take a very conservative approach with an inmate
25     they suspect of suicidal ideation.
```

1    A.    Yes.

2    Q.    And finally, do you agree with me, with this

3    particular prevention tip that's in the materials

4    that says, "Everyone is responsible for the

5    prevention of suicides," in -- and I'm -- this is

6    in -- with respect to an inmate population inside an

7    institutional facility.

8    A.    Yes.

9    Q.    And that would be mental health staff,

10   medical staff, doctors, nurses, and the correctional

11   staff; is that correct?

12   A.    Yes.

13         MS. NORRIS:  Off the record.

14         (Off-the-record discussion.)

15   BY MS. NORRIS:

16   Q.    Okay.  The other 30(b)(6) issue that you have

17   been identified to speak to, Ms. Wallace, is item

18   number four, (Reading) Policies and procedures

19   regarding training specific to suicide risk

20   prevention internally of CCS staff and externally of

21   LMDC; development of training modules on suicide

22   risk, prevention and training; decision making

23   regarding changes to training or changes to policies

24   and procedure.

25         Okay.  Do you understand that request?

1    A.    Yes.

2    Q.    Okay.  We have just been through a PowerPoint

3    which you have identified was the Suicide Risk

4    Prevention module that was prepared by CCS for LMDC,

5    correct?

6    A.    Yes.

7    Q.    Is that the -- is that the only module that

8    would be responsive to number four, to your

9    knowledge?

10   A.    Yes.

11   Q.    Okay.  And the -- the internally -- the

12   training risk prevention internally to CCS, would

13   that be Exhibit Number 3 that we've gone through?

14   A.    Yes.

15   Q.    Okay.

16         (Office personnel entered the deposition room

17   momentarily.)

18         OFFICE PERSONNEL:  There's one missing.  Is

19   he not eating anything?

20         MS. NORRIS:  No, we aren't feeding Den -- off

21   the record.

22         (Lunch recess from 12:11 p.m. to 12:49 p.m.)

23   BY MS. NORRIS:

24   Q.    Okay.  When we broke for lunch, we were

25   talking about 30(b)(6) item four.  We had already

1    talked about the internal CCS training and the

2    external LMDC training.

3         This request also asks you to testify to your

4    knowledge how these training modules on suicide risk

5    prevention are developed.

6    A.    CCS corporate.  The doctors are the ones that

7    develop it.

8    Q.    And did you know that before you were

9    designated as 30(b)(6) witness or did you learn that

10   after you were designated as a 30(b)(6) witness?

11   A.    I had a general idea, but I verified it when

12   I went -- when I sent an email.

13   Q.    And you were also asked to speak about who

14   makes decisions regarding changes to training.

15   A.    It would be the corporate doctors as well.

16   Q.    And who makes decisions with regard to

17   changes to policies and procedures relative to

18   suicide risk and prevention?

19   A.    Can you clarify that?

20   Q.    Who within the organizational structure would

21   make changes to policies and procedures relative to

22   suicide risk and prevention?

23   A.    We have corporate policies that we make site

24   specific, so the corporate policies would be changed

25   with the corporate doctors and teams there, and then

83

1    we would make it site specific.

2    Q.    Okay.  And when you say site specific, let me

3    see if I understand.  Corporate sets policies and

4    procedures in general for suicide prevention; is

5    that correct?

6    A.    Yes.

7    Q.    And then site specific means that if there's

8    any particular issue, for example, at Louisville

9    Metro Department of Corrections, they might add some

10   provisions or make some changes specific to that CCS

11   site.

12   A.    Correct.

13   Q.    Okay.  Do you know whether after Mr.

14   Troutman's suicide there were any changes to

15   training regarding suicide prevention?

16   A.    Training at the site?

17   Q.    Yes, ma'am.

18   A.    I can't remember.  I'd have to look back

19   through.

20   Q.    What would you need to look at to refresh

21   your recollection?

22   A.    I'd have to look through our staff meeting.

23   Q.    Notes?

24   A.    Uh-huh.

25         MS. NORRIS:  I would ask that she do an

1    examination of her staff meeting notes to determine

2    whether there were any changes implemented after Mr.

3    Troutman's suicide.

4    Q.    And back to the mortality review.  Would I

5    understand correctly, Ms. Wallace, that one of --

6    one of the goals of the mortality review, as you

7    previously articulated, would be to see if there

8    were any improvements that could be made with

9    respect to suicide prevention after that mortality

10   review?

11   A.    What was the question?

12   Q.    Would -- you said one of the goals would be

13   if you can make any improvements.  Okay.  After you

14   have a mortality review, one -- two goals were to

15   find out if all the care that was needed was

16   provided and if any improvements can be made.  Those

17   were the two goals you articulated for me from the

18   mortality review.

19   A.    Yes.

20   Q.    Okay.  My question was then, of these goals,

21   do they drive then potentially training changes?

22   Meaning we might need more training because of X

23   that we learned at the mortality review?

24   A.    They could potentially, yes.

25   Q.    Okay.  And could they also potentially drive

1   policy and procedure train -- training?  I mean

2   changes.  Policy and procedure changes.

3   A.     They could, yes.

4   Q.     Okay.  And as we sit here today, Ms. Wallace,

5   do you know whether there were any policy and

6   procedure changes after the mortality review on Mr.

7   Troutman?

8   A.     Can you clarify that question?

9   Q.     Do you know whether Mr. Troutman's mortality

10  review generated any policy and procedure trainings

11  at Louisville Metro Department of Corrections?

12  A.     Trainings.

13  Q.     Change -- policy and procedure changes.

14  A.     For CCS.

15  Q.     Yes.

16  A.     Not to my knowledge, no.

17  Q.     Okay.  Do you know whether it drove any

18  policy and procedure changes for Louisville Metro?

19  A.     I do not know.

20  Q.     Okay.  Who would I inquire?  Would that be

21  Mr. Bolton that would know that answer?

22  A.     It would be him or the policy -- policy --

23  policy -- I don't know his exact title.

24  Q.     What's his name?

25  A.     Don Griffin.

1   Q.      Don Griffin.  Okay.  Okay.  The next item on

2   your 30(b)(6) deposition notice is the description

3   of the Continuous Quality Improvement Program.  Can

4   you give me a description of the Continuous Quality

5   Improvement Program?

6   A.      CCS provides a yearly calendar.  On that

7   yearly calendar they have studies that they ask all

8   sites to do.  They also ask for site specific

9   studies as well.  Those studies have different

10  questions that you are to answer based on the chart,

11  and then you put them in a program and it calculates

12  your percentage.

13  Q.      Percentage of what?

14  A.      The percentage -- so there -- they're yes and

15  no questions, and based on the yes, no or NAs, it

16  calculates the overall score of the whole study.

17  Q.      Okay.  And it's a quality improvement study.

18  Okay.  So can you be a little bit more specific at

19  what quality we are improving with this study?

20  A.      It's all -- CCS has -- like each month you

21  have anywhere from one to four studies that year to

22  do.

23  Q.      Okay.  Do you do one specific to suicide

24  prevention?

25  A.      Yes.

1      Q.    How often are these done?

2      A.    Suicide prevention ones, I'd have to look.  I

3      don't know if it's -- maybe quarterly or maybe once

4      every six months.  I'm not sure.

5      Q.    When you became employed as HSA at Louisville

6      Metro Department of Corrections, were you giving --

7      were you given a file of the historical quality

8      improvement studies that were done with respect to

9      suicide prevention?

10     A.    Was I given a file?

11     Q.    Were you given the opportunity to review the

12     previous Continuous Quality Improvement studies on

13     suicide prevention?

14     A.    No.

15     Q.    Do you know where those are housed?

16     A.    Yes.

17     Q.    Where are those housed?

18     A.    In DataTrak.

19     Q.    Is that something you have access to if you

20     want to look at?

21     A.    Yes.

22     Q.    Is that a -- like a computer program that you

23     access and put in some -- a code or something and

24     you can pull up this information?

25     A.    Yes.

1    Q.    Have you looked at this information relative

2    to this 30(b)(6) deposition notice to answer

3    question number six to determine whether there were

4    any modifications of policies and procedures as a

5    result of quality assurance reviews related to

6    inmate suicide?

7    A.    I'm sorry.  State that again.

8    Q.    Okay.  Question number six in your 30(b)(6)

9    request asks if -- asks you to speak to Quality

10   Assurance reviews by LMDC of CCS, to include any

11   modifications of policies and procedures and/or

12   operations as a result of the LMDC Quality Assurance

13   review.

14        Do you have access to that?  I'm going to

15   show you number six.  I'm sorry.  It's really a

16   two-part -- let me see if I can break it down.  It's

17   really a two-part question.

18        I understand that CCS does internal quality

19   assurance reviews; is that correct?

20   A.    Yes.

21   Q.    And that's what we just talked about.  You

22   answered these questions and it gives a percentage

23   of, I guess, how well you're doing in, for example,

24   suicide prevention.

25   A.    Yes.

1    Q.    Okay.  And do you know -- let me start there.

2    Do you know how -- when you came on in August of

3    2015 how well CCS was doing from a perspective of

4    the quality assurance reviews with respect to

5    suicide prevention?

6    A.    I do not know.

7    Q.    And where would you have to look to find

8    that?  Would that be the DataTrak?

9    A.    Yes.

10        MS. NORRIS:  Okay.  I would ask that you

11   produce the DataTrak that was available to this

12   witness on her date of hire regarding the quality

13   assurance reviews of CCS, and, in fact, I would ask

14   that that -- that those quality assurance reviews be

15   produced from the date of the first one that was

16   conducted after the contract was entered into

17   between LMDC and CCS to any quality assurance

18   reviews that were done after Mr. Troutman's death as

19   responsive to item number five in the 30(b)(6)

20   deposition.

21   Q.    So as we sit here today, you cannot tell us

22   what your organization's position is with respect to

23   any changes that might've been made about suicide

24   prevention based upon those quality assurance

25   reviews that were performed on that topic.

1      A.      State that again.

2              MS. NORRIS:  Can you read it back for me,

3      please?

4              MS. O'REILLY:  I'm a little confused by that

5      question too.

6      Q.      Okay.  Let me see if I read it back if I can

7      make it better.

8              (Reporter read from the record as requested.)

9      Q.      The question -- the question being is as a

10     30(b)(6) deponent you are supposed to be informed

11     with respect to every aspect of the questions that

12     are listed here, and so what I'm trying to find out

13     is you are aware that there are quality -- quality

14     assurance reviews; you believe that those take

15     place -- and we're -- we're focusing on suicide

16     prevention, 'cause that's the nature of this

17     lawsuit.  You believe that those take place

18     quarterly, and you have testified that those quality

19     assurance reviews provide a prevent -- a percentage

20     to indicate how well CCS is doing with respect to

21     suicide prevention.

22             Did I understand your answers correctly?

23     A.      Yes.

24     Q.      Okay.  Understanding that, my question was:

25     As we sit here today, do you know whether any of

1    those quality assurance reviews that were done

2    specific to suicide prevention generated any change

3    in policies for CCS?

4    A.    Our policies at the site.

5    Q.    Yes.

6    A.    No, I do not know that.

7    Q.    Okay.  And who would have that information?

8    A.    At this time I'm not sure.

9          MS. NORRIS:  Okay.  Can you provide us who

10    would have that information, Megan?

11          MS. O'REILLY:  Well, let me just put on the

12    record real quick, I think previously -- just so

13    we're all clear.

14          MS. NORRIS:  Okay.

15          MS. O'REILLY:  That's what we want, I know.

16    I think previously you testified that the policies

17    and procedures related to suicide prevention have

18    not changed at the site since Mr. Troutman's death.

19          MS. NORRIS:  I think she said she didn't

20    know.

21    A.    They haven't changed.

22          MS. O'REILLY:  Okay.

23    Q.    Okay.

24          MS. O'REILLY:  So that should answer your

25    question.  I mean, they haven't changed, so they

1   wouldn't have changed.

2   Q.    Okay.  Is that your testimony, that the

3   suicide policies and prevention procedures have not

4   changed since Mr. Troutman's death?  Do you know?

5   A.    Yes, I do know.  No, they have not changed.

6   Q.    Okay.  So then the follow-up question would

