**ASSESSMENT OF *TROUTMAN v. LOUISVILLE METRO DEPARTMENT OF CORRECTIONS, ET. AL.***

<u>Introduction</u>

Detailed below is this writer's assessment of the above captioned case. Such assessment is based upon review of documents supplied to date and identified below. As such, this writer reserves the option of amending and/or enlarging upon this assessment if subsequent documents become available.

By way of background, this writer is a project director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts. A nationally recognized expert in the field of suicide prevention in correctional facilities, this writer has served as project director for the only five national U.S. Justice Department-funded studies conducted of jail, prison, and juvenile suicide. This writer previously served as editor and project director for the *Jail Suicide/Mental Health Update* newsletter, a quarterly publication devoted to research, training and prevention that was funded by the U.S. Justice Department from 1986 through 2009. This writer has authored over 100 publications in the area of suicide prevention in jail, prison, and juvenile facilities. These publications are listed in the curriculum vitae attached as Exhibit 1.

In addition, since 1983, this writer has served as a consultant in providing staff training and program assessment/development services in the area of suicide prevention in correctional facilities to various county and state jurisdictions throughout the country. This writer has also served as the suicide prevention consultant to the Special Litigation Section of the U.S. Justice Department's Civil Rights Division and Office of Civil Rights and Civil

2

Liberties of the U.S. Department of Homeland Security in their investigations of conditions of confinement in various correctional facilities; as well as serves as a consultant to several state departments of correction and state juvenile correctional agencies in the area of suicide prevention.

Further, this writer has been appointed as a federal court monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Finally, this writer has served as an expert witness/consultant in over 400 litigation cases involving suicide in correctional facilities, and has been qualified as an expert in both federal and state courts throughout the country.  Pursuant to Rule 26 of the Federal Rules of Civil Procedure, this writer's expert witness consultation rates are $300 per hour for case file review, $350 per hour for report writing, and $1,400 for the first four hours of deposition/trial testimony and $350 per hour thereafter.  A listing of deposition and trial testimony as an expert witness during the past four years is attached as Exhibit 2.

This writer was a past recipient of the National Commission on Correctional Health Care's Award of Excellence (2001) for outstanding contribution in the field of suicide prevention in correctional facilities.  This writer's work has been cited in the suicide prevention sections of various state and national correctional health care standards, and training curricula has been utilized by hundreds of correctional agencies throughout the country, including in this case by Correct Care Solutions (the contracted health care provider to the Louisville Metro Department of Corrections).

Finally, as a result of research, technical assistance, and consultant work in the area of suicide prevention in correctional facilities, this writer has reviewed and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 38 years.

## Documents Reviewed

The following documents were reviewed in preparation of this assessment. They include:

- Third Amended Complaint;

- Various jail records for Charles Troutman in the Louisville Metro Department of Corrections (LMDC) from November 13, 2015 thru November 24, 2015;

- Various Correct Care Solutions (CCS) medical and mental health records for Mr. Troutman in the LMDC;

- Various incident reports regarding Mr. Troutman's suicide attempt in the LMDC on November 13, 2015;

- Investigative Report of Mr. Troutman's suicide by the LMDC's Professional Standards Unit;

- Investigative Report of Mr. Troutman's suicide by the Louisville Metro Police Department's Public Integrity Unit;

- Various incident reports and recorded interviews of LMDC staff and inmates regarding Mr. Troutman's suicide;

- Various LMDC policies and procedures, including Suicide Prevention and Intervention (04-4.08), Special Management Unit (03-3.01), Classification Assessment (05-1.02), and e-mail correspondence amongst LMDC classification personnel regarding the "single cell" protocol dated January 13, 2014 and November 16, 2016;

- Various CCS policies and procedures, including "OPS-100-G-05 Suicide Prevention Program – Louisville, KY," "G-05 Suicide Risk Reduction Program," and "Technical and Price Proposal" dated July 30, 2013;

- Various materials regarding mental health and suicide prevention training from both LMDC and CCS, including LMDC's "Mental Health and Corrections" CCS's "Suicide Risk Reduction for Correctional Nurses;"

- LMDC's "Inmate Alert Report - No Bars Single Cell" dated November 24, 2015;

- Mr. Troutman's "Inmate Movement Sheet" during his LMDC confinement;

- Various case file documentation regarding the six (6) prior LMDC inmate suicides of Mahmoud Hindi, Laron Moore, Jonathan Wright, Franklin Bolton, Mark Webb, and James Ashby from October 2013 through October 2015; and

- Deposition transcripts and accompanying exhibits for Martin Baker, Mark Bolton, Kimberly Brown, Michael Callahan, James Cox, Heather Denning, Kyle Ernst, Dustin Miller, Randall Ramey, Joseph Schindler, Eric Schmitt, Donna Smith, Theresa Temple, Stephanie Troutman, Teresa Wallace, and Terry Warden.

