UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

STEPHANIE TROUTMAN, as
Administratrix of the Estate of Charles
Troutman, Jr.,                                                                                      Plaintiff,

v.                                                                       Civil Action No. 3:16-cv-742-DJH-CHL

LOUISVILLE METRO DEPARTMENT OF
CORRECTIONS et al.,                                                                          Defendants.

\* \* \* \* \*

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stephanie Troutman alleges that her father, Charles Troutman, Jr., died as a result of the gross negligence and deliberate indifference of Defendants Louisville-Jefferson County Metro Government, Mark Bolton, and James Cox (Metro Defendants). As administratrix of Charles Troutman's estate, Stephanie Troutman asserts violations of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 and state law claims of negligence and wrongful death. (Docket No. 7) The Metro Defendants have moved for summary judgment on Stephanie's claims against them. (D.N. 140) For the reasons set out below, the Court will grant the Metro Defendants' motion as to the federal claims and decline to exercise supplemental jurisdiction over the remaining state-law claims, which are dismissed without prejudice.

**I.**

Charles Troutman, Jr., was arrested for drug-related offenses on November 12, 2015, and booked into Louisville Metro Department of Corrections in the early morning hours of the following day. (D.N. 143-12, PageID # 3759) Charles's intake paperwork indicated that he was a daily user of heroin and methamphetamine (*id*., PageID # 3802), and that while he was not

1

currently contemplating suicide, he had attempted it multiple times in the past. (*Id.*, PageID # 3808) Charles also indicated at intake that he had not suffered any closed head trauma in the past year (*id.*), although Stephanie called the jail to report that her father had recently suffered a traumatic brain injury. (D.N. 143-16, PageID # 4185) That information was never conveyed to the medical staff. (D.N. 143-15, PageID # 4080)

While in a holding cell on the booking floor that same morning, Charles wrapped gauze around his neck and strangled himself. (D.N. 143-13, PageID # 3809) Medical personnel recorded the incident as an attempted suicide (*id.*), and placed Charles on "level one" observation for patient safety. (*Id.*, PageID # 3941) Dr. Donna Smith evaluated Charles after the incident but did not consider it "serious" because Charles did not tighten the gauze around his neck, "he didn't hang from anything," and Charles himself reported that he attempted suicide because he "was mad at being ignored and wanted to get out of down there [booking]." (D.N. 143-15, PageID # 4086–87) The medical unit also instituted detox protocols based on Charles's history of substance abuse. (D.N. 143-12, PageID # 3761) A subsequent mental-health evaluation on November 15, 2015, indicated that Charles did not express "current ideation" of suicide, but medical personnel kept Charles on suicide-watch protocols for another day, until November 16, 2015. (D.N. 143-13, PageID # 3781) The mental-health staff observed Charles for three days and "not one person said that he was even suicidal, saw him crying, saw him sad, saw him with a flat affect." (D.N. 143-15, PageID # 4106)

Following three days of observation and the November 15 mental-health evaluation, the medical staff on November 17 cleared Charles for release to the general population and lifted the medical and detox protocols. (*Id.*) Charles was involved in a verbal altercation with another inmate the next day and then moved to the Community Corrections Center, a different area of the

jail. (D.N. 143-12, PageID # 3761) Charles called and spoke to Stephanie several times following his release into the general population. They spoke about his case and attempted to secure money for bond. (D.N. 143-16, PageID # 4181–83) A week later, on November 24, Charles received a disciplinary write-up for fighting. (D.N. 143-12, PageID # 3761) Stephanie spoke to her father once more after the altercation, and Charles expressed his anger that he was moved. (D.N. 143-16, PageID # 4183–84) After this incident Officer James Cox, a member of the classification unit, transferred Charles to a single cell in the Hall of Justice, another area of the jail, pending disciplinary review. (*Id.*) Cox called the medical unit and informed Nurse Brown of the move as a courtesy and to ascertain whether the medical staff "had any objection to it." (D.N. 143-20, PageID # 4471) He never received a return phone call. (*Id.*, PageID # 4479)