7   be that the suicide prevention quality studies that

8   have -- have taken place since Mr. Troutman's death

9   have not generated any changes to policy.

10  A.    Correct.

11  Q.    Okay.

12        MS. NORRIS:  Thank you.

13        MS. O'REILLY:  You're welcome.

14        MS. NORRIS:  I still would like those

15  produced.

16  Q.    Now, the next question number six, which I

17  was getting ahead of myself, asks you to speak to

18  whether you know are there any Quality Assurances

19  reviews that Louisville Metro Department of

20  Corrections does of CCS concerning your medical

21  functions at their site.

22  A.    Not that I am aware of.

23  Q.    Is there any kind of quality control, let's

24  call it, to your knowledge that LMDC performs with

25  respect to CCS' services at Metro Corrections?

93

1    A.    Not to my knowledge.  LMDC would have a

2    better --

3    Q.    Okay.

4    A.    -- knowledge of that.

5    Q.    In other words, you're familiar with the fact

6    that you get these questionnaires from CCS and you

7    fill them out, they go into a computer hopper, and

8    they spit out a percentage to give you how you're

9    doing qualitywise, correct?

10   A.    Yes.

11   Q.    And you do not have anything similar to that

12   from Louisville Metro Department of Corrections.

13   A.    No.

14   Q.    The next question you are to provide insight

15   with respect to is number seven, which is internal

16   Quality Assurances and reviews that CCS does of its

17   staff at Louisville Metro.

18         How do you do quality control -- or I guess

19   first question is:  Does CCS do quality control of

20   the staff?

21   A.    We do peer reviews and yearly evaluations and

22   competency skills.

23   Q.    Where are those peer reviews housed?

24   A.    The certification's housed in their employee

25   file.

94

1    Q.    Okay.  And the same as their competency

2    reviews?

3    A.    Training file.

4    Q.    I would ask that you produce the

5    competence -- let me back up, one foundation

6    question.

7         Do you do those with respect to your doctors

8    and your psychiatrists as well?

9    A.    Yes.

10   Q.    Okay.  I would ask that you produce the

11   competency skills file on Nurse Brown and Dr. Donna

12   Smith.

13   A.    The competency skills are for medical nursing

14   skills.

15   Q.    Okay.  Is that to say that they don't have

16   anything to do with their competency as to suicide

17   prevention?

18   A.    The skills lab, no.

19   Q.    Okay.  And what about the psychiatrist

20   competency skills test?

21   A.    They have peer reviews.

22   Q.    Okay.  And Dr. Smith's peer review would --

23   would be in her employment file?

24   A.    Yes.

25   Q.    Okay.  And does she have a competency skills

1      training file?

2      A.      For the competency skills?

3      Q.      Yeah.

4      A.      No, she has a training file.

5      Q.      Okay.  And her training file, what does her

6      training file include?

7      A.      It would include the different trainings that

8      she's had, but she wouldn't have the nursing

9      training.

10     Q.      Okay.  So that -- that's what I've already

11     requested earlier in the deposition were those

12     training tests and files on these two, so this would

13     be a duplicate request.

14     A.      Yes.

15     Q.      Okay.  You were also asked to address in your

16     30(b)(6) request any corrections or amendments to

17     pertinent policies and procedures involving suicide

18     prevention and intervention or the development of

19     new policies, after each of the above inmate

20     suicides.

21             So let's back up a little bit.

22             Are you -- were you -- you weren't there at

23     the time, but I'm going to ask you if you know or

24     were made aware of these particular suicides.

25             Muhammad Hindi on October 19th, 2013.

96

1    A.    No.

2    Q.    Laron Moore on January 3rd, 2014.

3    A.    No.

4    Q.    Jonathan Wright on October 27th, 2014.

5    A.    No.

6    Q.    Franklin Bolton on February 16th, 2015.

7    A.    No.

8    Q.    Robert Workun, that's W-O-R-K-A-N, on

9    February 26, 2015.

10   A.    No.

11   Q.    James Ashby on October 4th, 2015.

12   A.    No.  Yes.

13   Q.    I was going to say --

14   A.    Yes.

15   Q.    -- that post-dates your employment.

16         Do you remember sitting in a mortality review

17   with respect to James Ashby?

18         MS. O'REILLY:  I'm going to object to this

19   line of questioning.  This is currently an issue for

20   the Court to decide at this point, so --

21         MS. NORRIS:  I can ask her generalities if

22   she participated in them.  Are you instructing her

23   not to answer?

24         MS. O'REILLY:  I'll let you ask her if she

25   participated in it, but that's the extent of the

97

1   questions --

2           MS. NORRIS:  Okay.

3           MS. O'REILLY:  -- that I will permit at this

4   point in time.

5   Q.    Okay.  Did you participate in James Ashby's

6   mortality review?

7   A.    Believe so.

8   Q.    Okay.  And would that mortality review have

9   had the same goals that we previously discussed

10  earlier today in the deposition?

11          MS. O'REILLY:  You can answer that.

12  A.    Yes.

13  Q.    Okay.  And do you know --

14          MS. NORRIS:  And let me just say in response

15  to your objection, Megan, that I will respect your

16  position at this point, and obviously this witness

17  will be subject to recall depending on the outcome

18  of that -- of our hearing on Tuesday -- Thursday

19  morning, and that also we may have to consider

20  whether somebody else needs to be designated to

21  answer this question with respect to these other

22  witnesses if the ruling is in our favor.  Okay?  So

23  our record's clear.

24          (Ms. O'Reilly nodded head.)

25          MS. NORRIS:  Is that a yes?

98

1          MS. O'REILLY:  That -- that -- the record is

2     clear, yes.

3          MS. NORRIS:  Okay.

4     Q.    As to James Ashby and Charles Troutman, you

5     have been designated to answer these questions on --

6     in item number nine.

7          Do you know, were there any corrections or

8     amendments to pertinent policies and procedures

9     involving suicide prevention and intervention with

10    respect to CCS policies and procedures after either

11    one of those suicides?

12         THE WITNESS:  Can I answer?

13         MS. O'REILLY:  You can.

14    A.    There was no corrections.

15    Q.    Do you know whether there were any

16    consultants hired by CCS to further investigate

17    either Mr. Ashby's or Mr. Troutman's suicide and to

18    make recommendation to corporate leadership?

19         MS. O'REILLY:  Can you repeat the question,

20    please?

21         THE REPORTER:  Sure.

22         (Reporter read from the record as requested.)

23         MS. O'REILLY:  I'm going to object with

24    respect to Mr. Ashby's.  I think that's part of the

25    prior objection.

99

1           MS. NORRIS:  Okay.  You can -- you're not

2      instructing her not to answer with regard to Mr.

3      Troutman.

4           MS. O'REILLY:  I'm not -- with respect to Mr.

5      Troutman, you can answer.

6      A.    Okay.  So what was the question regarding

7      Mr. Troutman?

8           MS. NORRIS:  Would you read it back one more

9      time, please?

10          THE REPORTER:  Sure.

11          (Reporter read from the record as requested.)

12     Q.    So just as to Mr. Troutman.

13     A.    No.

14     Q.    You do not know or there were not?

15     A.    Not to my knowledge.

16     Q.    There were not not to your knowledge.

17     A.    Correct.

18     Q.    Okay.  You were designated with respect to

19     item number ten to provide information on any

20     inspections and investigations for the previous five

21     years predating Mr. Troutman's suicide on

22     November 24th, 2015, by any outside agencies

23     (including American Corrections Corporation, the

24     National Institute of Corrections, and the National

25     Commission on Correctional Health) investigation or

1      reports from any of those agencies regarding any of
2      the suicides that were named above.
3          MS. O'REILLY:  And with the caveat that prior
4      to December of 2013 CCS did not have the contract,
5      so we wouldn't have any knowledge of that.
6          MS. NORRIS:  Right.
7          MS. O'REILLY:  So --
8          MS. NORRIS:  From -- from -- what date is the
9      contract?
10         MS. O'REILLY:  December 2013, I believe.
11     Q.    December 2013 forward, are you aware of
12     whether -- or have -- are you aware of whether
13     American Correctional Association, National
14     Institute of Corrections or the National Commission
15     on Correctional Health came in and did any
16     investigations at LMDC or of CCS staff with respect
17     to suicides that occurred after the date of the
18     contract?
19     A.    No.
20     Q.    You are not aware of any -- of such
21     investigations.
22     A.    Correct.
23     Q.    You've never seen any such reports.
24     A.    No.
25     Q.    Okay.  You've not seen a report from any of

1    those agencies with respect specifically to

2    Mr. Charles Troutman.

3    A.      Correct.

4    Q.      Okay.  You were also asked -- or you were

5    also tendered as a 30(b)(6) witness to answer

6    question number 11, whether there have been any

7    inspections conducted by the Department of Justice

8    relative to CCS' provision of medical and/or mental

9    health services to any CCS institution that it

10   serves.

11        MS. O'REILLY:  And again, at the beginning of

12   the deposition we had the caveat that she -- she

13   no -- has knowledge of LMDC only.

14   Q.      Okay.

15   A.      No, not to my knowledge.

16   Q.      Okay.  In other words, stated more simply,

17   you are not aware of any DOJ inspections of CCS'

18   medical services provisions to LMDC.

19   A.      Correct.

20   Q.      Okay.  You were produced with respect to

21   30(b)(6) number 12 relative to CCS policies and

22   procedures regarding the proper documentation of

23   communications between CCS employees internally, for

24   the proper transfer of information between CCS

25   employees and LMDC Classification Specialists.

1            What can you provide to us with respect to

2     that request?  And if you'd like to read it, I put

3     it in front of you, 12.

4     A.      There was a pra -- there's a practice.

5     Q.      Okay.  What's the practice?

6     A.      They either send out an email or call if they

7     need questions clarified or single cell clearances

8     made, and then medical responds back either per a

9     phone call or a move list.

10    Q.      Okay.  When you say they send an email, do I

11    understand that to be LMDC classification

12    specialists would send an email?

13    A.      Yes.

14    Q.      Or LMDC classification specialists would make

15    the call.

16    A.      Yes.

17    Q.      Okay.

18    A.      A phone call.

19    Q.      And we already established earlier that those

20    were important and that you expected your nurse on

21    staff to make immediate referral to the nurse

22    supervisor, correct?

23    A.      Yes.

24    Q.      Okay.

25    A.      As long as there's not emergencies going on

103

1    at that time.

2    Q.    Okay.  And what would an emergency be that

3    would -- that would take precedence over getting

4    this communication to nurse supervisor?

5    A.    Anybody with chest pain, doing an EKG,

6    someone complaining of labor.  We get phone calls

7    all the time with emergencies that nurses have to go

8    and respond to.

9    Q.    Okay.  Barring any emergency, you would

10   expect that communication to be immediately

11   transmitted to the nurse supervisor.

12   A.    Yes.

13   Q.    Okay.  Do you have any way of knowing whether

14   on November 24th, 2015, at the time of this -- that

15   the communication came in from classification to the

16   medical department, and that was specifically at

17   3:58 p.m., do you have any way of examining whether

18   there were any other emergencies that would've

19   preempted the transmittal of that information from

20   that call?

21   A.    No.

22   Q.    You don't have any -- you don't keep a task

23   list of emergency, emergency calls or emergency

24   responses in the jail?

25   A.    No.  We have a list of anybody we send out to

104

1    an emergency, but that's not every call we get.

2    Q.    Okay.  And with respect to that, if --

3    barring no other emergencies, which you've already

4    given that -- that qualifier.  Okay.  Absent any

5    other emergency, in your -- in your position as HSA,

6    is there a protocol for taking a message?

7         In other words, is there some sort of message

8    book where telephone messages should be written down

9    in to make sure that they get properly transmitted

10   to an individual?

11   A.    No.

12   Q.    And the call of the nature that we're

13   speaking of from classification regarding placing a

14   former suicidal inmate in a single barred cell,

15   would it be your expectation that the nurse taking

16   that call would personally -- with that information

17   and knowledge personally go and seek out the nurse

18   supervisor?

19   A.    Yes, she should talk to the nurse -- nurse

20   supervisor.

21   Q.    Okay.  Stated another way --

22        MS. NORRIS:  Can I take a brief break?  Off

23   the record a second?

24        MS. O'REILLY:  Uh-huh.

25        (Off-the-record discussion.)