Finally, this writer has reviewed the *Kentucky Jail Standards* within Title 501, Chapter 3, Justice and Public Safety Cabinet, Kentucky Department of Corrections, as well as the following nationally recognized correctional standards: American Correctional Association (ACA)'s *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition (2004); National Commission on Correctional Health Care (NCCHC)'s *Standards for Health Services in Jails*, 9th Edition (2014); and the "Suicide Prevention and Intervention Standard" from the U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* (2011).[1]

_____

[1]The *Kentucky Jail Standards* do not address suicide prevention. The following national standards address suicide prevention: American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities*, 4th Edition, Laurel, MD: Author; National Commission on Correctional Health

**Case Analysis**

This writer was asked by plaintiff's counsel to examine all pertinent documents available in this case to date, and give an opinion as to whether, through policy and practice, the actions and/or inactions by the Louisville Metro Department of Corrections (LMDC) and contracted personnel were either contrary to, or inconsistent with, both national correctional standards and the standard of care, and were the proximate causes of Charles Troutman's suicide in the LMDC on November 24, 2015.

The methodology this writer utilizes to review a suicide is to review and analyze documentation, determine the facts upon which to rely and compare the actions of officials and their staff to the applicable state and/or national standards, as well as well-established reasonable practices in the correctional facility setting, in this case, a county jail facility. This writer then bases his professional opinions on this comparison, as well as my education, training and experience, including conducting the only five national studies on inmate suicide for the US Justice Department, developing training curricula on suicide detection and prevention in jail and prison facilities, developing and/or revising suicide prevention policies, and acting as a federal court monitor in jail, prison, and juvenile facilities throughout the country.

---

Care (2014), *Standards for Health Services in Jails*, 9th Edition, Chicago, IL: Author; and U.S. Department of Homeland Security (2011), Immigration and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington, DC: Author.

### Charles Troutman

According to available records, Charles Troutman, 47-years-old, was arrested by Louisville Metro Police Department officers on various drug-related charges during the evening of November 12, 2015. He was subsequently transported to the Main Jail Complex (also referred to as the Hall of Justice) of the Louisville Metro Department of Corrections (LMDC). Mr. Troutman was booked into the Main Jail Complex at approximately 12:48am on November 13, 2015 and, apart from attending his initial arraignment hearing, remained in a holding cell for the next 18 hours.

At approximately 6:05pm on November 13, a correctional officer (Vanover) observed Mr. Troutman to be asphyxiating himself with a piece of Kerlix gauze wrapped tightly around his neck "so tight that I could not get a finger in," according to the officer's report. The inmate was observed to be "lying on the ground lightly shaking and spitting." Mr. Troutman appeared unresponsive and Officer Vanover called for an emergency response. The officer subsequently entered the cell and was able to remove the ligature so that Mr. Troutman became responsive, asking the officer "why I didn't just leave him for a few more minutes." When later asked by Sergeant Eric Schmitt why he tried to commit suicide, Mr. Troutman responded that "He was a junkie and had no reason to live because he was going to get 20 years for his charges." He was then seen by the intake nurse (Heather Denning) and placed on suicide precautions (i.e., "Level 1") which resulted in his transfer to an observation cell, removal of his clothing and issuance of a safety smock, and

requirement for observation at 15-minute intervals.[2] Nurse Denning identified Mr. Troutman's problem list as: "Hypertension Not Otherwise Specified, Drug Withdrawal, Suicide and Self-Inflicted Injury Not Otherwise Specified."

Following his suicide attempt, Mr. Troutman was also provided with intake medical screening by Nurse Denning.[3] According to the medical screening, Mr. Troutman self-reported daily use of both heroin and methamphetamine, and had last taken heroin the day before. He did not self-report or show any signs of detoxification. Although denying any current and prior history of mental illness or mental health treatment, Mr. Troutman self-reported "3-4" prior suicide attempts during 2015. (Nurse Denning did not initiate any inquiry regarding these recent suicide attempts.) As demonstrated by his suicide attempt in the holding cell, he also expressed current suicidal ideation. According to Nurse Denning's documentation on the intake medical screening form, Mr. Troutman answered "yes" to the following questions/observations: signs of depression; expressing feelings of hopelessness; appears anxious, afraid, or angry; and appears embarrassed or ashamed. In addition to placement on suicide precautions, Nurse Denning also placed Mr. Troutman on a detoxification protocol.