Following Charles's move to the single cell, LMDC officers saw "nothing [that] stood out" about Charles's behavior. (D.N. 143-10, PageID # 3476) LMDC did not receive any reports or warnings from other inmates about Charles that night. (D.N. 143-12, PageID # 3753) The corrections officers on duty the night of November 24, 2015, found Charles hanging unconscious from a sheet tied to the bars covering the window in his cell. The officers began CPR and utilized an automated external defibrillator in an attempt to resuscitate Charles. (D.N. 143-10, PageID # 3474) The charge nurse assisted in the lifesaving efforts and directed staff to call EMS, which transported Charles to University of Louisville Hospital. (D.N. 143-12, PageID # 3751) Sadly, Charles never regained consciousness and was pronounced dead on November 28, 2015. (*Id.*)

Stephanie filed this lawsuit on November 22, 2016 (D.N. 1), and amended her complaint to add Defendants Cox and Bolton on January 2, 2017. (D.N. 7) The Metro Defendants move for summary judgment (D.N. 140) and to exclude portions of Stephanie's expert testimony. (D.N. 141)

**II.**

Summary judgment is required when the moving party shows, using evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see* 56(c)(1). For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, the Court "need consider only the cited materials." Fed. R. Civ. P. 56(c)(3); *see Shreve v. Franklin Cty.*, 743 F.3d 126, 136 (6th Cir. 2014). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2)-(3). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of her claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

**III.**

Stephanie argues that the Metro Defendants' deliberate indifference caused her father's death. (D.N. 143, PageID # 979) Deliberate indifference can amount to a constitutional violation, and thus a successful claim under § 1983, because "[t]he Eighth Amendment 'forbids prison officials from unnecessarily and wantonly inflicting pain on an inmate by acting with deliberate indifference toward [his] serious medical needs.'" *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010) (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004)). This same protection is extended to pretrial detainees by the Due Process Clause of the Fourteenth Amendment. *Id.* (citation omitted). The deliberate-indifference standard contains both an objective and a subjective component. To satisfy the objective component, "the medical need

'must be, objectively, sufficiently serious.'" *Cooper v. Cty. of Washtenaw*, 222 F. App'x 459, 465 (6th Cir. 2007) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1970)). The subjective component "actually has three prongs embedded within it." *Id.* To meet the subjective component the plaintiff must establish "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Taking all facts in the light most favorable to Stephanie, there is at least a material issue of fact as to the objective component. Charles took his own life only ten days after his initial suicide attempt, and "[i]t is well-established in this Circuit that suicidal tendencies are considered 'serious medical needs.'" *Cooper*, 222 F. App'x at 465 (citing *Horn by Parks v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)). The Metro Defendants do not substantively argue the objective prong. (D.N. 140-1, PageID # 894)

This case turns on whether a material issue of fact remains regarding the Metro Defendants' culpability under the subjective component of the deliberate-indifference standard. The Court will consider whether the Metro Defendants have demonstrated that they are entitled to judgment as a matter of law on Stephanie's § 1983 claims against Cox, Bolton, and Louisville Metro.

**A.      James Cox**

To determine whether Stephanie's claim against Cox survives, the Court asks whether a reasonable jury could find that Cox, "based on facts within his knowledge, drew the inference that there was a 'strong likelihood' that the decedent was suicidal, but then disregarded that risk." *Galloway v. Anuszkiewicz*, 518 F. App'x 330, 335 (6th Cir. 2012) (citing *Perez v. Oakland Cty.*, 466 F.3d 416, 424 (6th Cir. 2006)). Prisoner-suicide cases receive special consideration because

5

of the difficulty inherent in predicting and preventing suicide. *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005). To account for this uncertainty, the Sixth Circuit has settled on a test that asks "whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs." *Id.* (quoting *Barber v. City of Salem*, 953 F.2d 232, 239–40 (6th Cir. 1992)). The test is also temporally dependent; "[t]hus, to be held liable, 'a prison official must be cognizant of the likelihood that an inmate may *imminently* seek to take his own life.'" *Mantell v. Health Prof'ls Ltd.*, 612 F. App'x 302, 306 (6th Cir. 2015) (emphasis added) (quoting *Linden v. Washtenaw Cty.*, 167 F. App'x 410, 421 (6th Cir. 2006)).