```
1    BY MS. NORRIS:
2         MS. NORRIS:  Would you orient us to where we
3    were?
4         THE REPORTER:  Sure.
5         (Reporter read from the record as requested.)
6    Q.   I want to show you what I'm going to mark as
7    Exhibit Number 8 to your deposition, Ms. Wallace,
8    and ask you if you recognize that form or this page.
9    A.   It's inmate notes.
10        (Wallace Deposition Exhibit 8 was marked for
11   identification and is filed with this transcript.)
12   Q.   Okay.  You know where this comes from?
13   A.   Yes.
14   Q.   Where does it come from?
15   A.   XJail.
16   Q.   What is XJail?
17   A.   The jail management system.
18   Q.   Do your -- does your staff have access to
19   XJail?
20   A.   Yes.
21   Q.   Do your nurses have access to XJail?
22   A.   Yes.
23   Q.   Okay.  Did they have access to XJail in 2015?
24   A.   Yes.
25   Q.   Okay.  If we examine this exhibit,
```

1        Ms. Wallace, I would like you to look at the -- oh,

2   let me ask you this way:  Have you reviewed this

3   form before?

4   A.      This form, no.

5   Q.      Or this XJail printout.

6   A.      No.

7   Q.      Okay.  Reading -- I understand we read from

8   the bottom to the top, which bottom is the oldest,

9   top most current.

10  A.      Yes.

11  Q.      And do you see there -- first of all, do you

12  agree with me that this pertains to Inmate Troutman?

13  A.      Yes.

14  Q.      And he was booked on 11-13 at 00:48, so

15  basically about 48 minutes after midnight on the

16  13th?

17  A.      Yes.

18  Q.      And on the bottom entry, we see that his

19  orientation was completed at 7:04 on the 13th; is

20  that correct?

21  A.      Yes.

22  Q.      And then what occurred on 11-13 at 18:06,

23  which effectively is 6:06 in the evening?

24  A.      You want me to read this?

25  Q.      Yes.

107

A.     (Reading) Inmate tried to hang himself on booking floor Hold 2.  Because of this inmate mental health per Nurse Stith and Denning and moved to OBS 1.  Inmate also detox per Nurse Denning.

Q.     Okay.  Then the next entry is that he was moved -- cleared from detox for a move to general population on 11-17 at 2:46 in the after -- no, that would be the morning; is that correct?  It's a 24-hour clock?

A.     That's what it states, yes.

Q.     Okay.  If there is a note in his medical file that shows that it's actually Dr. Smith who wrote the note clearing Mr. Troutman to general population, do you know why this would show Temple and -- Temple clearing him?

A.     I do not.

Q.     Okay.  On 11-18-2015 at 21:37, do you agree with me that Inmate Troutman appears to have been involved in a verbal altercation with another inmate?

A.     That's what it states, yes.

Q.     Okay.  On 11-21-15 at 22:15 he has another write-up?

A.     Yes.

Q.     Okay.  On 11-24-15 at 12:58 he has another

108

1 write-up for fighting?

2 A. That's what it states, yes.

3 Q. Okay.  And if we refer back to some of the

4 earlier exhibits regarding risks and things to watch

5 out for on suicide prevention, are these some of the

6 characteristics that can be red flags for ongoing

7 suicidal issues with an inmate?

8 A. It would be up to the nurse.

9 Q. I understand that, but those are the things

10 they're trained to look out for; is that correct?

11 A. If it's in their training, yes.

12 Q. Okay.  And we reviewed that earlier, correct?

13 A. Yes.

14 Q. Okay.  And then we see on 11-24-2015 at

15 15:58, which is I -- we translate that to our time,

16 3:58, can you read what the entry is at that time?

17 A. (Reading) Inmate moved to H5 dorm nine

18 pending disciplinary.  Notified Nurse Brown of

19 single cell in use -- single cell use and waiting to

20 hear back from medical on that.

21 Q. Who is James Cox?

22 A. I believe he's a classification officer, but

23 I'm not positive.

24 Q. Okay.  If we were to tell you that the record

25 reflects that he is a classification officer, would

1  that refresh your recollection?

2  A.    I've just seen his name.  I don't know --

3  Q.    Okay.

4  A.    -- who he is.

5  Q.    Okay.  I will tell you, Ms. Wallace, that he

6  is a classification officer, and do I understand

7  this communication to be as you would expect?

8  Because Inmate Troutman had a prior suicide attempt

9  on 11-13, does this indicate from XJail that he is

10 attempting to get clearance from -- or is it -- he's

11 at least -- he's notifying medical of the impending

12 use of a single cell for Mr. Troutman?

13 A.    Yes, that's what the note states.

14 Q.    Okay.  And he is waiting to hear back from

15 medical on that question.  Do you see that?

16 A.    Yes.

17 Q.    Okay.  The records reflect that Mr. Cox never

18 heard back from medical, and as a result Inmate

19 Troutman was placed in a single barred cell at 8:32

20 that evening.

21       Do you have any explanation as the HSA why

22 there would've been delay from 3:58 p.m. to 8:32 and

23 no communication back from medical to classification

24 on whether Mr. Troutman was cleared?

25 A.    I was not there during that process, so, no,

1      I do not.

2      Q.    Okay.  Would you consider a four and a half

3      hour delay a reasonable delay with respect to this

4      important communication?

5           MS. O'REILLY:  Objection.  Form.  Foundation.

6      A.    It would depend what was going on during

7      those four hours.

8      Q.    Okay.  As the health -- have to tell me what

9      second -- health -- what's your initials stand for?

10     A.    Health services administrator.

11     Q.    That's what I thought.  As the health

12     services administrator, would you have expected your

13     nurse to be more timely with referring -- to be

14     timely with referring this information to the nurse

15     supervisor?

16          MS. O'REILLY:  Objection.  Form.

17     A.    It would depend what's going on during those

18     four hours.

19     Q.    I understand.  If we were -- barring no

20     emergencies, would you expect your nurse to have a

21     more timely conveyance of this information than a

22     four -- than four and a half hours?

23          MS. O'REILLY:  Same objection.

24     A.    It again would depend on what's going on

25     during those four hours.

1    Q.    I understand that.

2    A.    The patients' care comes first, so it could

3    be they were passing medications, it could be

4    they're doing diabetic Accu-Cheks, it could be that

5    they're dressing wounds.  It -- it -- there's a lot

6    that would go on.

7    Q.    I understand that, but we talked about the

8    type of emergency before that would preclude an

9    immediate conveyance of that information and you

10   talked about emergencies.

11        So barring an emergency, would you expect

12   there to be -- as a health services administrator,

13   would you expect it to take four and a half hours

14   for that information regarding whether it was

15   appropriate to clear Mr. Troutman to single cell

16   use, would you expect that kind of delay?

17        MS. O'REILLY:  I'm going to object.  She's

18   asked -- you've asked this three times and she's

19   answered it three times, and you don't like her

20   answer, so you're trying to get her to change her

21   answer.

22        MS. NORRIS:  You're giving a speaking

23   objection.  Okay?  Where --

24        MS. O'REILLY:  Well, I've objected three

25   other times and you keep asking the question.

1          MS. NORRIS:  I'm not -- she hasn't answered

2     the question.  I added another factor.  I took out

3     the emergencies.

4     Q.    Is this the type -- let me ask it another

5     way.

6          Is this the type of information, the

7     conveyance of this information, that takes

8     precedence in the absence of an emergency?

9     A.    It would depend what's going on during those

10    four hours.

11    Q.    So pill changes takes precedence over putting

12    a formerly suicidal inmate into a single barred

13    cell?

14    A.    If it's -- if it's medication that's needed,

15    yes.

16    Q.    Okay.  And diabetic checks takes precedence

17    over checking an inmate out before he's put in a

18    single barred cell?

19    A.    There's multiple, multiple situations that

20    would -- as I said before, would prevent that nurse

21    from being able to talk to the charge nurse.

22    Q.    Okay.  Well, in fact, case in point, Nurse

23    Brown never talked to the charge nurse.

24         MS. O'REILLY:  Objection.

25    Q.    Would you have expected her to talk to the