The following day on November 14, Mr. Troutman was seen by a mental health clinician (Earl Ellis) from Correct Care Solutions (CCS).[4] Mr. Ellis did not complete an

---

[2]Review of the Medical/Mental Health Observation Forms completed by LMDC officers from November 13 through November 16, 2015 found that there were several violations of the required observation at 15-minute intervals.
[3]It was unclear from documentation in the medical chart whether part of the intake medical screening had been completed prior to his suicide attempt.
[4]Correct Care Solutions (CCS) was the contracted health care provider to the Louisville Metro Department of Corrections.

the "Suicide Watch Initial Assessment" as required, rather he completed a "Self-Harm Watch/Mental Health Observation Follow-Up Note." According to the clinician's note, "Patient stated 'I'm not good at all, I'm dying! The nurses don't like me because of a junkie. Patient reported sleep disturbance and minimal appetite. Patient denied current SI or HI and stated 'I just want to get out of this room.'" Suicide precautions were continued. Mr. Troutman was again seen by Mr. Ellis the following day (November 15), with the progress note stating that "Patient presented to MHP stating 'I wanna file a  grievance! I haven't been out of here since Friday, I wanna shower and go to the dayroom." Patient denied HI or SI, 'stating absolutely not, I love myself the most.' Patient reported positive appetite and interactions with peers. Patient noted significant sleep disturbance, likely related to detox." Suicide precautions were continued.

The following day (November 16), Mr. Troutman was seen by another mental health clinician (Mark Krank) who noted that the inmate "denies making any self-harm statements. 'They told me I'd see the doctor and get out of here today.' He denies any self-harm ideations." Suicide precautions were continued. Mr. Troutman was also seen later that day by the CCS psychiatrist (Donna Smith, MD) who completed a "Behavioral Health Psychiatric Provider Initial Evaluation." According to Dr. Smith's assessment, "I/M seen and evaluated while on level one. While in holding I/M had wrapped curlex, hand had been bandaged with it, around his neck in a suicide attempt. I/M said he did it on purpose because the guard was mean to him and he wanted out of holding and up to gp. He denied it was an actual suicide attempt and adamantly denies SI/HI/AH currently and was calm and

cooperative during evaluation."[5] Mr. Troutman denied any history of mental illness or prior mental health treatment, but did self-report a suicide attempt at age 13 by ingesting aspirin. He also stated that he was in a coma for nine days last year following "a blow to the head. Says he now stutters sometimes. HTN as well." Mr. Troutman also reported a long history of drug use, including daily heroin and methamphetamine use. Dr. Smith found his mental status to be within the normal range, but insight and judgment was assessed as being "fair." Dr. Smith determined that Mr. Troutman could be discharged from suicide precautions and housed in general population. No follow-up was ordered, although it was required by policy. In addition, a treatment plan for Mr. Troutman was not developed, although it was required by policy.

The following day (November 17), Mr. Troutman was also discharged from the detoxification protocol and re-housed in Unit 6, Dorm 6 of the Main Jail Complex (MJC). In addition, Stephanie Troutman (the inmate's daughter) called the MJC during the morning of November 17 to inquire about the health status of her father. Although verification of the telephone call was contained on the LMDC Classification "Inmate Movement Sheet" for Mr. Troutman, the context of the telephone call was not included in the narrative. However, according to the deposition testimony of Ms. Troutman, she called the MJC that day and wanted to talk to a mental health clinician regarding her father. When

---

[5]It was noteworthy that Dr. Smith subsequently testified during her deposition on December 19, 2017 that all the information utilized to assess Mr. Troutman's suicide attempt on November 13, 2015 was from the inmate himself, and she did not remember reviewing any written reports of the incident or talk with any officers or nursing personnel. In fact, Dr. Smith testified at page 87 of her deposition that the description of the incident in Officer Vanover's report "seems more serious" than how Mr. Troutman described the suicide attempt. Dr. Smith also did not recall reviewing the intake medical screening form and incident report for Mr. Troutman that was completed by Nurse Denning, but that the additional information contained in the nurse's documentation would have been helpful to her evaluation, particularly "because of the hopelessness" (at page 147) expressed by Mr. Troutman to the nurse.

informed that mental health personnel were not available at that time, she informed the unidentified individual taking the message (likely a "correction technician") that her father had complained "that the counselor kind of acted disinterested, and I wanted to let him know that he had - a previous traumatic brain injury and he was in the hospital. And I told them about that a little bit, that situation, and that he had been crying on the phone to me and he wasn't a crier normally, that he was upset. I reminded him of his previous suicide attempt and asked if she could maybe, you know, talk to him in depth."

Despite Stephanie Troutman calling the Main Jail Complex regarding her father on November 17, Mr. Troutman was <u>not</u> seen by any mental health personnel.

During the evening of the following day (November 18), Mr. Troutman was involved in a verbal altercation with another inmate and rehoused in the Community Correctional Center (CCC), Unit 4 North 1 at approximately 2:36am on November 19. Two days later during the evening of November 21, Mr. Troutman was involved in a physical altercation with another inmate and returned to the MJC. Initially housed in "Unit J1 Passive Booking" at approximately 9:57pm, Mr. Troutman was relocated to "Unit J1 Rear Security Dorm 2" at 11:48pm. Two days later on November 23, he was escorted to a court hearing in which it was determined that his criminal case would be forwarded to a grand jury.