Cox testified that he knew about Charles's initial suicide attempt because he was present on the booking floor when it happened (D.N. 143-20, PageID # 4453), and Stephanie points to this fact as evidence of subjectively deliberate indifference. Cox was also aware, however, that Charles had been cleared by the medical team on November 17th and returned to the general population, where he remained for seven days before his move to a barred single cell. (*Id.*, PageID # 4468) Charles's prisoner file did not contain a "no-bars alert," the designation that appears when the medical team has not cleared a prisoner for housing in a barred single cell. (*Id.*, PageID # 4502–03) Cox stated that he did not believe Charles was suicidal "[b]ecause Nurse Temple had cleared him from suicide risk." (D.N. 143-20, PageID # 4472) The Sixth Circuit has upheld findings that a prison official may avoid liability for deliberate indifference by relying on conclusions from a "presumably competent authority"— the medical staff—that a prisoner is not a suicide risk. *Perez v. Oakland Cty.*, 380 F. Supp. 2d 830, 848–49 (E.D. Mich. 2005), *aff'd*, 466 F.3d 416 (6th Cir. 2006); *see Linden*, 167 F. App'x at 422 (finding that since the decedent "was removed from suicide precautions before he entered maximum security, [the prison official] had no reason to believe [the

decedent] would soon commit suicide"). The reliance is supported by the officer's observation of no additional signs of suicidal ideation or behavior following the prisoner's clearance by medical personnel. *See Galloway*, 518 F. App'x at 335–36 (holding that prison official did not observe behavior indicating a "strong likelihood of suicide" and that the official was "entitled to rely on the mental health staff's assessment . . . that the decedent did not require self-harm observations, nor warranted a suicide watch"); *Soles v. Ingham Cty.*, 316 F. Supp. 2d 536, 543–44 (W.D. Mich. 2004), *aff'd*, 148 F. App'x 418 (6th Cir. 2005) (upholding finding that prison official was "clearly entitled to rely on the [medical team's] assessment of [the decedent's] suicide risk and on their conclusion that he had improved to the point of being fit for release from the observation cell").

Here, although he knew of Charles's suicide attempt, Cox reasonably relied on the medical staff's conclusion that Charles was fit to return to the general population without restrictions and did not observe any behavior indicating that Charles had become a risk thereafter. (*See* D.N. 143-14, PageID # 3964 ("Once we, as correctional staff, see an inmate harm himself or make threats of harming himself we immediately refer them to mental health. That is the scope of what we're capable of doing.")) Unlike the prison official in *Shultz v. Silliman*, who both knew of the decedent's suicidal tendencies and heard the decedent repeatedly crying for help the night of his suicide, neither Cox nor any other officer on site saw any indication that Charles was an imminent suicide risk. *See* 148 F. App'x 396, 402 (6th Cir. 2005). When an inmate does not express ongoing suicidal ideation or behavior suggesting suicidal tendencies to a prison official, generally that official cannot be found "aware of a substantial risk that [the] inmate would attempt suicide." *Jerauld v. Carl*, 405 F. App'x 970, 978 (6th Cir. 2010); *see also Soles,* 148 F. App'x at 419 (finding defendant's decision to return inmate to general population did not amount to deliberate indifference when inmate had not expressed suicidal thoughts for two weeks and there was "no

7

glaring, new factor" that defendants should have investigated). If the prison official was not aware of the risk, he could not have acted with deliberate indifference. *See id*. Following these cases, the Court cannot conclude that Cox's decision to move Charles was deliberately indifferent to a risk of suicide.