```
1     charge nurse?

2     A.     Clarification?

3     Q.     Nurse Brown testified that she never sought

4     out the charge nurse to convey this information.

5            MS. O'REILLY:  I don't know that that's --

6     A.     So what --

7            MS. O'REILLY:  -- exactly what her tes -- I

8     don't -- I don't think that accurately depicts Nurse

9     Brown's testimony.

10           MS. NORRIS:  It is.  It does.

11           MS. O'REILLY:  Well, we -- we disagree on

12    that, so you can take that --

13           MS. NORRIS:  You disagree on the --

14           MS. O'REILLY:  For what it's worth, you

15    can --

16           MS. NORRIS:  Right.

17    Q.     Would you -- testimony is from Nurse Brown

18    that she never sought out the charge nurse to convey

19    this information.  Would that be a problem from your

20    perspective as the health services administrator?

21           MS. O'REILLY:  I'm going to object to form,

22    foundation.  And, again, I don't know --

23    A.     It would depend on what other steps she took.

24    Q.     She took a message.

25    A.     Yes, but did -- there's more factors that go
```

114

1     into that --

2     Q.     What other factors?

3     A.     -- I guess before I could answer that.

4     Q.     Tell me what those factors are.

5     A.     Did she pass it on to another nurse?

6     Q.     No.

7     A.     Did she say call back in so many hours or --

8     not hours.  Call back?

9     Q.     No.

10    A.     So what's your question?

11    Q.     My question is would you have expected her to

12    take more immediate steps?

13    A.     I would expect it to get to the charge nurse.

14    Q.     Okay.  And, in fact, this message never got

15    to the charge nurse.

16           MS. O'REILLY:  Objection.  That's actually

17    not in evidence at all.  It's possible --

18           MS. NORRIS:  You take --

19           MS. O'REILLY:  -- but we can't -- you're just

20    making up facts at this point.  I can't --

21           MS. NORRIS:  No, I'm not.

22    Q.     The message never got to the charge nurse.

23    We've already test -- we've already deposed the

24    charge nurse, and he said he never got the message.

25    A.     So then the classification officer, if they

1    didn't hear back from the nurse, they should've

2    called back.

3    Q.    Okay.  That's -- that's fine.  From your

4    perspective as the HSA, your position is then that

5    Mr. Cox should've not perfected that move of Mr.

6    Troutman until he had an affirmative response from

7    medical; is that correct?

8    A.    Correct.

9    Q.    And if he didn't get an affirmative response

10   from medical, he should have initiated a second call

11   to get that affirmative response; is that correct?

12   A.    Yes.

13   Q.    Okay.  Mr. Cox did not do that and Mr.

14   Troutman committed suicide at 10:47.  So there was

15   never a call -- there was never an affirmative

16   response from medical either clearing or not

17   clearing Mr. Troutman, so Mr. Troutman was put in

18   the barred cell with bedsheets and committed suicide

19   approximately six hours later.

20         Looking at that timeline as the health

21   services administrator, do you see any deficiencies?

22         MS. O'REILLY:  Objection.  Form.  Foundation.

23         MR. OGBURN:  Same objection.

24   Q.    You may answer.

25         THE WITNESS:  So I'm allowed to answer?

1        MS. O'REILLY:  You can answer if you can.

2    A.    Yes.

3    Q.    What are your -- what deficiencies do you

4    see?

5    A.    Am I still allowed to answer?

6    Q.    Yes.

7    A.    There should've been follow-up.  There -- he

8    should've gotten an answer before it was -- before

9    he was placed in a single cell.  And the charge

10   nurse should've cleared him before he went in the

11   single cell.

12   Q.    Okay.  Thank you.  Just to clear up some more

13   aspects of the 20(b)(6) -- the 30(b)(6), I'm going

14   to give you Exhibit Number 9 and ask you if -- we

15   were talking about the Continuous Quality

16   Improvement Program.  Is this the policy that you

17   are familiar with with respect to continuous quality

18   improvement?

19   A.    Yes.

20        (Wallace Deposition Exhibit 9 was marked for

21   identification and is filed with this transcript.)

22   Q.    Okay.  And was this policy in effect in 2015

23   at the time of Mr. Troutman's death?

24   A.    Yes.

25   Q.    Okay.  And how do we know that?

1       A.      The date.

2       Q.      Okay.  And show me where the date is that

3       establishes that.

4       A.      The date of revision.

5       Q.      Okay.  So this policy was put in place on

6       10-15-2015?

7       A.      Yes.

8       Q.      And do you know what precipitated this date

9       of revision or this -- strike that question.

10              Do you know if there were any incidences or

11      anything that occurred at Louisville Metro

12      Department of Corrections between 5-23-14 and

13      10-15-2015 that would've created a revision in this

14      policy?

15      A.      I was redoing the policies.  I was --

16      Q.      Okay.  And why were you redoing the policies

17      at that time?

18      A.      Because they needed to be made site specific.

19      Q.      And what was it about this policy that you

20      revised that made it site specific?

21      A.      The title at the top.

22      Q.      You added the title LMDC, Kentucky A-06?

23      A.      I believe so.  And I reviewed it.

24      Q.      Meaning?

25      A.      You review all the policies on a yearly

118

1       basis.

2       Q.      Okay.  And the only -- am I clear in my

3       understanding the only change you made to this was

4       adding the site specification in the upper

5       right-hand corner?

6       A.      And the date.  Other than that, I'd have to

7       go back and look at what it was before.

8       Q.      I'd ask that you produce the 5-23-14 policy,

9       please.

10              I'm going to give you what I'm going to mark

11      as Exhibit Number 10.

12              (Wallace Deposition Exhibit 10 was marked for

13      identification and is filed with this transcript.)

14      Q.      Do you recognize this document?

15      A.      Yes.

16      Q.      Okay.  What does this -- what does this

17      document purport to be?

18      A.      Communication on Patients' Health Needs.

19      Q.      This looks like before you got there it was

20      last revised -- or maybe it was issued 7-28-14 and

21      then you revised it on 10-15-15; is that correct?

22      A.      Yes.

23      Q.      Okay.  What was the reason for the revision

24      of this policy, if you know?  Well, you should know,

25      you did it.

119

1   A.    Same as the last one.

2   Q.    To make it site specific?

3   A.    Yes.

4   Q.    Okay.

5   A.    And it was a yearly review.

6   Q.    Okay.  When you were speaking of the

7   deficiencies just recently about the time lapse

8   between when classification called medical and the

9   time of death of Mr. Troutman after being placed in

10  a single barred cell, does this policy speak to that

11  situation?

12  A.    Yes.

13  Q.    Okay.  Tell me what about this -- where

14  exactly in this policy this policy speaks to the

15  situation of Mr. Troutman.

16  A.    (Reading) If a patient is determined to have

17  special needs, the patients' needs, will be

18  communicated to custody in writing.  Custody will

19  then determine the appropriate housing for the

20  patient.

21  Q.    Okay.  So we are looking at this policy, page

22  2, paragraph 5.2; is that correct?  Is that what you

23  just read?

24  A.    Yes.  And 5.1.

25  Q.    Okay.  And 5.1 is -- please articulate that

1      for the record for me.

2      A.    (Reading) Upon an inmate's arrival at the

3      facility, CCS staff will determine whether the

4      patient meets criteria of special needs.  If a

5      patient meets the criteria, the individual will

6      be -- will be recommended for the housing unit

7      based -- best equipped to meet his needs.

8      Q.    Okay.  So how did these two subsets of this

9      policy apply to Mr. Troutman's situation?

10     A.    The first one when he was first booked in,

11     they would -- they -- he gets asked intake screening

12     on -- based on that, then they will put him where he

13     best meets housing.

14     Q.    And in this particular instance, special

15     needs is defined on the first page of the policy

16     under item three, the little arrow points mentally

17     ill or suicidal is a special needs patient; is that

18     correct?

19     A.    Yes.

20     Q.    And is that what you're referring to as Mr.

21     Troutman was a special needs patient because he was

22     suicidal?

23     A.    Yes.  If he came in, if that was stated on

24     his intake screening, yes.

25     Q.    Okay.  And then 5.2 applies to him in what

121

1    way?  Into the situation in what way?

2    A.    There would be a move list put in for -- to

3    put him in the appropriate housing unit.

4    Q.    Okay.  And it says -- in this particular

5    instance we have the 11-13 suicide actually,

6    correct?

7    A.    Yes.

8    Q.    He's determined special needs because he's

9    suicidal, correct?

10   A.    Yes.

11   Q.    Under 5.2 -- well, let's -- he is cleared to

12   general population after a few days by Nurse Smith.

13   Okay.  You take that fact as stated in other parts

14   of the record.

15        My question is, under 5.3, it says, "Nursing

16   personnel is responsible for arranging the

17   appropriate follow-up evaluation."

18        Can you tell me what that means?

19   A.    Based on how he's presenting, it would be how

20   he'd need to be followed up with, so it'd be at the

21   nurse's discretion.

22   Q.    Okay.  So if he's going to go out into the

23   general population, does this 5.3 policy apply?

24   A.    It would depend the nurse's judgment.

25   Q.    Okay.  Correct.  And based upon that

1    judgment, the nurse would decide patient A does need

2    to be followed up or patient B does -- or patient A

3    does not need follow-up.

4    A.    Correct.  It's the nurse's discretion.

5    Q.    5.4 says, (Reading) The status of a Special

6    Needs Patient should be continuous and ongoing.

7          My question with respect to this, Ms.

8    Weaver[sic], is just because Mr. Troutman was

9    released into the general population, that does not

10   erase his status as a special needs inmate, does it?

11         MS. O'REILLY:  Objection.  Form.  Foundation.

12   A.    Can you restate that, please?

13   Q.    Mr. Troutman was released into general

14   population.  He had a suicide attempt on

15   November 13th, he was released into general

16   population on November 17th.  The fact that he moves

17   into general population does not remove that

18   designation as a special needs patient, does it?

19         MS. O'REILLY:  Same objection.

20   A.    It would be at the discretion of the

21   psychiatrist.

22   Q.    And how would the psychiatrist note that?

23   A.    In his chart.

24   Q.    Okay.  And the psychiatrist would say Mr.

25   Troutman is no longer special needs?

123

1      A.      I'm not sure on that, no.

2      Q.      You don't know.

3      A.      I'm not sure, no.

4      Q.      But we did discuss earlier and I think we

5      agreed, Ms. Wallace, that an inmate who is

6      previously suicidal in the institution is an inmate

7      that is at high risk, correct?

8              MS. O'REILLY:  Objection.

9      Q.      We agreed on that earlier.

10             MS. O'REILLY:  Objection.  Form.

11     A.      Case-by-case basis.

12     Q.      Okay.  Your training materials say that an

13     inmate who was previously suicidal in an institution

14     is at high risk, do they not?

15     A.      I'd have to go back through and read.

16     Q.      Okay.

17     A.      That is correct.

18     Q.      Pardon me?

19     A.      That is correct.

20     Q.      Okay.  Thank you.  So again, I'm trying to

21     understand your policies.  Since Mr. Troutman

22     remains a special needs inmate, this policy A-08

23     continues to apply to him.

24             MS. O'REILLY:  Objection.  Form.  Asked and

25     answered.

124

1          MS. NORRIS:  I never asked that question yet.

2     My first time.

3          MS. O'REILLY:  You've asked it.  You can

4     answer.

5     Q.    You can answer.

6     A.    Yes.

7     Q.    Thank you.  I'm going to show you a policy

8     that I'm going to mark as Exhibit 11 to your

9     deposition.

10         MR. SIMON:  Did you say 11?

11         MS. NORRIS:  Yes, sir.

12         MR. SIMON:  Thanks.

13    Q.    Ask you if you recognize this policy.

14    A.    Yes.

15         (Wallace Deposition Exhibit 11 was marked for

16    identification and is filed with this transcript.)

17         MS. NORRIS:  Okay.  Before I forget, Megan,

18    because I don't want to forget, every policy that

19    I'm going to speak to her about, in the event that I

20    forget to ask you, I would like you to produce the

21    policy that it revised.  Okay?

22         MS. O'REILLY:  I'm not agreeing to produce

23    anything, but, yes, if you --

24         MS. NORRIS:  I'll make --

25    Q.    Okay.  You recognize that policy.

125

1    A.    Yes.

2    Q.    Based upon our prior discussion, it looks

3    like this came under your annual review on

4    October 15th, 2015.

5    A.    Yes.

6    Q.    It had been previously issued 5-23-2014; is

7    that correct?

8    A.    That's what it says, yes.

9    Q.    And do you know whether that was an original

10   issuance of that policy or if that was just the last

11   time it was updated?

12   A.    I do not know.

13   Q.    Okay.  Who would know that information?

14   A.    It would be the -- someone at the home

15   office.

16   Q.    Corporate?

17   A.    Yes.

18   Q.    Okay.  We had earlier talked about the

19   mortality review.  Is this the policy that guided

20   your mortality review on Mr. Troutman?

21   A.    Yes.

22   Q.    And it says at the bottom of this at 5.2.1

23   that there's an administrative review.  So when we

24   looked at the cast of characters that came to that

25   mortality review, which was the LMDC people, did

126

1    they bring a list of points that were from an

2    administration standpoint what they considered

3    important regarding the mortality review?

4    A.    I cannot remember.  I know that they --

5    they're given the opportunity to ask anything they

6    want.  I don't remember what was discussed during

7    this.

8    Q.    And were you the person that's in charge of

9    the clinical aspect of the mortality review?

10   A.    Yes.

11   Q.    And what is a psychological autopsy?

12   A.    It goes through the patient's background,

13   charges, family life.  I don't know if it states in

14   here.  I'd have to look at one to know what --

15   Q.    Okay.  But a psychological autopsy, is that

16   mandatory for each mortality review?

17   A.    No.

18   Q.    Okay.  So as we sit here today, do you know

19   if there was a psychological autopsy in Mr.

20   Troutman's file?

21   A.    For sure I'd have to look back.  I don't

22   know.

23   Q.    Okay.  But if there was, it would still exist

24   in his file, mortality review file.

25   A.    Yes.

127

```
 1      Q.      That wouldn't be one of the things you
 2      shredded.
 3      A.      No.
 4      Q.      And if we look at the second page of this
 5      policy, do you believe that that -- that procedure
 6      was, in fact, followed with respect to Mr.
 7      Troutman's death?
 8      A.      Yes.
 9      Q.      Okay.  We look at page 3 of that, at 5.3, it
10      says, "Within 30 days of the patient death the
11      formal mortality review is carried out, whether or
12      not autopsy information is available."  And it lays
13      out the particular responsibilities of the
14      different, I guess, agencies.
15              If you look at the action items to be taken
16      in that 5.3 subset, do you believe that those were
17      pursued appropriately in Mr. Troutman's death?
18      A.      Yes.
19      Q.      Okay.  And you get down to the bottom, it
20      talks about the Risk Strategies Department.  What is
21      that?
22      A.      We have a CQI department at the home office.
23      Q.      CQI is the Continuous Quality?
24      A.      Uh-huh.
25      Q.      What's the I stand for?
```

128

1      A.      Improvement.

2      Q.      Continuous Quality Improvement Department.

3  Is that also your -- also your Risk Strategies

4  Department?

5      A.      Yes.

6      Q.      And it says that the mortality review and

7  files will be submitted to DCCO.  What's that?

8      A.      I'm not sure what that stands for.

9      Q.      The CMO.

10     A.      Chief medical officer.

11     Q.      So that's somebody that's in the Nashville

12  office, not on site?

13     A.      Correct.

14     Q.      And in Mr. Troutman's case did the chief

15  medical officer come in from Nashville to attend the

16  meeting?

17     A.      Not that I recall, but I'm not 100 percent

18  sure.

19     Q.      Otherwise the chief medical officer would

20  attend telephonically?

21     A.      Yes.

22     Q.      Okay.  RMD?

23     A.      Regional medical director.

24     Q.      That's Mr. Morrissey that we discussed

25  earlier?

129

```
1        A.    No.

2        Q.    No?  Who is that?

3        A.    He's the regional manager.

4        Q.    Okay.  Who's the regional medical director at

5   that time?