On November 24, 2015, LMDC Classification received notification that Mr. Troutman had incurred a disciplinary infraction as a result of his physical altercation with

the above inmate on November 21. At approximately 3:58pm, James Cox [a Prisoner Classification Interviewer (PCI) also referred to as a "Classification Specialist"] contacted Nurse Kimberly Brown in a Medical Unit by telephone and requested clearance for Mr. Troutman to be placed in a single cell of the MJC segregation unit. Nurse Brown informed Mr. Cox that she would pass the message along to the Charge Nurse who was authorized to make such decisions. Mr. Cox, however, did **not** wait to hear back from medical personnel regarding the proposed housing clearance. Rather, approximately 4½ hours later, PCI Cox authorized Mr. Troutman to be relocated from "Unit J1 Rear Security Dorm 2" to "Unit 5, Dorm 9, Cell 2" at 8:32pm. Of significance, Unit 5 (H5), Dorm 9, Cell 2 of the segregation unit is a cell with open-faced bars and, as described below, inmates with prior histories of suicidal behavior (such as Charles Troutman) were prohibited from being placed in barred single cells without clearance from health care personnel.

Approximately two hours later at 10:47pm on November 24, 2015, a correctional officer (Dustin Miller) found Mr. Troutman hanging from the bars by a sheet in his segregation cell (H5, Dorm 9, Cell 2). An emergency response was initiated and other officers and medical staff responded to the scene. Cardiopulmonary resuscitation was initiated. Mr. Troutman was subsequently transported to a local hospital and pronounced dead a few days later on November 28, 2015.

## **Opinions**

Based upon review of the case file materials and above summary, this writer offers the following opinions. Such opinions are based upon a reasonable degree of professional

12

certainty. Although these opinions do not include a critique of any clinical judgment utilized by mental health clinicians in this case, the opinions do include a review of the standard of care by which clinicians are expected to provide a written suicide risk assessment, as well as follow-up assessments and treatment planning for inmates discharged from suicide precautions.

*First*, Charles Troutman should <u>not</u> have been housed in a single cell with inherently dangerous bars conducive to a suicide attempt by hanging. Based upon prior suicides within the Louisville Metro Department of Corrections,[6] the LMDC developed an unwritten custom and practice of prohibiting inmates who had previously attempted suicide and/or had been identified as previously expressing suicidal ideation from being housed in single cells with bars on the doors. This unwritten custom and practice was commonly referred to as the "no bars" policy within the LMDC and affected inmates were required to be placed on a daily "Inmate Alert Report - No Bars Single Cell" list. This initiative was supported by findings from this writer's national studies of inmate suicide (as well as other research) which found that 34 percent of inmates who committed suicide had prior histories of a suicidal behavior, including placement on suicide precautions during confinement.[7]

---

[6]There were at least six inmate suicides in the LMDC in the two years preceding Mr. Troutman's death. Almost all (5 of 6) of the suicides took place in the segregation units of the Main Jail Complex (MJC), and almost all (4 of 6) involved hanging from the dangerous bars in the cell doors. For example, although Mahmoud Hindi committed suicide by hanging from the bunk in his MJC segregation unit cell in October 2013, Laron Moore committed suicide by hanging from the bars in his MJC segregation unit cell in January 2014. Jonathan Wright committed suicide by hanging from the bars in his MJC segregation unit cell in October 2014. Franklin Bolton committed suicide by hanging from the bars in his MJC segregation unit cell in February 2015. Mark Webb committed suicide by hanging in the bathroom of his CCC unit cell in May 2015. James Ashby committed suicide by hanging from the bars in his MJC segregation unit cell in October 2015.

[7]See, for example, Hayes, L.M., "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3), 2012; *National Study of Jail Suicides: 20 Years Later*, Washington, DC: National Institute of Corrections, U.S. Department of Justice, April 2010. In addition, He et al. (2001) found a strong association with completed suicides and prior suicide attempts during confinement. The researchers

This writer's same research found that the vast majority (93%) of jail suicides occur by hanging and many involved use of bars and cell doors.

Although there was conflicting deposition testimony in this case as to when the policy was initiated and the criteria for placement on the "Inmate Alert Report - No Bars Single Cell" daily list, almost all of the information in this case indicated that the unwritten policy and practice began on or before the suicide of inmate Laron Moore in January 2014.[8] Mr. Moore had been previously identified as experiencing serious mental illness, seen by mental health clinicians numerous times during his LMDC confinement, and had previously attempted suicide by hanging on August 6, 2013, resulting in his placement on suicide precautions. He was subsequently found hanging from the bars of his segregation unit cell several months later on January 4, 2014. In the alternative, according to the deposition testimony of Kyle Ernst, who was a classification supervisor in the LMDC, the "no bars alert" was initiated in approximately 2012-2013 "to make sure that inmates that have been past identified as a – as a history, we make sure they get checked prior to – prior to being moved to a floor and being misplaced in the wrong cell where they could hurt themselves" (at page 29).

reviewed Texas prison suicides occurring over a 12-month period and found that over 64% of inmates committing suicide had made at least one prior suicide attempt while in prison (see He XY, Felthous AR, Holzer CE, et al: "Factors in Prison Suicide: One Year of Study in Texas," *Journal of Forensic Sciences* 46: 896-901, 2001).