Despite Cox's assertion that he did not believe Charles was a suicide risk, Stephanie points to the call Cox made to Nurse Brown as contradictory circumstantial evidence. (D.N. 143, PageID # 984) Cox testified that making such a call prior to a moving an inmate was a "common occurrence" to inform the medical staff of the move as a "general courtesy," and that he made the call because he saw that Charles had been detoxing and was concerned about seizures. (D.N. 143-20, PageID # 4472) The medical staff never returned Cox's call and had not placed any restriction on Charles's file indicating that he was at risk. (*Id.*, PageID # 4479) To be liable, the deliberate-indifference "standard requires that the defendant's *mens rea* be higher than negligence but lower than purposeful or knowing infliction of harm." *Linden*, 167 F. App'x at 416; *see Grabow v. Cty. of Macomb*, 580 F. App'x 300, 310 (6th Cir. 2014) (finding "no doubt" that prison official was negligent, but that the conduct did not rise to level of deliberate indifference). Even if Cox should have perceived that Charles was a suicide risk, "an official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under [Sixth Circuit] cases be condemned as the infliction of punishment." *Comstock*, 273 F.3d at 703 (quoting *Farmer*, 511 U.S. at 838). "Simply because [the official] may have been able to avert [the inmate's] suicide by making a different decision . . . does not give rise to culpability under the Eighth Amendment." *Linden*, 167 F. App'x at 418. Following this standard, and from the undisputed facts, the Court concludes that a reasonable jury could not find that Cox's conduct rose to the level necessary to support a claim of deliberate indifference.

Stephanie cites *Linden* to support her argument that Cox was deliberately indifferent to Charles's needs because he knew Charles had attempted suicide. But in *Linden*—despite evidence to the contrary—the prison official denied knowledge of the decedent's multiple previous suicide attempts, suicidal history, and another officer's warning to "keep an eye on" the decedent. 167 F. App'x at 426. The Sixth Circuit held that a reasonable jury could find that the prison official acted with deliberate indifference, "[g]iven the numerous inconsistent and improbable elements within [the official's] testimony and his intimate involvement with the events culminating in [the decedent's] suicide." *Id*. at 424. In contrast, the record here reflects no inconsistencies in Cox's testimony and Cox was only peripherally involved in Charles's case as a classification officer, moving Charles throughout the jail complex. Notably, in both *Linden* and *Bonner-Turner* the prison officials personally observed behavior indicating ongoing risk; here, Cox only knew that Charles previously attempted suicide and that approximately four days later the medical staff cleared him to return to the jail's general population. *Cf. Linden*, 167 F. App'x at 424 (finding deliberate indifference when official had been warned decedent was currently suicidal); *Bonner-Turner*, 627 F. App'x at 407 (finding deliberate indifference when decedent told official he was suicidal).

Stephanie also asserts that Cox's failure to receive approval from medical personnel prior to moving Charles into a barred single cell was a violation of LMDC policy, and that moving Charles anyway amounted to deliberate indifference. (D.N. 143, PageID # 981) First, "failure to follow administrative policies does not itself constitute deliberate indifference," although "evidence of such a violation may be considered as evidence of an officer's knowledge." *Bonner-Turner v. City of Ecorse*, 627 F. App'x 400, 407 (6th Cir. 2015). In *Bonner-Turner*, the Sixth Circuit found that the record supported a conclusion that one of the corrections-officer defendants

9

violated "jail protocol by not monitoring [the decedent] every hour." *Id*. at 410. But no such policy was in place here and the Metro Defendants deny that Cox violated any jail policy. Mark Bolton, Director of LMDC, testified that "Mr. Cox was cleared . . . in that [administrative] investigation. There was no policy violation." (D.N. 143-11, PageID # 3680) In *Bonner-Turner* the violation of jail protocol was just one of many circumstantial factors that added up to subjective knowledge of a substantial risk of suicide. 327 F. App'x at 407.

Further, although Stephanie asserts that she spoke with her father following the altercation on November 24 and before his move to his final cell (D.N. 143-16, PageID # 4183–84), Cox was not privy to those phone calls or their content. The substance of those calls, taken in the light most favorable to Stephanie, may indicate that Charles was a suicide risk due to his state of mind and alleged head trauma. (*See id*., PageID # 4182) But Stephanie "does not allege that [Cox] was informed of these calls," and that knowledge cannot be imputed to him. *Jerauld*, 405 F. App'x at 977. Deliberate indifference "is 'not an objective test or [based on] collective knowledge,'" but rather depends on what Cox knew when he moved Charles to the barred single cell. *Baker-Schneider v. Napoleon*, 769 F. App'x 189, 193 (6th Cir. 2019) (quoting *Gray*, 399 F.3d at 616). The evidence presented, viewed in the light most favorable to Stephanie, fails to establish that Cox knew that Charles posed a suicide risk after medical personnel cleared him for release from suicide protocols.