6        A.    I don't remember.

7        Q.    Okay.  That person would be from home office?

8        A.    Yes.

9        Q.    Would that person attend the mortality

10  review?

11       A.    I don't remember if he was there.

12       Q.    Okay.  If he wasn't there in person, would he

13  attend telephonically?

14       A.    Depends on what's going on.

15       Q.    His attendance would be reflected in Mr.

16  Troutman's mortality review file, correct?

17       A.    Yes.

18       Q.    The CBH?

19       A.    Corporate behavioral health, I think.

20       Q.    Okay.  And that person, would they normally

21  attend a mortality review?

22       A.    Depends on what the mortality is.

23       Q.    Okay.  If it's a suicide review.

24       A.    Yes.

25       Q.    Typically those people attend the suicide
```

130

1    reviews.

2    A.    Yes.

3    Q.    And why are those singled out as being

4    important for these corporate individuals to attend?

5    A.    Clarification, please.

6    Q.    You said that -- I think I understood you to

7    say that the chief medical officer, the RMD, the CBH

8    would attend a suicide mortality review either in

9    person or telephonically, but may not attend some

10   other mortality review.  Did I understand correctly?

11   A.    No.

12   Q.    Okay.  Fix my understanding.

13   A.    Behavioral health would attend suicide.

14   Q.    Okay.  Sorry.  So it's just that one

15   individual who you would --

16   A.    And it depends if they have a mental health

17   background.

18   Q.    Okay.  All right.  I'm going to show you what

19   I'm going to mark as -- actually I'm going to send

20   the able Mr. Simon go make copies while we continue.

21         MR. SIMON:  All right.  Is it not in here?

22   All right.

23   Q.    Thank you.  Exhibit Number 12 to the

24   deposition.

25         (Wallace Deposition Exhibit 12 was marked for

1        identification and is filed with this transcript.)

2        Q.    This is LMDC policy B-02.  Also looks like it

3        went under your annual review on -- this one on

4        10-22-2015?

5        A.    Yes.

6              MS. NORRIS:  Okay.  I'm also requesting

7        production of this policy's predecessor of 5-23-14.

8        Q.    What does this policy pertain to,

9        Ms. Wallace?

10       A.    Patient safety.

11       Q.    Okay.  And as I read it, it's talking

12       about -- I see under Procedure, it talks about, "A

13       critical clinical event (CCE) is defined as an

14       occurrence involving death or serious physical or

15       psychological injury, or risk thereof."  And

16       underneath that paragraph statement it talks about

17       near suicides.

18             My question is:  Is this policy implicated by

19       Mr. Troutman's suicide attempt on 11-13-2015?

20       A.    Can you clarify that, please?

21       Q.    I'm wondering with -- Mr. -- Mr. Troutman

22       attempted suicide on 11-13-2015.  We've established

23       that, correct?  By the --

24       A.    Yes.

25       Q.    Okay.  Is this policy implicated, meaning

1       does this policy come into action because of that

2       suicide attempt?  Is there any aspect of this policy

3       that applies given that Mr. Troutman attempted

4       suicide on 11-13-15?

5       A.    I don't remember.

6       Q.    Okay.  So I understand it, however, as I read

7       the policy, and correct me if I'm wrong, because

8       that's your job today, is to correct me where I've

9       misunderstood the policies, if there's a near

10      suicide, which there appears to have been on

11      11-13-15, does CCS have obligations under this

12      policy B-02 to do -- to make a full record of the

13      clinical event, to determine the root cause, and to

14      give information to the risk manager at corporate?

15      A.    So just to clarify, are you talking about his

16      overall -- the incident that happened on the 13th or

17      the incident that happened on the 24th?

18      Q.    I'm talking about the incident that happened

19      on the 13th which I would call a near suicide.

20      Maybe I'm describing it wrongly.

21      A.    I would have to go back through and look.

22      I'm not exactly sure what was entailed in this.

23      Q.    Okay.  Let me help you out with that.  Want

24      to give you what I'm going to mark Exhibit Number

25      13.

133

1           MS. NORRIS:  I only have one clean copy.  If

2      you-all share, you've seen it a million times.

3           MR. OGBURN:  Yeah.

4           (Wallace Deposition Exhibit 13 was marked for

5      identification and is filed with this transcript.)

6      Q.    Ask you if you recognize that document and

7      what information it conveys.

8      A.    I'm sorry.  I was reading it.  What --

9      what --

10     Q.    Go ahead, finish reading it.

11     A.    Okay.

12     Q.    Tell me when you're done.  I'm sorry.  You're

13     done?

14     A.    Yes.

15     Q.    Do you recognize this document and what --

16     and what information it conveys?

17     A.    Well, it recommends that this is an incident

18     report.

19     Q.    That would be something that you would see in

20     a daily briefing?

21     A.    Yes.

22     Q.    Okay.  And do you remember seeing this in --

23     do you remember attending a daily briefing where

24     this 11-13 incident involving Mr. Troutman was

25     discussed?

134

1    A.    Very vaguely.

2    Q.    Okay.  Having refreshed your recollection

3    with this exhibit, can you tell me whether it then

4    falls within policy B-02?

5    A.    No, I cannot.

6    Q.    Okay.  And why can't you tell me that?

7    A.    Because I would have to refer to the mental

8    health coordinator.  I am not sure if she put that

9    in.

10   Q.    Okay.  I think we're getting somewhere.  So

11   going back to Exhibit Number 13, do you agree with

12   me -- I mean, I think we're all on the same page

13   that this was a serious prior suicide attempt,

14   correct?

15         MS. O'REILLY:  Objection.  Form.

16   A.    I again would have to clarify that with the

17   mental health coordinator.

18   Q.    Okay.

19   A.    I'm --

20   Q.    Does it appear to you upon reading as the

21   health services administrator that this was a

22   serious suicide attempt?

23         MS. O'REILLY:  Objection.  Form.

24   A.    I would again refer to the mental health

25   coordinator.

135

1    Q.    Okay.  It was documented as such in the

2    XJail, correct?

3    A.    In XJail, yes.

4    Q.    Okay.  Do you have any reason to question the

5    documentation in XJail?

6    A.    A nurse did not write this.

7    Q.    Correct.  I'm asking if you have any reason

8    to question the documentation in XJail.

9    A.    What documentation in X --

10   Q.    The 11-13 entry.

11   A.    What do you mean by question it?

12   Q.    The entry, the way it is written.

13   A.    No.

14   Q.    Okay.  Fair enough.  So as we sit here today,

15   you do not -- it would've been the qualified mental

16   health professional who would have followed B-02 and

17   made whatever report to corporate office relative to

18   the 11-13-2015 incident.  Do I understand you

19   correctly?

20   A.    Yes.

21         MS. NORRIS:  Okay.  I would ask at this time

22   if there is an incident report at corporate relevant

23   to the 11-13 suicide attempt, that that be produced.

24         And B-04, Larry.

25         MR. SIMON:  Uh-huh.

1    Q.    I'll show you what I'm going to introduce as

2    Exhibit Number 14.

3          MR. SIMON:  What's the title?

4          MS. NORRIS:  Health Training of Correctional

5    Officers.

6          MR. SIMON:  Not B-04.  Sorry about that.

7          MS. NORRIS:  C-04.  Sorry.

8          MR. SIMON:  C-04.  Okay.  I knew I had it.

9    There (indicating).

10         (Wallace Deposition Exhibit 14 was marked for

11    identification and is filed with this transcript.)

12    Q.    Again, this would appear to me to be a policy

13    that came under your annual review November 17th,

14    2015.  Did I read that correctly?

15    A.    Say that one more time.

16    Q.    Did this come under your annual review on

17    11-17-2015 or did it come under your review for some

18    other reason?

19    A.    Annual review.

20         MS. NORRIS:  And it was first -- date of

21    issue prior to that was 5-23-14.  I would ask for a

22    copy of that prior iteration of this policy.

23    Q.    What is the reason and purpose for this

24    particular CCS policy?

25    A.    Health training for correctional officers.

1    Q.    And is that the training that we went over

2    earlier from the very large PowerPoint that we

3    discussed?

4    A.    Yes.

5    Q.    Going to show you C-07 which I'm going to

6    mark as Exhibit 15.

7          (Wallace Deposition Exhibit 15 was marked for

8    identification and is filed with this transcript.)

9    Q.    And ask you if you recognize this and if this

10   is another policy that came under your review.

11   A.    Yes.

12   Q.    Okay.  And what is this policy relevant to?

13   A.    Staffing.

14   Q.    Did -- do you know whether there was a

15   specific staffing plan in place when you came to

16   CCS?

17   A.    Yes.

18   Q.    And did you make any modifications to that

19   staffing plan?

20   A.    Can you clarify, please?

21   Q.    Did you change that staffing plan in any way

22   after -- during your policy review?

23   A.    No.

24   Q.    Do you know who prepared the original

25   staffing plan for the CCS employees at LMDC?

138

1    A.    The corporate representatives that came in

2    and did the RFP --

3    Q.    Do you know how --

4    A.    -- on the contract.

5    Q.    Okay.  Do you know how they came up with the

6    number of staff and the type of staff --

7    A.    No.

8    Q.    -- that would be necessary?  Would that be --

9    who would that be at corporate?

10   A.    I think that's what Jeff's talking about.

11         MS. O'REILLY:  Yeah.

12         MS. NORRIS:  So you have another designee?

13         MS. O'REILLY:  Uh-huh.

14         MS. NORRIS:  Okay.

15         MS. O'REILLY:  Yeah.

16   Q.    Okay.  And did you as HSA, overlooking both

17   the medical side and the mental health side, did you

18   ever believe there were any staffing issues, you

19   know, lack of staff, insufficient staff, unqualified

20   staff?

21   A.    During that time period?

22   Q.    Yes, ma'am.

23   A.    Don't remember.

24   Q.    Okay.  If you had had any issues regarding

25   staff, how would you have addressed them?

1    A.    Through corporate.

2    Q.    Okay.  So in other words, if you determined

3    that you believe that there was insufficient numbers

4    of nurses on the floor at any given time, you

5    would've communicated that to corporate to make a

6    staffing change to add staff --

7    A.    Yes.

8    Q.    -- for example?  And if you believe that a

9    particular nurse had violated a policy or procedure,

10   would that violation be communicated to corporate?

11   A.    Yes.

12   Q.    And would that violation have been put in

13   their personnel file?

14   A.    Yes.

15   Q.    And if -- same question.  If you believe that

16   there were any staffing in -- any staffing

17   deficiencies on the mental health side, would that

18   have been communicated via email to corporate?

19   A.    It would be communicated to corporate.

20   Q.    Okay.  And how?  Either call or email?

21   A.    Yes.

22   Q.    If you made a call, would you have documented

23   that with a call log?

24   A.    No.

25   Q.    And do you recall specifically in your

1    tenure, since August of 2015 to the present, have

2    you made -- have you ever made any staffing

3    complaints to corporate?

4    A.    Can you clarify?

5    Q.    Have you ever communicated to corporate that

6    you have staffing concerns of any nature?

7    A.    From the whole time we've been here?

8    Q.    Uh-huh.

9    A.    I have been here?  Yes.

10   Q.    Okay.  And what are the nature of those

11   complaints?

12   A.    We requested a training compliance nurse.

13   Q.    When did you request that?

14   A.    Off the top of my head, I don't remember.

15   Q.    Okay.  Did you communicate that in email?

16   A.    I'm not sure if I did or if the director of

17   nursing did.

18        MS. NORRIS:  Okay.  I would request a copy of

19   that communication, Megan.

20   Q.    And do you remember what prompted your

21   request for a training compliance nurse?

22   A.    I do not.

23   Q.    Okay.  Do you know timewise about when that

24   request was made?

25   A.    I do not.

1    Q.    Okay.  Is it closer in time to the present or

2    was it closer in time to your employment?

3    A.    I honestly -- I don't remember.

4    Q.    Okay.  Have you made any other staffing

5    communications to corporate?

6    A.    Have I personally?

7    Q.    Do you know of a health services

8    administrator -- as HSA do you know of any other

9    staffing communications that have been made to

10   corporate regarding the staff at LMDC?

11   A.    Yes.

12   Q.    What are the other ones?

13   A.    More nurses on the booking floor.

14   Q.    Anything else?

15   A.    And I believe they added in the nurses that

16   were over at CCC.

17   Q.    They added what?

18   A.    The nurses are -- that are over at CCC, I

19   believe those were added into our contract.

20   Q.    Can I ask you another question about -- I

21   mean, let me back up to finish that thought.

22        Do I understand you to say that there were

23   nurses at CCC that may not have been CCS employees

24   that you brought over onto your contract to be CCS

25   employees or you hired more nurses to go there?

142

1     A.     When our contract was originally set up, it

2     included CCS nurses.  When they signed the contract,

3     it did not include the CCS nurses.  Or CCC nurses.

4     So when we did a budget change to get the training

5     compliance nurses and the booking floor nurses, I

6     believe the CCC nurses were added into that as well.

7     Q.     Okay.  Going back to Exhibit Number 8 for a

8     moment.  I really did have a question.

9            Are you familiar with the setup of the

10    correction facility over at Louisville Metro, like

11    CCC, the different areas of the jail?

12    A.     At CCC?

13    Q.     All -- whatever Louisville Metro covers that

14    you have staff that attends to.

15    A.     Yes.

16    Q.     Okay.  If you were to see the designation of

17    H -- H5D9, what would that convey to you?

18    A.     The old jail.

19    Q.     And would it convey that it's a single barred

20    cell?

21    A.     I'm not sure of the actual cell, but I know

22    that there's bars over there, yes.

23    Q.     Okay.  And would you expect your nursing

24    staff to understand that H5D9 is an area of single

25    barred cells?

143

1          MS. O'REILLY:  Objection.  Form.

2     A.     Can you clarify that again?

3     Q.     Well, let me just clarify it this way:  Can

4     you verify for me that when Nurse Brown took this

5     communication as shown on XJail, mental -- or

6     medical was alerted that he was being moved to a

7     single cell?

8          MS. O'REILLY:  Objection.  Form.  Foundation.

9     That's not in evidence.

10    A.     There are single cells all over the jail.

11    They're not necessarily all over on the old jail.

12    Q.     Okay.  Would you expect your nurse to

13    appreciate that movement of a previously suicidal

14    inmate into a single barred cell creates a risk to

15    that inmate?

16    A.     Clarify that.

17         MS. NORRIS:  Would you reread the question,

18    please?

19         THE REPORTER:  Sure.

20         (Reporter read from the record as requested.)

21         MS. O'REILLY:  Objection.  Form.

22    A.     It would be on a case-to-case basis.  It

23    would be -- it'd be case by case.

24    Q.     And that's why you would want somebody from

25    mental health to go over and do an evaluation and

144

1    clear or not clear that inmate; is that correct?

2    A.    Yes.

3    Q.    Okay.  I'm going to show you E-05 and mark it

4    Exhibit Number 16.

5          (Wallace Deposition Exhibit 16 was marked for

6    identification and is filed with this transcript.)

7          MS. O'REILLY:  Can we take a quick break?

8          MS. NORRIS:  Yes, ma'am.

9          MR. SIMON:  Sure.

10         (Recess from 2:24 p.m. to 2:30 p.m.)

11   BY MS. NORRIS:

12   Q.    Okay.  I've just give you what I've marked as

13   Deposition Exhibit Number 16, Ms. Wallace.  Do you

14   recognize that policy?

15   A.    Yes.

16   Q.    And again, is that one that came under your

17   annual review?

18   A.    No.

19   Q.    Okay.  Tell me about this policy.

20   A.    This policy was in effect when I got there.

21   Q.    Okay.  And all of the other policies that

22   we've looked at heretofore you stated came under an

23   annual review when you got there in 2015.  Is there

24   some reason that no changes were made to this policy

25   in 2015 when you were doing your other review?

145

1      Excuse me.

2      A.     I hadn't gotten to this one yet.

3      Q.     Okay.  Did you eventually do a review of this

4      policy?

5      A.     Yes.

6      Q.     Do you know when you did that review?

7      A.     No.

8             MS. NORRIS:  Okay.  I would ask for both the

9      predecessor policy of this, Megan, the 10-1-08 and

10     subsequent policy that she reviewed and -- after her

11     annual review.

12     Q.     What is the importance of this policy?

13     A.     Mental health screening and evaluation.

14     Q.     Okay.  Is that what's done down on the

15     booking floor?

16     A.     Yes.

17     Q.     Okay.

18     A.     No.

19     Q.     No?

20     A.     I apologize.  It's during the 14-day physical

21     health assessment.

22     Q.     Can you describe that for me?  Can you be

23     more descriptive about that?

24     A.     About?

25     Q.     When it's done.

1      A.     At 14 days?

2      Q.     Okay.  It's done at the 14th day that the

3      person is in the institution?

4      A.     When -- they have to have it within 14 days.

5      Q.     Okay.  So if we know, do the math for me,

6      that Mr. Troutman came into the institution shortly

7      after midnight on the 13th and he hanged himself on

8      the 14th -- or the 24th, that was 11 days, so that

9      was within the window that he should have received

10     another mental health screening?

11            Or let me ask the question another way 'cause

12     I'm even confusing myself.

13            Okay.  Sometime between -- Mr. -- Mr.