[8]PCI Cox testified at his deposition that he was not aware of such a policy, but it noteworthy that the "Inmate Alert Report - No Bars Single Cell" list was issued by his Classification Department on a daily basis and he somehow knew to call medical personnel for clearance of Mr. Troutman. As Kyle Ernst, the LMDC classification supervisor stated in his deposition, if PCI Cox was unaware of the no bars policy, "why would he make the initial call to medical" (at pages 93-94) on November 24 to notify them he needed medical clearance to place Mr. Troutman in the segregation unit. Both Mark Bolton, LMDC Director, and Martin Baker, LMDC Offender Services Manager (overseeing classification), were vague as to their respective explanations as to why Mr. Troutman was not listed on the "Inmate Alert Report - No Bars Single Cell" list, even suggesting that Mr. Troutman's suicide attempt on November 13 was not serious and occurred in order to "manipulate" his housing.

Following the suicide of inmate Moore on January 4, 2014, Mr. Ernst sent an e-mail to all classification personnel, as well as medical staff, on January 13, 2014 to reinforce the "no bars alert" protocol regarding medical clearance for inmates placed in single cells.  The e-mail stated:

> "From this point on anytime a Sgt calls you for a single cell, let them know you will call them back. You are to call Medical 574-2145 speak with a supervisor and say 'I have an inmate that has to be housed in a single cell, is there any medical conditions that classification needs to make Security aware of before moving him into a single cell.' The PCI will then notify the Sgt. that the inmate can or can't be housed in a single cell, at the same time updating the notes with WHO you spoke with in medical, what was the condition if any, who in security you notified. This is to be documented in the inmate notes."

In addition, a "Special Management Unit Medical Notification Form" was created to document the communication between classification and medical personnel. The form was attached to the LMDC Special Management Unit policy (No. 03-3.01).

Further, LMDC's "Inmate Alert Report - No Bars Single Cell" list dated November 24, 2015 contained the names of nine (9) inmates who had histories of suicide attempts and suicidal ideation and, based on such behavior, were prohibited from being housed in single cells with bars.  Such designations were made on these nine (9) inmates on October 9, 2014, November 6, 2014, February 9, 2015, March 30, 2015, August 28, 2015, September 16, 2015, October 19, 2015, October 26, 2015, and November 22, 2015; providing ample evidence the no bars policy had been implemented well before Mr. Troutman's confinement. As such, despite his suicide attempt in LMDC custody on November 13,

2015, LMDC personnel <u>failed</u> to place Mr. Troutman on the "Inmate Alert Report - No Bars Single Cell" list along with these nine (9) other inmates.

In conclusion, any claim in this case that the "no bars policy" was not formalized, not applicable to all inmates with recent suicidal behavior, and/or not implemented until after Mr. Troutman's death was not consistent with the evidence in this record. In addition, according the deposition testimony of Teresa Wallace, CCS Health Services Administrator (HSA), there was no reasonable explanation for medical personnel failing to respond to PCI Cox's telephone request, and that Nurse Brown should have located the charge nurse and that the charge nurse should have responded back to classification. HSA Wallace also could not explain why Mr. Troutman was not placed on the "Inmate Alert Report - No Bars Single Cell," and that he should not have been housed in the segregation unit prior to clearance by medical personnel. In addition, Joseph Schindler, who was a CCS charge nurse, testified at his deposition that both LMDC and CCS had consistent "no bars" policies (at page 20); these policies were initiated well before Mr. Troutman's suicide (at page 57); he never received the clearance request from PCI Cox or any other classification or medical personnel (at page 71); Mr. Troutman should have never been placed in segregation without medical clearance (at page 53); and that if aware of Mr. Troutman's suicide attempt on November 13, he would <u>not</u> have approved the segregation placement into a barred cell, but rather referred the inmate to mental health clinician for assessment (at pages 31 and 48).

As such, the combined failure of LMDC personnel to place Mr. Troutman on the "Inmate Alert Report - No Bars Single Cell" list, failure of medical personnel to respond to classification, and the decision to place Mr. Troutman in segregation without clearance from medical personnel, resulted in his inappropriate placement in a single cell with inherently dangerous cell bars that were utilized as the anchoring device in his suicide.