The facts of this case are tragic, and ultimately lamentable. But "[p]rison officials need only take reasonable precautions to prevent inmate suicide; they do not insure or guarantee the life of a prisoner." *Galloway*, 518 F. App'x at 334 (citing *Danese v. Asman*, 875 F.2d 1239, 1245 (6th Cir. 1989)). The record demonstrates that Cox did not perceive that Charles was a suicide risk,

and Stephanie has thus not established a question of material fact on the subjective prong of the deliberate-indifference inquiry. Her claim against Cox therefore fails as a matter of law.

**B.      Mark Bolton**

Stephanie also alleges that LMDC Director Mark Bolton is liable for her father's death in his capacity as a supervisor. Bolton was not involved in the events leading up to Charles's suicide, but he was "responsible for the oversight, management, and direction of the jail system" and was the final decision-maker regarding the prison policies at issue here. (D.N. 143, PageID # 986) But the doctrine of *respondeat superior* cannot serve as the basis for supervisor liability; "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Ballamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984), *cert. denied*, 469 U.S. 845 (1984). Specifically, a jailhouse director "may be liable under § 1983 if he 'abandons the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department'" amounting to deliberate indifference to the needs of particular inmates. *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995) (quoting *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992)). Liability will only attach if a causal connection is present—i.e., where the "active performance of the [supervisor's] individual job function . . . directly resulted in [the decedent's] constitutional injury." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). Bolton could only be liable if he knew that LMDC was failing to protect at-risk inmates and abandoned his duty to mitigate those risks; and if abdication of that responsibility caused the deliberate indifference to Charles's serious medical needs alleged by the plaintiff.

Stephanie argues that Bolton was deliberately indifferent to the needs of suicidal inmates—including her father and leading to his death—and cites *Taylor* in support. (D.N. 143,

PageID # 987) (quoting *Taylor*, 69 F.3d at 81). But *Taylor* is unhelpful. In that case, the supervisor was the prison warden, who was personally responsible for approving inmate transfers. 69 F.3d at 81. The Sixth Circuit found that sufficient issues of material fact remained regarding whether the warden's delegation of his responsibilities to subordinates—when the warden knew that the subordinates were not adequately reviewing files—amounted to deliberate indifference. *Id*. at 82. Here, Bolton was not personally responsible for reviewing inmate files and making placement decisions. Any liability he might bear as a supervisor would thus have to come from another source. The Sixth Circuit drew the same distinction in *Winkler v. Madison County*, distinguishing that case from *Taylor* because the plaintiff did "not contend that [the supervisor] completely abdicated any of his responsibilities, but rather that he performed them inadequately." 893 F.3d 877, 899 (6th Cir. 2018). The court in *Winkler* ultimately found that the deliberate-indifference claim failed because the plaintiff did not cite evidence that the supervisor "allowed the jail to operate with the knowledge that existing healthcare policies were exposing inmates to a substantial risk of serious harm" despite the supervisor's failure to "promulgate additional or alternative policies." *Id*.

A similar situation is presented here. Stephanie alleges that Bolton knew that barred cells present a risk of suicide because of a report submitted to LMDC following a different inmate's suicide. (D.N. 143, PageID # 187–88) She argues that Bolton's failure to change the policies at LMDC with the knowledge that bars present an opportunity for suicide establishes that Bolton was deliberately indifferent to the medical needs of inmates at risk for suicide, thus rendering him individually liable for Charles's death. (*Id*.) Stephanie does not allege that Bolton "completely abdicated his responsibilities," only that he failed to do them adequately by not taking affirmative steps to change the policy. *Winkler*, 893 F.3d at 899. As the Metro Defendants point out in their

reply, LMDC had a standing policy on inmate transfer at the time of Charles Troutman's incarceration at LMDC. (D.N. 146, PageID # 4826) The policy provided that medical personnel would determine whether an inmate was a suicide risk and, if so, would either separate that inmate from the general population or place a "no bars alert" on the inmate's profile in "xjail", the software system LMDC used to manage inmate transfers. (*Id.*)