14     Troutman has a suicide attempt on the 13th, he goes

15     into mental health, correct?

16     A.     Uh-huh.

17     Q.     Yes?

18     A.     Yes.

19     Q.     And then once he's cleared for mental health

20     to go into general population, according to this

21     policy, should he have had another mental health

22     screening sometime within a 14-day period?

23     A.     This is a completely different policy than

24     that.

25     Q.     Okay.  So tell me the difference in this

1       policy.

2       A.      This policy is anybody that comes into the

3       facility, they need a physical and health

4       assessment.

5       Q.      Okay.

6       A.      So they get a whole screening, medical and

7       mental health.  That's what this is.

8       Q.      Okay.

9       A.      As long as I am -- yeah.

10              (Mr. Simon reentered the deposition room from

11      the break.)

12      Q.      So my question is -- did I give you the wrong

13      one?  Gave you one with the mark on it.

14              My question is:  If we take out Mr.

15      Troutman's first suicide attempt, we just say he

16      came in on the 13th, he committed suicide on the

17      24th, would this policy have applied to him that

18      somewhere in that time frame, before he committed

19      suicide or sometime before the 14th day, he should

20      have gotten a full physical and mental health

21      assessment?

22      A.      They have up until the 14th day to do the --

23      complete this.

24      Q.      Okay.  I understand that.  But what I'm

25      trying to figure out is should -- if Mr. Troutman

1     had been in the facility another 14 days, would you

2     have expected that this screening would be done?

3     A.    Yes.  All inmates get the screening, all

4     patients.

5     Q.    And that's irrespective of the fact that he

6     had a prior suicide attempt.  You still would've

7     done this mental health, medical, physical

8     screening.

9     A.    Yes.

10    Q.    So my next question is:  Given that Mr.

11    Troutman had a prior suicide attempt on the 13th, is

12    his medical file tagged or documented in any way to

13    expedite this more -- this more thorough physical

14    and mental health screening?

15    A.    This is completed by a nurse.

16    Q.    Okay.

17    A.    So it would've been flagged for him to see

18    mental health for a more thorough evaluation.

19    Q.    Okay.  But Mr. Troutman didn't ever -- didn't

20    make his 14th day, he committed suicide on the 11th

21    day; is that correct?  Did I do my math right?  24

22    minus 13 is 11?

23    A.    Yes.

24    Q.    I'm going to show you what I'm going to now

25    mark as Exhibit Number 17, G-04.

1          (Wallace Deposition Exhibit 17 was marked for

2     identification and is filed with this transcript.)

3     Q.     And ask you if you recognize this policy.

4     A.     Yes.

5     Q.     And again, from a date standpoint, from a

6     date standpoint this -- if I follow your prior

7     testimony, this appears to be last revised 6-25-14?

8     A.     That's what it says, yes.

9     Q.     And would I understand then that you hadn't

10    quite gotten around to reviewing this one to

11    determine whether you needed to make any revisions

12    to it?

13    A.     Correct.

14         MS. NORRIS:   I would ask at this time that

15    both the predecessor policy to Exhibit 17 and the

16    subsequent policy to Exhibit 17 be produced.

17    Q.     What is the intention of this policy?

18    A.     Basic -- basic mental health services.

19    Q.     Okay.  And what is it intended to inform your

20    medical and mental health staff about?

21    A.     The mental health program.

22    Q.     Okay.  And if we're looking at this policy in

23    Exhibit Number 17 through the lens of Mr. Troutman's

24    experience at Louisville Metro Department of

25    Corrections, is there any aspect of this policy that

150

1     is informative to his situation?

2          THE WITNESS:  Can you repeat the question?

3          THE REPORTER:  Sure.

4          (Reporter read from the record as requested.)

5     A.    What do you mean by informative?

6     Q.    I guess I'm -- what I'm getting at is -- what

7     I want to know is we know that he was suicidal on

8     the -- on the 13th, correct?

9     A.    Yes.

10    Q.    Okay.  And this policy says to me that CCS

11    wants to ensure that inmates get mental health

12    services, correct?  That's the purpose of the

13    policy.

14    A.    Yes.

15    Q.    So -- and part of those mental health

16    services are to -- are suicide prevention and crisis

17    intervention, correct?

18    A.    Yes.

19    Q.    So what I'm trying to figure out is when you

20    have an inmate like Mr. Troutman that's previously

21    suicidal on the 13th and you discharge him to

22    general population, if the policy is intended to

23    ensure mental health services, what does mental

24    health do to make sure that Mr. Troutman gets

25    suicide prevention services?

1          MS. O'REILLY:  Objection.  Form.

2     A.     Can you restate that?

3          MS. NORRIS:  Can you reread it?  'Cause I'm

4     not sure I could restate it.

5          THE REPORTER:  Sure.

6          (Reporter read from the record as requested.)

7          MS. O'REILLY:  I'm going to object to form.

8     A.     Well, it'd be on a case-by-case basis, and

9     mental health would -- can you clarify that question

10    again?

11    Q.     My question is:  If this policy is intended

12    to ensure that an inmate gets mental health

13    services, we have an inmate, Mr. Troutman, who has a

14    prior suicide attempt, my -- my question is:  What

15    should mental health do under the circumstances and

16    facts of this case to make sure that Mr. Troutman is

17    followed or gets services for suicide prevention?

18         MS. O'REILLY:  Objection.  Form.

19    A.     He would have the referral in.  It'd depend

20    if he was on medication for it.  He would have a

21    treatment plan.  The psychiatrist would've specified

22    in the treatment plan how often he needs to follow

23    up.

24    Q.     Is that the end of your answer?

25    A.     I believe so.

1       Q.    Okay.  And this policy specifically

2    references your position as health services

3    administrator, and that you would coordinate as

4    health services commi -- administrator with mental

5    health coordinator and director to develop a local

6    procedure to ensure that those activities required

7    by site contract are provided in an efficient and

8    professional manner by qualified mental health

9    staff.

10          Can you translate that for me, what you're

11   supposed to do under that sentence?

12   A.    It depends on what the situation is.

13   Q.    Okay.  We have a form -- we have a prior

14   suicidal inmate, so if we assume we have a prior

15   suicidal inmate, what does this require of you?

16   A.    Working with the psychiatrist to see what she

17   would like done based on her assessment.

18   Q.    And, Ms. Wallace, did Mr. Troutman's

19   situation ever come into your -- ever come to your

20   attention prior to his successful suicide?

21          MS. O'REILLY:  Objection.  Form.

22   A.    I don't remember.  I was in daily briefings.

23   It could've came up in that.

24   Q.    Okay.

25   A.    But I don't remember.

153

1    Q.    So we had the one daily briefing where we

2    discussed where you had the incident report of the

3    prior suicide attempt that we've made an exhibit,

4    correct?

5    A.    Correct.

6    Q.    Okay.  But other than that, in the daily

7    briefing -- no, strike that question.

8          When you learned about that situation in the

9    daily briefing, did you call mental health -- let's

10   make it more general.

11         If you -- if you get information on an inmate

12   that they're previously suicidal at a daily

13   briefing, what steps do you take, if any, as the

14   health services administra -- health services

15   administrator to do follow-up?

16   A.    I would confer with the mental health

17   coordinator.

18   Q.    And who is that?

19   A.    At the time?

20   Q.    Uh-huh.

21   A.    Laura Duke.

22   Q.    Okay.  And when you say you would confer with

23   Laura Duke, what would be the nature of your

24   conversation?

25   A.    I would make sure that she was aware of it

154

1        and make sure that she's following up with it, and

2        see if he's on the list to be seen by the

3        psychiatrist.

4        Q.    And if she were to tell you that the

5        psychiatrist discharged him to general population

6        without follow-up, would that raise a concern for

7        you given the history of this patient?

8        A.    I am not clinically -- I don't have any

9        clinical background to answer that.

10       Q.    I understand.  I'm not asking you as a

11       clinician, I'm asking you as a 30(b)(6) deponent and

12       with your knowledge as health services administrator

13       over medical and mental health.

14            With that -- that -- your understanding of --

15       of that's your expertise.  Okay?  If you had learned

16       in your conversation with the health services

17       coordinator that this particular inmate who had had

18       a prior suicidal attempt -- prior suicide attempt

19       was released into general population with the

20       designation of no follow-up, what actions would you

21       have taken, if anything, to be in compliance with

22       this policy?

23       A.    I would have the mental health coordinator

24       look into it.

25       Q.    Okay.  And do you recall if you had the

155

1     mental health coordinator look into this situation?

2     A.     I do not.

3     Q.     Okay.  Would you have any documentation of

4     that conversation?

5     A.     No.

6     Q.     Okay.  And then on the second page of this

7     particular policy, item number three, it says,

8     (Reading) Health staff will utilize a site specific

9     suicide prevention program to ensure the safety of

10    patients who present with risk of self-harm.

11         Can you explain to me what a specific suicide

12    prevention -- a site specific suicide -- easy for me

13    to say.  A site specific suicide prevention program

14    is?

15    A.     It's what the -- that facility practices.

16    Q.     Okay.  And that facility being LMDC?

17    A.     For us, yes.

18    Q.     Okay.  And did you know -- do you know as we

19    sit here today what LMDC's site specific suicide

20    prevention program was in November of 2015?

21    A.     If the patient came down, they were put on

22    levels.

23    Q.     You mean OBS?  Observation?

24    A.     Yeah.

25    Q.     Okay.

1    A.    And I don't remember when inmate watchers

2    were -- were in effect.  I'm not sure if they were

3    in effect when I first came on or not.  I'd have --

4    I'd have to ask someone.  I don't know.

5    Q.    Okay.

6    A.    But if they core single cell, they'd have an

7    inmate watcher outside of their cell, but I don't

8    remember when that started.

9    Q.    Can you please do an examination of your

10   records to verify that date for us and produce it to

11   your lawyer, to CCS' lawyer?

12   A.    Yeah.

13   Q.    It says underneath that --

14         MS. O'REILLY:  We'll talk about that later.

15         THE WITNESS:  Okay.

16   Q.    Yeah.  The request is being made.

17   A.    Okay.

18   Q.    She and I will figure it out.

19   A.    Okay.

20   Q.    "Particular attention will be paid to those

21   patients housed in segregation settings, whether for

22   administrative or disciplinary reasons."

23         And is that what you're talking about where

24   potentially the -- those people in single cells

25   would have inmate watchers?

1    A.    Yes.

2    Q.    And do you know as we sit here today whether

3    Inmate Troutman was provided an inmate watcher or

4    any other site specific suicide prevention program?

5    A.    I do not.

6    Q.    Ms. Wallace, do you know what the inmate

7    alerts are -- what inmate alerts are?

8    A.    Yes.

9    Q.    I'm going to produce to you what I've

10   identified as Exhibit 18.  This is two pages.

11         MS. NORRIS:  I only have one, Denis.  Do you

12   need another copy?

13         MR. OGBURN:  No, I'm fine.

14         MS. NORRIS:  Do you need a copy?

15         MS. O'REILLY:  I would like a copy, please.

16         MS. NORRIS:  My co-counsel has one.

17         MR. OGBURN:  I'll take one.

18         MR. SIMON:  Take one.

19   Q.    Exhibit 18.  It's not stapled, it's two

20   pages.  I'll give you a paper clip.

21         MR. SIMON:  You want one stapled?

22         MS. NORRIS:  That's fine.

23         (Wallace Deposition Exhibit 18 was marked for

24   identification and is filed with this transcript.)

25   Q.    Okay.  Can you tell me what Exhibit 18

158

1      depicts?

2      A.      According to the top, Inmate Alert Report.

3      Q.      Okay.  Tell me about inmate alert reports.

4      You know, what -- when did they come into being,

5      what exactly are they, how does an inmate get on it.

6      Not necessarily in that order.

7      A.      I don't know when they came to be.  I believe

8      classification is the one that puts the alert on.

9      If they are a detox patient, then there's a list

10     that's sent to -- when they come in, there is a form

11     that classification gets that states they're on

12     detox, and then classification, I believe, puts the

13     alert on.  I'm not 100 percent positive.

14     Q.      Do you recognize any of these inmates on the

15     inmate alert report?  First one is Joseph Cambron,

16     and he was put on the inmate alert on 11-24-15.  One

17     on the top.

18     A.      Oh, okay.

19     Q.      Do you recognize that inmate?

20     A.      His name's familiar.

21     Q.      Okay.  Do you have any -- as we sit here

22     today, any information as to why Mr. Cambron was put

23     on inmate alert watch on 11-24-15?

24     A.      No.

25     Q.      As we sit here today, Ms. Wallace, do you

1    have any information as to why Inmate Troutman, who

2    had a prior suicide on 11-13-15, was not placed on

3    the inmate alert report on 11-24-15?

4    A.    I'm sorry.  Say that again.

5    Q.    As we sit here today, do you know why Mr.

6    Troutman, who had a prior suicide attempt in the

7    jail on 11-13-15, was not placed on this inmate

8    alert report on 11-24-15 like Joseph Cambron was?

9    A.    No.

10   Q.    Does mental health or medical have any input

11   on who does or does not get placed on the inmate

12   alert report?

13   A.    Yes.

14   Q.    What is medical's input?

15   A.    I guess I know if they're on detox, medical

16   puts them on detox alert.  There is a medical alert.

17   There is -- I believe there's a mental health alert,

18   but I'd have to check on that.

19   Q.    What would you have to access to refresh your

20   recollection as to whether there was a mental health

21   alert?

22   A.    XJail.

23   Q.    Okay.

24   A.    Or one of the classification officers.

25   Q.    Okay.  So as we look at this Exhibit 18 that

1    spans two pages and has a number of inmate names on

2    them spanning back to 11-6-14 on the second page, do

3    I understand your testimony correctly that these

4    inmates could be on there for medical reasons, detox

5    reasons, and potentially mental health reasons?

6    A.    As well as SORT, office -- they could be SORT

7    inmates.  They're --

8    Q.    What's SORT mean?

9    A.    Special Operation -- is that -- something

10   Team Rescue.  I would have to look it up.  I'm not

11   sure.

12   Q.    Do you know what it means?  I mean, can you

13   give me a general description of what a SORT inmate

14   is?

15   A.    It's the ones that are aggressive that are --

16   that could harm themselves or officers or nurses.

17   Q.    And --

18   A.    There's also -- there's not just medical and

19   mental health reasons why they have an alert.

20   Q.    Okay.  But to be clear, this is a process

21   that was in effect well in advance of Mr. Troutman's

22   suicide.  In other words, that inmates could have a

23   special alert to be sure that they were not placed

24   in a single cell with no bars.  I mean, that they --

25   that if they went into a single cell, it was a no

161

1    bar cell.  Do I read this correctly?

2    A.    I'm sorry.  Repeat that question.

3    Q.    This -- the Inmate Alert Report, make sure

4    I'm reading it correctly, it says Alert Name and it

5    has the name, but at the top it says No Bars Single

6    Cell.

7         Do I understand that to mean that this alerts

8    classification that the inmates on this list should

9    not go into a single cell with bars?

10   A.    That's what it says.  Correct.

11   Q.    Okay.  And that's -- my understanding is

12   correct.

13   A.    Yes.

14   Q.    Okay.  So the question that was on the table

15   was the capacity to put an alert in the system to

16   make sure that you didn't put a particular inmate in

17   a single cell with bars was available, in place, and

18   being utilized on the date that Mr. Troutman

19   committed suicide.

20   A.    According to the date up here, yes.

21   Q.    Okay.  And, in fact -- and mental health

22   gives input to this system, correct?

23   A.    They give -- they can't actually put on the

24   alert.

25   Q.    Okay.  But they tell classification.

162

1     A.     Yes.

2     Q.     Classification puts the alert in XJail.

3     A.     Yes.

4     Q.     So in Mr. Troutman's situation, if we assume

5     for purposes of argument that the communication from

6     corrections to the nurse, Nurse Brown, that

7     classifications was calling to find out if Mr.

8     Troutman, a formerly suicidal inmate, should be --

9     was being moved to a single barred cell, if that

10    communication circle had been closed and mental

11    health had gone and assessed, Mr. Troutman could

12    conceivably had an inmate alert put on his record;

13    is that correct?

14    A.     Say that question again.

15           MS. NORRIS:  Can you reread the question?

16    'Cause I'm sure I couldn't say it again.

17           THE REPORTER:  Sure.

18           (Reporter read from the record as requested.)

19    A.     It's a possibility.

20    Q.     Okay.  Correct.

21           MS. NORRIS:  Can I take a break and speak to

22    my co-counsel for a moment?

23           (Ms. O'Reilly nodded head.)

24           (Recess from 2:58 p.m. to 3:10 p.m.)

25    BY MS. NORRIS:

163