*Second*, in addition to the above e-mail notification to both classification and medical personnel by Classification Supervisor Ernst and the creation of the "Special Management Unit Medical Notification Form," as well as the "Inmate Alert Report - No Bars Single Cell" list protocol, the LMDC Special Management Unit policy (No. 03-3.01) also required that "*When an inmate is transferred to segregation, Health Services Staff are notified immediately and provide assessment and review as indicated by protocols established by the health authority*" (at page 5). Such a policy directive is a basic standard of care requirement to ensure that there are no health care concerns (e.g., placing an inmate with a recent history of suicidal behavior by hanging in an inherently dangerous cell with bars) that contraindicate an inmate's placement in segregation. This was an additional policy requirement that was violated in Mr. Troutman's case.

*Third*, without opining about any clinical judgment utilized by any mental health clinicians in this case, the CCS mental health clinician (Earl Ellis) who initially saw Mr. Troutman on November 14, 2105 following his suicide attempt the previous day, failed to conduct and document a reasonable suicide risk assessment for Mr. Troutman. The standard of care requires that documentation of a comprehensive assessment of suicide risk

includes sufficient description of the current behavior and justification for either placement on, or discharge from, suicide precautions. The assessment should include a brief mental status examination (MSE), listing of chronic and acute risk factors (including prior history of suicidal behavior), listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and a treatment plan.[9] Level of risk determines whether the inmate requires constant observation or observation at a less frequent interval (e.g., 15-minutes). In addition, standards from the National Commission on Correctional Health Care require that:

> "An evaluation, conducted by a qualified mental health professional, designates the individual's level of suicide risk, level of supervision needed, and need for transfer to an inpatient mental health facility or program. Patients are reassessed regularly to identify any changes in condition indicating a need for a change in supervision level or required transfer or commitment. The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions."

The initial interaction between Mr. Ellis and Mr. Troutman simply resulted in the clinician completing a "Self-Harm Watch/Mental Health Observation Follow-Up Note." Other than a brief MSE, the note failed to list any chronic and acute risk factors (including inquiry into Mr. Troutman's alleged multiple suicide attempts during 2015 as self-reported during the intake medical screening), listing of any protective factors, level of suicide risk (e.g., low, medium, or high), and a treatment plan. This encounter was certainly not a suicide risk assessment and Mr. Ellis violated CCS policy. For example, pursuant to CCS policy, mental health clinicians were required to complete the CCS "Suicide Watch Initial Assessment" form. The policy required that the assessment include "Events leading to

---

[9]See American Psychiatric Association (2003), "Practice Guideline for the Assessment and Treatment of Patients with Suicidal Behaviors," *American Journal of Psychiatry*, (160) 11: 1-60 (Supplement).

placement on suicide watch; Mental Status Examination; the Columbia Suicide Severity Rating Scale, screening version; Corrections-specific risk factors and protective factors; Treatment plan with treatment goals; Property the inmate is permitted, Referrals and consultation that are needed (see CCS's "OPS-100-G-05 Suicide Prevention Program – Louisville, KY" policy).

In addition, contrary to the standard of care, Donna Smith, MD, the CCS psychiatrist (as well as the other mental health clinicians) failed to develop a treatment plan for Mr. Troutman as a result of discharging the inmate from suicide precautions on November 16. The CCS "OPS-100-G-05 Suicide Prevention Program – Louisville, KY" policy required that "treatment plans addressing suicidal ideation and its reoccurrence are developed, and patient follow-up occurrence as clinically indicated." This policy was somewhat consistent with NCCHC and other national correctional standards which stated that, mental health clinician(s) were required to develop treatment plans for inmates discharged from suicide precautions that "describe signs, symptoms, and the circumstances in which the risk for suicide is likely to recur, how recurrence of suicidal thoughts can be avoided, and actions the patient or staff can take if suicidal thoughts do occur" (see NCCHC, 2014).

Finally, and perhaps most importantly, contrary to the standard of care and CCS policy, *mental health clinicians failed to provide any follow-up assessments of Mr. Troutman following his discharge from suicide precautions on November 16, 2015*. As clearly required by NCCHC standards, a facility's suicide prevention policy shall include

"procedures for periodic follow-up assessment after the individual's discharge from suicide precautions." In addition, the CCS "OPS-100-G-05 Suicide Prevention Program – Louisville, KY" policy clearly stated (in bold font) "**Behavioral health staff conduct a face-to-face evaluation with the patient no later than 7 days after removal from suicide watch to assess adjustment to population**. The mental health professional may determine that additional clinical visits are indicated. Site specific policy may require more frequent follow-up for individuals taken off of suicide watch."

Finally, the "CCS Suicide Risk Reduction for Correctional Nurses" training curriculum which, according to the deposition testimony of HSA Wallace, was required to be completed by both nursing and mental health personnel, required "follow-up procedures for behavioral health care with suicidal patients should occur less than 7 days after release from observation status" (at page 11 of curriculum). Specific to this case, HSA Wallace testified that Mr. Troutman "would have a treatment plan. The psychiatrist would've specified in the treatment plan how often he needs to follow up" (at page 151). It would also have been appropriate for the psychiatrist to specify in Mr. Troutman's treatment plan that he was prohibited from being housed in a single cell with bars based upon his recent prior suicide attempt in the LMDC.