Stephanie has not submitted evidence showing that Bolton was aware of any deficiencies in this procedure or knew the staff was not adhering to the protocol. And Bolton testified that LMDC implemented data review and daily briefing protocols because the organization is "constantly looking to improve." (D.N. 143-11, PageID # 3604) Stephanie has not shown that Bolton had "actual knowledge of a breakdown in the proper workings of the department," *Taylor*, 69 F.3d at 81 (quoting *Hill*, 962 F.2d at 1213), such that Bolton "implicitly authorized, approved, or knowingly acquiesced" to unconstitutional procedures at LMDC. *Hays*, 668 F.2d at 874. Nor has she offered any evidence that Bolton knew Charles was an ongoing suicide risk, "participated in any way in the observation of the inmate, acted or failed to act in a manner that manifests deliberate indifference to [Charles's] medical needs, or approved of such unconstitutional actions or inaction." *Nallani v. Wayne Cty.*, 665 F. App'x 498, 512 (6th Cir 2016). The Court thus finds as a matter of law that Stephanie has failed to establish that Bolton was deliberately indifferent. The claim against Bolton will be dismissed.[1]

## C. Louisville-Jefferson County Metro Government

Stephanie also argues that the Louisville-Jefferson County Metro Government should be held "liable for a policy of inaction." (D.N. 143, PageID # 988) A theory of *respondeat superior*

---

[1] Because the Court concludes that Stephanie has not established a genuine issue of material fact regarding the deliberate-indifference claims against both Cox and Bolton, no qualified immunity analysis is necessary. *See Grabow*, 2013 WL 5816544 at *15.

is inapplicable here as "municipalities are responsible only for 'their *own* illegal acts.'" *Grabow*, 580 F. App'x at 311 (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 475 (1986)) (emphasis in original). For a municipality to be liable, a municipal employee must commit a constitutional violation by following one of the municipality's customs or policies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see Gregory v. Shelby Cty.*, 220 F.3d 433, 441 (6th Cir. 2000) ("For liability to attach, there must be execution of a government's policy or custom which results in a constitutional tort.") A plaintiff can establish a custom or policy by identifying "actions taken by officials with final decision-making authority." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). In the prisoner-suicide context, "the case law imposes a duty on the part of municipalities to recognize, or at least not ignore, obvious risks of suicide that are foreseeable," but "[v]ery few cases have upheld municipality liability for the suicide of a pre-trial detainee." *Id*.

Stephanie alleges that Bolton, as the final decision-maker on LMDC's relevant policies, failed to "protect at-risk inmates," and that this alleged inaction amounts to a custom or policy attributable to Louisville Metro. (D.N. 123, PageID # 986) Although she does not point to any particular procedure or protocol, she argues that Louisville Metro's failure to implement better suicide-prevention protocols amounts to a "policy of inaction and inadequate policies and procedures regarding inmates and suicide prevention" that caused her father's death. (*Id*., PageID # 889–90)

The parties argue about the relative strengths and weaknesses of LMDC's suicide prevention policies. Stephanie cites a report on a previous suicide in a different area of the jail (D.N. 143, PageID # 987), and LMDC points to Bolton's self-serving testimony about changes he has made to mitigate suicide risks during his tenure as director. (D.N. 143-11, PageID # 3604) But the Court need not delve into the factual dispute surrounding specific LMDC policies because

14

Stephanie has failed to establish that Bolton's actions or inactions were causally connected to the alleged violation of Charles's constitutional rights. The Supreme Court has made clear that "[n]o decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols." *Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015). Stephanie must first establish that Charles was clearly suicidal to show that LMDC's suicide-prevention protocols applied to him, and only once that limited showing is made can she then raise a factual issue as to whether LMDC policies were causally linked to Charles death. Since she has fallen short on showing that Charles was clearly suicidal at the time of his transfer, the Court will not dissect the policy specifics.