```
 1        Q.    Okay.  We're -- I think we're about finished
 2   here.  Just a couple of cleanup questions here.
 3              You said that you talked to a corporate
 4   training person in Nashville to help inform you
 5   about these specific things that you would be asked
 6   about as the 30(b)(6) designee.  Who was that
 7   individual in Nashville you spoke with?
 8        A.    It was -- her last name's Malone.  Her first
 9   name is Christine, Kristin.
10        Q.    Okay.  Christine or Kristin?
11        A.    Yes.
12        Q.    And how long has she been with CCS, to your
13   knowledge?
14        A.    I know years, but I don't know how many.
15        Q.    Number of years.
16        A.    Yes.
17        Q.    Predating you.
18        A.    I'm not sure.
19        Q.    Okay.  Well, you came on in 2015, so that's
20   two --
21        A.    I came on in 2012 --
22        Q.    Twenty --
23        A.    -- with Correct Care Solutions.
24        Q.    Okay.  Back --
25        A.    Yes.
```

164

1       Q.      I'm talking about was it --

2       A.      Oh.

3       Q.      -- predate your term at Louisville Metro.

4       A.      I believe so, yes.

5       Q.      Okay.

6       A.      But I'm not 100 percent sure.  I'd have to

7       ask.

8       Q.      And do you know what her exact title is?

9       A.      Can I look it up on my phone?

10      Q.      Sure.

11              MS. NORRIS:  And, Tracy, off the record.

12              (Off-the-record discussion.)

13      A.      Corporate director of nursing.

14      Q.      And is she in the risk management department

15      or is she like in her own department?

16      A.      It doesn't say what department she's in.

17      Q.      Okay.  That's fine.  Now, with respect to

18      Dr. Donna Smith and all the psychiatrists for that

19      matter, you said that their evaluations were done by

20      peer review?

21      A.      Yes.

22      Q.      Can you explain what that process is?

23      A.      About ten names of patients that they have

24      seen randomly chosen are sent to the home office to

25      the corporate psychiatrist.  He, I'm assuming, pulls

1    up their charts and looks through those, he has

2    questions that he answers, and once he has finished

3    that, he -- there's a certificate that he fills out

4    and then he discusses it with her.  Or with them.

5    Q.    So I'm clear on this, are these -- these

6    patients are inmates, correct?

7    A.    Yes.

8    Q.    They're inmate patients.

9    A.    From the facility.

10   Q.    Okay.  Are they actually physically

11   personally transported to corporate to go through a

12   home office psychiatric eval?

13   A.    Their names are sent to them so they can go

14   through their charts.

15   Q.    Okay.  So their names are sent to them

16   randomly and they go through the chart.

17   A.    Yes.

18   Q.    Okay.  And does he -- this -- I should not

19   assume it's a he.  Is the corporate psychiatrist

20   male or female?  I think you said he.

21   A.    Male.

22   Q.    Male.  Okay.

23   A.    Uh-huh.

24   Q.    And is it the same corporate psychiatrist

25   that was employed in 2015 that's still on staff that

166

1     does the peer reviews?

2     A.     I believe so.

3     Q.     Okay.  Do you know what that person's name

4     is?

5     A.     Damaski, Damosky.  Can I look that one up

6     too?

7     Q.     Yeah.

8     A.     Not going to be able to find it on my phone.

9     Q.     Okay.

10    A.     I'll have to --

11           MS. NORRIS:  Can you provide that name to me?

12           (Ms. O'Reilly nodded head.)

13           MS. NORRIS:  Megan will get it for us.

14    Q.     Okay.  To follow up on that, how often are

15    these peer reviews done of the psychiatrists?

16    A.     Yearly.

17    Q.     And if a psychiatrist is involved in a

18    situation where the psychiatrist cleared an inmate

19    to general population -- a prior suicidal inmate to

20    general population and that sui -- that inmate

21    subsequently commits suicide in the facility, is

22    there any separate review that's done or is that

23    part of the mortality review?

24    A.     That'd be part of the mortality review.

25    Q.     And does -- do you know if the corporate

1   psychiatrist, when he does the peer review, keeps a

2   separate file -- I understand the certificate goes

3   into the psychiatrist's file, but do you know, does

4   the corporate psychiatrist keep a separate file on

5   his peer review evaluations?

6   A.    I do not know.

7        MS. NORRIS:  I'm asking at this time for you

8   to ask the corporate psychiatrist to produce

9   Dr. Smith's peer review file evaluation that he

10  performed, if such a file exists.

11  Q.    And on site do the psychiatrists such as

12  Donna Smith have any -- any higher chain of command?

13  A.    On site, no.

14  Q.    If you disagree with a decision of the

15  psychiatrist, such as if you disagree with

16  Dr. Smith, how would you handle that disagreement?

17       MS. O'REILLY:  Objection.  Form.

18  A.    Can you clarify what you --

19  Q.    Let me see if I can ask -- lay a foundation,

20  ask a better question.

21       As HSA your job is to oversee mental health

22  and medical, correct?

23  A.    Yes.

24  Q.    And would my understanding be correct that

25  that would involve the psychiatrists?

168

1    A.    Yes.

2    Q.    And if you are alerted of a situation that

3    involved a psychiatrist judgment call and you

4    disagreed with that judgment call about a particular

5    inmate, how would you go about addressing that with

6    the psychiatrist?

7         MS. O'REILLY:  I'm going to object to form

8    and foundation, and I think that your question

9    mischaracterizes her prior testimony, which is that

10   she oversees them administratively, not clinically.

11        MS. NORRIS:  I understand that.  Subject to

12   that objection.

13   A.    So that means --

14        MS. O'REILLY:  You can answer.

15   A.    -- I can answer?

16   Q.    Yes, ma'am.

17        MS. O'REILLY:  To the extent --

18   A.    I would bring it to the corporate

19   psychiatrist's attention.

20   Q.    And then it would be up to corporate to

21   either tell you that her psychiatric decision was

22   correct or it would be up to the corporate

23   psychiatrist to override that psychiatric decision;

24   is that correct?

25   A.    It would all -- be all up to corporate.

169

1    Q.    Okay.  So let's take for purposes of argument

2    the Mr. Troutman situation, where we have a prior

3    suicide attempt on 11-13-15, he goes through detox

4    in observation one, and in the early morning hours

5    of the 17th of November 2015, approximately four

6    days later, he is seen for half an hour by Dr. Smith

7    and he's discharged to general population without

8    follow-up.  Okay?  Facts of the case.

9         You learn in a daily briefing that those --

10   that is the situation, that he was discharged in

11   general population without follow-up.  If you

12   disagreed with that psychiatric discharge note,

13   would that be something you would take up with

14   corporate?

15        MS. O'REILLY:  I'm going to object to form

16   and foundation.  I think it seeks speculation.  I'm

17   also objecting because this is completely outside

18   the scope of why this witness is being deposed

19   today.  This is not a part of the 30(b)(6) topics.

20        MS. NORRIS:  But she's also a fact witness.

21   Q.    So you may answer.

22        THE WITNESS:  I can answer?

23        MS. O'REILLY:  If you can answer the

24   question.

25   A.    What was the question?

170