Dr. Smith, the CCS psychiatrist, provided inconsistent testimony during her deposition regarding the requirements for follow-up after discharge from suicide precautions. For example, when initially asked if she made a determination as to whether inmates discharged from suicide precautions were or were not provided follow-up by

mental health personnel, Dr. Smith stated that "I made that decision on most of the inmates on my unit that I saw" (at page 39). Dr. Smith later stated that another mental health clinician would "usually follow up and see them every week" (at page 71). When explaining why she wrote "no" follow-up on her assessment form when discharging Mr. Troutman from suicide precautions on November 16, 2015, Dr. Smith testified "that's the way we put it when there was no MD follow-up, but everyone that was on our unit is followed up by a mental health professional" (at page 115). Despite such testimony, the facts in this case indicated that Mr. Troutman <u>never</u> received any contact by either Dr. Smith or any other mental health clinician following his discharge from suicide precautions on November 16, 2015 (including following the concerning telephone call from Stephanie Troutman on November 17).

*Fourth*, the Louisville Metro Department of Corrections had grossly inadequate policies, procedures, and practices in the area of jail suicide prevention that were contrary to not only the standard of care, but national correctional standards. Such policies were also contrary to the CCS suicide prevention policies. A sound written suicide prevention policy is a prerequisite for running a correctional facility of any size. The importance of written policy in suicide prevention is clearly stated in the American Correctional Association (ACA)'s *Performance-Based Standards for Adult Local Detention Facilities* (4-ADLF-4C-32): "A suicide-prevention program is approved by the health authority and reviewed by the facility or program administrator.  It includes specific procedures for handling intake, screening, identifying, and supervising of a suicide-prone inmate and is signed and reviewed annually," and recommends annual training in the "signs of suicide

risk" and "suicide precautions."[10] In addition, the National Commission on Correctional Health Care (NCCHC)'s *Standards for Health Service in Jails* (J-G-05) requires each jail to have a written suicide prevention plan that includes the following components:

**1) Training.** All staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide, and how to respond appropriately. Initial and at least biennial training are provided, although annual training is highly recommended.

**2) Identification.** The receiving screening form contains observation and interview items related to the inmate's potential suicide risk.  If a staff member identifies someone who is potentially suicidal, the inmate is placed on suicide precautions and is referred immediately to mental health staff.

**3) Referral.**  There are procedures for referring potentially suicidal inmates and those who have attempted suicide to mental health care providers or facilities.  The procedures specify a time frame for response to the referral.

**4) Evaluation**. An evaluation, conducted by a qualified mental health professional, designates the individual's level of suicide risk, level of supervision needed, and need for transfer to an inpatient mental health facility or program.  Patients are reassessed regularly to identify any changes in condition indicating a need for a change in supervision level or required transfer or commitment.  The evaluation includes procedures for periodic follow-up assessment after the individual's discharge from suicide precautions.

**5) Housing.**  Unless constant supervision is maintained, a suicidal inmate is not isolated.  Rather, he or she is housed in the general population, mental health unit, or medical infirmary, and located in close proximity to staff. All cells or rooms housing suicidal inmates are as suicide-resistant as possible (i.e., without protrusions of any kind that would enable the inmate to hang himself/herself).

**6) Monitoring.**  There are procedures for monitoring an inmate who has been identified as potentially suicidal.  Regular, documented supervision should be maintained, usually every 15 minutes or more frequently if necessary.   While there are several protocols for monitoring suicidal inmates, when an actively suicidal inmate is housed alone in a room, supervision through continuous monitoring by staff should be maintained. Other supervision aids (e.g., closed circuit television, inmate companions

---

[10]American Correctional Association (2004), *Performance-Based Standards for Adult Local Detention Facilities* (4th Edition), Lanham, MD: Author.

or watchers) can be used as a supplement to, but never as a substitute for, staff monitoring.

**7) Communication.**  Procedures for communication between health care and correctional personnel regarding the status of the inmate are in place to provide clear and current information.  These procedures also include communication between transferring authorities (e.g., county facility, medical/psychiatric facility) and facility correctional personnel.

**8) Intervention.**  There are procedures addressing how to handle a suicide attempt in progress, including appropriate first-aid measures.

**9) Notification.**  Procedures are in place stating when correctional administrators, outside authorities, and family members are notified of potential, attempted, or completed suicides.

**10) Reporting.**  Procedures for documenting the identification and monitoring of potential or attempted suicides are detailed, as are procedures for reporting a completed suicide.

**11) Review.**  There are procedures for medical and administrative review if a suicide or a serious suicide attempt (as defined by the suicide plan) occurs. See J-A-10 Procedure in the Event of an Inmate Death for details on these processes.