It is undisputed that Charles was cleared by medical personnel to return to the general population without housing restrictions. (D.N. 143-15, PageID # 4106) In *Perez*, the Sixth Circuit found that allowing case workers to make housing decisions that implicate serious medical needs, such as risk of suicide, was not a deliberately indifferent policy. 466 F.3d at 431. Here, a psychiatrist evaluated Charles and found that he was not at risk, and then after three additional days of observation he was cleared for release to the general population. (D.N. 143-15, PageID # 4086–87) The level of care provided by LMDC's policy exceeded that found adequate by the Sixth Circuit, and LMDC personnel were entitled to rely upon the medical staff's clearance. *See Galloway*, 518 F. App'x at 335–36 (holding that prison official was "entitled to rely on the mental health staff's assessment . . . that the decedent did not require self-harm observations, nor warranted a suicide watch"); *Soles*, 316 F. Supp. 2d at 543–44, *aff'd*, 148 F. App'x 418 (upholding finding that prison official was "clearly entitled to rely on the [medical team's] assessment of [the decedent's] suicide risk and on their conclusion that he had improved to the point of being fit for release from the observation cell"). Similarly, in *Gray*, the Sixth Circuit held that the city of

Detroit could not be liable for a pretrial detainee's suicide when the decedent did not display conduct indicating suicidal ideation, and "[t]he city's agents complied with city policies regarding medical care." 399 F.3d at 619. There, as here, the plaintiff submitted documentation of other in-custody deaths to bolster his claim. *Id*. But the *Gray* court upheld summary judgment in favor of the municipality because the decedent "never gave any indication, either verbally or through his actions, that he harbored suicidal intentions," and therefore "his suicidal tendencies were not sufficiently foreseeable to permit municipal liability." *Id*. Charles did not act in a way that alerted LMDC employees that he was a suicide risk following his clearance from the medical staff. The evidence shows LMDC personnel would have understood that Charles was not "clearly suicidal" at the time of his transfer—regardless of any expert dispute as to his actual mental state—so he could not fit a "'profile' of suicidal detainees, [and] his suicidal tendencies were not sufficiently foreseeable to permit municipality liability" based on Louisville Metro's suicide-prevention policies for at-risk prisoners. *Gray*, 399 F.3d at 619.

In the absence of this showing, Stephanie cannot establish that there was "a direct causal connection between the policies or customs of [Louisville Metro] and the constitutional injury to" her father. *Gray*, 399 F.3d. at 617. Stephanie points to changes that Bolton or Louisville Metro "'could have [made]' to prevent the unfortunate incident": but that is not enough for a claim of municipal liability under § 1983. *City of Canton v. Harris*, 489 U.S. 378, 392 (1989). "Pre-trial detainees do not have a constitutional right for cities to ensure . . . that every possible measure be taken to prevent their suicidal efforts. Detainees have a right that city policies, training and discipline do not result in deliberate indifference to foreseeable and preventable suicide attempts." *Gray*, 399 F.3d at 619. Stephanie has not presented evidence that establishes a material issue of fact as to whether the policies implemented at LMDC were deliberately indifferent to her father's

16

clearly-established risk of suicide. Summary judgment in favor of Louisville Metro is therefore appropriate.

**D.     State-Law Claims**

Stephanie's remaining claims are brought under state law. The Sixth Circuit "has held that 'a federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims.'" *Winkler*, 893 F.3d at 905 (quoting *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 454 (6th Cir. 2014)). Because Stephanie's § 1983 claims will be dismissed, the Court declines to exercise supplemental jurisdiction over her claims of gross negligence and wrongful death. *See Rouster*, 749 F.3d at 454.

**IV.**

The facts as alleged by the plaintiff do not meet the onerous standard required to establish a claim of deliberate indifference. The Metro Defendants have carried their burden of demonstrating that no material issue of fact remains as to the subjective component of each of Stephanie's deliberate-indifference claims. Thus, the Metro Defendants are entitled to judgment as a matter of law on all of the plaintiff's § 1983 claims. After dismissing those claims, the Court will decline to exercise supplemental jurisdiction over the remaining state-law claims. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) The Metro Defendants' motion for summary judgment (D.N. 140) is **GRANTED** as to the plaintiff's § 1983 claims (Count 1 and Count 4) against Defendants Cox, Bolton, and Louisville-Jefferson County Metro Government.

(2) The plaintiff's remaining state-law claims (Count 2 and Count 3) are **DISMISSED** without prejudice.

(3) The Metro Defendants' motion to exclude (D.N. 141) is **DENIED** as moot.

(4) A separate judgment will be entered this date.