```
1           MS. NORRIS:  Would you reread it, Tracy?
2    Q.    I'm really trying to get you out of here, so
3    this is the end.  Get this behind us, you can head
4    out to pick up your child.
5           THE REPORTER:  Sure.
6           (Reporter read from the record as requested.)
7    A.    I believe I first would talk to the mental
8    health coordinator about it.
9    Q.    Okay.  And I think you said you did in this
10   instance.  When you learned of Mr. Troutman on
11   the -- of his 13th suicide, you did talk to the
12   mental health coordinator about him; is that
13   correct?
14   A.    I might have.  I'm not sure.
15   Q.    Okay.  As we sit here today as the HSA and as
16   we've discussed Mr. Troutman's situation today, and
17   knowing the facts as I've just described them to
18   you, do you have any concerns that Dr. Smith
19   discharged Mr. Troutman to general population with a
20   note of no follow-up?
21          MS. O'REILLY:  Objection.  Form.  Foundation.
22   This is not a clinical witness.
23   Q.    You may answer the question.
24   A.    I'm not clinical, so I wouldn't --
25   Q.    I understand that you're not clinical.
```

1      That's not my question.  I'm asking within the scope

2      and the purview of your job as the health services

3      administrator to answer that question.

4          MS. O'REILLY:  I have the same objections.

5      A.    I would talk with the psychiatrist and find

6      out why they did what they did.

7      Q.    Okay.  Just let me have another brief break

8      and I think we will let you go.

9          (Off-the-record discussion.)

10     BY MS. NORRIS:

11     Q.    Okay.  Just a couple more questions.  That's

12     famous last words of a lawyer.

13         Did you say that Dr. Smith was at the

14     mortality review?  She would have to be there,

15     right?  Because she was the person that -- that

16     discharged him into general population without

17     follow-up, correct?

18     A.    I don't know.  I can't -- I don't remember if

19     she was there.

20     Q.    Right.  But I think when we talked earlier, I

21     asked you with respect to if there were a situation

22     where a psychiatrist were -- was involved in a -- in

23     a case where the inmate eventually committed

24     suicide, I think you told me that they would be

25     required to come to the mortality review.

172

1      A.      Yeah.

2      Q.      Okay.  So assuming those facts in evidence,

3      Dr. Smith discharging into general population, no

4      follow-up, he committed suicide after that

5      discharge, we could assume with pretty good

6      certainty that she was at the mortality review,

7      correct?

8              MS. O'REILLY:  Objection.  Form.

9      A.      I don't know if she was at the -- I don't

10     remember if she was at the mortality review or not.

11     Q.      I know you don't remember, but based upon

12     your prior testimony that if a psychiatrist is

13     involved in an inmate treatment that eventually

14     results in a suicide, those psychiatrists are

15     evaluated the mortality review.  Do I -- did I

16     misunderstand that testimony?

17     A.      Are evaluated at the --

18     Q.      Are -- are involved with mortality -- at the

19     mortality review.

20     A.      Say that one more time.  I'm sorry.

21     Q.      If a psychiatrist is involved with an inmate

22     who eventually commits suicide, that psychiatrist is

23     to be included in the mortality review discussions;

24     is that correct?

25     A.      Yes.

1    Q.    Okay.  In this case we know that Dr. Donna

2    Smith is the psychiatrist that discharged Mr.

3    Troutman to general population without follow-up

4    after he had a prior suicide attempt on 11-13-15.

5    Those are the facts in evidence.

6         Would you assume then that she would be

7    involved in the mortality review absent some other

8    extraordinary circumstance?

9         MS. O'REILLY:  Objection.  Form.  You can

10   answer.

11   A.    Yes.

12   Q.    Meaning yes, you expect her to be there.

13   A.    Yes.

14   Q.    Okay.  Would you also expect at that

15   mortality review for the types of -- well, strike

16   that question.

17        At that mortality review, did you question

18   Dr. Smith about why she discharged Mr. Troutman into

19   the general population without follow-up given his

20   prior suicide attempt?

21        MS. O'REILLY:  Objection.  Form.  This is --

22   the specific events with respect to Mr. Troutman's

23   mortality review are currently the subject of a

24   motion that's in front of the judge.

25   Q.    Do you remember asking Dr. Smith any

1    questions at the mortality review?

2    A.    I do not.

3          MS. NORRIS:  Okay.  That will start -- we'll

4    stop there then.  Thank you.

5          MS. O'REILLY:  I have quick just like two

6    questions.

7                    EXAMINATION

8    By Ms. O'Reilly:

9    Q.    Earlier you testified that if the

10   classifications officer wants to get in touch with

11   the charge nurse regarding putting an inmate on a

12   move list to a single cell, that classifications

13   officer can email or can call up to the nurse's

14   station.

15         Is there any other steps, anything else a

16   classifications officer can do to reach a nurse or a

17   charge nurse?

18   A.    They can call master control and see if

19   anybody has eyes on the nurse.  They can also have

20   one of the officers radio for the nurse or an

21   officer that's by the nurse if it needs to be right

22   then and there and it cannot wait.

23   Q.    And have you had -- are you familiar with

24   that situation happening in the past, where a

25   classifications officer will take those steps to

175

1    reach a nurse?

2    A.    I have not, but we -- they call management if

3    they can't reach the nurse's station as well.

4    Q.    Okay.  Earlier you testified that you believe

5    there was a deficiency in that a nurse did not clear

6    Mr. Troutman for the move list before -- before he

7    was put in the single cell.

8         MS. NORRIS:  I don't believe that that was

9    her testimony.  Objection.  That was not the

10   testimony.

11   Q.    Could you explain -- will you explain to me

12   what you think the deficiency was?

13   A.    In order for someone to be placed in a single

14   cell, they need clearance from medical.  If they

15   don't have clearance from medical, the patient

16   should not be moved.

17   Q.    So in your opinion Mr. Troutman should not

18   have been moved.

19   A.    Correct.

20        MS. O'REILLY:  Okay.  I think those are all

21   the questions I have.

22        MS. NORRIS:  Can you let me just confer one

23   more time with Mr. Simon?

24        (Ms. O'Reilly nodded head.)

25        (Off-the-record discussion.)

176

1           MS. NORRIS:  Assuming Mr. Ogburn doesn't have

2     any questions, we are concluded with this

3     deposition.  We appreciate your time, patience, your

4     candor, and your honesty today.

5           THE WITNES:  Thank you.

6           MR. OGBURN:  I don't have any questions.

7           (Deposition concluded at 3:30 p.m.)

8                     *              *              *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

177

STATE OF KENTUCKY      )
                       )   SS.
COUNTY OF JEFFERSON    )

        I, Tracy P. Lundergan, a Notary Public within

and for the State at Large, my commission as such

expiring 23 January 2021, do hereby certify that the

foregoing deposition of TERESA MARIE WALLACE was

taken before me at the time and place stated and for

the purpose in the caption stated; that the witness

was first duly sworn to tell the truth, the whole

truth, and nothing but the truth, that the

deposition was reduced by me to shorthand writing in

the presence of the witness; that the foregoing is a

full, true, and correct transcript of the said

deposition so given; that there was no request that

the witness read and sign the deposition; that the

appearances were as stated in the caption.

        I further certify that I am neither of

counsel nor of kin to any of the parties to this

action and am in nowise interested in the outcome of

said action.

        WITNESS my hand this 28th day of February

2018.


                        _____
                        Registered Merit Reporter
                        KY CCR 20042B070
                        Notary Public, State at Large

McLENDON-KOGUT REPORTING SERVICE, LLC (502) 585-5634