**12) Critical incident debriefing**. The facility administrator specifies the procedures for offering timely critical incident debriefing to all affected personnel and inmates.  Critical incident debriefing is a process whereby individuals are provided an opportunity to express their thoughts and feelings about a critical incident (e.g., suicide attempt, suicide), develop an understanding of critical stress symptoms, and develop ways of dealing with those symptoms.[11]

The U.S. Department of Homeland Security's *Operations Manual ICE Performance-Based National Detention Standards* requirements for a sound suicide prevention program mirror those of the NCCHC standards.[12]

---

[11]Ibid. As a nationally-recognized expert in the area of suicide prevention in correctional facilities, NCCHC has regularly requested this writer's assistance in critiquing and revising this provision when the standards are updated every several years, as well as developed a guide for the development of suicide prevention policies which is contained as an appendix to each edition of the NCCHC standards and/or contained on the organization's website.

[12]U.S. Department of Homeland Security (2011), Immigration and Customs Enforcement, *Operations Manual ICE Performance-Based National Detention Standards*, Washington, DC: Author.

Although state and national correctional standards are generally not legally binding and do not set constitutional requirements, the U.S. Supreme Court has stated that such standards have the ability to serve as guidelines or benchmarks in assessing "duty of care" or "reasonable conduct."[13] With that said, numerous jurisdictions throughout the country are required through court-orders and/or settlement agreements to develop and maintain comprehensive suicide prevention programs in their jail, prison, and juvenile systems that, as indicated above, include staff training, intake screening/assessment, safe housing, levels of observation, emergency response, and mortality reviews based upon national correctional standards.[14]  Others, such as the Louisville Metro Department of Corrections, become accredited by the ACA and NCCHC and, therefore required to have a reasonable suicide prevention policy.

Although the LMDC suicide prevention policy (Suicide Prevention and Intervention, No. 04-4.08) referenced both the ACA and NCCHC standards,[15] and contained procedures regarding intake screening, training, and responding to a suicide attempt; it failed to provide any written procedure or guidance as to the suicide risk assessment process utilized by either medical and/or mental health personnel, as well as the reassessment process utilized by such personnel; it failed to provide any written procedure or guidance as to whether the suicidal inmate should be placed in a suicide-resistant cell; it failed to provide options for multiple

---

[13]See *Rhode v. Chapman*, 452 U.S. 337 (1981), *Bell v. Wolfish*, 441 U.S. 520 (1979).
[14]See the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997a et seq., and U.S. Justice Department's Civil Rights Division, Special Litigation Section: https://www.justice.gov/crt/special-litigation-section-cases-and-matters0#corrections.
[15]The CCS suicide prevention policies also referenced both the ACA and NCCHC standards.

levels of observation of suicidal inmates other than 15-minute intervals (and, therefore, ignoring the ACA and NCCHC requirements that inmates identified as high risk for suicide necessitate constant observation); it failed to provide any written procedure or guidance regarding those medical and/or mental health personnel authorized to downgrade and/or discharge an inmate from suicide precautions; it failed to provide any written procedure or guidance regarding treatment planning for suicidal inmates, as well as follow-up assessments by medical and/or mental health personnel following release from suicide precautions; and failed to provide any written procedure or guidance regarding the mortality review process following an inmate suicide.

Finally, contrary to the standard of care and NCCHC standards, the LMDC practices allowed for the use of "inmate watchers" to provide constant observation of suicidal inmates. There are several ethical, legal, and practical problems associated with this practice, including the requirement of the NCCHC standards to only allow for inmate watchers (or "inmate companions") to "be used as a supplement to, but never as a substitute for, staff monitoring." Therefore, inmates at high risk for suicide requiring constant observation by designated staff, not another inmate. In addition, the LMDC practice of allowing inmate watchers to provide constant observation of suicidal inmates was contrary to the CCS suicide prevention policy that required either a "correctional officer or other trained staff member" to provide such constant observation.

In conclusion, it would be this writer's opinion that the combined failure of LMDC and CCS personnel to follow written policies and unwritten custom and practice, including

the <u>failure</u> to place Charles Troutman on the "Inmate Alert Report - No Bars Single Cell" list following his suicide attempt on November 13, 2015, <u>failure</u> to document a reasonable and comprehensive initial suicide risk assessment for Mr. Troutman on November 14, 2015, <u>failure</u> to develop a treatment plan for Mr. Troutman on November 16, 2015, <u>failure</u> to provide timely follow-up to Mr. Troutman by a mental health clinician after discharge from suicide precautions on November 16, 2015, and <u>failure</u> to obtain assessment and clearance for Mr. Troutman by medical staff prior to segregation placement were all proximate causes of his suicide on November 24, 2015.

Respectfully Submitted By:

<u>/s/ Lindsay M. Hayes</u>
Lindsay M. Hayes
October 5, 2018